IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **THIRD SUPERSEDING INDICTMENT** |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | CASE NO. 1:10CR387 |
| | ) | |
| JAMES C. DIMORA | ) | Title 18, United States Code |
| MICHAEL D. GABOR | ) | Sections 2, 371, 666, 1341, 1346, 1349, |
| | ) | 1519, 1951, 1962(d), and 26 U.S.C. Section |
| Defendants. | ) | 7206(1) |

The Grand Jury charges:

GENERAL ALLEGATIONS

At all times material to this Third Superseding Indictment:

**Public Entities**

1.    Cuyahoga County, Ohio ("County") was a government body whose departments included the Cuyahoga County Auditor's Office ("Auditor's Office"), Cuyahoga County Engineer's Office ("Engineer's Office"), and Cuyahoga County Sheriff's Office ("Sheriff's Office"), each of which was headed by an elected public official.

2.    The County was created on or about January 16, 1810 by the Ohio General Assembly.

3.    The Board of Cuyahoga County Commissioners ("County Commissioners") was the central governmental body of the County, consisting of three co-equal members who were elected at large for four-year terms. Each year, the County Commissioners elected a president,

1

who served on the Board of Revision and the County Records Commission. The County Commissioners' powers included budgeting, levying taxes, issuing bonds, letting contracts for public works services, monitoring expenditures, administering purchases, and making personnel decisions. The County Commissioners were also responsible for approving all collective bargaining agreements and administering federal grant monies.

4.      The County Commissioners had authority to appropriate funds for the operations of their own agencies and other elected County officials, including the County Auditor, County Engineer, County Prosecutor and the Cuyahoga County Court of Common Pleas ("Common Pleas Court").

5.      The operations of the Common Pleas Court affected interstate commerce.

6.      The operations of the County affected interstate commerce.

7.      The operations of the County Commissioners affected interstate commerce.

8.      The operations of the Auditor's Office affected interstate commerce.

9.      The operations of the Engineer's Office affected interstate commerce.

10.     The operations of the Sheriff's Office affected interstate commerce.

11.     The Ohio Public Employees Retirement System ("OPERS") was a state pension fund located in Columbus, Ohio. OPERS provided retirement, disability and survivor benefit programs for public employees throughout the State of Ohio, who were not covered by another state or local retirement system. OPERS was established in or around 1935 to make available a secure means to provide retirement for Ohio public employees. The system was originally named the Public Employees Retirement System ("PERS") and changed in or around 2003 to become OPERS. In order to obtain OPERS benefits, it was necessary that a completed Form A be mailed to OPERS in Columbus, Ohio.

2

12.     School Districts 1 and 2 were public school districts located within the County.

**Private Entities**

13.     Alternatives Agency ("AA") was a non-profit organization that provided treatment and rehabilitation services to post-incarceration individuals in criminal cases who had been ordered to receive such services.  The funding AA received from the County was controlled, in part, by the Cuyahoga County Corrections Planning Board, which fell under the auspices of the Common Pleas Court.  AA was located on East 55th Street in Cleveland, Ohio.

14.     AA's operations affected interstate commerce.

15.     DAS Construction ("DAS") was a commercial construction company located in Garfield Heights, Ohio, with experience as a general contractor, construction manager, and design builder.  DAS Development Inc. was related to DAS.

16.     The operations of DAS affected interstate commerce.

17.     Financial Network of America ("FNA") offered insurance and financial products and services to the individual and business marketplace, including a deferred compensation program.  It was located in Twinsburg, Ohio and its operations affected interstate commerce.

18.     Green-Source Products, LLC ("Green-Source") was a manufacturer of green building products located in Cleveland, Ohio.  Steven Wayne Pumper was a de facto executive of Green-Source.

19.     IceLand USA-Lakewood, LLC ("Winterhurst") was an ice skating rink located in Lakewood, Ohio.  Winterhurst's operations affected interstate commerce.

20.     Local Union No. 55 ("Local 55") was a labor organization, within the meaning of Title 29, United States Code, Section 402(i) and (j), engaged in an industry affecting interstate commerce.  Local 55 was a subordinate chapter of the United Association of Journeymen and

3

Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, which represented plumbers working for private companies and public entities in the Northern District of Ohio. Its operations affected interstate commerce.

21.     The Joint Apprenticeship and Training Committee Fund ("JATC"), was a Local 55 employee benefit plan that was designed to provide training and classes for Local 55 members. The JATC was subject to the provisions of Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"). Its operations affected interstate commerce.

22.     Reliance Mechanical, LLC ("Reliance Mechanical") was a heating, air conditioning, and plumbing contracting company located in Cleveland, Ohio.

23.     Reliance Mechanical's operations affected interstate commerce.

24.     Salva Stone Design ("Salva Stone") was a granite retailer located in Cleveland, Ohio. Salva Stone purchased granite from suppliers and custom fabricated the granite before installing it for customers. Its operations affected interstate commerce.

25.     Vandra Brothers Construction Co. ("Vandra Brothers") was a road paving company located in Oakwood Village, Ohio. Its operations affected interstate commerce.

26.     Zavarella Brothers Construction Company ("ZBC") was a masonry subcontractor located in Bedford Heights, Ohio. ZBC subcontracted its services to general contractors on private retail, commercial and office building construction projects. Its operations affected interstate commerce.

27.     Business 5 was a privately owned development firm. Business Executive or Employee 7 ("BE7") was an officer or employee of Business 5. Business 5's operations affected interstate commerce.

4

28.    Business 14 was an electrical and technology contracting company located in Bedford Heights, Ohio.  Its operations affected interstate commerce.

29.    VinCore was an Ohio limited liability company, operating to provide consulting and government relations services.  JAMES C. "JIMMY" DIMORA and Frank P. Russo had an interest in VinCore's success.

**Public Officials and Employees**

30.    Defendant JAMES C. "JIMMY" DIMORA ("DIMORA") was an elected County Commissioner from in or around 1998 until on or about December 31, 2010.  His responsibilities included budgeting, levying taxes, issuing bonds, letting contracts for public works services, monitoring County expenditures, administering all purchases for County use, and approving funding to build and maintain certain roads.  In addition, DIMORA had the authority to influence personnel decisions within the County, including hiring, approving raises and promotions, terminating employment, and establishing job duties.

31.    Frank P. Russo ("Russo") was the County Auditor, an elected County official, from in or around 1998 until on or about September 9, 2010.  He was the County's chief fiscal officer, with overall responsibility for all County funds.  As the Auditor, Russo served as secretary to the Board of Revision, which had responsibility to rule on property assessments and hear valuation complaints, and as secretary to the Automatic Data Processing ("ADP") Board, which reviewed information technology related purchases and contracts for the County.  Russo had the power to influence contracts and expenditures within the Auditor's Office and had authority over personnel decisions within the Auditor's Office, including hiring, approving raises and promotions, terminating employment, and establishing job duties.

5

32.     Defendant MICHAEL D. GABOR ("GABOR") was an Auditor's Office employee from on or about September 12, 2005 until in or around November 2010.

33.     Bridget M. McCafferty ("McCafferty") was a Common Pleas Court judge.

34.     John Kevin Kelley ("Kelley") was employed in various positions within County government from approximately 1998 through June 2009.  In 2004, Kelley became the Geographic Information Systems ("GIS") project manager.  His salary was funded in equal parts by the budgets of the Engineer's Office, the Auditor's Office, and the County Commissioners. From in or around January 2000 until in or around March 2009, Kelley served on the Parma City School District Board of Education, an elected position.  In both of those roles, Kelley had the power to influence public policy, contracts and expenditures.  In addition to his public employment, in or around May 2003, Kelley created a consulting business, J. Kevin Kelley Consulting, LLC.

35.     Kevin F. Payne ("Payne"), now deceased, served as the Chief of Staff at the Engineer's Office from in or around September 2002 to in or around February 2009.  In that capacity, Payne had the power to influence public policy, contracts and expenditures and to oversee hiring and promotion in the Engineer's Office.  Payne was also responsible for administrative matters at the County Sanitary Engineer's Office.  In that capacity, he was responsible for negotiating with the respective unions.  Payne was Kelley's supervisor at the Engineer's Office.  Payne was also an attorney licensed to practice law in the State of Ohio.

36.     The activities of Payne and Payne's law practice affected interstate commerce.

37.     Public Official 3 ("PO3") was an elected County official with jurisdiction over inspectors on road construction projects.

6

38.     Public Official 6 ("PO6") was an elected public official with the power to influence certain aspects of City of Cleveland contracting.

39.     Public Official 7 ("PO7") was an elected public official with the power to influence certain aspects of contracting for a municipality located within the County.

40.     Public Official 8 ("PO8") was a County Domestic Relations Court judge.

41.     Public Officials 9 and 10 ("PO9" and "PO10") were elected County officials, whose responsibilities included budgeting, levying taxes, issuing bonds, letting contracts for public works services, monitoring County expenditures, administering all purchases for County use, and approving funding to build and maintain certain roads.  In addition, PO9 and PO10 had the authority to influence personnel decisions within the County, including hiring, approving raises and promotions, terminating employment, and establishing job duties.

42.     Public Official 13 ("PO13") was Clerk of Courts for a municipality located within the County.

43.     Public Official 14 ("PO14") was an elected public official with the power to influence certain aspects of contracting for a municipality located within the County.

44.     Public Official 15 ("PO15") was a Common Pleas Court judge.

45.     DIMORA was an agent of the County as defined in Title 18, Section 666(d)(1), United States Code.

46.     Russo was an agent of the County as defined in Title 18, Section 666(d)(1), United States Code.

47.     Kelley was an agent of the County as defined in Title 18, Section 666(d)(1), United States Code.

48.     Public Employee 1 ("PE1") was employed by the Engineer's Office.

7

49.     Public Employee 10 ("PE10") was a County employee with jurisdiction over certain aspects of County contracting, including responsibilities related to the County's Small Business Enterprise ("SBE") and Minority Business Enterprise ("MBE") requirements.

50.     Public Employee 11 ("PE11") was a County employee who reported to DIMORA.

51.     Public Employee 13 ("PE13") was an employee of the County Commissioners' Office with management and policy responsibilities.

52.     Public Employee 15 ("PE15") was a County employee with jurisdiction over smoking issues.

53.     Public Employee 18 ("PE18") was a County employee who reported to DIMORA, and whose responsibilities included maintaining DIMORA's schedule.

54.     Public Employee 19 ("PE19") worked in the County Department of Development.

55.     Public Employee 21 ("PE21") was a County employee working in DIMORA's office.

56.     Public Employee 22 ("PE22") was a student employed at times by the County.

57.     Public Employee 23 ("PE23") was appointed by the County Commissioners as the County's chief operating officer.  PE23 served in that role until in or around July 2008.

58.     Public Employee 26 ("PE26") was the Human Resource Manager for a municipality located within the County.

59.     Public Employee 27 ("PE27") was a County employee working in Dimora's office.

60.     Public Employee 37 ("PE37") was an agent of the City of Cleveland Building and Housing Department.  PE37 worked as a building inspector, responsible for inspecting structural work on commercial and residential construction projects within the City of Cleveland to ensure compliance with the City of Cleveland's building and zoning codes.  At all times material to

Counts 17 and 28 of this Third Superseding Indictment, PE37 was cooperating with the government.

61.     Public Employee 38 ("PE38") was employed by the State of Ohio.

62.     Public Employee 39 ("PE39") was employed by a municipality located within Cuyahoga County.

63.     Public Employee 52 ("PE52") was employed in the County Department of Development.

64.     Public Employee 55 ("PE55") was Russo's domestic partner and at various times, a County employee.

**Other Individuals**

65.     William Neiheiser was the president and Chief Executive Officer of Reliance Mechanical.  Neiheiser had an ownership interest in Reliance Mechanical and in Winterhurst, an ice-skating facility in Lakewood, Ohio.

66.     Neiheiser's activities affected interstate commerce.

67.     Charles J. Randazzo ("Randazzo") was the president and chief executive officer of FNA.

68.     Randazzo's activities affected interstate commerce.

69.     Robert Rybak ("Rybak") was the Local 55 Business Manager from on or about July 20, 2004, until in or around September 2010.  Rybak was a relative of PE21 and PE22.

70.     Daniel P. Gallagher ("Gallagher") was employed in the Engineer's Office until he retired in 2002.  Thereafter, he served as a consultant, eventually forming a consulting company.

71.     Ferris Kleem ("Kleem") was the Vice-president of Blaze Construction Co., Inc. ("Blaze Construction"), president and majority owner of Blaze Building Corporation ("Blaze

9

Building"), half owner of Phoenix Cement, Inc. ("Phoenix"), and 60% owner of FJR Properties,
Ltd., all located in Berea, Ohio.  Kleem was PO7's relative.

72.     The activities of Kleem, Blaze Construction and Blaze Building affected interstate
commerce.

73.     Anthony Melaragno ("Melaragno"), was an officer or employee of Vandra
Brothers.

74.     Steven Wayne Pumper ("Pumper") was the Chief Executive Officer of DAS, an
officer of DAS Development, Inc., the manager of Parkview Housing, LLC, the manager of
Allerton Apartments, L.P., and a partner in multiple development projects in Northeast Ohio.

75.     Pumper's activities affected interstate commerce.

76.     Brian Schuman ("Schuman") was an employee of AA.

77.     John Valentin ("Valentin") was a principal in Salva Stone.

78.     Nicholas A. Zavarella ("Zavarella") was a shareholder of ZBC.

79.     Business Executive or Employee 8 ("BE8") had an interest in real estate he wished
to sell to the County and also had an interest in two apartment buildings on Cleveland's west side.

80.     Business Executive or Employee 10 ("BE10") was the president of Business 14.

81.     Vince Russo was a principal and agent of VinCore.  Vince Russo facilitated the
finding of business, including public business, for VinCore's clients.  Vince Russo was Russo's
relative.  One of VinCore and Vince Russo's clients, Business 22, was an MCO; that is, a health
organization that financed and delivered health care using a specific provider network and specific
provider services.  Business 22 retained VinCore and Vince Russo to solicit public and private
employers to contract with Business 22.  Business Executives or Employees 15 and 16 ("BE15"
and "BE16") were principals of Business 22.

10

82.     Business Executive or Employee 25 ("BE25") was a principal and 49% owner of Business 38, which was a design and architectural firm with offices in Cleveland, Ohio, and New York, New York.

83.     Business Executive or Employee 29 ("BE29") was an employee or agent of an engineering support services company located in the greater Cleveland area.

84.     Plumber 1 was a member of Local 55.

85.     Plumber 2 was a member of Local 55.

86.     Attorney 1 was an attorney licensed to practice law in the State of Ohio and a partner in a law firm doing business in the Northern District of Ohio and elsewhere.  Attorney 1 also served as a lobbyist/consultant for clients seeking municipal contracts.  His clients included AA.

The Grand Jury further charges:

COUNT 1
(18 U.S.C. §1962(d)(RICO Conspiracy)

87.     Paragraphs 1-44 and 48-86 of this Third Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

**General Allegations**

88.     At all times relevant to this Count of the Third Superseding Indictment, Samir Mohammad ("Mohammad") was a County employee.

89.     At all times relevant to this Count of the Third Superseding Indictment, Public Official 19 ("PO19") was a Cuyahoga County Domestic Relations Court Judge.

**The Enterprise**

90.     At all times material to this Third Superseding Indictment, the County constituted

11

an "Enterprise" as that term is defined in Title 18, United States Code, Section 1961(4), which was engaged in, and the activities of which affected, interstate commerce.

91.     Defendants JAMES C. DIMORA and MICHAEL D. GABOR were employed by and associated with the Enterprise.

## Purposes of the Defendants

92.     The purposes of the defendants included the following:

A.     Using the power and authority of public officials for the personal and financial benefit of DIMORA and GABOR, their co-conspirators, and their designees.

B.     To promote, conceal and otherwise protect purpose (A) of the conspirators from public exposure and possible criminal prosecution.

## The Racketeering Conspiracy

93.     Beginning in or around 2000 and continuing to on or about June 20, 2010, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants JAMES C. DIMORA and MICHAEL G. GABOR and others known and unknown to the Grand Jury, being persons employed by and associated with an enterprise engaged in, and the activities of which affected, interstate commerce, namely, the Enterprise, did knowingly and intentionally conspire with each other and others known and unknown to the Grand Jury to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity involving multiple acts indictable under the following provisions of federal law:

A.     18 U.S.C. §§ 1341 and 1346 (Mail Fraud and Honest Services Mail Fraud);

B.     18 U.S.C. § 1951 (Hobbs Act Extortion); and

12

      C.      18 U.S.C. § 1512 (Obstruction of Justice)

and multiple acts involving bribery chargeable under the following provision of state law:

      D.      Ohio Revised Code Section 2921.02 (Bribery).

      94.      It was part of the conspiracy that DIMORA and GABOR agreed that a conspirator would commit at least two acts of racketeering in conducting the affairs of the Enterprise.

### Manner and Means of the Conspiracy

It was part of the conspiracy that:

      95.      DIMORA, Russo, and others used and agreed to use the powers of their County offices and of certain public entities, departments, agencies, offices and committees subject to the influence of the County, to take, cause to be taken, and influence official actions, including actions in connection with: (1) awarding public business, (2) executing public business, (3) taking and withholding public personnel actions, (4) awarding and administering public loans, grants and other funding, (5) establishing and revising property valuations for tax purposes, (6) expediting, facilitating, and influencing judicial action in pending litigation, (7) expediting, facilitating and influencing official action in matters pending before public agencies, and (8) expediting, facilitating and influencing official action in matters pending before the United States government, in exchange and in return for things of value for themselves and their designees, to which they were not entitled.

      96.      DIMORA, Russo, and others used and agreed to use the powers of their County offices to influence and attempt to influence official actions by other public entities.

      97.      DIMORA, Russo, and others used and agreed to use the powers of their County offices to influence and attempt to influence private companies seeking or having County business.

98.     GABOR, Gallucci, Kelley, Kleem, Melaragno, Neiheiser, Payne, Pumper, Randazzo, Rybak, Valentin, Zavarella, and others, provided and offered to provide things of value to DIMORA, Russo and other County officials, in exchange and in return for DIMORA, Russo and other County officials using and promising to use their official positions to benefit them.

99.     DIMORA, Russo, and others used and caused to be used County resources for their personal benefit and the benefit of their co-conspirators and designees.

100.    At times, DIMORA and Russo acted as intermediaries and through intermediaries.

101.    DIMORA, GABOR, and other members of the conspiracy committed and attempted to commit various acts in furtherance of the conspiracy, including the following:

**A.      Schemes Related to Factual Allegations in this Third Superseding Indictment**

102.    The facts more fully described, and incorporated herein, in the factual allegations of Counts 2-29 and 31-33 of this Third Superseding Indictment.

**B.      Gabor Job Buying**

103.    Defendant MICHAEL D. GABOR sought to corrupt Frank P. Russo, a public official, and improperly influence Russo with respect to the discharge of Russo's official duties, by promising, offering and giving him cash and other things of value.

In furtherance of this scheme:

104.    In or around September 2005, GABOR and Dimora asked Russo to hire GABOR in the Auditor's Office.

14

105.    On or about September 12, 2005, Russo caused GABOR to be hired in the Auditor's Office at an annual salary of approximately $39,995.02.

106.    On or about September 12, 2005, GABOR gave Russo approximately $5,000 in cash, in return and in exchange for Russo helping GABOR to secure employment in the Auditor's Office.

### C.    Gabor Judicial Corruption

107.    Defendant MICHAEL D. GABOR sought to corrupt PO19, a public official, and improperly influence PO19 with respect to the discharge of PO19's official duties, by promising, offering and giving PO19 cash and other things of value.

In furtherance of this scheme:

108.    In or around Fall 2004, GABOR sought a favorable judicial ruling in litigation pending in Cuyahoga County Domestic Relations Court, to which GABOR was a party (hereinafter "Gabor Divorce Case").

109.    DIMORA and Kelley discussed helping GABOR obtain the favorable judicial ruling in the Gabor Divorce Case.

110.    GABOR gave approximately $10,000 to Kelley, understanding that Kelley would give the cash, through an intermediary, to PO19, who was presiding over the Gabor Divorce Case, to influence PO19's ruling in a manner favorable to GABOR.

111.    Kelley gave the cash he received from GABOR to an intermediary, understanding that the intermediary would give the cash to PO19 in connection with the Gabor Divorce Case.

15

112.    On or about February 7, 2005, PO19 entered a ruling granting, in part, the relief GABOR sought in the Gabor Divorce Case.

113.    When PO19 did not enter the exact ruling GABOR sought in the Gabor Divorce Case, GABOR asked Kelley to refund his payment.

114.    In response to GABOR's request, Kelley returned some of the money to GABOR.

### D.    Mohammad Bribe to Dimora

115.    Defendant JAMES C. DIMORA, a public official, solicited and accepted for himself and another person things of value to corrupt and improperly influence DIMORA with respect to the discharge of DIMORA's official duties.

In furtherance of this scheme:

116.    In or around 2003, Samir Mohammad was seeking a job as the Deputy County Administrator and sought DIMORA's support.

117.    In or around October 2003, Mohammad gave cash to Gallagher to entertain DIMORA in connection with Mohammad seeking the Deputy County Administrator position.

118.    Gallagher used some of the cash from Mohammad to entertain DIMORA and others at a casino in Windsor, Ontario from on or about October 31, 2003 to on or about November 1, 2003.

119.    On or about October 31 and November 1, 2003, Gallagher gave approximately $2,000 of the cash he received from Mohammad to DIMORA.

### E.    Kleem Bribe to Dimora

120.    Defendant JAMES C. DIMORA, a public official, solicited and accepted for himself and another person things of value to corrupt and improperly influence DIMORA and PO6 with respect to the discharge of DIMORA's and PO6's official duties.

In furtherance of this scheme:

121.    In or around April 2008, Ferris Kleem told DIMORA he was having trouble determining whether he had obtained a taxi-way contract on which he had bid at Cleveland Hopkins International Airport.

122.    On or about April 2, 2008 at approximately 3:45 p.m., DIMORA called PO6, stating that he was "sitting with a good friend of ours, Ferris Kleem." DIMORA asked PO6 about the status of the taxi-way project, for which Blaze Construction was the low bidder. Kleem then began speaking on DIMORA's telephone. Kleem told PO6, "We bid it about a month and a half ago, six, maybe eight weeks ago now and they, they been, it's just been going around and I, I can't get no answers from down there." PO6 stated, "That's a phone call away," and confirmed the name of the project. PO6 asked, "Should I call you directly or just call JIMMY [DIMORA]?" Kleem provided PO6 with his cell phone number for a direct call back. PO6 stated, "I won't specifically ask for you [Kleem], I'll just say, 'What's the status of everything in, if everything is in place, would it be a, a proper assumption that the low bid would get it?'" PO6 also told Kleem that he would obtain information about the "timing" of the contract award.

123.    On or about April 2, 2008 at approximately 9:35 p.m., PO6 informed DIMORA, "I took care of Ferris [Kleem] a little bit if that's all right." DIMORA replied, "Oh yeah. That's

17

fine." PO6 then informed DIMORA that Kleem was the low bidder and he was going to receive

the job.  DIMORA confirmed Kleem would receive the contract and stated, "Oh that's good."

PO6 then said, "You [DIMORA] helped deliver but I think it was going to go his way. We just

gave him the timing." DIMORA replied, "He [Kleem] said he was the low bidder."  DIMORA

continued, "He thought they were trying to take it away from him."  PO6 then informed DIMORA

that PO6's call should be helpful and the contract should be awarded to the lowest bid.  PO6

added, "If they are gonna    f--k around with him [Kleem] now, they know that I called.  I didn't

say anything about you [DIMORA]."  DIMORA stated, "He [Kleem] says he sends you [PO6]

money though. Does he?"  PO6 replied, "Minimal.  (Laughing)."

     124.    Kleem gave DIMORA the things of value described in Count 4 of this Third

Superseding Indictment in connection with DIMORA helping Kleem with respect to the taxi-way

project.

    **F.**    **Melaragno Bribe to Dimora**

     125.    Defendant JAMES C. DIMORA, a public official, solicited and accepted for

himself and another person things of value to corrupt and improperly influence DIMORA with

respect to the discharge of DIMORA's official duties.

    In furtherance of this scheme:

    A.    In or around 2002 and 2003, the County Commissioners, DIMORA voting in

favor, awarded Vandra Brothers resurfacing contracts and amendments thereto.

    B.    In or around Summer 2002, DIMORA asked Melaragno to provide and install

concrete for DIMORA's swimming pool.  Vandra Brothers performed the work requested.

DIMORA paid for the materials, and Vandra Brothers did not charge DIMORA for the labor. Melaragno and DIMORA did not discuss payment and DIMORA did not offer to pay Vandra Brothers for the labor.

All in violation of Title 18, United States Code, Section 1962(d).

The Grand Jury further charges:

COUNT 2

(Conspiracy to Commit Mail Fraud and Honest Services Mail Fraud, 18 U.S.C. §§ 1341 and 1346, in violation of 18 U.S.C. § 1349 )

126.    Paragraphs 1, 3, 4,13, 30, 31, 34, 44, 50, 51, 57, 64, 76, and 86 of this Third Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

THE CONSPIRACY

127.    From in or around November 2007 through on or about January 20, 2009, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES C. DIMORA, and Frank P. Russo (not charged herein), John Kevin Kelley (not charged herein), Brian Schuman (not charged herein), Attorney 1 (not charged herein), and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree with each other to commit offenses against the United States; that is, to knowingly devise and intend to devise a scheme and artifice:

(1) to defraud and deprive Cuyahoga County and its citizens of their right to the honest and faithful services of DIMORA, through bribery and kickbacks and the concealment of material information related thereto, and

19

(2) to defraud Cuyahoga County and to obtain money and property by means of materially

false and fraudulent pretenses, representations and promises,

and for the purpose of executing such scheme and artifice, to cause matters to be placed in any

post office and authorized depository for mail matter to be sent and delivered by the United States

Postal Service and private and commercial interstate carrier, in violation of Title 18, United States

Code, Sections 1341 and 1346.

