1

```
 1                   UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
 2                        EASTERN DIVISION

 3    UNITED STATES OF AMERICA,        Case No. 1:10cr387
                                       Cleveland, Ohio
 4              Plaintiff,             May 20, 2011

 5                 vs.

 6    JAMES C. DIMORA and
      MICHAEL D. GABOR,
 7

 8              Defendants.

 9
                        TRANSCRIPT OF PROCEEDINGS
10              BEFORE THE HONORABLE SARA LIOI
                  UNITED STATES DISTRICT JUDGE
11

12                        MOTION HEARING

13
      APPEARANCES:
14
      For the Government:        Antoinette T. Bacon
15                               Ann Rowland
                                 Nancy Kelley
16                               Assistant United States
                                 Attorneys
17                               Suite 400
                                 801 Superior Avenue, West
18                               Cleveland, Ohio  44113
                                 216/622-3966
19

20    For Defendant Dimora:      William T. Whitaker, Jr., Esq.
                                 Andrea L. Whitaker.
21                               Law Office of William T. Whitaker
                                 301 Gothic Building
22                               54 East Mill Street
                                 Akron, Ohio  44308
23                               (330) 762-0287

24

25
```

```
 1    For Defendant Gabor:        Leif B. Christman
                                  David Oakley
 2                                2000 Standard Building
                                  1370 Ontario Street
 3                                Cleveland, Ohio  44113
                                  (216) 241-5019
 4

 5

 6

 7    Court Reporter:             Lori Ann Callahan, RMR-CRR
                                  United States District Courthouse
 8                                Room 568
                                  2 South Main Street
 9                                Akron, Ohio  44308
                                  (330) 819-8676
10

11

12
      Proceedings recorded by mechanical stenography, transcript
13    produced by computer-aided transcription.

14

15

16

17

18

19

20

21

22

23

24

25
```

1          P R O C E E D I N G S

2                  -  -  -

3              THE COURT:  Please be seated.

4              We're here on Case Number 1:10CR387, United

15:05:43   5   States of America versus James Dimora and Michael Gabor, and

6    the third defendant in this case was not required to attend

7    because he has not sought a continuance.

8              This matter is to discuss the pending motions

9    for continuance of the trial.

15:06:06  10             Counsel, if you would please identify yourself

11   for the record and indicate who you represent and indicate

12   if you have either government representatives or client

13   present, and we will begin with the government's counsel.

14             MS. BACON:  Thank you.  Assistant United

15:06:19  15   States Attorney Antoinette Bacon on behalf of the United

16   States.  With me are my cocounsel, Ann Rowland and Nancy

17   Kelley, also on behalf United States.  And the government's

18   representatives are Special Agent Mike Massie of the FBI and

19   Special Agent Kelly Fatula of the IRS.

15:06:35  20             THE COURT:  Thank you.  Next, counsel for Mr.

21   Dimora?

22             MS. WHITAKER:  Good afternoon, Your Honor.

23   Andrea Whitaker and Bill Whitaker for Mr. Dimora, and Mr.

24   Dimora is present.

15:06:47  25             THE COURT:  Thank you.  Finally.

1          MR. CHRISTMAN:  Thank you, Your Honor.  Leif

2   Christman and Dave Oakley on behalf of Michael Gabor.

3   Michael Gabor is present.

4          THE COURT:  Thank you.  All right.  We had

15:06:58  5   some limited argument on the motions for a continuance which

6   have been briefed, and there are a couple of areas of

7   clarification that the court would like before the court

8   makes a final decision on the final disposition of this

9   matter.

15:07:15 10          There's been mention regarding the number of

11   wiretaps involved in this case, and I would like a review of

12   the number of wiretaps with the discussion of the number of

13   pertinent wiretaps and the number of wiretaps involved or

14   required because of the filing of the superseding

15:07:34 15   indictment.

16          So does the government have a breakdown of

17   that nature?

18          MS. BACON:  Yes, Your Honor.  In total, Your

19   Honor, there are approximately 44,290 completed sessions.

15:07:49 20   And of those sessions, some may be duplicates.  For example,

21   if someone left a voice mail message, that could be session

22   1.  Someone retrieving the same voice mail message is

23   session 2, but approximately 44,290.

24          Of those, upon an initial review by the

15:08:07 25   agents, they identified approximately 8,168 pertinent calls.

1    And by that, the government is not representing that there

2    aren't more pertinent calls or that each is pertinent; but

3    that is just the categorization given by the agents at the

4    time of the review.

15:08:26  5         THE COURT:  Okay.  And then do you have a

6    further breakdown of how many calls would have been

7    implicated due to any adage charges in the superseding

8    indictment?

9         MS. BACON:  I am not sure what I understand --

15:08:42  10    I'm not sure if I am understanding your question completely.

11         THE COURT:  You've added some conspiracies in

12    the superseding indictment and taken away some conspiracies

13    in the superseding indictment.  Maybe I can be more explicit

14    in my questioning.

15:08:55  15         And I am asking if you -- the government has

16    any idea of how many calls then additionally from the time

17    that the original indictment was filed -- it implicated a

18    certain number of calls that were pertinent.  Then the

19    superseding indictment was filed.  Some matters removed;

15:09:16  20    some conspiracies were removed, some added.  The ones that

21    were added, how many more calls would you estimate might be

22    involved or in that?

23         MS. BACON:  The 8 ,168 pertinent calls are

24    calls pertinent to all of the criminal conduct, both what

15:09:37  25    was charged originally, the superseding and perhaps other

1 uncharged criminal conduct. So the 8,168 was not solely

2 limited to only the initial indictment. In fact, some of

3 these have nothing to do with Defendants Dimora or Gabor.

4 They could have been pertinent because of something that

15:09:59 5 Kevin Kelley did or Steve Pumper or some other person.

6 But to say that each of the 8,168 calls is

7 pertinent because of these defendants is not an accurate

8 statement.

9 THE COURT: All right. Would the answer then

15:10:11 10 be there are no more calls implicated than -- implicated

11 originally or pertinent to the best -- I understand that --

12 MS. BACON: There are none added to this

13 number, but to say originally the government contemplated

14 using X amount of calls at the original trial, there are

15:10:30 15 different calls that will be added to our exhibit list

16 because of the superseding indictment.

17 THE COURT: Okay.

18 MS. BACON: So, for example, on the Melaragno

19 scheme, I believe there are only two additional calls.

15:10:41 20 THE COURT: Okay. That's the type of

21 information.

22 MS. BACON: But they would be included --

23 those two calls would have been included in the 8,168

24 pertinent calls.

15:10:51 25 THE COURT: I see.

1          MS. BACON:  The removal of the Skuhrovec

2     scheme eliminated quite a number of calls.  Originally, we

3     contemplated using approximately one to two dozen calls

4     related to that scheme that are gone.

15:11:05  5          So that eliminated pertinent calls that would

6     be government's trial exhibits.

7          The Randazzo count would probably add about a

8     dozen calls, Your Honor, give or take, depending on how we

9     choose to present the evidence and we haven't identified

15:11:27 10    each of our exhibits yet so they probably wash each other

11    out, those two schemes.

12          THE COURT:  Okay.

13          MS. BACON:  I don't believe there are any

14    additional calls we would use because of the tax scheme

15:11:43 15   because the tax is based on all of the other substantive

16    counts, so the top of my head right now, I can't think of

17    any additional calls that would be required because of that.

18          There are no additional calls related to Mr.

19    Gabor's divorce scheme or his job buys that are some of the

15:12:07 20   RICO predicate acts that were cited in the 1962(d) count.

21          But there may be a dozen calls approximately

22    that relate to the RICO conspiracy only that don't relate to

23    other schemes.  But, again, because we haven't completed our

24    trial exhibit list, that's just an approximation.

