# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.1:10CR387 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | OPINION & ORDER |
| | ) | |
| | ) | |
| JAMES C. DIMORA, et al., | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court are a series of pre-trial motions filed by the defendants. Specifically, the Court will address herein: Defendant James Dimora's motion to change venue (Doc. No. 409); Dimora's motion for expanded voir dire (Doc. No. 410); Dimora's motion to sever (Doc. No. 412); and Defendant Michael Gabor's motion to sever (Doc. No. 426.) All of the motions are fully briefed. The Court conducted a hearing on these motions on October 5, 2011 and is now ready to rule.

**Background**

In 2007, the Federal Bureau of Investigation launched one of the largest probes ever into potential public corruption in local government. Targeting political and business activity in Cuyahoga County, Ohio, the investigation to date has resulted in over

50 arrests.[1] The list of arrestees includes politicians, judges, and private business people. The majority of those arrested have entered into plea agreements with the federal government, a few have gone to trial, and several others are still awaiting trial.

One of the most highly publicized arrests was that of Defendant James Dimora.[2] At all times relevant to the Indictment,[3] Dimora was one of three County Commissioners, who had day-to-day responsibilities for the administration of the County government. On the political side, Dimora also served as the Chairman of the Cuyahoga County Democratic Party. Dimora was one of five individuals who were arrested on September 15, 2010 under the same Indictment. Defendant Michael Gabor was among the four arrested with Dimora and remains the only defendant, aside from Dimora, who has neither entered a plea nor gone to trial.[4] The charges against Dimora include RICO conspiracy, conspiracy to commit mail and wire fraud and honest services mail fraud, Hobbs Act conspiracy, bribery concerning programs receiving federal funds, tax fraud, obstruction, and destruction of records.

---

[1] In fact, four more individuals were recently arrested and charged in connection with the federal probe, and the government has indicated in public proceedings that more arrests are anticipated. Defendant Dimora was indicted in one of these new cases. *See United States v. Forlani, et al.*, Case No. 1:11CR491.

[2] Another high ranking county political figure to be indicted as a result of the federal government's investigation, and whose arrest drew considerable media attention, was Frank Russo, a political ally of Dimora, and who had served for many years as the Cuyahoga County Auditor. Russo entered into a plea agreement with the government, was sentenced, and is expected to testify at Dimora's trial.

[3] All cites to the Indictment refer to the Third Superseding Indictment, filed September 7, 2011. (*See* Doc. No. 444.)

[4] On March 30, 2011, a sixth individual, Anthony Melaragno, was arrested on the Superseding Indictment. Melaragno entered a counseled plea of guilty to certain charges on September 14, 2011 (*see* Doc. No. 468), and is awaiting sentencing.

At all times relevant to the Indictment, Defendant Gabor was employed by the Cuyahoga County Auditor's Office. Along with Dimora, Gabor is charged in Count 1 with RICO conspiracy. He is also charged (along with Dimora) with conspiracy to commit bribery concerning programs receiving federal funds, Hobbs Act conspiracy, and conspiracy to obstruct justice. He is separately charged with conspiracy to commit mail fraud and honest services mail, relating to Frank Russo's alleged efforts to compensate Joseph Gallucci for running a sham campaign against Russo in the 2006 Auditor's race.

This case was originally randomly assigned to the docket of the undersigned. Upon the government's notice that the case was related to several cases previously assigned to the Honorable Kathleen M. O'Malley, the action was transferred to Judge O'Malley on September 16, 2010. At the time of the transfer, Judge O'Malley's courtroom was located in the Federal Courthouse in Cleveland, Ohio. Cleveland is located in Cuyahoga County. The case was returned to the undersigned's docket on January 21, 2011, after Judge O'Malley was appointed to a seat on the Federal Circuit. This Court holds its proceedings in the Federal Courthouse in Akron, Ohio, and Akron, in turn, is located in Summit County.

Defendant Dimora now moves for a change of venue "to a district that has not been saturated with publicity negative to Mr. Dimora […]." (Mot. at 1.) In support of his motion, Dimora claims that the extent of the adverse publicity in this case will prevent him from receiving a fair trial in this judicial district. Attached to his motion are hundreds of press articles, predominately from the Cleveland Plain Dealer but also from magazine and local television stations, reporting on the public corruption investigation, which Dimora insists cast him in a negative light. The government urges a finding that the news

3

coverage though admittedly "prevalent" does not rise to the level of creating a presumption of prejudice.

Dimora also moves for an expanded voir dire process, with particular emphasis on jury questions relating to the venire members' exposure to pretrial publicity. Both defendants have also filed severance motions, each seeking a separate trial from his co-defendant.

**Law and Analysis**

**I.  Dimora's Motion for a Change of Venue**

The Sixth Amendment guarantees a criminal defendant the right to a trial by an impartial jury. *Irvin v. Dowd*, 366 U.S. 717, 721-22 (1961). "By constitutional design, that trial occurs 'in the State where the […] Crimes […] have been committed.'" *Skilling v. United States*, 130 S. Ct. 2896, 2913 (2010) (quoting Art. III, § 2, cl. 3). Given the need for an impartial jury, however, "[u]pon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a). The decision to change venue is left to the discretion of the trial court. *United States v. Jamieson*, 427 F.3d 394, 412 (6th Cir. 2005).

"Prejudice resulting from pretrial publicity can be presumptive or actual." *Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007). "The Supreme Court has found publicity inherently prejudicial when 'the influence of the news media […] pervaded the proceedings' to the point that the trial was 'conducted in a circus atmosphere.'" *Jamieson*, 427 F.3d at 413 (quoting *Murphy v. Florida*, 421 U.S. 794, 798-99 (1975)).

