# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.1:10CR387 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | OPINION & ORDER |
| | ) | |
| | ) | |
| JAMES C. DIMORA, et al., | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

The Indictment charges the defendants, James C. Dimora and Michael D. Gabor, with RICO conspiracy, conspiracy to commit mail fraud and honest services mail fraud, Hobbs Act violations, and various other related crimes. (Doc. No. 444, Third Superseding Indictment.)[1] The charges stem from an extensive three-year federal investigation into allegations of public corruption in Cuyahoga County, Ohio.

On September 1, 2011, defendants filed a series of pre-trial motions. A hearing on all of the pre-trial motions was held October 5, 2011. The Court has already issued several opinions and orders addressing many of these motions. This opinion addresses the remaining pre-trial motions, specifically: Dimora's motion to suppress evidence seized from the search of his home and office (Doc. No. 422); Dimora's motion for disclosure of grand jury transcripts and the identities of confidential informants (Doc.

---

[1] All citations to the Indictment refer to the Third Superseding Indictment, filed September 7, 2011. (*See* Doc. No. 444.)

No. 417); the motions of Gabor and Dimora to suppress wiretaps (Doc. No. 423 and 424, respectively); and Dimora's motion to suppress wiretaps based on a failure to minimize (Doc. No. 484).

### I.  Dimora's Motion to Suppress Evidence Seized from His Home and Office (Doc. No. 422)

Defendant Dimora seeks to suppress all evidence seized during the July 2008 searches of his home and office owing to what he perceives as insufficiencies in the search warrants and the affidavit offered in support of those warrants. Specifically, Dimora insists that: (1) the affidavit lacked the requisite nexus between the places to be searched and the evidence to be seized; (2) the search warrants were overly broad; (3) the search warrants authorized the seizure of political speech; (4) the affidavit relied on wiretaps obtained in violation of Title III of the Omnibus Crime Control and Safe Street Act of 1968; and (5) the warrants were not supported by probable cause. The government filed a response in opposition to Dimora's motion (Doc. No. 478.) and Dimora subsequently filed a reply (Doc. No. 511). Dimora's fourth contention will be addressed in the separate section of this opinion devoted exclusively to the defendants' motions to suppress the wiretaps. The remaining contentions are addressed directly below.[2]

---

[2] Dimora's motion includes a request for an evidentiary hearing. At the motion hearing on October 5, 2011, counsel for Dimora conceded that his client's attacks upon the search warrant were legal in nature and did not require an evidentiary hearing. *See United States v. Abboud*, 438 F.3d 554, 577 (6th Cir. 2006) (quoting *United States v. Downs*, No. 96-3862, No. 96-3862, 1999 WL 130786 at *3 (6th Cir. Jan. 19, 1999) (emphasis in original) ("An evidentiary hearing is required 'only if the motion is sufficiently definite, specific, detailed, and non-conjectural to enable the court to conclude that *contested issues of fact* going to the validity of the search are in question.'")). *See United States v. Knowledge*, 418 Fed. App'x 405, 408 (6th Cir. 2011) (quoting *Abboud*, 438 F.3d at 577) ("A defendant is not entitled to an evidentiary hearing where his arguments are 'entirely legal in nature.'"). Finding the challenges to the searches to be entirely related to the legal sufficiency of the warrants and the supporting affidavit, the Court agrees that an evidentiary hearing is not needed or required.

On July 25, 2008, a warrant application was submitted for the search of Dimora's office, as well as the work spaces of other individuals located within the Cuyahoga County Administration Building. (Doc. No. 422-1, Ex. A.) That same day (July 25, 2008), a second application was filed for the search of Dimora's home. (Doc. No. 422-2, Ex. B.) Both applications were supported by a Master Affidavit, totaling more than 365 pages and including contributions from IRS Agent Kelly Fatula and FBI Special Agent Gregory Curtis. (Doc. No. 422-3 and 422-4, Ex. C.)[3] The Master Affidavit included information derived from a review of bank records and pen registers, physical surveillance, the interception of telephonic communications, search and seizures of computer systems, consensual recordings, and interviews with confidential sources. Both contributing agents also drew from their personal experiences as federal officers in presenting the information to the neutral magistrate.

The Fourth Amendment mandates that there must be probable cause for any search and seizure. U.S. CONST. amend. IV. "Probable cause has been defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *United States v. Pardo*, 52 F.3d 120, 122-23 (6th Cir. 1995) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). "To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (internal

---

[3] The Mater Affidavit of S.A. Fatula consists of 58 pages and the Master Affidavit of S.A. Curtis consists of 307 pages. Collectively these two affidavits will be referred to sometimes as "the Master Affidavit." Citations will reference the specific affidavit.

quotations and citation omitted). "Probable cause is based on the totality of the circumstances; it is a 'practical, non-technical conception that deals with the factual and practical considerations of everyday life.'" *United States v. Abboud*, 438 F.3d 554, 571 (6th Cir. 2006) (quoting *Frazier,* 423 F.3d at 531)*; see United States v. Lazar*, 604 F.3d 230, 241-42 (6th Cir. 2010) (trial judge properly found probable cause in common-sense manner where affidavit was based on two-year involvement in case, personal visits to locations, review of bills, and extensive interviews).

### A. Nexus with the Location Searched

Dimora first challenges the sufficiency of the affidavit supporting the warrants because it allegedly failed to establish the necessary nexus between the places searched and the items to be seized. "To justify a search, the circumstances must indicate why evidence of illegal activity will be found 'in a particular place.' There must, in other words, be a 'nexus between the place to be searched and the evidence sought.'" *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (quoting *United States v. Van Shutters*, 163 F.3d 331, 336-37 (6th Cir. 1998)). *See Frazier*, 423 F.3d at 531 (internal quotation and citation omitted) ("To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search.") Dimora suggests that the Master Affidavit merely recites conversations between himself and others, but "provides no real implication that any physical or tangible evidence supporting the allegations made in the affidavit would actually exist at the places to be searched." (Mot. at 6.)

### 1. The Office Search

With respect to his office, Dimora complains that the Master Affidavit "alleges only that Mr. Dimora's office possesses a fax machine, Mr. Dimora uses the fax machine and that Mr. Dimora's assistant was able to handle some business for him." (Mot. at 7.) He notes that it also alleges that records of calls and meetings may be found at his office.

The government posits that the search warrant for the office instructed agents to seize personal and financial records, campaign records, records pertaining to County employees, and other records relating to County work. It insists that the fact that Dimora served as County Commissioner and had a County office assigned to him for use as County Commissioner is sufficient to establish probable cause that records of county business would be found there. Given the fact that the allegations of criminal activity set forth in the Master Affidavit focused on actions Dimora allegedly took in his position as a Cuyahoga County Commissioner, the Court agrees with the government. *See Abboud*, 438 F.3d at 572 ("One does not need Supreme Court precedent to support the simple fact that records of illegal business activity are usually kept at either a business location or at the defendant's home."); *see, e.g., Lazar*, 604 F.3d at 241 (warrant applications provided "a fair probability that evidence of health care fraud—namely, the defendant's patient files and records—would be found at the defendant treating physician's offices").

According to Dimora, the Master Affidavit only offers evidence that he used his office (and his home) for work, and separately offers evidence that he engaged in illegal activity. He argues that there is no connection such that it would be likely that

5

evidence of criminal activity would be found at either location. The Master Affidavit, however, provided more information supporting the searches, and supplied the link to illegal activity. Specifically, it provided:

> Multiple telephone calls evidence the fact that DIMORA regularly works from his home and typically travels to his office only on days that Cuyahoga County Commissioners' meetings are scheduled. DIMORA regularly has employees from his office deliver a folder containing mail, scheduling, and "call sheets"[4] to his home. After DIMORA reviews the items, those same employees pick up the folder and return the items to DIMORA's office.
>
> ***
>
> As mentioned above, DIMORA's office paperwork is relevant to this investigation because it is evidence of the meetings, telephone calls, and faxes that DIMORA has had with individuals who have asked him to take official acts in exchange for something of value. Therefore, there is probable cause to believe that the work areas of the sources of that paperwork [including the work stations of other individuals identified therein] will contain documents relevant to the investigation.

(Curtis Master Aff. at 290-94.) This information clearly established that paperwork, along with records of calls, were flowing between Dimora's home and office. Moreover, the Master Affidavit provides that the work Dimora performed at his office allegedly included unlawful activity that advanced the conspiracy.[5] As such, the Master Affidavit allowed a neutral magistrate to conclude that there was a "fair probability" that information involving illegal activity would be found at Dimora's office.[6]

---

[4] "Call sheets" were listings of calls received by Dimora's office. They included the name of the call, call back telephone numbers, and a reference to the topic on which the caller wished to speak to Dimora. The nature of the "call sheets" was explained in the Master Affidavit.

[5] Specifically, the Master Affidavit provides that Dimora used his County Commissioner's Office to initiate and receive phone calls involving incidents demonstrating that he received things of value in exchange for official acts. (Curtis Master Aff. at 293-94.)

[6] The Master Affidavit also provides details of evidence of personal and political activity that would be found in Dimora's office, as he used his office fax machine for Cuyahoga County Democratic Party business. Dimora would allegedly receive political contributions in exchange for taking official action. (Curtis Master Aff. at 292-94.)

## 2. The Home Search

This same evidence supports a finding of a "fair probability" that evidence of criminal activity would be found in Dimora's home. The Master Affidavit provides a substantial basis for finding that Dimora did most of his Cuyahoga County Commissioner work from home, only coming into the office on days of scheduled commissioner meetings, that he regularly had employees deliver mail, call sheets, and other office paperwork to his home, and that this paperwork is believed to contain information that individuals asked Dimora to take official action in exchange for things of value. In fact, the Master Affidavit offered specific examples of such activity, including an incident on February 18, 2008, wherein Dimora instructed an employee to fax bids related to the sale of a parcel to a contractor.[7] It was apparent that the employee had originally sent the fax to Dimora's home. The Master Affidavit further recounts information supporting a fair probability that Dimora received political information at home, and there was evidence that campaign contributions were among the "things of value" received by Dimora. (*See* Curtis Master Aff. at 290-92.) *See United States v. Gardiner*, 463 F.3d 445, 470-71 (6th Cir. 2006) (evidence that the defendant was involved in the conspiracy, coupled with evidence that he maintained an office in his home with a hidden safe, was sufficient to establish probable cause for a search of his home). Based on the "totality of the circumstances," and applying the "practical considerations of everyday life," the Court finds that the Master Affidavit supplied the necessary nexus between the locations

---

[7] The Master Affidavit also offers evidence that Dimora, from his telephone frequently discussed bids for other County projects, including projects involving alleged co-conspirators like Vince Russo, Steven Pumper, and Michael Forlani. (*See* Curtis Master Aff. at 290-91.)

searched and the evidence sought. *See Abboud*, 438 F.3d at 571-72

**B. Particularity**

Defendant Dimora insists that the warrants are merely "general" in nature, and, thus, violate the particularity requirement. The Fourth Amendment requires a warrant to "particularly describe the place to be searched, and the persons or things to be seized." U.S. CONST. amend IV. "The purpose of this particularity requirement is to prevent the use of general warrants authorizing wide-ranging rummaging searches in violation of the Constitution's proscription against unreasonable searches and seizures." *United States v. Logan*, 250 F.3d 350, 365 (6th Cir. 2001) (citing *Andresen v. Maryland*, 427 U.S. 463, 480 (1976)). "[T]he degree of specificity required is flexible and will vary depending on the crime involved and the types of items sought." *United States v. Henson*, 848 F.2d 1374, 1383 (6th Cir. 1988); *see United States v. Campbell*, 256 F.3d 381, 389 (6th Cir. 2001). A determination as to particularity is "best resolved upon examination of the circumstances of the particular case." *Logan*, 250 F.3d at 365. Further, a "description contained in a warrant is sufficiently particular if it is as specific as the circumstances and the nature of the alleged crime permit. In addition, once a category of documents has been adequately described in the warrant, in part by an illustrative list of items to be seized, the Fourth Amendment is not violated when officers executing the warrant exercise minimal judgment as to whether a particular document falls within the described category." *Id.* (internal citation omitted).

Even broadly worded warrants allowing for the seizure of all business records have been upheld where the investigation has involved a "pervasive scheme to

defraud." *United States v. Martinelli*, 454 F.3d 1300, 1308 (11th Cir. 2006) (quoting *United States v. Sawyer*, 799 F.2d 1494, 1508 (11th Cir. 1986)); *see United States v. Smith*, 424 F.3d 992, 1006 (9th Cir. 2005) (internal quotation omitted) (stating that "even an 'extraordinarily broad' warrant authorizing the seizure of essentially all business records may be justified when there is probable cause to believe that fraud permeated the entire business operation"); *United States v. Travers*, 233 F.3d 1327, 1330 (11th Cir. 2000) (internal citation omitted) (noting that cases involving "complex financial fraud . . . justify a more flexible reading of the fourth amendment particularity requirement").

Dimora argues that the warrants were overly broad because they permitted the seizure of "any information that pertains, in any way whatsoever, to over 80 different entities and individuals." (Mot. at 10.) Dimora's description fails to take into account the detail provided in the supporting documents, as well as the broad scope of the investigation.

Attached to each warrant was a picture of the place to be searched, along with a written description of the location. Also attached to each warrant was a multi-page list of fairly detailed categories of documents and other items that could be seized. Most of the categories were further limited by dates, with many limited to no more than five years preceding the search, and some limited further still to only two years prior to the search. The warrants also incorporated the 365-page Master Affidavit that included sworn statements from the agents seeking the warrants.

The Master Affidavit, in turn, included details relating to at least 60 fraudulent schemes in which Dimora and other co-conspirators were alleged to have been involved, the dates of the schemes, the names of other individuals or entities allegedly

involved, and information indicating that the items sought were related to these schemes. (*See* Resp. at 9-15 (setting forth the citations in the Master Affidavit to the various schemes).) Further, the accompanying Master Affidavit provided an evidentiary basis for each scheme, *see Logan,* 250 F.3d at 365 (warrant sufficient where alleged items sought related to a fraudulent scheme, and the scheme was set forth in the warrant and accompanying affidavit), and it is clear that the categories of things to be searched were narrowly tailored to recover documents and other items that would amount to evidence of the fraud laid out in the accompanying Master Affidavit.[8] *See, e.g., United States v. Poulsen*, No. CR2-06-129, 2008 WL 271661, at *5 (S.D. Ohio Jan. 30, 2008), *aff'd*, 655 F.3d 492 (6th Cir. 2011) (warrant calling for the seizure of "any and all records or information . . . relating to . . . accounts receivables, sellers of account receivables; investors; note holders; banking records; wire transfer records; and reports to investors, noteholders or indenture trustees" was not beyond the scope of the purported fraudulent

---

[8] Even if the warrants were overly broad, which the Court finds they were not, "most Courts of Appeals have held that a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant." *Groh v. Ramirez*, 540 U.S. 551, 557-58 (2004); *see United States v. Leveto*, 540 F.3d 200 (3d Cir. 2008) ("Such a defect [i.e., over-breadth] can be cured by an affidavit that is more particularized than the warrant."); *United States v. Bigi*, No. 3:09-cr-153, 2010 WL 3746172, at *7 (S.D. Ohio Sept. 22, 2010) (internal citations omitted) ("Generally, the government cannot rely on a warrant affidavit to cure an overbroad warrant. However, such reliance is permitted where the warrant actually cross-references the affidavit."); *see, e.g., Keweenaw Bay Indian Cmty. v. Rising*, 477 F.3d 881, 896 (6th Cir. 2007) ("Because the particularity of a search warrant can be measured by an accompanying document incorporated by reference, the two subsequent warrants here pass muster under the Fourth Amendment."). Any problem of over-breadth would be cured by the very detailed supporting affidavit, which is incorporated into the warrants by reference.

schemes). There is no doubt that the search warrants were broad.[9] However, given the fact that federal agents were investigating extensive  and far-reaching public corruption, involving multiple public officials and private business executives and companies, the details in the warrants and supporting documents were sufficiently specific as the "'circumstances and the nature of the activity under investigation would permit.'" *United States v. Ables,* 167 F.3d 1021, 1033 (6th Cir. 1999) (quoting *United States v. Henson*, 848 F.2d 1374, 1383 (6th Cir. 1988)); *see, e.g., United States v. Frost,* 125 F.3d 346, 388 (6th Cir. 1997) (stating that the search warrant "appropriately authorized the extensive seizure of paper and computer documents in this complicated mail fraud case").

