# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.1:10CR387 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | OPINION AND ORDER |
| | ) | |
| | ) | |
| JAMES C. DIMORA, et al., | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

This matter is before the Court on the written request of WKYC TV television station, filed on March 15, 2012, to release all of the exhibits admitted at trial. (Doc. No. 749.) Numerous other news organizations have made oral requests for the release of these same materials. Previously, at the end of proceedings on March 14, 2012—the day the jury was discharged—defendant James Dimora lodged an oral objection on the record as to any such dissemination. At that time, the Court advised counsel to be prepared to address the issue and, once the request for exhibits was filed by a media source, granted the parties a short leave (until noon on March 16, 2012) to file briefs in support of or in opposition to the release. While the government has indicated it takes no position on the release of the exhibits, defendant James Dimora continues to

strongly object to the immediate release of these materials,[1] citing the fact that he faces a second prosecution on related charges. (*See* Doc. No. 754.)

## I. Background

Former Cuyahoga County Commissioner James Dimora was indicted, along with former Cuyahoga County employee Michael Gabor and several other individuals, on multiple federal offenses resulting from an FBI investigation into suspected public corruption in Cuyahoga County. The indictment was one of many issued as a result of this three-year federal investigation. There has been significant public interest in these cases, with the present case receiving the most attention from the media due, in part, to the fact that Dimora was one of the two highest-ranking public officials ensnared in the FBI's probe.

On March 9, 2012, following a 37-day trial,[2] the jury returned 37 guilty verdicts against Dimora relating to 33 of the 34 counts in which he was charged. He was acquitted by the jury on one count. The charges of which Dimora was found guilty included: RICO conspiracy, conspiracy to commit mail and wire fraud and honest services mail fraud, Hobbs Act conspiracy, bribery concerning programs receiving federal funds, tax fraud, obstruction of justice, and destruction of records. (Doc. No. 738.)

---

[1] The parties maintain their respective exhibits in their own possession. By rule and by practice, the Court does not typically take possession of trial exhibits. *See* Local Criminal Rule 23.2.

[2] This number includes the three days of jury selection and also includes three days involving the admission of exhibits, Rule 29 motions for acquittal, a hearing regarding use of a possible expert witness by defendant Dimora, and hearings related to the jury charge to be given in Phase I (the guilt phase) of the trial. It does not include the five full days of jury deliberation or the days related to hearings relative to the jury charge to be given in Phase II (the forfeiture phase) of the trial, nor does it include the days when counsel and the parties appeared in open court to respond to questions from the jury.

Defendant Gabor was found guilty by the jury on nine charges contained in seven counts charging similar fraud and conspiracy-related offenses. He, too, was acquitted by the jury on one count. (Doc. No. 739.) After the Court scheduled the matter for a jury trial on the issue of forfeiture of property belonging to defendant Dimora, the Court was advised that the parties had reached an agreement as to forfeiture. On March 14, 2012, the Court placed the parties' forfeiture agreement on the record and discharged the jury.

Even before the jury was discharged, the Court began to receive informal inquiries from the press regarding access, upon conclusion of the proceedings, to the over 1,200 exhibits admitted at trial. This opinion places the exhibits into seven categories: government records; private business records; financial documents; photographs and videos; miscellaneous documents, including handwritten notes seized during the execution of search warrants; summaries; and audio recordings of intercepted telephone calls and their corresponding transcripts.

## II. Analysis

There can be no question that there exists a constitutional right of the public and the press to attend and observe judicial proceedings. This cherished right flows from the First Amendment rights to freedom of speech and freedom of the press, and the Sixth Amendment right to a public trial. *See United States v. Beckham*, 789 F.2d 401, 406-07 (6th Cir. 1986) (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576-78 (1980) ("It is fundamental that the public and the press have 'a right to be present' and the 'rights to speak and to publish concerning what takes place at trial.'"));

*see, e.g., Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982).  As the Sixth

Circuit observed in *Beckham*, transparency in public trials promotes:

> the appearance of fairness; public confidence in the judicial system; the
> discouragement of misconduct, perjury or secret bias; the enhancement of
> the performance of all parties; the protection of the judge from
> imputations of dishonesty; the education of the public; the provision of a
> safe outlet for public hostility and concern; the avoidance of covert actions
> and secret proceedings; and equal treatment of rich and poor.

789 F.2d at 406-07.

"The requirement of a public trial is satisfied by the opportunity of

members of the public and the press to attend the trial and report what they have

observed." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 610 (1978).  The

constitutional right to a public trial does not, however, extend to the right of the public

and the press to inspect and copy exhibits that have been admitted during the public trial.

