# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.  1:10CR387 |
| | ) | |
| | ) | |
| | ) | JUDGE SARA LIOI |
| PLAINTIFF, | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION & |
| | ) | ORDER |
| JAMES C. DIMORA, et al., | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court are defendant James C. Dimora's motion for a judgment of acquittal (Doc. No. 874) and motion for a new trial (Doc. No. 875). The government has responded in opposition to both motions. (Doc. Nos. 882, 902.) The Court will also address Dimora's motion to modify the protective order (Doc. No. 782), which was also opposed by the government (Doc. No. 859).

## I. Background

In 2007, the Federal Bureau of Investigation launched a large-scale probe into potential public corruption in local government. Targeting political and business activity in Cuyahoga County, Ohio, the investigation to date has resulted in over 60 arrests and numerous criminal charges. Most of those charged have entered into plea agreements with the federal government, a few have gone to trial, and several others are still awaiting trial. Dimora and his co-defendant, Michael Gabor, were among those charged who elected to go to trial.

Between 1998 and 2010, Dimora served as an elected county commissioner for Cuyahoga County. It was the government's theory that he and Frank Russo, who served for much of this same period as county auditor, orchestrated a conspiracy whereby the two men would benefit themselves, their co-conspirators, and their designees, by using the power and authority of their public offices to elicit monetary and in-kind bribes in exchange for public contracts, employment with the county, and other special government benefits.

At all times relevant to the federal investigation, Gabor was employed by the Cuyahoga County Auditor's Office. Evidence presented at trial demonstrated that Gabor used his long-standing relationship with Dimora to secure work in the auditor's office under Russo, and paid Russo a fee of $5,000 for his position in the Department of Weights and Measures.

By the Third Superseding Indictment,[1] Dimora was charged, along with Gabor, in Count 1 with RICO conspiracy. He and Gabor were also charged with conspiracy to commit bribery concerning programs receiving federal funds, Hobbs Act conspiracy, and conspiracy to obstruct justice. Dimora was separately charged with conspiracy to commit mail fraud and honest services mail fraud; bribery concerning programs receiving federal funds; substantive Hobbs Act violations; conspiracy to commit wire fraud and honest services wire fraud; destruction, alteration or falsification of records; mail fraud and honest services mail fraud; and making false statements on income tax returns.

---

[1] All indictment references are to the Third Superseding Indictment. (Doc. No. 444.)

On March 9, 2012, after a 37 day jury trial, the jury returned guilty verdicts against Dimora as to 33 of 34 counts in which he was charged. He was acquitted by the jury on one count. The charges of which Dimora was found guilty included: RICO conspiracy; conspiracy to commit mail and wire fraud and honest services mail and wire fraud; Hobbs Act conspiracy and Hobbs Act extortion; bribery concerning programs receiving federal funds; tax fraud; obstruction of justice; and destruction of records. (Dimora Verdicts, Doc. No. 738.) Dimora's co-defendant, Michael D. Gabor, was found guilty by the jury on seven counts charging similar fraud and conspiracy-related offenses. He, too, was acquitted by the jury on one count. (Gabor Verdicts, Doc. No. 739.)

In his motion for judgment of acquittal, brought under Rule 29 of the Federal Rules of Criminal Procedure, Dimora requests that the Court grant a judgment of acquittal on all counts of which he was convicted on the ground that the evidence was insufficient to support the verdicts. In the alternative, and with respect to his Rule 33(a) motion, Dimora argues that he is entitled to a new trial because the verdicts are against the manifest weight of the evidence, and that the interests of justice otherwise require a new trial.

**II. Standards**

If the defendant moves for a judgment of acquittal after the government concludes its case, the Court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "The relevant inquiry is whether, 'viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a

3

reasonable doubt.' " *United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)). "Under the *Jackson v. Virginia* standard, a reviewing court does 'not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury.' " *Id.* (quoting *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009)). " 'Substantial and competent circumstantial evidence by itself may support a verdict and need not remove every reasonable hypothesis except that of guilt.' " *Id.* (quoting *United States v. Lee*, 359 F.3d 412, 418 (6th Cir. 2004)).

A motion for a new trial is governed by Rule 33 of the Federal Rules of Criminal Procedure, which provides that the court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The paradigmatic use of a Rule 33 motion is to seek a new trial on the ground that 'the [jury's] verdict was against the manifest weight of the evidence.' " *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (quoting *United States v. Crumb*, 187 F. App'x 532, 536 (6th Cir. 2006)). "Generally, such motions are granted only 'in the extraordinary circumstance where the evidence preponderates heavily against the verdict.' " *United States v. Graham*, 125 F. App'x 624, 628 (6th Cir. 2005) (quoting *United States v. Turner*, 490 F. Supp. 583, 593 (E.D. Mich. 1979)). Under this type of challenge, the district judge may act as a "thirteenth juror," assessing the credibility of witnesses and the weight of the evidence. *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998).

Thus, while Rule 29(c) and Rule 33(a) may deal with similar issues, the two rules are governed by different standards of review. When assessing a motion for judgment of acquittal, pursuant to Rule 29(c), a court is required to approach the evidence

4

from a standpoint most favorable to the government, and to assume the truth of the evidence offered by the prosecution. With a Rule 33(a) motion for new trial on the ground that the verdict is against the weight of the evidence, the power of a court is much broader because a court may weigh the evidence and consider the credibility of the witnesses. *See Turner*, 490 F. Supp. at 593 (citing 2 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 553 (3d ed. 2004)).

Rule 33's "interest of justice" standard also "allows the grant of a new trial where substantial legal error has occurred." *Munoz*, 605 F.3d at 373. This includes "any error of sufficient magnitude to require reversal on appeal." *Id.* (quoting *United States v. Wall*, 389 F.3d 457, 474 (5th Cir. 2004)). The trial court does not assume the role of the "thirteenth juror" for purposes of this type of challenge. *Id.* at 373 n.9. Because defendant Dimora relies on both the "against the weight of the evidence" and the "substantial legal error" theories in his motion for a new trial, the Court shall apply the standard applicable to each type of argument advanced.

## III. Discussion

### A. Dimora's Motion for a Judgment of Acquittal

At the conclusion of the government's case, both defendants moved for a judgment of acquittal, and the Court denied these motions for reasons stated on the record. Dimora's present Rule 29 motion is a renewal of his previous motion, and the Court incorporates by reference its prior findings and conclusions set forth on the record. Additionally, to the extent that Dimora's motion attempts to incorporate the arguments

made by co-defendant Gabor in support of his motion for judgment of acquittal, the Court incorporates its ruling on Gabor's post-trial motion.[2] (*See* Doc. No. 923.)

The Court finds it necessary, however, to write separately on one issue previously raised by defendant Dimora. In a pretrial motion (Doc. No. 414.) , Dimora sought the dismissal of seven of the counts against him charging conspiracy to violate the Hobbs Act, 18 U.S.C. § 1951, on the ground that these counts were brought in violation of the Sixth Circuit's decision in *United States v. Brock*, 501 F.3d 762 (6th Cir. 2007). In an opinion issued October 28, 2011, the Court denied Dimora's motion to dismiss those counts, stating that a proper analysis of the *Brock* issue could not be conducted until after the presentation of evidence at trial. (Doc. No. 530 at 7-8, Page ID # 18785-86.)

In the October 28 opinion, the Court set forth a detailed analysis of the relevant holding in *Brock* as well as in *United States v. Gray*, 521 F.3d 514 (6th Cir. 2008)—a case which discussed and applied *Brock*. It is unnecessary to embark on a second all-out explication of those cases here. But a brief summary of them and of this Court's previous conclusions as to the application of *Brock* and *Gray* is appropriate.