## OBJECT OF THE CONSPIRACY

128.    It was the object of the conspiracy that DIMORA, with Russo's assistance, secretly

used his official position to enrich himself, Russo, and their designees by soliciting and accepting

gifts, payments, and other things of value from AA, in exchange for favorable official action, and

that AA, through Kelley, Schuman and Attorney 1, enriched itself by secretly obtaining favorable

official action for itself through corrupt means.

## MANNER AND MEANS

It was part of the conspiracy that:

129.    DIMORA and Russo solicited and accepted gifts, payments, and other things of

value from AA, including meals and travel from Cleveland to Las Vegas for DIMORA, Russo and

PE55.

130.    DIMORA, with Russo's assistance, provided favorable official action for the

benefit of AA both as requested and as future opportunities arose.

131.    The conspirators took steps to hide, conceal, and cover up their activity and the

nature and scope of AA's dealings with DIMORA.

20

Acts in furtherance of the conspiracy

132.    In or around November 2007, after County Probation Department officials told Schuman that the County intended to eliminate its contract with AA for 2008, Schuman and Attorney 1 asked Kelley to help restore AA's funding.

133.    Kelley asked Russo and DIMORA to assist in restoring AA's funding and in obtaining additional funding.

134.    Kelley received money from AA for his role in obtaining Russo's and DIMORA's assistance.

135.    In or around December 2007, Russo and DIMORA each talked to other public employees with responsibility and influence over the funding.

136.    On or about December 21, 2007, Kelley informed Attorney 1 he had good news regarding AA.  Kelley indicated that PE13 told Russo that the County was re-working the budget, and AA would be back in the budget.  Kelley then instructed Attorney 1 to call and thank Russo. Attorney 1 agreed and said, "You and I need to get together on this too, you know what I mean."

137.    On or about December 21, 2007, Kelley told Schuman that a County employee called Russo and DIMORA, telling them that a funding mechanism was in place to reinstate AA in the County budget.  Kelley said that Russo was not given an exact number, but PE13 told Russo things "look good" for AA.  Kelley emphasized the importance of AA receiving a budget allocation, because after the budget was in place, DIMORA and Russo could influence other County employees to increase AA's allocation after the Health and Human Services levy passed.

21

138.    On or about January 4, 2008, Schuman asked Kelley if there were any developments.  Kelley said he received a verbal commitment that AA was allocated $400,000 towards 2008, and they were waiting for the paperwork.  Schuman replied, "That's f---ing beautiful."  Kelley explained that there would be two County funding sources, and the County might make up the difference through the halfway house initiative.  Kelley told Schuman that DIMORA had informed Kelley to keep the billing up until the budget allocation was spent, and then DIMORA would find more money once the Health and Human Services levy passed.  Kelley said that AA might actually receive more money than it had the prior year.  Again, Schuman responded, "That's f---ing beautiful."  Kelley told Schuman that Kelley heard about the funding decision from Russo.  Kelley ended the conversation by commenting that he always tells people, "Loyalty makes up for brains any day."

139.    On or about January 11, 2008, Kelley told Attorney 1 that AA was allocated $250,000 because AA had only used $500,000 the previous year even though it was budgeted for $600,000.  Kelley and Attorney 1 agreed it would be easier for the County to amend and add money in the future, once AA was included in the budget.  Kelley said that he was on his way to AA because Kelley just had a meeting with Russo, who was "very clear on what his thoughts were."  Attorney 1 replied, "Understood."  Attorney 1 and Kelley agreed to meet the following Monday.  Kelley then stated, "I am just gonna, you know, uh be coy about it with these guys, but they gotta. . . . It's one thing to hold me back a couple, you know, I just don't wanna."  Attorney 1 replied, "I understand," and inquired whether "the two boys on 55 [referring to AA located on E.

22

55th Street]" would know about it before Kelley and he met. Kelley said he was on his way to meet with them.

140.   On or about January 16, 2008, Schuman asked Kelley, "How did everything go on Thursday? Did they sign their budget?" Kelley responded, "No they didn't, but it doesn't matter." Kelley later told Schuman, "You're in the thing, so it's just, but it's not official until they approve it." Kelley continued, "They're not going to pull it out." Schuman asked if "they're the only one that can do anything with it." Kelley responded, "The only one who can take it out is the Commissioners, . . . and we got two of them on our side on the issue."

141.   In or around January 2008, Attorney 1 instructed Schuman to increase Kelley's monthly fee by $2,000 for four months for the purpose of funding expenses associated with a Las Vegas trip for DIMORA, Russo and PE55.

142.   Schuman concealed the bribe payment from others at AA by recording the $2,000 increase in AA's books as an increase in Kelley's monthly consulting fee.

143.   On or about February 13, 2008, Schuman, another AA employee, and Kelley met for lunch at Delmonico's restaurant in Independence, Ohio. During that meal, Dimora called Kelley and Kelley said that he was having lunch with Schuman and another AA employee. Kelley said, "Yeah, that thing is on your agenda for tomorrow for their money." DIMORA asked, "Yeah, give 'em more you mean or take it away?" Kelley responded, "No to give 'em back some of their, what you stole from them." DIMORA laughed and said, "I don't wanna know what you get out of this, I don't even wanna f--ing know." Kelley replied, "I get nothing out of this," to which DIMORA responded, "I don't even wanna know. . . . The less I know the better." Kelley

23

responded, "Really. The less you know the better is right." Kelley added, "Speaking of that, . . . uh Vegas." Kelley and DIMORA then discussed reservations for their upcoming trip to Las Vegas.

144.    On or about February 14, 2008, the County Commissioners, with DIMORA voting in favor, approved a $250,000 allocation for Residential Facilities for the Work Release Program for the period May 1, 2008 through December 31, 2008, and authorized the Office of Procurement & Diversity to advertise for bids.

145.    On or about February 22, 2008, Schuman told Kelley that another halfway house met with PE13 regarding the Sheriff's line item. PE13 was going to meet with another County employee, who would take it to DIMORA. Schuman asked Kelley to schedule a meeting with the other halfway house and DIMORA to discuss the idea. Schuman said, "They know we got the juice, now let's just f---in' shove it down their face."

146.    On or about March 6, 2008, Kelley and DIMORA discussed the meeting with AA and the other halfway house.

147.    On or about March 6, 2008, DIMORA met Kelley, Schuman and others for dinner at Delmonico's restaurant and discussed public funding for AA.

148.    On or about March 20, 2008, Kelley and Schuman discussed a recent meeting that DIMORA had with County court officials to promote AA. Schuman told Kelley it went well, explaining DIMORA had everyone in the room. Schuman, as Kelley predicted, "didn't say two words. [JIMMY] DIMORA took the lead on the meeting," talking about what he thought and why

it was a good idea.  Schuman said the other halfway houses know we have the "f--ing juice. We got him in the room."

149.    On or about March 25, 2008, DIMORA and PE23 discussed the halfway house initiative and the upcoming judges' meeting.  DIMORA said, "I'll go and tell 'em [judges] my colleagues agree about saving money and, ya know, basically we just gotta convince these judges if there's some that are skeptical that it's safe to house prisoners there that they don't have to worry about 'em escaping."  DIMORA continued, "So I just wanna make sure we don't let the thing fall through the cracks that we follow up and get . . . the meeting date when they're gonna have the judges together . . . that's what [PO15] said . . . I'll have you guys come and those halfway house people come to talk to the judges."

150.    Kelley used the additional funds he received from AA to purchase first class airfare aboard Continental Airlines for Russo, PE55, and DIMORA, at a cost of approximately $1,268.50 per ticket.

151.    On or about April 2, 2008, DIMORA and Kelley discussed the flight arrangements for the Las Vegas trip.  DIMORA asked Kelley, "How much is that ticket?  Frank [Russo] and I, 'cause I don't want to have no headaches with the tickets."  Kelley replied, "Ok, I'll talk to to you tonight uh."  DIMORA replied, "I'll have to bring a check with me, ya hear?"  Kelley replied, "Yeah, I hear you a hundred percent, and I, I'll take care of that, ok?"  DIMORA replied, "Alright, alright."  Kelley stated, "'Cause, uh, you know, you know what I am sayin'."  DIMORA replied, "We'll talk about it."

152.    DIMORA and Russo each gave Kelley a check to cover the cost of the airline ticket.  Russo's check did not include payment for PE55's ticket.  Upon receiving the checks from Russo and DIMORA, Kelley gave them back cash in the approximate amount of the check each had given to Kelley.

153.    On or about April 6, 2008, Kelley telephoned Schuman and said, "Hey, we're heading out now [on the Las Vegas trip].  The guys [DIMORA and Russo] wanted me to call and thank you."  Schuman replied, "Oh, I hope everybody has a good time."

154.    On or about April 6, 2008, Kelley, DIMORA, Russo, and PE55 boarded a Continental Airlines flight from Cleveland to Las Vegas.

155.    On or about April 9, 2008, Schuman asked Kelley if he was back in town.  Kelley confirmed he flew from Las Vegas on the red eye the previous night.  Schuman then said, "Come on down to the Agency tomorrow.  I got the rest of your money."  Kelley replied, "Oh beautiful."

156.    On or about April 14, 2008, Kelley and Schuman discussed the Las Vegas trip. Schuman then confirmed that Kelley had picked up his check from AA and inquired, "We're all square right?"  Kelley explained that one month remained at the increased rate before returning to the regular rate.

157.    On or about April 14, 2008, DIMORA told PE11 that he wanted to know when the meeting about the halfway houses, which was originally scheduled for April 8 but was canceled, was taking place.  DIMORA told PE11 he wanted to put the new date on his (DIMORA's) schedule because he wanted to go to the meeting.  DIMORA asked PE11 to pass along the date to

26

those "halfway house people."  DIMORA said a judge arranged the meeting through another

County employee and, "I don't want to miss it."

158.    On or about April 17, 2008, the County Commissioners, with DIMORA voting in

favor, approved a $250,000 contract with AA for residential facilities for the work release

program.

159.    On or about April 22, 2008, Schuman and Kelley discussed AA receiving the

County contract.

160.    On or about May 12, 2008, PE23 told DIMORA that the meeting with the halfway

houses and the Court was scheduled the following day at 12:30.  DIMORA explained that he will

say that the judges were overlooking halfway houses as an alternative to jail.

161.    On or about May 13, 2008, Kelley told Schuman that they were confirmed for

Thursday at Delmonico's restaurant.  Kelley wanted to start working on the Sheriff's line item and

suggested that they discuss it Thursday.  Kelley told Schuman that he would pick up his

consulting check from AA so that he could pay for Thursday's dinner.

<u>EXECUTION OF THE SCHEME</u>

162.    On or about the dates listed below, in the Northern District of Ohio and elsewhere,

DIMORA, Russo, Kelley, Schuman, Attorney 1 and others, for the purpose of executing the

above-described scheme and artifice, caused documents to be delivered and sent through the

United States mails, including invoices from AA in Cleveland, Ohio, to the County in Cleveland,

Ohio, and payments from the County to AA in satisfaction of those invoices, including the

following:

| Date | Description | Approximate Amount |
|------|-------------|--------------------|
| May 19, 2008 | Check from the County in Cleveland, OH, to AA in Cleveland, OH, for April 2008 Work Release | $4,705.30 |
| June 19, 2008 | Check from the County in Cleveland, OH, to AA in Cleveland, OH, for May 2008 Work Release | $15,781.29 |
| July 17, 2008 | Check from the County in Cleveland, OH, to AA in Cleveland, OH, for June 2008 Work Release | $24,113.56 |
| August 14, 2008 | Check from the County in Cleveland, OH, to AA in Cleveland, OH, for July 2008 Work Release | $28,593.44 |
| September 25, 2008 | Check from the County in Cleveland, OH, to AA in Cleveland, OH, for August 2008 Work Release | $39,813.97 |
| October 27, 2008 | Check from the County in Cleveland, OH, to AA in Cleveland, OH, for September 2008 Work Release | $47,974.17 |
| November 20, 2008 | Check from the County in Cleveland, OH, to AA in Cleveland, OH, for October 2008 Work Release | $49,382.63 |
| December 15, 2008 | Check from the County in Cleveland, OH, to AA in Cleveland, OH, for November 2008 Work Release | $41,555.14 |

28

| January 20, 2009 | Check from the County in Cleveland, OH, to AA in Cleveland, OH, for December 2008 Work Release | $2,785.80 |

All in violation of Title 18, United States Code, Section 1349.

The Grand Jury further charges:

COUNT 3
(Hobbs Act Conspiracy, 18 U.S.C. § 1951)

163.    Paragraphs 1, 3-7, 13, 14, 30, 31, 34, 64 and 76 of this Third Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

164.    Beginning in or around November 2007 and continuing until in or around May 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES C. DIMORA, and Frank P. Russo (not charged herein), John Kevin Kelley (not charged herein), Brian Schuman (not charged herein) and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree with each other to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is, DIMORA obtained property not due to him or his office, namely, travel from Cleveland, Ohio, to Las Vegas, Nevada, for DIMORA, Russo, and PE55, and a Delmonico's restaurant dinner party valued at approximately $826, from AA, with its consent, under color of official right.

All in violation of Title 18, United States Code, Section 1951.

The Grand Jury further charges:

<u>COUNT 4</u>
(Conspiracy to Commit Bribery Concerning Programs Receiving Federal Funds,
18 U.S.C. § 371)

Paragraphs 1, 3, 4, 29-32, 34, 37, 39, 45-52, 63, 64, 71, and 81 of this Third Superseding

Indictment are re-alleged and incorporated by reference as if fully set forth herein.

<u>INTRODUCTION</u>

<u>HUD-funded County Grant to City of Berea</u>

165.    Beginning in or around the mid-1990's, Ferris Kleem engaged in a series of fund

raising efforts to benefit the City of Berea.  In approximately 2006 and early 2007, and at Kleem's

request, DIMORA and Russo used their influence to assist the City of Berea in obtaining a

$150,000 grant funded by the United States Department of Housing and Urban Development

("HUD") and awarded by the County for the Coe Lake Nature Trail and Bridge Project.

<u>The Juvenile Justice Center Project</u>

166.    In or around 2006, the County Commissioners approved construction of a new

Juvenile Justice Center at East 93rd Street and Quincy Avenue in Cleveland, Ohio, at an estimated

cost of approximately $160 million (hereinafter "JJC project").

167.    On or about December 13, 2007, the County Commissioners issued requests for

proposals ("RFPs") for various portions of the JJC project.  Blaze Building sought the General

Trades portion of the JJC project budgeted at approximately $22.6 million.  Phoenix Cement

sought the concrete portion of the project valued at approximately $4.6 million.

168.    Phoenix Cement was the low bidder on the concrete portion and on or about March

20, 2008, received the $4.6 million contract.

169.    On or about March 13, 2008, the County Commissioners voted to reject all bids received for the general trades portion of the JJC project and ordered it be rebid with revised specifications and estimates.

170.    On or about April 3, 2008, the County Commissioners approved an addendum to the general trades portion of the JJC project, making technical changes and changing the estimated cost from $36,800,000 to $37,000,000.

171.    On or about April 7, 2008, the bids for the general trades were opened. Blaze Building bid approximately $38 million but was the second lowest bidder and did not receive the contract, which was awarded to the low bidder on or about April 24, 2008.

The Snow Road Project

172.    In or around October 2007, the Engineer's Office issued an RFP for resurfacing Snow Road from Ridge Road to Broadview Road in the City of Parma.

173.    On or about May 1, 2008, Blaze Construction, the low bidder, obtained a contract valued at approximately $2,887,359 to resurface Snow Road ("Snow Road Project").

174.    The County paid Blaze Construction approximately $3.5 million for the Snow Road Project, after approved change orders.

Vince Russo and Business 22

175.    In the Spring of 2006, DIMORA and Russo urged Kleem to enroll his employees in Business 22. Thereafter, the employees of two of Kleem's companies enrolled in Business 22. In the next enrollment period in Spring 2008, DIMORA and Russo urged Kleem to retain his two

31

companies' enrollment in Business 22 and also urged Kleem to persuade PO7's employees to Business 22.  Russo and DIMORA indicated that Kleem owed it to them because DIMORA and Russo had backed PO7 in a political campaign.

Federal Funds

176.    At all times relevant, the County was a government agency as that term is defined in Title 18, United States Code, Section 666(d)(2).  The County received benefits in excess of $10,000 during the years May 31, 2006 through May 30, 2007, and May 31, 2007 through May 30, 2008, under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance and other form of Federal assistance.

## THE CONSPIRACY

177.    From in or around Fall 2006 and continuing through on or about May 23, 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES C. DIMORA, and Frank P. Russo (not charged herein), Ferris Kleem (not charged herein), John Kevin Kelley (not charged herein), and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree with each other to commit an offense against the United States, that is, bribery concerning programs receiving federal funds, in violation of Title 18, United States Code, Sections 666(a)(1)(B) and (a)(2).

## OBJECTS OF THE CONSPIRACY

178.    It was an object of the conspiracy that DIMORA and Kelley, with Russo's assistance, corruptly solicited, demanded and accepted things of value for the benefit of any

person from Kleem and the companies in which Kleem had an interest, DIMORA, Kelley and Russo acting with the intent that DIMORA and Kelley be influenced and rewarded in connection with a business, transaction and series of transactions of the County valued at $5,000 or more in the years May 31, 2006 to May 30, 2007, and May 31, 2007 to May 30, 2008; that is, the award and administration of County business, both as requested and as future opportunities arose.  The things of value included, among others, cash, tangible items, entertainment for DIMORA, Kelley, Russo and their friends, including PE55, and business opportunities for Vince Russo and Business 22.

179.    It was a further object of the conspiracy that Kleem and the companies in which Kleem had an interest corruptly gave, offered and agreed to give to DIMORA and Kelley things of value, acting with the intent to influence and reward DIMORA and Kelley in connection with the business, transaction and series of transactions alleged in paragraph 178.

<u>MANNER AND MEANS</u>

It was part of the conspiracy that:

180.    Russo and DIMORA sometimes shared information about things of value they received and favors they performed in return.

181.    Kleem, knowing of the close political, professional and personal relationship of DIMORA and Russo, provided things of value to both DIMORA and Russo, believing that providing a thing of value to one tended to influence the other.

182.    Russo, knowing that DIMORA and he had received things of value from Kleem, corruptly encouraged DIMORA to perform official acts to benefit Kleem and Kleem's interests.

33

183.    From approximately late 2006 to approximately early 2008, DIMORA, Russo and Kleem had several conversations about Kleem entertaining DIMORA and Russo in Las Vegas.

<u>OVERT ACTS</u>

184.    In furtherance of the conspiracy, and to effect the objects thereof, DIMORA, Russo, Kelley, Kleem and others committed the following overt acts in the Northern District of Ohio and elsewhere:

A.    In or around Spring or Summer of 2006, Kleem asked DIMORA and Russo to assist him in obtaining a HUD-funded County grant for the City of Berea to build a pedestrian bridge connecting a nature trail to a pavilion on Coe Lake.

B.    In or around Spring or Summer 2006, DIMORA, in the presence of Russo and Kleem, called PE52 in an effort to expedite Berea's application for the grant.

C.    Shortly before November 29, 2006, DIMORA and Kleem agreed that (1) Kleem would purchase a refrigerator valued at approximately $1,150 and have it delivered to the DIMORA residence, (2) Kleem would give DIMORA approximately $1,150 in cash and (3) Kleem would send DIMORA an invoice for the refrigerator.

D.    On or about November 29, 2006, Kleem caused FJR Properties, Ltd. to purchase the refrigerator and deliver it to the DIMORA residence.

E.    On or about December 11, 2006, or December 12, 2006, Kleem contributed approximately $1,500 to $2,000 in cash toward DIMORA's purchase of a $6,260 Rolex watch.

F.    On or about December 27, 2006, Kleem caused FJR Properties Ltd. to send DIMORA an invoice for the refrigerator, which DIMORA did not pay.

34

G.    On or about February 1, 2007, DIMORA voted to award a HUD-funded $150,000 grant to the City of Berea for the Coe Lake Nature Trail and Bridge Project.

H.    In or around Spring or Summer 2007, and at Kleem's request, DIMORA called a representative of First Energy and requested that First Energy expedite turning on the power at an apartment building FJR Properties had just completed building on Bagley Road in Berea, Ohio.

I.    On or about July 19, 2007, Kleem entertained DIMORA and Russo at the Trout Club.

J.    In or around February 2008, Kleem asked DIMORA to assist Kleem's relative with a smoking violation citation Kleem's relative had received at his restaurant during a fundraiser at which Russo had been smoking.

K.    On or about February 11, 2008, DIMORA asked PE15 to "intervene" on the smoking violation.  DIMORA explained that the owner of the restaurant was a "big contractor," and "a friend of [Russo] and mine."  DIMORA also mentioned that Russo and he were at the restaurant when the citation was issued.  DIMORA gave PE15 Kleem's cellular telephone number and the restaurant's address and asked PE15 to call Kleem.  DIMORA indicated he thought the restaurant was in compliance, but DIMORA admitted he was not familiar with the laws.  DIMORA then told PE15 that Russo also asked DIMORA to call PE15 about the citation.  PE15 agreed to speak with Kleem and "sort it out."  DIMORA said he would let Kleem know that DIMORA had talked to PE15.

35

L.      On or about February 22, 2008 at approximately 2:15 p.m., Kelley had a telephone conversation with Kleem in which Kelley said he was with DIMORA and Russo and further said, "We are putting a little trip to Vegas together."  Kleem replied, "Are we?" Kelley responded in the affirmative and asked Kleem to join them.  Kelley provided Kleem with the dates of the trip and the names of those going, including Kelley, DIMORA, and Russo.  When Kleem replied that he was "definitely in" for the trip, Kelley told Kleem to hold on because DIMORA wanted to talk to Kleem.  DIMORA asked Kleem about a smoking citation which had been issued at Kleem's brother's restaurant and whether PE15 helped Kleem.  Kleem replied, "Oh, yeah."  DIMORA then stated, "I just wanted to make sure he treated you right."  Kleem responded, "He definitely did."  Kleem then told DIMORA that he was "excited about this April trip" and asked if DIMORA had booked his flight.  DIMORA replied, "No, they're gonna book it this week I guess."  Kleem asked, "Do you want to be on the same plane with everybody or do you want, want me to take care of some things?"  DIMORA and Kleem discussed traveling for personal reasons and staying at the Mirage Hotel and Casino in Las Vegas.  Kleem said, "I'll get everybody, tell everybody, tell them, tell them, I'll get, you know, to use my name. Then I don't have to get involved. Everybody gets a, a, a, casino rate, okay?"  Dimora replied, "Okay."  Kleem continued, "They will get the lowest rate and you and Frank [Russo], I'll, I'll take care of you with a suite."  Kleem added, "When I see you, we'll talk."  The conversation then turned to the JJC project.  Kleem told DIMORA, "You know this Juvenile Justice Center, it's way over budget on the general trades."  DIMORA replied, "It is?"  Kleem said, "It's gonna be $35 million,

[DIMORA], instead of $22 [million].  You gonna be able to award it to me if I am low?"
DIMORA responded, "Yeah."

   M. On or about February 22, 2008 at approximately 3:16 p.m., Kleem and
DIMORA had a telephone conversation in which Kleem told DIMORA that Blaze Construction
was about $10 million over budget on the JJC project.  DIMORA responded, "Okay.  And there
was nobody lower?"  Kleem said, "Yeah . . . we're low, we're low."  DIMORA said, "Oh you're
the lowest, . . . good."  Kleem and DIMORA then discussed details of the bids.  DIMORA said,
"I'm gonna get a copy of uh this."  Kleem also told DIMORA that his other company, Phoenix
Cement, was the low bidder on the concrete portion of the JJC project and would not be an issue.
DIMORA replied, "No headache there."

   N. On or about February 26, 2008 at approximately 3:41 p.m., DIMORA told
Russo, "[Blaze Construction's] bid is f--ked up.  Did you ever hear of anything like this?  He
submits a $35 million bid and he only puts a [sic] $30 million bond."  DIMORA and Russo
discussed how the Prosecutor's Office would have to decide whether to accept or reject Blaze
Construction's bid.  Russo asked DIMORA which company was competing against Blaze
Construction.  DIMORA told him and Russo replied, "Ohhh, try everything to give it to him
[Blaze Construction]."  Russo then suggested DIMORA call Kleem and tell him to be "proactive"
and explain it was just a "clerical error."  DIMORA and Russo then discussed the fact that Kleem,
through Phoenix Cement, was the low bidder on the concrete portion of the JJC project.
DIMORA said, "I don't know why they do stupid things these guys. . . . Don't even, I mean why
do you subject yourself to the risk of the problem . . . unless he can't get the 35 million bond."

Later in the conversation, DIMORA and Russo discussed other companies that bid for different portions of the JJC project but were not the lowest bidders. DIMORA complained there was not much he could do because he would have to explain to the other County officials why they were not accepting the lowest bid. Russo said, "I tell all these guys - go in low and just add a thing or two on as you go along." DIMORA responded, "Yeah." Russo said, "But they don't listen." DIMORA replied, "No."