15:12:29 25          THE COURT:  Sure.  Now, you've talked in terms

| | |
|---|---|
| 1 | of 8,168 pertinent calls.  Have those been identified in any |
| 2 | way for the defendants? |
| 3 | MS. BACON:  Yes, Your Honor.  In the index |
| 4 | they received, they received a detailed index of the call |
| 15:12:48  5 | session, number, the date, the time of the call, the |
| 6 | duration of the call, I believe the call participants, and |
| 7 | initial characterization of whether or not it was pertinent |
| 8 | or nonpertinent understanding that there could be |
| 9 | nonpertinent calls that are pertinent, or are pertinent in |
| 15:13:09  10 | certain respects, not trial exhibits, but generally it's a |
| 11 | way to segregate between -- |
| 12 | THE COURT:  So all the calls have been |
| 13 | demarcated in some fashion, pertinent versus nonpertinent. |
| 14 | MS. BACON:  Yes, Your Honor. |
| 15:13:22  15 | THE COURT:  So is that the only designation |
| 16 | given? |
| 17 | MS. BACON:  I believe some may have also been |
| 18 | designated as potentially privileged, intercepted but marked |
| 19 | as privileged so appropriately -- |
| 15:13:40  20 | THE COURT:  Which the government would not be |
| 21 | using? |
| 22 | MS. BACON:  Yes, Your Honor, clearly. |
| 23 | THE COURT:  I think it's fair to say. |
| 24 | MS. BACON:  Yes. |
| 15:13:46  25 | THE COURT:  That's one thing we can agree on |

1    for certain.

2    So we're talking about -- let's talk about the

3    superseding indictment then if I was listening closely. No

4    more than or -- you mentioned two dozen calls as they relate

15:14:04   5    to -- I am sorry, one dozen as it relates to the RICO, and

6    one dozen as it relates to Randazzo.

7    MS. BACON: Approximately, Your Honor, yes.

8    THE COURT: Perhaps two additional calls as it

9    relates to Melaragno.

15:14:23  10    MS. BACON: Yes, with respect to those

11    Melaragno calls, they also overlap into the obstruction

12    count. That's why I hesitate a little there, because they

13    could have been included in the supercede -- in the original

14    indictment under the obstruction. But they also

15:14:34  15    specifically relate to the Melaragno counts of the

16    indictment.

17    THE COURT: All right. Does the government

18    intend to provide transcripts of any of the pertinent calls?

19    MS. BACON: We intend to provide transcripts

15:14:51  20    well in advance of trial of the calls that we intend to use

21    in our case in chief.

22    THE COURT: Okay. And when will you make that

23    -- I know it depends upon the trial date; but let's say

24    hypothetically the trial date were September 12, how far --

15:15:07  25    MS. BACON: May I have one minute to consult

1    with the case agent?

2                  THE COURT:  Sure.

3                  MS. BACON:  Your Honor, we think we could have

4    the majority, substantial majority of that project completed

15:15:34  5    by the end of July.

6                  THE COURT:  Okay.  And that's -- you're

7    indicating end of July is your determination of what you --

8    what the government intends to use at trial?

9                  MS. BACON:  Together with the transcripts.

15:15:50  10                  THE COURT:  Together with transcripts?

11                  MS. BACON:  Yes, Your Honor.  We could earlier

12    than that identify the session numbers, if that would be

13    helpful, but to have the completed transcripts and have them

14    in a substantially completed form that would require some

15:16:02  15    additional time.

16                  THE COURT:  Now, I know I hesitate to ask this

17    question, and I am certainly not going to hold you to it, do

18    you have any concept, any idea whatsoever of how many calls

19    might be involved?  I know I am not certainly going to hold

15:16:22  20    you to it because it is -- I don't want to say it's early on

21    because it's not early on.

22                  The indictment was filed in September, and

23    it's already May, so substantial time has already elapsed

24    relative to this case and this matter.  So do you have any

15:16:41  25    idea?  If you don't, that's fine, of how many calls may be

1    used by the government and, therefore, identified to the

2    defendants?

3         MS. BACON:  Yes.  We haven't counted all of

4    the calls.  I can't give you an exact number.  We can

15:17:11  5    certainly say there are a number of calls that were charged

6    in the indictment, and certainly all of those we would

7    anticipate having as trial exhibits.

8         So as a starting point, the number of calls

9    listed in the indictment which obviously has been public for

15:17:25  10    now quite some time.  It's difficult to give you an accurate

11    estimate at this point.

12         THE COURT:  No, I understand -- I can

13    appreciate this.

14         MS. BACON:  There's a number above and beyond

15:17:38  15    what is charged in the indictment.  As we have in the

16    previous trials, we will be trying to clip the calls because

17    many of them are very long to only the most relevant

18    portions of the calls.

19         THE COURT:  Okay.  Now, you also indicated in

15:17:49  20    your briefing that these are in searchable format.  Can you

21    describe what that means?

22         MS. BACON:  Yes, Your Honor.  All of the

23    discovery has been -- I should not say all, but vast, vast

24    majority have been scanned.  There are some items that are

15:18:07  25    too bulky to scan, or tangible items, for example, a framed

1    artifact of sorts which clearly can't be scanned.

2            But they have been scanned and provided on a

3    disk, and the way it works is similar to a Google search or

4    a Westlaw search, where you can type in a word and you can

15:18:23  5    have a list then of all the documents that hit on that

6    particular word.

7            For example, if the defendant was interested

8    in searching for anything related to Vandra Brothers

9    Construction, one could type in Vandra and all of the items

15:18:36  10   with Vandra Brothers would come on to the screen, and from

11   there you can see where in the document that term is

12   located.

13           THE COURT:  Okay.  Now, as to Mr. Gabor, I

14   mean, in the superseding indictment, he is charged in the

15:18:58  15   RICO count plus six other counts, correct, if I've

16   identified these?

17           MS. BACON:  I believe there are two related to

18   Steve Pumper, a substantive count and a conspiracy, the

19   obstruction conspiracy, the Gallucci mail fraud conspiracy

15:19:40  20   which was the prior indictment that was reincorporated back

21   in that was joined into this indictment, the January 2012

22   trial that was merged into this.  I believe there may have

23   been two counts related to that, so that would be six.

24           THE COURT:  So --

15:19:57  25           MS. BACON:  I believe you're correct, Your

1    Honor.

2            THE COURT:  I have -- and, of course, Count 1,

3    which is the RICO count.  Count 17, I don't know if you have

4    the indictment before you.

15:20:10  5            MS. BACON:  I don't have a copy of it here,

6    Your Honor.

7            THE COURT:  And, of course, his counsel is

8    here, and I would think he would ought to know if I have

9    this accurate.  So Count 1, Count 17, Count 19, Count 21,

15:20:27  10   and Count 28, 31 and 32.

11            Mr. Christman or --

12            MR. OAKLEY:  Your Honor, I believe that's

13   correct in terms of the ones he's specifically indicted

14   under; however, the RICO conspiracy incorporates virtually

15:21:01  15   every count of the indictment, and there's a number of

16   counts of the indictment where he is mentioned as aiding and

17   abetting or assisting in some manner without any greater

18   specificity and we haven't had a response to the Bill of

19   Particulars that we filed, so we really don't know.

15:21:22  20            THE COURT:  Let's just go one step at a time.

21   He's actually named in seven counts.  The first one being

22   the RICO and the remaining six are the ones that I just

23   identified, 17, 19, 21, 28, 31 and 32, correct?

24            MR. OAKLEY:  I believe that is accurate.

15:21:42  25            THE COURT:  Do you have a response to his

1    counsel's statement regarding the RICO then involving Mr.

2    Gabor in each and every other count?

3              MS. BACON:  Your Honor, he is correct.  That

4    is part of the RICO conspiracy.  The government has to prove

15:21:57  5    that Defendant Gabor agreed that one member of the RICO

6    conspiracy would commit two acts of racketeering.

7              And the government has cited as potential acts

8    of racketeering not only the specific acts in Count 1, which

9    are his -- the job buy and the divorce fraud, but also the

15:22:18  10    other counts in the indictment with the exception of the

11    count related to Landerhaven, which is not included in the

12    RICO conspiracy.  So he is right with respect to that.

13              I'm not aware of Mr. Gabor being charged as an

14    aider and abettor in other counts just because he is

15:22:37  15    mentioned in them.  I mean, clearly if he's not charged in

16    the charging language, he's not -- if he's not named in the

17    charging language, he's not charged with that count.  And

18    certainly, while he's mentioned perhaps in the manner and

19    means and that may give notice to the defendant as to how he

15:22:53  20    agreed that one or more conspirators would commit two acts

21    of racketeering, that's not a substantive count against

22    which he has to defend.

23              So I think we're talking a little bit past

24    each other here.  For the RICO conspiracy, we don't actually

15:23:06  25    have to prove that he committed two racketeering acts or

1    that someone else committed two racketeering acts, only that

2    he agreed that someone in the conspiracy would commit two

3    acts of racketeering.