4

This standard is "demanding," with prejudice presumed in only "the rare case." *United States v. Angelus*, 258 Fed. App'x 840, 845 (6th Cir. 2007); *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998) ("Indeed, the few cases in which the Court has presumed prejudice can only be termed extraordinary […].")

Extensive pre-trial media coverage, alone, is insufficient to support a finding of presumed prejudice. *Nebraska Press Ass'n v. Staurt*, 427 U.S. 539, 554 (1976) ("[P]retrial publicity---even pervasive, adverse publicity—does not inevitably lead to an unfair trial."). Likewise, the jurors who will hear a case need not be "totally ignorant of the facts and issues involved." *Irvin*, 366 U.S. at 722-23;[5] *see Ritchie v. Rogers*, 313 F.3d 948, 962 (6th Cir. 2002). It is only when the defendant shows "a trial atmosphere […] utterly corrupted by press coverage" that the court may presume that the defendant cannot obtain a fair trial within the court's judicial district. *See Murphy*, 421 U.S. at 798.

The familiar trilogy of cases dedicated to the issue of presumed prejudice is *Irvin v. Dowd*, *Rideau v. Louisiana*, and *Sheppard v. Maxwell*.[6] In *Irvin*, the defendant was accused of the murder of a family of six, and the small, rural town where the killings occurred was inundated with news reports of the details of these heinous crimes. Ninety percent of the prospective jurors indicated that they had formed some opinion as to the

---

[5] The Court in *Irvin* explained: "In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 722-23.

[6] *Sheppard v. Maxwell*, 384 U.S. 333 (1966); *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Irvin v. Dowd*, 366 U.S. 717 (1961).

defendant's guilt "ranging in intensity from mere suspicion to absolute certainty." *Irvin,* 366 U.S. at 727. In another highly publicized case, the day after the defendant in *Rideau* was arrested on charges of bank robbery, a 20 minute video of his alleged jail house confession was broadcast via the local television station. The confession ran on the local news for several consecutive days. *Rideau*, 373 U.S. at 723. Finally, *Sheppard*, a case that drew significant national attention, involved the murder of a socialite allegedly by her husband, a well-known local physician. There, the Supreme Court found that "the carnival atmosphere at trial" and the "bedlam" that "reigned at the courthouse" made it impossible for Dr. Sheppard to receive a fair trial. *Id.* at 355, 358. In each case, the Court found the existence of presumed prejudice dictating the need for a change of venue.

The Court has reviewed the articles submitted in support of this motion, and has observed that they are, for the most part, merely factual reports of the cases and the charges against the various defendants.[7] *See Beck v. Washington*, 369 U.S. 541, 556 (1962) ("straight news stories rather than invidious articles which would tend to arouse ill will and vindictiveness" are less troubling); *Jameison*, 427 F.3d at 412 (In finding no presumed prejudice, the court noted that the articles, though not flattering, presented a fair and balanced portrayal of events.) While many articles have quoted some of the more titillating allegations from the various indictments, it is clear from the reporting that they

---

[7] A good example of such reporting can be found attached to Dimora's reply brief as Exhibit A. Both articles, one from an on-line affiliate of a Cleveland-based television station, and other from the Plain Dealer's "dot-com" affiliate, reported on the facts arising out of Dimora's September 14, 2011 arraignment on the Second Superseding Indictment. The articles reported on the nature of the proceeding, and the government's representation that more charges were expected to be filed against Dimora, without any hint of opinion as to Dimora's guilt or innocent. Additional charges were filed against Dimora on October 20, 2011. (*See* Case No. 1:11CR491.)

are doing just that—quoting from these public records. Those few editorials (and it is also clear that they are editorials and not factual accounts) are not nearly as acidic as the ones that called for Sheppard's arrest in 1996, nor did they "present the kind of vivid, unforgettable information [the Court] [has] recognized as particularly likely to produce prejudice […]."[8] *Skilling*, 130 S. Ct. at 2916. *Compare Rideau,* 373 U.S. at 725; *Irvin*, 366 U.S. at 727. Further, while Dimora makes much of the articles that negatively comment on his weight, this physical feature has no bearing on his guilt or innocence.

The pretrial publicity in the present case, though significant, cannot seriously be compared to that seen in the trilogy cases. Unlike *Rideau*, there has been no inflammatory information, such as a confession, that would unduly taint any possible jury pool. Dimora has consistently maintained his innocence, and the press has not reported to the contrary. Further, the pretrial publicity and early proceedings have not risen to the

---

[8] The only publication with articles that give the Court some concern have come from Scene Magazine. This is not a "hard news" or mainstream publication, and it is obvious from the tone of the articles contained therein that they are really editorials. Dimora was unable to provide any circulation statistics for this magazine and the Court is not aware that the magazine has a high readership. In fact, in the nearly 14 years that the undersigned has been presiding over jury selection (in Stark County, initially, and now in U.S. District Court sitting in Akron, which draws its jurors from Carroll, Holmes, Portage, Stark, Summit, Tuscarawas, and Wayne), I do not recall many, if any, instances where this magazine was identified by jurors as a publication that was regularly read. Of course, if any juror called for duty in this case has read something in this publication about this case, that can be addressed during jury voir dire.

level of a carnival atmosphere like that seen in *Sheppard*.[9] Though members of the press have been present for most of the pre-trial hearings in varying numbers, their conduct has been professional and their coverage has been both accurate and responsible. Finally, the *Irvin* case, the one Dimora suggests is closely analogous, is "worlds apart" from the circumstances presented in this case. *See Skilling*, 130 S. Ct. at 2921.