Dimora also argues that the warrants were overly broad because they sought documents reflecting his "awareness" of the County's policies on hiring, promotion, outside employment, lobbying, and ethics. Likewise, he argues that the fact that the warrants sought all documents reflecting his "awareness" of any "Sunshine laws" was overly broad. With respect to both of these categories of documents, Dimora suggests that the language did not allow law enforcement officials to "reasonably ascertain" or "identify" the things to be seized. (Mot. at 9.) However, in *Logan*, the Sixth Circuit upheld a similar search warrant where its apparently general nature was due to the

---

[9] Though broad, the categories were not nearly as far reaching as Dimora would suggest. For example, while the warrants sought information relating to a number of different companies and entities, the search was limited to any such documents from July 1, 2003, to the date of the search. (*See* Master Aff., Attachment B.) Also, while the warrants sought evidence of personal living expenses, the search was limited to: "real estate expenses (such as mortgages, home improvements, maintenance, landscaping, taxes, building costs, building permits)." (*Id*.) The companies and entities listed in the search warrant were identified in the accompanying affidavit as either participants or victims of the fraudulent schemes under investigation, and the records of personal living expenditures went to Dimora's alleged practice of receiving things of value in exchange for taking official action, also delineated in the accompanying affidavit.

fact that agents were investigating a complex and far-reaching fraud. *Logan*, 250 F.3d at 365. Viewing the sufficiency of the warrants from the specific circumstances surrounding the multiple and complex alleged fraudulent schemes under investigation, the categories of items identified in the warrants were sufficiently particular to allow the agents to recover relevant documents with only minimal judgment. *Id.; see United States v. Blair*, 214 F.3d 690, 697 (6th Cir. 2000); *United States v. Word*, 806 F.2d 658, 661 (6th Cir. 1986). Accordingly, there is no basis for invalidating the search warrants here on grounds that they lacked the necessary particularity.

Of course, even if the Court found that portions of the warrants were overly broad, the remedy would not necessarily be suppression of all evidence derived from the searches. Instead, the proper remedy would be to "sever the overbroad portions of the warrant from those portions that are sufficiently particular." *United States v. Ford*, 184 F.3d 566, 578 (6th Cir. 1999) (citing *United States v. Blakeney*, 942 F.2d 1001, 1027 (6th Cir.), *cert. denied*, 502 U.S. 1008 (1991)); *see United States v. Hanna*, Nos. 09-1425 & 09-2086, 2011 WL 3524292, at *12 (6th Cir. Aug. 12, 2011)). Dimora has failed to identify which documents were seized as a result of any over-breadth in the warrants. As such, even if this Court were to find over-breadth, Dimora has failed in his burden of identifying what documents would be properly suppressed. *See, e.g., Abboud*, 438 F.3d at 576 (proper to suppress only documents beyond the relevant time period); *Blakeney*, 942 F.2d at 1027 ("jewelry seized pursuant to the overbroad portion of the search warrant was not introduced into evidence"); *United States v. Greene*, 250 F.3d 471, 477 (6th Cir. 2001) (severance of over-broad clause in warrant did not "impugn the validity of the three firearms which are the basis for Green's conviction" and were properly seized

12

pursuant to the warrant).

### C. Probable Cause

Defendant Dimora suggests that there is a lack of probable cause because the Master Affidavit merely strings together conversations involving Dimora and others, with no evidence to support the conclusions reached by the affiant. He also complains that the warrants gratuitously include "salacious" facts and draw improper inferences from Dimora's innocent receipt of dinners and invitations to family and friends' barbecues.

The Master Affidavit incorporates sworn statements from IRS Special Agent Fatula and FBI Special Agent Curtis. S.A. Fatula details her review of the financial and other bank records of various co-conspirators, and demonstrates that many of the public officials under investigation, including Dimora, appeared to be living beyond their means. (Fatula Master Aff. at 1-48.) S.A. Curtis's affidavit begins with his representation that there is probable cause to believe that Dimora and other co-conspirators had committed certain crimes, including Hobbs Act violations, 18 U.S.C. § 1951; obstruction, 18 U.S.C. § 1512; bank fraud, 18 U.S.C. § 1344; and other related crimes.

Before identifying with particularity the places to be searched, the Curtis Affidavit describes the scope of the investigation and the use of various investigatory techniques. His affidavit explains that a focus of the investigation had been Dimora's and Frank Russo's "obtaining or being offered things of value from local contractors and individuals seeking to do business with Cuyahoga County." (Curtis Master Aff. at 21.) It also details the use of confidential sources, the nature and length of the relationship

13

between the affiant and the source, the reliability of the source, and each source's connection to the alleged public corruption fraud under investigation.

The next section of the Curtis Master Affidavit lays out the numerous schemes in which Dimora and his co-conspirators are alleged to have participated. For all of the approximately 60 schemes, the affiant provides identifies the participants in each scheme and the participants' alleged roles, along with a detailed account of the evidence that supports the affiant's conclusion that the scheme involved criminal activity. Included in these recitations are word-for-word accounts of intercepted communications, as well as information from confidential sources and various forms of surveillance.

For example, the very first scheme identified involved a trip to Las Vegas by Dimora, Gabor, Kevin Kelley, Steve Pumper, Frank Russo, and others. It was alleged that the trip was funded by Ferris Kleem, who owned Blaze Construction and was a part owner of Phoenix Cement, and that Kleem financed the trip in exchange for influence from Dimora on the awarding of County projects. In support of this scheme, the Master Affidavit details phone conversations between Dimora and others wherein Dimora expressed his understanding that Kleem would pay for the trip and various expenses incurred during the trip. Phone conversations also supported a finding that Kleem covered the expenses in the hopes of receiving favorable consideration from Dimora on certain public works contracts. (Curtis Master Aff. at 31-37.)

Additional schemes provided details as to (1) the other things of value that Dimora and Russo allegedly received in exchange for official action and (2) the conversations and other evidence that supported such allegations. These schemes establish probable cause to believe that Dimora had committed violations of the Hobbs

14

Act, 18 U.S.C. § 1951. *See United States v. Loftus*, 992 F.2d 793, 796 (8th Cir. 1993) (quoting *McCormick v. United States*, 500 U.S. 257, 273 (1991)) ("When a public official accepts money and 'asserts that his official conduct will be controlled by the terms of the promise or undertaking,' that official has received money 'under color of official right within the meaning of the Hobbs Act.'"); *United States v. Collins*, 78 F.3d 1021, 1033-34 (6th Cir. 1996) (same); *see also United States v. Ostrander*, 411 F.3d 684, 691 (6th Cir. 2005) (to prove a Hobbs Act violation, the government must prove the interference with interstate commerce, in the course of a substantive criminal act).

The Curtis Master Affidavit also outlined and detailed evidence that supported a probable cause determination that Dimora had engaged in obstruction. *See United States Collis*, 128 F.3d 313, 318 (6th Cir. 1997) (outlining the elements of obstruction). For example, the Master Affidavit offered evidence that, after Pumper was approached by the FBI in connection with allegations that he had bribed a City of Cleveland building inspector, Dimora instructed Pumper, Forlani, and others to create false invoices for work done on Dimora's house in order to make it appear as though Dimora had paid for such work when in fact it was done in exchange for help securing County contracts. (Curtis Master Aff. at 93-125.)

There was substantial evidence in the Master Affidavit connecting Dimora to alleged fraud, obstruction, and Hobbs Act violations, and providing support for the search of his office and home. Dimora, however, selectively identifies a few instances where he believes that the Master Affidavit fails to make a *direct* connection between the conversations and the alleged criminal activity. While it is true that some schemes describe a quid pro quo without direct evidence of the connection, such a connection can

be established by circumstantial evidence. *See United States v. Bryant*, Nos. 09-3243 &
09-3275, 2011 WL 3715811, at *7 (3d Cir. Aug. 25, 2011) (in honest services fraud case,
evidence of quid pro quo arrangement may be established with circumstantial evidence).
For example, at the time that Dimora was allegedly using his office to secure County
funding for Alternatives Agency, co-conspirator Kevin Kelley was depositing checks
from Alternatives Agency totaling more than $75,000 into his checking account and
thanking Alternatives Agency Director Brian Schuman for contributing to the Las Vegas
trip that was attended by Dimora and others. (Curtis Master Aff. at 203-210.)

Likewise, the Hegedus Empire Tree scheme, highlighted by Dimora, was
supported by more than amassed conversations and logical leaps. The Master Affidavit
demonstrated that Hegedus solicited Dimora's influence over a judicial proceeding
involving Hegedus and one of its employees, as well as Dimora's efforts to obtain public
works contracts for the company in exchange for personal benefit. In the conversation,
Dimora makes a clear reference to Hegedus's willingness to contribute to events. (*Id.* at
276-79.) Further, while Dimora characterizes the Hegedus barbecue he attended as a
"private barbecue hosted by a friend," the government argues that the inference remains
that it was a thing of value received by Dimora in exchange for him exercising his public
duties.[10] In his reply, Dimora challenges the affiant's conclusions with respect to much of
the evidence offered in support. He claims, without support, that the government should
have eliminated all possible "innocent" inferences to be drawn from the evidence. But

---

[10] In fact, the Master Affidavit makes several references to conversations where Dimora and others
discussed meals they were to receive and "sponsorship" for them. (*See* Curtis Master Aff. at 48, 49, 199,
and 212.)

"the probable cause requirement does not require that every contrary hypothesis be excluded." *United States v. Alfano*, 838 F.2d 158, 162 (6th Cir. 1988), *cert. denied, Palazzolo v. United States*, 488 U.S. 821 (1988); *see United States v. Poulsen*, 655 F.3d 492, 504 (6th Cir. 2011) (citing *Alfano*, 838 F.2d at 162) ("Certainty is not required, but rather a fair probability and something more than mere suspicion."); *United States v. Martin*, 526 F.3d 926, 936 (6th Cir. 2009) ("Probable cause is described as a fair probability—not an absolute certainty . . . ."). These arguments actually go to Dimora's theory of the defense that these were really innocent encounters.[11] In the end it would be for the jury, as fact finder, to determine what reasonable inferences may be drawn from the evidence; at this stage, however, the conversations and other evidence offered in the Master Affidavit support a finding of a fair probability of illegal activity.[12]

Not all schemes relied on inference and circumstantial evidence. Some schemes were far more specific. The Master Affidavit sets forth a scheme whereby Dimora allegedly used his influence with County Sheriff Gerald McFaul to obtain County employment for co-conspirator Jerry Skuhrovec in exchange for Skuhrovec holding a fundraiser for Anthony Russo and for another unspecified thing of value. According to the Master Affidavit, Dimora refused to hire McFaul's grandson for a County position until McFaul hired Skuhrovec. The details of this quid pro quo scheme were laid out in a

---

[11] Likewise, Dimora's suggestion that "neither the affiant nor the government explore the possibility that Mr. Dimora asked his assistant to compile a list of HUD loans for purposes concerning his County Commissioner business" improperly implies that the government must prove beyond a reasonable doubt that the conduct in question is criminal. (*See* Reply at 11.) Such proof simply is not a requirement to establish probable cause. *See Alfano*, 838 F.2d at 162 ("Facts can amount to a fair probability without being proof beyond a reasonable doubt or even a *prima facie* showing.")

[12] In reaching this conclusion, the Court observes that Judge Wells (the District Judge who authorized the warrants) was entitled to rely, in part, on the informed assessment of facts by the contributing agents. *See United States v. Stotts*, 176 F.3d 880, 885 (6th Cir. 1999) ("A judicial officer may rely on an experienced officer's conclusions based on the nature of the evidence and type of offense.")

phone conversation between Dimora and Michael Forlani wherein Dimora told Forlani "that Frank [Russo] told Jerry [Skuhrovec] that he [Skuhrovec] wouldn't get the job with McFaul if he didn't get the money for Anthony [Russo]." (Curtis Master Aff. at 156.) Dimora later stated in a conversation with Skuhrovec, "We're going to put his grandson on. I didn't put him on deliberately until you got on. Cause if he don't put you on, f—k his grandson. I ain't putting him on. I got it in limbo. I got it held up." (*Id.* at 157.) When Skuhrovec called Dimora to thank him for the job with McFaul, he said, "I'm going to have to bring food all summer [to Dimora's pool parties]." Dimora replied, "More than food Jer, but I'll explain that more when we're not on the phone." (*Id.* at 158.) These conversations clearly allow for a finding that political appointments were being made in exchange for things of value, and that Dimora was a part of the schemes.[13]

In another scheme highlighted by Dimora, he complains that there were insufficient facts to set forth probable cause to believe that he had accepted things of value from Ken Fisher in exchange for assisting Fisher in obtaining County legal work and securing an appointment to a Cleveland Metroparks position for an unidentified individual. He notes that a reference to "go[ing] back" to a restaurant does not supply probable cause that Fisher had bought Dimora dinner in the past and would do so again. (*See id.* at 165.)

Of course, if the Court were to consider this portion of the Master Affidavit in a vacuum, it might find that probable cause was lacking. The Court is

---

[13] The Master Affidavit also references a conversation between a confidential source and an attorney who was seeking County business. The attorney indicated that when he told Dimora he could save the county money, Dimora's response was "What's in it for me?" (Curtis Master Aff. at 23.)

required, however, to consider the entire affidavit and determine whether, under the totality of circumstances, there is probable cause to believe that a crime has been committed and that evidence of such crime will be discovered during a search of the premises in question. *See United States v. Olson*, 408 F.3d 366, 372 (7th Cir. 2005) (affirming denial of motion to suppress; individual details were not sufficient for probable cause but together supported issuance of search warrant); *United States v. Maddox*, No. 2:09-CR-045, 2010 WL 31558916, at *2 (E.D. Tenn. Aug. 10, 2010) (quoting *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977) ("Individual paragraphs should not be read 'in isolation from the remainder of the affidavit.' ")).[14] Given the substantial documentation of Dimora's alleged practice of receiving free meals and other things of value from contractors and others seeking official action from him, a fair probability existed that Fisher had paid for a meal in the past and was planning to do so again.[15]

Ultimately, Dimora's attempts to pick apart conclusions drawn by the contributing agents as to certain schemes fall short of defeating a finding of probable cause. Even without consideration of these particular schemes, there was ample evidence supporting the validity of the warrants. *See, e.g., United States v. Mastromatteo*, 538 F.3d

---

[14] As the court in *Maddox* further explained: "The notion that every paragraph of an affidavit must individually establish probable cause is simply not the law. Again, supporting affidavits 'must be judged on the totality of the circumstances and in a reasonable and common sense manner.' Affidavits should not be subjected to 'line-by-line scrutiny,' nor should they be interpreted 'in a hypertechnical, rather than a commonsense, manner.'" No. 2:09-CR-045, 2010 U.S. Dist. LEXIS 81626, at *14 (internal citations omitted).

[15] Other facts devoted to the relationship between Dimora and Fisher support this conclusion. In other wire communications between the two men, Fisher discussed his efforts to raise money for the judicial campaign of Frank Russo's brother and his request to Dimora that Dimora exert influence over Cuyahoga County Prosecuting Attorney Bill Mason with respect to the awarding of County legal work. (Curtis Master Aff. at 162-65.)

535, 641 (6th Cir. 2008) (probable cause still existed and a *Franks* hearing was not necessary, even without certain questionable portions of the supporting affidavit); *United States v. Graham*, 275 F.3d 490, 505 (6th Cir. 2001) (even if omitted material had been included in the affidavit, probable cause would still have existed); *United States v. Zimmer*, 14 F.3d 286, 288 (6th Cir. 1994), *rev'd and remanded on other grounds*, No. 94-2038, 1995 WL 462405 (6th Cir. Aug. 3, 1995) (probable cause to support search warrant, even if informant's statements were taken out of the analysis).