*Beckham*, 789 F.2d at 409 (quoting *Warner Commc'ns*, 435 U.S. at 609).  Such a right

finds its origins in the "general, common-law right to inspect and copy public records and

documents," *id.* (citing *Warner Commc'ns*, 435 U.S. at 597), and must, at times, give way

to other considerations.

### A. The Constitutional Right to a Public Trial

In this case, the Court took extraordinary measures to ensure that both the

public and the press enjoyed their right to a public trial.[3]  With respect to the press, the

Court reserved seating in the courtroom for members of the media, where reporters were

---

[3] Even during jury selection, Court observers were, with very few exceptions, able not only to see and hear the voir dire of the panel as a group, but were also able to see and hear proceedings when prospective jurors were brought into open court one-by-one for questioning on several issues.

4

permitted to take notes and prepare sketches of the proceedings.[4] Members of the press were also provided a second room where they were permitted to view the proceedings via a live, closed circuit audiovisual feed. This room was reserved exclusively for credentialed members of the media; those taking advantage of this media room were permitted to use electronic communication and data entry devices in the room.[5] (*See* Courtroom Decorum and Media Order, Doc. No. 601.)[6] Moreover, even after the jury retired to deliberate on the afternoon of March 8, 2012, members of the media were permitted to remain in the media room to await a verdict or any questions from the jury. As such, this room remained available to the media through March 14, 2012, when the jury was discharged.

The Court also made arrangements for additional seating for the public. While the public was permitted to view the proceedings from the courtroom, those wishing to observe also had the option of watching the trial from an overflow room. As was the case with the media room, a live, closed circuit audiovisual feed was piped into the overflow room. (*Id.*)  Additionally, the Court kept the public and the press updated as

---

[4] Other seats in the courtroom were also available to members of the press on a first-come, first-served basis.

[5] The Court originally designated a room in the basement of the courthouse as the media room. When members of the press expressed concerns that a basement room might interfere with their ability to use their data entry devices, the Court made alternative arrangements for the use of a room on the fourth floor of the building.

[6] In fact, the press even reported on the many considerations afforded them by the Court and those federal employees working in the courthouse. *See* Ken Trump, *An Inside Peek at How the Media Covers the Jimmy Dimora Corruption Trial*, NEWSNET5.COM (Feb. 20, 2012), http://www.newsnet5.com/dpp/news/political/corruption_probe/an-inside-peek-at-how-the-media-covers-the-jimmy-dimora-corruption-trial.

to the Court's calendar[7] with regular minute entries on the docket and made available for public review a copy of the juror questionnaire, the jury instructions, and the verdict forms.

All exhibits that were published to the jury were displayed for the public and the press on large screens—in some cases, specially installed—located in the courtroom, media room, and overflow room. In addition, special steps were taken in regard to all audio recordings admitted into evidence to ensure all spectators had complete, real-time access. When audio exhibits were played in Court, they were transmitted both through the courtroom speaker system and through the speaker systems in place in the media and overflow rooms. Simultaneously, through use of the software program *Sanction II*, a "rolling" transcription of the contents of the recordings was displayed on the screens, providing a sort of closed-captioning for spectators. Similarly, when paper transcripts were discussed, electronic versions of those documents were displayed on the screens in the courtroom, media room, and overflow rooms.

During the course of the trial, no member of the press or the public was turned away due to a lack of seating. In fact, on many occasions, the courtroom was largely empty, with very few spectators, and the public overflow room was closed from time to time for lack of use. While the Court may actually have over-estimated the interest of the media and the public in viewing the proceedings, one thing is clear: "[T]he

---

[7] Following the conclusion of the government's case-in-chief, there was a full day of court proceedings during which the government moved to admit into evidence a large number of exhibits. Each of defendants' objections were extensively discussed on the record. Following the Court's ruling from the bench relative to the exhibits, the Court entertained a number of Rule 29 motions for acquittal made on behalf of each defendant. Again, the Court ruled from the bench that day relative to the majority of the motions, and took a very limited number of the motions under advisement. At a later date, the Court announced its ruling from the bench on these few remaining motions as well.

Media [and the public] had an unfettered 'opportunity for the communication of thought and the discussion of public questions' as required by the Constitution." *See Beckham*, 789 F.2d at 408 (quoting *Richmond Newspapers*, 448 U.S. at 581-82 n.18). Neither the First nor the Sixth Amendment requires more.