In *Brock*, the Sixth Circuit reversed two brothers' convictions for conspiracy to extort under the Hobbs Act in part because the "property from another" requirement found in that statute was not met. The Hobbs Act provides that

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by . . . extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to

---

[2] In support of his Rule 29 motion, Dimora also incorporates by reference various pre-trial motions. (*See* Doc. Nos. 414, 415, 445, 560, 568.) The Court hereby refers to, and incorporates by reference, its rulings on these pre-trial motions.

do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). The act goes on to define extortion as "the obtaining of *property from another*, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2) (emphasis added). The court in *Brock* concluded that the "property from another" requirement was not met in that case because the purportedly extorted funds had come either from the defendants themselves or from "their own company." *Brock*, 501 F.3d at 767. "To be covered by the [Hobbs Act extortion provision]," the Sixth Circuit held, "the alleged conspirators . . . must have formed an agreement to obtain 'property from *another*,' which is to say, formed an agreement to obtain property from someone outside the conspiracy." *Id.*

In its prior opinion discussing *Brock*, this Court found that there were two main conclusions to be drawn from the *Brock* court's discussion of the "property from another" requirement. First, "the ties between an individual conspirator and a business controlled or owned by that conspirator can be so close as to make the individual and the business indistinguishable for purposes of the 'property from another' Hobbs Act conspiracy requirement." (Doc. No. 530 at 4, Page ID # 18782.) Second, this Court also concluded, based on the Sixth Circuit's discussion in its *Brock* opinion of *United States v. Spitler*, 800 F.2d 1267 (4th Cir. 1986), that "an individual conspirator's status as an employee, even a high-ranking employee, is not by itself enough to 'merge' the individual with the business for purposes of the 'property from another' requirement." (*Id.*) The *Gray* decision, this Court found, reinforced these two broad principles. In that

7

case, the court reaffirmed the *Brock* principle that the "property from another" requirement is only met when the defendant attempts to extort property from "an unrelated entity outside the conspiracy." *Gray*, 521 F.3d at 540. At the same time, the court in *Gray* determined that the "unrelated entity" requirement was met where the Honeywell Corporation was the victim of the extortion conspiracy and one of its vice presidents was a conspirator, thus conforming with the *Brock* panel's *Spitler* analysis. *Id.* at 536-39.

It is these principles that the Court must apply in determining whether to dismiss any or all of the Hobbs Act conspiracy counts Dimora challenges. Based upon the evidence submitted at trial, the Court has determined that counts 3, 12, 14, 22, 24, and 26 do not warrant dismissal under *Brock*. In all of these counts, the Dimora co-conspirators were merely officers, employees, or part owners of the extorted entities. In none of these Counts could it be said, for purposes of *Brock*, that, in reference to the co-conspirators, the entities were "their own." *Cf. Brock*, 501 F.3d at 767. These co-conspirators were aiding in the extortion of things of value not from themselves but from separate entities with which they merely had an affiliation. They did not exercise complete control and hold complete ownership.

Count 10 is a different story. On that count, Dimora was convicted of conspiring with John Valentin to extort Salva Stone Design, Inc. Valentin is associated in some way with Salva Stone, a business that fabricates and installs granite countertops. Dimora received free granite countertops from Salva Stone in exchange for political favors for Valentin. At trial, the government produced evidence demonstrating that Salva Stone was a "corporation for profit" incorporated in Ohio. (Gov. Exs. 1035, 1036.) Yet

8

the government failed to adduce any evidence indicating who owned Salva Stone beyond Valentin's own testimony that he was the "[s]elf proprietor [sic]" of the business, which suggests that he might be the sole shareholder.[3] (Doc. No. 702 at 5, Page ID # 14228.)

In *Brock*, the Brock brothers ran a bail bond business. As this Court has previously noted, the court in *Brock* did not "discuss the legal and practical status of Brock Bonding (e.g., whether Brock Bonding was incorporated, whether any individuals other than the Brocks had an ownership interest in the business, or whether the business employed anyone in addition to the two Brock brothers)[.]" (Doc. No. 530 at 4, Page ID # 18782.) Since the *Brock* opinion is bereft of details that might give guidance as to what traits an entity must or must not possess in order to be considered "outside the conspiracy" for purposes of a charge of conspiracy to commit Hobbs Act extortion, it is difficult for this Court to determine whether the nature of the relationship between Valentin and Salva Stone was sufficiently close (i.e., sufficiently similar to the relationship between the Brocks and Brock Bonding) to bar conviction here. In short, it is hard to tell whether Valentin and Salva Stone are simply too closely related to permit this conspiracy charge to stand.

Despite the ambiguities left unresolved by *Brock* and *Gray*, however, the Court concludes that Salva Stone is not an entity "outside the conspiracy" for purposes of

---

[3] Valentin also indicated in his testimony that Salva Stone was not incorporated:
  Q. So your business is called Salva Stone Design, is that correct?
  A. Correct.
  Q. And it's a corporation?
  A. No, it's not.
  Q. What is it?
  A. It's not. It's not a corporation. Self-proprietor.
(Doc. No. 702 at 5, Page ID # 14228.) But this statement seems to have been the product of a layman misunderstanding the legal concept of incorporation. Similarly, his "[s]elf proprietor" characterization seems to have been made to indicate that he was the sole owner of the company, rather than that the

*Brock* analysis. As such, Dimora is entitled to a judgment of acquittal on Count 10. Though Salva Stone is incorporated, and therefore has a legal existence separate from Valentin, the *Brock* opinion gives no indication that incorporation alone weighs against a finding that a co-conspirator and his related entity are separate for purposes of conspiracy-to-extort analysis. The same can be said as to whether the entity has employees who are not members of the conspiracy. But what we know is relevant here is whether the entity can be said to be Valentin's "own company." *Cf. Brock*, 501 F.3d at 767. Again, the only evidence offered as to who owns and controls Salva Stone is Valentin's testimony that he was the "[s]elf proprietor" of the company. Beyond that, the government offered no evidence that any other person held an ownership interest in the company or that anyone else exercised any form of control over it. It short, it offered no evidence to clearly distinguish the relationship between Valentin and Salva Stone from the relationship between the Brocks and their company.

The consent requirement found in the Hobbs Act definition of extortion also creates a problem for the government here. *See* 18 U.S.C. § 1951(b)(2) (defining extortion as the obtaining of property from another, *with his consent* . . ." (emphasis added)). For, given the absence of any evidence indicating Valentin had anything less than complete control over Salva Stone, how can it be said that Valentin conspired with Dimora to obtain his own consent to provide free countertops to Dimora via Salva Stone? *Cf. Brock*, 501 F.3d at 767 ("And how could it be said that the Brocks conspired with [the public official] to obtain their consent to give, say, '10 $100 bills' to [that official], money which came from their own pockets or at most from their own company, Brock

---

business had the legal status of a sole proprietorship. ¹⁰

Bonding?" (internal citation omitted)). Salva Stone, though it existed as a separate legal entity, nevertheless appears to be an asset controlled and owned completely by Valentin.

For these reasons, Dimora's motion for a judgment of acquittal on Count 10 is granted.

With respect to the remaining counts of conviction, the Court concludes that the evidence, when viewed in a light most favorable to the government, was sufficient for a rational juror to have found the essential elements of the charged crimes beyond a reasonable doubt. For these reasons, Dimora's motion for a judgment of acquittal on Counts 1-9, 11-29 and 34-37 of the indictment is denied. In light of the Court's ruling on Count 10, the remainder of this opinion will address Dimora's arguments only as they apply to the jury's findings of guilt on Counts 1-9, 11-29 and 34-37.

**B. Dimora's Motion for a New Trial**

Dimora also seeks a new trial on all counts for which he was convicted on the ground that the interests of justice necessitate such. In support of his motion, Dimora incorporates by reference the arguments set forth in his pretrial motions, his objections at trial, and his motions for a mistrial.[4] These motions and arguments were addressed in

---

[4] Dimora also attempts (without explanation or elaboration) to rely upon the arguments advanced by Gabor in his post-trial motions. While the Court does not believe that Gabor's fact specific arguments are relevant to Dimora, the Court finds that Gabor's arguments no more warrant the granting of a new trial for Mr. Dimora than they did for Mr. Gabor.

pretrial written orders and rulings on the record at trial, and the Court incorporates by reference these orders and rulings. Dimora also, however, highlights several arguments that he believes support his request for a new trial. The Court will address each argument in turn.

### 1. The Convictions were not Against the Manifest Weight of the Evidence

Count 9 of the indictment charged Dimora with conspiracy to commit mail fraud and honest services mail fraud in connection with his efforts to obtain employment for Gina Coppers. Counts 11-13 and Counts 26-27 charged Dimora with Hobbs Act conspiracy and substantive Hobbs Act violations relating to Dimora's solicitation and receipt of things of value from contractors in exchange for official actions. Dimora argues that the jury's guilty verdicts on these counts were against the manifest weight of the evidence.

Under 18 U.S.C. § 371, it is illegal for "two or more persons [to] conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose . . . ." The government may establish the existence of a conspiracy if it can prove, beyond a reasonable doubt: (1) the existence of an agreement to violate the law; (2) knowledge and intent to join the conspiracy; (3) and an overt act constituting actual participation in the conspiracy.[5] *See United States v. Hughes*, 505 F.3d 578, 594 (6th Cir. 2007).

"To prove that a conspiracy existed, the government need not show a formal written agreement." *Fisher*, 648 F.3d at 450 (citing *United States v. Crossley*, 224

---

[5] Hobbs Act conspiracy is governed by 18 U.S.C. § 1951 and does not require an overt act.