      O.     On or about March 10, 2008 at approximately 11:41 a.m., Kelley and Kleem had a conversation about the Las Vegas trip. Kelley informed Kleem that DIMORA and Russo only wanted a select group of people to travel with them to Las Vegas because "they [DIMORA and Russo] were just afraid of too many people knowing too much about what we're doing." Kleem indicated he would "book" all the hotel rooms. Kleem then asked Kelley who was "taking care of the travel." Kelley responded by telling Kleem it was up to him how Kleem wanted to handle the travel. Kelley also informed Kleem that DIMORA and Russo were traveling first class and asked, "If you want to do that, you know, I can book that for you if you want." Kleem replied, "Absolutely. I can take care of that, that's not a problem. I, ah, I need to know the times and the dates and tell [my secretary] I'll talk to my travel agent and I'll get it arranged, but you know we, we got to work it out in a certain way, you know that – right?" Kelley replied, "Yeah, absolutely."

      P.     On or about March 10, 2008 at approximately 3:35 p.m., DIMORA, Kelley and Gabor had a conversation about the Las Vegas trip in which DIMORA confirmed he was working with Kleem and that everything would be fine with the room.

38

Q.     On or about March 10, 2008 at approximately 3:58 p.m., DIMORA and Kelley had a conversation in which they discussed the possibility that Russo might not go to Las Vegas.  Kelley said, "He [Russo] ain't passing up Vegas, especially with Ferris [Kleem] gonna be there.  He's [Russo's] already got Ferris convinced that he's got him ten jobs lined up." DIMORA replied, "Yeah."

R.     On or about March 20, 2008, DIMORA voted to award Phoenix Cement a contract valued at approximately $4,576,000 for the concrete portion of the JJC project.

S.     On or about March 25, 2008 at approximately 9:04 p.m., Kelley and DIMORA spoke about the need to give Kleem's secretary a list of people who needed hotel rooms at the Mirage.  DIMORA then informed Kelley that DIMORA and Russo had a lunch scheduled with Kleem on April 1st or April 2nd.  DIMORA agreed to speak to Kleem about the rooms during that lunch.

T.     On or about March 26, 2008, Kelley and Russo spoke about their upcoming trip to Las Vegas.  Russo said, "I can't wait."  Russo confirmed he was meeting with Kleem before the trip.  Kelley and Russo then spoke about their hotel rooms in Las Vegas and whether the reservations were set.  Russo said he would speak to Kleem about the rooms and "get it all organized."

U.     On or about April 1, 2008, Russo spoke with Vince Russo about his upcoming lunch with Kleem and DIMORA.  Vince Russo asked Russo to make sure "we keep the MCOs at his [Kleem's] personal companies and then [PO7] in Berea is what we are really looking for."  Russo confirmed, "We wanna keep his [Kleem's] MCOs and we want to get . . . what is the

39

kid's name out there, [PO7]?"  Vince Russo gave Russo the name and indicated he had met with

PO7 already but "I think [PO7] needs a push from you know who."  Russo said, "We got to get

that one out there, you know what I mean."

      V.    On or about April 2, 2008, Kleem met with DIMORA and Russo at Teamz

Restaurant to discuss the Las Vegas trip.  During the meeting, Kleem gave DIMORA and Russo

each an envelope containing approximately $6,000 in cash.

      W.    On or about April 2, 2008 at approximately 1:50 p.m., during the Teamz

meeting described above, Russo received a call from Vince Russo.  Russo told Vince Russo that

DIMORA and he were still at lunch with Kleem.  Vince Russo asked Russo,  "Will you true up

with that stuff I talked to you about with his companies and that other thing."  Russo replied,

"Absolutely."  Vince Russo told Russo that he was "heading to that office [Business 22] and they

[BE15 and BE16] are going to be drilling me."  Russo said, "Tell him JIMMY and I are having

lunch with him now.  We're gonna try to keep those, plus get more plus . . . [PO7] will definitely

take care of us."  Russo said, "JIMMY's taking care of us, they [Kleem and PO7] got no choice."

Russo said to DIMORA in the background, "JIM, remind me before we leave about something

over here at the city."  DIMORA replied, "Berea city?"  Russo said, "Yeah, okay with [BE15]."

Russo confirmed that Vince Russo had already talked to PO7 once.  Vince Russo responded that

he already talked to PO7 and was supposed to get back to [PO7] by May 1st, but "you know . . .

little bit a, a little, little, little message that's all."  Russo responded, "Okay."

      X.    On or about April 2, 2008 at approximately 3:00 p.m., Russo left the

following voice mail message for Vince Russo: "[I]t's about ten to three.  My luncheon's over.

Everything worked out good.  He [Ferris Kleem] said he was going to talk to [PO7].  And his accounts are still stable so everything's fine.  I'll call ya on the cell."

      Y.     On or about April 2, 2008 at approximately 4:20 p.m., and after the Teamz lunch, Russo and DIMORA discussed their meeting with Ferris Kleem.  DIMORA stated, "He [Kleem] made me sick with ten more f---ing issues."  Russo replied, "You should have left when I left."

      Z.     On or about April 3, 2008, Russo and Gabor had a conversation in which Russo said, "Don't say anything, well we met with the one guys [Kleem] who's gonna be there [in Las Vegas], he's gonna have whores and he's got a tiki hut by the pool . . . he's got everything."  Gabor replied, "That's a beautiful thing, that's awesome."  Russo continued, "Monday night we're going to dinner at this . . . restaurant there."  Gabor said, "Yeah, that's awesome."  Russo added, "It is gonna be a nice time."  Gabor then confirmed Russo received his "package [itinerary]."  Gabor told Russo it was his (Gabor's) decision to put it in an envelope because it was "nobody's business."  Russo replied, "I paid Kevin [Kelley].  Ah, I don't want anybody to say they paid for our tickets.  So JIMMY [DIMORA] and I gave him a check today . . . for our tickets because I don't want no rumors starting . . . Kevin [Kelley] took us to Vegas or that other guy [Kleem] took us to Vegas.  This way we got proof we paid our own tickets and I have no problem then.  You know what I mean?"  Gabor responded, "Absolutely.  F--k it.  This way whatever, I mean you got the check, it's done."

AA.  On or about April 6, 2008, Kleem called DIMORA and asked if DIMORA found the limousine driver who was waiting for DIMORA at the Las Vegas airport.  Kleem told DIMORA to check in as a VIP at the Mirage.

BB.  Starting on or about April 6, 2008, Kleem gave DIMORA gaming chips valued at approximately $3,500.

CC.  On or about April 7, 2008 at approximately 3:31 p.m.,[1] DIMORA had a telephone conversation with PE11 about the JJC project bids.  DIMORA asked PE11 whether the low bidder had included a $3.5 million allowance.  DIMORA explained that if the low bidder had not included the allowance, its bid would not be low.  DIMORA asked PE11 to find out and to call DIMORA back.  DIMORA emphasized it was "important."

DD.  On or about April 7, 2008 at approximately 3:44 p.m., PE11 called DIMORA back.  PE11 explained the bid specifications to DIMORA, which made Blaze Construction the second lowest bidder.  PE11 also informed DIMORA that he had spoken to PE10 to ascertain whether the lowest bidder had fulfilled its SBE requirement.  DIMORA instructed PE11 to speak to Kleem directly to make sure "we're talking apples to apples."  DIMORA then handed the telephone to Kleem.  Kleem inquired whether the low bidder included the $3.5 million allowance in its bid.  PE11 agreed to ask other County employees to find an answer for Kleem.

---

[1]All times mentioned in this Third Superseding Indictment are Eastern Time, even when describing conduct occurring outside the Northern District of Ohio.

EE.    On or about April 7, 2008 at approximately 8:11 p.m., DIMORA told Kleem that Kleem had missed all the crazy antics at the Bare pool after Kleem left.  Kleem asked, "What happened?"  Dimora then explained what happened at the Bare pool.  Dimora then indicated they had a lot of laughs."  Kleem said, "I'm glad you had a good time."  DIMORA replied, "Oh we laughed, we laughed.  The hottest broad though was the one in the red, that server.  Ohhh. . . ."  Kleem later said, "The girl that my friend here - she looks kinda like that except she dyed her hair blonde, that's the only difference . . . She would come up, she's in f--- ing California.  I couldn't f---ing believe it."  Kleem continued, "That's the one I was gonna send to your room."  DIMORA said, "Well, hopefully [the casino host] can come up with somebody."  Kleem replied, "Yeah we'll. We'll come up with somebody tonight.  Don't worry, I'll make some calls. I know some other broads here."  Dimora and Kleem later agreed to meet at the poker table.

FF.    On or about April 8, 2008 at approximately 11:10 a.m., DIMORA called PE11.  DIMORA said, "This Ferris Kleem is down here."  PE11 indicated he spoke with PE10 about the "$3.5 million thing," and PE10 was confused about what it meant so PE11 needed to speak with PE13.  DIMORA said, "I don't even know what he's [Kleem's] talking about." DIMORA told PE11 that Kleem was down here, and "He [Kleem] comes and grabs me with this nonsense.  I says, 'Ferris I don't know anything about it.  Let me call PE11 and I'll let you talk to PE11 direct.'"  PE11 again indicated he wanted to talk to PE13 about the issue.  DIMORA then instructed PE11 to call Kleem back on Kleem's cell phone and "see if you can't . . . give him.  I don't know what answer he's looking for."  DIMORA and PE11 then spoke about potential "SBE issues" which might exist with the low bidder.  DIMORA told PE11 he never spoke to Kleem

43

about the "SBE issues."  PE11 responded by telling DIMORA that PE11 would not say anything about the SBE issues when he spoke to Kleem.

GG.    On or about April 8, 2008 at approximately 7:02 p.m., Kleem, while sitting at a gaming table with DIMORA and others, received a telephone call from the casino host, who provided Kleem with the name and telephone number for a woman.  Kleem wrote the woman's first name on a piece of paper along with a telephone number.

HH.    Shortly after on or about April 8, 2008 at approximately 7:02 p.m., Kleem placed a telephone call to the woman to solicit her services for DIMORA.

II.    On April 8, 2008 at approximately 9:40 p.m., Kleem met the woman described above at a bar in the Mirage Hotel and Casino, paid her approximately $1,000 in cash for the purpose of servicing DIMORA, and escorted the woman to DIMORA's hotel room.

JJ.    On or about April 8, 2008 at approximately 9:46 p.m., Kleem called DIMORA to say that he was trying to bring the woman Kleem had hired up to DIMORA's room. DIMORA confirmed his room number was C-56 and said, "This girl, does she give me a massage and that?  Is that what she does and then . . ."The call dropped and DIMORA called back and asked, "I just said, she gives a massage.  Is that how we're going to start her out?"  Kleem responded, "It's yeah, don't worry.  We'll talk about it. I'll be there in a minute."

KK.    On or about April 9, 2008 at approximately 12:44 a.m., DIMORA called Kleem and thanked him.  Kleem asked DIMORA, "Was that the best or what?"  DIMORA said, "Yeah, she's good, little chatty, but good."  DIMORA and Kleem then agreed to meet at the

44

Chinese restaurant in the Mirage.  At the end of the conversation DIMORA said, "Thank you though.  It was gre, excellent.  Thank you, thank you."  Kleem replied, "No problem buddy."

      LL.    On or about April 9, 2008 at approximately 1:35 a.m., while at the Chinese Restaurant in the Mirage, Kleem asked DIMORA to have a certain inspector at the Engineer's Office assigned to the Snow Road project.  DIMORA agreed to use his influence to have the inspector assigned to the Snow Road project.

      MM.    On or about April 9, 2008 at approximately 12:10 p.m., DIMORA called Russo to inquire about Russo's return flight from Las Vegas.  Russo described his flight and then asked DIMORA, "Where the hell were you last night?  We waited until 9:30."  DIMORA replied, "I had a masseuse come over to the room and, uh. . . ."  Russo and DIMORA then had a lengthy discussion about the charges on Russo's bill from the Mirage.  Russo said, "I lost money.  Don't say nothing but my room was $900 and [the casino host] wouldn't do any different but you know we had it to pay so. . . ."  DIMORA said, "What?"  Russo continued, "Yeah.  But don't, remember he [Kleem] said don't tell Kevin [Kelley] or anybody what the bill is 'cause he gave us . . . money for the bill too."  DIMORA then inquired, "You didn't have to pay it did you?"  Russo informed DIMORA he put the bill on his credit card and suggested DIMORA would also be charged for his room.  DIMORA expressed surprise that he might be charged.  Russo then said, "I didn't want to say it in front of Kevin [Kelley] 'cause remember he [Kleem] said, 'don't say nothing in front of Kevin.'  So when Kevin says, 'Is your room taken care of?' I just looked at him and said, 'Yeah.'"  DIMORA asked if Russo spoke with the casino host.  Russo said, "Yeah. They called him up and he says, 'Nope, they already got their discount, they know the story . . . the two suites.'  So. . . ."

DIMORA said, "Oh.  No s--t we got to pay $900?"  Russo and DIMORA then discussed how

PE55 had room service charges and how DIMORA's hotel bill may be less since DIMORA did

not order room service.  Russo then suggested some of the others may have charged things to his

room and to DIMORA's room.  Russo told DIMORA he was with the others the previous night at

the Chinese restaurant when the bill came, "Kevin [Kelley] goes, 'f--k 'em. You guys [Russo and

DIMORA] are getting all your s--t.'"  DIMORA and Russo then discussed how Kelley and

Pumper both received free rooms.  DIMORA said, "Yeah.  So, I don't know.  Ferris [Kleem] told

me, he says, 'Oh, your room should be free you know, you played enough, you were playing

$100.'  They were telling me I averaged $100 a, a hand.  And they, I don't know how many hours

they had me down."  Russo then complained, "Well I lost six thousand f--ing dollars in black and

white.  They seen it."  DIMORA then inquired if the money Russo lost appeared on his Player's

Club account.  Russo confirmed the money he lost was reflected on his account and said he was

told by a casino worker, "Nah, that ain't enough for the big suites."  DIMORA was surprised

Russo did not receive anything from the Mirage based on the amount of money Russo spent

gambling.  Russo replied he only received the "casino rate."  Russo then added,  "Yeah, so they

charged $911 on my charge.  I'm not gonna argue with the girl.  I said I'll pay."  DIMORA

replied, "Yeah."  Russo continued, "Because we had the money to pay for it.  So it isn't like you

know what I mean?"  DIMORA agreed.  Russo again suggested DIMORA would be charged for

his suite and told DIMORA, "Just throw it on your charge and be done."  Russo then added, "Just

don't say nothing to anybody.  I don't want . . . 'cause if I would have told Kevin [Kelley] he

would have made a thing and remember he [Kleem] told us, 'Don't say nothing about the room,'

remember." DIMORA replied, "Yeah." Russo then said, "'So that's why I don't wanna get

nobody in hot water." DIMORA and Russo then discussed the logistics of checking out of the

Mirage. DIMORA questioned whether he should speak to the casino host. Russo responded,

"Yeah you better, [DIMORA], unless you wanna have $600 on your charge."

      NN.   On or about April 9, 2008 at approximately 1:26 p.m., Kleem, while at the

Las Vegas Airport, called DIMORA, who was at the Mirage. Kleem told DIMORA he had heard

PE10 was going to recommend throwing out the low bid for the JJC project general trades

contract. DIMORA inquired whether the low bid was going to be disqualified because of the

SBE. Kleem replied, "Yeah." DIMORA then confirmed he had previously heard some rumblings

that the SBE used by the low bidder was "questionable." Kleem then added that the SBE

subcontract was also unsigned. DIMORA said, "We threw out the same thing for the fire

suppression system," referring to an unsigned SBE. DIMORA later added, "Well, that's good

news for you [referring to the possibility that Kleem's higher bid might be accepted]." Kleem

responded, "Yeah, it is." DIMORA then offered to have PE11 make some inquiries about the

questionable SBE and call Kleem back. Kleem informed DIMORA he (Kleem) was boarding a

plane in fifteen minutes and suggested they talk when they returned to Cleveland. Kleem also

said, "I just wanted to let you know, see if there was anything you know, you could do."

DIMORA indicated he would check with PE11 to see what was going on with the bid. DIMORA

also told Kleem that he (DIMORA) was going to meet with the Mirage marketing host to check

out. DIMORA informed Kleem that the Mirage charged Russo for his suite. Kleem replied,

"Yeah, yeah, I'll take care of him [Russo], don't worry just whatever, whatever we got to do."

DIMORA then suggested he would not be charged for his room because he "gambled pretty heavy on every day." Kleem replied, "I think you're fine. I think you're fine." DIMORA added, "I think he [Russo] also charged a bunch of s--t to his room." Kleem replied, "Yeah, we'll take care of it, don't worry." DIMORA again offered to "check on that other thing [the low bid on the JJC project]." DIMORA and Kleem agreed they had a great time in Las Vegas. DIMORA said, "It was a f---ing blast." Kleem replied, "Ohhh . . . It was the bomb. We gotta do it again." DIMORA said, "We were all just saying what a f---ing great time we all had. We appreciate your hospitality and your generosity. That was very nice of you." DIMORA concluded the conversation by telling Kleem, "Well, I'm going to keep my fingers crossed for you. That [the JJC project] would be a good thing for you."

      OO.    On or about April 10, 2008 at approximately 11:05 a.m., Kelley thanked Kleem for everything in Las Vegas and informed Kleem that he (Kelley) owed Kleem money. Kleem responded, "I don't wanna hear that anymore, just take care of me some time or do something." Kelley replied, "Well, you know that, that goes without saying." Kleem then told Kelley the name of the inspector Kleem wanted assigned to the Snow Road Project. Kelley told Kleem, "Okay, that's good, I'll call you right back okay, let me get started on that right now."

      PP.    On or about April 10, 2008 at approximately 11:14 a.m., Kelley and Kleem had a second telephone conversation in which Kelley recounted a conversation Kelley had with PE1. Kelley said PE1 had not been receptive to Kleem's request that a certain inspector be assigned to the Snow Road project. In response, Kelley had invoked DIMORA's name and told PE1 that DIMORA wanted to do this for Kleem and suggested if PE1 could not "get it done,"

DIMORA would contact PO3 directly to make sure the inspector was assigned to the job.  Once

Kelley had said this to PE1, PE1 agreed to "look into" the situation.

      QQ.    On or about April 10, 2008 at approximately 4:13 p.m., DIMORA and

Kelley had a telephone conversation in which they spoke about what a good time they had in Las

Vegas.  DIMORA jokingly said he put a picture of Kelley on the internet.  Kelley responded that

he is calling all their wives to tell them about what they did in Las Vegas.  DIMORA said, "I just

went, 'One simple massage is all I had.'"  Kelley joked that DIMORA was going to get "hives" all

over his lips because of what he did with the "hooker."  DIMORA replied, "If I get them, I am

drinking out of everybody's cup when nobody is looking, so that everybody catches it so it is a

common, uh, disease that we are all gonna catch together."  DIMORA then told Kelley that Russo

had complained about DIMORA getting "comped" because Russo had to pay $900 for his room.

Kelley suggested Russo had to pay because of all the clothes PE55 charged to Russo's room.  At

the end of the conversation DIMORA told Kelley, "Don't forget to talk to [PO3] about that guy

[the inspector for Snow Road]."  Kelley said, "I already did.  I talked to [PE1] first."  Kelley then

added, "I talked to [PE1] and he was a little like, well, 'Why didn't Ferris call me?'  So I called

Ferris and I told him, I said, 'Ferris, you know I told [PE1] that we ran into [you].  I didn't tell him

where.'  So, um, I told Ferris, 'I says, hey, just tell him [PE1] you ran into us and, and ah you told

us not to say anything but we [Kelley and DIMORA] jumped on it too fast, you were going to call,

wait a day or so and call him [PE1].'  So I think it will all work out.  If not, then I'll have to get

you on the phone, me, you and [PO3] on a three way or something like that."  DIMORA replied,

"Alright.  I saw [PO3] today.  I should have said something to him."  Kelley replied, "It'll will

work itself out.  It will all be fine."  DIMORA added, "I mean it didn't sound like it was a big

deal."  Kelley replied, "It's not, but you know these f---ing guys, these people get power they

think they f–k, you know, I'm hoping that PE1 does the right . . . I told him [PE1] what to do.  I

led him [PE1] to it.  Hopefully he [PE1] does it.  If he doesn't then I got to go over his . . . ."

DIMORA replied, "Let me know if I need to do something.  I mean he's [Kleem] not asking for

anything ridiculous."  Kelley said, "I know. Absolutely.  I'll take care of it."  DIMORA said, "We

definitely got to do that at least."  Kelley added, "If it doesn't get taken care of, I mean, I'll call

you, but it should be taken care of."  Kelley continued, "I told [PE1] that you [DIMORA] would

consider it a personal favor if he [PE1] took care of this."

> RR.    On or about April 10, 2008 at approximately 6:46 p.m., DIMORA and

Gabor discussed the JJC bids.

> SS.    On or about April 10, 2008 at approximately 8:14 p.m., DIMORA and

Russo discussed a Plain Dealer reporter who called Russo about the Las Vegas trip.  Russo and

DIMORA agreed it was nobody's business about their personal trip to Las Vegas because the

County did not pay for their trip.  Russo said, "I'm so glad I purchased my ticket."  DIMORA

replied, "You had to.  They're going to check all that."  DIMORA and Russo then complained

about the reporter wanting to know who was with them in Las Vegas.  DIMORA said, "I'm not

going to tell him [the Plain Dealer reporter] . . . that I saw Ferris Kleem over there [in Las Vegas].

Russo replied, "Oh, no.  I would say I didn't see him.  DIMORA responded, "I'll say . . . I saw a

bunch of people over there."  Russo said, "Whatever you do, don't mention his name JIM

[DIMORA]."

TT.    On or about April 15, 2008 at approximately 6:15p.m., DIMORA asked Kelley, "Listen, did you get, take care that guy with the, that project, whatever the f--k his name is?"  Kelley replied that he had spoken to Kleem earlier in the day, and that Kleem had indicated everything was going well at the moment, but that Kleem would let Kelley know if Kleem needed additional help.  DIMORA asked whether PE1 "took care of it."  Kelley said that he was "pretty sure," but explained that Kleem instructed Kelley to "let it play out" because Kleem had not yet been awarded the job.  DIMORA replied, "Okay, alright."

UU.    On or about April 17, 2008, Kleem told Kelley he was meeting PE1 and another County employee for lunch later in the day.  Kelley responded, "Oh, beautiful.  Will you call me afterwards and make sure it's all taken care of?"  Kleem said, "Yeah."  Kelley said, "'Cause JIMMY, JIMMY [DIMORA] really wants to make sure this is done."

VV.    On or about May 1, 2008, DIMORA voted to award the Snow Road resurfacing contract to Blaze Construction in the amount of approximately $2,887,359.

WW.    In approximately the Spring of 2008, as a result of Kelley's efforts and DIMORA's influence, the inspector Kleem had requested was assigned to the Snow Road project.

XX.    In approximately May 2008, and prior to May 23, 2008, DIMORA asked Kleem to assist DIMORA in purchasing a Rolex watch as a graduation gift for a relative of DIMORA.

YY.    On or about May 28, 2008 at approximately 11:46 a.m., Kleem thanked DIMORA for the "message."  DIMORA indicated everything was alright so far but he is "always waiting for the other shoe to fall you know or drop."  Kleem replied, "Well there is not other shoe

51

to drop. I think everything is gonna be good." At the conclusion of the call, Kleem and DIMORA

agreed to meet at a later date. Kleem told DIMORA, "Don't worry too much."

All in violation of Title 18, United States Code, Section 371.

The Grand Jury further charges:

COUNT 5

(Bribery Concerning Programs Receiving Federal Funds,
18 U.S.C. §§ 666(a)(1)(B) and 2)

185.  Paragraphs 1, 3, 4, 29, 30, 45, 71, 81, and 165 of this Third Superseding Indictment

are re-alleged and incorporated by reference as if fully set forth herein.

186.  At all times relevant, the County was a government agency as that term is defined

in Title 18, United States Code, Section 666(d)(2). The County received benefits in excess of

$10,000 during the year May 31, 2006 through May 30, 2007 under a Federal program involving a

grant, contract, subsidy, loan, guarantee, insurance and other form of Federal assistance.

187.  Beginning on or about May 31, 2006 and continuing until on or about May 30,

2007, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern

Division and elsewhere, Defendant JAMES C. DIMORA did corruptly solicit, demand, accept

and agree to accept for the benefit of any person things of value from Kleem, companies Kleem

controlled and entities over which Kleem had influence; namely, among other things, a

refrigerator, cash, meals in the Cleveland area, entertainment in Las Vegas for DIMORA and for

his friends, MCO business for Vince Russo and Business 22, a discount on a Rolex watch Kleem

could obtain because of his personal and business relationships with a jeweler, and other things of

value, DIMORA acting with the intent to be influenced and rewarded in connection with any

52

business, transaction and series of transactions of the County involving any thing of value of

$5,000 or more; that is, a HUD-funded $150,000 grant to the City of Berea for the Coe Lake

Nature Trail and Bridge Project and other County business both as requested and as future

opportunities arose.

All in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

The Grand Jury further charges:

COUNT 6
(Bribery Concerning Programs Receiving Federal Funds,
18 U.S.C. §§ 666(a)(1)(B) and 2)

188.     Paragraphs 1, 3, 4, 29-31, 45, 46, 71, 81 and 166-174 of this Third Superseding

Indictment are re-alleged and incorporated by reference as if fully set forth herein.

189.     At all times relevant, the County was a government agency as that term is defined

in Title 18, United States Code, Section 666(d)(2). The County received benefits in excess of

$10,000 during the year May 31, 2007 through May 30, 2008 under a Federal program involving a

grant, contract, subsidy, loan, guarantee, insurance and other form of Federal assistance.