4                    THE COURT:  Okay.

15:23:20  5                    MR. OAKLEY:  Your Honor, if I could respond?

6                    THE COURT:  Yes.

7                    MR. OAKLEY:  Counsel for the government said

8    that those are not substantive counts that he has to defend

9    against; however, under the RICO statute, if he's found

15:23:30 10    guilty of having agreed to participate in these acts, he's

11    going to prison.

12                    So I would say those are substantive acts he's

13    got to defend against because every single count in the

14    indictment with the exception of maybe six could send him to

15:23:44 15    prison if he's found to have somehow conspired to

16    participate.

17                    And only to the fact that there's an honest

18    services act claim, we don't know if Mr. Gabor picked up the

19    tip at Delmonico's, if that's going to be one of his two

15:24:01 20    parts of the conspiracy to send him to prison.  So this is

21    an open-ended indictment and it is really quite impossible

22    right now to tell exactly what my client is charged with

23    having done.

24                    THE COURT:  You're saying that this 149-page

15:24:34 25    indictment doesn't specify the charges against your client?

1          MR. OAKLEY:  It specifies the charges, but it

2     doesn't specify things like a time or a manner.  Some of

3     these he's alleged to have showed up and played cards at a

4     condominium.  I don't know if the government's

15:24:55  5     interpretation of honest services would include that as

6     being a potential agreement to engage in the RICO

7     conspiracy.  That's part of the reason we filed the Bill of

8     Particulars so we would have a better idea of what exactly

9     of these charges my client was actually conspiring to be

15:25:12  10    part of.

11          You know, as the government stated, there's

12     the RICO count.  There's the six substantive charges.

13     There's the two parts in the RICO, the two specific

14     predicate acts mentioned in the RICO charges, and then

15:25:26  15    there's anything else they might think of he may have been

16     with and they're being very coy about whether or not there

17     is anything there or not because they're not required to

18     until they give us the 302s.

19          But that puts us in the difficult position.

15:25:40  20    And we have to look at, I mean, there's 44,000 calls

21     mentioned.

22          THE COURT:  Let's correct that for the record.

23     Somebody misstated in the briefing that there were more

24     calls than that, and that was why I wanted that clarified

15:26:00  25    early on.

1            You would agree that the number of calls total

2    is closer to the 44,000 number than I believe it was 65,000

3    number mentioned in the briefing?

4            MR. OAKLEY:  Your Honor, I will have to

15:26:20 5    confess to being uncertain as to which number is more

6    accurate.  I didn't do the count for the 44 or 65,000.

7            THE COURT:  You what?

8            MR. OAKLEY:  I did not personally count them

9    to be able to say they're either 44,000 or 64,000.

15:26:36 10            MS. BACON:  Your Honor, I might be able to add

11    some clarity to this.

12            The 44,290 are the number of completed calls.

13    There are some sessions where for some reason the call was

14    disconnected or sometimes there's a duplicate session for

15:26:48 15    one call or the call malfunctions.  So when you look at a

16    list of session numbers, it could be the 66 or 65,000

17    number, but in terms of number of complete conversations

18    where there's voice over the interception, it's 44,290.

19            MS. WHITAKER:  I am the one that put that

15:27:09 20    number in the briefing, and I based that, Your Honor --

21    obviously, at this moment, we have not listened to all

22    64,000.  So until we listen to them, we don't know what is,

23    in fact, a completed call, what is a malfunction call.  We

24    certainly found some that are malfunction.  We communicated

15:27:23 25    that to the government.  But the 64,000 is the number of

1    total recorded sessions we've been provided.  Until we

2    listen to them, we don't know which of those are the 44,000

3    that are actually completed calls.

4              So that number came from me, and I think it's

15:27:37  5    accurate on the number of recorded sessions we need to

6    review.

7              THE COURT:  Are those ones calls that are not

8    completed and, therefore, have no recording identified?  Did

9    you hear what counsel just argued?

15:28:00  10              MS. BACON:  Yes, Your Honor.

11              MS. ROWLAND:  If we can have a moment.

12              THE COURT:  Yes.

13              MS. BACON:  Your Honor, the case agent is

14    informing me that the completed calls are identified all on

15:28:11  15    the index that I described earlier with the session number,

16    the date, the time, the duration, pertinent, nonpertinent

17    and the participants.  From the index, it should be clear

18    which are the completed calls.

19              THE COURT:  The ones that are not completed

15:28:25  20    are just hang-ups or not recorded, no voices?

21              MS. BACON:  There are a number of reasons why

22    they can be malfunctions, Your Honor, and through the --

23    there's not one answer as to why they are malfunctions, but

24    there's nothing there to listen to.

15:28:42  25              THE COURT:  Those are not included in the

1    index?

2                    MS. BACON:  No, they are not on the index.

3                    THE COURT:  But they were given to the

4    defendants?

15:29:04  5                    MS. BACON:  The way that the transfer of data

6    worked, Your Honor, it would be on the disk, the actual

7    malfunction session or session that doesn't have

8    conversation in it, but it wouldn't be on the index.  So we

9    couldn't, as we were driving the data over, remove all of

15:29:20  10   the calls that were malfunctioned; but by going through the

11   index, you can cross-reference and see the calls on the

12   index that's completed and click on the corresponding audio

13   file.

14                   THE COURT:  So if it's not in the index, it's

15:29:35  15   fair to say there's nothing on that session?

16                   MS. BACON:  Yes, Your Honor.

17                   THE COURT:  Okay.  Why then, Ms. Whitaker,

18   would you listen to a call that doesn't have anything

19   recorded?

15:29:49  20                   MS. WHITAKER:  Well, first, if I may, we were

21   provided with a disk that was all the Title III recordings

22   that were taken in this case.  That's what we began to

23   review.  That's what --

24                   THE COURT:  Did you look at the index?

15:30:00  25                   MS. WHITAKER:  We do have an index.  And it

1    indicates some pertinent and nonpertinent calls.  This is

2    the first time that's why some things were not on the index

3    and some things were on the index.

4              THE COURT:  Did you see a pattern developing

15:30:13  5    where if the call wasn't on the index, there was no

6    information on the call that was recorded?

7              MS. WHITAKER:  Every time I am opening a call,

8    I'm not also checking the index, Your Honor.  That would add

9    minutes to every single call.  I am listening to the calls

15:30:25  10   that are on the disks that were provided to me.  I have not

11   every time I open a call do I go into the separate index,

12   open it up, find that session.

13             THE COURT:  Are you randomly listening to

14   calls then?  I don't understand how you would -- you're

15:30:36  15   telling me that this is the process that you're undertaking

16   to review this information, but there's got to be a rhyme or

17   reason to the way you're doing it.  And are you just

18   randomly opening calls and that's how you're pursuing it

19   without cross-referencing it on the index?

15:30:52  20             MS. WHITAKER:  The index, Your Honor, only --

21   for example, there's a disk of calls from Mr. Dimora's home

22   phone.  I am listening to all the calls on Mr. Dimora's home

23   phone.  There's no reason for me to look at the index while

24   I'm listening to all the calls of the Mr. Dimora's home

15:31:10  25   phone.  All that tells me is that it's from his home phone,

1    how long it is.  The government has indicated they marked

2    pertinent and nonpertinent, but as they have said here, you

3    can't be guaranteed if it's pertinent, it says pertinent,

4    it's not pertinent, it says not pertinent.  In fact, we were

15:31:24  5    required to sign a waiver saying we wouldn't rely on what

6    the government has identified at pertinent and nonpertinent.

7            So certainly we're not using the index for

8    that.  There really is no reason.  There are times when I've

9    been looking for specific calls on specific issues where,

15:31:39  10   yes, I do go to the index.  I find the call I am looking for

11   and I go to the disk.

12           But when I am listening to all Mr. Dimora's

13   calls, all Mr. Dimora's calls from his cell, all Mr. Russo's

14   call from a time period that is relevant, I just have the

15:31:54  15   disk out and I am listening to the entire disk because

16   there's nothing -- there's no reason for me to be going to

17   that index.  I need to listen to all the calls that were

18   provided on those certain phones or from another person's

19   phones during a certain time period.

15:32:08  20           THE COURT:  So you're choosing to listen to

21   sessions that have no information on it?