Instead, this case is more closely analogous to *Skilling*, a decision wherein the Supreme Court recently revisited the issue of presumed prejudice. Jeffery Skilling, a high ranking executive with Enron, and two others, were charged with a variety of crimes including conspiracy to commit securities and wire fraud. The case generated enormous pretrial publicity, and was tried in Houston, Texas, where Enron had its headquarters. In finding no presumptive prejudice, the Court specifically distinguished *Irvin*, noting that while the trial in *Irvin* took place in a small rural community, Skilling's trial was conducted in a large metropolitan area where circulation percentages for the local newspapers were lower. The Court also found that the publicity did not contain the same sort of damaging information, such as details of a grizzly and brutal crime, and the seated

---

[9] In *Sheppard*, articles appearing in the local media repeatedly called for Sheppard's arrest, and newspapers "emphasized evidence that tended to incriminate Sheppard and pointed out discrepancies in his statements to authorities [...]." *Sheppard*, 384 U.S. at 340. The press also "delved into Sheppard's personal life[,]" accusing him of having an affair. *Id.* at 340. Perhaps most disturbing, however, was the activity during the investigation and trial. "Sheppard was examined for more than five hours without counsel during a three-day inquest which ended in a public brawl. The inquest was televised live from a high school gymnasium seating hundreds of people." *Id.* at 354. "During the trial, pictures of the jury appeared over 40 times in the Cleveland papers alone. The court permitted photographers to take pictures of the jury in the box, and individual pictures of the members in the jury room. One newspaper ran pictures of the jurors at the Sheppard home when they were there to view the scene of the murder. Another paper featured the home life of an alternate juror. The day before the verdict was rendered—while the jurors were at lunch and sequestered by two bailiffs—the jury was separated into two groups to pose for photographs which appeared in the newspapers." *Id.* at 345. The end result was that the jurors were thrust "into the role of celebrities." *Id.* at 353.

jurors uniformly disclaimed ever having formed an opinion about the case.

Similarly here, the publicity, though not always flattering, has not contained the same horrifying information as involved in *Irvin*. Moreover, the alleged crimes were committed in a large, metropolitan area, where the coverage, though intense, had not saturated the area as extensively as in *Irvin*. It is also significant that almost two years will separate Dimora's arrest and the beginning of the trial.[10] "[T]he Court has repeatedly suggested that a cessation of publicity for some period prior to trial will go a long way toward undoing the damage of a previous media blitz." *DeLisle*, 161 F.3d at 385; *see Patton v. Yount,* 467 U.S. 1025, 1034 (1984) ("That time soothes and erases is a perfectly natural phenomenon, familiar to all."). While the Court cannot say that press coverage has completely ceased at any point following Dimora's arrest, it is clear that the coverage has dropped off over time. Of course, it is anticipated that the coverage will, again, ramp up as the Court draws closer to trial.. Such future reports will most likely focus on the trial, itself, and are not likely to contain the same type of sensational reporting that occurred when the first indictments were returned.

Perhaps most critical to the Court's analysis is the fact that the case will not be tried in Cuyahoga County but rather in Summit County.[11] In addition, this Court draws from an entirely separate jury pool than that utilized by the district court sitting in

---

[10] Upon defense motions, the Court has granted two extensions of time. In each instance, the Court found that the ends of justice served by such extensions outweighed the best interest of the public and the defendants in a speedy trial. The result has been that considerable distance has been placed between the flurry of media coverage to which the public was exposed at Dimora's arrest and the steady but lighter coverage that the case has generated lately.

[11] There are approximately 40 miles separating the district courts in Akron and Cleveland. Source: http://www.mapquest.com.

Cleveland.[12] Many of the counties from which this Court draws its jurors are rural and have their own newspapers. Significantly, none of the potential jurors who will be called in this case will come from Cuyahoga County and could be called from areas that are more than 100 miles away from Cleveland. As is clear from the articles submitted in support of this motion, most of the coverage has been in the Cleveland metropolitan area.

Dimora insists that Cleveland-based newspapers, such as the Cleveland Plain Dealer, have "significant circulation" in Summit County, one of seven counties from which this Court draws its jurors. Without support, he maintains that daily circulation in Summit County for the Plain Dealer is 14,144 with Sunday circulation topping off at 20,680.[13] Even if the Court accepts these numbers as true, they merely amount to between 2.6% and 6.3% of households in Summit County.[14] *Compare Skilling*, 130 S. Ct. at 2922 (distinguishing cases like *Irvin*, finding approximately 33% circulation in Houston-based newspapers "far lower than the 95% saturation level recorded in *Irvin*.") He also notes that the Cleveland-based television stations are the "sole source of major network news for Summit County residents as well as virtually every other county from which this Akron based Court will draw its jurors." (Reply at 1.)

The Court's prior history with related public corruption cases, however,

---

[12] The United States District Court, Eastern Division, sitting in Akron, Ohio, draws its potential jurors from the following counties: Carroll, Holmes, Portage, Stark, Summit, Tuscarawas, and Wayne. In contrast, the Cleveland branch of the Eastern Division calls its prospective jurors from Ashland, Ashtabula, Crawford, Cuyahoga, Geauga, Lake, Lorain, Medina, and Richland.

[13] In his reply brief, Dimora indicated that "evidence confirming [these figures] will be presented at the hearing on this matter." (Reply at 2.) At the October 5, 2011 hearing, however, counsel indicated that the Cleveland Plain Dealer considers such information to be proprietary and not available for public consumption and, therefore, there is no evidence before the Court that supports Dimora's bald assertions.

[14] Source: http://quickfacts.census.gov/qfd/states/39/39153.html, U.S. Census Bureau, 2010 Census Data, Summit County, Ohio.

does not bear out Dimora's claim that the judicial district in which this Court sits has been saturated with news reports. The Court has seated three related high profile public corruption cases, and the Court's experience has been that potential jurors are either entirely unaware of the press coverage or are largely disinterested.[15] In three trials, the Court has only excused a few potential jurors because of bias resulting from pretrial publicity.