On the whole, the Master Affidavit provided a sufficient basis for the neutral magistrate to conclude that there was probable cause to believe that Dimora and others had engaged in criminal activity and that evidence of such activity was likely to be found in Dimora's office and home. For this reason alone, Dimora's motion to suppress must be denied. [16]

**D. Good Faith**

Even if probable cause were lacking, however, the searches would still be upheld under the good faith exception articulated in *United States v. Leon*, 468 U.S. 897 (1984). Under this exception, the exclusionary rule will not apply to bar the admission of evidence seized in violation of the Fourth Amendment where the officers had a "good-faith reliance on a search warrant that is subsequently held to be defective." *United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996). The "good-faith inquiry is confined to the

---

[16] As for the "salacious" facts included in the Master Affidavit, they involved a recorded telephone conversation between Rob Rybak, Manager of the Plumber's Union Local 55, and Dimora. The references to sex and prostitutes were intertwined with the conversation regarding Rybak's frustration with doing multiple favors for Dimora. (*See* Curtis Master Aff. at 159.) There was nothing wrong with including the entire conversation, and it does not detract from a finding of probable cause.

objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the circumstances . . . may be considered." *Leon*, 468 U.S. at 922-23 n.23.

The good-faith defense will not apply, however, where: (1) the supporting affidavit contains information the affiant knew or should have known is false; (2) the issuing magistrate lacked neutrality and detachment; (3) the affidavit is devoid of information that would support a probable cause determination making any belief that probable cause exists completely unreasonable; or (4) the warrant is facially deficient. *Leon*, 468 U.S. at 923; *United States v. Helton*, 314 F.3d 812, 824 (6th Cir. 2003).

The government argues that, given the level of detail in the Master Affidavit, setting forth over 60 schemes, many of which contained "explicit exchanges of things of value for official acts," and the details and specific terms of the categories of documents to be retrieved, the officers acted in good faith in executing the warrants. (Resp. at 54.) The Court agrees. It is clear from the Master Affidavit that the contributing agents took much care in laying out the over 60 schemes of fraud with specific details, which were substantiated by bank records, physical surveillance, intercepted telephone communications, searches and seizures of computer systems, pen registers, consensual recordings, and interviews with confidential sources. The Master Affidavit also sets forth Dimora's  involvement in the fraudulent schemes, including his alleged receipt of things of value in exchange for official action. Appended to the warrant applications, in turn, were several pages of detailed categories of documents and other items that were to be seized. Many of the categories were further limited by dates. Given the obvious effort

21

exhibited by the applying agents to comply with the requirements of the Fourth Amendment, coupled with the fact that the applications were granted by a detached and neutral magistrate, the Court cannot find that a reasonably well trained officer would have known that such a search was illegal if, in fact, it had been illegal (and as stated previously, the Court finds that it was not). *See, e.g., United States v. Stelton*, 867 F.2d 446, 451 (8th Cir. 1989) (good faith exception applied where agents "took much care in drafting the descriptions of the items to be seized"); *United Sates v. Buck*, 813 F.2d 588, 593 (2d Cir. 1987) (good faith exception applied where officers provided details outlining the crimes and the evidence sought to a neutral magistrate).

Dimora challenges a finding of good faith, however, arguing that the absence of probable cause is so great as to render it unreasonable that any officer would have found probable cause, due to a lack of nexus between the items sought and the location to be searched. However, "[w]here a warrant is held invalid due to a simple error in the determination of probable cause, the evidence should be suppressed *only* if the supporting affidavit was 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *United States v. Savoca*, 761 F.2d 292, 296 (6th Cir. 1985) (quoting *Leon,* 468 U.S. at 923) (emphasis in original). As set forth above, the agents offered detailed information as to Dimora's use of his home and office and why evidence of suspected illegal activity would be found at these locations. Even if this information was technically insufficient to establish the necessary nexus, which this Court does not believe that it was, "the connection was not so remote as to trip on the 'so lacking' hurdle." *United States v. Schultz*, 14 F.3d 1093, 1098 (6th Cir. 1994) (quoting *Leon*, 468 U.S. at 923) (finding the existence of good faith even though the affidavits

22

failed to establish the necessary nexus); *see Van Shutters*, 163 F.3d at 338 (same). The Court thus finds that the searches were constitutionally valid for the additional reason that the officers executed the search warrants in good faith.


### E. Political Speech

Defendant Dimora also complains that the warrants sought information, including campaign contributions, which could be categorized as protected by the First Amendment, and suggests that the directive to seize documents containing such information was based on mere "conclusions" that were not supported by "concrete evidence" that Dimora accepted campaign contributions in exchange for steering bond issuances and providing other official acts. (Mot. at 13.)

It is true that the seizure of protected speech requires an application of the Fourth Amendment with "scrupulous exactitude." *Frisby v. United States*, 79 F.3d 29, 32 (6th Cir. 1996) (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978)). It is also true, however, that "the fact that some of the seized property is expressive written material does not insulate it from government seizure where there is, as here, probable cause to believe that it was used to facilitate criminal activity." *Id*. at 32. Moreover, the standard for probable cause is not "concrete evidence," but rather is whether there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). A court will find that the Fourth Amendment has been followed with "scrupulous exactitude" where "[p]roperly administered, the preconditions for a warrant—probable cause, specificity with respect to the place to be searched and the things to be seized, and overall reasonableness"—are

met. *See Zurcher*, 436 U.S. at 565.

Here, the affidavit offered in support of the warrants established multiple schemes, the existence of which was supported by information from confidential sources and intercepted wiretaps involving Dimora and others, wherein Dimora was allegedly motivated in the performance of his official duties by the likely receipt of campaign contributions. (*See* Curtis Master Aff. at 22, 41, 156, 157, 158-61, 162-65, 189-91, 273-74, 276-78, 281-85.) The fact that some of the seized property was protected by the First Amendment does not insulate it from seizure where the other requirements of the Fourth Amendment—probable cause, particularity, and sufficient nexus—are met. *See Frisby*, 79 F.3d at 32.

Because the warrants and the supporting affidavit satisfy the Fourth Amendment's requirements and because the warrants were executed in good faith, Dimora's motion to suppress the evidence resulting from the search of his home and office is DENIED.[17]

## II.  Dimora's Motion for Disclosure of Grand Jury Transcripts and Identities of Confidential Informants (Doc. No. 417

### A. Grand Jury Transcripts

Defendant Dimora moves for the disclosure of all grand jury transcripts, as well as the identification of all confidential sources and government deals. He bases his request for grand jury transcripts on the following grounds: (1) extensive and ongoing use

---

[17] Inasmuch as the Court finds ample support for the searches, it does not reach the issue of whether the searches were justified under the inevitable discovery doctrine.

of the grand jury; (2) such information may contain "relevant and possibly exculpatory [*Brady*] evidence"; (3) the inability to identify any of the government's confidential sources; and (4) extensive publicity. He makes further claims with respect to his request for the identities of confidential informants and any deals they may have been given, noting that without such information he will be unable to investigate whether such individuals have relevant or exculpatory evidence. According to Dimora, there is a "possibility that an informant may possess evidence relevant to Mr. Dimora's innocence." (Mot. at 7.) The government filed a response to Dimora's motion (Doc. No. 481) and Dimora subsequently filed a reply (Doc. No. 502.)

A party seeking disclosure of grand jury material under Rule 6(e) of the Federal Rules of Criminal Procedure must demonstrate a particularized need. *See Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 228 (1979). To meet the particularized need standard, a party must establish that: (1) the material sought is necessary to avoid a possible injustice in another judicial proceeding; (2) the need for disclosure outweighs the need for continued secrecy; and (3) the request is structured narrowly to cover only the material needed. *See id.* at 222. The district court has considerable discretion in determining whether to require disclosure of grand jury proceedings. *See id.* at 223*; In re Antitrust Grand Jury*, 805 F.2d 155, 161 (6th Cir. 1986) (same).

Dimora offers nothing more than general representations that the transcripts *may contain* relevant and/or exculpatory evidence. This generalized request is insufficient to establish a particularized need for the transcripts. *See, e.g., United States v. Miramontez*, 995 F.2d 56, 59-60 (5th Cir. 1993) (particularized need not shown because

25

request was general and did not specify which portions of proceedings should be disclosed); *United States v. Azad*, 809 F.2d 291, 294-95 (6th Cir. 1986) (particularized need not shown when request for wide-ranging search to bolster unsubstantiated claim of prosecutorial misconduct was based on prosecutor's "off-hand remarks"); *cf. In re Grand Jury Proceedings*, 838 F.2d 304, 308 (8th Cir. 1988) (particularized need existed because plaintiff's case significantly hampered without grand jury materials, documents sought generated independently of grand jury, grand jury long dissolved, and disclosure carefully limited).

Defendant Dimora's request for grand jury transcripts is, therefore, DENIED.


### B. Confidential Source Information

Dimora also seeks the identification of all confidential sources. He argues that "[b]oth the identity and information regarding any confidential informants is important to the defense because of the possibility that an informant may possess evidence relevant to Mr. Dimora's innocence." (Mot. at 7.) He further notes that his request also encompasses the government's entire internal "Confidential Source file." (*Id.*)

The government has a limited privilege to withhold the identity of a confidential informant. *Roviaro v. United States*, 353 U.S. 53, 59-62 (1957); *United States v. Jenkins*, 4 F.3d 1338, 1341 (6th Cir. 1993); *see United States v. Moore*, 954 F.2d 379, 381 (6th Cir. 1982). "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement." *Roviaro*, 353 U.S. at 59. It

26

encourages persons to cooperate with the police in such a capacity. *Id.* The privilege is not, however, absolute. "Where disclosure of an informant's identity is relevant and helpful to the defense of an accused, or is essential to a fair adjudication of the case, the privilege must give way." *United States v. Leslie*, No. 4:02CR039, 2002 WL 32059743, at *3 (E.D. Tenn. Oct. 4, 2002) (citing *Roviaro*, 353 U.S. at 60-61) (omitting further citations); *see United States v. Hammons*, 411 Fed. App'x 837, 843 (6th Cir. 2011); *Moore*, 954 F.2d at 381 (quoting *Roviaro*, 353 U.S. at 62) ("The court must 'balance the public interest in protecting the flow of information against the individual's right to prepare his defense.'").

The burden of establishing the need for disclosure of an informant's identity is upon the party who seeks the disclosure. *See Moore*, 954 F.2d at 381; *United States v. Sharp*, 778 F.2d 1182, 1185 (6th Cir. 1985). A mere request is not sufficient to establish need. *United States v. Smith*, 90 Fed. App'x 120, 125 (6th Cir. 2004) (quoting *Sharp*, 778 F.2d at 1187) (holding that the denial of a defense motion to compel disclosure of any informant's identity was not an abuse of discretion where defendant made no showing as to how such disclosure would substantively assist the defense.) Speculation as to helpfulness also falls short of establishing need. *See United States v. Williams,* 898 F.2d 1400, 1402 (9th Cir. 1990); *Sharp*, 778 F.2d at 1187 (quoting *United States v. Gonzales*, 606 F.2d 70, 75 (5th Cir. 1979) ("Mere conjecture or supposition about the possible relevance of the informant's testimony is insufficient to warrant disclosure.")). Instead, a defendant must come forward with probative evidence supporting the need for disclosure. *Sharp,* 778 F.2d at 1187.

Here, Dimora offers nothing more than the "possibility" that such

27

disclosure might lead to exculpatory evidence; this is insufficient to meet his burden. Further, the government has indicated that, to the extent such information triggers its discovery obligations under *Giglio, Brady*, and the Jenks Act, it will disclose the information in accordance with the rules of law enunciated under these authorities.

At the hearing on October 5, 2011, counsel for Dimora indicated that they were in possession of information that they believed called into question the integrity of a particular confidential source. Specifically, counsel indicated that they had engaged in conversations with counsel for the individual they believe to be the confidential source in question, and he shared with them his client's belief that he did not say certain things that were allegedly attributed to him in the Master Affidavit. The Court granted Dimora leave to supplement his motion with evidence that would substantiate his counsel's claims. His supplement (*see* Doc. No. 519, filed under seal) merely reiterates the suspicions his counsel shared with the Court at the hearing, but provides no substantiation (such as an affidavit) for these claims. These bare suspicions are insufficient to justify requiring the government to identify this, or any, confidential source.[18] *See, e.g., United States v. Makki*, No. 06-20324, 2007 WL 781821, at *3 (E.D. Mich. Mar. 13, 2007) (refusing to require the government to reveal the identity of confidential sources, noting that "[u]nsworn assertions of . . . counsel will not suffice").

---

[18] In *Sharp*, the Sixth Circuit observed that "in analyzing [the issue of whether a confidential source must be disclosed], courts have traditionally utilized *in camera* interviews in order to assess the relevance and possible helpfulness of the informant's identity to the defense. This has long been the accepted practice in this circuit . . . ." 778 F.2d at 1187 (internal citations omitted). The court in *Sharp* also "emphasize[d]," however, that "it is ordinarily not even appropriate for the trial court to compel the production of the suspected informant for an *in camera* interview unless the defendant has first borne his burden of producing some evidence supportive [of his claim], and not merely unsworn assertions of his counsel." *Id.* (citations omitted). Because Dimora has failed to come forward with any evidence in support of his claim, no *in camera* interview of the confidential source in question is necessary.

Dimora has failed to meet his burden of demonstrating the need for such information. His motion to compel the government to reveal the identities of the confidential sources is, therefore, DENIED.

### III. Motions to Suppress the Wiretaps (Doc. Nos. 423 and 424)

Both defendants seek the suppression of all the wiretap communications intercepted by the FBI in which they are parties, as well as the suppression of all information derived therefrom. The government has filed an "Omnibus Response" (Doc. No. 476) to the defendants' motions to suppress the wiretaps and fruits of the wiretaps, and the defendants have, in turn, filed separate replies (Doc. Nos. 510 (Gabor) and 512 (Dimora)). Both defendants challenge the wiretaps on the basis of an absence of probable cause, a lack of necessity, and a failure to minimize. Defendant Dimora also challenges the intercepts on the grounds that they were not authorized by the proper agent, that they violated his First Amendment rights, and that there were a variety of deficiencies in the warrants themselves. Defendant Gabor requests a *Franks* hearing.

The first wiretap application was filed by the government on December 5, 2007, and the first order of authorization was also filed on December 5, 2007. This application was renewed for the first time on December 21, 2007. Additional applications for renewal followed. While each subsequent application included different factual details and identified new schemes as they were unearthed during the investigation, each of the applications mirrored the original application. The first order of authorization was also issued on December 5, 2007, and each of the subsequent orders likewise mirrored the order issued on December 5, 2007. The Court's analysis therefore applies to all of the

29

applications and orders.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, allows an aggrieved person[19] to move to suppress the contents of intercepted oral or wire communications, or evidence derived from such communications, obtained in violation of the statute. An aggrieved person may challenge the use of such evidence at trial on the grounds that:

    (i)      the communication was unlawfully intercepted;
    (ii)     the order of authorization or approval under which it was intercepted is insufficient on its face; or
    (iii)    the interception was not made in conformity with the order of authorization or approval.

18 U.S.C. § 2518(10)(a).


## A. Probable Cause

Both the Fourth Amendment and Title III require a showing of probable cause before a wiretap authorization order may issue. Specifically, Title III requires a finding of probable cause as to three circumstances. The judge reviewing a wiretap application must determine, among other things, that

    (a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;
    (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;
**. . .**
    (d) except as provided in subsection (11) [exception inapplicable here], there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be

---

[19] An "aggrieved person," for purpose of 18 U.S.C. § 2518(10)(a), is a person "who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11).

> intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. 2518(3)(a)–(d). The challenges to probable cause brought by Dimora and Gabor deal primarily with the probable cause requirements found in paragraphs (a) and (b).

In determining whether probable cause exists to issue a wiretap order, "[c]ertainty is not required, but rather a fair probability and something more than mere suspicion." *United States v. Poulsen*, 655 F.3d 492, 504 (6th Cir. 2011) (citing *United States v. Alfano*, 838 F.2d 158, 162 (6th Cir. 1988)). "A succession of superficially innocent events can be sufficient for probable cause if 'a prudent man could say to himself that an innocent course of conduct was substantially less likely than a criminal one.'" *Id.* (quoting *Alfano*, 838 F.2d at 162–63).