### B. The Common Law Right to Access to the Exhibits

Having addressed the constitutional concerns regarding the need for transparency in judicial proceedings, the Court turns its attention to the media's common-law right to inspect and copy exhibits previously displayed at trial. In *Warner Commc'ns*, the Supreme Court formally recognized the existence of this common-law right. The Court noted, however, that courts disagreed on the scope of the right and that "its contours ha[d] not been delineated with any precision." *Id.* at 597. Notwithstanding this admission, the Court in *Warner Commc'ns* expressly refused to "undertake to delineate precisely the contours of the common-law right" to inspect and copy trial exhibits. *Id.* at 599. Precedent in our own circuit, however, gives the Court guidance on application of this common-law right.

Analysis under the common-law right to access begins with a presumption in favor of access. *Beckham*, 789 F.2d at 413. But while some other courts have held that this presumption can only be overcome by the most extraordinary of circumstances, *see*, *e.g.*, *In re Application of National Broadcasting Co.*, 635 F.2d 945, 952 (2d Cir. 1980), the Sixth Circuit "respectfully disagree[s] that only the most extraordinary reasons justify a restriction on the common-law right" to inspect and copy exhibits, *Beckham*, 789 F.2d

at 414. In a case like the one at bar, where the public and media were given full access to the information contained in exhibits when those exhibits were presented at trial, later requests to again inspect and to copy those exhibits do not implicate any fundamental constitutional rights. *See id.* at 414-15. In such a situation, a trial court has considerable discretion in balancing the factors militating for and against allowing the exhibits to be inspected and copied. *Id.* Ultimately, "[e]very court has supervisory power over its own records and files, and access [may be] denied where court files might . . . become a vehicle for improper purposes." *Warner Commc'ns*, 435 U.S. at 598.

Several factors weigh in favor of granting the media access to inspect and copy the exhibits in this case. First, this case has engendered considerable media and public interest, and because the case centers on the conduct of a public official, the importance of public scrutiny is heightened. "[W]hen the conduct of public officials is at issue, the public's interest in the operation of government adds weight in the balance toward allowing permission to copy judicial records." *Beckham*, 789 F.2d at 412; *see United States v. Thomas*, 745 F. Supp. 499, 502-03 (M.D. Tenn. 1990) (recognizing that "greater scrutiny of public officials is clearly appropriate since, by their office, they carry greater responsibilities and expectations than those demanded of ordinary citizens"). Second, releasing the exhibits would—to a varying degree depending on the specific exhibit at issue—increase the depth of public knowledge of this case. *See Beckham*, 789 F.2d at 409 (stating that one factor to consider when determining whether to release an exhibit is "the incremental gain in knowledge that would result from" enhanced public access to the exhibit). Third, and similarly, the sheer volume of exhibits in this case can

perhaps be said to weigh in favor of allowing the media and public to more thoroughly and effectively scrutinize the evidence through post-trial inspection and copying, as such a massive quantity of exhibits might pose special challenges to those members of the public present at trial who are attempting to digest it firsthand and those members of the media, also present at trial, who are attempting to gather and condense that information for the broader public not present at trial. *See Warner Commc'ns*, 435 U.S. at 609 (noting that "the press serves as the information-gathering agent of the public"). Last, a large number of exhibits constitute public records that were—and are—already available from other sources. *See Beckham*, 789 F.2d at 412 (indicating that "the proposals and contracts had been available for many months in a public records depository" and that this weighed in favor of release).

Most of the factors that weigh against allowing the inspection and copying of certain exhibits at this time relate to the procedural posture of this case and other cases related to it, and thus implicate the due process rights of Dimora and others. First, Dimora is not scheduled to be sentenced in this case ("Dimora I") until July 25, 2012. While the time for direct appeal has therefore not yet arrived, when it does arrive, Dimora may opt to exercise his right to appeal. Release of certain exhibits might prejudice Dimora's rights in the event a retrial is required following an appeal. *Cf. Warner Commc'ns*, 435 U.S. at 595, 603 n.14 (noting that, while the trial judge in the case had cited pending appeals as a major factor in refusing to release recording, those appeals had since been resolved without the need for retrial and the issue was thus mooted). Moreover, even preceding the possibility of appeal, Dimora and Gabor have both recently filed motions for extension of