F.3d 847, 856 (6th Cir. 2000)). "A showing of 'tacit or mutual understanding among the parties' is sufficient." *Id.* (quoting *Crossley*, 224 F.3d at 856). "Likewise, direct evidence of the conspiracy is not necessary. It is enough to present 'circumstantial evidence which a reasonable person could interpret as showing participation in a common plan . . . .' " *United States v. Hunt*, 521 F.3d 636, 647 (6th Cir. 2008) (quoting *Crossley*, 224 F.3d at 856); *see United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002) (A conspiracy may be inferred from "circumstantial evidence which may reasonably be interpreted as participation in a common plan." (internal citations omitted)).

### a. The Contractor Schemes

The essential elements of the crime of Hobbs Act extortion are, for purposes of this indictment: (1) that the individual obtained or attempted to obtain property; (2) that he did so knowingly by extortion under color of official right; (3) that the property was given with the giver's consent; and (4) that in so acting, interstate or foreign commerce was obstructed, delayed or affected, would have been affected, or had the potential to be affected in any way or degree. *See Evans v. United States*, 504 U.S. 255, 268 (1992); *United States v. Gray*, 521 F.3d 514, 533-34 (6th Cir. 2008). Thus, in order for the jury to have convicted Dimora of conspiracy to commit Hobbs Act violations, the government would have had to prove, beyond a reasonable doubt, that: (1) two or more persons conspired, or agreed, to commit the substantive crime of Hobbs Act extortion; and (2) Dimora knowingly and voluntarily joined the conspiracy.

Dimora suggests that the evidence supporting the schemes involving John Valentin (Count 11),[6] Nicholas Zavarella (Counts 12 and 13), and Charles Randazzo (Counts 26 and 27) was legally deficient because it established nothing more than that "anything of value given to Mr. Dimora was done so, at best, only with a generalized hope of a future favor . . . ." (Doc. No. 875, Page ID # 18160.) Citing *United States v. Whitfield*, 590 F.3d 325, 350 (5th Cir. 2009), Dimora contends that a "generalized hope or expectation of ultimate benefit" cannot support the finding of the necessary quid pro quo agreement required for bribery and extortion. (*See* Doc. No. 875 at 4, Page ID # 18161.).

However, "the government does not have to prove an explicit promise to perform a particular act made at the time of payment. Instead, it is sufficient if the public official understands that he or she is expected as a result of the payment to exercise particular kinds of influence—i.e., on behalf of the payor—as specific opportunities

---

[6] Count 10 also involved Valentin's company, Salva Stone. Because the Court has already determined that defendant Dimora is entitled to a judgment of acquittal on Count 10, the only charge involving Valentin that will be addressed herein is the charge of Hobbs Act extortion set forth in Count 11.

14

arose." *United States v. Ganim*, 510 F.3d 134, 144 (2d Cir. 2007) (Sotomayor, J.) (internal quotation and citation omitted, and cited with favor by *Skilling v. United States*, 130 S. Ct. 2896, 2934 (2010)). As the court in *Whitfield* explained:

> while noting that the 'generalized hope or expectation of ultimate benefit on the part of the donor does not constitute a bribe,' the Fourth Circuit has observed that 'the government need not show that the defendant intended for his payments to be tied to specific official acts . . . . [A]ll that must be shown is that the payments were made with the intent of securing a specific *type* of official action or favor in return. For example, payments may be made with the intent to retain the official's services on an 'as needed' basis, so that whenever the opportunity presents itself the official will take specific action on the payor's behalf. This sort of 'I'll scratch your back if you scratch mine' arrangement constitutes bribery because the payor made payments with the intent to exchange them for specific official action.

590 F.3d at 350 (internal citations omitted, emphasis in original). Thus, "it is sufficient if the public official understood that he or she was expected to exercise some influence on the payor's behalf as opportunities arose." *United States v. Abbey*, 560 F.3d 513, 518 (6th Cir. 2009) (citations omitted) (rejecting the argument that the benefits received by the public official must have some "explicit, direct link with a promise to perform a particular, identifiable act when the illegal gift is given to the official").

The evidence offered at trial demonstrated that Dimora enjoyed a relationship with several contractors wherein they provided him with things of value in exchange for his willingness to exercise his influence as opportunities arose. Valentin testified that he did not charge Dimora for the thousands of dollars of granite his company installed in the Commissioner's home because he and Dimora had a "mutual agreement" that "if I need some help from him I can get some favors." (Doc. No. 702 at 17, Page ID # 14240.) Similarly, in explaining why he never sent Dimora an invoice for

15

the granite, Valentin testified that "[a]gain, I considered it like a favor that I did to [sic] him in expecting in the future some favors for him, too."[7] (*Id.* at 23, Page ID # 14246.)

According to Valentin, there did come a time when he needed a "favor" from Dimora. In 2007, Valentin asked Dimora for his assistance in securing a visa for a friend to permit him to travel to the United States from Romania. Dimora responded by writing a letter to Senator George Voinovich requesting that he take action to expedite the visa application process. (*See* May 3, 2007 letter from Senator Voinovich, Gov. Ex. 1002 (noting Dimora's request).) Dimora's efforts to assist Valentin in this matter corroborate Valentin's understanding of their "mutual relationship" as one where Dimora's official services were retained on an "as needed" basis.

Dimora had a similar relationship with Charlie Randazzo, a securities broker, who testified that he gave numerous things of value to Dimora and Russo in exchange for their influence and assistance. Randazzo owned a company that provided insurance and retirement planning programs for public entities, and testified that in 2002 he was experiencing difficulty in getting his foot in the door with various government entities, including Cuyahoga County. He testified that he supplied Dimora with things of value—including a tiki bar, food, drinks, and meals in restaurants—because Dimora (along with Russo) helped with "opening doors, getting access to, you know, places that I had a chance to do some business." (Doc. No. 710 at 7-30, Page ID # 14996-15019; Gov. Exs. 1021, 2626, 2627.) In return for these "gifts," he *expected* "an open line of

---

[7] Valentin, for whom English was a second language, also testified that "I gave him free granite because, like I said, I was thinking, if I make him a favor, I'm going to get a favor back in the future. If I have a problem, I can have a door open to him to ask him for help if I need help." (*Id.* at 33,  Page ID # 14256.)

communication. So if I needed help. I could ask." (*Id.* at 31, Page ID # 15020.) At trial, Randazzo explained that Russo and Dimora were the "centers of influence" for the county (*Id.* at 30, Page ID # 15019), and that it was of considerable value to have immediate access to such powerful public officials.[8] (*Id.* at 8, 53, Page ID # 14997, 15042.).

These sentiments were echoed by Nicholas Zavarella, a contractor who testified that he performed free masonry work at Dimora's residence between 2002 and 2008. (Doc. No. 708 at 6-15, Page ID # 14910-19; Gov. Exs. 1221, 1222.) Zavarella testified that Dimora was "a friend and a political official, and I figured that if I could help him, I'm sure he could help me." (Doc. No. 709 at 36, Page ID # 14940.) In exchange for improvements made to the Dimora residence, Zavarella asked for Dimora's help in getting Zavarella's daughter a position with the county, and, later, with obtaining a teaching position. (*Id.* at 36-38, Page ID # 14940-42.) He also asked Dimora to intercede on his behalf on a county project for which Zavarella's company was serving as a subcontractor. (*Id.* at 40, Page ID # 14944.).

To be sure, Zavarella also testified that he was friends with Dimora, and that he had first sought to exploit Dimora's influence as commissioner before he had provided any free masonry work. (*Id.* at 36-51, Page ID # 14940-55.) Indeed, evidence at trial showed that all three contractors, to varying degrees, considered Dimora to be a friend. Still, the evidence demonstrated that it was not friendship alone that motivated the

---

[8] Like Valentin, Randazzo took advantage of this arrangement. He testified that Dimora arranged for meetings with the Mayor of Beachwood, and assisted Randazzo in his efforts to earn the business of the county sewer district. (Doc. No. 710 at 23, 26-27, Page ID # 15012, 15015-16.)

exchange of things of value for political favors. The testimony of Valentin, Randazzo, and Zavarella, together with Dimora's "as needed" official actions, supported the jury's determination that Dimora illegally received things of value in exchange for official acts.[9] *See Anderson v. United States,* 417 U.S. 211, 226 (1974) ("A single conspiracy may have several purposes, but if one of them—whether primary or secondary—be the violation of a federal law, the conspiracy is unlawful under federal law."); *United States v. Woodward*, 149 F.3d 46, 71 (1st Cir. 1998) (A defendant may be prosecuted for fraud if he has a dual intent, "i.e., if he is found to have intended both a lawful and an unlawful purpose to some degree."); *see also United States v. Coyne*, 4 F.3d 100, 113 (2d Cir. 1993) (on bribery and extortion counts, jury charge stating that "defendant accepted or solicited the thing of value, at least in part, for or because of his conduct or intending to be influenced in connection with any business or transaction of [the] County" was appropriate in light of the defendant's argument that he was motivated by friendship).