190.     Beginning on or about May 31, 2007 and continuing through on or about May 30,

2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern

Division and elsewhere, Defendant JAMES C. DIMORA, aided and abetted by Frank P. Russo

(not charged herein) did corruptly solicit, demand, accept and agree to accept for the benefit of

any person things of value from Kleem, companies Kleem controlled and entities over which

Kleem had influence; namely, among other things, cash, meals in the Cleveland area, suites at the

Mirage in Las Vegas, entertainment, meals and limousine service in Las Vegas, gaming chips,

53

MCO business for Vince Russo and Business 22, and discounts on jewelry and appliances that Kleem could obtain because of his personal and business relationships with vendors, DIMORA and Russo acting with the intent that DIMORA be influenced and rewarded in connection with any business, transaction and series of transactions of the County involving any thing of value of $5,000 or more; that is, the JJC project, the Snow Road project, a smoking violation, and other County business both as requested and as future opportunities arose.

All in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2. The Grand Jury further charges:

COUNT 7
(Hobbs Act, 18 U.S.C. § 1951)

191.    Paragraphs 1, 3, 4, 6, 7, 9, 29, 30, 71, 72 and 81 of this Third Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

192.    From in or around Summer 2005 and continuing through on or about May 30, 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES C. DIMORA did knowingly obstruct, delay and affect and attempt to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is DIMORA obtained property not due to him or his office, namely among other things, cash, household appliances, meals in the Cleveland area, a suite at the Mirage in Las Vegas, entertainment, meals and limousine service in Las Vegas, gaming chips, MCO business for Business 22, a discounted television, and assistance with the purchase of a Rolex

54

watch, from Ferris Kleem and the companies he controlled, with their consent, under color of official right.

All in violation of Title 18, United States Code, Section 1951.

The Grand Jury further charges:

COUNT 8
(Hobbs Act, 18 U.S.C. § 1951)

193.    Paragraphs 1, 3, 4, 6, 7, 9, 27, 30, 32, 34-36, and 70 of this Third Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

Introduction

194.    In or around 2002, the Engineer's Office began looking for new office space. Gallagher, then employed by the County, participated in the office relocation project.

195.    In or around September of 2002, Gallagher retired and Payne assumed responsibility for the relocation project.

196.    In or around April of 2003, an RFP was issued for new office space for the Engineer's Office.  Potential landlords, including a representative of Stonebridge, made presentations to the Engineer's Office.

197.    At various times during this conspiracy, Payne's law practice had a barter agreement by which Touch of Class ("TOC") provided Payne's law practice with limousine service and in return, Payne's law practice provided TOC with legal services.

55

<u>The Scheme</u>

198.    Beginning in or around February 2003 and continuing until in or around May 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES C. DIMORA did knowingly obstruct, delay and affect and attempt to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is, DIMORA obtained property not due to him or his office, namely, travel via limousine, entertainment, and the use of a condominium, from Kevin Payne (now deceased) and Payne's law practice, with their consent, under color of official right.

It was part of the scheme that:

199.    Payne lobbied DIMORA to approve and retain a lease for the Engineer's Office at the Stonebridge location.

200.    On several occasions between in or around 2003, through on or about June 29, 2007, Payne and Payne's law practice provided DIMORA and his family with free limousine service from TOC.  For example, on or about May 9, 2003, Payne's law practice provided DIMORA with limousine service valued at approximately $480, and on or about June 1, 2003, Payne's law practice provided DIMORA with limousine service valued at approximately $160.

201.    On or about June 10, 2003, the County Commissioners, with DIMORA voting in favor, approved the Engineer's Office move to the Stonebridge location.

202.    On or about June 11, 2003, Payne's law practice provided DIMORA with limousine service valued at approximately $480.

56

203.    On or about August 1, 2003, the Engineer's Office entered into a ten-year lease for office space at Stonebridge.  The lease fees totaled approximately $3,992,320 for the life of the lease, payable in monthly installments.

204.    On several occasions, Payne allowed DIMORA and DIMORA's friends access to a condominium at Stonebridge for their personal use, which condominium had been loaned to Payne by Business 5.

205.    On several occasions, Payne paid prostitutes to entertain and provide services to DIMORA.  Payne also paid the travel expenses for the prostitutes.

206.    On or about December 10, 2006, Payne's law practice provided DIMORA with limousine service valued at approximately $1,023.75.

207.    On several occasions from in or around January 2005 through in or around May 2008, DIMORA assisted Payne in connection with obtaining the County Commissioners' approval of amendments to the County Sanitary Engineer's Office and Engineer's Office collective bargaining agreements with certain unions and salary matters for nonunion employees in the County Sanitary Engineer's Office.

208.    On or about April 3, 2008 at approximately 5:35 p.m., Kelley told Payne that the Commissioner wanted to know if he had access to the unit across the way because he (the Commissioner) had a "Saturday night adventure" planned.  Payne said that he would check the next day.  DIMORA then started speaking with Payne.  Payne and DIMORA discussed the condominium and matters Payne had pending before the County Commissioners.

209.    On or about April 4, 2008 at approximately 11:03 a.m., Kelley told Payne that DIMORA wanted to know if he could use that condominium over the weekend.  Payne said that the condominium was not there anymore, but that he could obtain a key to the new model.

210.    On or about April 4, 2008 at approximately 11:09 a.m., Payne and Kelley discussed obtaining a condominium or other private location for DIMORA's use.

211.    On or about April 4, 2008 at approximately 11:29 a.m., Kelley and DIMORA discussed arrangements for using a Stonebridge unit the following day.  Kelley told DIMORA there were two options, a new model unit in a new building at Stonebridge or one of the suites at the Embassy Suites at Reserve Square.  DIMORA and Kelley discussed the Embassy Suites option being too visible and discussed how to access the new the Stonebridge unit.  Kelley said to DIMORA, "I still think you're crazy.  I think I'd wait 'til f---in' the next day and just get your f---in' c--k blown, ya know."  DIMORA replied, "Yeah, it's just some old friend that's all."  Kelley agreed to set it up and said he would "get a hold of Payne" and work on getting the key.

212.    On or about April 4, 2008 at approximately 11:34 a.m., Kelley left a message for Payne that DIMORA preferred to use the model unit at Stonebridge.

213.    On or about April 4, 2008 at approximately 11:40 a.m., Payne returned Kelley's call and said that he left a message for a Stonebridge agent with DIMORA's decision and that the Stonebridge agent had not returned the call.

214.    On or about April 4, 2008 at approximately 12:02 p.m., Kelley and DIMORA discussed Kelley obtaining the key to the Stonebridge condominium from Payne.

58

215.    On or about April 4, 2008 at approximately 12:55 p.m., Payne told Kelley that the Stonebridge agent would drop off the key in an envelope at Payne's front desk.  Payne also said he would pick it up and call Kelley.  Kelley said that either Kelley or Payne could give it to DIMORA.

216.    On or about April 4, 2008 at approximately 6:29 p.m., Payne told Kelley that it was a big production, but he received keys to the model in the new building.  Payne asked if DIMORA was going to drive himself there.  Kelley said that he believed so.  They discussed parking and directions to the unit.  Payne said that he would deliver the key to DIMORA the next day.

217.    On or about April 4, 2008 at approximately 6:33 p.m., Kelley told DIMORA that Payne would call DIMORA the following day because Payne had "all the stuff."  Kelley told DIMORA to park on the bridge and walk to Unit 808.

218.    On or about April 5, 2008 at approximately 11:42 a.m., Payne asked DIMORA where he should deliver the key.  Payne offered to drop it off at DIMORA's house.  DIMORA asked Payne if it was okay over there at the new Stonebridge unit because Kelley kept saying "you know it's risky, risky."  DIMORA said he told Kelley it was the same as it was before.  Payne told DIMORA he checked it out the previous day and made sure all the keys worked.  Payne said he would give the keys to Kelley if he was unable to meet DIMORA.  DIMORA told Payne he would call him either way and said, "I appreciate your uh due diligence on this for me. Thank you. You're a good man.  Thank you."

219.    On or about April 5, 2008 at approximately 3:07 p.m., DIMORA left a voice mail message for Payne asking him to meet DIMORA at DIMORA's house.

220.    On or about April 5, 2008 at approximately 4:47 p.m., Payne told DIMORA that he was en route to a birthday party with his daughter and was pulling into DIMORA's development. DIMORA told Payne that he would meet Payne outside.

221.    On or about April 16, 2008 at approximately 3:06 p.m., Kelley asked DIMORA if he still had the key to the condominium that Payne had given him.  DIMORA said that he still had the key.  Kelley said that they needed the key for poker the following night.

222.    On or about April 16, 2008 at approximately 5:41 p.m., Gabor and DIMORA confirmed that they were playing cards at Kevin Payne's condominium the following evening.

223.    On or about May 1, 2008 at 10:03 a.m., Kelley told DIMORA that Payne had an item on the Commissioners' agenda that day and would be there presenting.

224.    On or about May 1, 2008, the County Commissioners, DIMORA voting in favor, approved items related to the County Engineer/Sanitary Engineering Division.

All in violation of Title 18, United States Code, Section 1951.

The Grand Jury further charges:

COUNT 9
(Conspiracy to Commit Mail Fraud and Honest Services Mail Fraud, 18 U.S.C. §§ 1341 and 1346, in violation of 18 U.S.C. § 1349 )

225.    Paragraphs 1, 3, 4, 11, 30, 32, 42, 53, 58, 61 and 62 of this Third Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

THE CONSPIRACY

226.    From on or about March 14, 2008, and continuing through on or about July 24, 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern

60

Division, Defendant JAMES C. DIMORA, PE39 (not charged herein) and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree with each other to commit an offense against the United States, namely, to devise and intend to devise a scheme and artifice:

> (1) to defraud and deprive Cuyahoga County and its citizens of their right to the honest and faithful services of DIMORA, through bribery and the concealment of material information related thereto, and

> (2) to defraud Cuyahoga County, the City of Bedford, Ohio, the City of Solon, Ohio and OPERS, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises,

and for the purpose of executing such scheme and artifice, to cause matters to be placed in any post office and authorized depository for mail matter to be sent and delivered by the United States Postal Service and private and commercial interstate carrier, in violation of Title 18, United States Code, Sections 1341 and 1346.

<u>OBJECT OF THE CONSPIRACY</u>

227.    It was the object of the conspiracy that DIMORA secretly used his official position to benefit himself, by soliciting and accepting sexual favors and other things of value from PE39, in exchange for favorable official action, and that PE39 enriched herself by secretly obtaining favorable official action for herself through corrupt means.

61

<u>MANNER AND MEANS</u>

It was part of the conspiracy that:

228.    DIMORA solicited and accepted sexual favors and other things of value from PE39.

229.    DIMORA provided favorable official action for the benefit of PE39 both as requested and as future opportunities arose, to include causing favorable personnel actions to benefit PE39, including, to help obtain public employment for PE39, on terms agreeable to PE39, and which included PE39 obtaining OPERS benefits and a salary PE39 desired.

230.    The conspirators took steps to hide, conceal, and cover up their activity and the nature and scope of PE39's dealings with DIMORA.

<u>Acts in furtherance of the conspiracy</u>

231.    On or about March 14, 2008, DIMORA and PE39 agreed to meet at the Doubletree Hotel in Independence, Ohio the following day for the purpose of having sex with one another. DIMORA told PE39 that it was discreet there.  PE39 commented, "F---ing you's a wonderful thing."  Later in the conversation, DIMORA told PE39 that he looked forward to tomorrow, stating, "What an unexpected pleasure."  PE39 responded, "Good things come to those who wait."

232.    On or about March 15, 2008 at approximately 11:26 a.m., DIMORA asked Gabor if it was necessary to provide a name when checking into a hotel if paying in cash.  Gabor told DIMORA that the hotel would ask for your driver's license.  DIMORA asked if Gabor would reserve a room for DIMORA at the Doubletree Hotel that day.  DIMORA told Gabor he wanted to go to a hotel that did not have a lot of "activity" and where DIMORA could "hide."  Gabor agreed

to rent the room for DIMORA, but indicated that he was not available until later in the day, due to plumbing repairs at his house.

233.    On or about March 15, 2008 at approximately 12:25 p.m., Gabor told DIMORA he was still occupied with the plumbing repairs at his house.

234.    On or about March 15, 2008 at approximately 2:50 p.m., PE39 rented a hotel room at the Holiday Inn in Independence, Ohio, paying in cash.

235.    On or about March 17, 2008, DIMORA asked PE39 if she had a resume and told PE39 that he needed to get "somethin' in their hands." DIMORA said he had spoken with PO13, and PO13 could find PE39 a job at the City of Bedford Municipal Court in a few months but they had something for PE39 now in Solon for a few days per week. DIMORA told PE39 she could make more money working three or four days a week in Solon than she did presently working full-time. DIMORA instructed PE39 to send her resume to DIMORA's County office.

236.    On or about March 19, 2008, DIMORA asked PE18 if she received a resume from PE39. PE18 told DIMORA that the resume was there. DIMORA replied that it was not for a County job and that he had to give the resume to someone. DIMORA instructed PE18 to put the resume in DIMORA's folder, which was to be delivered by a County employee to DIMORA's residence.

237.    On or about March 21, 2008, PE39 told DIMORA that PO13 had left PE39 a message "saying that he [PO13] didn't have anything available" and that PO13 would probably talk to PE39 on Tuesday. DIMORA told PE39, "But uh what they're gonna do is they're gonna put you in Solon I think. . . . I just told him [PO13], 'Let's, let's get her in, back into PERS, even

if it's part-time to start out with . . . and then we'll either move it to full time over at Solon or we'll try to put you at the court.'" PE39 replied, "Okay . . . that's good." DIMORA also told PE39, "So, I would imagine, you know I'll just stay on top of him, hound him, so I'm hoping you know three, four months, we'll be able to get you over there." At the end of the conversation, PE39 said to DIMORA, "We'll have to get together soon." DIMORA responded, "Okay, I look forward to it."

238.    On or about March 24, 2008, DIMORA and PO13 discussed PE39 obtaining public employment. DIMORA told PO13 that PE39 said, "She'd like to be somewhere around 40 [$40,000 per year]." PO13 told DIMORA, "If we get her even part-time, least this way the clock's ticking." DIMORA replied, "Least then I got a lay over like I did with uh, . . . uh, uh, PE38, yeah then see, I got her into full-time now at the State, so she's happy and I don't even hear from her." DIMORA said, "So I want to do the same thing with her [PE39] and then I'm done."

239.    From on or about March 17, 2008 through on or about July 17, 2008, PO13 had approximately 31 conversations with DIMORA and others about PE39 obtaining public employment.

240.    On or about March 25, 2008, DIMORA and PE39 discussed PO13 leaving PE39 a message about a part-time job with the City of Solon. DIMORA told PE39, "What I want to try to do is, you know, if I can get your foot in the door like we did with [PE38]. Then I can, you know, press 'em a little harder then to make it full time." PE39 responded, "Right, right."

241.    On or about April 2, 2008, PE39 said, "You need to look in your schedule and see when you're available." DIMORA replied, "Everything going okay?" PE39 responded, "Yeah

everything's fine. I just am uh rarin' to go." DIMORA said, "Alright." PE39 and DIMORA then

spoke about a job opportunity for PE39. PE39 informed DIMORA that she makes two thousand

per month and would need to make at least that much. PE39 mentioned that she never went to see

PO13 but spoke with him on the phone. DIMORA told PE39 he would make a call and informed

her that they were "three quarters of the way there so I'm gonna make sure we get it." DIMORA

said he would "work" on PO13 and try to obtain 85% to 90% of her current salary and OPERS

benefits. PE39 stated, "Let me know when you're available. We'll go have drinks . . . or

something (laughs)." DIMORA said, "That's a deal, deal, deal."

242.    On or about April 3, 2008 at approximately 2:53 p.m., DIMORA left a message for

PE39 that he had spoken with PO13, and PO13 would call PE26 about getting her more money.

243.    On or about April 3, 2008 at approximately 8:27 p.m., DIMORA told PE39 that he

had spoken with PO13, who had spoken with PE26. DIMORA wanted to know if PE39 would

meet him on Saturday afternoon for a "drink or somethin'."

244.    On or about April 22, 2008 at approximately 7:36 p.m., PE39 asked DIMORA if

he received her text message the previous day. DIMORA said he received the message and had

spoken to PO13 about the finance position. DIMORA explained that PO13 had indicated to

DIMORA that the finance position would not work out, but PO13 could put PE39 at the court for

the Summer and then they would move her to Solon City Hall. PE39 said she had received a

message from PE26 informing her they had someone else in mind for the finance job, but then

received a message from the finance department for an interview. PE39 said she was unsure if it

was just a courtesy interview and talked with DIMORA about whether she should attend.

65

DIMORA told PE39 he would contact PO13 to "see what's going on with this."

245.    On or about April 22, 2008 at approximately 9:31 p.m., DIMORA explained to PE39 the circumstances surrounding the finance position and encouraged her to interview. DIMORA provided PE39 with PO13's telephone number and told her to call him (PO13) the following day.

246.    On or about April 25, 2008, DIMORA and PE39 discussed her job interview. PE39 said that she could not judge the interview either way and that she was told they would call her the following week about a second interview.  PE39 said, "F--k this," explaining that she had already met with PE26.  The female interviewer questioned PE39's lack of finance experience. DIMORA assured PE39 he would stay on top of PO13 to make the other thing happen.  PE39 said that a part-time position would be fine, but she needed to make at least $2,000 per month.  PE39 said she would call DIMORA.  DIMORA said that his wife would be gone the following day.

247.    On or about April 30, 2008, DIMORA told PE39 that he had spoken with PO13 and PO13 was coordinating the Summer situation and would work with PE26 to arrange something for the Fall.  DIMORA stated, "I just want to get you going, you know, get the foot in the door."  PE39 wanted to know when she would be able to start.  DIMORA thought she would start at the end of May or the first part of June.  DIMORA told PE39 that his wife would be out of town for the weekend and stated, "If you get free on the weekend, let me know. . . I'll stay on top of these guys."

248.    On or about May 13, 2008, DIMORA told PE39 she would start with the court in the middle of June, where she would work until they created another job.

249.     On or about May 15, 2008, DIMORA told PE39 that PO13 mentioned having PE39 start in the middle of June, and work in the court for the Summer.  PO13 would talk to PE26 that evening about hiring PE39 full time.  DIMORA told PE39, "I just wanna get you in the um, you know, in the PERS, 'cause I know once you're in it, . . . they're not gonna let you out."  PE39 replied, "Right, exactly."  DIMORA stated, "I guess what I would do if I were you maybe next week just call PO13 . . . and just talk to him about um, you know, what I just told you, . . . and try to get a, um, you know, like an approximate start date."  DIMORA then said, "They'll pay you at least what you were making a week there for the time being, maybe he can do a little more.  That's what he was working on."  PE39 said one of these days she was going to "get together" with DIMORA.

250.     On or about June 2, 2008 at approximately 5:19 p.m., PE39 informed DIMORA that she had just met with PO13 and the earliest she could start would be July 14th.  PE39 said that PO13 told her that they had some archiving and shredding that needed to be done.  PE39 indicated she was told that there were no immediate openings, and the only way she could work would be if a project was created.  PE39 expressed her concern to DIMORA that once the project was over she would be out of a job if Solon could not provide a job.  DIMORA replied, "No, no, that's nuts.  That's no good, that ain't what they told me anyways."  PE39 and DIMORA agreed to meet 15 to 20 minutes later for a drink at Shula's restaurant.

251.     On or about June 2, 2008 at approximately 6:01 p.m., DIMORA asked PE39, "Nobody in there that you recognize is there?"  PE39 replied, "Nope, it's pretty slow."  DIMORA

67

replied, "That's what I wanted to hear. . . . Two minutes I'll be there. You're in the restaurant all the way to the back?" PE39 replied, "Yep."

252. On or about June 2, 2008 at approximately 8:34 p.m., DIMORA asked Gabor to meet him "over there" and to call him when he (Gabor) arrived "there." DIMORA stated, "Call me when you're there in the lot." Gabor asked, "Okay, after I do it?" DIMORA replied, "No, before." Gabor replied, "Okay, you got it. I'll call you ten, fifteen minutes."

253. On or about June 2, 2008 at approximately 8:42 p.m., PO13 told DIMORA that the "game plan" was to bring PE39 on board with the court because PO13 had a record retention project, and thereafter, they would work toward the Solon deal. DIMORA informed PO13 that he believed PE39 was nervous about not having a job. PO13 stated, "I'm gonna have her, uh, she's gonna work like three and half days a week. . . . So I'm gonna pay her so that it works out so she's makin' what she needs to make." DIMORA asked again, "Okay, that'd be good, but you think you guys'll be able to carry her until the Solon deal comes through?" PO13 replied, "Yeah, I'm not gonna, I'm not gonna stiff her." DIMORA told PO13 that PE39 wanted to be back into the OPERS system and asked, "You're pretty sure, though, PE26, uh, can deliver?" PO13 replied, "I talked to PE26 today, again, and you know we're gonna make it work one way or the other." PO13 stated, "We're doing okay (UI). I know she's, she's looking to you and, and you know uh, I wanna get, I wanna do this for you and you know for her, and you know the judge does, too and I mean we'll get it done." PO13 confirmed with DIMORA that PE39 wanted to make $2,000 per month.

68

254.     On or about June 2, 2008 at approximately 9:01 p.m., DIMORA told Gabor, "I'll be there in two minutes." Gabor replied, "Where we said, right?" DIMORA replied, "Yeah, I'm gonna meet you right in the parking lot there." DIMORA later stated, "I don't know the people here. I don't wanna know 'em."

255.     On or about June 2, 2008 at approximately 9:11 p.m., Gabor rented a hotel room at the Holiday Inn in Independence, Ohio, paying in cash.

256.     On or about June 2, 2008 at approximately 9:19 p.m., DIMORA stated, "Hey, I'm coming back." PE39 asked, "Hey, did Michael already get the room?" DIMORA replied, "Yeah, we're all set." PE39 replied, "I was gonna tell you there's nobody at my house for the entire night." DIMORA replied, "We're all set. I'm on my way, coming back already." PE39 replied, "Alright. Well, let me know when you get there and what room and all that good stuff." DIMORA told PE39 that he wanted to make sure Gabor had left and then would bring her a key to the room. PE39 asked, "You don't trust him, huh?" DIMORA replied, "Yeah, I trust him. I just don't wanna have him uh, you know." PE39 said, "You just don't want him to know who it is." PE39 told DIMORA that she trusted Gabor and did not care if he knew about them.

257.     On or about June 2, 2008 at approximately 10:29 p.m., DIMORA asked PE39, "You're already in your car?" PE39 replied, "No, I'm just walking out of the building." DIMORA stated, "Oh, I'll talk to you 'til you get in your car then," and then asked, "You got dressed that fast?" PE39 replied, "I'm pretty quick . . . doesn't take much to get dressed." DIMORA stated, "I guess not." PE39 stated, "Underwear, bra, pants, shirt." DIMORA and PE39 discussed a couple of "seedy lookin' guys" DIMORA saw in the parking lot, which caused him to

check on her.  DIMORA stated, "I'll stay in touch with ah, with ya, after I see what's goin' on with PO13.  Did he, how did you guys leave it?  Are you supposed to call him at the end of June?"  PE39 replied, "He made it sound like I need to show up on July 15th, so that's what I'm doin'."  DIMORA stated, "I'll call him [PO13], um, you know, I'll wait a day or two and I'll say you called me . . . PO13 will follow through with it."

258.    On or about June 5, 2008, DIMORA told PE39, "And, um, um, I'll be you know talking to you.  I talked uh, to [PO13].  Everything's good there, and um, you know.  We may end up, uh, we'll see how things work out.  You may end up, he was even saying he doesn't know what's gonna happen by the end of the year with some of the people there."

259.    On or about June 19, 2008, PE39 asked DIMORA if he had spoken with PO13 or PE26 because she wanted to make sure everything was in line for her employment.  DIMORA told PE39 to call PO13 and say, "JIMMY said I should call you."  PE39 said that she was submitting her two week notice the following Monday.  PE39 suggested DIMORA call her and stated, "If we don't get together this weekend, maybe one day next week or whatever."  DIMORA replied, "Okay honey . . . I always like your company."  PE39 replied, "I like yours, too."

260.    On or about June 20, 2008, DIMORA left a voice mail message for PE39.  DIMORA informed PE39 that he had spoken with PO13, who told DIMORA to tell PE39 that everything was "fine" and "set" for PE39 to start working for the court.

261.    On or about July 11, 2008, PE39 and DIMORA discussed PE39 starting a new job at the Bedford Court and also discussed meeting that evening because PE39's husband took her children to the water park.

## EXECUTION OF THE SCHEME

262.    On or about July 22, 2008, DIMORA and PE39, for the purpose of executing the above-described scheme and artifice, caused documents related to PE39's enrollment in OPERS to be sent through the United States mails from Bedford, Ohio, in the Northern District of Ohio, to OPERS in Columbus, Ohio.

All in violation of Title 18, United States Code, Section 1349.

The Grand Jury further charges:

## COUNT 10
(Hobbs Act Conspiracy, 18 U.S.C. § 1951)

263.    Paragraphs 1, 3, 4, 6, 7, 24, 30 and 77 of this Third Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

264.    Beginning in or around 2007 and continuing until on or about June 6, 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES C. DIMORA, and John Valentin (not charged herein) and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree with each other to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is, DIMORA obtained property not due to him or his office, from Salva Stone, with its consent, under color of official right.

All in violation of Title 18, United States Code, Section 1951.

## OBJECTS OF THE CONSPIRACY

265.    It was an object of the conspiracy that DIMORA solicited and accepted from Salva Stone things of value, to include free and discounted home improvements and materials, in return for DIMORA using his County position to benefit Valentin's friend with an immigration issue.

266.    It was a further object of the conspiracy that DIMORA and his co-conspirators concealed and attempted to conceal the bribes described in this Count of the Third Superseding Indictment from law enforcement and the public.

## MANNER AND MEANS

It was part of the conspiracy that:

267.    In or around 2007, DIMORA visited Salva Stone and selected granite for his residence.  There was no discussion about price or payment.