22           MS. WHITAKER:  As I said, until sitting here

23   today --

24           THE COURT:  Which you wouldn't hear anything?

15:32:19  25           MS. WHITAKER:  No, I don't hear anything, but

1    it takes 16 seconds simply to open up a call before I even

2    know there was no information.  Certainly if I immediately

3    hear a dial tone, I stop listening because I know there's

4    nothing there.

15:32:33  5         Sometimes you open it up and you don't hear

6    anything for a while because there isn't anything on it.

7    Sometimes you open it up and you don't hear anything for a

8    while because it takes a while for them -- the equipment to

9    go.  Sometimes you open it up and you don't hear anything

15:32:44  10    for a while because people don't start talking for a moment

11    or two.

12         I mean, I am opening these sessions up, on

13    especially Mr. Dimora's home and his cell, and I need to

14    review them all and then, again, like I said, during certain

15:32:57  15    specific time periods referenced in the indictment, I have

16    an obligation to listen to these phone calls not just single

17    one isolated in the indictment, but what was happening

18    around that time, what was going on around that time.

19         That's how I am proceeding with reviewing this

15:33:11  20    discovery.  I don't know that there's any other way to do it

21    to assess the circumstances in which these charges are being

22    made.

23         MS. BACON:  Your Honor, just to clarify

24    perhaps one misunderstanding.  At the time the government

15:33:26  25    gave the discovery, Agent Massie and other members of the

 1    prosecution team sat down and explained the index, the

 2    calls, the idea of the malfunctioning calls, explained why

 3    there would be some absence of -- why there's a disconnect

 4    between a hard drive and the chart.

15:33:43  5         If it would help, we've never been asked to

 6    provide, but we could provide next week an index of all the

 7    malfunctioned calls if that would facilitate the review.

 8         MS. WHITAKER:  I did sit down with them and we

 9    did talk about the fact there were some problems with some

15:33:57 10    calls.  I don't remember if I was told that.  Again, there

 11    was a whole list of calls that they had isolated that were

 12    malfunctioned.  Again, I was provided disks that were Title

 13    III discovery in this case and I began --

 14         THE COURT:  All right.  So if the differential

15:34:13 15    between your number and your brief and their number they

 16    represented today, the government's number is 20,000 calls

 17    that have malfunctioned and have no information on that,

 18    wouldn't you want to know that so you didn't open that up

 19    and take 16 seconds to do that?

15:34:26 20         MS. WHITAKER:  I mean, if they can give me a

 21    list of malfunctions.

 22         THE COURT:  I think that's what the government

 23    just said.

 24         MS. WHITAKER:  That would be helpful.

15:34:34 25         THE COURT:  That eliminates 20,000 sessions.

1        MS. WHITAKER:  That eliminates 20,000

2    sessions, but it does not eliminate --

3        THE COURT:  Well, actually 22,000 sessions.

4        MS. WHITAKER:  It does.  I would imagine from

15:34:44  5    what the government is telling me is those 22,000 sessions

6    don't have any recording.  It does not affect the total

7    hours of recording that we also identified in our brief.

8        Am I correct about that?

9        MS. BACON:  That should be correct, Your

15:35:02  10    Honor.

11        MS. WHITAKER:  So there's still 1,600 hours.

12        THE COURT:  That's only if you choose to

13    listen to calls that are not pertinent --

14        MS. WHITAKER:  Again, Your Honor --

15:35:13  15        THE COURT:  -- and don't come into the time

16    frame that's relevant as you've described it?

17        MS. WHITAKER:  Again, Your Honor, the

18    government is the one who's identified pertinent and

19    nonpertinent in the index.  They made us sign a waiver that

15:35:24  20    we would not rely upon that in any kind of court filing or

21    statements.  They said here today on several occasions that

22    they can't guarantee it was pertinent, it's not pertinent.

23    So I think that we cannot rely on the fact that the case

24    agent has identified what he considers to be pertinent and,

15:35:43  25    therefore, we don't need to listen to these nonpertinent

1    calls.

2              Obviously, pertinent for them would be more

3    intending to be inculpatory.  I think I may have a very

4    different perception of what I consider to be exculpatory

15:35:56  5    pertinent phone calls.  I don't think I can effectively

6    represent my client and rely on Agent Massie, as diligent as

7    I know he is, representation of what is in his opinion a

8    pertinent call in defending my client.  So I do need to

9    listen to the calls that we've been provided.

15:36:13 10              As the court is aware, the time frame for the

11    RICO is certainly far greater than we've got the recordings

12    for.  The recordings we have go --don't start until 2008 and

13    end -- you know, when this investigation was culminated in

14    the indictment.  That's not a long time period.  There

15:36:32 15    certainly was many, many things in the indictment happening

16    during that time.

17              MR. OAKLEY:  If I could say one thing about

18    the pertinent calls.  I began my review of the wiretaps by

19    looking at the indictment and the Title III affidavit and I

15:36:48 20    found at least two calls in the indictment that are

21    specifically mentioned relating to my client that were not

22    listed as pertinent in the index that I have.  So I gave up

23    relying on the index, because it's not trustworthy.

24              The government won't even stand behind it and

15:37:04 25    I am certainly not going to rely on it for representation of

1    my client.

2                    THE COURT:  Okay.  I found the number that was

3    cited in the brief is 64,237?

4                    MS. WHITAKER:  Yes.

15:37:28  5                    THE COURT:  Recorded conversations is what the

6    brief says.  We now can agree that those are not recorded

7    conversations, correct?

8                    MS. WHITAKER:  Based on the representations

9    from the government, apparently there are many of those

15:37:39 10    recorded sessions we received have no voice on them.  So I

11    would just simply refer the court to the total hours of the

12    recordings, and that would cover the 44,000 or whatever

13    number the court -- the government says actually has a voice

14    on them.

15:37:52 15                    THE COURT:  Okay.

16                    MS. WHITAKER:  If I can clarify, when they say

17    malfunction calls, does that mean it was a call that was

18    dropped, or were you guaranteeing on these 22,000 calls

19    there's no voice at all?

15:38:10 20                    MS. BACON:  There could be a variety of

21    different things happening.  Some could be text messages

22    which we are not authorized to intercept and so they come up

23    with the session but we don't have a content because it was

24    a text.  It could be an equipment malfunction.  It could be

15:38:24 25    a problem with the phone company.  There could be many

```
 1    different things.  I hate to limit it to one because there
 2    are a variety of reasons.
 3              MS. WHITAKER:  I understand what you're saying
 4    about the reasons.  There are a variety of reasons for the
 5    malfunction.  What I am looking for --
 6              MS. BACON:  There's no audio.
 7              MS. WHITAKER:  There's no audio whatsoever on
 8    these 22,000?
 9              MS. BACON:  So it's not a hello, hello and the
10    other person can't hear.  That would be included in the
11    44,290.
12              MS. WHITAKER:  So the 44,000 calls, that
13    represents the nearly 1,600 recorded conversations?
14              MS. BACON:  Correct.
15              THE COURT:  When were these sessions, again,
16    provided to the defendants?
17              MS. BACON:  Defendant Dimora received it on or
18    about February 24, Your Honor, and I believe Defendant Gabor
19    received it around December 20 of last year.
20              THE COURT:  And Defendant Dimora received it
21    in February because of the situation involving --
22              MS. BACON:  Involving his counsel, Your Honor.
23    It took until February -- I believe February 2 was the
24    hearing in Akron before Your Honor where the Whitakers
25    discussed their representation and we organized that they
```

1      would be the counsel of record going forward.  That took a

2      while.  And then the government met with the Whitakers

3      almost immediately thereafter and began discussing the

4      protective order, the discovery plan, et cetera.

15:39:55  5           MS. WHITAKER:  For the record, I will note

6      that previous counsel had been on for quite some time and

7      had not signed the protective order.  There were -- it

8      wasn't so they weren't communicating.  There were issues

9      they were trying to address.  As soon as we got on board, we

15:40:10  10    preliminarily agreed because we wanted to get started on the

11     discovery.  So we got it and started as soon as we possibly

12     could.

13          THE COURT:  Okay.  I guess I will ask the

14     defendants to address the situation that this case, and I

15:41:03  15    think it's reflected in the record, was, of course, filed in

16     September of 2010; and in October, I believe, is when the --

17     thereafter, I think it was October where there was a date

18     set for the trial.  And there was contemplation of a

19     superseding indictment and, thereafter, that was built in to

15:41:44  20    the selected trial date of September 12.