Based on the record, the Court cannot find that this is one of the rare cases where prejudice can be presumed. While defense counsel suggested at the motion hearing that this case has attracted a "media circus," the fact that there has been significant local coverage, with reporters often flanking the sidewalks in front of the courthouse on hearing dates, simply cannot be equated with the "bedlam" in the courtrooms of cases where such prejudice has been found.

"When [,as here,] pretrial publicity cannot be presumed prejudicial, the trial court must then determine whether it rises to the level of actual prejudice." *Foley*, 488 F.3d at 386 (citing *Ritchie*, 313 F.3d at 962). "The primary tool for discerning actual prejudice is a searching voir dire of prospective jurors." *Id.* at 386; *see United States v. Quinones*, 511 F.3d 289, 299 (2d Cir. 2007) ("[T]he law recognizes the important role [voir dire] plays in ensuring the fair and impartial criminal jury mandated by the Sixth Amendment."). As the Sixth Circuit has observed, the trial court's job is to:

> [R]eview the media coverage and the substance of the jurors' statements at voir dire to determine whether a community-wide sentiment exists against

---

[15] *See United States v. Mitchell*, Case No. 1:10CR502; *United States v. McCafferty*, Case No. 1:10CR387-2; and *United States v. Terry*, Case No. 1:10CR390. During the voir dire of these prior Akron trials, members of the jury panel were specifically asked if they knew of Defendant Dimora. Judge O'Malley had previously seated a jury on another related public corruption case in Cleveland. *See United States v. Greco*, Case No. 1:09CR506.

the defendant. Negative media coverage by itself is insufficient to establish actual prejudice, and the existence of a juror's preconceived notion as to guilt or innocence of the defendant, without more, is not sufficient to rebut the presumption of impartiality. '[M]ere prior knowledge of the existence of the case, or familiarity with the issues involved, or even some preexisting opinion as to the merits, does not in and of itself raise a presumption of jury taint […]. The prospective juror must be able to lay aside his or her impressions or opinions and render a verdict based upon the evidence presented in court. The relevant question is 'did [the] juror swear that he could set aside any opinions he might hold and decide the case on the evidence, and should the juror's prostration of impartiality have been believed.' *Foley,* 488 F.3d at 387 (internal citations omitted).

At the motion hearing, counsel for Dimora conceded actual prejudice could not be demonstrated until after voir dire has been conducted. The Court granted Dimora leave to renew his motion for a change of venue on the basis of actual prejudice at the conclusion of voir dire, should he believe that there is still a need for such a motion. Nonetheless, as will be set forth below in the discussion of Dimora's motion for expanded voir dire, the Court has every intention of conducting the type of "searching voir dire" that will systematically identify potential biases and prejudices and ensure the seating of an impartial jury. Thus, in the interim, and for all of the foregoing reasons, Dimora's motion to change venue is DENIED.

## II.  Dimora's Motion for Expanded Voir Dire

In a motion closely linked to his Rule 21(a) motion, Dimora seeks to expand the voir dire process. His proposed plan for voir dire would utilize a large juror panel, a detailed juror questionnaire, individual questioning of potential jurors on the issue of exposure to pretrial publicity, and early identification of potential jurors who should be excused for bias or hardship. He also seeks additional peremptory challenges

for all parties, and requests that counsel be permitted to ask questions of the jury panel. Because the Court finds that an expanded voir dire process would be advisable to eliminate potential prejudice from pretrial publicity, the Court GRANTS the motion, in part.

"[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 726-27 (1992). "'Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled.'" *Williams v. Bagley*, 380 F.3d 932, 944 (6th Cir. 2004) (quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981)). "The presence of even a single biased juror deprives a defendant of his right to an impartial jury." *Williams*, 380 F.3d at 944 (citing *Morgan*, 504 U.S. at 729).

The Supreme Court has "stressed the wide discretion granted to the trial court in conducting voir dire in the area of pretrial publicity and in other areas of inquiry that might tend to show juror bias." *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991). *See United States v. Guzman*, 450 F.3d 627, 629 (6th Cir. 2006) ("The task of empaneling an impartial jury is left to the sound discretion of the district court […].") Further, the "United States Supreme Court has *not* established any *per se* rule which it requires trial judges to follow in the voir dire of a jury venire." *United States v. Blanton*, 719 F.2d 815, 822 (6th Cir. 1983) (emphasis in original). "Rather than a per se rule, district courts are guided by the general standard that voir dire be tailored toward ensuring 'a fair trial by a panel of impartial, indifferent jurors.'" *Guzman*, 450 F.3d at 630 (quoting *Irvin*, 366 U.S. at 722).

In *Skilling,* a case involving substantial pretrial publicity, the district court employed the use of a detailed questionnaire, which "asked prospective jurors about their sources of news and exposure to Enron related publicity, beliefs concerning Enron and what caused its collapse, opinions regarding the defendants and their possible guilt or innocence, and relationships to the company and to anyone affected by its demise." *Skilling,* 130 S. Ct. at 2900. During voir dire, the trial court declined defense counsel's request for attorney-led voir dire, but permitted counsel the opportunity to ask follow-up questions. The court also agreed that individual questioning of the jurors at side bar on the subject of pretrial publicity was appropriate. *Id.* at 2910. On review, the Supreme Court specifically approved of voir dire, finding that the "selection process successfully secured jurors who were largely untouched by Enron's collapse." *Id.* at 2920.