"[I]n evaluating the existence of probable cause, reviewing courts must give substantial deference to the [issuing judge's] determination." *United States v. Leon*, 468 U.S. 897, 967 (1984) (Stevens, J., concurring in part and dissenting in part) (citations omitted). "Thus, the fact that a later trial judge or reviewing court may feel that a different conclusion was appropriate does not require, nor even authorize, the suppression of evidence gained through" the issuance of the wiretap order in question. *Alfano*, 838 F.2d at 162. An issuing judge's "determination on the question of probable cause will not be reversed if the record contains a 'substantial basis for his probable cause findings.'" *Id.* (quoting *United States v. Lambert*, 771 F.2d 83, 93 (6th Cir. 1985), *cert. denied*, 474 U.S. 1034 (1985)); *see also United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000)

31

(citation omitted) (Regarding probable cause determinations, "an issuing magistrate's discretion should only be reversed if it was arbitrarily exercised.").

Regarding Title III probable cause determinations, a careful reading of § 2518(3) shows that provision contains no requirement that, in order for a valid wiretap order to issue, probable cause be demonstrated as to *every* individual who is either named as a possible interceptee or who is unnamed yet ultimately intercepted. Rather, the issuing judge need only determine that there is probable cause that "*an* individual is committing, has committed, or is about to commit a" qualifying offense. 18 U.S.C. § 2518(3)(a) (emphasis added). Probable cause need not exist as to every individual named in the wiretap application and order. *United States v. Martin*, 599 F.2d 880, 885 (9th Cir. 1979) ("Section 2518(3)(a) permits a judge to issue an authorization order upon a showing that probable cause exists with respect to *an individual*; it does not expressly require a similar showing with respect to *each person* named in the application."); *see also, e.g., United States v. Figueroa*, 757 F.2d 466, 475 (2d Cir. 1985) (quoting *United States v. Tortorello*, 480 F.2d 764, 775 (2d Cir. 1973)) ("'[T]he government need not establish probable cause as to all participants in a conversation. If probable cause has been shown as to one such participant, the statements of the other participants may be intercepted if pertinent to the investigation.'"); *United States v. Domme*, 753 F.2d 950, 954 n.2 (11th Cir. 1985) (citations omitted) ("A wiretap application need not provide probable cause of criminal activity for each person named in an application, or even every resident of the place where the wiretap is sought. What is required is sufficient information so that a judge could find probable cause to believe that the telephone in question is being used in an illegal operation.") (citation omitted); *United States v.*

32

*Dorfman*, 542 F. Supp. 345, 377-78 n.30 (N.D. Ill. 1982) (citation omitted), *judgment aff'd sub nom. United States v. Williams*, 737 F.2d 594 (7th Cir. 1984) ("[T]he government need not demonstrate probable cause for every person named as an interceptee in the order, and . . . suppression is not required merely because one person named as an interceptee was placed in the order without probable cause.").

To require a showing of probable cause as to every potential interceptee named in the application and order would place the government in a most untenable position. The Supreme Court has held that "a wiretap application must name an individual if the Government has probable cause to believe that the individual is engaged in the criminal activity under investigation and expects to intercept the individual's conversations over the target telephone." *United States v. Donovan*, 429 U.S. 413, 428 (1977); *see also United States v. Kahn*, 415 U.S. 143, 155 (1974) ("Title III requires the naming of a person in the application or interception order only when the law enforcement authorities have probable cause to believe that that individual is 'committing the offense' for which the wiretap is sought."). If the government were also required to *exclude* from its list of interceptees all individuals for whom it did not have probable cause, it would be left on a tightrope with no room for even the slightest error when making probable cause determinations. The smallest misstep in either direction would render it in violation of Title III or the Fourth Amendment. Failure to name an individual for whom there was probable cause would violate *Donovan*, and failure to exclude an individual for whom probable cause was lacking would also amount to a violation.  *See United States v. Rodriguez*, 606 F. Supp. 1363, 1370 (D. Mass. 1985) ("To require identification of persons for whom probable cause exists, yet punish for naming a person

for whom it does not exist would be to force passage between Scylla and Charybdis."); *Martin*, 599 F.2d at 885 (noting that such a requirement would create "an impossible burden of exactness" for the government). This task would be especially harrowing in investigations which—like the one underlying the case at bar—involve a very large number of alleged participants and potential participants.

Moreover, the naming in an application and order of individuals against whom the government has not demonstrated probable cause but whose conversations may nevertheless be intercepted often redounds to the benefit of those interceptees. Section 2518(8)(d) requires that after-the-fact notice of the interception (or lack thereof if the judge reviewing the application for wiretap denies the application) be issued to all those "named in the order or the application." In light of these provisions, "over-inclusion of persons in [a] wiretap affidavit is not a cause for suppression but rather 'furthers the policy of preventing unreasonable invasions of privacy' by ensuring that persons will be given notice of the order and intercepted communications." *United States v. Ambrosio*, 898 F. Supp. 177, 184 (S.D.N.Y. 1995) (quoting and characterizing *United States v. Milan-Colon*, Nos. S2, S3 91CR.685(SWK), 1992 WL 236218 (S.D.N.Y. Sept. 8, 1992)).

Additionally, § 2518(1)(e) requires the wiretap applicant to supply the reviewing judge with "a full and complete statement of the facts concerning all previous applications known to" the applicant where such applications involved an individual named in the current application. This provision allows the reviewing judge to examine the fruit—or lack thereof—of past wiretaps and thus make a more informed decision as to the propriety of the wiretap application in question. *See* CLIFFORD FISHMAN & ANNE MCKENNA, WIRETAPPING & EAVESDROPPING: SURVEILLANCE IN THE INTERNET AGE

34

§ 8:33 (2010) (discussing the benefits—for both the named individual and the government—of including individuals in a wiretap application for whom probable cause is not established).

Analogy to a conventional search and seizure further demonstrates the soundness of the principle that probable cause as to every interceptee is not necessary. If probable cause exists to believe that documents relating to the execution of a crime are housed in a specified residence and a warrant is issued as to that residence and those documents, they may be seized even if they were written in whole or in part by an individual against whom the searching authority did not have probable cause to believe was personally involved in the crime. *See generally Kahn*, 415 U.S. at 155 n.15 (analogizing wiretap orders to conventional search and seizure warrants in a related context).

### 1. Confidential Sources

Both defendants challenge the veracity or reliability and basis of knowledge of the confidential sources relied upon by the government to demonstrate probable cause in its wiretap applications. Defendant Dimora contends that the information obtained from the confidential sources "was from unreliable individuals looking to avoid their own legal problems, lacked any explicit or detailed information, was often second hand and was often easily contradicted with a simple public records check or investigation." (Dimora Mot. at 12.)

It appears that Dimora's challenges to veracity or reliability and basis of knowledge are limited to five of the ten confidential sources relied upon in the affidavit

accompanying the government's December 5th wiretap application. For these five confidential sources, Dimora brings three main types of concerns: (1) that the information provided by the confidential source constituted hearsay or rumor (e.g., *id.* at 16, 19); (2) that the confidential source erred on a factual detail (e.g., *id.* at 13, 14, 20, 33); and (3) that the confidential source is known to have himself[20] been involved in bribery or other crime (e.g., Dimora Reply at 3, 6).

Defendant Gabor's arguments are similar, though he raises challenges to nine of the ten confidential sources relied upon in the government's December 5th application. Gabor asserts that, though the government is required to establish the veracity or reliability and basis of knowledge for all the confidential sources, it has instead merely alleged "in vague terms" that these factors are present for each confidential source and "provides no specific details for corroboration." (Gabor Mot. at 8.) Where acts of specific corroboration are presented in the affidavit, Gabor contends that the facts corroborated consist only of information that is "generally known" or "common knowledge." (Gabor Reply at 3, 4.) Gabor also raises several specific concerns as to the reliability of individual sources. (E.g., Gabor Mot. at 8; Gabor Reply at 3.)

Informants are frequently used as sources for establishing probable cause in Title III wiretap applications. While, all other things being equal, named informants are understandably considered more reliable than confidential ones, *see United States v. Ferguson*, 252 Fed. App'x 714, 720-21 (6th Cir. 2007), use of confidential informants is nevertheless common, and often necessary. Moreover, "[a]n informant's willingness to be named is not necessarily a better predictor of reliability . . . than an informant's having

---

[20] Pronouns used in reference to an unnamed source are not an indication of that individual's gender.

a track record of providing reliable information." *United States v. McCraven*, 401 F.3d 693, 698 (6th Cir. 2005).

Both defendants thus focus on the requirement that the government demonstrate veracity or reliability and basis of knowledge as to the confidential sources. This is often referred to as the "two-pronged test," asking whether sufficient information was provided to the issuing judge to allow the judge to make an independent assessment of the (1) informant's reliability or veracity as well as his (2) basis or source of information. The test developed from two Supreme Court cases that arose during the 1960s: *Aguilar v. Texas*, 378 U.S. 108, 114-16 (1964), and *Spinelli v. United States*, 393 U.S. 410, 412-13, 416 (1969). In *Illinois v. Gates*, however, the Supreme Court decried the rigid application of the two-pronged test. 462 U.S. 213 (1983). The Court stated that there were "persuasive arguments against according these two elements such independent status" and determined, instead, that the two elements, were "better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by *some other indicia of reliability*." *Id.* at 233 (citations omitted) (emphasis added). Post-*Gates*, the two prongs of veracity or reliability and basis of knowledge no longer serve a talismanic function. *See United States v. Allen*, 211 F.3d 970, 972 (6th Cir. 2000) (describing *Gates* as an "abandon[ment of] the inflexible two-part test developed in the light of" *Aguilar* and *Spinelli*.) The standard instead is whether the issuing judge had a substantial basis for concluding that probable cause existed. *Gates*, 462 U.S. at 238-39. This is not to say that veracity or reliability and basis of knowledge are not important

issues in determining whether probable cause based on confidential source information exists. To the contrary, these factors must still be considered. *United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003) (interpreting and applying *Gates*). But they no longer monopolize the probable cause inquiry.

The issuing judge here—District Judge Lesley Wells—had sufficient information to make an independent determination as to the weight that should be given to the confidential source information contained in the application and as to the presence or absence of probable cause for issuance of the wiretap order. Though the defendants raise a number of specific concerns regarding the reliability of the confidential sources, they are so focused on these "trees" of concern that they have lost sight of the probable cause "forest" that surrounds them.

For each of the ten confidential sources relied upon in the December 5th affidavit (Doc. No. 430-1), the affiant informs the issuing judge how long the confidential source has been providing the FBI with information. The length of relationship varies considerably, the longest being seven years and the shortest being sometime in 2007 before the December 5th affidavit was sworn.[21] For each of the ten confidential sources, the affidavit also states that information provided by that individual "has never been found to be false or misleading."[22] (12/5/07 Aff. at ¶ 5.) For every confidential source, the affidavit also states that at least some of information provided by that source has been independently corroborated through multiple means and identifies the means used for

---

[21] Eight of the ten confidential sources began acting as FBI informants before 2007.
[22] For one source, the affidavit uses different, though analogous, language, asserting that "there has never been an instance in which" the confidential source's "reliability or honesty was brought into question." (12/5/07 Aff. at ¶ 5.I.)

each source. The affidavit also briefly discusses the criminal history (or lack thereof) of each confidential source. Of the ten confidential sources, one has been convicted of a felony in the past and another was, at the time of the affidavit, cooperating with the government to reduce his liability for his involvement with the alleged corruption conspiracy at issue here. None of the other eight confidential sources had a felony record.

Defendant Gabor contends that these sorts of "vague" assertions were not sufficient to allow Judge Wells to assess the confidential sources' reliability. "However, Sixth Circuit precedent clearly establishes that the affiant need only specify that the confidential informant has given accurate information in the past to qualify as reliable." *United States v. Greene*, 250 F.3d 471, 480 (6th Cir. 2001). Here, the affiant averred that, for every confidential source relied upon, (1) that source has provided information in the past, (2) at least some of that information has been independently verified, and (3) the source had never been found to be false or misleading.

Even if the reliability of one or more of the confidential sources had been called into question by the affiant or otherwise, that *ten* apparently-autonomous individuals served as confidential sources in this case—and that they all provided information tending to show the existence of a public corruption conspiracy about which information could be gathered through a wiretap of the telephone facilities in question— would still constitute strong evidence from which an issuing court could infer probable cause. *See United States v. Hyde*, 574 F.2d 856, 863 (5th Cir. 1978) (even though investigators admitted none of the sources were "independently completely reliable," fact that ten different informants who had no special reason to collaborate supplied information that agreed in many particulars and "was mutually reinforcing and

39

corroborative" meant that probable cause could still be inferred). When multiple individuals, even those much less reliable than the confidential sources in this case, provide the same or similar information, the probability that that information is accurate greatly increases. *See id.* ("When three unreliable but unconnected persons all report the same fact, it is probable that the fact is true.").

In addition to the large number of confidential sources and the affiant's general assertions of corroboration and reliability found in the opening pages of the December 5th affidavit, the affidavit also contains a wide variety of other information that would have helped the issuing judge make an informed decision as to the reliability of the confidential sources and the existence of probable cause. First, as already indicated, the affidavit lists for each confidential source the various methods by which investigators corroborated that source's information. This includes, for three of the sources, the use of consensual recordings. The affidavit relies most heavily on two confidential sources in particular. Both of these sources participated in a number of consensual recordings and the single confidential source who contributed most to the government's case for probable cause is averred to have made more than 500 consensual recordings. (12/5/07 Aff. at ¶ 5.I.) The government also goes even further by recounting in some detail a number of specific recordings made by some of the confidential informants—recordings some of which strongly reinforce the government's case for source reliability and probable cause.

The government also details other ways in which it has verified source information. The government discusses specific instances where physical surveillance, pen registry data, public records checks, and a "trash pull" were used to corroborate

40

source information. In short, there was a great deal of information available upon which the issuing judge was able to rely in making an independent assessment of the reliability of the confidential sources in this case and of the existence of probable cause.

The defendants' general concerns as to the reliability of the confidential informants and the vagueness of the information supplied to support the sources' reliability now having been dealt with, we turn to the defendants' source-specific concerns. This topic can be dealt with rather briefly, as some of these concerns have already been addressed and the remainder are not sufficient to warrant a reconsideration of the issuing judge's assessment of the sources' reliability. Defendant Dimora's concerns as to the criminal records or other criminal involvement of some of the confidential sources fall into the former category. As already stated, the December 5th affidavit contains information as to the criminal history of each confidential source— information that the issuing judge was free to weigh as he felt appropriate in making her reliability and probable cause determinations. Defendant Dimora also asserts that some of the information gleaned from the confidential sources constitutes rumor or hearsay (sometimes multiple levels of hearsay). Inclusion of hearsay information in such an affidavit is far from unheard of. *See, e.g., United States v. Graham*, 275 F.3d 490, 503 (6th Cir. 2001) (stating affiant in search warrant affidavit relied in part on hearsay). Indeed, most statements made by any informant which are then offered in the affidavit by an affiant in order to demonstrate the truth of those statements are hearsay by definition. Dimora's major qualm here, however, is with the instances where the affiant relied upon statements conveyed to him through multiple layers of hearsay. It is true that, as a general rule, a statement's reliability is inversely proportional to its indirectness. But Judge Wells

was certainly competent to take this factor into consideration when making her probable cause determination.

Dimora also points out approximately four instances where he contends a confidential source misstated specific facts. (E.g., Dimora Mot. at 13, 14, 20, 33.) None of the four—nor the four combined—would alter the overall reliability or probable cause calculus significantly. One of the alleged misstatements can be recognized only by one truly skilled in hair-splitting. Dimora asserts that a confidential source was untrustworthy in part because that source indicated that money would flow from a specified entity, "through" a certain individual who sat on the board of that entity, and on to Dimora. (Dimora Mot. at 20.) Dimora takes issue with the use of this preposition, asserting that it is impossible for money to flow "through" an individual who serves in such capacity. (*Id.*)

Only one of these alleged misstatements has any possible potential to damage the case for probable cause. A confidential source reported that over the two years leading up to the date of the affidavit, a specified company had "made large contributions to Dimora in exchange for public contract awards." (12/5/07 Aff. at ¶ 13.) Dimora asserts that, during the two-year period in question, he received no contributions from the company and that the company received only a single contract with Cuyahoga County. (Dimora Mot. at 13.) In its Omnibus Response, the government countered (and Dimora did not dispute) that in fact, during this period, the company gave $6,000 not directly to Dimora but instead to the Cuyahoga County Democratic Party and that within the 26 month period before the December 5th affidavit was sworn, the owner of that company, rather than the company itself, had given $4,500 directly to Dimora's

campaign. (Resp. at 15 n.5.) The existence of such a discrepancy is not enough to mandate a conclusion that all information provided by the confidential source was unreliable. Nor does it even lead to the conclusion that the source was unreliable on the specific issue of contributions. While the source may have been technically incorrect as to the precise identities of the donors and recipients, he was correct on what really mattered—i.e., that large amounts of money were flowing in Dimora's direction courtesy of DAS and Pumper.[23] *Cf. Greene*, 250 F.3d at 479 ("Courts should review the sufficiency of the affidavit in a commonsense, rather than hypertechnical manner.").