time to file a motion for a new trial and a motion for a judgment of acquittal. (Doc. Nos. 755 & 757, respectively.) Second, defendant Dimora is also a defendant in another case currently pending before this Court, *United States v. Michael Forlani & James C. Dimora*, case number 1:11CR491 ("Dimora II"), involving conduct that is substantially similar to that at issue in Dimora I. Dimora II has yet to go to trial; jury selection is scheduled to begin on the October 17, 2012. There is a serious danger that widespread release of certain exhibits from Dimora I would serve to taint the jury pool for Dimora II. Considering the degree of media coverage surrounding Dimora I,[8] the Court took extraordinary measures during jury selection in this case—including a considerable expansion of the number of potential jurors brought in for voir dire—to ensure that a fair and impartial jury was ultimately seated.[9] The Court is thus loathe to release any exhibits at this time that might make it more difficult to ensure that Dimora's due process right to a fair and unbiased jury is preserved in Dimora II. *See Beckham*, 789 F.3d 401 (affirming district court's decision to refuse to release audio recordings and transcripts where one of the motions for release was made during interim between initial trial and retrial). Third, a number of other cases stemming from the same corruption investigation—many of which involve Dimora's alleged co-conspirators—are still pending at this time. These include *United States v. Anthony O. Calabrese, III, et al.*, case number 1:11CR437 (scheduled to

---

[8] The Clerk of Court's Office reports that 70 press passes were issued to members of the media in this case.
[9] Over 700 questionnaires were mailed to prospective jurors. Approximately 160 pre-screened jurors reported to this Court two months before trial to fill out a second, detailed questionnaire designed to reveal potential bias based on the nature of the charges and possible exposure to pretrial publicity. Jury selection took place over a three-day period beginning on January 4, 2012. Ninety-five jurors were brought in for more extensive questioning on January 4 through January 6. This group was further winnowed to 62 potential jurors. The final 12-person jury (along with 6 alternates) was selected later on January 6, after the exercise of preemptory challenges.

begin with jury selection on September 5, 2012) and *United States v. Samir Mohammad, et al.*, case number 1:10CR389 (scheduled to begin with jury selection on June 8, 2012). The due process rights of the individuals charged in these cases, likewise, must be jealously guarded by the Court. *See United States v. Boyd*, No. 3:07-CR-3, 2008 WL 2437725, at *3 (E.D. Tenn. June 13, 2008) (denying request to release certain exhibits in part because cases against others allegedly involved in the same crime as defendant were awaiting trial in another court).

In addition to these weighty due process concerns, the privacy rights of disinterested, uninvolved third parties whose names, images, and other personal information are included in certain exhibits weigh against allowing inspection and copying of the portions of those exhibits containing protected personal information. *See Thomas*, 745 F. Supp. at 499 (citing "intrusion upon . . . right to privacy" as consideration weighing against release of exhibit); *In re Application of KSTP Television*, 504 F. Supp. 360, 363 (D. Minn. 1980) ("The scant value to the public of any additional information inherent in the [exhibit in question] is clearly outweighed by the interest of [the victim] and of the public in maintaining the dignity of the private person."); *United States v. Mitchell*, No. 2:08CR125DAK, 2010 WL 890078, at *7 (D. Utah March 8, 2010) (quoting *Nixon*, 435 U.S. at 603 ("The court 'has a responsibility to exercise an informed discretion as to release of the tapes, with a sensitive appreciation of the circumstances that led to their production.'")). Similarly, by Rule, personal identifying information

contained within the exhibits may not be released.[10]

Consideration of these factors is what undergirds the Court's category-specific analysis below. As to some categories, this analysis leads the Court to conclude that permitting inspection and copying of those exhibits at this time is appropriate. In other cases, however, the Court must exercise its duty to restrict access—at least temporarily—to certain types of exhibits in order to ensure that the due process rights of those involved in this case and related cases are protected. *See Beckham*, 789 F.2d at 415 ("trial judge has primary responsibility to provide the fair trial that the Constitution guarantees"); *Ashworth v. Bagley*, 351 F. Supp. 2d 786, 789 (S.D. Ohio 2005) (court "has the power, if not the duty, to restrict access to . . . materials where they might be used improperly").

### 1. Government Records

During its case-in-chief, the government introduced records of other court proceedings, as well as plea agreements entered into by certain co-conspirators. These documents are a part of the public record of the various courts from which they originated and will be released.