The Court had the opportunity to observe Valentin, Zavarella, and Randazzo testify a trial. The Court found the testimony of these witnesses credible, especially in light of the fact that the testimony was supported by documents and records. Moreover, the fact that each witness provided similar testimony on the nature and mechanics of the relationship with Dimora was compelling evidence that Dimora conspired to, and did, extort things of value in exchange for official acts. The jury's decision was not against the manifest weight of the evidence. This is not "the

---

[9] Valentin and Zavarella both testified that, while they never had discussions with Dimora about payment contemporaneously with the performance of the work done on Dimora's residence, Dimora paid by check a small portion of the cost of the projects after Pumper was approached by the FBI on May 23, 2008. (Doc. No. 702 at 30, Page ID # 14253; Doc. No. 709 at 55, 74, Page ID # 14959, 14978; Gov. Exs. 1003, 1004, 1009, 1213, 2821.) Obviously, if the gifts were truly given out of friendship, there would have been no

extraordinary circumstance where the evidence preponderates heavily against the verdict." *See United States v. Hughes*, 505 F.3d 578, 592-93 (6th Cir. 2007) (internal quotation and citation omitted).


### b. The Gina Coppers Scheme

With respect to Count 9, the indictment charged that Dimora entered into a conspiracy to defraud and deprive Cuyahoga County and its citizens of the right to the honest services of Dimora, through bribery, by obtaining a position with the City of Bedford, Ohio for Gina Coppers. Alternatively, the indictment charged Dimora with conspiring to obtain money and property by means of materially false and fraudulent pretenses, representations and promises. Both theories charged the use of the United States mail to advance the conspiracy.

The elements of the substantive crime of mail fraud are: (1) an individual identified in the count knowingly participated in a scheme to defraud; (2) that the scheme involved a material misrepresentation or concealment of a material fact; (3) that the same individual had the intent to defraud; and (4) an individual used the mails. *Neder v. United States*, 527 U.S. 1, 20-25 (1999); *United States v. Gold Unlimited, Inc*., 177 F.3d 472, 488 (6th Cir. 1999); *United States v. Frost*, 125 F.3d 346, 358-59 (6th Cir. 1997); Sixth Circuit Pattern Instruction 10.01. The elements of the substantive crime of honest service mail fraud are: (1) an individual intended to defraud the county and its citizens of their rights to the honest services of a public official through bribery or kickbacks; (2) an individual identified in the count committed a material misrepresentation or concealment

---

reason for Dimora to attempt to make partial payments years after the free work was performed.

of a material fact; (3) that the same individual intended to defraud the county and its citizens; and (4) an individual used the mails. *See generally Skilling*, 130 S. Ct. 2896 (2010); *see, e.g., United States v. Bruno*, 661 F.3d 733, 743-44 (2d Cir. 2011). Thus, in order for the government to obtain a conviction for conspiracy to commit mail fraud and honest mail fraud, it was required to prove, beyond a reasonable doubt, that (1) two or more persons conspired, or agreed, to commit mail fraud or honest services mail fraud; and (2) that Dimora knowingly and voluntarily joined the conspiracy.

Evidence offered at trial, including intercepted telephone conversations between Dimora and Coppers, established that Coppers had sought Dimora's help in obtaining a public position that would entitle her to accrue Ohio Public Employees Retirement System (OPERS) credits. OPERS provided retirement, disability and survivor benefit programs for public employees throughout the State of Ohio, and several witnesses testified that these benefits were quite desirable. The evidence further demonstrated that Dimora took steps to secure employment for Coppers with the Bedford Municipal Court, including placing calls to Bedford Clerk of Courts Tom Day. In exchange for this assistance, Coppers provided Dimora with a hotel room and sexual favors.

Dimora argues that the government failed to establish that material false pretenses, representations or promises were made by any of the alleged co-conspirators. He notes that there was no misrepresentation as to Coppers's experience or qualifications for the position she was seeking. According to Dimora, the only possible omission—that Dimora was romantically involved with Coppers—did not amount to a material misrepresentation. The Court disagrees.

20

"A material misrepresentation or omission is an element of honest services . . . fraud, and in this context a misrepresentation or omission is 'material' if it 'ha[s] the natural tendency to influence or [is] capable of influencing [the public at large and such relevant decisionmakers as are members of the public to] change [their] behavior.' " *United States v. Foxworth*, 334 F. App'x 363, 366 (2d Cir. 2009) (quoting *United States v. Rybicki*, 354 F.3d 124, 147 (2d Cir. 2003) (alterations in original)). Neither Dimora nor Coppers disclosed that Coppers provided Dimora with a hotel room and sexual favors in exchange for his help in securing government employment. That a recommender is receiving sexual favors in exchange for his recommendation would certainly be a fact that would be capable of influencing a decisionmaker in evaluating the weight to give such a recommendation.

Dimora also claims that the government's evidence fell short of establishing that Dimora, or any of his co-conspirators, intended to deprive any victim of money or property. He underscores the fact that there "is no accusation that Mrs. Coppers did not perform the work for which she was hired." (Doc. No. 875 at 7-8, Page ID # 18164-65.) There was, however, substantial evidence that the salary which Coppers demanded, and which she was given upon her hiring, was nearly double the salary earned by her predecessor. (*See* Gov. Ex. 956.) Recorded telephone conversations between Dimora and Coppers, and between Dimora and Day and other public officials, established that Coppers's salary was based upon Coppers's demands, which were conveyed by Dimora, and not based upon the employer's needs.[10] The fraud perpetrated on local

---

[10] On March 24, 2008, Dimora told Day that Coppers said, "She'd like to be somewhere around 40 [$40,000 per year]." (Gov. Exs. 906 and 907.) On April 2, 2008, Coppers told Dimora that she made

government and its citizens harmed these victims because it deprived them of the monies that could have been saved if Coppers had not been hired, or had been hired at a lower salary.

Dimora next challenges the government's proof on the use of the United States mail in furtherance of the conspiracy. Noting that Coppers mailed her OPERS application after she had started working for the Bedford Courts, he argues that the mailing occurred after the end of the alleged fraudulent scheme and was not in furtherance of the charged conspiracy.

"To be part of the execution of the fraud . . . the use of the mails need not be an essential element of the scheme. It is sufficient for the mailing to be incident to an essential part of the scheme, or a step in [the] plot. " *Schmuck v. United States*, 489 U.S. 705, 710 (1989) (internal citations and quotation marks omitted). The evidence offered at trial established that it was one of the central goals of the conspiracy that Coppers obtain public employment with OPERS benefits. State employees Kim Jaworski and Beverlon Hodge both testified that the OPERS form must be completed, mailed and received in Columbus before an employee participates in the OPERS program. Because a central goal of the conspiracy could not be achieved before the OPERS application was mailed, the mailing occurred during the course of the conspiracy.

---

$2,000 per month in her current position, and that she would not be able to take a job making $1,500 a month. Dimora told Coppers that he would call Day, and informed her that they were "three quarters of the way there so I'm gonna make sure we get it." He promised Coppers that he would try to get 85% to 90% of her current salary and OPERS benefits. (Gov. Exs. 910 and 911.) In a subsequent call to Day, Dimora further discussed Coppers's salary demands. (Gov. Ex. 924.)

With respect to the honest services prong of Count 9, Dimora argues that the government's evidence at trial failed to include any "official act."[11] He explains that because he was not a public official in Bedford Heights, his efforts to assist Coppers in securing employment with that government entity cannot be considered official acts. In support of his position, he underscores the fact that he was not involved in the hiring decisions and had "no duties, official or otherwise, related to Bedford Heights." (Doc. No. 875 at 9, Page ID # 18166.).

Witnesses, however, testified to the influence and power Dimora was able to exert over the suburbs in Cuyahoga County. Paul Oyaski testified that cities in the county competed for grant funds, with the commissioners making the final award. Mike Dever testified that the commissioners controlled the contracts for new roads and bridges that ran through the cities located within the county. Significantly, Frank Gambosi testified that the commissioners controlled the funding for the Bedford Courts. In fact, Gambosi testified that the commissioners voted to release money to fund the salary of Tom Day, the decisionmaker who hired Coppers. (*See* Gov. Ex. 962.).

That Dimora, as one of three commissioners, exercised control over matters involving the cities located within the county was also borne out by documents produced at trial. The government introduced several "agenda actions" showing Dimora voted to award county grants to Bedford, Bedford Heights and Solon; some of these actions took place during the time period when Dimora was pushing for a job for Coppers. (*See* Gov. Ex. 400-G.)

---

[11] The Court notes that Dimora was convicted under both theories offered in Count 9: conspiracy to commit mail fraud and conspiracy to commit honest services fraud. (*See* Doc. No. 738, Dimora Verdict Forms.) To

23

Substantial evidence demonstrated that Dimora exercised control over financial matters that affected cities located in Cuyahoga County, including Bedford. This evidence was sufficient to establish that he performed official acts during the conspiracy. The Court cannot, therefore, find that the jury's verdict was against the manifest weight of the evidence.