268.    In or around 2007, Salva Stone installed granite in DIMORA's residence.  Salva Stone did not bill DIMORA for the work and did not expect payment for the work.

269.    On or about May 3, 2007, DIMORA caused a federal official to correspond with the Embassy of the United States in Bucharest, Romania, related to a non-immigrant visa application submitted by Valentin's friends.

270.    In or around Spring 2008, Salva Stone performed work at DIMORA's residence. Salva Stone did not bill DIMORA for the work and did not expect payment for the work.

271.    On or about May 23, 2008, after DIMORA learned the Federal Bureau of Investigation ("FBI") was investigating Steven Pumper, DIMORA caused a personal check on his bank account to be written payable to Salva Stone in the amount of $250, which Valentin caused

72

to be deposited on or about June 6, 2008.  The amount of the check did not cover the total value of the work performed at the DIMORA residence.

All in violation of Title 18, United States Code, Section 1951.

The Grand Jury further charges:

COUNT 11
(Hobbs Act, 18 U.S.C. § 1951)

272.     Paragraphs 1, 3, 4, 6, 7, 24, 30 and 77 of this Third Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

273.     Beginning in or around 2007 and continuing until on or about June 6, 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES DIMORA did knowingly obstruct, delay and affect and attempt to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is, DIMORA obtained property not due to him or his office, namely, free and discounted home improvements and materials, from Salva Stone and John Valentin, with their consent, under color of official right.

All in violation of Title18 United States Code, Section 1951.

The Grand Jury further charges:

COUNT 12
(Hobbs Act Conspiracy, 18 U.S.C. § 1951)

274.     Paragraphs 1, 3, 4, 6, 7, 12, 26, 30, 50 and 78 of this Third Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

73

275.    Beginning in or around 2001 and continuing until on or about May 30, 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES DIMORA, and Nicholas Zavarella (not charged herein), and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree with each other to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is, DIMORA obtained property not due to him or his office, from ZBC, with its consent, under color of official right.

## OBJECTS OF THE CONSPIRACY

276.    It was an object of the conspiracy that DIMORA solicited and accepted from ZBC things of value, to include free and discounted home improvements and materials, in return for DIMORA using his County position to benefit Zavarella, Zavarella's relative, and others, both as requested and as future opportunities arose.

277.    It was a further object of the conspiracy that DIMORA and his co-conspirators concealed and attempted to conceal the bribes described in this Count of the Third Superseding Indictment from law enforcement and the public.

## MANNER AND MEANS

It was part of the conspiracy that:

278.    In or around 2001, DIMORA assisted a relative of Zavarella in obtaining a job with the County.

279.    In or around 2002, DIMORA asked Zavarella to have ZBC perform work at DIMORA's residence.  DIMORA did not ask for a quote and did not offer to pay for the work.

74

ZBC performed the work, but neither ZBC nor Zavarella billed DIMORA for the work.

280.    In or around 2004, DIMORA asked Zavarella to have ZBC perform work at DIMORA's residence.  Zavarella and DIMORA did not discuss payment.  ZBC performed the work, but neither ZBC nor Zavarella billed DIMORA for the work.

281.    In or around late 2005 or early 2006, DIMORA agreed to help Zavarella's relative obtain a teaching job in School District 1.  Zavarella's relative began teaching in School District 1 in early 2006 as a substitute.

282.    On or about April 26, 2007, DIMORA caused a reference letter for Zavarella's relative, bearing his signature on County Commissioners' letterhead to be sent to School District 2.  Zavarella's relative began teaching in School District 2 in the Fall of 2007.

283.    In or around 2007, DIMORA asked Zavarella to have ZBC perform work at DIMORA's residence.  Zavarella and DIMORA did not discuss payment.  ZBC performed the work, but neither ZBC nor Zavarella billed DIMORA for the work.

284.    On or about March 24, 2008, Zavarella called DIMORA to express his concern about the possibility that a proposed County construction project was being undermined. Zavarella explained that ZBC would be obtaining subcontract work on the project and that Zavarella was working with a contractor on budget numbers.  DIMORA said he would have his assistant "snoop around."

285.    On or about March 24, 2008, DIMORA called PE11 and asked that PE11 investigate the matter about which Zavarella had inquired.

75

286.     Beginning on or about May 23, 2008, DIMORA attempted to conceal from law enforcement and the public the fact that DIMORA had not paid for the work performed by ZBC.

287.     On or about May 23, 2008, DIMORA caused a personal check on Lori and JAMES DIMORA's personal checking account to be written payable to ZBC in the amount of $500.

288.     On or about May 28, 2008, DIMORA asked Zavarella to send DIMORA a bill for the work ZBC had performed at DIMORA's residence.  DIMORA told Zavarella that something was happening and DIMORA did not want Zavarella to get involved because Zavarella did not do County work.

289.     On or about May 30, 2008, Zavarella caused to be sent an invoice to DIMORA falsely stating that $6,687 worth of work had been completed "as of 3/31/08."

All in violation of Title 18, United States Code, Section 1951.

The Grand Jury further charges:

COUNT 13
(Hobbs Act, 18 U.S.C. § 1951)

290.     Paragraphs 1, 3, 4, 6, 7, 26, 30 and 78 of this Third Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

291.     Beginning in or around 2001 and continuing until on or about May 30, 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES DIMORA, did knowingly obstruct, delay and affect and attempt to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is, DIMORA obtained property not due to him or his office, namely,

free and discounted home improvements and materials, from ZBC and Nicholas Zavarella, with their consent, under color of official right.

All in violation of Title 18, United States Code, Section 1951.

The Grand Jury further charges:

COUNT 14
(Hobbs Act Conspiracy, 18 U.S.C. § 1951)

292.    Paragraphs 1, 3, 4, 7, 8, 19, 22, 23, 28, 30, 43, 53, 59, 65, 80 and 166 of this Third Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

INTRODUCTION

293.    On or about December 13, 2007, the County Commissioners issued RFPs for various portions of the JJC project.

294.    On or about February 22, 2008, Reliance Mechanical submitted bids in response to the County's RFP for the HVAC and plumbing portion of the JJC project.

295.    On or about March 13, 2008, the County Commissioners voted to reject all bids received for the plumbing portion (and other portions) of the JJC and ordered that the plumbing portion (and other portions) be rebid.

296.    On or about April 7, 2008, Reliance Mechanical submitted a second bid for the plumbing portions of the JJC project.

297.    In or around early 2008, Neiheiser sought to obtain a lease for an ice skating rink between the City of Lakewood and Winterhurst.  On or about June 6, 2008, the City of Lakewood entered into the lease with Winterhurst.

77

## THE CONSPIRACY

298.    Beginning in or around Fall 2007 and continuing until in or around June 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendants JAMES C. DIMORA and William N. Neiheiser (not charged herein), and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree with each other to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is, DIMORA obtained property not due to him or his office, from Reliance Mechanical, with its consent, under color of official right.

## OBJECT OF THE CONSPIRACY

299.    It was the object of the conspiracy that DIMORA solicited and accepted things of value, including free and discounted home improvements and materials, from Reliance Mechanical, in return for DIMORA using his County position to benefit Neiheiser, Reliance Mechanical and Winterhurst, both as requested and as future opportunities arose.

300.    It was a further object of the conspiracy that DIMORA and his co-conspirators concealed and attempted to conceal the bribes described in this Count of the Third Superseding Indictment from law enforcement and the public.

## MANNER AND MEANS

It was part of the conspiracy that:

301.    In or around Fall 2007, Neiheiser caused Reliance Mechanical to perform free and discounted home improvements at DIMORA's residence.

78

302.    On or about February 11, 2008, DIMORA and Neiheiser spoke about the JJC project.  Neiheiser mentioned that the County Commissioners threw out the low bid for the structural steel portion of the JJC project based on technicalities.  Neiheiser told DIMORA that when Reliance Mechanical has the low bid, "Don't f--k it up," because when Reliance Mechanical wins the bid they (DIMORA and Neiheiser) could "have fun for two years."  DIMORA replied, "Good," and that he hoped Reliance Mechanical was the low bid.

303.    On or about February 16, 2008, DIMORA purchased a Chris "Beanie" Wells football jersey at the Cornerstone of Hope charity auction for approximately $3,600.

304.    On or about February 22, 2008, BE10 and DIMORA discussed the JJC bids, including Reliance Mechanical not being the low bidder by "a couple million dollars."  DIMORA said, "There's no way we could do him if he's that far off."  BE10 stated that he was going to call Neiheiser.  DIMORA told BE10, "Just make sure he [Neiheiser] remembers about my 3,600."  BE10 responded, "That we'll take care of.  May, maybe he threw it in the bid."  They both laughed.

305.    On or about March 6, 2008 at approximately 5:08 p.m., DIMORA told PE18 to get Neiheiser on the phone or leave Neiheiser a message to call DIMORA.

306.    On or about March 6, 2008 at approximately 5:10 p.m., DIMORA told PE27 to retrieve documents related to the JJC from DIMORA's desk and bring them to DIMORA, who was by Frank Russo's office.

307.    On or about March 6, 2008 at approximately 5:11 p.m, DIMORA told Neiheiser he would be at Delmonico's restaurant from 6:00 p.m. to 9:00 p.m.  Neiheiser said he would stop by

and have a drink.  Neiheiser said that he would pay for the Wells jersey if DIMORA bought the drink.  DIMORA replied, "Deal."  They both laughed.

308.    On or about March 6, 2008 at approximately 8:15 p.m., DIMORA spoke to PO14, who said, "I heard you were lookin' for me."  DIMORA replied, "Yeah.  I was sittin' here with a friend of mine who's been tryin' to get ahold of you and talk to you about your ice rink.  He wants, wants to make a proposal to you uh that he thinks'll be advantageous to the City and to, to you if uh you wanted to talk to him and I mean the guy's. . . ."  PO14 asked if it was Neiheiser.  DIMORA confirmed it was.  PO14 said that he has been unable to return Neiheiser's call because PO14 had been in union negotiations.  PO14 told DIMORA that PO14 would "be more than happy to talk to the guy."  DIMORA said, "Okay.  Um, you want me to tell, I'm just, I'm sittin' next to him here but he can't hear me.  Do you want me to tell him like you'll call him next week or. . . ."  PO14 told DIMORA to have Neiheiser call him at 9:30 the following morning and PO14 will "make time . . . I'll make time . . . I'll make time to talk to him."  DIMORA told PO14, "If there's anything we can do, uh, let us know, you know, uh, any help we can provide."

309.    On or about March 6, 2008 at approximately 9:06 p.m., DIMORA told BE10 that Kelley, Neiheiser, Neiheiser's acquaintance and his acquaintance's daughter, Gabor and others were with DIMORA at Delmonico's restaurant.  DIMORA told BE10, "Billy [Neiheiser] just left."  BE10 asked, "Hey, did my guy [Neiheiser], when he stopped by there, took care of business didn't he?"  DIMORA replied, "I just told you he took care of more than me."  BE10 responded, "Beautiful."

All in violation of Title 18, United States Code, Section 1951.

80

The Grand Jury further charges:

COUNT 15
(Hobbs Act, 18 U.S.C. § 1951)

310.     Paragraphs 1, 3, 4, 6, 7, 22, 23, 30, 65 and 66 of this Third Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

311.     Beginning in or around Fall 2007 and continuing until in or around June 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES C. DIMORA did knowingly obstruct, delay and affect and attempt to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is, DIMORA obtained property not due to him or his office, namely, free and discounted home improvements and materials and financial assistance, from William Neiheiser and Reliance Mechanical, with their consent, under color of official right.

All in violation of Title 18, United States Code, Section 1951.

The Grand Jury further charges:

COUNT 16
(Conspiracy to Commit Wire Fraud and Honest Services Wire Fraud, 18 U.S.C. §§ 1343 and
1346, in violation of 18 U.S.C. § 1349 )

312.     Paragraphs 1, 3, 4, 19, 22, 28, 30-32, 34, 43, 53, 59, 65, 80, 166, and 293-97 of this Third Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

81

## THE CONSPIRACY

313.    From in or around Fall 2007 through in or around May 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendants JAMES C. DIMORA and William Neiheiser (not charged herein), and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree with each other to commit offenses against the United States; that is, to knowingly devise and intend to devise a scheme and artifice:

> (1) to defraud and deprive Cuyahoga County and its citizens of their right to the honest and faithful services of DIMORA, through bribery and kickbacks and the concealment of material information related thereto, and

> (2) to defraud Cuyahoga County and certain contractors and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises,

and for the purpose of executing such scheme and artifice, to cause to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Sections 1343 and 1346.

## OBJECT OF THE CONSPIRACY

314.    It was the object of the conspiracy that DIMORA, with BE10's assistance, secretly used his official position to enrich himself by soliciting and accepting gifts, payments, and other things of value from Neiheiser and Reliance Mechanical, in exchange for favorable official action, and that Neiheiser enriched himself, Reliance Mechanical and Winterhurst by secretly obtaining favorable official action for themselves through corrupt means.

82

<u>MANNER AND MEANS</u>

It was part of the conspiracy that:

315.    Neiheiser and Reliance Mechanical gave and offered to give DIMORA gifts, payments, and other things of value, and in exchange, DIMORA provided favorable official action for the benefit of Neiheiser, Reliance Mechanical and Winterhurst both as requested and as future opportunities arose.

316.    DIMORA attempted to deprive the County and certain contractors of money and property and to give Reliance Mechanical and Neiheiser a financial benefit by taking official action related to the award and administration of public business, based on Neiheiser and Reliance Mechanical offering and giving things of value to DIMORA and not based on merit.

317.    The conspirators took steps to hide, conceal, and cover up their activity and the nature and scope of Neiheiser's dealings with DIMORA.

318.    At times, Gabor and BE10 served as an intermediary between DIMORA and Neiheiser.

<u>Acts in furtherance of the conspiracy</u>

319.    In or around Fall 2007, Neiheiser caused Reliance Mechanical to perform free and discounted home improvements at DIMORA's residence.

320.    On or about February 11, 2008, DIMORA and Neiheiser spoke about the JJC project.  Neiheiser mentioned that the County Commissioners threw out the low bid for the structural steel portion of the JJC project based on technicalities.  Neiheiser told DIMORA that when Reliance Mechanical has the low bid, "Don't f--k it up," because when Reliance Mechanical

83

wins the bid they (DIMORA and Neiheiser) could "have fun for two years."  DIMORA replied,

"Good," and that he hoped Reliance Mechanical was the low bid.

321.    On or about February 16, 2008, DIMORA purchased a Chris "Beanie" Wells

football jersey at the Cornerstone of Hope charity auction for approximately $3,600.

322.    On or about February 17, 2008, DIMORA spoke to BE10 about the Wells football

jersey Dimora purchased the previous evening.  DIMORA complained that Neiheiser had

convinced DIMORA to purchase the jersey.  DIMORA also indicated that Neiheiser agreed to pay

for half the jersey.  DIMORA, imitating Neiheiser, said, "I [Neiheiser] got your back, I'm, I'm in

for half."  DIMORA then questioned, "What are we [DIMORA and Neiheiser] gonna do, rotate it

every week?"  BE10 responded by telling DIMORA to sell the jersey to Neiheiser.

323.    On or about February 22, 2008, BE10 and DIMORA discussed the JJC project,

including Reliance Mechanical not being the low bidder by "a couple million dollars."  DIMORA

said, "There's no way we could do him if he's that far off."  BE10 stated that he was going to call

Neiheiser.  DIMORA told BE10, "Just make sure he [Neiheiser] remembers about my 3,600."

BE10 responded, "That we'll take care of.  May, maybe he threw it in the bid."  They both

laughed.

324.    On or about March 2, 2008, BE10 told DIMORA he recently exchanged calls with

Neiheiser.  BE10 then said, "Your buddy's [Neiheiser] comin' on an airplane tomorrow.  He's

gonna call you and come see you."  BE10 then clarified who he was referring to and stated, "My

friend in the mechanical business who erred in judgment.  Who now wants to con, fix his error in

judgment."  DIMORA asked how Neiheiser was going to "fix it."  BE10 replied, "He's gonna fix

84

it the only way he possibly can." DIMORA then asked if he was supposed to meet with Neiheiser. BE10 told DIMORA, "He'll come see you." DIMORA and BE10 then discussed Reliance Mechanical's bid for work at the JJC. DIMORA informed BE10 that Reliance Mechanical was $2 million higher than the low bidder and inquired, "How could you be two million off?" BE10 agreed two million was a lot of money. BE10, who was in Florida at the time of the telephone call, told DIMORA he was staying in Florida a couple of extra days. DIMORA and BE10 then discussed throwing out all the bids for the JJC because the proposals submitted for the general trades portion were all significantly over budget.

325.   On or about March 3, 2008, BE10, from Florida, called DIMORA in Ohio. After initially discussing the weather in Florida, BE10 asked DIMORA, "Did that clown call you today yet?" DIMORA verified that BE10 was referring to Neiheiser and told BE10 he had spoken with Neiheiser and they (DIMORA and Neiheiser) were going to "hook up" the following day. BE10 then suggested that Neiheiser was "feelin' the pressure" because Reliance Mechanical was not the low bidder on the JJC. DIMORA told BE10 that he had spoken to the Construction Manager and suggested throwing out the bids. BE10 agreed and later responded that he wants to make sure Neiheiser takes care of business. That's all I care about. DIMORA replied that tomorrow, hopefully I'm going to see him.

326.   On or about March 6, 2008 at approximately 5:08 p.m., DIMORA told PE18 to get Neiheiser on the phone or leave Neiheiser a message to call DIMORA.

85

327.    On or about March 6, 2008 at approximately 5:10 p.m., DIMORA told PE27 to retrieve documents related to the JJC from DIMORA's desk and bring them to DIMORA, who was by Frank Russo's office.

328.    On or about March 6, 2008 at approximately 5:11 p.m, DIMORA told Neiheiser he would be at Delmonico's restaurant from 6:00 p.m. to 9:00 p.m. Neiheiser said he would stop by and have a drink.  Neiheiser said that he would pay for the Wells jersey if DIMORA bought the drink.  DIMORA replied, "Deal."  They both laughed.

329.    On or about March 6, 2008 at approximately 8:15 p.m., DIMORA spoke to PO14, who said, "I heard you were lookin' for me."  DIMORA replied, "Yeah.  I was sittin' here with a friend of mine who's been tryin' to get ahold of you and talk to you about your ice rink.  He wants, wants to make a proposal to you uh that he thinks'll be advantageous to the City and to, to you if uh you wanted to talk to him and I mean the guy's. . . ."  PO14 asked if it was Neiheiser.  DIMORA confirmed it was.  PO14 said that he has been unable to return Neiheiser's call because PO14 had been in union negotiations.  PO14 told DIMORA that PO14 would "be more than happy to talk to the guy."  DIMORA said, "Okay.  Um, you want me to tell, I'm just, I'm sittin' next to him here but he can't hear me.  Do you want me to tell him like you'll call him next week or. . . ."  PO14 told DIMORA to have Neiheiser call him at 9:30 the following morning and PO14 will "make time . . . I'll make time . . . I'll make time to talk to him."  DIMORA told PO14, "If there's anything we can do, uh, let us know, you know, uh, any help we can provide."

330.    On or about March 6, 2008 at approximately 9:06 p.m., DIMORA told BE10 that Kelley, Neiheiser, Neiheiser's acquaintance and his acquaintance's daughter, Gabor and others

were with DIMORA at Delmonico's restaurant.  DIMORA told BE10, "Billy [Neiheiser] just left."  BE10 asked, "Hey, did my guy [Neiheiser], when he stopped by there, took care of business didn't he?"  DIMORA replied, "I just told you he took care of more than me."  BE10 responded, "Beautiful."

331.    On or about March 7, 2008, DIMORA told BE10 that Neiheiser wanted to take DIMORA on a trip to Atlantic City.  DIMORA asked BE10 if he (DIMORA) should go.  BE10 questioned, "On Good Friday?"  DIMORA confirmed they would travel on Good Friday.  BE10 told DIMORA to use his judgment and cautioned DIMORA, as long as you go with Neiheiser, you might as well "publish it on CNN."  BE10 said, "Oh my God, JIMMY.  God love him he can't shut his f--in' mouth. I mean he's brutal."  DIMORA said that is why he is nervous.

332.    On or about March 11, 2008, DIMORA caused to be deposited into his joint checking account, a check in the amount of $3,600 drawn on Neiheiser's account and made payable to Lori Dimora, who was DIMORA's wife.

333.    On or about March 12, 2008, DIMORA asked Gabor to call Neiheiser regarding the Atlantic City trip.  Neiheiser wanted five people to fill the plane, and they discussed possible travel companions.

334.    On or about March 19, 2008, DIMORA confirmed that Russo definitely did not want to go to Atlantic City.  Russo expressed concern about going on the trip because the media had been inquiring about Vince Russo.  DIMORA said that it was not worth it, considering their upcoming trip to Las Vegas.  Russo was concerned that they would blow a couple thousand and then would be disappointed when they did not have that money in Las Vegas.  Russo suggested

that DIMORA tell Neiheiser to hire a limo to drive them to Mountaineer casino.

335.    On or about April 4, 2008, Neiheiser told DIMORA that Russo wanted to go but DIMORA wouldn't let him go.  DIMORA laughed and said, "I wouldn't let him go?"  Neiheiser responded, "He said yeah, JIMMY's squished the trip."  DIMORA said, "Oh, he didn't wanna go. I was the only one . . . me and Michael [Gabor] were the only two that wanted to go. . . . but let's do it again.  Let's you know, we're going in uh, uh . . . Vegas."  Neiheiser told DIMORA to have fun in Las Vegas, "get your money back and then we'll reload the trip and we'll go up to the East Coast some time in the Spring."  DIMORA replied, "Definitely, please."

336.    On or about May 5, 2008, BE10 told DIMORA, "Neiheiser said he might wanna stop out tomorrow night.  So . . . maybe I'll give you a jingle," and then added, "That's a major sponsor.  That's serious."  DIMORA responded, laughing, "I know."

<u>EXECUTION OF THE SCHEME</u>

337.    On or about the dates listed below, in the Northern District of Ohio and elsewhere, DIMORA, Neiheiser and others, for the purpose of executing the above-described scheme and artifice, caused to be transmitted by means of wire communication, in interstate commerce, writings, signs, signals, pictures, and sounds, including the following:

88

| Date | Description |
|------|-------------|
| February 17, 2008 | Telephone call from BE10 in Florida to DIMORA in the Northern District of Ohio. |
| March 2, 2008 | Telephone call from BE10 in Florida to DIMORA in the Northern District of Ohio. |
| March 3, 2008 | Telephone call from BE10 in Florida to DIMORA in the Northern District of Ohio. |

All in violation of Title 18, United States Code, Section 1349.

The Grand Jury further charges:

<u>COUNT 17</u>
(Conspiracy to Commit Bribery Concerning Programs Receiving Federal Funds,
18 U.S.C. § 371)

338.    Paragraphs 1, 3, 4, 15, 18, 27, 30, 32, 33, 40, 49, 50, 53, 54, 60, 74, 79, and 82 of this Third Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

<u>GENERAL ALLEGATIONS</u>

339.    At all times relevant, Pumper and DAS participated in renovating the Parkview Apartments (the former Allerton Hotel) located in downtown Cleveland, Ohio for low income housing.  Pumper also had a financial interest in the project which was financed by HUD, County loans and other means.

340.    At all times relevant, the County was a government agency as that term is defined in Title 18, United States Code, Section 666(d)(2).  The County received benefits in excess of $10,000 during the years July 31, 2004 through July 30, 2005, July 31, 2005 through July 30, 2006, July 31, 2006, through July 30, 2007, and July 31, 2007 through July 30, 2008 under a

89

Federal program involving a grant, contract, subsidy, loan, guarantee, insurance and other form of Federal assistance.

### THE CONSPIRACY

341.    Beginning in or around 2004 and continuing until on or about July 28, 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendants JAMES C. DIMORA and MICHAEL D. GABOR, and Steven Pumper (not charged herein) and others known and unknown to the Grand Jury, did knowingly and intentionally conspire, combine, confederate and agree to commit an offense against the United States, that is bribery concerning programs receiving federal funds, in violation of Title 18, United States Code, Sections 666(a)(1)(B) and (a)(2).

### OBJECTS OF THE CONSPIRACY

342.    It was an object of the conspiracy that DIMORA, assisted by GABOR in some instances, corruptly solicited and accepted for the benefit of any person things of value from Pumper, DAS, DAS Development and Green-Source, DIMORA and GABOR acting with the intent that DIMORA be influenced and rewarded in connection with a business, transaction and series of transactions of the County valued at $5,000 or more in each of the years July 31, 2004 through July 30, 2005, July 31, 2005 through July 30, 2006, July 31, 2006, through July 30, 2007, and July 31, 2007 through July 30, 2008.  The things of value included, among other things, free and discounted home improvements, cash, meals, commissions and entertainment.  The County business included County real estate projects, real estate acquisitions, the award and

administration of construction projects, loans, judicial proceedings and other County business, both as requested and as future opportunities arose.

343.     It was a further object of the conspiracy that Pumper, DAS, DAS Development and Green-Source, with the assistance of GABOR in some instances, corruptly gave, offered and agreed to give to DIMORA things of value, GABOR, Pumper, DAS, DAS Development and Green-Source, acting corruptly with the intent to influence and reward DIMORA in connection with the business, transaction and series of transactions alleged in paragraph 342.

344.     It was a further object of the conspiracy that Pumper used his access to DIMORA to ingratiate himself with others in an effort to advance Pumper's interests.

345.     It was a further object of the conspiracy that DIMORA and his co-conspirators concealed, attempted to conceal and encouraged others to conceal from the public and from law enforcement his corrupt relationship with Pumper.