21          And my question is, the argument is, well, a

22     90-day continuance isn't that long given the RICO; but it's

23     a 90-day continuance plus the original continuance that was

24     factored in from originally a day of July, I believe, so

15:42:17  25    it's July to September built-in continuance, plus a

1    continuance of 90 days that really translates to a

2    continuance of 120 days, because a continuance of 90 days as

3    everybody knows in this room is right in the middle of

4    December, and if you're suggesting that I start the trial

15:42:37  5    right in the middle of December, I don't think anyone has

6    suggested that.  So it's really you're suggesting I start it

7    in January, which is not a 90-day continuance.  It's 120-day

8    continuance beyond the original three-month or 90-day

9    continuance already built into the schedule.

15:43:00  10          So knowing that, I need to know what justifies

11    that kind of continuance.

12          MR. CHRISTMAN:  Your Honor, may it please the

13    court.  Leif Chrstiman on behalf of Michael Gabor.  Your

14    Honor, I was appointed to represent Mr. Gabor a couple days

15:43:18  15    before that -- before that hearing and I don't remember

16    specific dates as it was late last fall.

17          When I accepted the appointment, certainly,

18    Your Honor, I had no idea of the volume of discovery.  And,

19    you know, discussing the calls that the court just gone

15:43:36  20    through, that's nothing to say about the other physical

21    documents that have been provided to us to review, as well.

22    And I think that should be part of the equation whether the

23    court is considering the continuance.

24          To ask the government about the specific

15:43:54  25    documents, you know, all the scanned material, you know, I

1    think I mentioned previously about having an external hard

2    drive that's capable of handling two terabytes, and the

3    hundreds and if not millions of documents that have been

4    provided, that's not went in the equation when I agreed to

5    accept the appointment on this case.  Those dates have been

6    set prior to my accepting the appointment to the case.

7                    THE COURT:  I guess that's -- that's a point

8    we need to address.  You accepted the case knowing what the

9    dates were.

10                   MR. CHRISTMAN:  Without having any of the

11   discovery to make, you know, an intelligent knowing decision

12   on that.

13                   THE COURT:  Well, when did you get the

14   discovery?

15                   MR. CHRISTMAN:  I got it December 23.

16                   THE COURT:  When did you move for a

17   continuance?

18                   MR. CHRISTMAN:  After the superseding

19   indictment.

20                   THE COURT:  Precisely.  What has changed

21   between then when you never asked for a continuance in

22   December or January or February or March to when you did ask

23   for a continuance?

24                   MR. CHRISTMAN:  Your Honor, I briefed those

25   issues and what I put in there would be that fact of the

1    RICO indictment, and what Mr. Oakley was touching on

2    earlier, opens up the universe so the information that we've

3    been provided that I have a duty and obligation to review in

4    order to be prepared to go to trial.  I think that

15:45:20  5    previous -- on previous indictment could have

6    compartmentalized the information and, you know, looked at

7    various portions that would have relayed to specific

8    charges.

9                 But I think with the RICO indictment, Judge,

15:45:31  10    you know, I have an obligation for a much broader universe

11    of the information that's been given me to review and

12    prepare for trial.

13                 THE COURT:  Ms. Whitaker?

14                 MS. WHITAKER:  Just a few points, Your Honor.

15:45:45  15    In terms of the court's inquiry about why no -- you know,

16    obviously, nobody knows the size of the discovery when they

17    initially get the case.  If it turns out that they're going

18    to need some more time, as the government just in another

19    case they have, they then move the court for additional time

15:46:02  20    based on the complexity of the case, based on the volume of

21    discovery.  So I don't know that at the time anybody

22    originally signs on that they ever know the answer to that

23    question.

24                 I think the -- I know I had discussions with

15:46:13  25    Mr. Christman prior to the RICO coming out that it would be

1    somewhat immature and premature to file a motion to continue

2    until we got the RICO indictment.

3              As the court knows, we were hoping to get it a

4    little earlier.  We were waiting -- he was waiting for my

15:46:26  5    discussions with him until he got the RICO indictment so he

6    can make an informed complete single, one-time to the court

7    a motion to continue if that was necessary.

8              In terms of what Mr. Christman says about the

9    need to look at the documentary, yes, I think that's

15:46:43  10   obviously very important.  If the court is looking to get an

11   assessment of the total world of discovery we've been

12   provided --

13             THE COURT:  You certainly can address it.

14   That's why we're here.

15:46:52  15            MS. WHITAKER:  Yeah.  I appreciate the court

16   giving us an opportunity to do that.

17             We have been pro -- the government is correct.

18   There are some items that are not contained in the disk that

19   we've been given.  I don't know that I would go far as to

15:47:05  20   say there are a few; things are just too bulky.  This is the

21   index of items that are not included in the discovery.  Some

22   of these items include computers, so we're not -- parts of

23   evidence from search warrants, so we're not talking about a

24   few big pictures of blueprints.

15:47:21  25            We're talking about a large volume of

1    information that is not also included in the huge volume of

2    information provided on the two terabyte hard drive.

3             So it's not a minimal -- it's certainly not a

4    minimal.  For example, they're divided into different

15:47:39  5    sections, and by far, the biggest section, so I'm not trying

6    to claim that all of them are big, but by far the biggest

7    section is the 352 gigabits.  That contains, Your Honor,

8    2,476,000 some files.  Now, everything is duplicated.

9    There's two of everything in there.  So it really means that

15:48:00 10    there are 1,240,000 files on this one section of discovery.

11             We are talking about an incredible, an

12    incredible volume of discovery to review in addition to the

13    recordings.  And until you get that handed to you, there's

14    simply no way to contemplate the amount of time it's going

15:48:21 15    to take to go through that.  We're certainly also not

16    discussing here any Jencks material or any other material we

17    haven't received yet.  Obviously that will add to that.

18             But just in terms of giving the court an

19    overview of the amount of discovery that we simply have to

15:48:38 20    go over.

21             In terms of the exploring the idea that this

22    was originally going to be set in July, and then September

23    was chosen because it's such a more complex case, obviously

24    we weren't involved in the case.  If I had been, I certainly

15:48:54 25    would have said a month and a half, which is really what

1  that is, it wasn't the whole month of July, whole month of

2  August, whole month of August, who month of September.  It

3  was a much more limited, I believe, time that was factored

4  in there.  I just don't think even that was enough to

15:49:07 5  account for the complexities.

6              THE COURT:  Maybe 60 days.

7              MS. WHITAKER:  I just don't think it was

8  enough to account for the complexities of this case.

9              As I mentioned in one of our briefing that the

15:49:20 10  court's local rules provides 24 months.

11              THE COURT:  You know, I don't argue the civil

12  rules.  The civil rules of discovery are very vastly

13  different than the criminal rules.  You know that; I know

14  that.  So we're not going to go down that path because it's

15:49:43 15  not very persuasive.

16              MS. WHITAKER:  I apologize.  I just thought

17  this was document intensive.  That's why I referred to those

18  more related.  Certainly won't argue it if the court is not

19  interested in hearing it.

15:49:56 20              THE COURT:  I'm not interested in hearing it

21  because unless you're going to have your client sit for

22  deposition in this case like defendants are required to do

23  in civil cases, then it's just clearly not pertinent.

24              MS. WHITAKER:  We're certainly not going to do

15:50:10 25  that.

1          THE COURT: Okay. It's not pertinent, and we

2    would agree.

3          MS. WHITAKER: In terms of, you know, we

4    received the discovery as they indicated end of February.

15:50:18  5    As I am sure, I will hope the government can attest, they're

6    well aware that we are jumped right in and started. We

7    filed several letters. Every time we have come up with a

8    problem, an issue with discovery, which there have been

9    several, we've contacted them.

15:50:33  10          They've been very expedient in getting back to

11    us, but, again, we don't know about these issues until we

12    get them. It wasn't until I was sitting here today that I

13    knew I could eliminate 22,000 recordings.

14          THE COURT: I think it's 20,000. I think

15:50:45  15    it's --

16          MS. WHITAKER: 20,000 recordings. And I am

17    certainly very glad to do that. I don't think, however, it

18    doesn't change the numbers that I added in my brief which

19    was we're talking about 1,600 hours of recordings and nearly

15:51:02  20    40-hour work weeks to play those.