The Court plans to employ a similar approach as that taken by the trial court in *Skilling*, incorporating many of the suggestions advanced by Dimora's counsel into its voir dire plan. The first wave of screening of potential jurors will focus on the length of trial. The government anticipates that the trial will last approximately three months. The Court has already caused seven hundred questionnaires[16] to be distributed to randomly selected prospective jurors, with questions limited to the jurors' availability to serve for

---

[16]  Due to the length of the trial, in order to insure an adequate jury pool, the Court determined that notices would be sent to 700 prospective jurors, rather than the 500 initially contemplated.

the expected duration of the trial.[17]

Those initial potential jurors for whom serving on a lengthy trial would not pose an extreme hardship will be asked to come to the courthouse in November, 2011, in smaller groups. The process will begin by having these prospective jurors fill out a detailed questionnaire, which will focus on the individual juror's exposure to pretrial publicity in this case.[18] *See, e.g., Quinones*, 511 F.3d at 299 (internal citations omitted) ("District courts routinely employ pretrial questionnaires to facilitate voir dire in a number of circumstances, […] including where there has been extensive pre-trial publicity […]."). The Court will prepare a draft questionnaire that it will share with counsel, and counsel will be given an opportunity to submit additional proposed questions for the Court's consideration. The Court will incorporate any question it believes will be of assistance in identifying any biases or prejudices.

According to Dimora, "[t]he usefulness of the questionnaire is directly proportional to the amount of time the parties have to review, analyze and process the information it captures." (Mot. at 6.) Given the fact that the juror questionnaire will be longer than the Court's usual questionnaire, the Court agrees with Dimora that the parties will need additional time to digest and analyze these documents. Thus, copies of the completed questionnaires will be distributed to counsel for review, and it is anticipated

---

[17] The Court submitted a draft pre-screen juror questionnaire, which was limited to the question of availability for a three months trial, to counsel for comments. The Court considered the comments of counsel, and made certain modifications to the questionnaire based on counsel's suggestions. The final version was shared with counsel before it was mailed out to potential jurors on October 14, 2011.

[18] The Court denies Dimora's request for counsel and the parties to be present while the jurors fill out their questionnaires. Counsel will have an opportunity to introduce themselves and their clients at the beginning of in-court voir dire questioning.

that counsel will have a number of weeks to consider the venire members' written answers. Additionally, at the time the potential jurors complete their questionnaires, the jurors will be instructed to avoid any news stories relating to the case or the Cleveland public corruption investigation, and will be cautioned against conducting any independent research.

Thereafter, the Court will call the potential members, in manageable groups, into the courtroom where it will pose some questions to the group. While the Court will not permit attorney-led questioning, it will allow counsel to ask follow-up questions. With respect to the questions relating to pretrial publicity, the Court will question each potential juror separately at side bar, with counsel present, "thus preventing the spread of any prejudicial information to other venire members."[19] *See Skilling*, 130 S. Ct. at 2919. Counsel will, again, be offered the opportunity to ask follow-up questions on the subject of pretrial publicity. Following each individual side bar colloquy, the Court will entertain any motion to excuse for cause.

Once the issues relating to cause have been resolved, the Court will permit the exercise of peremptory challenges, as it would in any other case, with one exception. Dimora has requested that the parties be given additional peremptory challenges. Under Rule 24(b)(2) of the Federal Rules of Criminal Procedure, "the government has 6 peremptory challenges and the defendant or defendants jointly have 10 peremptory

---

[19] Dimora invites the Court to refrain from asking potential jurors if they could put aside any preconceived biases that may have resulted from exposure to pretrial publicity. The Court declines the invitation. The nature of the publicity and whether it is the sort that could be laid aside by jurors, rather than its volume, is the crucial factor to be considered. *See Murphy*, 421 U.S. at 800. Indeed, this is the very inquiry upon which the Court must focus during voir dire. *See Irvin*, 366 U.S. at 723 ("It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.")

challenges[…]." Moreover, "[t]he court may allow additional peremptory challenges to multiple defendants, and may allow the defendants to exercise those challenges separately or jointly." Fed. R. Crim. P. 24(b). Even in multi-defendant cases, however, the award of additional peremptory challenges is not mandatory, but permissive, and rests in the trial court's discretion. *United States v. Vaccaro*, 816 F.2d 443, 456 (9th Cir. 1987). *See United States v. Gibbs*, 1999 U.S. App. LEXIS 36343, at *60 (6th Cir. Apr. 16, 1999) ("Rule 24(b) requires that co-defendants be given a minimum of ten challenges to be exercised jointly or separately. Here the district court gave the [eight] defendants sixteen challenges and ordered that they be used jointly."); s*ee, e.g., United States v. Mayes*, 512 F.2d 637, 644 (6th Cir. 1975) (no abuse of discretion where the district court afforded a total of 24 peremptory challenges between 24 defendants).

While the Court is under no obligation to give defendants any additional peremptory strikes, the Supreme Court in *Skilling* observed that "[p]eremptory challenges, too, provide protection against prejudice […]." *Skilling*, 130 S. Ct. at 2918, n.21 (citations omitted). Thus, toward the end of seating an impartial jury, the Court shall permit the defendants to share 14 peremptory challenges and the government to exercise up to 8 peremptory challenges.[20] *See, e.g., id.* (approving of the trial court's decision to permit two additional peremptory challenges to be shared between three defendants as one of the many appropriate measures taken to ensure a voir dire process that would result in an unbiased jury).

---

[20] The Court will also allow each *side* additional peremptory strikes for use in the alternate juror selection process.

The Court believes that the procedure outlined above will more than adequately protect the defendants' Sixth Amendment right to a jury trial before an impartial jury. Once the jury is in place, the Court plans to take further measures to protect the jurors' privacy and shelter them from any further exposure to publicity generated from the trial. Jurors will be instructed that they are to avoid any news reports related to this case or the trial or speak with anyone regarding the case, and that they will be required to reach a verdict based solely on the evidence that they hear and read in the courtroom. *See Skilling*, 130 S. Ct. at 2919 (quoting *Nebraska Press Ass'n*, 427 U.S. at 564, 565) (noting "the prophylactic effect of 'emphatic and clear instructions' on the sworn duty of each juror to decide the issues only on the evidence presented in open court'").