The specific "errors" pointed out by Gabor are likewise insufficient to raise significant doubts as to probable cause. Some, in fact, are not errors at all. Gabor asserts that the fact that one confidential source had served as a reliable informant six years earlier could not be used to support the source's reliability now in part because the information was "stale." (Gabor Mot. at 8.) Gabor appears to be confusing this situation—where information on past reliability is being used to support present reliability—with the doctrine of staleness which applies to information included in the affidavit and used to support probable cause as to whether the things or information to be seized are likely still present. *See, e.g., United States v. Brooks*, 594 F.3d 488 (6th Cir. 2010) (applying the staleness doctrine in determining whether probable cause existed at the time of the search warrant, not to determine the veracity of the source).

Gabor also points to several instances of FBI corroboration that were quite weak. The clearest example of weak corroboration identified by Gabor is found in

---

[23] In its response, the government does not address Dimora's assertion that the company in question received only one contract with Cuyahoga County over the two-year period.

paragraph nine of the February 4, 2008, affidavit. There, the affiant averred that, after receiving information from one of the confidential sources regarding statements made by a certain attorney who had met with Dimora, the FBI determined that the attorney did indeed exist and that he had an office in the city reported by the confidential source. Gabor is right to point out the minimal value of corroborating such an insignificant and relatively simple fact. (Gabor Reply at 4.) Such corroboration contributes little, if anything, to the reliability of the confidential source or to the existence of probable cause. But Gabor neglects the considerable quantity of other information, some of which has already been discussed, that was at the issuing judge's disposal in making her initial determination as to the reliability of the confidential sources. For instance, this particular source's reliability had also been verified through, among other methods, consensual recordings. (12/5/07 Aff. at ¶ 5.) Further, this instance of corroboration was offered by the government in its response merely to indicate that the FBI was continuing to verify the reliability of its confidential sources well after the December 5th wiretap order was issued and the first round of wiretaps was completed. It was not held forth as a model of diligent investigative corroboration.

## 2. Additional Probable Cause Issues

Both defendants direct the bulk of their arguments in these wiretap motions toward questioning the existence of probable cause in ways beyond the reliability of the confidential sources. Gabor attacks the sufficiency of the substantive bribery schemes alleged in the affidavits. He asserts that the evidence provided in the

December 5th and December 21st affidavits was "insufficient to establish probable cause *with respect to Gabor*." (Gabor Mot. at 7 (emphasis added).)

The weight of Gabor's attack is targeted at the December 5th affidavit, and is thus largely in vain. As already set forth above, the wiretap application and order need not demonstrate probable cause "with respect to Gabor." Rather, the only probable cause requirements are the three found in paragraphs (a), (b), and (d) of § 2518(3). For the wiretap applications to withstand probable cause scrutiny, therefore, they must demonstrate probable cause only as to the following: (1) that "*an* individual is committing, has committed, or is about to commit" a qualifying offense; (2) that "particular communications concerning that offense will be obtained through" the wiretap; and (3) that the telephone to be tapped "[is] being used, or [is] about to be used, in connection with the commission of" a qualifying offense or is "leased to, listed in the name of, or commonly used by" an individual involved with the crime. (Emphasis added).

As to the December 5, 2007, application and order, Gabor was not even named as a potential interceptee, let alone a "target interceptee" or "target subject." It appears from the December 5th affidavit that, as of that date, Gabor was not even a subject of the investigation. Rather, Gabor became a target of the investigation based, at least in part, on the information gleaned from the first round of wiretaps effected under the December 5th order. So long as the probable cause requirements above were met, this is perfectly acceptable. One of the main purposes of many wiretaps, after all, is to determine the extent of the alleged conspiracy, both in terms of the "magnitude" of wrongdoing and the number of people involved. Indeed, the December 5th affidavit states

45

that "others yet unknown" were likely also involved in committing the "target offenses." *Cf. Kahn v. United States*, 415 U.S. 143 (1974) (contents of wife's conversation with a gambling conspiracy member on the wiretapped telephone facility was admissible even where the application and order listed only conversations of husband and "of others yet unknown" as covered under the wiretap order). Even if the investigators believed that it was likely that Gabor would be involved in some of the conversations intercepted, "[i]t is not a constitutional requirement that all those likely to be overheard engaging in incriminating conversations be named." *Donovan*, 429 U.S. at 427 n.15.

In short, there was no assertion by the government in the December 5th affidavit that it had probable cause to believe Gabor was involved in any target offense, nor did the authorizing court make such a finding.  Therefore, to the extent that Gabor attacks the existence of probable cause as to himself in the December 5th authorization order, his attack is of no avail, assuming that probable cause existed as to at least one of the targets using the telephone facility for which the wiretap order was issued (an issue discussed in detail below).

The government did claim probable cause as to Gabor in its December 21st application. Gabor is correct that the information included in the December 21st affidavit is at best tenuous support for probable cause as to Gabor, but that has little effect on the disposition of this motion. As discussed below, probable cause is demonstrated as to other interceptees, for example Dimora, Pumper and Kelley, on both of the target telephone facilities in the December 21st order and thus Gabor's communications on those facilities may nevertheless be intercepted. Similarly, Gabor's limited challenges as

46

to the January 19, 2008, February 4, 2008, and April 16, 2008, affidavits are not significant enough to call the issuing judge's probable cause finding into question.

Dimora's probable cause challenges extend to four of the wiretap applications: those dated December 5, 2007; December 21, 2007; January 19, 2008; and February 4, 2008. Dimora's challenges to the December 5th application are the most important, as the information gleaned from the wiretap order authorized in light of that application was used to help build the case for the December 21st and subsequent applications. Many of Dimora's arguments go to the reliability of the confidential sources, a topic already fully addressed. Dimora's other probable cause arguments mostly either allege minor factual discrepancies or assert that there are missing pieces to the puzzle, that is, that there was not enough information provided in the affidavit to show probable cause that Dimora was engaged in *illegal* conduct.

But as previously noted, in order for the wiretap order to issue, probable cause need be established as to only one target interceptee. Even more important in light of the arguments advanced here, Dimora loses sight of the fact that an issuing judge is to "consider whether the totality of the circumstances supports a finding of probable cause, rather than engaging in line-by-line scrutiny." *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004) (citing *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001)). The affidavit must be read as a whole, not disassembled and scrutinized bit by bit. *See United States v. Jewell*, 60 F.3d 20, 23 (1st Cir. 1995) (rejecting "piecemeal" review of a warrant affidavit and stating instead that affidavit must be reviewed "as a whole").

Keeping this standard in mind, there was ample information in the December 5th affidavit for the issuing judge to make the determination that probable

cause as to Dimora himself was present. Looking at only two of the numerous "schemes" discussed in the affidavit demonstrates that this is the case.[24] As to information contained in the section of the affidavit on the first "scheme" (¶¶ 12-37), the following goes to probable cause that Dimora was involved in criminal activity which he would discuss over the tapped telephone: (1) perhaps the most reliable of all of the confidential sources cited in the affidavit (one of the two who had made a number of consensual recordings as part of the investigation) told FBI agents that Steve Pumper (the businessman whose telephone was the one the FBI sought permission to tap in the December 5th application) and Dimora were extremely close to one another (¶ 13); (2) that same confidential source, himself a public employee, had received bribes from Pumper in exchange for official actions (¶¶ 13-14); (3) the confidential source also stated that one of Pumper's companies had renovated Dimora's house (¶ 13); (4) a consensual recording of a conversation between the confidential source and Pumper indicated that, during a meeting between the two, Pumper took a call (which pen registry data showed to be from a phone subscribed to by Pumper's contracting company) during which he told the individual on the telephone, "I'll have to talk to Jimmy about that" (¶ 24); (5) at that same meeting Pumper asked the source, "What else can I do for you?" in response to the source's taking official actions to benefit Pumper (¶ 25); (6) pen register and trap and trace data examined by the FBI indicated that a number of calls were made between Dimora, Pumper, a member of the Cleveland City Council, and others in the hours before and after a Cleveland City

---

[24] Likely in order to make the tremendous amount of information presented more manageable for the reader, the affiant organized the 76-page December 5th affidavit into "schemes" involving various public works projects.

Council meeting where the Council approved a resolution expressing its support of a downtown Cleveland development project from which Pumper's company would allegedly benefit (¶ 32); (7) from July 2006 through November 2007, a total of 360 calls were documented between Pumper's telephone and telephones subscribed to Dimora (¶ 36);[25] and (8) the affiant averred that it was likely that Pumper, Dimora, and others would continue using Pumper's telephone to discuss funding arrangements for the downtown Cleveland development project in question (¶ 37).

Another "scheme" discussed in the affidavit involved the pending sale of a building owned by Cuyahoga County. The following information supporting probable cause that Dimora was involved in criminal activity which he would discuss over the Pumper telephone is found in this other "scheme" (¶¶ 60-68): (1) on November 15, 2007, the Cuyahoga County Commissioners voted to place the property in question up for sale (¶ 62); the affiant indicated that Pumper had close ties to a certain company ("Company A") (¶ 61); (2) telephone toll data indicated that a number of calls were placed on the evening of November 15th between, variously, Dimora, Company A, Pumper, and Michael Forlani (another major contractor with allegedly close ties to Dimora and Pumper) (¶ 64); (3) during the consensually-recorded meeting mentioned above between Pumper and the confidential source, Pumper, after rubbing his fingers together in a "money" gesture, stated that the County Commissioners often "want a little action" (¶ 66); and (4) Pumper indirectly indicated to the confidential source that the reason the County had opted to purchase the now-for-sale building in the first place instead of

---

[25] Notably, a full 681 calls were placed between Pumper's telephone and Gabor's telephone during a period of just over one year stretching from November 2006 to November 2007. (¶ 36.)

49

another property under consideration was because the owner of the other property refused to pay bribes or kickbacks (¶ 66-67).

Other "schemes" provided a large amount of evidence supporting probable cause that Dimora was involved in criminal activity yet did not make a strong connection between that activity and use of the Pumper telephone. By viewing the affidavit as a whole, however, this information can be coupled with the evidence, found elsewhere in the affidavit, of the close relationship and frequent telephone calls between Dimora and Pumper. One example of such a scheme is that involving the bidding process for a contract for "soft demolition" in a building owned by the County. This scheme included the following information supporting probable cause as to Dimora (¶¶ 38-57): (1) pen registry data showed that, in the hours following the county commissioners' meeting at which contractor bids for the project were opened, a number of calls were placed between Dimora's telephone and a major Cleveland area contracting company (this company was not mentioned as being involved in the bidding process, however) (¶ 43); (2) a confidential source reported that Dimora had close ties to the individuals who owned a contracting company that had submitted the second-lowest bid (¶ 46); (3) that same source reported (second-hand) that the second-place company had offered money to one of the winning bidder's essential subcontractors to withdraw in order to disqualify the winning bidder (¶ 45); (4) another confidential source reported (second-hand) that several Cuyahoga County officials held a private meeting at which they decided to award the contract to the second-place company despite its higher bid (¶ 47); (5) this second confidential source also reported that a public employee close to Cuyahoga County Auditor Frank Russo told the source that Russo and Dimora had been waiting for a

company like the second-place company to need their help (*id.*); (6) the owner of the company that had placed the lowest bid informed the FBI that Cuyahoga County officials were trying to avoid contact with him and that, when he did have a conversation with one official, that official vacillated between a number of different excuses as to why the company's low bid should be disqualified (¶¶ 51-52); and (7) Dimora, in his capacity as County Commissioner, ultimately voted to award the contract to the second-place company (¶ 55).

These are only three of the at least seven different "schemes" laid out in the December 5th affidavit. And the information provided here goes only to probable cause as to a single interceptee—Dimora. As might be expected, the case for probable cause as to Steve Pumper, the individual whose phone was the one against which the December 5th wiretap order was directed, is likewise very strong. Moreover, Dimora and Pumper are only two of the four "target interceptees" named in the affidavit. (¶ 5.)

As to the December 21st application, probable cause to continue the wiretap on the Pumper telephone is easily established.  The affidavit incorporates by reference the contents of the earlier December 5th affidavit. (¶ 8.) In addition, the affidavit discusses multiple calls intercepted pursuant to the December 5th order in which Pumper made his influence with Dimora evident and available to others. (¶ 16.) The affidavit also documents a new bribe paid by Pumper to one of the confidential sources. (¶¶ 17-18.) Furthermore, the affidavit identifies telephone calls where Pumper appears to be arranging gifts for a member of the Cleveland City Council (¶ 16(j)) and Dimora (¶ 38(a)). These are just some examples of information provided in the December 21st

affidavit that supports probable cause as to the continued interception of Pumper (and Dimora, among others) on Pumper's telephone.

The December 21st affidavit (Doc. No. 430-2) also includes a request to tap a phone owned by J. Kevin Kelley. Another of the confidential sources who has made consensual recordings as part of the investigation identified Kelley as Dimora's "bagman." (¶ 20). Kelley was a member of the Parma City School Board, and another confidential source reported that Kelley was involved in contract steering and kickbacks awarded to the school board. (¶ 22.) One such contract-for-kickback scheme involved one of Pumper's companies. (*Id.*) Telephone records identified 905 calls made between the Kelley telephone sought to be tapped and Dimora's home and cellular telephones from July 24, 2006, through December 15, 2007. (¶ 35.) Six hundred seventy-six calls were made between Kelley's telephone and Pumper's from November 8, 2006, through December 15 of the following year. (*Id.*). The affidavit provides information from a call intercepted during the first round of Pumper telephone wiretaps wherein Pumper indicated he had sporting event tickets for Dimora and Kelley. (¶ 38(a), mentioned above.) Also included in the affidavit is a lengthy description of a series of calls between Pumper and Kelley discussing a personal construction project that one of Pumper's companies was performing on Kelley's behalf. (¶ 26-32). While the affiant's suggestion that Kelley is receiving free or discounted work is thinly supported, the information gleaned from these conversations nevertheless indicates a continuing close relationship between Kelley and Pumper.

From the December 21st application forward, probable cause only continues to build as to Dimora, Gabor, and others. While Dimora and Gabor both attack

details of later affidavits, their attacks are not broad-ranging enough to call Judge Wells's probable cause determination into question. Their motions to suppress the wiretaps in this case due to lack of probable cause are thus DENIED.

### B. Necessity

Both defendants suggest that the government failed to establish the necessity for wiretaps. Title III dictates that an application for a wiretap contain "'a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" *United States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002) (quoting 18 U.S.C. § 2518(1)(c)). The purpose of this "necessity" requirement is "to ensure that a wiretap 'is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" *Alfano*, 838 F.2d at 163 (quoting *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974)). "Further, the necessity requirement protects against the impermissible use of a wiretap as the 'initial step in [a] criminal investigation.'" *United States v. Rice,* 478 F.3d 704, 710 (6th Cir. 2007) (quoting *United States v. Giordano*, 416 U.S. 505, 515 (1974)).

In establishing the necessity of the tap, "the government is not required to prove that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted." *Alfano*, 838 F.2d at 163. Instead, "'all that is required is that the investigators gave serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigator's belief that such non-wiretap techniques have been or will likely be

53

inadequate.'" *Id*. at 163-64 (quoting *United States v. Lambert*, 771 F.2d 83, 91 (6th Cir. 1985)).