In addition to records of other court proceedings, there are also two types of county and municipal records found in the exhibits. The first type of documents consists of those county and municipal records that pertain solely to public business and

---

[10] Rule 49.1 of the Federal Rules of Criminal Procedure sets forth, in detail, certain sensitive, identifying information that must be redacted before documents are filed with a court. FED. R. CRIM. P. 49.1(a). In addition to the instructions set forth in this Opinion and Order, the Court directs the government to insure that all exhibits made available to the public and the press for inspection and copying comply with the requirements of Rule 49.1.

were created and kept by county and municipal officials and employees in the normal course of government business. Many of these documents were a matter of public record before they were introduced at trial and are readily accessible. These include county contracts, county grants and leases, agendas of county and municipal meetings, and municipal building permits. Reports and memoranda as well as letters and emails generated by and between government employees, though not as readily available, can also be obtained by the media or public via formal records requests. The Court sees little harm that could come from the release of these documents, as the Court is unaware of any information in these documents that could be characterized as "inflammatory" or as an "inaccurate representation[] of other evidence." *See Beckham*, 789 F.2d at 413. The Court will permit the release of these documents.

The second type of documents in this category consists of those that may include information not relating to public business, such as personal information of current and former county and municipal employees. Release of these documents gives the Court pause. While certain information contained within these files may be accessible through a public documents request, the files may also contain sensitive personal information (such as bank account numbers, dates of birth, and home addresses) that is not otherwise available for public inspection, and was not germane to the proceedings in this case. Thus, the Court will only permit the release of these documents, subject to the government's redaction of all such personal information in accordance with Rule 49.1(a).

13

### 2. Business Documents

The second category of documents covers business records that were created in the ordinary course of business, and includes: bills, invoices, receipts, and casino and limousine records. These documents, to the extent that they do not contain personal information (such as bank account numbers, dates of birth, and home addresses), may also be released. Those documents containing personal information must be redacted by the government, in accordance with Rule 49.1(a), before they are made available for inspection and copying by members of the press.

### 3. Financial Records

Financial records, such as bank statements, credit card statements, income tax returns, and W-2 statements, comprise the third category of documents. Again, analysis of the factors for and against expanded release of these documents leads the Court to the same conclusion reached in relation to government records and business documents. While it is the Court's recollection that the government took care to redact any such information, the government must review these documents prior to release to ensure that all personal information is redacted in accordance with Rule 49.1(a). The Court will permit properly redacted financial exhibits to be released.

### 4. Photographs and Videos

The government also introduced hundreds of photographs at trial. Some of these photographs were still shots taken from surveillance cameras operated by the FBI

or Mirage Hotel in Las Vegas, Nevada. Of course, photographs of the conspirators—some of whom were public officials or employees—engaged in the conduct that formed the conspiracy charged in the indictment will be of great interest to the press and the public. Viewing the photographic proof of this conduct will also serve to verify for the public that the conduct charged did in fact occur. Thus, those surveillance photographs that merely show defendants Dimora or Gabor, as well as those that depict co-conspirators who have entered into plea agreements with the government, may be released. Other surveillance pictures showing images of uninvolved, disinterested third-parties, including those taken during the April 2008 Las Vegas trip, may not be disseminated unless the government first blurs the faces of all uninvolved and disinterested third parties (such as the two innocent employees who accompanied businessman and co-conspirator Ferris Kleem on the trip). *See, e.g., United States v. Thomas*, 745 F. Supp. 499, 502-03 (M.D. Tenn. 1990) (media request for release of video tape of the search of defendant's residence denied where defendant's wife, an innocent third party, was visible on the videotape and the tape could not be edited to effectively remove the troubling portions of the footage).

Three specific photographs of individuals will not be released at this time: government exhibits 175, 469, and 471. These three photographs would add little to public knowledge of the case and could be subject to misuse. Because they would likely be widely disseminated by the media, they could also serve to taint future jury pools. *Cf. KSTP Television*, 504 F. Supp. at 364 (release of tapes would "only place the court in support of the dissemination of scenes . . . appealing only to the curiosity and prurient interest of some members of the public").

15

Still other photographs offered by the government depict public establishments that served as the location for meetings, meals, parties, and other rendezvous about which testimony was given at trial. Because these photographs will certainly increase the depth of public knowledge with respect to the events charged in the indictment, and do nothing more than depict facilities that are open to the public, a balancing of the relevant factors weighs in favor of dissemination. The Court sees no prejudice in releasing the photographs of these public facilities provided, once again, that the faces of all uninvolved and disinterested third parties who may have been captured in the photographs are blurred.