---

warrant a new trial on this Count, the Court would have to determine that the interests of justice demanded a new trial under both theories.

## 2. The Court's Jury Instruction Properly Defined "Official Act"[12]

In a related argument, defendant Dimora maintains that the Court erred in defining the term "official act" for purposes of the bribery and extortion counts. In its instructions, the Court charged the jury that:

> The term "official act" includes any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit. Official acts include the decisions or actions generally expected of the public official. In addition, "official action" includes the exercise of both formal official influence (such as a public official's votes) and informal official influence (such as a public official's influence on other public officials). The term "official act" does not include actions taken in a personal or non-official capacity, such as actions taken as a political party leader.

(Doc. No. 735-1 at 23-4, Page ID # 16988-89.) Dimora contends that the definition is

---

[12] Regarding the jury instruction drafting process, Dimora's statement that "electronic correspondence . . . was the vehicle by which the parties and the Court communicated throughout the drafting of the jury instructions" is somewhat misleading. (Doc. No. 875 at 11, Page ID # 18168.) Email was not *the* vehicle used but rather only *a* vehicle. But even that clarification might overstate the importance of email: The lion's share of jury instruction discussions were conducted in person. The importance of email communication did grow late in the drafting process, but this was in part because Dimora sent an untimely, eleventh-hour request for changes to the jury instructions electronically.

The Court's amended trial order required the parties to submit proposed jury instructions to the Court by December 12, 201l, including those "instructions proposed by defendants but opposed by plaintiffs." (Doc. No. 329 at 7, Page ID # 3063.) Though the way in which the submitted instructions were to be organized was ultimately changed at the request of the government (*see* Doc. No. 557 and 12/5/2011 non-document order), the deadline remained unaltered. The proposed jury instructions submitted to the Court by that deadline included all of the instructions proposed by the government as well as a number of general objections made by Dimora (as well as co-defendant Gabor) to various portions of those instructions. What they did not include were any alternative instructions proposed by Dimora. (*See* Joint Proposed Jury Instructions, Doc. No. 566 at 146, Page ID # 12052 ("Defendant Dimora will propose additional instructions at a later date when they are complete.").) In fact, Dimora did not propose any written alternative jury instructions until February 17, 2012. (*See* Doc. No. 665.)

After significant edits were made to the submitted instructions, Court drafts were circulated to all parties and a two-day, in-person charging conference was held to discuss any further alterations to the instructions. It was not until after this that Dimora proposed further alternative instructions, via email on Sunday, February 26, 2012. He formally filed proposed instructions later that day. (*See* Doc. No. 696.) Despite the late-in-the-game nature of these proposals, the Court gave them due consideration Sunday evening and incorporated some into its final instructions. (The same was true for other untimely motions and proposed instructions submitted or filed by Dimora throughout the pendency of the case. Recognizing the complexity of the case, the Court took care to give thoughtful consideration to motions and requests

25

unduly expansive, and permitted the jury to convict for seemingly minor and insignificant acts. While Dimora does not state which part of the charge he is challenging, because he advocated for the first and last sentences, it is presumed that he challenges the second and third sentences.

The Court's instruction represented an accurate statement of the law. In *United States v. Birdsall*, 233 U.S. 223, 231 (1914), the Supreme Court held that the acts reached by the federal bribery statute—the current version codified at 18 U.S.C. § 201—extended beyond those that were "prescribed by a written rule." Instead, official action can also include actions of a public official taken by settled practice and established usage. *Id.*; *see United States v. Urciuoli*, 513 F.3d 290, 294 (1st Cir. 2008) (honest services fraud statute prohibits both formal and informal official actions such as informal exercise on bills by legislators and influence-buying short of formal bribes); *United States v. Freeman*, 6 F.3d 586, 593 (9th Cir. 1993) ("[T]he Hobbs Act reaches anyone who actually exercises official powers, regardless of whether those powers were conferred by election, appointment, or some other method."); *see also United States v. Seminerio*, S1 08 Cr. 1238 (NRB), 2010 U.S. Dist. LEXIS 92881, at *18 (S.D.N.Y. Aug. 20, 2010) ("The quid pro quo element of bribery may be satisfied where the payments are made to an official 'to obtain his assistance as a public official in securing favorable action from other public officials, [i.e., where the recipient official] expected to be influenced by the payment to render such assistance.' " (quoting *United States v. Biaggi*, 909 F.2d 662, 683 (2d Cir. 1990))); *United States v. Carter*, 530 F.3d 565, 574 (7th Cir.

---

whenever presented.) A hearing was held the following day (Monday, February 27, 2012), during which counsel were permitted to place any objections to the final version of the Court's instructions on the record.

2008) (the official act need not fall within the specified duties of his position, "[s]o long as the motivation for the payment focuses on the recipient's office" (internal quotation and citation omitted)); *United States v. Bibby*, 752 F.2d 1116, 1127 (6th Cir. 1985) (same).

Moreover, it is well settled that "official acts" are not limited to those acts performed pursuant to the public official's actual power. It is enough that the person for whom the acts are performed has a reasonable expectation that the public official had that power. *See Carter*, 530 F.3d at 574-75 (sufficient that victim reasonably believed that the defendant public official could deliver on his promise); *United States v. Rivera-Rangel*, 396 F.3d 476, 485 (1st Cir. 2005) ("[I]t is irrelevant that Rivera lacked (and that Ventura knew she lacked) the ultimate authority to issue permits or otherwise affect his government business; Rivera, in her official capacity, had the power to facilitate Ventura's government business, and it was that power that Ventura paid her to exercise."); *United States v. Farley*, 2 F.3d 645, 651 n.3 (6th Cir. 1993) (sale of nonexistent honorary deputy sheriff commissions constituted official acts); *United States v. Loftus*, 992 F.2d 793, 796 (8th Cir. 1993) ("Actual authority over the end result— rezoning—is not controlling if Loftus, through his official position, had influence and authority over a means to that end.").

The Fourth Circuit recently upheld an instruction on "official acts" that was substantially similar to the instruction with which Dimora now takes issue. In the Fourth Circuit case, a congressman was charged with federal bribery under 18 U.S.C. § 201. The official acts in question involved the defendant's efforts to obtain business assistance for certain business ventures by "exerting his influence as a Member of

Congress on various U.S. and African government officials and agencies, including, *inter alia*, the Nigerian government . . . ." *United States v. Jefferson*, 634 F. Supp. 2d 595, 597 (E.D. Va. 2008). On appeal, the court upheld the district court's definition of "official acts," which provided that an official action need not be an activity that was explicitly assigned by law, but included activities established by settled practice. The court found that the instruction properly informed the jury that "an official act need not be prescribed by statute, but rather may include acts that a congressman customarily performs, even if the act falls outside the formal legislative process."[13] *United States v. Jefferson*, 674 F.3d 332, 357 (4th Cir. 2012).

The evidence offered at trial demonstrated the power of the county commissioners, not only as to legislative and voting matters, but also as to other activities over which they had considerable influence by virtue of the office. (Gov. Ex. 173.) The charge given represented an accurate statement of the law, and was properly given, in light of the nature of the charges and the evidence offered at trial. Defendant Dimora is not entitled to a new trial on the basis of the Court's jury instructions.

### 3. The Court Properly Supplemented its Instructions

After the jury had retired to deliberate, and after the Court had instructed the jury on the law, but early in the deliberative process, the jury sent the Court a note requesting a definition of "interstate/foreign commerce." (Doc. No. 750, Page ID

---

[13] At trial, defendant Dimora relied on *United States v. Sun-Diamond Growers*, 526 U.S. 398 (1999) and *Valdes v. United States*, 475 F.3d 1319 (DC Cir. 2007) to advance a more restrictive definition of "official acts" for bribery. The Fourth Circuit rejected the argument that these cases required a more limited definition of official act. *Jefferson,* 674 F.3d at 351-54. *See Abbey*, 560 F.3d at 521 ("*Sun-Diamond*, however, is not germane" as a "heightened quid pro quo standard is inapplicable to both the Hobbs Act and

# 17274.) Upon review, the Court determined that it had inadvertently failed to include a definition for the term for purposes of the Hobbs Act and wire fraud counts.[14]

After consulting with counsel, the Court instructed the jury that, in the context of the counts relating to the Hobbs Act:

> Interstate commerce means trade, business or travel between one state of the United States and another state, including the District of Columbia. Foreign commerce means trade, business or travel between any part of the United States and any other country.[15]

With respect to wire fraud and honest services wire fraud, the Court instructed:

> The term "interstate or foreign commerce" includes wire, radio or television communications which crossed a state line.[16]

Following receipt of this supplemental instruction, the jury returned to its deliberations.