## MANNER AND MEANS

It was part of the conspiracy that:

346.     In or around 2004 and 2005, DIMORA requested that Pumper construct a large roof over a patio and a bathhouse at DIMORA's residence.  Pumper arranged for DAS to perform the work, valued at approximately $31,977 (above and beyond amounts DIMORA paid directly to DAS suppliers and subcontractors).  DAS did not bill DIMORA for the work DAS performed and caused to be performed, and DIMORA did not pay for that work in 2004 or 2005.

347.     In or around the Fall of 2004, DIMORA agreed to assist Pumper in obtaining for DAS a County construction management contract valued at approximately $24,842.

91

348.    On or about September 26, 2006, BE8 offered to sell a parking garage to the County for approximately $5,250,000.  Sometime in 2006, the exact date unknown to the Grand Jury, BE8 asked Pumper to assist BE8 with problems that were delaying BE8's sale of the parking garage to the County.  Pumper offered DIMORA approximately $35,000 in cash if DIMORA facilitated the sale.  DIMORA agreed and accepted approximately $33,000 in cash from Pumper in installments ending in approximately May 2008.

349.    From on or about October 23, 2006 to in or around March 2008, DIMORA used his influence to assist Pumper in obtaining County loans for the redevelopment of the Parkview Apartments (hereinafter "Parkview loan") and an extension on the Parkview loan.

350.    In or around 2007, DIMORA requested that Pumper construct a grill area, barbecue shelter, patio floor and roof at DIMORA's residence.  Pumper caused DAS to perform the work, valued at approximately $27,225 (above and beyond amounts DIMORA paid directly to DAS suppliers and subcontractors).  DAS did not bill DIMORA for the work DAS performed and caused to be performed, and DIMORA did not pay for that work in 2007.

351.    Sometime between in or around June 2007 and December 2007, DIMORA, at Pumper's request, called the chambers of PO8, the judge assigned to Pumper's divorce case.

352.    Beginning at a time unknown to the Grand Jury and continuing through 2008, BE8 sought HUD financing for rehabilitating two apartment buildings he owned on the west side of Cleveland.  He also sought a HUD commitment guaranteeing HUD-subsidized tenants.  BE8 asked Pumper, who expected DAS would obtain the construction work on the rehabilitation project, to obtain DIMORA's assistance with HUD.  Specifically, BE8 wanted DIMORA to

influence two federal officials' offices to intercede with HUD on BE8's behalf.  Pumper agreed to

approach DIMORA.  Between on or about February 12, 2008 and on or about May 6, 2008, and at

Pumper's request, DIMORA agreed to assist and caused his staff to make calls to two federal

officials' offices.

353.    From approximately December 2007 or January 2008, through in or around March

or April 2008, the exact dates unknown to the Grand Jury, DIMORA, Pumper and GABOR

agreed to assist Green-Source in its efforts to obtain public and private contracts and subcontracts.

DIMORA, Pumper and GABOR contemplated that GABOR and DIMORA would be

compensated for their efforts.

354.    From on or about December 18, 2007 through on or about April 9, 2008, DIMORA

used his official influence to support an application for an approximately $200,000 "Brownfield"

loan and an approximately $800,000 Economic Redevelopment Loan for the Green-Source

building on Ivanhoe Road in Cleveland, Ohio.

355.    On or about January 4, 2008, at the request of Pumper, DIMORA recommended to

BE7 that Business 5 use DAS as a preferred contractor on two downtown Cleveland development

projects, both of which projects involved the County.

356.    In or around April 2008, DIMORA contacted Judge Bridget McCafferty and her

staff in an attempt to influence her in Pumper's favor regarding a case in which DAS was a party

(hereinafter "the DAS case").

357.    On or about May 23, 2008, when DIMORA learned that Pumper was under federal

investigation for bribing PE37, a City of Cleveland building inspector, DIMORA caused to be

written the first in a series of checks payable to DAS for the work DAS had performed on his residence in prior years.

358.    On or about May 25, 2008, Pumper created a Construction Agreement purporting to reflect a verbal agreement of October 10, 2005 between DIMORA and DAS for work DAS performed at the DIMORA residence, and arranged to have the Construction Agreement delivered to DIMORA through GABOR.

359.    On numerous occasions during times material to this Count of the Third Superseding Indictment, Pumper paid and caused DAS and DAS Development to pay for entertainment, dinners and drinks for DIMORA and his friends and family.

<u>OVERT ACTS</u>

360.    In furtherance of the conspiracy, and to effect the objects thereof, DIMORA, GABOR, Pumper and others committed the following overt acts in the Northern District of Ohio and elsewhere:

A.    On or about October 7, 2004, Pumper caused DAS to purchase supplies for use at the DIMORA residence.

B.    On or about November 16, 2004, DIMORA voted to approve a County Department of Central Services contract with DAS in the amount of approximately $24,842 for consultant engineering services on the Courthouse Square Renovation Project.

C.    On or about November 17, 2005, Pumper caused DAS to purchase supplies for use at the DIMORA residence.

94

D.     On or about October 23, 2006, DIMORA voted to recommend two Brownfield Redevelopment Fund loans, each in an amount not-to-exceed $1,000,000 for the Parkview Apartment Project.

E.     On or about March 20, 2007, Pumper caused DAS Development to distribute to DIMORA eight tickets for the March 25, 2007 Cleveland Cavaliers game, the tickets valued at approximately $2,400.

F.     On or about May 23, 2007, DIMORA instructed County staff to place the purchase of the BE8 parking garage on the agenda for Tuesday, May 29, 2007.

G.     On or about May 29, 2007, DIMORA voted to approve the County's purchase of BE8's parking garage for approximately $5,145,000.

H.     On or about June 27, 2007, Pumper caused DAS to pay a contractor $1,250 for work done on the DIMORA residence.

I.     On or about September 1, 2007, Pumper caused DAS Development to distribute to DIMORA tickets to a Cleveland Indians game.

J.     On or about December 15, 2007, GABOR said to Pumper that GABOR's employment at Green-Source would be great for "everybody."

K.     On or about December 17, 2007, Pumper informed DIMORA he had tickets for him to a Cleveland Cavaliers game.

L.     On or about December 20, 2007, Pumper caused DAS Development to distribute to DIMORA four tickets for the December 20, 2007 Cleveland Cavaliers game, the tickets valued at approximately $780.

95

M.     On or about January 4, 2008, as part of Pumper's efforts to have DIMORA

assist DAS obtaining contracts with BE7's company, Pumper told BE7, "I was just talking to

[DIMORA] the other day and we wanted to grab some lunch with you or dinner and wanted to see

how your schedule was coming up next week and uh, so I can coordinate that with him so." BE7

asked what was "going on" with DIMORA.  Pumper replied, "Uh, just you know, with the County

stuff and you know, just you know, he just wants to break a lil' bread with you a lil' bit.  So . . .

we wanted to try to do that sometime next week if that's possible."  Pumper and BE7 agreed to

coordinate it with DIMORA.

N.     On or about January 8, 2008, DIMORA voted to authorize the County

Department of Development to issue to "1170 Ivanhoe, LLC for various projects, located at 1170

Ivanhoe Road, Cleveland [the Green-Source building]" loans "a) in the amount not-to-exceed

$200,000 for a Brownfield Redevelopment Fund Project, b) in the amount not-to-exceed $800,000

for a Commercial Redevelopment Fund Project."

O.     On or about January 15, 2008, Pumper signed a purchase order authorizing

DAS to pay Beacon Metal Fabricators approximately $7,500 for work that had been performed on

the DIMORA residence in 2007.

P.     On or about January 18, 2008 at approximately 3:34 p.m., GABOR and

Pumper discussed DIMORA approving GABOR's plan to work at Green-Source.

Q.     On or about January 18, 2008, Pumper met GABOR and DIMORA at

Green-Source for a walk-through.

R.      On or about January 19, 2008, GABOR and Pumper had a conversation in which GABOR told Pumper that DIMORA was "cool" with GABOR working at Green-Source. Pumper told GABOR that DIMORA should do what he could to help GABOR while DIMORA was "still in power." GABOR responded that DIMORA will be rewarded with it.

S.      On or about January 22, 2008, Pumper and GABOR talked about a possible public project for Green-Source in a Cuyahoga County suburb where GABOR's relative was a public official. Pumper and GABOR discussed how GABOR could earn commissions on the project. GABOR said, "Alright, well I mean I don't want to talk now but." Pumper attempted to interrupt and then GABOR said, "I'll treat him like JIM [DIMORA], you understand?"

T.      On or about February 4, 2008, Pumper told GABOR to relay a message to DIMORA that Pumper wanted DIMORA to ask the director of a County agency to do an official act in connection with Pumper's divorce.

U.      On or about February 6, 2008, GABOR told Pumper that DIMORA needed the case number and that DIMORA would call that day or the next.

V.      On or about February 8, 2008 at approximately 11:55 a.m., Pumper and GABOR discussed their plan to have DIMORA approach PE10 on Green-Source's behalf.

W.      On or about February 11, 2008 GABOR and PUMPER discussed their efforts to have DIMORA insert Green-Source products as a required part of the bid for a proposed County project.

X.     On or about February 20, 2008, GABOR and Pumper had a conversation in which GABOR reported that he had talked with DIMORA about getting Green-Source's products spec'd in the building.  GABOR said DIMORA offered to have lunch with PE10 and asked Pumper if he wanted to do that on Monday or Tuesday.

Y.     On or about February 27, 2008, DIMORA had a conversation with PE19 about Pumper needing an extension on the Parkview loan.  DIMORA sought advice from PE19 about which County officials the Parkview representatives should meet to discuss obtaining an extension.  PE19 named two individuals and asked if DIMORA wanted PE19 there.  DIMORA replied, "Well only because I'm sure they're not gonna be able to tell them yes or no on their request."  PE19 said, "If you don't mind, let me have my staff there and tell them they gotta report back to me, and then we can sit there and think about what we wanna do and I could be the prick if you need a prick."  DIMORA responded, "Okay.  Well I'm okay with givin' 'em the extension, uhm and again they're said they're willing to pay the interest on the extension they're not."  PE19 said the County had done that for a restaurant and affordable housing is an easier thing to do than a restaurant.  PE19 told Dimora, "You tell me where and when and I'll have 'em  there.  PE19 stated, "If it comes from you, it's even better than comin' from me."

Z.     On or about March 3, 2008 at approximately 4:34 p.m., DIMORA had a conversation with PE11 in which he expressed frustration that County employees had not yet scheduled the meeting on the Parkview extension.

AA.     On or about March 4, 2008, DIMORA wrote a note to PE11 and PE18 on a printed e-mail message about the Parkview extension instructing them to make sure Pumper was

"called on this meeting date and time above and that this is the meeting he wanted on the Allerton

Project, not Parkview Project, and advise me." He also wrote that he wanted two particular

County employees "in attendance" at the meeting.

BB.    On or about March 3, 2008 at approximately 2:38 p.m., PUMPER

discussed a potential Green-Source business lead with GABOR and said they do "retirement

facilities, which is perfect for Green-Source." PUMPER told GABOR, "What you want is for me

to hook up with you and maybe JIMMY and him, just have them start to put that stuff into play

for us." GABOR replied, "Ok, now wait, wait, wait a minute, why JIM [DIMORA]?" PUMPER

replied, "Well, because you know, [the business man] likes JIMMY [DIMORA], and you know

and maybe if [the business man] needs something he can talk to JIMMY, or something like that

you know." GABOR replied, "Ok," and confirmed that JIM [DIMORA] doesn't really have

anything to do with it. PUMPER stated, "Yeah, just to have 'em there."

CC.    On or about March 3, 2008 at approximately 4:26 p.m., Pumper had a

conversation with DIMORA in which Pumper mentioned an east side Neighborhood Family

Services Center ("ESNFSC") as being a perfect project for Green-Source. DIMORA explained

the positions various politicians were taking on the project and then said, that he will try and nail

it down and see where it's at. Pumper responded that as long as we know what direction it's

going and that way we can like have MICHAEL G (GABOR) over there, kinda contact the guys

and try to sit down with their architects.

DD.    On or about March 3, 2008 at approximately 4:42 p.m., PE11 reported to

DIMORA that there was no answer for the ESNFC.

EE.    On or about March 5, 2008, DIMORA and Pumper had a conversation in which DIMORA told Pumper the meeting with Parkview/Allerton representatives had been scheduled for March 10th.  Pumper told DIMORA that he needed the loan moved out about five to ten years.  DIMORA replied, "Five?" and said that he told them maybe one or two.  DIMORA then stated, "Well have the meeting and then let me see what I, you know, what I can do with it."

FF.    On or about March 10, 2008, Pumper met with County employees to discuss an extension of the Parkview loan.

GG.    On or about March 12, 2008, Pumper, DIMORA and GABOR met with PE10 at Delmonico's restaurant to promote Green-Source products for the JJC.

HH.    On or about March 14, 2008 at approximately 8:08 a.m., Pumper had a conversation with a Green-Source employee about DIMORA's influence over PE10 with respect to the JJC.

II.    On or about Friday, March 14, 2008, Pumper gave PE10 a tour of Green-Source.

JJ.    On or about March 14, 2008 at approximately 10:59 a.m., GABOR and Pumper discussed DIMORA's role in assisting Green-Source with the JJC.

KK.    On or about March 16, 2008, PUMPER and GABOR had a conversation about whether they needed DIMORA to do anything to assist Green-Source regarding a pending County project.

100

LL.    On or about March 21, 2008, GABOR and Pumper had a conversation about DIMORA's concerns regarding GABOR's attendance at a meeting that DIMORA was arranging for Pumper and BE25 regarding Green-Source working on the JJC.

MM.    On or about March 26, 2008 at approximately 1:03 p.m., GABOR and Pumper had a conversation in which Pumper stated that he was working on the addendum for the JJC.

NN.    On or about March 26, 2008 at approximately 11:58 a.m., Pumper and DIMORA had a conversation in which Pumper asked DIMORA about union reaction to Green-Source products in the JJC.

OO.    On or about March 26, 2008, DIMORA told Pumper that he saw the County had given a three-year extension on the Parkview loan.  Pumper thanked DIMORA who responded,  "Yeah, so that worked out good."

PP.    On or about March 31, 2008 at approximately 3:44 p.m., DIMORA told PE18 that Steve Pumper wants a meeting with [BE25 regarding Green-Source]. DIMORA asked PE18 to try and schedule the meeting for the following day at Delmonico's.

QQ.    On or about March 31, 2008 at approximately 5:15 p.m., Pumper asked DIMORA what he was doing.  DIMORA replied in a jocular manner, "Oh what the f--k, I'm doing nothing, I'm trying to make calls, make a living, help my friends make more money than they already got."  Later in the conversation, DIMORA told Pumper that DIMORA was trying to arrange a meeting for the next day at Delmonico's restaurant with BE25.

101

RR.    On or about April 1, 2008 at approximately 9:00 a.m., BE25 and Pumper had a conversation about DIMORA asking BE25 to attend a meeting at Delmonico's restaurant regarding the JJC.  Pumper said, "We'll [DIMORA and I] guide you through a couple things and then we'll let you take it from there."

SS.    On or about April 1, 2008, Pumper, DIMORA and BE25 met at Delmonico's restaurant to discuss BE25 using Green-Source products for the JJC.

TT.    On or about April 2, 2008, BE25 and Pumper had a conversation in which BE25 said, "Just to let you know, in a follow up to yesterday, our team is writing the spec for you guys [Green-Source]."

UU.   On or about April 22, 2008, DIMORA and Pumper had a conversation in which DIMORA stated that DIMORA had a nice talk with Bridget (McCafferty) and would let Pumper know what was going on with that.

VV.   On or about April 28, 2008, DIMORA and Pumper had a conversation in which DIMORA told Pumper that McCafferty's bailiff would be calling Pumper to discuss the sub-contractor issue in the DAS case and to get the particulars to McCafferty's staff attorney to try to get the thing worked out for Pumper.  DIMORA said he had told the bailiff that he thought the other issue is okay, but I said if it's not, when he calls you, you can talk to him about that, too.  DIMORA said to let him know what's shaking after you talk to him.  If there's something more we need to do or I need to talk to somebody you know what I mean after you get the conversation and the opinion back.

102

WW.  On or about April 28, 2008, McCafferty had a private telephone conversation with Pumper about the DAS case, in which Pumper and McCafferty discussed the status of the case and McCafferty agreed to schedule a settlement conference.

XX.  On or about May 2, 2008, McCafferty and Pumper had a private telephone conversation about the DAS case in which McCafferty said, referring to a settlement conference she had held earlier in the day, "I know it's more than you wanted to pay but I hope you can live with it." Pumper replied, "You know what, I mean it's, you know we're gonna spend another 20,000, 30,000 getting this thing done anyhow." McCafferty stated, "I was trying to get it at 175 [$175,000.00], but I just couldn't get it done." Pumper replied, "Yeah, no that's okay. Listen, hey, you did a great job for me, so, um, I appreciate that." Later in the call, McCafferty stated that she would see Pumper soon, and Pumper replied, "Next fund raiser."

YY.  On or about May 28, 2008, five days after the FBI had confronted Pumper, DIMORA told BE29 to relay a message to Pumper about an invoice for work at DIMORA's residence. DIMORA said that he sent a check in, just so there is enough money on account towards the uh project. BE29 indicated that he would relay the message to Pumper.

All in violation of Title 18, United States Code, Section 371.

The Grand Jury further charges:

COUNT 18

(Bribery Concerning Programs Receiving Federal Funds, 18 U.S.C. §§ 666(a)(1)(B) and 2)

361.  Paragraphs 1, 3, 4, 15, 30, 45, 74, 79 and 339 of this Third Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

362.  At all times relevant, the County was a government agency as that term is defined

103

in Title 18, United States Code, Section 666(d)(2). The County received benefits in excess of

$10,000 during the year May 24, 2007 through May 23, 2008 under a Federal program involving a

grant, contract, subsidy, loan, guarantee, insurance and other form of Federal assistance.

363.    Beginning on or about May 24, 2007 and continuing until on or about May 23,

2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern

Division and elsewhere, Defendant JAMES C. DIMORA did corruptly solicit, demand, accept

and agree to accept for the benefit of any person things of value from Pumper, DAS, and DAS

Development, acting with the intent to be influenced and rewarded in connection with any

business, transaction and series of transactions of the County involving any thing of value of

$5,000 or more; that is, among other things, the Parkview loan extension, the County's purchase

of the BE8 parking garage, the DAS case, and Pumper's litigation in the Cuyahoga County

Domestic Relations Court.

All in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

The Grand Jury further charges:

## COUNT 19
(Bribery Concerning Programs Receiving Federal Funds,18 U.S.C. §§ 666(a)(1)(B) and 2)

364.    Paragraphs 1, 3, 4, 15, 18, 30, 32, 45, 74 and 166 of this Third Superseding

Indictment are re-alleged and incorporated by reference as if fully set forth herein.

365.    At all times relevant, the County was a government agency as that term is defined

in Title 18, United States Code, Section 666(d)(2). The County received benefits in excess of

$10,000 during the year October 1, 2007 through September 30, 2008 under a Federal program

involving a grant, contract, subsidy, loan, guarantee, insurance and other form of Federal assistance.

366.    Beginning in or around October 2007 and continuing until on or about May 23, 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES C. DIMORA, aided and abetted by Defendant MICHAEL D. GABOR, did corruptly solicit, demand, accept and agree to accept for the benefit of any person things of value from Pumper and Green-Source, acting with the intent to be influenced and rewarded in connection with any business, transaction and series of transactions of the County involving any thing of value of $5,000 or more; that is, among other things, the use of Green-Source products in the JJC project and other County-funded projects.

All in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.
The Grand Jury further charges:

<u>COUNT 20</u>
(Hobbs Act, 18 U.S.C. § 1951)

367.    Paragraphs 1, 3-7, 15, 16, 30, 74 and 75 of this Third Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

368.    From sometime in early 2004 and continuing through on or about July 28, 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES C. DIMORA did knowingly obstruct, delay and affect and attempt to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is DIMORA obtained property not due to him or his office,

105

namely, cash, free and discounted home improvements and materials, meals, sports tickets and

entertainment, from Steven Wayne Pumper, DAS, and DAS Development, with their consent,

under color of official right.

All in violation of Title 18, United States Code, Section 1951.

The Grand Jury further charges:

<u>COUNT 21</u>
(Hobbs Act Conspiracy, 18 U.S.C. §§ 1951 and 2)

369.    Paragraphs 1, 3, 4, 6, 7, 18, 30, 32 and 74 of this Third Superseding Indictment are

re-alleged and incorporated by reference as if fully set forth herein.

370.    At all times material hereto, the operations of Green-Source affected interstate

commerce.

371.    From in or around late 2006 and continuing through on or about early May 2008,

the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern

Division and elsewhere, Defendants JAMES C. DIMORA and MICHAEL D. GABOR, and others

known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire,

confederate and agree with each other to obstruct, delay and affect commerce and the movement

of articles and commodities in commerce, by extortion; that is, DIMORA and GABOR solicited

property for DIMORA not due to him or his office, namely, commissions, from Green-Source,

with its consent, under color of official right.

All in violation of Title 18, United States Code, Sections 1951 and 2.

The Grand Jury further charges:

## COUNT 22
(Hobbs Act Conspiracy, 18 U.S.C. § 1951)

372.    Paragraphs 1, 3, 4, 6, 7, 9, 25, 30, 53 and 73 of this Third Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

### THE CONSPIRACY

373.    Beginning in or around 2005 and continuing until in or around May 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES C. DIMORA and Anthony Melaragno (not charged herein) did knowingly and intentionally combine, conspire, confederate and agree with each other to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is, DIMORA obtained property not due to him or his office, namely, free and discounted home improvements and materials, from Vandra Brothers Construction Co., with its consent, under color of official right.

### OBJECTS OF THE CONSPIRACY

374.    It was an object of the conspiracy that DIMORA obtained and attempted to obtain things of value from Vandra Brothers, in return for DIMORA using his County position to benefit Melaragno, Vandra Brothers and Melaragno's designees, both as requested and as future opportunities arose.

375.    It was a further object of the conspiracy that DIMORA and his co-conspirators concealed and attempted to conceal the bribes described in this Count of the Third Superseding Indictment from law enforcement and the public.

<u>MANNER AND MEANS</u>

It was part of the conspiracy that:

376.    On or about September 1, 2005, the County Commissioners, DIMORA voting in favor, awarded Vandra Brothers a contract to repair and resurface St. Clair Avenue valued at approximately $5,935,639.98.

377.    In or around March 2006, DIMORA helped Melaragno's relative obtain employment in the Engineer's Office.

378.    In or around 2006, DIMORA asked Melaragno to install a concrete pad for an outdoor bathroom and a basketball court at DIMORA's residence.  Vandra Brothers performed the work requested.  Vandra Brothers did not receive payment for the work.

379.    On or about July 27, 2006, the County Commissioners, DIMORA voting in favor, awarded approximately $336,618.42 to Vandra Brothers in additional funds for repairing and resurfacing St. Clair Avenue from East 140th Street to the Cleveland East Corporation line.

380.    On or about December 21, 2006, the County Commissioners, DIMORA voting in favor, awarded a contract valued at approximately $4,926,211.50 to Vandra Brothers to repair and resurface Berea Road from Triskett Road to Detroit Avenue.

381.    In or around 2007, DIMORA asked Melaragno to pour concrete for footers for DIMORA's outside kitchen area.  Vandra Brothers performed the work requested.

382.    On or about May 2, 2008 at approximately 1:08 p.m., DIMORA asked PE18 for Melaragno's cell phone number.

383.    On or about May 2, 2008 at approximately 1:10 p.m., DIMORA told Melaragno that he needed to see him for about ten minutes.  Melaragno agreed to come to DIMORA's residence that afternoon.

384.    In or around May 2008, DIMORA told Melaragno that something was going on and asked Melaragno to send him a bill for the footer project.  DIMORA expressed concern and told Melaragno that someone was checking up on something and he (DIMORA) needed a bill.

385.    In or around May 2008, Melaragno sent DIMORA an invoice for work Vandra Brothers performed at DIMORA's residence.  The invoice was lower than the value of the work performed.

386.    On or about May 23, 2008, DIMORA caused to be written a check drawn on Lori and JAMES DIMORA's personal checking account made payable to Vandra Brothers for $300.

All in violation of Title 18, United States Code, Section 1951.

The Grand Jury further charges:

## COUNT 23
(Hobbs Act, 18 U.S.C. § 1951)

387.    Paragraphs 1, 3, 4, 6, 7, 9, 25, 30 and 73 of this Third Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

388.    From in or around 2005 through in or around May 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES C. DIMORA did knowingly obstruct, delay and affect and attempt to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is DIMORA obtained property not due to him or his office, namely free and

discounted home improvements, labor and materials, from Anthony Melaragno and Vandra Brothers Construction, with their consent, under color of official right.

All in violation of Title 18, United States Code, Section 1951.

The Grand Jury further charges:

<u>COUNT 24</u>
(Hobbs Act Conspiracy, 18 U.S.C. § 1951)

389.    Paragraphs 1, 3, 4, 6, 7, 9, 20, 21, 30-32, 34, 41, 50, 55-57, 69, 84, and 85 of this Third Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

390.    Beginning in or around 2007 and continuing until on or about May 29, 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendants JAMES C. DIMORA and Robert W. Rybak (not charged herein), and John Kevin Kelley (not charged herein), PO9 (not charged herein), and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree with each other to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is, DIMORA and PO9 obtained property not due to them or their offices, from Local 55 and the JATC, with their consent, under color of official right.

<u>OBJECTS OF THE CONSPIRACY</u>

391.    It was an object of the conspiracy that Local 55 and the JATC provided DIMORA and PO9 with things of value in return for DIMORA and PO9 using their County positions to benefit Rybak and others designated by Rybak, in connection with County personnel issues, both

as requested and as future opportunities arose.  The things of value included free and discounted home improvements, meals and entertainment, political donations, and organizing a political fundraiser.