21          I understand the court -- maybe I am

22    misunderstanding the court that there's some indication that

23    I might not need to listen to most of those. I disagree

24    that -- that my obligation is to listen to those. This is

15:51:17  25    actually a very discrete period of time in the whole range

```
           1    of the RICO indictment.  It is a period of time where all

           2    these individuals that were recorded, and I don't think I

           3    can say who they are because of the protective order, but

           4    the court's aware all these individuals are important

15:51:34   5    players in this case.  All their calls just during the small

           6    limited time period were recorded.  There are a lot of

           7    charges that are occurring during this time period.

           8              I am looking for both inculpatory, as well as

           9    exculpatory information.

15:51:49  10              We were notified there have been two calls

          11    listed in the indictment that were noted as not pertinent in

          12    the thing, and I don't think that that is by any means any

          13    attempt to misrepresent anything by the government.  I think

          14    it's just dealing with this volume of calls.  And that is

15:52:06  15    why we cannot rely on the index to determine which calls we

          16    can't listen to and we calls we can listen to.

          17              THE COURT:  Okay.  Thank you.  Do you care to

          18    respond?

          19              MS. BACON:  Thank you, Your Honor.  A couple

15:52:16  20    of issues about the time frame.

          21              Mr. Christman was appointed as counsel for

          22    Michael Gabor on November 8, and on November 9, Judge

          23    O'Malley issued the trial order that set forth the relevant

          24    dates including the trial dates.

15:52:30  25              We met with Mr. Christman on November 29,
```

1    2010.  That was the meeting as stated in our brief where we

2    told him the exact scope of the superseding indictment

3    including that the RICO conspiracy contemplated all of the

4    substantive counts that were in the then current indictment.

15:52:49  5         So as of November 29, 2010, he knew that he

6    had to go beyond the counts -- substantive counts charged in

7    Defendant Gabor and he needed to start preparing for all of

8    the counts.

9         We also told him about the additional schemes,

15:53:04 10   the nature of the additional schemes that would be added and

11   had other discussions, including the fact that he would need

12   to produce a two terabyte external hard drive.  He sent us a

13   letter on December 7, 2010, enclosing the internal hard

14   drive for us.

15:53:21 15        As of December 7, there's no misunderstanding

16   about the scope of discovery from Defendant Gabor's

17   perspective.  He knew it was going to be two terabytes full

18   of information, and he had all of that material on or about

19   December 23, 2010.  So within two weeks of him providing us

15:53:40 20   the signed protective order and the hard drive, he had

21   everything.

22        In terms of Defendant Dimora and the scope of

23   discovery, our notes of the February 2, 2011 in Akron

24   reflect that the Whitakers, Attorneys Whitakers acknowledged

15:53:57 25   that they knew through former counsel, Dick Lillie, the

1    scope of discovery; they were aware of the complexity; they

2    discussed the dates; they are prepared to meet those dates,

3    and they agreed to be bound by those dates.

4         And at that time, Mr. Lillie knew the scope of

15:54:15  5    discovery, because as Ms. Whitaker indicated, we had been

6    having regular conversations about the scope of the

7    protective order and other issues related to discovery, and

8    he actually had some of the discovery through a limited

9    protective order as it related to some contemplated

15:54:30 10    depositions and within that included Jencks material, some

11    material that could be considered as Brady and Giglio

12    material.  And they had that as early as November 16, 2010.

13         And I am also informed, Your Honor, that

14    Attorney Lillie actually provided to the government the

15:54:52 15    necessary hard drives to transfer all of the information.

16    So certainly, before the February 2, 2011 hearing, everybody

17    in the Dimora camp understood the size of the discovery, the

18    scope of the indictment, the type of material and even had

19    samples through the material provided on or about November

15:55:12 20    16, 2010 of the type of material we were all contemplating.

21         MS. WHITAKER:  May I respond?

22         THE COURT:  Yes, please.

23         MS. WHITAKER:  Okay.  Thank you.  First, I

24    would just like to point out that they're correct.  Mr.

15:55:25 25    Lillie was given some discovery.  And I have not even

1    included any of that discovery in the numbers that I'm

2    talking about here because it was received early on and I

3    didn't think it was fair to include that in the volumes of

4    discovery we need to review.  But that is in addition --

15:55:38  5    what she's talking about is in addition to all the things

6    I've informed the court of.

7                    In terms of this switching the lawyers, I

8    think it's important to point out and I understand the court

9    -- or I am sensing a concern that it was the problem with

15:55:52 10    the lawyers that did not let us get involved until February.

11    It's important to point out that Mr. Lillie sought to stay

12    on this case.  He asked to be appointed to the case.  They

13    went out looking to switch a legal team midway.  Mr. Lillie

14    sought to be appointed.

15:56:09 15                    The court was very well aware of Mr. Dimora's

16    many attempts to obtain a loan on his home.  Those were

17    unsuccessful until we were able to make further negotiations

18    with the government and the court declined to appoint Mr.

19    Lillie.

15:56:23 20                    So that I think is important to note that it

21    wasn't as if it was just a wholesale decided to delay things

22    by switching lawyers.  Mr. Lillie sought to be appointed in

23    the case, so there would be no break in representation.

24                    The court debated -- made the decision not to

15:56:39 25    appoint him and that's why we got involved.

1                In terms of --

2                THE COURT:  Wait a minute.  The court did

3       appoint counsel.  So it wasn't like counsel wasn't

4       appointed.

15:56:49   5                MS. WHITAKER:  Right, but it was -- the lag

6       between Mr. Dimora not going with the court's appointed

7       counsel was a week or two.  That certainly can't be blamed

8       for any delay in this case.  I just -- I want to make it

9       clear that the delay the government refers --

15:57:05  10                THE COURT:  You're saying that the situation

11       you worked out with the government relative that permitted

12       you to remain on wouldn't have applied if Mr. Lillie wished

13       to go that route?

14                MS. WHITAKER:  I am sure that they -- he could

15:57:19  15       have worked the same thing out.  He just didn't.

16                THE COURT:  That's the whole point.  You are

17       trying to say that the government wouldn't do that.  You are

18       alluding or intimating that the government wasn't willing to

19       do that.  I mean, they did it for you.

15:57:32  20                MS. WHITAKER:  That is not -- if I alluded to

21       that, I apologize, because that is --

22                THE COURT:  In other words, if it would have

23       been broached with Mr. Lillie or if Mr. Lillie would have

24       approached, you don't see that would have had any different

15:57:45  25       treatment than you were given?

1         MS. WHITAKER:  No.  I don't mean to suggest

2    the government wasn't cooperative in this.  I think Mr.

3    Lillie did broach the topic with the government.  I think he

4    did tried to work this out.  I think Mr. Dimora had nine

15:57:55  5    attempts or some number to get funding to retain a lawyer.

6         It just didn't happen, and he kept trying, as

7    the court was aware of it.  That's why Mr. Lillie sought to

8    be appointed.  The government never withheld any approval to

9    do that.

15:58:09 10         If I intimiated that, I certainly didn't mean

11    to.  They've been nothing but cooperative, so I don't mean

12    to allude that at all.

13         The only thing I am trying to do is clarify

14    that there wasn't some sort of attempt to delay by switching

15:58:26 15    attorneys.  That's what I wanted the court to understand is

16    that Mr. Lillie --

17         THE COURT:  Because there wouldn't have been a

18    delay at all had Mr. Lillie made the same arrangements that

19    you've made?

15:58:35 20         MS. WHITAKER:  Well, I think that he closely

21    did.  I just think that there was several, several no's from

22    several, several banks before Mr. Dimora was able to get the

23    funding he needed, so I think that he attempted to do both.

24         I think Mr. Lillie was diligent in attempting

15:58:50 25    to get appointed or help Mr. Dimora find funding for

1    retained counsel.

2              MS. ROWLAND:  Your Honor, if I might just

3    briefly explain, because the government was a little more

4    involved in that aspect of things.

15:59:01  5              From the beginning, just as Ms. Whitaker just

6    clarified, the government was always willing to subordinate

7    its interest in the forfeiture to a bank so that the

8    defendant could obtain the funds he eventually did obtain

9    and any delays were solely between the defendant and the

15:59:21 10    bank he was dealing with.  The government wasn't involved at

11    all other than signing the paperwork along the lines we

12    agreed to do in the beginning.