Dimora's motion to expand voir dire is GRANTED in part as set forth in this Opinion and Order.

### III. Defendants' Motions to Sever

Each defendant has filed a motion to be severed from his co-defendant. Both claim that they have been misjoined, in violation of Fed. R. Crim. P. 8, and also claim that discretionary severance is warranted under Rule 14. While they each raise different arguments in support of severance, the law applies equally to both. As such, the Court shall address the motions together.

Rule 8(b) provides that multiple defendants may be charged together "if they are alleged to have participated in the same act or transaction, or the same series of acts or transactions, constituting an offense or offenses." Where defendants are improperly

18

joined, severance is mandatory. *United States v. Hatcher*, 680 F.2d 438, 441 (6th Cir. 1982). Where defendants have been properly joined, a district court may still choose to sever one or more defendants if joinder "appears to prejudice a defendant or the government." Fed. R. Crim. P. 14(a). A decision to grant or deny a motion to sever under Rule 14(a) is left to the discretion of the trial court. *See United States v. Lopez*, 309 F.3d 966, 971 (6th Cir. 2002); *United States v. Anderson*, 89 F.3d 1306, 1312 (6th Cir. 1996).

A. <u>Mandatory Severance</u>

Both defendants argue that they were improperly joined under Rule 8. Specifically, Dimora claims that joinder was improper because there is no common scheme or plan. Gabor complains that there is no evidence that Dimora is related in any way to many of the schemes involving Gabor. The government, however, underscores the fact that Count I charges both defendants in a RICO conspiracy involving a pattern of racketeering activity.

"Under Rule 8(b) multiple defendants may be joined only if a sufficient nexus exists between the defendants and the single or multiple acts or transactions charged as offenses." *United States v. Johnson*, 763 F.2d 773, 775 (6th Cir. 1985).

> Rule 8(b) provides substantial leeway to prosecutors who would join racketeering defendants in a single trial. The rule permits joinder of defendants charged with participating in the same racketeering enterprise or conspiracy, even when different defendants are charged with different acts, so long as indictments indicate all the acts charged against each joined defendant (even separately charged substantive counts) are charged as racketeering predicates or as acts undertaken in furtherance of, or in association with, a commonly charged RICO enterprise or conspiracy.

*United States v. Efrasio*, 935 F.2d 553, 567 (3d Cir. 1991); *see United States v. Davis*, 707 F.2d 880, 883 (6th Cir. 1983) ("[W]here two defendants are charged with a RICO

19

conspiracy it is not improper to join such defendants and include the individual illegal actions that constitute the pattern of racketeering alleged."); *United States v. Triumph Capital Group*, 260 F. Supp. 2d 432, 438 (D. Conn. 2002) (internal quotation and citation omitted) ("In essence, if the RICO charge is valid, an indictment charging the substantive crimes alleged as predicate acts along with the RICO claim satisfies the requirements for valid joinder under Rule 8(b)."); *see also United States v. Warner*, 690 F.2d 545, 551 (6th Cir. 1982) ("It is well settled that joinder is proper under Rule 8(b) where an indictment charges multiple defendants with participation in a single conspiracy.").

Here, Count 1 charges both defendants with RICO conspiracy, in violation of 18 U.S.C. § 1962(d). It identifies the Enterprise as Cuyahoga County, and further alleges that both defendants were employed by, or associated with, the County. Paragraphs 92 and 93 allege a racketeering conspiracy to benefit the defendants and their co-conspirators, and paragraph 101 alleges that the defendants and others "committed and attempted to commit various acts in furtherance of the conspiracy […]" and further identifies the specific schemes and predicate acts, which also form the basis for Counts 2-29 and 31-33. Because the Indictment properly charges a RICO conspiracy, with the substantive crimes also forming the predicate acts for the conspiracy, it satisfies Rule 8(b). *See Triumph*, 260 F. Supp. 2d at 438; *see, e.g., United States v. Gardiner,* 463 F.3d 445, 457  (6th Cir. 2006) (joinder of codefendants under single RICO conspiracy count proper because informal agreement to exchange school district construction contracts for cash and services sufficient to establish RICO conspiracy); *United States v. Carson,* 455 F.3d 336, 373 (D.C. Cir. 2006) ("The indictment alleged that all of these counts were overt acts in furtherance of the narcotics conspiracy and predicate acts in furtherance of

the RICO conspiracy. This provided the necessary link to satisfy Rule 8(b)."); *United States v. Neace,* 2008 U.S. Dist. LEXIS 30029, at *8-9 (E.D. Mich. Apr. 14, 2008) ("Thus, the RICO framework of this now-challenged indictment satisfies the basic requirement of Rule 8(b), in that the accused criminal conduct stems from 'the same series of acts or transactions constituting an offense.'").

    B. <u>Permissive Severance</u>

Finding the defendants to have been properly joined, the Court considers each defendant's request for permissive severance. "In order to prevail on a motion for [permissive] severance, a defendant must show compelling, specific, and actual prejudice from a court's refusal to grant the motion to sever." *United States v. Saadey*, 393 F.3d 669, 678 (6th Cir. 2005) (citing *United States v. Sherlin*, 67 F.3d 1208, 1215 (6th Cir. 1995)).