In *Rice*, the court affirmed the district court's finding that there was insufficient credible evidence that other investigative methods had been considered. The district court had determined that the explanations offered for not attempting certain techniques were merely pro forma recitations of the general shortcomings of each technique, and that the statements regarding physical surveillance were made recklessly inasmuch as they suggested that such a technique had been attempted when it had not. Stripping away the misleading information, the district court determined that the affidavit merely offered generalized and uncorroborated information about why certain techniques would not work, and did nothing more than establish that a confidential source was unable to penetrate the drug conspiracy and that the pen registers revealed a possible connection between the defendant and others with histories of drug-related arrests. The Sixth Circuit found that the district court did not err in concluding that the affidavit did not provide a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous. *Id*. at 709-10.

Relying on *Rice,* Dimora claims that the affidavits merely offer conclusory statements on why certain techniques are not likely to succeed. He also notes that other methods, such as trash pulls, were used with success. Gabor offers similar challenges as to "necessity," noting that the affidavits also indicate that interviews and physical surveillance had been highly effective. In particular, he observes that a combination of interviews and consensual recordings had yielded all of the evidence necessary to fully

54

investigate a scheme involving Steve Pumper's bribery of a building inspector.

The government posits that each affidavit gave a lengthy and thorough discussion as to why alternative methods of investigation had been attempted and failed, why continued use of certain techniques would not yield the necessary results, or why certain techniques were unlikely to succeed. The affidavits discussed the past use of interviews, search warrants, trash pulls, surveillance, pen registers, confidential sources, consensual monitoring, and trap and trace, as well as the relative success of each technique. For example, with respect to interviews, the December 5th affidavit noted that, while interviews had been conducted in the past, many of the people interviewed did not have direct knowledge or were "no longer in a position to be directly involved in the illegal activity." (12/5/07 Aff. at ¶ 124.) It further noted that interviews of conspirators were likely to compromise the investigation by tipping off others involved and resulting in the destruction of evidence.[26] (*Id.* at ¶¶ 45-46.) *See also Alfano*, 838 F.2d at 163 (necessity for wiretap shown though government failed to exploit use of informants or visual surveillance because large, close-knit crime family immune to normal techniques.) As for physical surveillance, the December 5th affidavit states that defendant Gabor had, while driving Dimora, engaged in evasive driving that hampered surveillance, driving at speeds in excess of 80 miles per hour and weaving through traffic. The affidavit also documents three occasions in September 2007 when agents attempting to conduct

---

[26] The government notes that after the FBI approached Steve Pumper on May 23, 2008, Pumper immediately told co-conspirators about the event. The co-conspirators began destroying evidence and creating fictitious documents. These actions form the basis for Count 28 of the present Indictment.

physical surveillance in Dimora's neighborhood were stopped, within minutes of entering the neighborhood, by the Independence Police. (*Id.* at 136.)

The affidavits also recount the past success of various other techniques, but explain why such techniques were likely to yield diminishing returns. For example, while noting that trash pulls at Dimora's house in September 2007 had netted some documents, subsequent pulls uncovered the fact that Dimora was shredding many of his discarded documents. The "mere fact that some investigative techniques were successful in uncovering evidence of wrongdoing does not mandate that a court negate the need for wiretap surveillance." *Stewart*, 306 F.3d at 305. As for confidential sources, the December 5th affidavit included a specific example of Dimora patting down an acquaintance to ensure that the person was not wearing a recording device. (¶ 143.) Further, while Dimora and Gabor challenge the affidavits' representation that techniques, such as consensual monitoring, would not reveal the full scope of the criminal activity, such a concern is valid in considering the use of wiretaps.[27] (*See* ¶ 306 ("In addition, it does not appear that the government could have uncovered the full scope of the conspiracy, especially not in a relatively safe manner, without the wiretaps."))

"Far from being an initial step," the affidavits describe a lengthy and involved investigation into ongoing public corruption where a variety of investigatory techniques were utilized before wiretap authorization was sought. *United States v.*

---

[27] Gabor also claims that wiretaps were unnecessary because certain schemes, including the Pumper bribery scheme involving a building inspector, had been fully investigated prior to the tap. (Mot. at 7.) The government contests Gabor's argument that the investigation into this scheme had been completed and, further, underscores the facts that investigation into other schemes had not ended and that the use of the confidential source's information, though productive in assisting the investigation of this one particular Pumper bribery scheme, would be, by itself, insufficient to fully investigate other schemes outlined in the various wiretap affidavits.

*Sherrills*, 432 Fed. App'x 476, 481 (6th Cir. 2011) (citing *Rice,* and finding the necessity of wiretaps was established where affidavit set forth the details regarding a seven-month drug investigation involving the use of a variety of investigatory techniques and the limitations associated with a continued reliance on these methods). Indeed, numerous less intrusive methods were employed with varying success. The affidavits document these past successes and specific shortcomings, and demonstrate why wiretaps were necessary to advance the investigation. As such, the necessity requirement was met.

### C. Dimora's Other Wiretap Issues

Finally, Dimora raised a number of miscellaneous issues relating to other Title III wiretap requirements. First, he claims that the wiretaps were not authorized by the proper authority under 18 U.S.C. § 2561(1), because they were authorized by John Roth, Acting Deputy Assistant Attorney General of the Criminal Division. This contention is wholly without merit. Section 2561(1) authorizes "any Deputy Assistant Attorney General or Acting Deputy Assistant General in the Criminal Division specially designated by the Attorney General" to authorize a Title III application. Exhibit 1 to the December 5th application contained the Attorney General's Order designating "any Acting Deputy Assistant Attorney General of the Criminal Division" to authorize wiretap applications. Exhibit 2 contained the authorization letter, signed by Acting Deputy Assistant Attorney General John Roth.[28] As the government correctly points out, the fact that ADAAG Roth may have at one time also served as Chief of the Fraud and Public Corruption Section for the U.S. Attorney's Office has no bearing on his authority to

57

authorize the wiretap application. *See generally, United States v. Nanfro*, 64 F.3d 98, 100 (2d Cir. 1995) (per curiam) (application for interception valid when Attorney General designated "any Deputy Assistant Attorney General of the Criminal Division" to authorize applications rather than designating authorizing officials by name).

Dimora also suggests that the Title III orders do not identify the "person, if known, whose communications are to be intercepted," as required by 18 U.S.C. § 2518(4)(a), and do not identify the things to be seized with particularity. The Court previously considered, and rejected, similar claims as to the same wiretap orders in *United States v. McCafferty*, 772 F. Supp. 2d 863 (N.D. Ohio 2011). Specifically, in *McCafferty*, the Court found:

> Orders authorizing surveillance under Title III must include, among other things, the identity, if known, of the persons whose communications are to be intercepted and the nature and location of the place where the interception is to occur. The order must also describe the type of communication to be intercepted, the particular crime to which it relates, and the period during which interception is authorized. The defendant challenges the sufficiency of the orders of authorization, alleging that they fail to identify the persons whose communications are authorized to be intercepted and the communications that are to be intercepted.

> A review of the December 5, 2007 order reveals that the order authorizing wire interceptions clearly includes in the court's findings the identification, by name, of the known target interceptees and the target subjects. (*See* Doc. No. 132, attached computer disc.) No more is required under 18 U.S.C. § 2518(4)(a) (Section 2518(4)(a) provides that the order "specify the identity of the person, if known, whose communications are to be intercepted.")

> Section 2518(4)(c) requires authorization orders to contain "a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates." 18 U.S.C. § 2518(4)(c). Each order specifies that "wire communications" may be

---

[28] Both Exhibits 1 and 2 are attached to the government's response. (Doc. No. 476-1.)

intercepted.[29] *See* 18 U.S.C. § 2518(4)(c). In addition, the orders state that the wire communications are expected to concern: "the manner, scope and extent in which the targeted interceptees interfere with interstate commerce by extortion under color of official right; . . . the identities and roles of other conspirators, aider and abettors, and the role of each participant in the conspiracy and in the substantive violations of the Hobbs Act; the precise nature and scope of the illegal activities, including information about the receipt and delivery of bribes to public officials. […]" (December 5, 2007 Order Authorizing Interception, ¶ (b).) This same information is repeated in the instructions as to when the interception is to terminate. (*See id*. at p.4.) This description of the particular offense to which the intercepted wire communications are expected to relate is sufficient to satisfy § 2518(4)(c). *See, e.g., Shell v. United States*, 448 F.3d 951, 956 (7th Cir. 2006) (specificity requirement met when order stated wiretap would reveal discussion of gang business); *United States v. Spillone*, 879 F.2d 514, 517-18 (9th Cir. 1989) (specificity requirement met when order listed offenses under investigation, including violation of Hobbs Act, extortion, and conspiracy).

772 F. Supp. 2d at 868.

As he did with respect to the search warrants, Dimora also complains that the Title III wiretap orders impermissibly sought the interception of political speech. He states that "[t]he statements authorizing the seizure of this speech were overly broad and allowed law enforcement to seize all communications of Mr. Dimora many of which are constitutionally protected." (Mot. at 45.) As set forth above, the orders described with particularity the communications that were to be intercepted. That the monitoring agents may have anticipated that some of the recorded conversations would include political speech does not invalidate the orders. The conspiracy under investigation included many influential members of the Cuyahoga County Democratic Party, including Dimora and

---

[29]  Some orders provide for the interception of both "wire communications" and "electronic communications" (text messages). (*See* 3/17/08 Aff. at p. 12-13.)

Frank Russo. Other co-conspirators, such as Kevin Kelley, also had political ties.[30] That the co-conspirators held political positions, and may have used these positions to advance the conspiracy, does not insulate such activity from investigation.[31] *See Frisby*, 79 F.3d at 32; *United States v. Harris*, No. 2:06 CR 118, 2007 U.S. Dist. LEXIS 54319, at *26-27 (N.D. Ind. July 24, 2007) (citing *Frisby*, 79 F.3d at 32) (rejecting the defendant's First Amendment challenge to a wiretap on the ground that the wiretap was properly administered under the Fourth Amendment).

### D. Gabor's Request for a *Franks* Hearing

Gabor also requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). *Franks* stands for the proposition that, when a defendant makes a "substantial preliminary showing that a false statement" is (1) "knowingly and intentionally, or with reckless disregard for the truth, . . . included by the affiant in the warrant affidavit" and (2) "necessary to the finding of probable cause," the Fourth Amendment entitles the defendant to a hearing. *Id.* at 155–56. If, at the hearing, the defendant demonstrates by a preponderance of the evidence that the above are in fact true, "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was

---

[30] As previously noted, Dimora was a County Commissioner and Frank Russo was the County Auditor. In addition, Kevin Kelley was an elected Parma City School Board member, and Judges Steven Terry and Bridget McCafferty were elected judges on the Cuyahoga County Common Pleas Court and were also members of the Democratic Party. Terry and McCafferty were not targets of the investigation, but both were ultimately indicted and charged with criminal activity uncovered during the investigation.

[31] In addition, Dimora's suggestion that the wiretap orders are deficient because the target interceptees are listed in the probable cause section versus the decretal section is without merit. The Court rejected a similar argument in *McCafferty*. It is clear that courts are directed to "look to the entire order to determine if it complies with the statute." *Spillone*, 879 F.2d at 517 (citing *United States v. Kalustian*, 529 F.2d 585, 589 (9th Cir. 1975)). *See also United States v. Cozzo*, Nos. 02 CR 400-1 & 02 CR 400-7, 2003 WL 57031, at *2 (N.D. Ill. Jan. 7, 2003) (considering the application, affidavit, and order together when determining whether an order describes subject offenses with particularity).

lacking on the face of the affidavit." *Id.* at 156. Although material omissions, as opposed to affirmatively false statements, included in an affidavit, "are not immune from inquiry under *Franks*, . . . an affidavit which omits potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information." *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997) (citation omitted).  After reviewing six separate affidavits totaling some 466 pages and containing a multitude of statements, Gabor identifies a scant seven, possibly eight, alleged false or incomplete statements that he asserts give him the right to a *Franks* hearing.

Even if all of these statements were found to be knowingly and intentionally false and therefore excised from the affidavits, the probable cause calculus would hardly be affected. The alleged false or incomplete statements for the most part go only to very specific issues.  For perhaps a few of the statements, their effects reach more broadly but not nearly far enough to eliminate probable cause as to every target interceptee.

Furthermore, none of the statements are knowingly and intentionally false. Including analysis in this opinion of every allegedly false statement identified by Gabor is unnecessary. A representative statement or two, however, illustrate the futility of his attack. During a conversation between Kelley and Pumper, Kelley tells Pumper in regard to the personal construction work one of Pumper's companies is doing for Kelley, "You know I am not paying anyway, so it does not matter, right"? (12/21/07 Aff. at ¶ 29(d)). Later in the paragraph, the affiant concludes that the call demonstrated that Pumper "will be providing a thing of value in the form of free or discounted work." (*Id.*). Gabor asserts

that Kelley's comment was "made in jest, a fact omitted from the affidavit." (Gabor Mot. at 22.) In fact Gabor's characterization comes closer to being a misrepresentation than does the government's. Immediately after the Kelley quote, above, the affidavit reads: "P[umper] laughed." (12/21/07 Aff. at ¶ 29(d)).

Gabor also challenges the government's conclusion that "[b]ased on the nature of the conversation," a call made on January 19, 2008, discussed kickbacks to Dimora. (Gabor Mot. at 22 (quoting 2/4/08 Aff. at ¶ 50(C)). But when the government sets forth a portion of the content of a call and then draws a conclusion, that conclusion is not a false statement. The issuing judge can decide whether she agrees with the conclusion or not. Moreover, it was perfectly reasonable, at least based on the excerpts of the call provided by the government in the February 4th affidavit, for the government to draw such a conclusion. Gabor asserts that, based on the nature of the call in its entirety, the government's conclusion is false, but Gabor does not provide the remainder of the call to the Court. Regarding this call and others, Gabor also asserts that the government "frequently omit[s]" the fact that Pumper, Gabor, Dimora, and other interceptees were personal friends. But personal friends can still violate the Hobbs Act, and many of the dealings detailed in the affidavits are not of the kind common among those interested only in friendship.

Because Gabor has not demonstrated that any of the statements made by the affiant in any of the wiretap affidavits at issue in this case were knowingly and intentionally false, let alone that such statements were crucial to a finding of probable cause, his request for a *Franks* hearing is DENIED.

**IV. Dimora's Motion to Suppress Wiretaps for Failure to Minimize[32] (Doc. No. 484)**

Title III requires the government to conduct electronic surveillance "in such a way as to minimize the interception of communications not otherwise subject to interception." 18 U.S.C. § 2518(5). To assess minimization efforts, the Court conducts "an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time." *Scott v. United States*, 436 U.S. 128, 136 (1978); *see United States v. Feldman*, 606 F.2d 673, 678 (6th Cir. 1979) (citation and internal quotation omitted) ("[T]he (minimization) statute is deemed to be satisfied if 'on the whole the agents have shown a high regard for the right of privacy and have done all they reasonably could to avoid unnecessary intrusion."). Title III "does not forbid interception of all non-relevant conversations, but rather instructs the agents to conduct the surveillance in such a manner as to 'minimize' the interception of such conversations." *Scott*, 436 U.S. at 140. The government's minimization efforts need not be perfect; instead, the monitoring agents' actions need only be "reasonable." *Scott*, 436 U.S. at 137-40. *See Feldman*, 606 F.2d at 678.

Initially, the government must make a *prima facie* showing of reasonable minimization. *See United States v. Yarbrough,* 527 F.3d 1092, 1098 (10th Cir. 2008) (citing *United States v. Willis,* 890 F.2d 1099, 1102 (10th Cir. 1989)); *United States v. Gray*, 372 F. Supp. 2d 1025, 1042 (N.D. Ohio 2005), *aff'd in relevant part,* 521 F.3d 514 (6th Cir. 2008). "Then, the burden shifts to the defendant to show that more effective

---

[32] Dimora filed a separate motion to suppress, limited to the issue of minimization. (*See* Doc. No. 484.) The government filed a response (Doc. No. 514), and Dimora filed a reply. (Doc. No. 518.) Gabor filed one motion to suppress the wiretaps, which included arguments relating to minimization. (*See* Doc. No. 423.) All of the minimization arguments are addressed in this section of the opinion and order.

minimization was possible." *Gray*, 372 F. Supp. 2d at 1042 (citing *Willis*, 890 F.2d at 1102). As to the defendant's burden, "it is not enough to identify particular calls which [he] contend[s] should not have been intercepted; [he] must establish a pattern of interception of innocent conversations which developed over the period of the wiretap." *United States v. Lawson*, 780 F.2d 535, 540 (6th Cir. 1985) (internal citations and quotations omitted.) If the defendant fails to meet this burden, the court will deny the motion to suppress, "even if the defendant has identified isolated instances where the [g]overnment failed to minimize non-pertinent conversations." *Gray*, 372 F. Supp. 2d at 1042-43 (citing *United States v. Armocida*, 515 F.2d 29, 45 (3rd Cir. 1975)).