The Court will also permit the release of photographs depicting portions of the Dimora residence, specifically, images that are visible from public streets and sidewalks, as well as those photographs depicting discrete images of things of value at the residence that were given by contractors identified at trial who were seeking county business. (This includes discrete images of improvements made to Dimora's back yard, as well as the other things of value received for free or at a discount, such as the refrigerator, framed B. Wells jersey, and granite countertops.) A central theme of the government's case was that many of the improvements to the property and other things of value received by Dimora represented bribes that Dimora had received from contractors who were seeking county contracts. Because a jury has found that these improvements and other things of value were obtained at the expense of the public—who had an expectation that their public officials would make decisions regarding the awarding of public contracts free from considerations of personal gain—the public has a vested

16

interest in discovering the truth of these improvements and other things of value. Two specific photographs that fall into this category will not be released. The first, government exhibit 1014, inadvertently includes images of Dimora family personal effects. The second, government exhibit 1026, itself includes images of personal photographs belonging to the Dimora family. These two photographs were admitted because they depict a refrigerator and a granite countertop, respectively, installed in the Dimora residence. Both the refrigerator and the countertop in question are depicted in other photographs that will be released at this time.

As part of its analysis in determining the propriety of releasing the photographic exhibits at this time, the Court considered whether any of the photographs were general depictions of the interior of the Dimora residence or the layout of the back yard—both private areas generally outside the view of the public. Since any such images would sweep more broadly than mere depictions of objects that were the subject of the FBI search warrant—and since any such images, unlike the images showing solely the improvements made to the home and other things of value at issue, would not have been central to the government's evidence in the case—the knowledge the public could gain from viewing any such additional images would be minimal. The Court would thus be inclined to delay release of any such images at this time. *See Beckham,* 789 F.2d at 409 (amount of knowledge to be gained by release of an exhibit should be considered in determining the propriety of such a release); *see, e.g., Thomas*, 745 F. Supp. at 502 (video not released in part because it provided little additional information relevant to the case and because it included "items not listed in the search warrant"). It appears, however, that

there are no such photographs at issue here, as all of those taken at the Dimora residence depict improvements and other things of value that were at issue in this case.

The government also relied on a demonstrative exhibit (Government Ex. 3457) consisting of an interactive compilation of photographs and computer drawings of the Dimora residence. Because this exhibit served as a summary of other exhibits that will be released, the knowledge the public could gain from viewing this additional exhibit is de minimis. Additionally, the overall purpose and effect of the exhibit is to highlight the extent of the improvements made to the Dimora residence, particularly the back yard, by a number of contractors. This will likely be a topic of considerable importance in Dimora II. Finally, the format of this exhibit is such that its broad dissemination presents a greater danger of tainting the jury pool than does the separate dissemination of the individual photographs contained within the exhibit. In light of these considerations, the need to protect Dimora's and others' due process rights tips the balance in favor of delaying release of the demonstrative exhibit.

Also admitted into evidence were a series of videos depicting Dimora and others during the April 2005 trip to Las Vegas. Government exhibits 400-BB and 400-BB-1 through 400-BB-15 depict Dimora and others seated at casino gaming tables. In these videos, it is difficult to discern—barring reference to other evidence—exactly who is who or what is taking place. The videos themselves therefore add relatively little to the public's knowledge of the happenings which they depict. That these exhibits are videos increases the probability that they will be widely disseminated and thus taint the jury pool. Add to this the fact that the government contends the videos show Dimora receiving

bribes in the form of gambling chips and the danger of prejudice to Dimora—who is also charged with bribery-related activity in Dimora II—becomes even clearer. Considering these factors, the videos will not be released at this time.

        In another video, government exhibit 432, centers on businessman Ferris Kleem allegedly arranging a bribe for Dimora in the form of a prostitute's services. Though the persons depicted in the video are easier to discern, the other considerations just discussed in the context of the 400-BB series of videos also apply here and weigh heavily against release at this time. This video therefore will also be temporarily withheld.

        One last video deserves specific attention. Government exhibit 430 depicts Dimora and others on the Las Vegas trip leaving the Mirage hotel and casino and entering limousines. While this exhibit will be released at this time, the beginning portion of the video that includes images of Kleem's employees must first be excised. These uninvolved and disinterested third parties' privacy rights must be protected. *See Thomas*, 745 F. Supp. at 499 (citing "intrusion upon . . . right to privacy" as consideration weighing against release of exhibit); *In re Application of KSTP Television*, 504 F. Supp. 360, 363 (D. Minn. 1980) ("The scant value to the public of any additional information inherent in the [exhibit in question] is clearly outweighed by the interest of [the victim] and of the public in maintaining the dignity of the private person."); *United States v. Mitchell*, No. 2:08CR125DAK, 2010 WL 890078, at *7 (D. Utah March 8, 2010) (quoting *Nixon*, 435 U.S. at 603 ("The court 'has a responsibility to exercise an informed

discretion as to release of the tapes, with a sensitive appreciation of the circumstances that led to their production.'")).