Dimora does not contend that these supplemental instructions were inaccurate, or that they were contrary to existing law. Instead, he maintains that, having failed to include these definitions in the initial jury instructions provided by the Court, the only remedy was to declare a mistrial. His conclusion is incorrect.

In *United States v. Fisher*, the Sixth Circuit held that "[w]here there is evidence that the jury is confused over an important legal issue that was not covered by the original jury instructions, a district court abuses its discretion by *not* clarifying the issue." 648 F.3d 442, 447 (6th Cir. 2011) (citing *United States v. Nunez*, 889 F.2d 1564, 1567-69 (6th Cir. 1989) (emphasis added)). Here, the jury was clearly confused by the absence of a definition for the term "interstate/foreign commerce," and the Court did

---

18 U.S.C. § 666.").
[14] The defense stipulated to the interstate commerce element for purposes of the RICO conspiracy.
[15] *See* 18 U.S.C. § 1951(b)(3); Eleventh Circuit Pattern Instruction 70.0; *United States v. Chance*, 306 F.3d 356, 373-78 (6th Cir. 2000); *United States v. Turner*, 272 F.3d 380, 384-88 (6th Cir. 2001).
[16] Sixth Circuit Pattern Instruction § 10.02(2)(G).

nothing more than address the confusion by clarifying its instructions. *See United States v. Brown*, 54 F. App'x 201, 210 (6th Cir. 2002) ("When a jury seeks clarification of particular issues . . . the judge should clear away its difficulties 'with concrete accuracy.' " (quoting *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946))); *cf. Nunez*, 889 F.2d at 1567-69 (trial court erred in failing to provide a supplemental jury instruction where the original instruction did not address a key legal issue, and the jury expressed confusion). In answering the jury's question, the Court did not "stray[] beyond the purpose of jury instructions by answering  jury questions that seek collateral or inappropriate advice." *Fisher*, 648 F.3d at 447 (citing *United States v. Combs*, 33 F.3d 667, 670 (6th Cir. 1994)); *see United States v. Rowan*, 518 F.2d 685, 693 (6th Cir.) ("In response to a jury's question after it has begun to deliberate . . . a trial judge may and should make clear the law the jury is bound to apply, though it is not his province to advise the jury of collateral aspects of its decision."), *cert. denied*, *Jackson v. United States*, 423 U.S. 949 (1975). The Court's jury instructions, including its supplemental instructions, were appropriate, and do not provide grounds for a new trial.

### 4. All Evidence Seized from Dimora's Residence and Office was Legally Obtained

In pretrial motions, defendant Dimora sought to suppress all evidence seized during the July 2008 searches of his home and office owing to what he perceived as insufficiencies in the warrants and the affidavits offered in support of the search warrants. (Doc. No. 422.) The Court denied the motion in a comprehensive opinion and order dated December 28, 2011. (Doc. No. 592.) Dimora, again, challenges the admission

of evidence seized during the aforementioned searches, raising the same arguments that this Court previously considered and rejected. Consequently, the Court, again, rejects these arguments, and relies upon its previously ruling. (*See* Doc. No. 592 at 2-24, Page ID # 12554-76.)

### 5. The Court Provided Dimora Sufficient Opportunity to Present a Defense

Near the end of the trial, defendant Dimora filed a motion for an order requiring the government to produce hard drives owned by government witness Steve Pumper, and allegedly seized by the FBI. (Doc. No. 695.) During his testimony, Pumper stated that he kept a Quicken database and several financial programs on numerous computers. He testified that, after he was approached by the FBI on May 23, 2008, he attempted to delete these items from his computers, before dumping one computer in Lake Erie and throwing another computer in a dumpster. He further testified that when he deleted the information from his laptop, he transferred it to a flash drive so that he could reconstruct his financial records. According to Pumper, his efforts to purge these files from his computers were only partially successfully, as a fragment of one file remained. This fragment included a spreadsheet, introduced as government exhibit 1831, which showed a $2,000 payment to defendant Dimora. Defense counsel cross-examined Pumper at length on this exhibit and his attempts to destroy evidence. Counsel was also given wide latitude to explore bias on cross, including such topics as: Pumper's plea agreement, his belief regarding the type of sentence he could have received had he not entered into a plea and cooperated with the government, and his drinking problem.

31

More than two weeks after Pumper completed his testimony, and after the government rested, Dimora moved to compel the production of the Pumper hard drives still in existence.[17] In his motion, filed February 24, 2012, Dimora postulated that Pumper's testimony that he attempted to delete entire Quicken accounts with only a small fragment remaining lacked plausibility. Inspection of the remaining hard drives, Dimora claimed, would enable the defense to further challenge Pumper's credibility. Attached to the motion was the affidavit of Damon Hacker, a defense expert, who opined that "[a]ccess to the hard drives still in existence would provide the information necessary to determine whether a series of payments were made to Mr. Dimora." (D. Hacker Affidavit, Doc. No. 695-1 at 2, Page ID # 13764.)

In order to place defendant Dimora's request in the proper context, it is necessary to review the series of events leading up to defense counsel's filing of the motion to compel, and the Court's ultimate denial of this untimely motion. On February 22, 2011, the government produced its discovery to defendant Dimora. An itemized list of material not included in discovery but available for review accompanied the disclosure. This list specifically identified the flash drive, which contained the spreadsheet that became government exhibit 1831, from Pumper's residence as available for review. While defense counsel met with FBI Special Agents Michael Massie and

---

[17] The formal motion was filed on February 24, 2012. Dimora's counsel first brought this issue to the Court's attention on February 21, 2012 at a side bar conference. (*See* Doc. No. 875-3, Page ID # 18204.)

Christine Oliver on October 20, 2011 to discuss certain bulky items identified on the list, counsel did not ask to review Pumper's flash drive.

On December 16, 2011, the government delivered copies of its trial exhibits to Dimora's counsel. Included in these exhibits was government exhibit 1831. On January 12, 2012, the jury was sworn, and the government produced the remaining FBI 302 summaries that had not previously been disclosed. Included in this production were the summaries of interviews with Pumper in which he discussed the various computers he owned, his efforts to delete information from these computers, and the destruction of two of these computers. Pumper's testimony began on February 7, 2012, and concluded on February 9, 2012. On direct, he gave testimony as to his efforts to destroy any evidence of payments to Dimora, and how the spreadsheet containing the one $2,000 payment to Dimora survived. As previously noted, Pumper was cross-examined, at length, regarding government exhibit 1831.

On February 16, 2012, at a side bar conference, defense counsel asked the Court for an order compelling the government to produce the flash drive. The Court directed the government to immediately investigate whether the flash drive could be imaged. In the interim, on February 20, 2012, Dimora moved for a two day recess of the trial "so that witnesses can be scheduled and Mr. Dimora be permitted to present his case

in chief."[18] (Doc. No. 676 at 2, Page ID # 13737.) The motion made no reference to any discovery issues involving Pumper or his computer hard drives. The following day (February 21, 2012), the Court ordered the government to produce the flash drive image, and the government produced it by the end of the day.

It was not until a late night telephonic conference call with counsel on February 23, 2012 that defense counsel raised, for the first time, their desire to have a previously unidentified expert view multiple hard drives from computers owned by Pumper. The Court adjourned testimony on February 24, 2012 in order to conduct a hearing on this discovery request. At the conclusion of the hearing, the Court determined that it would not (and in the case of at least two of the hard drives, could not[19]) compel the government to produce the requested hard drives.

The Court placed on the record its reasons for denying Dimora's discovery request. At the outset, the Court found that the request was untimely. Defense counsel knew as early as the start of trial in January when it received Pumper's 302 summaries that he had attempted to destroy evidence after the FBI approached him. Yet counsel chose to wait until two weeks after Pumper had concluded his testimony to seek the hard drives. In addition, the Court determined that the request was nothing more than a fishing

---

[18] While Dimora claimed that this motion was precipitated by the fact that the government had unexpectedly ended its case a couple of weeks early, the reality is that defense counsel benefitted from the government's early conclusion of its case-in-chief. Testimony in the government's case-in-chief concluded Thursday, February 16, 2012. Due to a protracted hearing relative to the admission of exhibits, the government was unable to rest until Friday, February 17, 2012. (The protracted nature of the hearing was the result of Dimora positing largely unsuccessful challenges to the admission of numerous government exhibits.) The trial did not resume until Tuesday, February 21, 2012, due to the intervening federal holiday. Defense counsel thus had the option of using the long weekend for further preparation—a benefit which they would not have enjoyed had the government rested at a later date.