392.  It was a further object of the conspiracy that DIMORA and his co-conspirators concealed and attempted to conceal the bribes described in this Count of the Third Superseding Indictment from law enforcement and the public.

<u>MANNER AND MEANS</u>

It was part of the conspiracy that:

393.  At times, Kelley served as an intermediary among and between Rybak, DIMORA and PO9.

394.  On or about February 9, 2008 at approximately 12:56 p.m., Kelley and Rybak discussed obtaining a promotion for PE21 which would result in a pay raise.  During the conversation, Kelley commented how "naive" PE21 was to think she could obtain the job on her own.  Rybak agreed.  Kelley also instructed Rybak to use his "resource" to get PE21 the job. Rybak indicated he told PE21, "I can get every one of those three Commissioners to vote you a raise.  She goes, 'Yeah right.'  I said, 'How much you wanna bet?  Yeah, I'm, I'm telling you I could talk to DIMORA or [PO10] and, ah, the other one [PO9] faster than JIMMY [DIMORA] would do it for me.'"  Kelley agreed.  Rybak then added, "Maybe he's concerned that we're friends and people are tied in that way.  But then again, what the f--k, look at Frank [Russo] with all his friends."  Kelley responded, "And why is Frank [Russo] as strong as he is?  Because he takes care of his friends."  Rybak said, "Well maybe JIMMY's [DIMORA] gotta learn that."

111

395.    On or about February 9, 2008 at approximately 5:09 p.m., Rybak told Kelley how "f--ked" he was because he and DIMORA just left the bar.  Rybak again discussed his bar bill. Rybak said, "Mine was $160 plus tip.  Then we got [another person] drinking.  We picked up the drinks afterwards.  Guess how much those were."  Kelley asked, "How much?"  Rybak replied, "Another $100.  We spent 300 f--kin' dollars there today."  Rybak then commented Kelley "laid it on too heavy" when Kelley was talking to DIMORA about the raise for PE21.  Kelley replied, "I got JIMMY [DIMORA] right where you want him."  Kelley realyed his conversation with DMIORA.  Rybak then said, "Yeah f--k that five grand.  Get her ten that's for sure."

396.    On or about February 11, 2008, Kelley and Rybak discussed obtaining County jobs for Local 55 employees.  Rybak explained to Kelley how there used to be a union worker employed at the Engineer's Office, but the worker was fired.  Rybak said it would benefit him (Rybak) to "get a guy in there."  Kelley said that he would work on it.  Rybak then assured Kelley the union worker hired would either be harmless and do the job or somebody politically that will help him all the time.

397.    On or about February 20, 2008, DIMORA had a conversation with PE23, who informed DIMORA that PE21 did not want to move her office to a different building which was a requirement with the promotion, so PE21's boss was going to give PE21 other responsibilities which would result in a comparable pay raise.  PE23 then suggested this would make PE21 happier.  DIMORA replied, "If she's happy, that's fine."

112

398.    On or about February 22, 2008, Kelley and Rybak discussed coordinating a fundraiser for PO9.  Kelley confirmed he spoke to PO9, who already put the fundraiser on his calendar.

399.    On or about March 10, 2008, DIMORA asked PE23 if he received the message regarding PE21.  PE23 replied, "Yeah, I took care of it."

400.    On or about March 12, 2008, Rybak and DIMORA discussed the County hiring Plumber 1 to replace another plumber who left the County.  Rybak inquired if the Commissioners had to approve the hiring of Plumber 1.  Rybak then offered to speak to the other Commissioners in order to keep DIMORA out of it.  DIMORA confirmed that the hiring needed to be passed at a Board of Commissioners meeting.  DIMORA then instructed Rybak to write a letter to the three Commissioners and fax it to DIMORA that evening so he could discuss the hiring with the other Commissioners in the morning.  DIMORA said he would initiate the conversation with the other Commissioners.  At the conclusion of the conversation, Rybak and DIMORA discussed their upcoming trip to Las Vegas.

401.    On or about March 13, 2008, DIMORA called PE23 with Rybak's request to have a worker from the plumbers' union hired at the County.  PE23 told DIMORA that PE23 would take care of it.  DIMORA then encouraged PE23 to lean on a certain County employee to make it happen.

402.    On or about March 13, 2008, DIMORA asked Rybak, "How many times am I gonna do you a f---ing favor?"  Rybak responded that he already installed the ice machine.  Rybak then asked what else "do you need," and made a reference to oral sex.  DIMORA replied, "Come

113

up with some p--sy, you mother f---er."  Rybak replied that he did not want DIMORA to "go

down like Governor Spitzer."  DIMORA told Rybak, "I ain't f---in' gonna pay for no p--sy.  That's

why he went down."  Rybak replied, "Yeah, you'll let Gabor, Kelley and Rybak pay it for you,"

and then laughed.  Rybak then inquired about a recent County meeting.  DIMORA told Rybak that

PE23 told another County employee to take care of this.  Rybak and DIMORA then discussed the

plumbers' union receiving spots similar to those the electricians' union received from the County.

Rybak then told DIMORA, "Good man . . . Okay maybe now you'll get that, that bun [sexual

reference which was previously discussed in the conversation]."

403.    On or about March 14, 2008, DIMORA told PE23 about his conversation with

Rybak and then inquired about the plumbers' union receiving spots with the County.  PE23

indicated he assigned the request to another County employee and told DIMORA he would

follow-up.  PE23 then assured DIMORA he [PE23] would get it done.

404.    On or about March 18, 2008, Rybak told DIMORA, "Remember Spitzer, if I go

down, you're going with me."  DIMORA said, "We're all going down together baby."  Rybak

responded, "Thank you Spitzer."

405.    On or about March 20, 2008, Rybak spoke to both DIMORA and Gabor and

complained about how Gabor and DIMORA treated the plumbers' union international officers the

previous evening.  During the conversation DIMORA said that he took care of Rybak again today.

Rybak replied, "About f---in' time.  Nine months later."

114

406.    On or about March 21, 2008, Rybak sent a letter to the County Commissioners recommending Plumber 1 and Plumber 2 to fill two journeyman plumber positions with the County.

407.    On or about March 27, 2008, DIMORA and PO9 both voted in favor of appointing Plumber 1 and Plumber 2 as full-time temporary plumbers with the County.

408.    On or about April 15, 2008 at approximately 3:49 p.m., DIMORA complained to Kelley that PE21 wanted more money.  DIMORA then explained how PE21 applied for a job but did not receive it because the County hired someone from the outside and how they (Rybak and PE21) are now trying to figure out how to block it and put PE21 in there.  DIMORA then said that they need another Commissioner.  Kelley suggested Rybak call PO9 since he was holding a fundraiser for PO9.

409.    On or about April 15, 2008 at approximately 4:12 p.m., DIMORA spoke to PE21, who told DIMORA that she had applied for a position within the County but another candidate was hired. PE21 was upset about not being selected and about the salary for the new hire.  PE21 confirmed for DIMORA that her raise was on the Commissioners' Agenda for Thursday (04/17/2008).  PE21 informed DIMORA of the salary she wanted and they discussed a way to make that happen.  DIMORA suggested that Rybak contact PO9, since they would need a "second Commissioner" to approve the salary increase.  DIMORA also offered to have the matter pulled from the Commissioners' Agenda until an agreement was made on the amount of PE21's raise.

410.    On or about April 15, 2008 at approximately 4:31 p.m., DIMORA told Rybak that he better deliver, and made a reference to a woman Rybak offered to provide to DIMORA.  Rybak

115

told DIMORA not to help PE21 if it was going to create problems for DIMORA.  DIMORA then

inquired what he would receive from Rybak.  Rybak replied that he always takes care of

DIMORA.  DIMORA then told Rybak that they need to get another Commissioner either way to

do this.  DIMORA indicated both he and PE21 believed PO9 was the one to go after, because he

is on the hook here with his election time.  Rybak then suggested he could also approach PO10

about PE21's raise because Rybak knew someone who was close with PO10.  DIMORA then

recommended Rybak go to PO9 first and then use PO10 as a fall back.  DIMORA told Rybak to

inform PO9 that he (DIMORA) was on board with PE21's raise.

     411.    On or about April 15, 2008, Kelley spoke to PO9 about PE21's raise.  Kelley

informed PO9 that Rybak was speaking to PO10 about PE21's raise because Rybak was

uncomfortable talking to PO9 about PE21's raise since Rybak was involved in PO9's fundraiser.

PO9 then stated that PE21 would have his vote if she could wait until after the election in

November.

     412.    On or about April 15, 2008, Kelley informed Rybak about his conversation with

PO9.  According to Kelley, PO9 was willing to give PE21 a raise if DIMORA was "on board" and

if they waited until after the election.  Rybak expressed frustration about the delay.  Kelley

indicated that PO9 wanted to delay PE21's raise because Rybak was participating in a fundraiser

for PO9 and seeking a raise for PE21 at the same time.

     413.    On or about April 15, 2008, Rybak informed DIMORA that PO9 wanted to delay

PE21's raise until after the election because Rybak was hosting a fundraiser for PO9.  DIMORA

suggested Rybak go through PO10.

414.    On or about April 17, 2008, Rybak told DIMORA he had spoken to PE21 the previous evening and she had told Rybak to tell DIMORA to do what made him comfortable and not to do anything that made DIMORA uncomfortable.  DIMORA then discussed different options for PE21's raise and inquired whether PE21 wanted to increase the smaller raise now.

415.    On or about April 17, 2008, DIMORA told Kelley he hated not to do something for PE21 because Rybak would complain.  Kelley assured DIMORA, "Without you they don't have anything."

416.    On or about April 17, 2008, DIMORA called his office and asked PE11 to pull PE21 from the Commissioners' Agenda.

417.    On or about April 30, 2008, DIMORA and a landscaper discussed some plumbing work that needed to be done at DIMORA's house.  DIMORA inquired whether Rybak needed to be present when the plumber did the work.  The landscaper indicated Rybak did not need to be there and informed DIMORA he would come to DIMORA's house later that day to start on the work.  DIMORA and Rybak had a subsequent conversation in which they discussed the work being done at DIMORA's house.

418.    On or about May 12, 2008, Rybak and DIMORA spoke about the ice machine Rybak delivered to DIMORA's house the previous day.  Rybak asked DIMORA if he would hire PE22.

419.    On or about May 12, 2008, DIMORA and Kelley discussed PE22's summer job.  DIMORA was concerned PE21 would draw too much attention to PE22's job.  DIMORA then explained to PE11 that PE22 wanted to start then rather than waiting until June 1.  Kelley

117

complained how difficult it was for him to move PE22's start date up to June 1 because it was two weeks before the summer hiring program started.  DIMORA then suggested he would tell PE11 that if Kelley could not move up the starting date, DIMORA would instruct PE11 to hire PE22, because DIMORA cannot say no.

420.    On or about May 18, 2008, DIMORA left a voicemail message for Rybak thanking him for performing plumbing work at DIMORA's house the previous day.  DIMORA then said the ice maker was not working and requested Rybak come to DIMORA's house to fix it.

All in violation of Title 18, United States Code, Section 1951.

The Grand Jury further charges:

## COUNT 25
### (Hobbs Act, 18 U.S.C. § 1951)

421.    Paragraphs 1, 3, 4, 6, 7, 9, 20, 21, 30 and 69 of this Third Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

422.    Beginning in or around 2007 and continuing until on or about May 29, 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES C. DIMORA did knowingly obstruct, delay and affect and attempt to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is DIMORA obtained property not due to him or his office, from Rybak, Local 55 and the JATC, with their consent, under color of official right.

All in violation of Title 18, United States Code, § 1951.

The Grand Jury further charges:

## COUNT 26
(Hobbs Act Conspiracy, 18 U.S.C. § 1951)

423.     Paragraphs 1, 3, 4, 6, 7, 17, 30, 31 and 67 of this Third Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

### General Allegations

424.     At all times relevant to this Count of the Third Superseding Indictment, a deferred compensation plan, similar to a 401K plan in the private sector, permitted plan participants to invest part of their paychecks before withholding for state and federal income taxes was deducted. The savings and earnings on the investments were not subject to taxes until they were withdrawn from the plan, usually at retirement.

425.     At all times relevant to this Count in the Third Superseding Indictment, Ohio Revised Code Section 148.06 limited the number of deferred compensation plans the County may offer.

### THE CONSPIRACY

426.     Beginning in or around 2000 and continuing until on or about July 28, 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES C. DIMORA, and Frank P. Russo (not charged herein), Charles J. Randazzo (not charged herein) and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree with each other to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is, DIMORA and Russo obtained property not due to them or their offices,

119

namely, food, meals, wine, sporting event tickets, and outdoor furnishings, from Financial Network of America, with its consent, under color of official right.

## MANNER AND MEANS

It was part of the conspiracy that:

427.    From in or around 2000 through in or around 2004, Randazzo sought to have the County as an FNA client.  Randazzo asked Russo to help introduce Randazzo to a County employee who could assist FNA in this endeavor.  Russo used his official position to introduce Randazzo to a County employee who had influence over or involvement in the deferred compensation selection process, which facilitated FNA's ability to compete for the County payroll slot.  Russo's introduction provided Randazzo with a benefit over his competitors.

428.    On or about June 10, 2004, DIMORA received from Randazzo approximately $1,079.14 to apply toward the purchase of an artificial palm tree for DIMORA's backyard.

429.    On or about June 10, 2004, Russo received from Randazzo approximately $1,079.14 to apply toward the purchase of an artificial palm tree for Russo's backyard.

430.    On or about August 11, 2004, the County Commissioners, DIMORA voting in favor, selected FNA as a deferred compensation provider for County employees.

431.    On or about April 15, 2005, DIMORA applied the $1,079.14 from Randazzo to purchase a tiki hut for DIMORA's backyard.

432.    On or about October 15, 2006, after resolving legal issues related to FNA's contract with the County, the County entered into a contract with FNA for deferred compensation services.

433.    Periodically from in or around 2004 through in or around 2008, Randazzo caused FNA to provide DIMORA with wine, food, and meals for DIMORA and DIMORA's designees.

434.    On or about March 14, 2008, DIMORA received from FNA tickets for club seats to a Cleveland Cavaliers game.

435.    From in or around 2004 through in or around 2008, Randazzo asked DIMORA to introduce Randazzo to other public employees who could assist FNA in securing other public contracts, which DIMORA did.

All in violation of Title 18, United States Code, Section 1951.

The Grand Jury further charges:

COUNT 27
(Hobbs Act, 18 U.S.C. § 1951)

436.    Paragraphs 1, 3, 4, 17, 30, 67 and 68 of this Third Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

437.    Beginning in or around 2004 and continuing until on or about July 28, 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Defendant JAMES C. DIMORA did knowingly obstruct, delay and affect and attempt to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is DIMORA obtained property not due to him or his office, namely, food, meals, wine, sporting event tickets, and outdoor furnishings, from Charles Randazzo and Financial Network of America, with their consent, under color of official right.

All in violation of Title 18, United States Code, Section 1951.

The Grand Jury further charges:

COUNT 28

(Conspiracy to Obstruct Justice, 18 U.S.C. § 1512, in violation of 18 U.S.C. § 371)

438.    Paragraphs 1, 15, 24, 26, 30-32, 34, 60, 65, 69, 71, 74, 78 and 83 of this Third Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

439.    From in or around December 2007 through the date of the filing of this Third Superseding Indictment, the FBI and Internal Revenue Service, Criminal Investigation Division ("IRS") were investigating, among other things, whether individuals and private companies had provided things of value, including free and discounted home improvements, to DIMORA and other public officials in return for their promise to perform official acts.  In the course of that investigation, federal grand jury subpoenas from the Northern District of Ohio were issued.

440.    On or about May 23, 2008, in one of the first overt steps in the investigation described above, FBI agents interviewed Steven Pumper about Pumper bribing PE37 and sought Pumper's cooperation in an investigation of municipal public corruption.  Although the interviewing agents did not mention the County or any County official, Pumper volunteered, "I know you guys are thinking of DIMORA and Russo and them."

441.    On or about the morning of May 26, 2008, Attorney 5, then representing Pumper, learned that a grand jury subpoena would be forthcoming requiring DAS and Pumper to produce documents.

442.    On or about May 29, 2008, and in furtherance of the investigation described above, the United States served a grand jury subpoena on DAS requiring production of "all documents reflecting any financial relationship between DAS Construction and any public official" and also

122

served a grand jury subpoena on Pumper requiring production of "all documents reflecting any financial relationship between DAS and any public official."

## THE CONSPIRACY

443.    Beginning on or about May 23, 2008, and continuing until on or about June 20, 2010, in the Northern District of Ohio, Eastern Division and elsewhere, Defendants JAMES C. DIMORA and MICHAEL D. GABOR, and Robert W. Rybak (not charged herein), Steven Wayne Pumper (not charged herein), John Kevin Kelley (not charged herein), Nicholas Zavarella (not charged herein), and others known and unknown to the Grand Jury, did knowingly and intentionally conspire, combine, confederate and agree together and with each other and with other persons known and unknown to the Grand Jury, to commit an offense against the United States, namely, to violate Title 18, United States Code, Section 1512(b).

## OBJECT OF THE CONSPIRACY

444.    It was the object of the conspiracy that DIMORA, GABOR, Rybak, Kelley, Pumper, Zavarella and others known and unknown to the Grand Jury, concealed, attempted to conceal and encouraged others to conceal from law enforcement and the Grand Jury the fact that DIMORA had solicited and accepted bribes, kickbacks and gratuities.

## MANNER AND MEANS

It was part of the conspiracy that:

445.    In order to make it appear that the work performed on DIMORA's house was not free and discounted, and did not constitute bribes or gratuities, DIMORA, Pumper, Zavarella and

123

others created and caused to be created documents related to work performed at DIMORA's residence.

446.    During the course of the conspiracy and continuing thereafter through on or about June 20, 2010, DIMORA caused to be sent a series of checks drawn on Lori and JAMES DIMORA's personal checking account made payable to DAS, ZBC, Vandra Brothers, and others who performed work at DIMORA's residence.

447.    DIMORA, GABOR, Rybak, Pumper and others influenced and attempted to influence statements of witnesses about the work performed at DIMORA's residence and other things of value provided to DIMORA.

448.    At times, DIMORA communicated with Pumper and others through intermediaries, including GABOR.

## OVERT ACTS

449.    In furtherance of the conspiracy, and to effect the object thereof, DIMORA, GABOR, Rybak, Pumper, Zavarella, Kelley and others committed the following overt acts in the Northern District of Ohio and elsewhere:

A.    On or about May 23, 2008, Pumper and BE29 agreed that BE29 would notify DIMORA and others that Pumper had been confronted on that date by FBI agents investigating Pumper's bribery of PE37.

B.    On or about May 23, 2008, DIMORA caused to be issued a check drawn on Lori and JAMES DIMORA's personal checking account made payable to DAS in the amount of $600.

124

C.     On or about May 23, 2008, DIMORA caused to be issued a check drawn on Lori and JAMES DIMORA's personal checking account made payable to ZBC for $500.

D.     On or about May 23, 2008, DIMORA caused to be issued a check drawn on Lori and JAMES DIMORA's personal checking account made payable to Salva Stone Design for $250.

E.     On or about May 24, 2008 at approximately 11:38 a.m., DIMORA told Russo he was en route to Your's Truly restaurant and said that if BE29 arrived, Russo should pull him aside for a minute.  Russo responded, "I know.  The mother told me yesterday."  DIMORA instructed Russo not to talk on the phone.

F.     On or about May 24, 2008 at approximately 12:48 p.m., DIMORA and GABOR discussed meeting the following afternoon.

G.     On or about May 25, 2008, Pumper created a Construction Agreement purporting to reflect a verbal agreement of October 10, 2005 between DIMORA and DAS for work DAS performed at the DIMORA residence, and arranged to have the Construction Agreement delivered to DIMORA through GABOR.

H.     On or about May 26, 2008 at approximately 5:13 p.m., DIMORA called Kelley to give him a heads up on something coming up maybe this week.

I.     On or about May 26, 2008 at approximately 8:40 p.m., Kelley told Rybak that he needed to see him.  Rybak told Kelley to come over to Rybak's house.

J.     On or about May 27, 2008, GABOR asked DIMORA if everything was okay?  DIMORA replied so far, we'll see what happens this week.  GABOR informed DIMORA

125

that he was going to see Rybak.  DIMORA said that it was okay for GABOR to meet with Rybak.
DIMORA added, "The other guy [Kleem] we talked about maybe you should stop and see."
GABOR said, "Get it done with?"  DIMORA agreed.  GABOR asked, "Just tell him the story
right?"  DIMORA replied, "Not to broadcast it," and Gabor said, "Right for his own good."

      K.     On or about May 28, 2008 at approximately 7:41 a.m., BE29 told
DIMORA he was with Pumper.  BE29 informed DIMORA that Attorney 5 wanted DIMORA to
call him [Attorney 5].  DIMORA asked, "Attorney 5?"  BE29 replied that it was "nothin' serious,
but just wanted to let you know couple things."  BE29 gave Attorney 5's telephone number to
DIMORA and told DIMORA that Attorney 5 "talked to the U.S. Attorney yesterday" and there
was no "real problems, they're [the FBI] just diggin'."  DIMORA responded, "Well, yeah, we
knew they they're always aren't they always?"  BE29 replied, "He just wanted to let you know
what was up."

      L.     On or about May 28, 2008 at approximately 7:42 a.m., DIMORA called
Attorney 5 and while the phone was ringing, DIMORA spoke with someone in the background.
Attorney 5 then answered the phone and told DIMORA that he would like 15 minutes of
DIMORA's time and specified, "It's kind of important."  Attorney 5 told DIMORA, "The sooner
the better," and agreed to meet DIMORA at DIMORA's residence later that morning.

      M.     On or about May 28, 2008 at approximately 7:45 a.m., DIMORA told
BE29 to relay a message to Pumper about an invoice for work at DIMORA's residence.
DIMORA said that he sent a check in, just so there is enough money on account towards the uh
project.  BE29 indicated that he would relay the message to Pumper.

N.    On or about May 28, 2008 at approximately 11:46 a.m., Kleem thanked

DIMORA for the "message."  DIMORA indicated everything was alright so far but he was

"always waiting for the other shoe to fall or drop."  Kleem replied that there is no other shoe to

drop and he thinks everything is going to be good.  At the conclusion of the conversation, Kleem

and DIMORA agreed to meet at a later date.  Kleem told DIMORA, "Don't worry too much."

O.    On or about May 28, 2008 at approximately 11:54 a.m., DIMORA called

Zavarella.

P.    On or about May 28, 2008 at approximately 12:12 p.m., Rybak told

DIMORA that he had spoken to GABOR earlier that day.  Rybak said he did not want to discuss it

on the telephone, but wanted to speak to DIMORA in person.  DIMORA said, "No, I know."

Q.    On or about May 28, 2008 at approximately 7:22 p.m., GABOR told Kelley

that he was socializing with a friend.  Kelley handed the phone to DIMORA, who said to GABOR

that he thought GABOR was meeting with someone else and wanted an update.  GABOR replied,

"Exact same thing."  DIMORA asked, "What does he think about me?" GABOR replied, "Zero."

DIMORA said, "Oh, he thinks it's somethin' else?"  GABOR replied, "No, he thinks that they

were just tryin' to push him against the wall and he said, 'F--k you.'"  DIMORA said that

[Attorney 5] came and that DIMORA did not want to speak on the phone.  GABOR agreed to

talked to DIMORA later.

R.    On or about May 28, 2008 at approximately 9:45 p.m., DIMORA, Rybak

and Kelley met in a post office parking lot and discussed Rybak's concern about law enforcement

discovering that Local 55 and JATC resources had been used for DIMORA home improvements.

S.      On or about May 28, 2008 at approximately 9:55 p.m., Rybak and Kelley told each other in a jocular manner, "To the best of my recollection.  I don't recall."  Rybak said, "Hey listen, on a serious note, ask him [DIMORA] on those fixtures the toilet fixtures, and all that stuff . . . where is he [DIMORA] gonna say that came from?  Rybak said he thought it came from "Mr. Bill."  Kelley replied tell the truth that's all that matters.  Rybak agreed.  Kelley said if you "start lyin', you get in trouble."

T.      On or about May 30, 2008, Nicholas Zavarella caused to be sent an invoice from ZBC to DIMORA in the amount of $6,687 for masonry, labor and material completed as of March 31, 2008.

U.      On or about May 30, 2008 at approximately 6:24 p.m., DIMORA asked Attorney 5 whether a certain person who had recently called DIMORA was with the FBI. Attorney 5 told DIMORA that the name did not match either of the two business cards the FBI had given to Pumper, but Attorney 5 agreed to check for DIMORA since Attorney 5 did not have the business cards with him and he could not recall with certainty the name of one of the Agents. During the conversation, Attorney 5 told DIMORA, "Nope, nothin' directed toward your direction."  DIMORA responded, "Oh, okay, fine."  Attorney 5 continued, "So that's good.  I'm not sayin' it can't change."  Attorney 5 added, "The initial one, nothin' your way."  DIMORA said, "So what should we still try to uh get this thing resolved or sit on it?"  Attorney 5 and DIMORA continued discussing work performed at DIMORA's residence.  DIMORA then asked, "Okay, nothing with the County either [Attorney 5]?"  Attorney 5 responded, "No, nothin', nothin' directed that way.  Strict, strictly directed towards my client [Pumper]."  At the conclusion

128

of the conversation, Attorney 5 agreed to call if he found out the person DIMORA inquired about was an FBI Agent.

      V.     In or around May 2008, DIMORA told Melaragno that something was going on and asked Melaragno to send him a bill for the footer project.  DIMORA expressed concern and told Melaragno that someone was checking up on something and he (DIMORA) needed a bill.