13              And the reason that discovery did not occur

14    while Mr. Lillie was representing the defendant was simply

15:59:36 15    because I think we can see now in hindsight the relationship

16    had broken down, and although Mr. Lillie was willing to sign

17    the limited protective order so that we could provide the

18    discovery with respect to the Payne deposition that had been

19    anticipated, it got to the point where Mr. Lillie would not

15:59:52 20    sign the protective order for the broader discovery, and

21    that was why we hit an impasse on our ability to deliver the

22    rest of the discovery.

23              THE COURT:  Was that issue ever brought to the

24    court's attention formally?

16:00:07 25              MS. ROWLAND:  I believe by the time, without

1    checking the record, it's difficult to say with certainty,

2    but I think by the time that became clear, Mr. Lillie had --

3    it was almost simultaneous with his motion to withdraw.

4                    THE COURT:  Okay.  All right.

16:00:22  5                    Ms. Whitaker, anything else to add?

6                    MS. WHITAKER:  If I may just have one second,

7    Your Honor.

8                    THE COURT:  Sure.

9                    MS. WHITAKER:  I think that in terms of the

16:00:39  10   recordings -- another thing -- the only thing we've given is

11   the amount of recorded hours, if there was some button to

12   hit to have it play straightforward.  Each of these

13   recordings, you know, obviously -- they don't roll from one

14   to the other.  You need to go to each one and open each one

16:00:56  15   and that's several seconds to do that, and even with now

16   that I've discovered I only have to listen to 44,000 instead

17   of 62,000 or whatever the number is, we're still talking

18   that in and of itself obviously takes a tremendous amount of

19   time.

16:01:11  20               I just -- we got on this case, and we

21   obviously will and always will abide by the court's

22   deadlines is what you do as an attorney.  We have an

23   obligation, however, to inform the court after getting the

24   discovery that we believe as officers of the court as those

16:01:31  25   tasks with giving Mr. Dimora's constitutional effectiveness

1    of counsel, we have an obligation to notify the court that

2    without additional time to review the mass amount of

3    discovery we've been given by the government, we simply will

4    be at a severe disadvantage.

16:01:46  5              It will affect our ability to effectively

6    prepare for trial, and that's why we brought it to the

7    court's attention.  If you know, we did not bring it to the

8    court's attention until the government affirmatively

9    represented in its opposition to Mr. Gabor that there was

16:02:00 10  something to be gleaned from the idea that we did not make a

11   motion to continue.

12              We -- once that statement was made, we felt an

13   obligation to inform the court we absolutely think more time

14   is necessary.  We think that we are, again, at a grave

16:02:16 15  disadvantage if we don't have time to adequately review the

16   mass amount of discovery.

17              And while I appreciate the knowledge that

18   there are less recordings, it does not affect the hours that

19   I gave the court, and I think that the original time, the

16:02:35 20  original dates, the September date would not have -- the

21   July date certainly would not have adequately allowed time

22   for that and the extra time that was contemplated by the

23   court, nobody had the discovery.  Obviously, sure they can

24   tell us there's a whole lot of recordings; there's a whole

16:02:51 25  lot of documents.

1           But until you have that information in front

2      of you, you cannot -- it's just impossible to accurately

3      assess the time necessary to review this information to

4      prepare for trial and that's all we're asking for, Your

16:03:07 5      Honor, is enough time to effectively prepare for trial.

6                THE COURT:  You've asked -- you're suggesting

7      90 days.  You are, in essence, asking for 120 days, and I am

8      asking you how do you justify the number of days requested?

9                MS. WHITAKER:  I mean, quite honestly, Your

16:03:26 10     Honor, I certainly think that we've asked for what we

11     consider to be the limited amount of time.  I think we could

12     use any extra time.  Obviously, we're not going to ask the

13     court for a year, but we could easily spend that time.  So

14     we've -- we've looked at this discovery and determined what

16:03:42 15     is the least amount of time that we can come up with to

16     review this discovery, and that's what Mr. Christman asked

17     for.

18                THE COURT:  You've indicated to the court at

19     the last hearing you could be ready -- you could be ready in

16:03:56 20     November was your representation.

21                MS. WHITAKER:  What we said to the court in

22     response was we would appreciate any additional time.  The

23     court said, could you be ready in November.  We said if 60

24     days is all we can get, we will be ready in 60 days.

16:04:09 25     Obviously, if the court denies this motion, we have to be

1    ready in September.  But what we're saying is, you know, I

2    agree with Mr. Christman, an additional 90 days is

3    necessary.

4         And, obviously, the government has indicated

16:04:21   5    and the court indicated -- everybody has indicated that does

6    create unworkable time because of the holidays and some

7    trial scheduling issues for the government, I believe, but

8    the number of 90 days is certainly what I would consider to

9    be a minimal amount of what we would need to be necessary.

16:04:41  10         THE COURT:  Okay.  Mr. Oakley, anything

11   further?

12         MR. OAKLEY:  Yes, Your Honor, just briefly.  I

13   do want to discuss, because I don't want everybody to be

14   concerned about the wiretaps.  In term of the documents,

16:04:51  15   I've worked on several class actions.  I am used to dealing

16   with a large number of documents.

17         And, you know, I've looked at -- we have a

18   29-page index of documents which initially seemed pretty

19   helpful.  I looked at, for example, the Dimora office.

16:05:04  20   There's 240 files in there.  Taking into account the

21   duplicates, that's 148 files.

22         To put a workable index together, because

23   they're not indexed beyond this 30 days, it just tells you,

24   you know, Dimora office, so that index brings me to about

16:05:20  25   maybe 148,000 pages.

1          You know, to properly index that to look at

2    everything, it might take 200 hours, maybe a little bit

3    less, maybe a little more.  But then when I look at the

4    Russo office, which is 61 items, I thought it would be about

16:05:36  5    the same, it turns out there's 163,979 files in that.  I'm

6    not sure how I am going to manage that because looking at

7    each of those files for only one minute would take 16 months

8    of 40-hour weeks.  I am sure I will figure out some way to

9    narrow that down.  But, you know, any additional time is

16:05:57  10   going to be helpful just to try to figure out what exactly

11   are in these documents, even narrowing them down to just the

12   absolute bare bones parts of the indictment.

13          The problem is with these documents, what

14   might be relevant is like a salt sprinkled into a bucket of

16:06:16  15   sand.  You know, I have to look at everything, and in terms

16   of the auditor's personnel records, there's 195,900 files

17   there.  They're divided in 80 folders.  I've already figured

18   out I probably only have to look at 25 percent of those.

19   But they are not searchable.  They're in a TIP format

16:06:35  20   instead of a PDF format, which means they can't be searched.

21          But they're handwritten and with a PDF format

22   and optical character recognition software, it only picks up

23   very cleanly scanned originally typed information.  If

24   something has been handwritten in, it won't come up.  And I

16:06:50  25   am not so optimistic to think that only those documents that

1    are relevant to my client are going to somehow have his name

2    on it.

3               There's a lot of documents that, you know, I

4    really need to look through everything to be sure and

16:07:03  5    certainly within that terabyte, there's a lot that doesn't

6    need to be reviewed.  But there's still many hundreds of

7    hours that need to be reviewed and that's all got to be done

8    before we get the 302s.  Because as soon as we get the 302s,

9    we're not going to do anything else but the 302s and this

16:07:19  10    has to be indexed.

11               I can't just read it once.  I've got to index

12    this stuff because if something comes up in a 302 that I

13    have yet to find out about, I need to be able to find it

14    within a couple of seconds.  It's not good enough to have an

16:07:32  15    index that keeps you within -- I think I worked out the

16    Russo's office to be somewhere between 10 to 100 million

17    pages of documents.  I need to have a much clearer idea.

18               So, you know, any additional time is extremely

19    helpful to be able to effectively prepare this case for

16:07:51  20    trial due to the overwhelming body of documents that we have

21    and the overwhelming number of 302s we will be eventually

22    receiving.

23               THE COURT:  Okay.  Does the government wish to

24    address the documents as opposed to the wiretaps.  It sounds

16:08:07  25    like there's a sizable amount.