"As a general rule, persons jointly indicted should be tried together because 'there is almost always common evidence against the joined defendants that allows for the economy of a single trial.'" *United States v. Lopez*, 309 F.3d 966, 971 (6th Cir. 2002) (quoting *United States v. Phibbs*, 999 F.2d 1053, 1067 (6th Cir. 1993); *see Gardiner*, 463 F.3d at 472; *United States v. Horton,* 847 F.2d 313, 317 (6th Cir. 1988) (internal citations omitted) ("There is a strong policy in favor of joint trials when charges will be proved by the same series of acts […] and there is a presumption that the jury will be able to sort out the evidence applicable to each defendant and render its verdict accordingly.")) "Once defendants have been properly joined under Federal Rule of Criminal Procedure 8(b), a 'strong showing of prejudice' is required to justify severance." *United States v. Hessling*, 845 F.2d 617, 619 (6th Cir. 1988) (quoting *United*

*States v. Reed*, 647 F.2d 678, 689 (6th Cir.), *cert. denied*, 454 U.S. 837 (1981); *see also United States v. Scaife*, 749 F.2d 338, 344 (6th Cir. 1984) (showing of prejudice must be made by demonstrating that the jury will be unable to separate and treat distinctively evidence that is relevant to each particular defendant on trial)). Severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). "Even where the risk of prejudice is high, 'less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice.'" *United States v. Driver*, 535 F.3d 424, 427 (6th Cir. 2008) (quoting *Zafiro*, 506 U.S. at 539); *see United States v. Mitchell*, 484 F.3d 762, 775 (5th Cir. 2007); *see, e.g., United States v. Fernandez*, 559 F.3d 303, 317 (5th Cir. 2009) (limiting instruction that each charge against each defendant was to be considered separately was sufficient to cure any possible prejudice from joint trial).

Moreover, "[t]he fact that a defendant may have a better chance at acquittal if his trial were severed does not require the judge to grant his motion [to sever]: the defendant must show 'substantial,' 'undue' or 'compelling' prejudice.'" *United States v. DeFranco*, 30 F.3d 664, 669-70 (6th Cir. 1994) (quoting *Warner*, 971 F.2d at 1195); *see Stanford v. Parker*, 266 F.3d 442, 458 (6th Cir. 2001)). Nor does he have a right to severance merely because his defense is antagonistic to that of his co-defendants. *Zafiro*, 506 U.S. at 538; *Stanford,* 266 F.3d at 458. Likewise, a spillover of evidence from one case to another generally does not require severance. *Anderson*, 89 F.3d at 1312; *see Lopez*, 309 F.3d at 971. In fact, "a defendant is not entitled to a severance simply because the evidence against a codefendant is far more damaging than the evidence against him."

22

*United States v. Causey*, 834 F.2d 1277, 1288 (6th Cir. 1987); *see Driver*, 535 F.3d at 427.

Dimora posits that, even if mandatory severance is not warranted, a permissive severance is still necessary owing to the presence of multiple defendants, the volume of evidence, the complexity of the case, possibility of jury confusion, and concern for the Court's docket while the Court attends to this "mega case." He cites *United States v. Andrews*, 754 F. Supp. 1161 (N.D. Ill. 1990), in support. In *Andrews*, the district court was confronted with the prospect of a RICO "mega trial" involving between 22 and 29 defendants, with many of these defendants represented by court-appointed counsel, 150 criminal acts occurring over a period of 20 years and involving crimes ranging from drugs to murder conspiracies, and an expected trial duration of a year or more. The court ruled that severance of certain defendants was advisable, noting the likelihood for "mass confusion" from the multitude of expected antagonistic defenses and countless attorneys jockeying for position at any moment, the "gross disparity in weight of the evidence," the inconvenience to the parties and the jury, and the burden on the court. *Id.* at 1176-1180.

This case, though large and complex, cannot be considered in the same vein as the *Andrews* "mega case." With only two defendants, there is little concern that the jury will be unable to compartmentalize the evidence.[21] Further, while there may be more evidence amassed against Dimora, there is not the gross disparity in the nature of

---

[21] This is especially true given the fact that the Indictment sets forth which charges are brought against each defendant, and this division of charges will also be stressed in the Court's jury instructions.

the crimes, as in *Andrews*.[22] *See United States v. Urban*, 404 F.3d 754, 775-76 (3d Cir. 2005) (rejecting argument that severance was necessary because the evidence against a co-defendant "was voluminous and more aggressive in nature"). Moreover, while three months is not an insignificant period of time, it hardly compares to the year-long marathon that awaited the court and the jurors in *Andrews*.

Defendant Gabor raises many of the same concerns. He also alleges that he will be prejudiced by the spill-over from the evidence against Dimora, noting that he is charged in fewer substantive schemes and that some schemes only "mention him in passing." He notes that, if he were granted a severance, his trial would only require two weeks, and cites *United States v. Sampol*, 636 F.2d 621 (D.D.C. 1980).[23] In *Sampol*, seven defendants were charged with conspiracy to murder a foreign official, and various other murder charges. An eighth defendant was charged with false declarations to the grand jury and misprision of a felon. The court ruled that the trial court erred in failing to sever this eighth defendant from the first seven due to the gross disparity in the charges, noting that the separate trial of this eighth defendant, due to its limited and self-contained nature, would be brief. *Id.* at 643-648.

While it is true that Gabor is charged in fewer schemes, and it would appear that more time will be devoted and more evidence will be offered as to Dimora's involvement in the RICO conspiracy, such a disparity rarely provides a sufficient basis

---

[22] While there are factual distinctions between the various charges, both defendants are accused of the same type of non-violent crimes that often arise out of allegations of public corruption.