In applying the reasonableness standard articulated in *Scott*, courts look to a variety of factors including: "the nature and scope of the criminal investigation; the [g]overnment's reasonable expectations of the character of conversations; and, the extent of judicial supervision over the surveillance." *Feldman*, 606 F.2d at 678 (collecting cases); *see United States v. Uribe*, 890 F.2d 554, 557 (1st Cir. 1989); *United States v. Thomas*, No. 5:07 CR 00563, 2008 WL 5378345, at *2 (N.D. Ohio Dec. 19, 2008). Courts may also consider "at exactly what point during the authorized period the interception was made," *Scott*, 436 U.S. at 141, as well as the government's internal monitoring of minimization. *United States v. Parks,* No. 95 CR 510, 1997 WL 146761, at * 13 (N.D. Ill. Mar. 24, 1997) (citing *United States v. Dorfman*, 542 F. Supp. 345, 391 (N.D. Ill. 1982)); *United States v. Villegas*, No. 92 CR 699 (CSH), 1993 WL 535013, at *9 (S.D.N.Y. Dec. 22, 1993).

With respect to the nature and scope of the criminal investigation, "when the investigation is focusing on what is thought to be a widespread conspiracy more

64

extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise. And it is possible that many more conversations will be permissibly intercepted because they will involve one or more of the co-conspirators." *Scott*, 436 U.S. at 140; *see United States v. Adams*, 759 F.2d 1099, 1115 (3d Cir. 1985); *Parks,* No. 95 CR 510, 1997 WL 136761, at *12 ("The fact that this investigation was directed against a broad conspiracy eases the government's minimization burden.") The investigation further increases in complexity where the target interceptees intermingle conversations about legitimate business with those about corrupt business or illegal activity, *see United States v. Abscal*, 564 F.2d 821, 827 (9th Cir. 1977) ("The conversing conspirators frequently discussed non-narcotic-related matters at the beginnings of conversations . . . ."), or when the participants use ambiguous or coded language. *See United States v. Bennett,* 219 F.3d 1117, 1124 (9th Cir. 2000) (recognizing that with "guarded or coded language, a higher rate of nonrelevant intercepted calls should be expected because it takes longer to figure out the meaning of a particular call"); *Abscal*, 564 F.2d at 827.

The Court begins with the government's duty to make a prima facie showing of reasonableness, and observes that it previously considered the reasonableness of the government's efforts as to these particular wiretaps. In *United States v. McCafferty*, this Court found that the government had made a showing that its minimization efforts were objectively reasonable. 772 F. Supp. 2d at 870-74. Specifically, the Court held:

> Here, there is no doubt that this case involves allegations of a large conspiracy with many identified and unidentified participants. The present Indictment, one of 9 filed following the government's investigation (in addition to 19 Informations filed by the government), charges fraud, corruption, obstruction of justice, making false statements to law enforcement and other federal offenses, which are alleged to have affected nearly every aspect of county government. The Title III applications

65

contain details regarding numerous schemes, some spanning over a decade, others involving shell companies, and still others relating to a series of complex financial transactions. Following the initial December 5, 2007 application, each subsequent application included newly discovered schemes and conspirators. The expanse and reach of the conspiracy clearly warranted more surveillance.

In addition, the sheer volume of the calls intercepted complicated the investigation. Approximately 44,000 phone calls were intercepted over a ten month period. *See Gray*, 372 F. Supp. 2d at 1044 (considering large number of intercepted calls as a minimization factor). The investigation was further hampered by the fact that the targets mixed conversations about legitimate business with those about corrupt activities. Because the targets were employed in lawful positions in the business and the public sectors, and because the alleged criminal conduct was so closely tied to these lawful positions, it is no wonder that the monitoring agents could not always immediately minimize an innocent call without some initial monitoring. The fact that the targets and co-conspirators were also friends and political allies, who relied on their professional and political relationships to further the conspiracy, compounded even more the difficult task of the monitoring agents by requiring them to determine whether a conversation regarding benign, personal matters might turn to criminal concerns.

Notwithstanding the breadth and complexity of the investigation, the government offers evidence to establish that it was still able to minimize over 1/3 of the calls over two minutes.[33] (Doc. No. 148-1, Title III

---

[33] The defendant insists that the Court should include in its analysis calls lasting less than two minutes, noting that the Sixth Circuit has yet to hold that calls less than two minutes cannot be minimized. Nonetheless, courts have consistently refused to consider calls lasting less than two minutes in minimization analyses, finding that it is extremely difficult to monitor and minimize very short calls. *See United States v. Mansoori*, 304 F.3d 635, 647 (7th Cir. 2002); *United States v. Apodaca*, 820 F.2d 348, 350 n.3 (10th Cir. 1987); *United States v. Fisher*, 2009 U.S. Dist. LEXIS 22847, *3 (E.D. Wis. Mar. 20, 2009); *United States v. Suggs*, 531 F. Supp. 2d 13, 21 (D.D.C. 2008). *See also Scott*, 820 U.S. at 140. At least two courts within this judicial district have refused to consider such short calls. *See, e.g., United States v. Galloway*, 2007 U.S. Dist. LEXIS 31070, *14 (W.D. Tenn. Apr. 27, 2007) (refusing to consider calls less than two or three minutes); *Gray*, 372 F. Supp. 2d at 1045 ("[M]onitoring during the first two or three minutes to determine the relevance of the call satisfies the minimization requirement.") Still, the defendant challenges the government's practice of monitoring calls for two minutes, noting that "to suggest that little of substance can be communicated in that time frame ignores the realities of our communications with one another. Two minutes of communication is not inconsequential. The Gettysburg Address was delivered in a little more than two minutes . . . ." (Doc. No. 166 at 6.) The defendant misses the point. Courts excluding communications less than two minutes do not do so because short calls are always irrelevant. Rather, "[c]ourts have generally concluded that calls less than two or three minutes in duration are too short to minimize*." United States v. Lamantia*, 1996 U.S. Dist. LEXIS 14344, *38 (N.D. Ill. Sept. 30, 1996). This is especially true in conspiracies, such as the present case, where the participants often mixed legitimate discussions with that of criminal activity making it difficult, at first, to determine the nature of the call.

Statistical Summary.)  Many of those calls, 682 in total, were pertinent calls. The statistics further reveal that the government treated each tapped line individually. For example, the Neiheiser Cellular Telephone contained the highest percentage of minimized calls, 56.28%. The majority of these calls were intercepted several months into the investigation, which demonstrates that the government became more adept at identifying non-pertinent calls as its understanding of the nature and scope of the conspiracy grew. *See Scott*, 436 U.S. at 141 ("During the early stages of surveillance the agents may be forced to intercept all calls to establish categories of nonpertinet calls which will not be intercepted thereafter."); *Parks*, 1997 WL 136761, at *13. As further evidence that the government tailored its interception of calls, with an eye toward minimization of non-pertinent calls, the government notes that 52.26% of calls to the  Dimora Home Telephone were minimized, while only 21.31% of calls (over two minutes) were minimized from the Dimora Cellular Telephone. The difference reflects the fact that the government understood that it was far more likely that non-criminal calls would be placed on the home line as it was used by other members of the Dimora family.

Nonetheless, the government acknowledges that a large number of "agent-designated non-pertinent" calls were captured during the wiretaps, but notes that the number is over-inclusive.[34] Some of the calls marked "non-pertinent" by the agents did contain information relevant to the conspiracy, such as information about a public official's receiving or expecting to receive a thing of value, including free meals, which is relevant to Hobbs Act violations. (Doc. No. 148 at 9, citing numerous intercepted calls.) Other calls designated by the agents as "non-pertinent" involved discussions between Target Interceptees about meetings, which sometimes revealed the identity of previously unknown participants. (*Id*., citing numerous intercepted calls.) Thus, despite their designation for internal purposes by the agents as "non-pertinent," many of these calls were relevant to the investigation.

Moreover, the Supreme Court has cautioned that: "blind reliance on the percentage of nonpertinent calls intercepted is not a sure guide to the correct answer. Such percentages may provide assistance, but there are

---

[34] The government explained that "the designation of 'pertinent' and 'non-pertinent,' was given by agents at or around the time of the interception or on review thereafter, as a method for the prosecution team to later readily identify the conversations that would likely be used to support an indictment, exhibit at trial or sentencing hearing, disclosed as *Brady/Giglio*, or otherwise readily accessed. It is agent work-product, not a prosecutor's designation given with the full understanding of the term 'pertinent.' 'Non-pertinent' in this context does not necessarily mean irrelevant or unrelated to a Target Offense." (Doc. No. 148 at 8-9.)

surely cases, such as the one at bar, where the percentage of nonpertinent calls is relatively high yet their interception was still reasonable. The reasons for this may be many. Many of the nonpertinent calls may have been very short. Others may have been one-time only calls. Still other calls may have been ambiguous in nature or apparently involved guarded or coded language. In all these circumstances agents can hardly be expected to know that the calls are not pertinent prior to their termination." *Scott*, 436 U.S. at 140. As was the case in *Scott*, a significant number of the calls (the defendant concedes 30,222 of the 44,290) were less than two minutes in length. (*See* Doc. No. 166 at 6 n.6.) Because many of the non-pertinent calls were too short to minimize, and because they were captured during a wide-ranging conspiracy investigation, it would be inappropriate to place too much emphasis on the number of non-pertinent calls recorded.

As for the government's reasonable expectation of the character of the conversations, the government offers substantial evidence that the Target Interceptees and those they contacted employed ambiguous or coded language during their conversations. (*See* Doc. No. 148 at 17 n.7, citing examples of ambiguous or coded language.) Employment of ambiguous language increases the challenge before the monitoring agents. *See Abscal*, 564 F.2d at 827; *United States v. Hoffman*, 832 F.2d 1299, 1308 [1st Cir. 1987] (use of "coded language" is a factor which "militates strongly in favor of added leeway" in evaluating minimization efforts); *Gray*, 372 F. Supp. 2d at 1045.

With the exception of Dimora's home telephone, each of the telephones monitored was a Target Interceptee's personal cellular telephone used primarily by the Target Interceptee. As the Court previously observed, the government minimized more than 50% of the calls made to the Dimora home telephone because it anticipated that many innocent calls may originate from this line. *See Parks*, 1997 WL 136761, at *13 (citing *United States v. Quintana*, 508 F.2d 867, 874-75 (7th Cir. 1974) ("Although the government must increase its minimization efforts when it has reason to expect a large volume of innocent calls, it might nevertheless conduct some monitoring during those times in order to determine that they are in fact innocent.")). Likewise, the government did not even ask to monitor other home or work telephones, which were likely to receive a high number of innocent calls involving those inside and outside of the conspiracy. In sum, it is a clear that the government tailored its monitoring to focus on where and when it reasonably believed the majority of the relevant calls would be placed. *See Parks*, 1997 WL 13761, at *12.

The Court now turns to a consideration of "the degree of judicial supervision over the surveillance practices." *See United States v. Angiulo*,

847 F.2d 956, 979 (1st Cir. 1988); *see also Feldman*, 606 F.2d at 678. In this case, judicial supervision, which included the bi-monthly review of progress reports, was more than adequate, "which suggests that the agents complied with the minimization requirements." *Gray*, 372 F. Supp. 2d at 1045 (citing *Feldman*, 606 F.2d at 678). In addition, the government states, and the defendant does not challenge, that the monitoring agents were provided with a memorandum detailing the minimization requirements. The Assistant U.S. Attorneys who submitted the Title III Applications reviewed the summaries of the intercepted communications during the monitoring and confirmed that agents were minimizing conversations. These precautions establish that the supervision was sufficient to properly minimize non-pertinent calls.

In view of these circumstances, the Court concludes that the government has made a showing that its minimization efforts were objectively reasonable.

772 F. Supp. at 871-74.

There is nothing presently before the Court that would cause it to disturb its earlier determination that the government met its initial burden. By implication, Dimora suggests that the Court's prior determination that the government produced substantial evidence that the co-conspirators employed ambiguous or coded language during their phone conversations was in error. Dimora claims that the target interceptees and those they contacted "spoke of their business and personal dealings in clear and unambiguous language." (Mot. at 8.) Yet, the calls demonstrate that certain code was, indeed, employed by the participants.[35]

Perhaps even more significant was the use of ambiguous or guarded language. Participants often made vague references to prior unidentified meetings, discussions, or projects, and many calls were merely continuations of prior conversations

---

[35] In addition to discussions relating to the acquiring of "sponsors" (persons who would pay for public officials' meals), words such as "one bird," "flying," and "American Eagle" were used. *See, e.g.,* Session Nos. 977KCT, 1861KCT.

(which may or may not have been captured) where each participant assumed that the person on the other end understood the subject matter that was up for discussion.[36] *See Scott*, 436 U.S. at 140 (identifying guarded or ambiguous language as a hindrance to effective minimization). This guarded and ambiguous language made it especially difficult for monitoring agents to quickly determine whether the conversation was innocent or not.

Dimora also references a report containing statistics regarding the average number of intercepted communications in this district, which shows that the average investigation nets considerably fewer than the 44,000 calls that were captured with the present wiretaps. However, as defendants have often reminded this Court, this case is far from average, and with a large number of schemes and participants, along with the extensive use of cellular telephones to facilitate the conspiracy, it is not surprising that the wiretaps yielded a large number of calls. Dimora further questions, without support, whether the government submitted bi-monthly reports to Judge Wells. There is nothing in the record to suggest that the government failed to submit such reports, and the fact that the Title III orders required the submission of such reports, coupled with the issuing judge's approval of subsequent orders, is strong evidence that such reports were submitted.[37]

---

[36] *See, e.g,* Session Nos. 1861KCT, 2646DCT, 5152DCT, 1160PCT, 3449PCT, 1508KCT, 5197DCT.

[37] In addition, Dimora urges the Court to consider calls less than two minutes in its analysis, and suggests that, when such calls are factored into the equation, the government's minimization efforts come up lacking. As this Court held in *McCafferty*, however, consideration of extremely short calls is inappropriate because some monitoring of every call at its beginning is necessary before the agent can determine whether minimization is required. It is for this reason that courts have routinely refused to consider very short calls. *McCafferty,* 772 F. Supp. at 873 n.12 (collecting cases); *see United States v. Mansoori*, 304 F.3d 633, 647 (7th Cir. 2002); *Gray,* 372 F. Supp. 2d at 1045 ("[M]onitoring during the first two or three minutes to determine the relevance of the call satisfies the minimization requirement.").

In sum, the Court finds that the government has met its burden of demonstrating a prima face case of reasonable minimization. The burden now shifts to Dimora to show a pattern of intercepting innocent conversations. Dimora fails to meet this burden.

In an effort to demonstrate a pattern, Dimora focuses on the minimization of certain cellular and home telephone lines, making some general statements as to the effectiveness of the government's efforts as to each line. In support of his general statements, he offers a sample of calls that he believes shows a chronic failure to minimize. A discussion of these highlighted calls, however, demonstrates that his "proof" falls far short of establishing a pattern of intercepting and monitoring innocent conversations.[38]

### A. Pumper Cellular Line

First, Dimora maintains that, prior to February 2008, "the Government failed to minimize 100% of Mr. Dimora's phone calls." (Mot. at 11.) He begins with calls on Mr. Pumper's phone. As the government points out, however, prior to February 2008, only five calls were intercepted between Pumper and Dimora. (*See* Session Nos.