### 5. Miscellaneous Documents

Other documents were also introduced as exhibits at trial but do not neatly fall into any of the categories constructed by the Court. These documents consist primarily of handwritten notes seized during the execution of search warrants in this case. Because these documents add to public knowledge of this case and do not pose a significant threat of prejudice that could taint a future jury pool, they will be released at this time, provided that those documents containing personal information are redacted by the government, in accordance with Rule 49.1(a), before they are made available for inspection and copying by members of the press.

### 6. Summaries

Several exhibits were also introduced at trial that summarized the content of other exhibits and the content of witness testimony. These summaries are based in large part on other exhibits that the Court is releasing for inspection and copying. Moreover, those portions of the summaries that draw on witness testimony or other sources beyond exhibits already approved for release present the information in abbreviated, fact-intensive form that is not prejudicial to Dimora or related defendants. As such, the summaries are to be released at this time.

### 7. Recorded Conversations and Transcripts

During the course of the federal investigation, the FBI intercepted more than 44,000 telephone conversations between defendants, co-conspirators, and third parties. At trial, the government introduced hundreds of these calls into evidence. Each call was accompanied by a written transcript prepared by the FBI, which was also published to the jury. The Court has some reservations about the release of this final category of exhibits and must carefully balance the competing interests militating for and against allowing these exhibits to be released. The general factors, previously articulated, that weigh for and against allowing the inspection and copying of trial exhibits also apply here.

The Court begins, as it must, with the presumption in favor of disclosure and also recognizes that the recorded conversations will certainly provide the public with a deeper understanding of the offenses for which defendants were convicted and for which others have entered guilty pleas. While these calls do not represent the only evidence of such misconduct, conversations between co-conspirators regarding matters relating to the conspiracy itself provide unique insight into the depth and breadth of the conspiracy. The fact that the RICO conspiracy so thoroughly infected local government makes the public's need to know the content of these calls all the greater. Nonetheless, many of the calls touch upon matters that will be the subject of future prosecutions and involve defendants who are still awaiting trial. Thus, the Court must balance the public's interest against the Court's own obligation to ensure that Dimora and other defendants receive fair trials in the future.

Recognizing the unique issues raised by requests for the release of audio recordings of intercepted communications, courts have identified additional factors to be weighed in determining whether release of such exhibits is appropriate. These factors are:

> the court's supervisory powers, the benefit to the public from the incremental gain in knowledge that would result from hearing the tapes themselves, the degree of danger to defendants or persons speaking on the tapes, the possibility of improper motives on the part of the media such as promoting public scandal or gratifying private spite, and any special circumstances in the particular case.

*Beckham*, 789 F.2d at 409 (quoting *Warner Commc'ns*, 435 U.S. at 599-603).

As previously discussed, some of the recorded conversations relate to conduct that will be the subject of subsequent federal prosecutions, including Dimora II (involving defendant Dimora and a co-defendant, Michael Forlani) and a separate trial involving Anthony Calabrese. As previously discussed, both of these cases are scheduled to go to trial within the next seven months. Additionally, many of the conversations contain vulgar language and deal with inappropriate, and sometimes disturbing, topics. There is a very real concern that repeated airings of these recordings on television, on the radio, or on the internet will contaminate future jury pools and hinder the Court's efforts to ensure that parties to future prosecutions receive fair trials.[11] These types of concerns have led other courts to withhold such exhibits from further public view. *See, e.g.,*

---

[11] Of course, careful voir dire designed to ferret out biases caused by pretrial publicity and proper limiting instructions, along with admonitions to the jury regarding the importance of avoiding news reports related to the trial in which they are serving, can limit the likelihood that a future defendant's jury will be tainted by adverse publicity. These tools are not, however, without their limits. *See Beckham*, 789 F.2d at 414 (giving credence to the trial court's finding that sequestration, voir dire, and cautionary instructions would not necessarily cure any harm from the release of audio recordings). In crafting its decision, the Court has taken into account the availability (and limitations) of such techniques.

22

*Beckham*, 789 F.2d at 415 (affirming the trial court's refusal to release recorded conversations and transcripts presented at trial).