[19] Dimora requested that the Court order the government to turn over three hard drives, two of which were not even in the government's possession. Even regarding the hard drive in the government's possession, Dimora sought access to files which were beyond the scope of the government's warrant to access the

34

expedition, noting that Dimora's expert could not say that any information that was not already on the flash drive would exist on the hard drives.[20] While the expert testified that there was evidence that the remaining files had been updated after the date the flash drive was created, he admitted that the Quicken program contained an automatic update feature that could account for those updates. Further, the request to view all information on the sole hard drive in the possession of the government was overly broad as it went well beyond the scope of the search warrant under which the government seized Pumper's laptop.[21] Balanced against the remote chance that the discovery would yield impeachment material was the fact that the discovery would result in another unnecessary delay in the proceedings.[22] (Doc. No. 894 at 59-65, Page ID # 18524-30.)

   A number of rules and principles guided the Court's determination of this eleventh-hour discovery request. The Court began with the discretion it is afforded over the administration of discovery in a criminal case. Rule 16(d) of the Federal Rules of

---

drive.

[20] Defendant's expert spoke only in terms of guesses and possibilities. Damon testified that: "there's at least one, if not two locations it *may* still be in existence." He further testified that "there *may have been* other copies . . . ," and that "analyzing the laptop and/or other devices that *may* exist *could* provide further evidence . . . ." (Doc. No. 894 at 7-8, Page ID # 18472-73 (emphasis added).)

[21] At the hearing, and at the telephone conference that preceded the hearing, the Court attempted to determine whether it would be possible to image portions of the hard drive without exceeding the scope of the search warrant. Defense counsel, however, foreclosed this possibility by refusing to permit Dimora's expert to speak with the FBI computer forensic expert to determine if such middle ground could be found.

[22] The Court explained that defendants had engaged in a pattern of dilatory behavior. After the Court had granted, as requested by defense counsel, two generous pre-trial extensions in this matter (but refused to grant a third, multi-month extension when it ruled that it would not consolidate this matter with a second, more recently filed action against Dimora), counsel for Dimora sought to further delay the proceedings by filing an unwarranted notice of appeal (Doc. No. 603) and by seeking a writ of prohibition from the Court of Appeals. While the Sixth Circuit acted swiftly to deny the writ, the start of the trial was delayed nonetheless by several days. These delay tactics culminated in defense counsel requesting a two day recess in the middle of the trial, and refusing to produce more than one or two brief witnesses per day during defendant Dimora's case-in-chief. The end result was that what should have been one-and-one-half days of testimony took a week to introduce. In the end, then, Dimora's counsel actually received even more time to prepare than the two days they had requested. Permitting the defense to start from scratch with discovery on this topic would have added further unwarranted and unnecessary delay to the proceedings.

Criminal Procedure provides that "[a]t any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief." Fed. R. Crim. P. 16(d). Likewise, Rule 611(a) of the Federal Rules of Evidence provides, in relevant part that, "The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to . . . avoid wasting time." Fed. R. Evid. 611(a)(2). Finally, Rule 403 permits a court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

With respect to the question of timeliness, Dimora now argues that his counsel was not dilatory in seeking this discovery, citing the extensive discovery produced by the government and the fact that the decision had to be made during trial. He also claims that it was not apparent until Pumper testified that the hard drives might contain additional information, and that, once Pumper's testimony did raise a red flag, counsel worked diligently to inquire into possible defense strategies. Yet Dimora's expert witness testified that he was not even retained until 48 hours before the Court held a hearing on the matter. (Doc. No. 894, Page ID # 18495.) At a minimum, the request should have been made immediately after Pumper testified and the need for such discovery became apparent.[23] Dimora having failed to make the request then, the Court

---

[23] Because the Court finds that Dimora's request was untimely as of February 9, 2012, the date that Pumper concluded his testimony, it is not necessary for the Court to consider the earlier-produced FBI 302 summaries of Pumper's interviews. It, therefore, denies Dimora's request to file the 302s under seal.

again finds that the request was untimely.

Ultimately, the Court finds that Dimora has not demonstrated that the interests of justice warrant a new trial. The Court exercised its discretion to restrict discovery to avoid further delays where the untimely discovery request was unlikely to yield discoverable information. That the document in question was only one of hundreds of documents offered at trial, that it went solely to the issue of credibility of one witness, that defense counsel cross-examined Pumper on the document at length, and that defendants were otherwise afforded considerable latitude in exploring Pumper's biases all weighed heavily against allowing such discovery.

### 6. The Court Properly Excluded Financial Disclosure Forms

The Court finds it necessary to write on one final evidentiary issue in order to more fully preserve its ruling at trial. In a pretrial motion *in limine*, the government moved to prevent defendant Dimora from introducing evidence of ethical rules that govern public officials in the State of Ohio. (*See* Doc. No. 532.) Dimora opposed the motion, suggesting that he might "touch upon" certain ethics and reporting requirements by offering the financial disclosure forms that he submitted to the Ohio Ethics Commission. Because Dimora failed to identify either the purpose for offering the forms, or the manner and means in which these documents would be offered, the Court ruled that defense counsel should approach the Court before offering such evidence at

trial.[24] (Doc. No. 602 at 40-41, Page ID # 12711-12.)

In response to the Court's *in limine* ruling, and without citing any supporting authority, Dimora filed a supplement explaining his theory for offering the financial disclosure forms:

> Just as the Government will argue that any attempt to conceal things of value from the alleged co-conspirators is evidence of criminal intent, Mr. Dimora should be able to argue that the disclosure of things of value is relevant to refuting intent.

(Doc. No. 629 at 3, Page ID # 12922.) The government opposed any effort to introduce these documents.

The Court addressed the issues raised by the possible introduction of this evidence on multiple occasions throughout the trial. In a telephone conference on January 11, 2012, the Court expressed its concern that Dimora's statements contained within the forms could be hearsay, and advised defense counsel that the forms must be admitted through a competent witness. In addition, because the FBI case agents who testified at trial had no personal knowledge of these forms, the Court held that Dimora could not introduce the forms through these witnesses. The following day (January 12, 2012, the first day of jury selection), the Court (at defense counsel's request) revisited its ruling with counsel at sidebar. Because defense counsel represented that there might be circumstances under which a government agent may be able to testify as to the financial disclosure forms, the Court revised its ruling to permit the defense to offer the disclosure forms through *any* competent witness, but held that counsel should approach the Court

---

[24] The Court also ruled, however, that defendant Dimora would be permitted to offer evidence that the meals and other things of value Dimora received from contractors were given out of friendship, and were not given in exchange for official action. The "friendship" theory represented the heart and soul of Dimora's defense. (*See* Doc. No. 602 at 40, Page ID # 12711.)

first before attempting to lay a foundation for the introduction of these documents. *See* Fed. R. Evid. 611(a).

Defense counsel did not attempt to offer the disclosure forms through any government witness, and did not raise the issue again until after the government rested. During defendant Dimora's case-in-chief, defense counsel approached the Court and proposed that defendant Dimora would offer the financial disclosure forms through a representative of the Ohio Ethics Commission, who would be called for the sole purpose of authenticating the forms.[25] The government opposed the proffer on the ground that the statements contained in the disclosure forms were hearsay, and that the state ethics representative had no personal knowledge about the content of the forms.

Defense counsel insisted, however, that the statements were not inadmissible as hearsay because they were not being offered for the truth of the matter asserted. "Instead, they demonstrate Mr. Dimora's willingness to disclose the names of individuals included in the reports." (Doc. No. 681 at 2, Page ID # 13744.) The Court conducted a hearing on this and other evidentiary matters on February 24, 2012. During the hearing, defense counsel reiterated its position that the statements contained in the disclosure forms were not hearsay. (Doc. No. 894 at 75, Page ID # 18540.) At the conclusion of the hearing, the Court ruled that the statements were hearsay, and that the testimony of the Ohio Ethics Commission representative, which would have been limited to the issue of authenticity, would not cure the hearsay. While it still did not rule out the

---

[25] In connection with this request, Dimora also filed a motion to admit the financial disclosure forms. (Doc No. 681.) In this motion, Dimora stated that "[t]hese financial disclosure forms are being offered to refute the Government's continuous claims that Mr. Dimora and others intended to hide their associations." (*Id.* at 1, Page ID # 13743.)

possibility that a competent witness might cure the hearsay problem, it further offered its concern that the admission of the forms would likely confuse the jury. (*Id.* at 78-79, Page ID # 18543-44.)