      W.     In or around May 2008, Melaragno sent DIMORA an invoice for work Vandra Brothers performed at DIMORA's residence.  The invoice was lower than the value of the work performed.

      X.     On or about May 23, 2008, DIMORA caused to be written a check drawn on Lori and JAMES DIMORA's personal checking account made payable to Vandra Brothers for $300.

      Y.     On or about June 3, 2008, Pumper caused to be sent an invoice from DAS to DIMORA dated May 30, 2008.

      Z.     On or about June 30, 2008, DIMORA caused to be issued a check drawn on Lori and JAMES DIMORA's personal checking account made payable to DAS for $600.

      AA.     On or about January 22, 2010, DIMORA caused to be issued a check drawn on Lori and JAMES DIMORA's personal checking account made payable to DAS for $1,500.

    All in violation of Title 18, United States Code, Section 371.

129

The Grand Jury further charges:

COUNT 29

(Destruction, Alteration, or Falsification of Records in Federal Investigations,
18 U.S.C. §§ 1519 & 2)

450.   Paragraphs 30, 74 and 78 of this Third Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

451.   From in or around December 5, 2007 through the filing of this Third Superseding Indictment, the FBI and IRS, both part of the executive branch of the Government of the United States, were investigating DIMORA and other public officials for soliciting and accepting things of value from business executives and employees, including Pumper and Zavarella, in return for Dimora and other public officials using and promising to use their official position to benefit Pumper, Zavarella and others.

The Obstruction

452.   From on or about May 23, 2008 to on or about January 22, 2010, in the Northern District of Ohio, Eastern Division, Defendant JAMES C. DIMORA, and Nicholas Zavarella (not charged herein), Steven Wayne Pumper (not charged herein) and others known and unknown to the Grand Jury, did knowingly alter, conceal, cover up, falsify and make a false entry in any record, document and tangible object with the intent to impede, obstruct, and influence the investigation and proper administration of any matter within the jurisdiction of any department and agency of the United States, and in relation to and in contemplation of any such matter.

All in violation of Title 18, United States Code, Sections 1519 and 2.

The Grand Jury further charges:

<u>COUNT 30</u>
(Mail Fraud, 18 U.S.C. § 1341)

453.    Paragraph 30 of this Third Superseding Indictment is re-alleged and incorporated by reference as if fully set forth herein.

<u>General Allegations</u>

At all times material to this Count of the Third Superseding Indictment:

454.    Executive Caterers ("Landerhaven") was an event resource company catering to social, corporate and civic communities in the greater-Cleveland area. Landerhaven was licensed in seven states and provides event planning, catering, logistical, technical and other services.

455.    Harlan Diamond was the Chief Executive Officer at Landerhaven.

456.    The Dimora Boosters Committee was established to account for and manage Dimora's campaign funds.  Political contributions to Dimora and/or fundraising proceeds were deposited into a financial account controlled by the Dimora Boosters Committee, and Dimora's campaign and fundraising expenses were paid from said account.  The Dimora Boosters Committee filed campaign finance reports annually with the Cuyahoga County Board of Elections.

457.    Ohio Revised Code Section 3717.13(O) provided that "No beneficiary of a campaign fund or other person shall convert for personal use . . . anything of value from the beneficiary's campaign fund."

<u>The Scheme</u>

458.    From in or around July 2006 through on or about March 2, 2009, the exact dates

131

being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and

elsewhere, Defendant JAMES C. DIMORA, and others known and unknown to the Grand Jury,

aided and abetted by Harlan Diamond (not charged herein) did knowingly devise and intend to

devise a scheme and artifice to defraud the Dimora Boosters Committee and its contributors and

to obtain money and property by means of materially false and fraudulent pretenses,

representations and promises, and for the purpose of executing such scheme and artifice, caused

matters to be placed in any post office and authorized depository for mail matter to be sent and

delivered by the United States Postal Service and private and commercial interstate carrier, in

accordance with the directions thereon.

It was part of the scheme that:

459.  On or about July 14, 2006, DIMORA held a 50th birthday party for Lori Dimora at

Landerhaven (hereinafter "Lori Dimora's birthday party").

460.  On or about July 17, 2006, Landerhaven sent an invoice to DIMORA for

approximately $8,725.51 for Lori Dimora's birthday party.

461.  On or about October 15, 2006, Dimora caused a brunch to be held for the Dimora

Boosters Club at Landerhaven (hereinafter "Dimora Boosters 2006 Brunch").

462.  On or about October 16, 2006, Landerhaven prepared an invoice for the Dimora

Boosters 2006 Brunch in the amount of approximately $16,158.14.

463.  In or around January 2007, Diamond met with DIMORA to discuss the outstanding

balance DIMORA owed Landerhaven, which included Lori Dimora's birthday party and the

Dimora Boosters 2006 Brunch.  During this meeting, DIMORA instructed Diamond to increase

132

the amount of the invoice for the Dimora Boosters 2006 Brunch and apply the overage towards

the balance due on Lori Dimora's birthday party.

464.    On or about February 13, 2007, Diamond caused Landerhaven to send an invoice

for approximately $19,800 for the Dimora Boosters 2006 Brunch.

465.    On or about February 15, 2007, Diamond caused Landerhaven to credit the

$8,725.51 invoice for Lori Dimora's Birthday Party by approximately $3,641.86.

466.    On or about March 8, 2007, DIMORA caused a check in the amount of

approximately $19,800 to be drawn on the account of the Dimora Boosters Committee payable to

Executive Caterers, as satisfaction of the Dimora Boosters 2006 Brunch invoice.

467.    On or about October 28, 2007, DIMORA caused a brunch to be held for the

Dimora Boosters Club at Landerhaven (hereinafter "Dimora Boosters 2007 Brunch").

468.    On or about October 31, 2007, Landerhaven prepared an invoice for the Dimora

Boosters 2007 Brunch in the amount of approximately $18,658.50.

469.    In or around early November 2007, Diamond met with DIMORA to discuss the

outstanding balances DIMORA owed Landerhaven, which included Lori Dimora's birthday party

and the Dimora Boosters 2007 Brunch.  During this meeting, DIMORA instructed Diamond to

increase the amount of the invoice for the Dimora Boosters 2007 Brunch and apply the overbilling

towards DIMORA's personal outstanding balance to Landerhaven.

470.    On or about November 14, 2007, Diamond caused Landerhaven to send an invoice

for approximately $22,125.44, for the Dimora Boosters Brunch.

471.    On or about November 16, 2007, DIMORA caused a check in the amount of

133

$22,125.44 to be drawn on the account of the Dimora Boosters Committee payable to Executive Caterers to satisfy Landerhaven's invoice for the Dimora Boosters Brunch.

472.    On or about March 2, 2009, Landerhaven applied approximately $3,466.94 from the Dimora Boosters Committee check to the outstanding invoice from Lori Dimora's Birthday Party.

473.    On or about the dates listed below, in the Northern District of Ohio and elsewhere, DIMORA and others, for the purpose of executing the above-described scheme and artifice, caused documents to be delivered and sent through the United States mails, including the following:

| Date | Description |
| --- | --- |
| February 13, 2007 | Executive Caterers at Landerhaven invoice to County Commissioner Jimmy Dimora c/o Pat Smock for $19,800 mailed from Mayfield Hts., Ohio, to Fairview Park, Ohio |
| March 8, 2007 | Check No. 9993, drawn on the Dimora Boosters Committee account, payable to Executive Caterers, for $19,800, sent from Fairview Park, Ohio to Executive Caterers in Mayfield Hts., Ohio |
| November 14, 2007 | Executive Caterers at Landerhaven invoice to Mr. County Commissioner Jimmy Dimora for $22,125.44, mailed from Mayfield Hts., Ohio, to Cleveland, Ohio |
| November 16, 2007 | Check No. 10511, drawn on the Dimora Boosters Committee account, payable to Executive Caterers, for $22,125.44, sent from Fairview Park, Ohio to Executive Caterers in Mayfield Hts., Ohio |

All in violation of Title 18, United States Code, Section 1341.

134

The Grand Jury further charges:

COUNT 31

(Conspiracy to Commit Mail Fraud and Honest Services Mail Fraud, 18 U.S.C. §§ 1341 and
1346, in violation of 18 U.S.C. § 1349 )

474.    Paragraphs 1, 11, 31, 32, 34 and 81 of the Third Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

At all times relevant to this Third Superseding Indictment:

475.    Joseph Gallucci ("Gallucci") was a candidate for County Auditor in the 2006 election.  Gallucci became an Auditor's Office employee on or about November 29, 2006.

476.    Joseph O'Malley ("O'Malley") was an attorney licensed to practice law in the State of Ohio.

THE CONSPIRACY

477.    From in or around August 2005, and continuing through on or about July 28, 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division, Defendant MICHAEL D. GABOR, and Frank P. Russo (not charged herein), John Kevin Kelley (not charged herein), Joseph Gallucci (not charged herein) and others known and unknown to the Grand Jury, did knowingly and intentionally combine, conspire, confederate and agree with each other to commit an offense against the United States, namely, to devise and intend to devise a scheme and artifice:

> (1) to defraud and deprive Cuyahoga County and its citizens and the Auditor's Office of their right to the honest and faithful services of Russo, through bribery and kickbacks and the concealment of material information related thereto, and

> (2) to defraud Cuyahoga County, the Auditor's Office and OPERS and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises,

135

and for the purpose of executing such scheme and artifice, to cause matters to be placed in any post office and authorized depository for mail matter to be sent and delivered by the United States Postal Service and private and commercial interstate carrier, in violation of Title 18, United States Code, Sections 1341 and 1346.

## OBJECTS OF THE CONSPIRACY

478.   It was an object of the conspiracy that Russo, with the assistance of GABOR and others, secretly used his official position to enrich himself, by soliciting and accepting gifts, payments, and other things of value from Gallucci, in exchange for favorable official action, and that Gallucci enriched himself by secretly obtaining favorable official action for himself through corrupt means.

479.   It was a further object of the conspiracy that Russo deprived and attempted to deprive the County and the Auditor's Office of money and property by making salary decisions based on things of value provided by Gallucci and not based on merit.

480.   It was a further object of the conspiracy that Russo unjustly enriched Gallucci by giving Gallucci, with the assistance of GABOR and others, money to remain in a political race.

## MANNER AND MEANS

It was part of the conspiracy that:

481.   Russo, with GABOR's assistance, solicited and accepted gifts, payments, and other things of value from Gallucci, including cash, Gallucci's sham candidacy for County Auditor in 2006, Gallucci's agreement to remain in the race for a certain period, and Gallucci's withdrawal from the race.

136

482.    By encouraging Gallucci to run a sham campaign against him for County Auditor, Russo obtained money and property in the form of retaining his County position, with its salary and benefits, and which also enabled Russo to engage in bribery and kickback schemes.

483.    Russo provided official action for the benefit of Gallucci both as requested and as future opportunities arose, including hiring Gallucci in a position that offered OPERS benefits. Russo also provided and arranged to provide Gallucci with financial assistance so Gallucci could maintain his sham candidacy.

484.    The participants in the scheme took steps to hide, conceal, and cover up their activity and the nature and scope of Gallucci's dealings with Russo.

485.    In or around August 2005, Gallucci approached Kelley about obtaining a job with the County in order to secure health insurance benefits.  Kelley, Gallucci and others discussed Gallucci raising approximately $15,000 for Russo's re-election campaign in exchange for Gallucci receiving a County job.

486.    In or around the second half of 2005, Russo and Kelley discussed Russo's 2006 re-election campaign; specifically, Russo's desire to identify a Republican candidate who would not run an aggressive campaign against Russo.

487.    In or around the latter half of 2005, Kelley suggested to Gallucci that instead of raising money for Russo's election campaign, Gallucci, a Republican, could run against Russo in the 2006 election.

488.    Gallucci agreed to run against Russo, understanding that in exchange, Gallucci would receive a job in the Auditor's Office after the November 2006 election at a salary of

137

approximately $50,000 per year.  As agreed, Gallucci did run, but did not campaign actively and spent approximately only a few hundred dollars on the campaign.

489.    In or around early 2006, GABOR arranged a meeting between Russo and Gallucci to discuss Gallucci withdrawing from the race after the primary election.

490.    In or around May 2006, Gallucci complained that he needed to withdraw from the political race and find employment.  Russo and others encouraged Gallucci to stay in the race long enough to preclude the Republican Party from entering a replacement candidate.  Russo offered Gallucci cash to subsidize Gallucci's income until Gallucci began employment with the County.

491.    In or around June 2006, Kelley introduced Gallucci to BE15 and BE16.  Beginning on or about July 7, 2006, and continuing approximately monthly for five months, BE15 and BE16 caused Business 22 to issue checks in the amount of $2,000 to Gallucci.  While the payments were purportedly for consulting, Gallucci performed no work for Business 22.

492.    Beginning in or around July 1, 2006, GABOR delivered approximately $2,000 cash to Gallucci on about a monthly basis for approximately five months.

493.    In or around August 2006, Russo asked Gallucci to withdraw from the race, explaining that it would be easier to hire Gallucci at the Auditor's Office if he withdrew before the general election.  Russo further said it would save Russo's campaign approximately $50,000.

494.    On or about October 2, 2006, Gallucci withdrew from the race, guaranteeing Russo would be elected as County Auditor.

495.     On or about November 29, 2006, Russo hired Gallucci in the Auditor's Office at a salary of approximately $67,849.86 per year, which, at that time was approximately $3,400 more than the salary of Gallucci's supervisor at the Auditor's Office.

496.     In or around December 2006, GABOR asked Gallucci to contribute cash to be included in a card for Russo and Dimora. Gallucci gave GABOR approximately $250 cash, in part to thank Russo for the job.

497.     In or around January 2008, the Plain Dealer began investigating patronage in the Auditor's Office. As part of that investigation, the Plain Dealer requested from the Auditor's Office the employment files of certain individuals, including Gallucci. Russo asked Joseph O'Malley to help Russo respond to the Plain Dealer's requests for information. In particular, Russo requested that O'Malley review Gallucci's personnel file.

498.     In or around early to mid-2008, Russo discussed with Gallucci questions the media might pose to Gallucci, as Russo's former opponent. Russo advised Gallucci to tell the media that it was difficult to raise money against Russo and that Russo was a good guy. Russo suggested Gallucci make these same statements to the FBI, if questioned about the campaign. Russo instructed Gallucci not to mention that Gallucci received money to stay in the campaign.

<u>EXECUTION OF THE SCHEME</u>

499.     On or about the dates listed below, in the Northern District of Ohio and elsewhere, GABOR, Russo, Kelley, Gallucci and others, for the purpose of executing the above-described scheme and artifice to defraud and deprive, caused the following documents to be delivered and sent through the United States mails:

| Date | Description |
|------|-------------|
| July 7, 2006 | Check from Business 22 in Cleveland, Ohio to Gallucci's residence in Independence, Ohio |
| August 1, 2006 | Check from Business 22 in Cleveland, Ohio to Gallucci's residence in Independence, Ohio |
| September 1, 2006 | Check from Business 22 in Cleveland, Ohio to Gallucci's residence in Independence, Ohio |
| October 1, 2006 | Check from Business 22 in Cleveland, Ohio to Gallucci's residence in Independence, Ohio |
| November 1, 2006 | Check from Business 22 in Cleveland, Ohio to Gallucci's residence in Independence, Ohio |
| November 29, 2006 | Documents related to Gallucci's enrollment in OPERS sent from Cleveland, Ohio to OPERS in Columbus, Ohio |

All in violation of Title 18, United States Code, Section 1349.

The Grand Jury further charges:

### COUNT 32
(Mail Fraud and Honest Services Mail Fraud, 18 U.S.C. §§ 1341, 1346 & 2)

500.    Paragraphs 1, 11, 31, 32 and 34 of this Third Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

### The Scheme

501.    From in or around August 2005, and continuing through on or about December 1, 2009, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division, Frank P. Russo (not charged herein), John Kevin Kelley (not charged herein), Joseph Gallucci (not charged herein), and others known and unknown to the Grand Jury, aided and

140

abetted by Defendant MICHAEL D. GABOR, did knowingly devise and intend to devise a

scheme and artifice to:

> (1) to defraud and deprive Cuyahoga County and its citizens and the Auditor's Office of their right to the honest and faithful services of Russo, through bribery and kickbacks and the concealment of material information related thereto, and

> (2) to defraud Cuyahoga County, the Auditor's Office and OPERS and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises,

and for the purpose of executing such scheme and artifice, caused the following matters to be

placed in any post office and authorized depository for mail matter to be sent and delivered by the

United States Postal Service and private and commercial interstate carrier, in accordance with the

directions thereon:

| Date | Description |
|------|-------------|
| July 7, 2006 | Check from Business 22 in Cleveland, Ohio to Gallucci's residence in Independence, Ohio |
| August 1, 2006 | Check from Business 22 in Cleveland, Ohio to Gallucci's residence in Independence, Ohio |
| September 1, 2006 | Check from Business 22 in Cleveland, Ohio to Gallucci's residence in Independence, Ohio |
| October 1, 2006 | Check from Business 22 in Cleveland, Ohio to Gallucci's residence in Independence, Ohio |
| November 1, 2006 | Check from Business 22 in Cleveland, Ohio to Gallucci's residence in Independence, Ohio |
| November 29, 2006 | Documents related to Gallucci's enrollment in OPERS sent from Cleveland, Ohio to OPERS in Columbus, Ohio |

All in violation of Title 18, United States Code, Sections 1341, 1346 and 2.

The Grand Jury further charges:

<u>COUNT 33</u>
(Hobbs Act, 18 U.S.C. §§ 1951 and 2)

502.    Paragraphs 1, 8, 31 and 32 of this Third Superseding Indictment are re-alleged and incorporated by reference as if fully set forth herein.

<u>Introduction</u>

503.    Public Employee 57 ("PE57") was an Auditor's Office employee, who began working part-time in or around October 2007.

504.    At all times relevant to this Count of the Third Superseding Indictment, Business Executive or Employee 41 ("BE41") was a former relative of PE57. BE41 had a financial interest in the activities of PE57, such that an increase in PE57's income and employment benefits was a financial benefit to BE41. BE41 was also an acquaintance of MICHAEL GABOR.

<u>The Scheme</u>

505.    From on or about April 5, 2008 through on or about April 28, 2008, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division and elsewhere, Frank P. Russo (not charged herein), aided and abetted by Defendant MICHAEL D. GABOR, did knowingly obstruct, delay and affect and attempt to obstruct, delay and affect commerce and the movement of articles and commodities in commerce by extortion; that is, Russo obtained property not due to him or his office, namely cash from BE41, with his consent, under color of official right.

It was part of the scheme that:

506.    GABOR, Russo and others planned a trip to Las Vegas, Nevada, from on or about April 6, 2008 through on or about April 8, 2008.

507.    Russo was interested in obtaining additional money to bring on the Las Vegas trip.

508.    GABOR communicated to Russo that BE41 wanted PE57 to make more money and to obtain health benefits, and that Russo would receive cash in return for Russo's assistance in that endeavor.

509.    GABOR served as intermediary between BE41 and Russo.

510.    At times, GABOR and Russo used coded conversation to discuss Russo hiring PE57 and the money that Russo would receive in return.

511.    On or about April 6, 2008, in Las Vegas, Nevada, GABOR gave Russo an envelope containing cash.

512.    On or about April 11, 2008 at approximately 2:14 p.m, GABOR called BE41's cellular telephone.

513.    On or about April 11, 2008 at approximately 2:17 p.m., GABOR asked Russo about PE57's change in employment status.  Russo told GABOR that no one, not even Russo's personnel director, knew about Russo's decision to make a favorable personnel decision to benefit PE57.  Russo said that he was going to call PE57 and tell her that in two weeks there would be an opening.  Russo told GABOR, "Tell her the 27th, we have an opening."

143

514.    On or about April 11, 2008 at approximately 2:19 p.m, GABOR called BE41's cellular telephone.

515.    On or about April 11, 2008 at approximately 2:22 p.m., GABOR asked Russo about when PE57's hospitalization would start.  GABOR told Russo, "Because he asked me, I was curious when she starts.  Does she have to wait for her hospitalization?"  Russo said that his personnel director was on vacation.  GABOR told Russo, "He's asked me, I mean, I don't mean to bug you . . .because she's been there already . . . they just asked, so next week I'll talk to you."  Russo said, "Just tell him, next week, we'll get everything organized for him."

516.    On or before April 28, 2008, Russo caused PE57 to receive a raise in her hourly salary, an increase in her work hours, and other favorable personnel action, including health insurance benefits, in return for the envelope of cash he had received from GABOR on April 6, 2008.

All in violation of Title 18, United States Code, Sections 1951 and 2.

The Grand Jury Further Charges:

## COUNTS 34-37
### 26 U.S.C. § 7206(1)(False Statements on Tax Returns)

517.    On or about the dates stated below, in the Northern District of Ohio, Eastern Division, Defendant JAMES C. DIMORA, a resident of Independence, Ohio, who was married, did willfully make and subscribe U.S. Individual Income Tax Returns, Form 1040, for the calendar years stated below, on behalf of himself and his spouse, each of which was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal

144

Revenue Service, and each of which Defendant did not believe to be true and correct as to every material matter in that, as he then and there well knew and believed, each said return understated his total income (on line 22) by failing to report income Defendant had that year from bribes he received, as a result of which each return understated the amount of taxes owing for that year, each year constituting a separate count:

| Count | Year | Date |
|-------|------|------|
| 34 | 2004 | April 15, 2005 |
| 35 | 2005 | April 15, 2006 |
| 36 | 2006 | April 15, 2007 |
| 37 | 2007 | April 15, 2008 |

All in violation of Title 26, Section 7206(1), United States Code.

## RACKETEERING FORFEITURE

518.    The allegations contained in Count 1 of this Third Superseding Indictment are hereby repeated, realleged, and incorporated by reference herein as though fully set forth at length for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 1963 and Title 28, United States Code, Section 2461(c).  Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendants that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 1963 in the event of any defendant's conviction under Count 1 of this Third Superseding Indictment. As a result of the foregoing offense, defendants JAMES C. DIMORA and MICHAEL D. GABOR shall forfeit the following property to the United States:

145

a.)      Any interest defendants JAMES C. DIMORA and MICHAEL D. GABOR acquired or maintained in violation of 18 U.S.C. § 1962;

b.)      Any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which defendants JAMES C. DIMORA and MICHAEL D. GABOR established, operated, controlled, conducted, or participated in the conduct of, in violation of 18 U.S.C. § 1962; and,

c.)      Any property constituting, or derived from, any proceeds which defendants JAMES C. DIMORA and MICHAEL D. GABOR obtained, directly or indirectly, from racketeering activity in violation of 18 U.S.C. § 1962.

519.    The interests of the defendants subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1), (a)(2), and (a)(3),  include, but are not limited to:

a.)      a sum of money equal to the total amount of proceeds obtained by defendants JAMES C. DIMORA and MICHAEL D. GABOR as a result of their violation of 18 U.S.C. § 1962, excluding the interests described in b.) through d.) below.

b.)      7254 Forestwood Drive, Independence, Cuyahoga County, Ohio (Permanent Parcel Number 563-11-038); more particularly: the value of the free and discounted improvements provided to defendant JAMES C. DIMORA at the property.

c.)      Ohio State jersey in a 38" x 30" frame with B. Wells and #28 inscribed thereon; and

146

d.)     Any and all salary and other compensation received by defendant MICHAEL D. GABOR from his employment with the Cuyahoga County Auditor's Office.

520.    Defendants JAMES C. DIMORA and MICHAEL D. GABOR are jointly and severally liable for this forfeiture obligation.

### FORFEITURE UNDER 18 U.S.C. § 981(a)(1)(C) AND 28 U.S.C. § 2461(c)

521.    The allegations of Counts 2 through 28 and Counts 30 through 33 are hereby realleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 981(a) (1)(C) and 28 U.S.C. § 2461(c).  As a result of the foregoing offenses, defendants JAMES C. DIMORA and MICHAEL D. GABOR shall forfeit to the United States all property, real and personal, which constitutes, or is derived from, proceeds traceable to the commission of Counts 2 through 28 and Counts 30 through 33; including, but not limited to:

a.)     7254 Forestwood Drive, Independence, Cuyahoga County, Ohio (Permanent Parcel Number 563-11-038); more particularly: the value of the free and discounted improvements provided to defendant JAMES C. DIMORA at the property.

b.)     Ohio State jersey in a 38" x 30" frame with B. Wells and #28 inscribed thereon.

c.)     MONEY JUDGMENT: defendant JAMES C. DIMORA shall forfeit property, including, but not limited to, a sum of money equal to the proceeds of Counts 2 through 28 and Count 30.  Defendant JAMES C. DIMORA is jointly and severally liable for this forfeiture obligation.

d.)     MONEY JUDGMENT: defendant MICHAEL D. GABOR shall forfeit property,

147

including, but not limited to, a sum of money equal to the proceeds of Count 17, Count 19, Count 21, Count 28, and Counts 31 through 33.  Defendant MICHAEL D. GABOR is jointly and severally liable for this forfeiture obligation.

SUBSTITUTE PROPERTY

522.    In the event that any property subject to forfeiture under 18 U.S.C. § 1963(a) and/or 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), as a result of any act or omission of the defendant(s):

a.)    cannot be located upon exercise of due diligence;

b.)    has been transferred or sold to, or deposited with a third party;

c.)    has been placed beyond the jurisdiction of this Court;

d.)    has been substantially diminished in value; or,

e.)    has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 18 U.S.C. § 1963(m) and/or 21 U.S.C. § 853(p) [as incorporated by 28 U.S.C. § 2461(c)], to seek forfeiture of any other property of the defendant(s), up to the value of the forfeitable property described above.

A TRUE BILL

Original document -- Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.

148