1          MS. BACON:  There is, Your Honor.  The number

2    can be also misleading in terms of the amount of time it

3    takes to review.  As Mr. Oakley mentioned, when you get into

4    the auditor's office files, and at risk of violating the

16:08:19  5    protective order, I hate to talk about too many categories,

6    one large category are personnel files.  Another very, very

7    large category are property tax records.

8          So you can see when you're reviewing those

9    right away, that's a lot different from a one-page

16:08:34 10    handwritten note that maybe was found on somebody's desk.

11          And that it's easier to say, I want to look at

12    this property and take a look at that particular file,

13    rather than look through a large amount of property tax

14    records.

16:08:46 15          In other cases, a document might be 200 pages

16    long, but it's an employee manual, and it's the same

17    employee manual that was found in five different places.  So

18    after seeing one employee manual, it's quite easy to click

19    through.  So the number of pages at first blush sounds like

16:09:07 20    a monumental task, but when you start to consider the types

21    of documents, the review actually goes much more quickly

22    than it would be if it was 1,000 single page letters that

23    had to be read.

24          Your Honor, if it is easier for the review, we

16:09:40 25    had made available all of the actual physical, tangible

1  evidence, so to the extent that it takes too long to thumb

2  through the individual files, if defense counsel thought it

3  would be easier to actually see the hard copy documents so

4  you can tell right away if whole boxes are relevant to

16:09:56  5  something they're searching for, that has been and will be

6  an available option.  All they have to do is contact us and

7  we can schedule a review of anything on the indexes that

8  they've received.

9  MR. OAKLEY:  If I could respond to that point,

16:10:13  10  Your Honor.

11  THE COURT:  Sure.

12  MR. OAKLEY:  Frankly, I don't see that as

13  being particularly helpful, aside from having to go through

14  arranging a trip of walking into a, I don't know, warehouse

16:10:22  15  full of paper and trying to figure out which bankers box to

16  even start looking at.  It will probably be an hour before I

17  would be able to tell whether or not I can accomplish that.

18  Thank you.

19  THE COURT:  All right.  Let's just consider

16:10:46  20  some potential options and then the court will make its

21  determination so that this case can proceed with some

22  certainty relative to the dates.

23  So one option is obviously to keep the

24  September trial date.

16:11:10  25  The other option is to give a continuance as

```
 1           requested which, in essence, is a continuance to the

 2           beginning of January.  Even though it's suggested as a

 3           90-day continuance, I am certainly hoping that that wasn't

 4           disingenuous knowing that the trial could not for many

16:11:30  5  reasons start in mid-December unless of course that truly

 6           was your request, and you were indicating that was not.

 7                     MS. WHITAKER:  Your Honor, we did not put --

 8           we joined with Mr. Christman.

 9                     THE COURT:  Mr. Christman, were you suggesting

16:11:43 10  that?

11                     MR. CHRISTMAN:  Your Honor, that was my

12           number, but certainly this court wouldn't think that, you

13           know, there was anything disengenuous about number of days

14           for the continuance or any of the reasons that I put in my

16:11:55 15  various motions for the continuance, Your Honor.  Truly,

16           this is a case that has tremendous amount of material to

17           review.

18                     THE COURT:  I only say that because 90 days

19           takes us -- I mean the month -- there's been an indication

16:12:17 20  that this trial may last as long as three months.  Is that

21           correct?  Is that still everyone's estimate?

22                     MR. CHRISTMAN:  When I put that 90-day

23           continuance in, I wasn't thinking September, that puts this

24           day.  It really did not cross my mind.  What would be the,

16:12:33 25  you know, 90 days from September 12.  That wasn't part of
```

1    any of my thought process, and --

2                    THE COURT:  Okay.  You will -- you admit the

3    math that you really need 120 days, closer to 120 days?

4                    MR. CHRISTMAN:  Sure.  Yes.

16:12:51  5                    THE COURT:  I'm not suggesting you ought to

6    get that.  I am just saying let's just be honest about what

7    we're requesting.  You are saying 90 days to January.  90

8    days to January doesn't calculate to 90 days from the trial

9    date.  True?

16:13:12 10                    MR. CHRISTMAN:  True.

11                    THE COURT:  All right.  So if -- we've

12    discussed this to some extent.  I want to know how

13    problematic it would be then if we pick some interim date

14    versus a January date, and we're going to consider all three

16:13:28 15    potential options.  There are obviously multiple options,

16    but I am going to issue my decision on the trial date come

17    January -- I'm sorry, come Monday as whether it's January,

18    somewhere in between, October, November, or September, as

19    presently scheduled.

16:13:51 20                    And I just want to hear one last time any

21    potential arguments or problems anyone can foresee besides

22    the obvious that's been argued relative to the September

23    dates as it pertains to the defendants.  So now is your last

24    chance, because Monday I am going to issue the order.  And I

16:14:13 25    will say this:  If, if I give a continuance, I trust that I

1  will not have another request for a continuance?

2                    MR. CHRISTMAN:  Got my word, Your Honor.

3                    MR. WHITAKER:  Yes.

4                    MS. BACON:  Certainly we will not ask for a

16:14:38 5  continuance, Your Honor.  Our position is we're ready to go

6  September 12.  We've done everything we can to keep the

7  September 12 date, and we absolutely prefer a September 12

8  date.  If the court believes that after weighing all the

9  options that's not possible, considering the length of the

16:14:56 10  trial and the difficult time we may have seating a jury

11  because of the length of the trial, the government is

12  concerned that if the trial goes over the holidays that,

13  one, it might be impossible to seat a jury to find someone

14  who doesn't already have plans during that time period, or

16:15:12 15  to be able to somehow not be inappropriately exposed during

16  a time when people are mingling with family and friends.  We

17  think it would be in the best interest of everybody to start

18  it in early January, mid-January.

19                    THE COURT:  All right.  I will issue the

16:15:26 20  decision on Monday, and I will issue with the decision a

21  schedule, a case management plan that will cover everything

22  from pretrial motions to motions in limine, which are

23  different, to all the way up through trial, jury

24  instructions.

16:15:52 25                    And we will maintain the dates.  I have a duty

```
     1  │  to make an analysis not only as it pertains to the

     2  │  defendants, but also the government and the public have

     3  │  rights in this analysis.  The public has a right to a speedy

     4  │  trial.

16:16:16  5  │         And I understand that the case has been

     6  │  designated as complex, and I understand all of the arguments

     7  │  that have been made relative to the numbers of documents and

     8  │  the breadth and depth involved in the discovery, but it

     9  │  seems to me if counsel takes on a case after dates have been

16:16:33 10  │  set, it is incumbant upon them to make sure that they have

    11  │  the ability to do what they have undertaken.

    12  │         Now, I also understand the argument that

    13  │  sometimes you can't know for certain how things are going to

    14  │  unfold, and I also understand the arguments that until you

16:16:53 15  │  receive the superseding indictment, you just can't know for

    16  │  certain, despite all the good will and good intentions there

    17  │  might be in conveying the information in advance.

    18  │         So I am well aware of all those arguments.  I

    19  │  am well aware of the interests of the public and the

16:17:19 20  │  interests of the defendant when it comes to speedy trial and

    21  │  when it comes to proper preparation for trial.

    22  │         And I will make my ruling in consideration of

    23  │  all the factors that I am required to consider when

    24  │  considering these motions for continuance.

16:17:44 25  │         Is there anything further?
```

1           I do think we have one issue that I want to

2   see if we can resolve, because I don't want any more delays

3   in this case.  There's been a recent motion filed relative

4   to some discovery, and I want counsel in my chambers so that

16:18:01  5   we can see if we can resolve this quickly.  We cannot

6   continue to have stops and starts in this case relative to

7   discovery.

8           That is not the way we're going to run the

9   case; okay?  So I need to talk to counsel because I want

16:18:18  10   this issue resolved posthaste.

11           So with that, I appreciate your attendance.  I

12   appreciate your providing me more detailed information

13   relative to the discovery, and the court will issue its

14   ruling relative to the date on Monday, and that will be the

16:18:43  15   end of the discussion relative to the trial dates.

16           That will concludes this hearing.

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3              I certify that the foregoing is a correct

4      transcript from the record of proceedings in the

5      above-entitled matter.

6

7

8                  s/Lori A. Callahan
                   Lori Ann Callahan, RMR-CRR
9                  U.S. District Court, Suite 568
                   2 South Main Street
10                 Akron, Ohio  44308
                   (330) 252-6022

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25