[23] The government fervently disagrees with Gabor's estimation that his separate trial would only take a few weeks. At the motion hearing, the government noted that, even in a separate trial, it would still need to establish the RICO conspiracy and Gabor's relationship to it, and that evidence of the entire conspiracy charged in the Indictment would be admissible and available to the government to meet this burden. Even Gabor's counsel conceded that there would be some overlap if the Court conducted separate trials.

for severance. *See United States v. Gallo*, 763 F.2d 1504, 1526 (6th Cir. 1985) ("Merely because inflammatory evidence is admitted against one defendant, not directly involving another codefendant (and with which the other is not charged) does not, in and of itself, show substantial prejudice in the latter's trial."); *see, e.g., United States v. Walls,* 293 F.3d 959, 966 (6th Cir. 2002) (in a drug case, denial of severance was not reversible error on basis of spill-over from co-defendant's unrelated drug activity); *Efrasio*, 935 F.2d at 568 ("Prejudice should not be found in a joint trial just because all evidence adduced is not germane to all counts against each defendant."); *Fernandez*, 388 F.3d at 1243; *Urban*, 404 F.3d at 775-76.

Nor has Defendant Gabor demonstrated such a basis here. Aside from making some conclusory allegations of prejudice and a concern for "guilt by association," Gabor has failed to identify any particular aspect of his co-defendant's case which could arguably adversely affect his presumption of innocence. He has also failed to demonstrate why instructions to the jury directing them to consider the evidence and charges against each defendant separately will not eliminate any possible prejudice. *See Walls*, 293 F.3d at 966 ("Juries are presumed to be capable of following instructions, like those given in this case, regarding the sorting of evidence and the separate consideration of multiple defendants."). Without more, his spill-over prejudice argument must fail. *See Warner*, 971 F.2d at 1196 (The defendant "bear[s] the burden of making a strong showing of factually specific and compelling prejudice resulting from a joint trial.")

Gabor's argument is even less compelling, given the fact that all of the evidence relating to the overall RICO conspiracy, including the schemes in which Gabor or Dimora played no major role, would be admissible against Gabor in a separate trial.

*See United States v. DeCologero*, 530 F.3d 36, 54 (1st Cir. 2008) (internal quotation and citations omitted) ("[E]ven if the defendants had received separate trials, evidence of the murder would have been independently admissible against each, and it is far from clear that the potentially prejudicial impact of that evidence would have made it inadmissible under Federal Rule of Evidence 403. This is why, in the context of conspiracy, severance will rarely, if ever, be required due to evidentiary spillover."); *Gardiner*, 463 F.3d at 473 ("Severance should not be granted where the same evidence is admissible against all defendants […]."); *United States v. Spinelli*, 352 F.3d 48, 55-56 (2d Cir. 2003) (denial of severance upheld in conspiracy case in part because much of evidence against codefendant, though more substantial than that against defendant, would have been admissible in a separate trial); *Warner*, 971 F.2d at 1196 ("Where the same evidence is admissible against all defendants, a severance should not be granted."). Although it is alleged that Dimora committed more predicate acts, both defendants are accused of engaging in similar conduct, and all of the conduct is tied to the overall RICO conspiracy. *See, generally, Triumph Capital*, 260 F. Supp. 2d at 440 (internal citation omitted) ("Joint trials involving defendants who are only marginally involved alongside those who are heavily involved are constitutionally permissible.").

   Gabor's reliance on *United States v. Breing*, 70 F.3d 850 (6th Cir. 1995) is equally unavailing. In *Breing*, the defendant and his ex-wife were tried together on charges of evading federal income tax, in violation of 26 U.S.C. § 7201. Both pointed the finger at the other, with the ex-wife offering a defense that she was controlled and manipulated by the defendant. In support of her defense, she offered evidence of the defendant's cruelty, abusive behavior, and extra-marital affairs. On appeal, the court

reversed the defendant's convictions and remanded for a new trial, finding that the defendant was severely prejudiced by the introduction of "bad acts" evidence that clearly would not have been admissible if the defendant had been tried separately. *Id*. at 853.

In contrast, neither defendant in this case has even suggested that antagonistic defenses will be offered at trial, *see United States v. Parks*, 278 Fed. Appx. 527, 531 (6th Cir. 2008) (distinguishing *Breing* on grounds that defendant's co-defendant "did not offer any testimony in his own defense that was highly antagonistic toward [the d]efendant"); *United States v. Graham*, 484 F.3d 413, 419 (6th Cir. 2007) (no prejudice in failing to sever where there was no logical inconsistency between defendants' strategies at trial), let alone prove that such defenses would be irreconcilably prejudicial. *See Gardiner*, 463 F.3d at 473 (quoting *Warner*, 971 F.2d at 1196) ("The burden is on the defendants to show that an antagonistic defense would present a conflict 'so prejudicial that defenses are irreconcilable, and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.'") Nor have the defendants suggested that evidence offered by one defendant (or against one defendant) would be inadmissible against another in a separate trial. Rather, it is clear that most, if not all, evidence would be admissible against either defendant to establish the existence of the RICO conspiracy.

Because the defendants were properly joined as RICO co-conspirators, much of the evidence offered at trial would be the same if the trials were conducted separately, and less drastic measures, such as limiting instructions, should be sufficient to protect against any possible prejudice from a joint trial, the defendants' motions to sever are DENIED. *See, e.g, Zafiro*, 506 U.S. at 541 (instructions explaining the need to consider each charge and each individual separately "sufficed to cure any possibility of

prejudice"); *Urban*, 404 F.3d at 775-76 (instruction to compartmentalize the evidence sufficient); *see also United States v. Mays*, 69 F.3d 116, 120 (6th Cir. 1995) (recognizing the "strong policy favoring joint trials" and "the presumption of the validity of curative instructions").

**Conclusion**

For all of the foregoing reasons, Defendant Dimora's motions to change venue and sever, as well as Defendant Gabor's motion to sever, are DENIED. Defendant Dimora's motion for expanded voir dire is GRANTED in part.

**IT IS SO ORDERED**.

Dated: October 31, 2011

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**