---

[38] The government questions the right of Dimora and Gabor to challenge minimization efforts on the cell phone lines of Pumper and Kelley. As this Court noted in *McCafferty*, a person's status as an "aggrieved person" under the statute does not confer upon him standing to challenge minimization. The Court further observed that courts are split on whether individuals who do not have a possessory interest in the line that was tapped may challenge minimization. *See McCafferty*, 772 F. Supp. 2d at 870 (collecting cases.) The Court ultimately concluded that, "giving the defendant every benefit of the doubt on the subject," it would permit the defendant to challenge those calls to which she was a party. *Id.* Likewise, in an abundance of caution, the Court will permit Dimora and Gabor to challenge any call to which they were a party, including the identified calls on the Pumper and Kelley cellular lines. In addition, the Court finds that Dimora has standing to challenge all of the calls on his cellular and home telephones, in which he obviously has a privacy interest.

1156PCT, 1275PCT, 1300PCT, 1504PCT, 4028PCT.) Four of the calls were less than two minutes and were not, therefore, subject to minimization. The fifth call (Session No. 1156PCT) involved Pumper asking Dimora and Kelley if they were going to the Browns game. When Dimora indicated that Pumper had not yet invited them, Pumper reminded Dimora that he had given him, Kelly, and another public official loge tickets for the last game. Inasmuch as the RICO conspiracy under investigation involved public officials receiving things of value for official action, this call—wherein a contractor was recounting his providing public officials with free tickets to sporting events—was properly intercepted. The treatment of these calls, therefore, cannot establish a pattern of a failure to minimize.

### B. Kelley Cellular Line

Dimora represents that the treatment of Kelley's cellular line was much more telling, and he cites 36 calls which he maintains should have been minimized because they "discuss little more than Mr. Dimora's ailing father and the desire of the group of friends to schedule a poker game." (Mot. at 11.). Dimora's characterization of these calls fails to take into consideration the nature of the investigation, the alleged criminal activity that was being investigated, and the difficulties associated with such an investigation.[39]

A recurring theme in this investigation was that of public officials performing official acts in exchange for things of value, including meals, and the practice

---

[39] The government notes that two of the Pumper cellular line calls identified by Dimora (Session Nos. 1179KCT and 1269KCT) were minimized.

of obtaining "sponsors" (usually individuals and entities seeking public contracts) to pay for meals and social events. (*See, e.g.*, Session Nos. 566KCT and 567KCT as examples of meal sponsorship.) For example, Dimora cites Session No. 694KCT, which was a continuation of a discussion of a dinner at a restaurant that was apparently being organized by a contractor and would be attended by several public officials. Based upon this and other calls related to this dinner, it appears that Dimora ultimately paid for some or all of the expenses from this event. The Court will not, however, review the government's minimization efforts through the perfect vision that hindsight affords. *See United States v. Vento*, 533 F.2d 838, 854 (3d Cir. 1976) ("Minimization is not to be judged by a rigid hindsight that ignores the problems confronting the officers at the time of the investigation.") Because it was unclear from this and prior conversations relating to this dinner (*see* Session Nos. 450KCT and 547KCT) whether Dimora was expecting to pay for some or any of his bill, it was properly intercepted.[40] Numerous other calls cited by Dimora involved various collections of alleged co-conspirators planning dinner, drinks and other events, which could have involved "sponsorship," and the Court cannot say that the interception of these calls was in error. (*See* Session Nos. 1037KCT (drinks and dinner) and 1039KCT (a call between Kelley and Dimora to discuss who paid for Dimora's drinks and dinner and to determine if funding on a particular project would

---

[40] During the conversation, Dimora discussed going to Dante's Restaurant instead. In a previous call, Dimora lamented that he could have gone to a free party at Dante's Restaurant because the owner was seeking a favor from the County Engineer. (*See* Session No. 667KCT.) Session Nos. 699KCT and 703KCT also related to the dinner at this particular restaurant. Similarly, Session No. 775KCT was intercepted immediately after the dinner at the restaurant that was the subject of Session No. 694KCT. All of these calls were properly intercepted.

come up)).[41]

Along the same lines, Dimora complains that many of the calls cited merely involved friends making arrangements to play poker. The fact that these "friends" were also alleged co-conspirators who often mixed alleged corrupt business with pleasure made the interception of the calls acceptable. Moreover, many of the poker games in question were to include both public officials and contractors, such as Pumper and Forlani, who were seeking and receiving public contracts. (*See* Session Nos. 1116KCT, 1166KCT, 1213KCT, 1949KCT, 2734KCT, and 2905KCT.) Because these card games represented opportunities for public officials to receive things of value and for contractors to discuss the desired official acts they were seeking in return, the Court finds that they were permissibly monitored.

Many of the calls cited by Dimora illustrate further difficulties the agents experienced in attempting to filter out innocent calls. Dimora and other co-conspirators had a habit of putting people on hold while tending to other matters or attempting to connect other individuals to the call. (*See* calls cited by Dimora: Session Nos. 694KCT, 699KCT, 1037KCT, 1082KCT, 1116KCT, 1166KCT, 1248KCT, 1547KCT, 1949KCT, and 2905KCT.) This resulted in considerable stretches of "dead air" and, if an additional individual was connected to the conversation, the result often was a change of topic.

---

[41] Other calls cited by Dimora involved either the potential receipt of things of value by a public official (Session No. 2393KCT) or involved official acts that may have been tied to such receipt. (*See* Session Nos. 851KCT (a continuation of Session No. 849KCT) and 1073KCT (awarding of public contract in exchange for a candidate dropping out of a political race)). In his reply, Dimora suggests that the government has mischaracterized Session No. 1073KCT. The Court disagrees. A review of the call reveals that Dimora clearly spoke of a candidate receiving a $130,000 public contract in exchange for withdrawing from an election. Dimora notes that it would be best if the contract was not awarded until after the November election for fear that Democrats would be sullied for engaging in "backroom deals." Dimora also joked that he was unwilling to speak with this candidate because he suspected that he tapes conversations.

74

Obviously agents could not discern from "dead air" whether a call was going to be personal in nature, and the monitoring of such "dead air" was not inappropriate. Nor was it inappropriate to continue to monitor for a short period an otherwise personal call when a new participant (especially an alleged co-conspirator) entered the conversation, as the conversation may have turned to matters specifically covered by the wiretap warrants.

Viewing these calls with the benefit of hindsight, it is clear that some ultimately involved alleged co-conspirators merely socializing without discussing anything related to the conspiracy under investigation. The monitoring agents did not, however, have the luxury of hindsight. Instead, they were faced with a wide-reaching conspiracy where alleged co-conspirators routinely mixed business with pleasure, often with meals and other social events either providing platforms for advancing the conspiracy or representing the "thing of value" that the public official received. Under these circumstances, the Court cannot find that the interception of these calls constitutes a pattern of a failure to mitigate.

### C. Dimora Home and Cellular Lines

Finally, Dimora focuses on the monitoring of his home and cellular lines. He claims that only 17% of the calls on his cellular phone, and only 47.5% of the calls on his home line were minimized.[42] He further claims that "[o]f the 884 non-minimized calls over 2 minutes on the Dimora home phone, over seventy percent were not subject to

---

[42] The government disputes Dimora's statistics, and attaches a chart breaking down the calls on the various lines by certain categories including: completed calls, pertinent calls, privileged calls, minimized calls, and calls lasting less than two minutes. (*See* Doc. No. 515.)

interception and should have been minimized." (Mot. at 13.) He identifies ten calls that he believes demonstrate a pattern.

Of the calls he identifies from his cellular phone, two calls followed a phone conversation in which Dimora discussed attempting to steer County contract work to an attorney (Session Nos. 1912DCT and 1933DCT, connected to Session No. 129DCT), and two other calls provide further illustration of Dimora's habit of bringing different people into the conversations. (*See* Session Nos. 1652DCT and 1913DCT.) In one of these calls, a March 5, 2008, call to Tom Day, Dimora spoke with three different individuals, including a one-and-a-half minute stretch where he essentially left the phone conversation to speak with someone identified only as "John." (*See* Session No. 1652DCT.) Without question, monitoring agents were entitled to continue to monitor as individuals moved in and out of the conversation as the subject of the conversation changed with the introduction of each new participant. Still, the Court agrees with Dimora that there did come a point in time when agents should have realized that the conversation was locked onto innocent personal and political matters and monitoring should have ceased. Though this conversation was certainly tricky to negotiate, portions of it should have been minimized.[43]

Likewise, a review of the calls indentified on Dimora's home line demonstrates that arguably three of them should have been minimized. Session No. 137DHT involves a brief conversation between an individual identified only as "Colleen" and Lori Dimora, the wife of defendant Dimora. While the government argues that agents

---

[43] The government represents that Session No. 1652DCT was actually minimized twice. The Court has reviewed the call and could not detect any evidence of minimization.

were entitled to continue to monitor this communication to ascertain the identity of Colleen, it has failed to point to any evidence that Dimora's wife was suspected of having a role in the conspiracy. Consequently, her conversation with "Colleen" should not have been suspect. Similarly, Session No. 185DHT involved Lori Dimora's discussion of a life insurance policy issued to Dimora's father, and Session No. 2477DHT involved a conversation between defendant Dimora and "Chris" about the same insurance policy. Neither defendant in this case is charged with insurance fraud, nor has the government suggested that the use of private insurance policies played any role in the alleged conspiracy. It is not lost on the Court that all of these calls were intercepted within the first week of the wiretaps on Dimora's home phone, and agents were still attempting to learn the pattern of calls on these lines.[44] Nonetheless, these calls were of a private nature and should have been minimized.[45]

That said, Dimora has merely established that a handful of calls should have been minimized but were not. These few isolated calls fail to show a "pattern of interception of innocent conversations which developed over the period of the wiretap." *United States v. Lawson*, 780 F.2d 535, 540 (6th Cir. 1985) (quoting *United States v. Dorfman*, 542 F. Supp. 345, 391 (N.D. Ill. 1982)). Instead, as the government points out,

---

[44] Indeed, the government points out that subsequent calls were minimized more extensively. While Session No. 137DHT between "Colleen" and Lori Dimora may not have been minimized, the government identified subsequent calls involving "Colleen" and indicate that both were minimized multiple times. (*See* Session Nos. 6624DCT and 6654DCT, intercepted July 16, 2008.)

[45] Session Number 179DHT involved a conversation between Dimora and a car sales representative regarding a car lease for Dimora's daughter. While subsequent intercepted calls identified by the government uncovered evidence that the dealership in question might have been providing things of value to Dimora (*See* Session Nos. 860DCT and 6173DCT), this call predates those conversations and cannot be used to justify the monitoring of this call. Still, the government points out that agents minimized numerous subsequent calls pertaining to this dealership's vehicles. Under these circumstances, the Court cannot find that a failure to minimize this call represented a disregard for the duty to minimize.

the fact that considerably more calls were minimized on his home line than his cellular line demonstrates that the monitoring agents were aware that more innocent calls might come to a residential line used by both targets and non-targets, and demonstrates that the execution of the wiretaps was done with an eye toward proper minimization.[46]

Of course, even if these few calls constituted a pattern, which the Court does not believe they do, it would not warrant the drastic remedy Dimora seeks—suppression of all calls captured by the wiretaps. At most, suppression of only the non-pertinent calls that were improperly minimized would be appropriate. *See United States v. Baltas*, 236 F. 3d 27, 32 (1st Cir. 2001), *cert. denied*, 532 U.S. 1030 (2001) ("[E]rrors in minimizing one particular interception within the context of a lengthy and complex investigation . . . do not automatically warrant suppression of all the evidence obtained through electronic surveillance."); *see Gray*, 372 F. Supp. 2d at 1046. The First Circuit has noted that "in a particularly horrendous case, total suppression may be . . . an 'appropriate' solution," but the court also noted that the "sweeping relief" of complete suppression is only appropriate upon a showing of "taint upon the investigation as a whole . . . ." *Hoffman*, 832 F.2d at 1309 (While the district court suppressed 22 calls it believed to be improperly minimized, defendant was not entitled to total suppression because the "minimization effort, assayed in light of the totality of the circumstances,

---

[46] That the monitoring agents were concerned with minimization is further evidenced by the fact that portions of pertinent, relevant calls were nonetheless minimized. For example, Session No. 1351DHT involved Dimora speaking to an individual identified only as "Rich" who was seeking Dimora's assistance in influencing the outcome of a criminal matter before a common pleas judge. Because the conspiracy included public officials, and others, influencing legal proceedings, the call was highly relevant, yet it was minimized. Had the agents not been concerned over their duty to minimize, such a call certainly would have been captured in its entirety.

was managed reasonably."); *see United States v. Mansoori*, 304 F.3d 635, 648 (7th Cir. 2002) (If the defendants were to prevail on their minimization argument, "the appropriate relief likely would be to suppress any conversation or conversations that were inappropriately monitored."); *United States v. Charles*, 213 F.3d 10, 22 (1st Cir. 2000) (district court properly suppressed only the call that violated the minimization order, and not the entire wiretap, where no evidence that entire investigation was tainted); *United States v. West*, No. 06-20185, 2009 WL 4506420, at *1 (E.D. Mich. Nov. 30, 2009) ("suppression of all wiretap evidence is only appropriate when the failure to minimize is egregious").

In support of the drastic remedy of complete suppression, Dimora cites *United States v. George*, 465 F.2d 772 (6th Cir. 1972), and *United States v. Focarile*, 340 F. Supp. 1033 (D. Md. 1972). Both cases pre-date the Supreme Court's decision on minimization in *Scott*, and have been rejected as authority for total suppression. *See Gray*, 372 F. Supp. 2d at 1046 (rejecting *George* and *Focarile* as support for suppression of all intercepts and noting that *George* involved a situation where agents were never told which conversations to intercept and were not given a copy of the intercept order). Dimora cannot establish that the failure to minimize a few calls (one of which was admittedly difficult to minimize) was egregious enough to warrant suppression of all intercepted communications.

Ultimately, the Court finds that Dimora has fallen fall short of establishing

a pattern of failure to minimize non-pertinent or personal calls.[47] His motion to suppress

on the basis of a failure to minimize is, therefore, DENIED.


## V. Conclusion

For all of the foregoing reasons, Dimora's motions to suppress evidence

from the searches of his office and home, to compel production of grand jury transcripts

and identification of confidential informants, as well as the motions of Dimora and Gabor

to suppress evidence of intercepted wire communications, are DENIED.

**IT IS SO ORDERED**.


Dated: December 28, 2011

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[47] Because Dimora failed to "show a *prima facie* pattern of minimization over the period of surveillance," *United States v. Giacalone*, 853 F.2d 470, 482 (6th Cir.), *cert. denied*, 488 U.S. 910 (1988), he is not entitled to an evidentiary hearing on the subject of minimization. *See Parks*, No. 95 CR 510, 1997 WL 136761, at *16 (citing *United States v. Angiulo*, 847 F.2d 956, 980 n.32 (1st Cir. 1988)) ("The court may decline to hold a hearing where defendants do not raise sufficient facts to substantiate a claim of minimization."); *see also United States v. Licavoli*, 604 F.2d 613, 621 (9th Cir. 1979) (quoting *United States v. Ledesma*, 499 F.2d 36, 39 (9th Cir.), *cert. denied*, 419 U.S. 1024 (1974)) ("An evidentiary hearing on a motion to suppress ordinarily is only required if 'the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question."); *United States v. Soto-Del Valle*, 102 F. Supp. 2d 57, 62 (D.P.R. 2000) (denying motion for hearing on minimization issue when agent had outlined sufficient procedures to be followed in his affidavit in support of wiretap application and defendants "failed to offer any proof of outrageous or systematically inappropriate or illegal behavior during the electronic surveillance at issue.") While Dimora submitted additional evidence (amounting to lists of additional calls he believes should have been minimized but were not), he noted that "if the Court does not find that Defendant Dimora has met [his] burden to obtain an evidentiary hearing, it will be unnecessary for the Court and the Government to analyze the evidence attached hereto that was previously intended to be introduced at an evidentiary hearing." (Doc. No. 517 at 2.) A hearing is unnecessary for the Court to conclude that the government complied with statutory minimization requirements in this case. Further, of the additional 638 calls identified by Dimora, the government represents that approximately 112 of those calls were, indeed, minimized, and the Court also observes that approximately 5% of the cited calls lasted less than two minutes and were not, therefore, subject to minimization. (*See* Resp.)