Still, the public's interest in these exhibits, and the incremental gain in knowledge that would result from being given access to the recordings and transcripts at this time, cannot be denied. Further, the wiretap recordings were a crucial part of the government's case. But these same considerations weighing in favor of ultimate release of the recordings and transcripts—public interest in these exhibits, the nature of the information contained therein, and the integral role that wiretap recordings played in this case—also highlight the danger of releasing these exhibits at this time. The very factors that make the recordings and transcripts significant also make it likely that releasing them while multiple cases stemming from the investigation are still pending and while this very case may still be appealed would taint the jury pool and possibly deprive the defendants in those cases of their right to due process. In this regard, the Court is mindful of its duty "to exercise an informed discretion as to release of the [recordings]." *Warner Commc'ns*, 435 U.S. at 603. The same holds true for release of the transcripts.

In *Beckham*, the Sixth Circuit upheld the district court's decision to disallow release of both the recordings themselves and the transcripts (which had not been admitted into evidence) until after the close of the retrial at issue. 789 F.2d at 411. In the case at bar, while the transcripts were admitted as exhibits and the jurors were permitted to utilize them during their deliberations, the jurors were also instructed immediately prior to retiring to deliberate that "the transcripts are not evidence" and that "[t]hey were given only as an aid to help [the jurors] follow what was being said" on the

recordings themselves. (Jury Instructions, Doc. No. 735-1, p. 81.) The jurors were also instructed throughout the trial that, should any of them notice a discrepancy between what was heard in a recording as played at trial and what was printed in the transcript of that recording, the recording itself must control.

Under certain circumstances, it may be appropriate for a court to provide for earlier inspection and copying of transcripts but to delay it for the recordings themselves, as the tone of voice, cadence, and other "live" effects of the latter may be what makes the contents of the recording particularly inflammatory or memorable—and thus likely to taint the jury pool and create due process concerns. *See Nat'l Broadcasting*, 635 F.2d at 953 ("seeing the tapes on television will create a stronger impression of the events among those who have already been exposed to news accounts of their contents"); *United States v. Mitchell*, 2010 WL 890078, at *5 (citing *Nat'l Broadcasting* at 635 F.2d at 953 ("Even though the information contained on the tapes has been extensively reported in the press, viewing the videos firsthand is far more likely to make a longstanding impression that potential jurors may find more difficult to set aside.")). But in this case, it is the type of topics discussed in the recordings—along with the speakers' word choice—that would be most memorable and inflammatory. The speakers' exceedingly tawdry language would still come through with great force in the transcripts. Here, because the threat to due process inheres primarily in the linguistic content of the conversations—and not in the inflection of a speakers' voices or in other, more subtle aspects that might be discerned only by listening to the recordings—releasing the transcripts while withholding the recordings themselves would do little to mitigate

24

against the prejudicial effects of the conversations' contents. Given (1) the extreme nature of many of the conversations memorialized in the recordings and transcripts; (2) that this case has yet to be appealed and could potentially be remanded for a retrial; and (3) that several individuals, including defendant Dimora himself, are still awaiting trial on charges related, at the very least, tangentially to the contents of the transcripts and recordings, the Court is convinced that it would be improper to release the recordings and transcripts at this time. Under these circumstances, the public's and the media's right to access and transparency is temporarily outweighed by the need to safeguard the integrity of impending judicial proceedings.

This delay in release of the recordings and transcripts is just that—a delay. Once judicial proceedings relevant to this investigation and these exhibits have been concluded, little will stand in the way of unfettered access to these records.

### 8. Additional Limitation

In addition to the criteria set out above, no exhibit pertaining to (1) Michael Forlani (or Doan Pyramid and Neteam, his related companies); (2) Anthony Calabrese (or Alternatives Agency, his related company); (3) or any other individual who has been indicted—but who has yet to be tried or to enter a plea of guilty—as part of the investigation from which this case stemmed, may be released at this time. Release of such exhibits will be delayed only until the relevant proceedings with which they might be associated are concluded.

### III. Conclusion

For all of the foregoing reasons, the Court grants, in part, the media's request for the immediate release of all trial exhibits. The government shall, within three business days of the issuance of this opinion, file, for review by defendants and approval by the Court, a list of all exhibits that it believes meet the criteria set forth in this opinion for immediate release. If the government desires further guidance from the Court as to the propriety of releasing specific exhibits, it may seek it at that time. Each defendant shall, within three business days after the government's list is filed, in turn file any additional objections he has to release of any of the exhibits on the government's list. Any such objections must state the specific exhibits objected to and the exhibit-specific grounds for each objection.

**IT IS SO ORDERED**.

**Dated: March 22, 2012**

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**