        With respect to the question of hearsay, the Court found guidance in the Sixth Circuit's decision in *United States v. Hatchett*, 918 F.2d 631 (6th Cir. 1990). There, the defendant, who did not testify at trial, was charged with four misdemeanor counts of willful failure to pay federal income taxes. In support of his advice-of-counsel defense, the defendant attempted to offer the testimony of his tax counsel, who would testify about the conversations he had with the defendant and the advice counsel gave the defendant regarding his tax troubles. On appeal, Hatchett argued that the statements he made to his tax attorney were "not offered to prove the truth of the content of Hatchett's statements about his tax situation, but rather to prove that Hatchett made a full disclosure of all pertinent facts to [his tax legal advisor]." *Id.* at 638. The court cited with favor the district court's ruling that

> although attorney Gettleson's testimony may have been admissible for the limited purpose of showing defendant made a disclosure, it was not admissible to prove the facts constituting the disclosure. The advise [sic] of counsel defense requires not only evidence of disclosure, but also evidence that the facts disclosed are relevant . . . . The relevance of the facts disclosed could only have been determined *had the jury considered as truthful* the out-of-court statement which attorney Gettleson was asked to recite.

*Id.* (emphasis added by the Sixth Circuit). Because the testimony was "offered to prove the truth of Hatchett's out-of-court disclosures, and in the absence of a proffer by Hatchett's counsel of other evidence that could prove the truth of the disclosures," the Sixth Circuit ruled that the trial court properly excluded the proffered testimony. *Id.*

Similarly here, in order to show "Mr. Dimora's willingness to disclose" his relationship with contractors and certain alleged co-conspirators, it would have been necessary to offer more than evidence that he filed disclosure forms, but also the facts disclosed (i.e., that he had received things of value from contractors and co-conspirators and had not received other things of value not listed on the forms). Without some evidence to prove the truth of the disclosures, the testimony would have been rank hearsay.[26]

While making no final determination on the admissibility of such evidence through a competent witness, the Court also expressed its concern that such evidence would likely cause confusion, requiring a mini-trial on the disclosure laws governing elected officials in the State of Ohio. (Doc. No. 894 at 84-86, Page ID # 18549-51.) The Court now expounds upon this conclusion.

As the Court noted in its initial *in limine* ruling, any evidence relating to financial disclosures would likely open the door to evidence of ethics reporting requirements. The government indicated that, if Dimora offered the disclosure forms, it would seek to offer testimony from the Director of the Ohio Ethics Commission on the

---

[26] Of course, the circumstances surrounding Dimora's motion to admit are distinguishable from pre-*Skilling* cases where courts have held that financial disclosure forms were admissible to demonstrate *a failure* to disclose financial relationships because such evidence showed intent to conceal. *See, e.g., United States v. Harvey*, 532 F.3d 326, 334 (4th Cir. 2008); *United States v. Woodward*, 149 F.3d 46, 62-63 (1st Cir. 1998). There were no hearsay concerns in those cases inasmuch as the failure to report was a fact and not an out-of-court statement. Of course had these forms been treated as out-of-court statements of the defendant, they would have been admissible under Rule 801(d)(2). However, while Rule 801(d)(2) permits the introduction of a defendant's statements as non-hearsay admissions of a party opponent, "[t]he rules [of evidence] do not . . . provide an exception for self-serving, exculpatory statements made by a party which are being sought for admission by that same party." *United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996); *see United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005) (emphasis in original) ("Rule 802(d)(2) . . . does not extend to a party's attempt to introduce his or her *own* statements through the testimony of other witnesses.").

laws relating to financial disclosures, in an effort to show that Dimora did not satisfy his reporting requirements.[27] Indeed, the focus of the trial would have shifted from the charges against the defendants to the rules, regulations, and penalties surrounding Ohio disclosure laws, and how these laws differed from criminal laws relating to fraud and conspiracy.

A review of Dimora's disclosure forms illustrates the point. Question No. 3 on the form directed the elected official to report "any source of payment of expenses for meals, food or beverages, received *in connection with your official duties* . . . ." (Def. Dimora's Ex. F3 (emphasis added).) While Dimora claims that the fact that he listed the names of certain co-conspirators in response to Question No. 3 is evidence of his willingness to reveal these connections, the fact remains that free dinners and other things of value offered by contractors seeking county projects would not have been expenses legitimately received "in connection with [Dimora's] official duties." Not only would such a disclosure have to be explained in the context of the law relating to the duties of a Commissioner, it would also have had the effect of implicating Dimora in wrongdoing by virtue of his arguably inappropriate disclosure. The only possible result would have been a thoroughly confused jury.

A further source of confusion would have been the fact that instructions contained in the forms themselves appear to provide the Ohio Ethics Commission's endorsement of the disclosure process and of the forms completed by any public official.

---

[27] Specifically, government counsel proffered that the director would testify that all income from any source, including the value of meals purchased for a public official, had to be reported as income. The government would have then argued that, while Dimora's disclosure forms listed certain items as "expenses," he did not report these "expenses" under the "income" section of the forms.

In the instructions portion of certain forms, it explains that:

> Filing a financial disclosure statement is required by law. Disclosure assists public servants in positions of public trust with identifying potential conflicts of interest between their public responsibilities and private pursuits. *Disclosure also increases public awareness of potential conflicts and reassures Ohio citizens in the integrity of government.* Please note that disclosure itself does not constitute compliance; it does not replace Ethics Law restrictions on public transactions or improper gifts.

(Emphasis added). While the statement warns that disclosure does not equate with compliance, it suggests that disclosure equates with transparency. In doing so, such a statement would have the effect of usurping the jury's province, by suggesting that the Ohio Ethics Commission had already determined that Dimora, by virtue of his disclosure, lacked the intent to conceal the fraud.

A final concern is the fact that the statements are made under penalty of perjury. That these sworn statements are not subject to cross-examination would confuse the jury as to the weight to give these untested statements, and unfairly prejudice the government. Balanced against these serious concerns of prejudice and confusion is the reality that the evidence would have been of limited probative value inasmuch as the government's own case established that Dimora did not hide his associations with his co-conspirators. The evidence offered at trial demonstrated that Dimora was, in fact, often seen in public dining with contractors who were seeking county work. Ultimately, any limited probative value would have been "substantially outweighed by . . . unfair prejudice, confusing the issues, [and] misleading the jury . . . ." Fed. R. Evid. 403.

### 7. Defendant Dimora's Request to Modify the Protective Order

Dimora also seeks an order modifying the protective order as it relates to

Jencks Act and *Giglio* material provided to trial counsel prior to and during trial. (Doc. No. 782.) Specifically, Dimora requests that his counsel be permitted to retain Jencks Act and *Giglio* discovery, and that his appellate counsel be allowed access to this evidence. The government opposes the motion. (Doc. No. 859.).

The protective order that governs this case provides, in relevant part:

> At the conclusion of trial, lead counsel shall either (1) return all of the material in a sealed envelope for destruction by the FBI in the presence of defense counsel; (2) destroy the material in the presence of the FBI; or (3) provide the Government with a written certification that original and all copies have been destroyed. The Government shall file under seal an electronic version of all material produced under this order to the Court.

(Doc. No. 588 at ¶ 5, Page ID # 12524.) Counsel for each defendant advised the government that they would retain the documents until post-trial motion practice was completed, and the government appears to have consented to this "request."

In support of his motion, Dimora argues that his appellate counsel will need access to this material because the issue of the timing of production of this evidence will be raised on appeal. He posits that "the content of the documents, read in conjunction with the testimony of various witnesses, will be essential to establishing whether there was a prejudicial effect with regard to the timing of the release of the documents." (Doc. No. 782 at 2, Page ID # 17630.) As a second basis, he claims that the material in question will be used in a second trial (Case No. 1:11CR491), and it would be wasteful and unnecessary to require him to copy the material twice.

The second justification for his request, the need to prepare for a subsequent trial, is moot because defendant Dimora was recently dismissed from case number 1:11CR491. As to the first rationale, the government insists that Dimora's post-

trial needs are outweighed by the government's "interest in preserving ongoing criminal investigations and protecting the privacy of uncharged individuals." (Doc. No. 859 at 2, Page ID # 17999.).

Now that the Court has ruled on post-trial motions, the Court agrees that the government's need to protect its on-going investigations substantially outweighs Dimora's need to retain this information. As the government notes, the protective order requires the government to preserve this discovery electronically and file it with the Court, under seal. Should appellate counsel need access to this electronically saved information, it can petition the Court for access. Dimora's motion to modify the protective order is denied.

## IV. Conclusion

Viewing the evidence in a light most favorable to the government, a rational juror could have found, beyond a reasonable doubt, the essential elements of each crime for which Dimora was convicted. As such, with the exception of Count 10 as set forth above, defendant Dimora is not entitled to a judgment of acquittal. In addition, the guilty verdicts are not against the manifest weight of the evidence, taking into consideration the nature and the strength of all of the evidence and the credibility of the witnesses, and justice does not otherwise require a new trial. His motion for a judgment

of acquittal is denied, with the exception that the Court hereby dismisses Count 10.

Dimora's motion for a new trial is denied in its entirety.

**IT IS SO ORDERED**.

Dated: July 18, 2012

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**