## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:10CR387 |
| | ) | |
| Plaintiff, | ) | JUDGE: SARA LIOI |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES C. DIMORA, | ) | GOVERNMENT'S OPPOSITION TO |
| | ) | DEFENDANT DIMORA'S MOTION TO |
| Defendant. | ) | VACATE AND SET ASIDE JUDGMENT |
| | ) | OF CONVICTION UNDER |
| | ) | 28 U.S.C. § 2255 |

Now comes the United States of America, by and through counsel, Daniel L. Lemisch,

Acting United States Attorney, and Ann C. Rowland and Antoinette T. Bacon, Assistant United

States Attorneys, and opposes Defendant James C. Dimora's Motion to Vacate and Set Aside

Judgment of Conviction under 28 U.S.C. § 2255 for the reasons set forth in the attached Brief.

Respectfully submitted,

JEFFERSON B. SESSIONS III
Attorney General of the United States

DANIEL L. LEMISCH
Acting United States Attorney
Eastern District of Michigan

By:   /s/ Ann C. Rowland
Ann C. Rowland (OH: 0015156)
Antoinette T. Bacon (DC: 474696)
Assistant United States Attorneys
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3847
(216) 522-2403 (facsimile)
Ann.Rowland@usdoj.gov
Antoinette.T.Bacon@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of December 2017 a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's system.

/s/ Ann C. Rowland
Ann C. Rowland
Assistant U.S. Attorney

# TABLE OF CONTENTS

Table of Authorities ................................................................................................. 9

Introduction ............................................................................................................. 12

Law and Argument .................................................................................................. 13

The Standard of Review .......................................................................................... 13

    Generally ............................................................................................................ 13

    Petitioner Did Not Raise McDonnell Error On Appeal .................................... 14

    Procedural Default ............................................................................................. 15

        Cause-and-Prejudice ..................................................................................... 16

        Actual Innocence .......................................................................................... 17

    If This Court Concludes Petitioner Did Raise McDonnell Error On Appeal, He Did So Only On Counts 9, 11, and 12-13 ............................................................ 17

    The Harmless Error Standard ............................................................................ 18

    Conclusion ......................................................................................................... 20

The McDonnell Decision ......................................................................................... 20

    Identification Requirement ................................................................................ 21

    Performance Requirement .................................................................................. 22

    Cases Decided After McDonnell ....................................................................... 24

McDonnell Has No Application To Schemes Not Requiring An Official Act ............................ 30

    The Money and Property Mail Fraud and Wire Fraud Conspiracies Are Not Affected By McDonnell (Counts 2, 9, 16 and 32) ............................................. 30

    McDonnell Has No Application to the § 666 Convictions (Cts 4, 5, 6, 17, 18 & 19) .......... 32

    McDonnell Has No Impact on the State Bribery Predicates of the Rico Count .................. 34

In Closing Argument, Petitioner, Under The Jury Instructions This Court Gave, Was Able To, and Did Make, His Arguments About Meetings and Phone Calls Not Constituting Official Acts ........................................................................................................ 34

Scheme-By-Scheme Analysis of Official Acts ............................................................ 41

Petitioner's Official Powers In General ............................................................. 41

Introduction To Scheme-By-Scheme Analysis .................................................. 46

RICO (Count 1)................................................................................................... 47

Agreeing That Russo Employ Gabor for a Partially No-Show County Job in Exchange for $5,000 In Cash ........................................................................... 47

Agreeing That Gabor Would Bribe A County Domestic Relations Judge ...................... 48

Voting for County Contracts for Benefit of Melaragno and Vandra Brothers ................ 49

Advising or Pressuring City Officials to Expedite Execution of Taxiway Contract at the Airport.................................................................................................................. 49

Agreeing That Petitioner and Russo Would Accept Bribes in Exchange for Russo Hiring Mohammad ..................................................................................................... 49

Agreeing That Russo Would Hire Gallucci in Exchange for Dropping Out of the Auditor's Race (Counts 31 and 32) ...................................................................... 50

Pulling the Towpath Vote from the Agenda .................................................... 51

Voting on, and Taking Action on Qualifying Steps to, Fund Alternatives Agency (Counts 2 and 3) ..................................................................................... 52

Background ................................................................................................. 52

Official Acts................................................................................................ 54

Kleem And His Companies (Counts 4, 5, 6 and 7)............................................ 58

Agreeing that Russo Hire Kleem's Cousin ..................................................... 59

Voting for the Coe Lake Grant ..................................................................... 59

Voting on Juvenile Justice Center Contracts and Taking Action on Qualifying Steps .... 61

Background ........................................................................................... 61

Official Acts ............................................................................................................ 62

Voting on the Snow Road Contract and Advising Or Pressuring The Engineer's Office to Assign A Particular Inspector for Snow Road ..................................................... 64

Advising or Pressuring the Cuyahoga County Board of Health to Resolve A Smoking Violation ................................................................................................................... 66

Voting on Contracts for First Energy .................................................................................. 67

Advising or Pressuring City of Cleveland Officials To Expedite Execution of Taxiway Contract ................................................................................................................... 69

Stonebridge and the Engineer's Office: Voting to Make Kleiber the Sanitary Engineer, Voting for the Stonebridge Lease, Voting on Collective Bargaining Agreement for the Engineers Office and Other Labor Issues and Voting to Establish a County Sewer District in Parma (Count 8) .................................................................................................... 71

   Background ........................................................................................................... 71

   Official Acts ......................................................................................................... 75

Pressuring or Advising Municipal Officials to Hire Gina Coopers (Count 9) .................... 78

Valentin and Salva Stone (Count 11) ................................................................................. 82

   Pressuring or Advising Federal Officials to Issue A Visa ................................. 83

   Voting To Approve Funds For Employment Of Valentin's Daughter In The Auditor's Office ............................................................................................................... 83

Zavarella and Zavarella Brothers (Counts 12 and 13) ........................................................ 84

   Hiring Zavarella's Daughter at the County ....................................................... 84

   Pressuring or Advising the Parma School Board to Hire Zavarella's Daughter as a Substitute Teacher ......................................................................................... 84

   Pressuring or Advising the Bedford Schools to Hire Zavarella's Daughter .................... 85

   Pressuring Or Advising Russo to Hire Lillian Trovato ................................... 86

   Taking Action on Qualifying Steps on the Eastside Neighborhood  Service Center Contract ........................................................................................................... 86

Neiheiser (Counts 14, 15 And 16) ..................................................................................... 88

Advising or Pressuring the Mayor of Lakewood to Enter Into Contract Re: the Lakewood Ice Rink ........................................................................................................ 88

Voting On JJC Contracts and Taking Action on Qualifying Steps ................................. 91

Pumper (Counts 17-21) ........................................................................................... 92

DAS................................................................................................................. 93

Signing County Resolution for Courthouse Square Contract ................................... 93

Pressuring or Advising Federal Officials to Expedite HUD Financing for Neal and Boulevard Terrace......................................................................................... 94

Voting for County Purchase of Oppmann Parking Garage .................................... 95

Pressuring or Advising Common Pleas Judge to Schedule  Settlement Conference and to Settle DAS Litigation with the Cleveland Browns ...................................... 95

Voting to Approve a $1.1 Million County Loan to K & D for 668 Euclid Development .................................................................................................. 97

Greensource ..................................................................................................... 97

Voting, and Taking Action on Qualifying Steps Toward Changing Bid Specifications on JJC Contract and Other County Projects..................................... 97

Voting to Approve Two County Loans for 1170 Ivanhoe LLC, a Pumper Company that Housed Greensource ................................................................................ 100

Pressuring or Advising County Officials to Expedite Closing the Ivanhoe Loans............................................................................................................ 101

Parkview/Allerton Loans ..................................................................................... 102

Voting for $1 Million Loan for Parkview Rehabilitation .................................... 102

Pressuring or Advising County Officials to Extend the Parkview Loan ............ 102

Pressuring or Advising Children's Services to Expedite Checking on Pumper's Children.......................................................................................................... 104

Petitioner's Arguments ................................................................................... 105

Melaragno and Vandra Brothers (Counts 22 and 23) ....................................... 105

Voting for $1.3 Million County Contract to Vandra Brothers, and for Two Amendments .................................................................................................... 106

Voting for $6 Million County Contract to Vandra Brothers............................................ 106

Voting for Employment of Melaragno's Relative at the County Sanitary Engineer's Office ......................................................................................................................... 106

Voting for $337,000 County Contract to Vandra Brothers ............................................ 106

Voting for $5 Million County Contract to Vandra Brothers .......................................... 107

Rybak and the Plumbers Local (Counts 24 And 25) ....................................................... 107

Voting for Linda Rybak Raise ...................................................................................... 107

Advising or Pressuring County Employees to Hire Dana Rybak for Summer Job ........ 109

Voting to Employ Two Plumbers .................................................................................. 110

Randazzo and FNA (Counts 26 and 27) ............................................................................ 111

Voting for County Contract with FNA for Deferred Compensation Product................. 112

Taking Action on Qualifying Steps Toward Sewer District Officials Contracting with FNA.............................................................................................................................. 113

Taking Actions on Qualifying Steps Toward Beachwood Officials Contracting with FNA.............................................................................................................................. 114

Petitioner's Allegations Re: Government Counsel's Closing Argument ........................... 115

The Jury Could Not Have Convicted on Acts Petitioner Might Have Performed As Democratic Party Chair........................................................................................................ 116

There was Overwhelming Evidence Linking the Things of Value Petitioner Received to Official Acts He Performed .................................................................................................. 116

This Court Need Not Address the Tax Counts ................................................................... 122

This Court's Ruling Excluding the Ethics Reports is Not Reviewable on Collateral Attack
Five Years After Trial, And, As the Sixth Circuit Found on Direct Appeal, Did Not Alter
the Verdicts ...................................................................................................................... 122

This Court Should Deny Petitioner's Motion Without A Hearing ........................................... 128

Conclusion ............................................................................................................................... 128

# TABLE OF AUTHORITIES

## Federal Cases

Bousley v. United States, 523 U.S. 614 (1998) ........................................................ 16, 17

Brecht v. Abrahamson, 507 U.S. 619 (1993).......................................................... 13, 18

Chapman v. California, 386 U.S. 18 (1967) ................................................................. 18

Davis v. Ayala, 135 S. Ct. 2187 (2015) ....................................... 12, 18, 20, 40, 129

Davis v. United States, 417 U.S. 333 (1974) ............................................................... 13

Dobbs v. Kemp, 790 F.2d 1499 (11th Cir. 1986) ...................................................... 115

Estelle v. McGuire, 502 U.S. 62 (1991) ...................................................................... 18

Evans v. United States, 504 U.S. 255 (1992)................................................ 23, 45, 62, 117

Griffin v. United States, 330 F.3d 733 (6th Cir. 2003)................................................. 13

Hedgpeth v. Pulido, 555 U.S. 57 (2008)...................................................................... 32

Hill v. United States, No. 3:15CV725-M, 2016 U.S. Dist. LEXIS 165084
    (N.D. Tex. Nov. 3, 2016)........................................................................................ 51

Kotteakos v. United States, 328 U.S. 750 (1946) ........................................... 18, 40, 129

McCormick v. United States, 500 U.S. 257 (1991) .................................................... 117

McDonnell v. United States, 136 S. Ct. 2355 (2016) ........................................... passim

Murr v. United States, 200 F.3d 895 (6th Cir. 2000)...................................... 18, 20, 26

Neder v. United States, 527 U.S. 1 (1999)............................................................ 18, 26

Pope v. Illinois, 481 U.S. 497 (1987) ......................................................................... 19

Reed v. Ross, 468 U.S. 1 (1984)................................................................................. 16

Richardson v. United States, 526 U.S. 813 (1999) ...................................................... 18

Rose v. Clark, 478 U.S. 570 (1986)............................................................................ 19

Salinas v. United States, 522 U.S. 52 (1997)................................................... 47,30, 47

Skilling v. United States, 561 U.S. 358 (2010)............................................................ 31

United States v. Abbey, 560 F.3d 513 (6th Cir. 2009) .................................................. 33

United States v. Blackwell, 459 F.3d 739 (6th Cir. 2006) ........................................... 128

United States v. Boyland, 862 F.3d 279 (2d Cir. 2017) .................................................. 33

United States v. Clarke, 842 F.3d 288 (4th Cir. 2016) ................................................... 40

United States v. Delgado, 401 F.3d 290 (5th Cir. 2005) ................................................ 47

United States v. Dimora, 750 F.3d 619 (6th Cir. 2014) ........................................... 12, 18

United States v. Frady, 456 U.S. 152 (1982) ........................................ 16, 20, 26, 40, 128

United States v. Garrido, 713 F.3d 985 (9th Cir. 2013) ................................................. 33

United States v. Hardy, 586 F.3d 1040 (6th Cir. 2009) ............................................... 128

United States v. Holzer, 816 F.2d 304 (7th Cir. 1987) .................................................. 45

United States v. Jackson, 688 F. App'x 685 (11th Cir. 2017) ....................................... 33

United States v. Jefferson, No. 1:07CR209, 2017 U.S. Dist. LEXIS 165824
   (E.D. Va. Oct. 4, 2017) ......................................................................... 24, 25, 27

United States v. Johnson, 763 F.2d 773 (6th Cir. 1985) ................................................ 32

United States v. Jones, 207 F. Supp. 3d 576 (E.D.N.C. 2016) .................................. 21, 22

United States v. Jones, 647 F.2d 696 (6th Cir. 1981) .................................................... 15

United States v. Lee, No. 1:15CR445, 2016 U.S. Dist. LEXIS 174984
   (N.D. Ohio Dec.19, 2016) ........................................................................ 21, 29

United States v. McDonnell, 792 F.3d 478 (4th Cir. 2015) .......................................... 22

United States v. McNair, 605 F.3d 1152 (11th Cir. 2011) ............................................ 33

United States v. Pipkins, 378 F.3d 1281 (11th Cir. 2004) ............................................ 47

United States v. Porter, No. 7:15-022 DCR, 2017 WL 1095040 (E.D. Ky. Mar. 22, 2017) ........ 33

United States v. Posada-Rios, 158 F.3d 832 (5th Cir. 1998) ........................................ 47

United States v. Pungitore, 910 F.2d 1084 (3d Cir. 1990) ............................................ 47

United States v. Rayborn, 491 F.3d 513 (6th Cir. 2007) ............................................ 123

United States v. Silver, 864 F.3d 102 (2d Cir. 2017) ................................ 25, 26, 27, 28, 121, 122

10

United States v. Smith, 723 F.3d 510 (4th Cir. 2013) ....................................................... 18, 19, 26

United States v. Skelos, No. 16-1618, 2017 U.S. App. Lexis 18525 (2d Cir. Sept. 26, 2017) .... 33

United States v. Spellissy, No. 17-11067, 2017 U.S. App. LEXIS 19110
    (11th Cir. Oct. 3, 2017) ............................................................................................ 24

United States v. Sun-Diamond Growers of Cal., 526 U.S. 398 (1999) ........................................ 16

United States v. Terry, 707 F.3d 607 (6th Cir. 2013) .................................................. 31

United States v. To, 144 F.3d 737 (11th Cir. 1998)........................................................ 47

United States v. Tran, 433 F.3d 472 (6th Cir. 2006) .................................................. 32

United States v. White, 663 F.3d 1207 (11th Cir. 2011) ........................................... 127

United States v. Woodward, No. 95-10234, 2017 U.S. Dist. LEXIS 172084
    (D. Mass. Oct. 18, 2017)............................................................................................ 35

United States v. Wright, 665 F.3d 560 (3d Cir. 2012).......................................... 32, 32

United States v. Yancy, 725 F.3d 596 (6th Cir. 2013)................................................. 16

Weeks v. Angelone, 528 U.S. 225 (2000) ................................................................. 116

## Federal Statutes

18 U.S.C. § 666....................................................................................................... 32

18 U.S.C. § 1962..................................................................................................... 47

## State Statutes

Ohio Revised Code § 307 ........................................................................................ 41

## Federal Rules

Fed. R. App. P. 40(a)(2)........................................................................................... 15

Fed. R. Evid. 404(b)................................................................................................ 125

## I.  __INTRODUCTION__

Five years ago, Petitioner James Dimora and his co-defendant, Michael Gabor, were convicted of "39 violations of federal anti-corruption laws stemming from their participation in a slate of bribery and fraud schemes involving various Cleveland-area favor-seekers.  Expensive trips to Las Vegas in exchange for county patronage, thousands of dollars in cash in exchange for government jobs, extensive home improvements to the tune of $30,000 in exchange for public construction contracts—these and other this-for-that arrangements were more than kindly gestures, more than mere "pleases" and "thank yous," among friends. The jury instead found, after a 37 - day trial, that the evidence showed Dimora and Gabor participated in a host of corrupt bargains and arrangements prohibited by federal law."  United States v. Dimora, 750 F.3d 619 (6th Cir. 2014).

Following the Supreme Court's decision in McDonnell v. United States, 136 S. Ct. 2355 (2016), clarifying the definition of "official act," Petitioner filed the § 2255 motion now before this Court seeking to vacate the RICO, bribery and tax counts.

For the reasons set forth below, this Court should find that there is no reasonable possibility that this Court's definition of "official act" was harmful or prejudicial to Petitioner. Indeed, if the jury had been instructed under the McDonnell definition, the outcome would have been the same.  Davis v. Ayala, 135 S. Ct. 2187, 2198 (2015).

In every bribery scheme at issue in this post-conviction proceeding, the United States proved an identifiable question or matter then pending or which at any time might be pending or which by law might be brought before a public official, thus satisfying the identification prong of McDonnell.  For each of these matters or questions, the United States also satisfied the performance prong of McDonnell by establishing that (1) Petitioner voted, made a decision or otherwise took an action on an identified matter or question, or agreed to do so, or (2) exerted

pressure or advised another official to perform an "official act," or advised another official, knowing or intending that such advice would form the basis for an "official act" by another official, or agreed to do so or (3) made a decision or took action on a qualifying step toward those ends.  Furthermore, McDonnell had no effect on the money and property fraud conspiracies or on the Section 666 counts, neither of which required the jury to find an official act.  It also had no impact on the state bribery predicates in the RICO count, or, as Petitioner admits, on the two obstruction counts.

## II.   LAW AND ARGUMENT

   A.   The Standard of Review

       1.   Generally

"To warrant relief under section 2255, a petitioner must demonstrate the existence of an error of constitutional magnitude which had a substantial and injurious effect or influence on . . . the jury's verdict." Griffin v. United States, 330 F.3d 733, 736 (6th Cir. 2003) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).  "Relief is warranted only where a petitioner has shown 'a fundamental defect which inherently results in a complete miscarriage of justice.'"  Griffin, 330 F.3d at 736 (quoting Davis v. United States, 417 U.S. 333, 346 (1974)).

In reviewing a challenge to jury instructions in the context of 2255 proceedings, the Court has two options for the standard of review depending on whether petitioner could have and did raise the issue on direct appeal.   For the reasons set forth below, this Court should find that Petitioner has procedurally defaulted on all counts, and should apply the cause and prejudice standard of review.  However, if this Court determines that Petitioner did raise McDonnell error on appeal, as he claims, the Court should find that he did so only with respect to four counts, and should review only those counts under the enhanced Section 2255 harmless error standard of

13

review.  The Court should find that Petitioner has procedurally defaulted on the remaining counts.

### 2.    Petitioner did Not Raise McDonnell Error on Appeal

In his brief on appeal, Petitioner claimed that this Court erred in refusing to give two instructions, only one of which, in part, is a correct statement of the law under McDonnell[1] – "Encouraging or directing subordinate employees to assist givers does not constitute an official act, unless the public official's actions involve a matter or issue that could properly, by law, be brought before him as a public official – here as County commissioner." (Doc. 40: Appellant Brief, Case No. 12-4004, PageID 59).  He also alleged that one of the Court's instructions on official acts was overly broad.  (Id. at PageID 58).[2]  Petitioner now claims that these allegations preserved McDonnell error.  (R. 1162-1: Brief in Support, PageID 32282).

However, the Sixth Circuit disagreed, describing Petitioner's claims on appeal regarding jury instructions as "the court fail[ing] to instruct the jury sufficiently on the differences between gifts given in friendship and bribes given in exchange for official acts."  Dimora, 750 F.3d at 624-25 (6th Cir. 2014).  Indeed, friendship was the gist of Petitioner's defense at trial.

The Sixth Circuit did not characterize Petitioner's arguments as raising error in the definition of "official act," as later addressed in McDonnell, 136 S. Ct. 2355. The Court of Appeals reviewed the instructions Petitioner had proposed at trial, and found that, with the

---

[1] The other instruction Petitioner requested relates to the issue of paying a bribe for generalized good will, which the Sixth Circuit found this Court gave, although perhaps not in the words Petitioner requested. (Doc. 40: Appellant Brief, Case No. 12-4004, PageID 56); Dimora, 750 F.3d at 626-27.

[2] "Official acts include the decisions or actions generally expected of the public official. '[O]fficial action' includes the exercise of both formal official influence (such as a public official's votes) and informal official influence (such as a public official's influence on other public officials)."  (Doc. 40: Appellant Brief, Case No. 12-4004, PageID 58).

additional limiting instructions this Court gave, Petitioner received the benefit of the instructions he had requested.  "Choosing different words to explain the same concept does not amount to an abuse of discretion."  Id. at 625 (citing United States v. Jones, 647 F.2d 696, 700 (6th Cir. 1981)).  In its analysis, the Sixth Circuit did not mention or quote this Court's definition of "official act," a clear indication that the Court of Appeals did not view Petitioner's allegations as involving that definition.  Dimora, 750 F.3d at 624-25.

The Sixth Circuit devoted a full page of its opinion to Petitioner's challenges to the jury instructions.  Id.  Nevertheless, Petitioner contends in his 2255 brief that he raised McDonnell error but that the Sixth Circuit "rejected the instruction issue without discussion."  (R. 1162-1, Motion to Vacate, PageID 32292).  If Petitioner believed he had raised a McDonnell-type error on direct appeal that the Sixth Circuit did not address, he should have filed a Petition for Panel Rehearing under Fed. R. App. P. 40(a)(2) which addresses just such a situation: "The petition must state with particularity each point of law or fact that the petitioner believes the court has overlooked or misapprehended and must argue in support of the petition."  Instead of pursuing this readily available avenue to pursue a McDonnell claim that the Sixth Circuit allegedly overlooked, Petitioner filed a Petition for Certiorari that did not raise any error in the jury instructions.  Petition for Certiorari, Dimora v. United States, No. 14-55.  Given Petitioner's failure to preserve the claims he now raises in his Section 2255 motion, this Court should find Petitioner's claims procedurally defaulted.

### 3. Procedural Default

As a general rule, federal courts will not review a procedurally defaulted claim unless the defendant can show either (1) cause for the default and actual prejudice from the error, or (2) that the court's failure to consider the claim will result in a miscarriage of justice because the

defendant is "actually innocent."  Bousley v. United States, 523 U.S. 614, 622 (1998) (internal quotation marks omitted).

a. Cause-and-Prejudice

With respect to the issue of cause, a claim that is "so novel that its legal basis is not reasonably available to counsel" may constitute cause to excuse a procedural default.  Reed v. Ross, 468 U.S. 1, 16 (1984).  However, a claim of error based on McDonnell does not present a novel claim.  A McDonnell claims is not "so novel that its legal basis [was] not reasonably available to counsel," because McDonnell flows from the Supreme Court's decision in United States v. Sun-Diamond Growers of Cal., 526 U.S. 398 (1999).  McDonnell at 2370.  See Bousley, 523 U.S. at 622-23.  Furthermore, futility of objection because of prior case law going against the defendant does not establish cause.  Bousley, 523 U.S. at 623; United States v. Yancy, 725 F.3d 596, 600-601 (6th Cir. 2013).  Thus, Petitioner cannot show cause for the default.

With respect to actual prejudice in a case involving a faulty jury instruction, a defendant cannot obtain relief unless he can show that the "ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether 'the instruction is undesirable, erroneous, or even universally condemned."  United States v. Frady, 456 U.S. 152, 169 (1982) (internal citations and quotations omitted).  The Supreme Court explained in Frady that "the degree of prejudice resulting from instruction error [must] be evaluated in the total context of the events at trial."  Id.  Indeed, "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge."  Id.  The Court went on to explain, "[A] judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge. Thus not only is the challenged

16

instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction."  Id.

As will be demonstrated below, given the overwhelming evidence at trial demonstrating an entrenched pattern of bribery, Petitioner cannot demonstrate actual prejudice.

b.      Actual Innocence

A defendant who cannot demonstrate both cause and prejudice may still obtain relief on collateral review if he can show that he is "actually innocent."  Bousley, 523 U.S. at 622.  In a prior pleading Petitioner stated that he does not contend he is actually innocent.  In response, this Court stated it was taking  "[Petitioner] at his word that he is not advancing an argument that any procedural default should be excused on the basis that he is actually innocent." (R. 1175: Order, PageID 32611.)  Thus, the government will not address actual innocence in this pleading.

4.      If this Court Concludes Petitioner did Raise McDonnell error on Appeal, He did so Only on Counts 9, 11, and 12-13.

If this Court determines that Petitioner did raise issues cognizable under McDonnell on appeal in the present case, he did so only as to Counts 9 (Coppers), 11 (Valentin), and 12-13 (Zavarella).  (Doc. 40: Appellant Brief, Case No. 12-4004, PageID 61-65).  In his appellate brief, Petitioner stated, "applying the correct law that the district court omitted from its jury instructions, four counts must be reversed and dismissed based on insufficient evidence."  Id. at 61.[3]  In other words, on appeal Petitioner conceded he was not prejudiced by the jury instructions on 28 of the 32 counts.

The Sixth Circuit evaluated the evidence of official acts on each of the four counts Petitioner identified in his brief as having been affected by his challenge to the jury instructions

---

[3] The Sixth Circuit said Petitioner "himself [did] not even independently challenge the sufficiency of the evidence on 28 of the 32 counts of conviction."  Dimora, 750 F.3d at 629.

and, although not in the words of McDonnell, found the official acts sufficient under that standard, recognizing that Petitioner's requests of other public officials to perform official acts came with significant pressure and influence.  United States v. Dimora, 750 F.3d at 626-27.

## 5.  The Harmless Error Standard

In the event this court finds that Petitioner preserved McDonnell error on Counts 9 (Coppers), 11 (Valentin,) and 12-13 (Zavarella), the United States discusses the harmless error standard for Section 2255 proceedings below.

The harmless error standard as applied to Section 2255 proceedings is more favorable to the government than the harmless error standard on direct review.  On direct review, the government must show that the error was harmless beyond a reasonable doubt under Chapman v. California, 386 U.S. 18 (1967).  On collateral review, however, courts apply the "substantial and injurious effect" standard of Kotteakos v. United States, 328 U.S. 750 (1946).  See Brecht, 507 U.S. at 623; Murr v. United States, 200 F.3d 895, 906 (6th Cir. 2000) (where district court had failed to instruct the jury on the unanimity requirement of Richardson v. United States, 526 U.S. 813 (1999) in a CCE case).  In order to obtain habeas relief "because of incorrect jury instructions, Petitioner must show that the instructions, as a whole, were so infirm that they rendered the entire trial fundamentally unfair."  Murr, 200 F.3d at 906, (citing Estelle v. McGuire, 502 U.S. 62, 72 (1991)).  Under this standard, "[t]here must be more than a reasonable possibility that the error was harmful [and] . . . the court must find that the defendant was actually prejudiced by the error."  Davis v. Ayala, 135 S. Ct. at 2198.

Even a "jury instruction that omits an element of the offense" does not "necessarily render a trial fundamentally unfair."  Neder v. United States, 527 U.S. 1, 8 (1999).  See also United States v. Smith, 723 F.3d 510, 515 (4th Cir. 2013) (using harmless error standard to review a 2255 claim for an erroneous jury instruction on witness tampering that required the

government to prove only a likelihood or possibility of interference, when the correct standard was more likely than not).  In <u>Smith</u>, the Fourth Circuit explained how to apply the harmless error standard when a Section 2255 claim is made on the jury instructions: "[w]e must determine whether the erroneous instruction had a substantial and injurious effect or influence on the jury's verdict, and to resolve this, we consider the effect or influence that the erroneous instruction had in light of the evidence presented."  <u>Id.</u> at 517.  In applying that standard to the evidence in the case, the <u>Smith</u> court rejected the Section 2255 claim because there was substantial evidence satisfying the reasonable likelihood standard.  <u>Id.</u> at 518.  <u>See also</u> <u>Pope v. Illinois</u>, 481 U.S. 497 (1987) (harmless error standard for misstatement of an element of the offense) and <u>Rose v. Clark</u>, 478 U.S. 570 (1986) (harmless error standard for erroneous burden shifting as to an element of the offense).

Here there is no possibility that Petitioner was prejudiced by any deficiency in the instructions because the overwhelming evidence at trial established that Petitioner performed official acts as defined in <u>McDonnell</u> in exchange for things of value.  The indictment[4] alleged, and the evidence showed, that Petitioner's responsibilities included "budgeting, levying taxes, issuing bonds, letting contracts for public works services, monitoring County expenditures, administering all purchases for County use, and approving funding to build and maintain certain roads.  In addition, Petitioner had the authority to influence personnel decisions within the County, including hiring, approving raises and promotions, terminating employment, and establishing job duties."  (R. 444: Third Superseding Indictment, PageID 9634).  All of these responsibilities fall within the <u>McDonnell</u> standard.

---

[4] Throughout this pleading, the term "indictment" refers to the Third Superseding Indictment, (R. 444: Third Superseding Indictment, PageID 9630-9777).

The RICO count specified the following official actions Petitioner took or caused to be taken, all of which comport with the McDonnell standard:  "(1) awarding public business, (2) executing public business, (3) taking and withholding public personnel actions, (4) awarding and administering public loans, grants and other funding, (5) establishing and revising property valuations for tax purposes, (6) expediting, facilitating and influencing judicial action in pending litigation, (7) expediting, facilitating and influencing official action in matters pending before public agencies, and (8) expediting, facilitating and influencing official action in matters pending before the United States government . . . ."  (Id. at PageID 9642).

Because the indictment (which the jury had during deliberations) alleged only official acts that comport with McDonnell, and because this Court's instructions were not as over-inclusive as those in McDonnell, any possible error was incredibly slight, and does not provide a basis for collateral relief.  Petitioner has shown no actual prejudice in that the "ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  Frady, 456 U.S. at 169.  Nor, under the 2255 harmless error standard, has Petitioner shown that the instructions "were so infirm that they rendered the entire trial fundamentally unfair," Murr, 200 F.3d at 906, or that there is "more than a reasonable possibility that the error was harmful [and] . . . that the defendant was actually prejudiced by the error." Davis, 135 S. Ct. at 2198.

> 6.  Conclusion

Under either of these standards of review – procedural default or harmless error – Petitioner has failed to meet his burden for the reasons set forth below.

> B.  The McDonnell Decision

McDonnell clarified the definition of "official acts" to delineate between conscientious public officials hearing from their constituents and acting appropriately on their concerns and corrupt public officials accepting money and property in return for using the power of their

20

offices to benefit bribe payors.  The Supreme Court held that the jury in <u>McDonnell</u> had not been properly instructed on the meaning of "official act," and it therefore clarified the definition and outlined two requirements for proving an "official act."

### 1.  Identification Requirement

First, the government must identify a "question, matter, cause, suit, proceeding or controversy" that involves "a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." <u>McDonnell</u>, 136 S. Ct. at 2371-72.  The matter must be "pending" or one that "may by law be brought" before any public official, meaning that the matter must be "relatively circumscribed" and, with respect to a matter that may by law be brought, "something within the specific duties of an official's position—the function conferred by the authority of his office."  <u>Id.</u>  This is often dubbed the identification requirement.  <u>See</u> <u>United States v. Jones</u>, 207 F. Supp. 3d 576, 581 (E.D.N.C. 2016) (coining these terms) and <u>United States v. Lee</u>, No. 1:15CR445, 2016 U.S. Dist. LEXIS 174984, at *8 (N.D. Ohio Dec.19, 2016) (using these terms).

As to the identification requirement, the meetings and social gatherings identified as the relevant matters or proceedings in <u>McDonnell</u> missed the mark because they were insufficiently "formal," "focused and concrete."  <u>McDonnell</u>, 136 S. Ct. at 2368-69.  Specifically, <u>McDonnell</u> stated that the district court got it wrong when it concluded that Virginia business and economic development was a question or matter.  <u>Id.</u> at 2360.  The "pertinent 'question, matter, cause, suit, proceeding or controversy' must be more focused and concrete."  <u>Id.</u> at 2369.  The matter must be at least "the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete."  <u>Id.</u>  But, <u>McDonnell</u> said the Fourth Circuit got it right when it concluded that the following three questions or matters qualify as matters under § 201(a)(3): "(1) 'whether researchers at any of Virginia's state universities would initiate a study of Anatabloc'; (2)

'whether the state-created Tobacco Indemnification and Community Revitalization Commission' would 'allocate grant money for the study of anatabine'; and (3) 'whether the health insurance plan for state employees in Virginia would include Anatabloc as a covered drug.'" Id. at 2370 (quoting United States v. McDonnell, 792 F.3d 478, 515-16 (4th Cir. 2015)).

As will be demonstrated in the Scheme-by-Scheme Analysis below in Section II. E. below, all of the matters and questions on which Petitioner was paid to involve himself were sufficiently focused and concrete. They are all things that "can be put on an agenda, tracked for progress, and then checked off as complete." Id. at 2369. Indeed, all of Petitioner's votes were on the agendas of the Board of County Commissioners ("BOCC"). Thus, the evidence in this case satisfied the identification prong of the McDonnell standard.

### 2.    Performance Requirement

As to the performance requirement, a public official must "make a decision or take an action on the 'question, matter, cause, suit, proceeding or controversy,' or agree to do so." McDonnell, 136 S. Ct. at 2372 (emphasis in original). This is often dubbed the performance requirement. See Jones, 207 F. Supp. 3d at 581. McDonnell provided examples of qualifying official acts including (1) "a decision or action to initiate a research study," or (2) a "decision or action on a qualifying step, such as narrowing down the list of potential research topics," or (3) "using his official position to exert pressure on another official to perform an 'official act,'" or (4) "a public official us[ing] his official position to provide advice to another official, knowing or intending that such advice will form the basis for an 'official act' by another official." Id. at 2370 (emphasis in original).

The Court observed that simply setting up a meeting, hosting an event or making a phone call is not always an innocent act, and is not irrelevant. "If an official sets up a meeting, hosts an event, or makes a phone call on a question or matter that is or could be pending before another

22

official, that could serve as evidence of an agreement to take an official act," as it often did in the present case.  Id. at 2371.  The Court explained that merely "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so) ***without more***" is not sufficient.  Id. at 2372 (emphasis added).  In the present case, when the official act involved making a phone call or setting up a meeting, there was always more, as will be demonstrated below in the Scheme-by-Scheme Analysis in Section II. E.3. et seq. below.

In light of the fact that McDonnell asked subordinates to attend a meeting but did not expect them to do anything beyond that, the Supreme Court explained that the district court "should have instructed the jury that merely arranging a meeting or hosting an event to discuss a matter does not count as a decision or action on that matter."  McDonnell, 136 S. Ct. at 2374-75.  The evidence in the present case demonstrated that Petitioner clearly expected his subordinates to do more than attend a meeting or host an event to discuss a matter.  He expected them to act in accordance with his instructions to do an official act, such as including Pumper's company in bid specifications, granting a loan extension to Pumper, or finding a way for the Coe Lake development grant to go forward for Kleem's benefit.  Since this Court's instructions limited informal action to informal official influence, and defined official action using the statutory definition, there is no material difference between the additional instructions that the Supreme Court required in McDonnell and the instructions provided by this Court.  (R. 1044: Tr. Jury Trial Vol. 35, PageID 30007-30008.)  See discussion of the jury instructions below in Section II.D. below.

The Court in McDonnell left intact its long-standing precedent that a defendant need only agree to make a decision or take an action on a question or matter.  Id. at 2371 (citing Evans v. United States, 504 U.S. 255, 268 (1992)).  That "agreement need not be explicit, and the public

official need not specify the means that he will use to perform his end of the bargain.  Nor must

the public official in fact, intend to perform the 'official act,' so long as he agrees to do so."  Id.

        3.    Cases Decided After McDonnell

In United States v. Spellissy, No. 17-11067, 2017 U.S. App. LEXIS 19110, at *4 (11th

Cir. Oct. 3, 2017), the Eleventh Circuit applied the harmless error standard to an appeal from the

denial of a writ of coram nobis by a defendant who had been tried and convicted of bribery

before McDonnell had been decided.  The court found that any alleged over-inclusiveness in the

jury instructions was harmless because the government did not rely at trial on conduct that did

not satisfy the McDonnell standard.  In Spellissy, as in the present case, the evidence established

that the defendant participated in reviewing and prioritizing a specific pending proposal  –

"conduct that involved the awarding of specific government contracts up for bid, and that still

meets the definition of 'official act' after McDonnell."  Id.  As will be demonstrated in the

scheme-by scheme analysis below, the government's evidence in the present case also meets the

McDonnell definition.

In United States v. Jefferson, No. 1:07CR209, 2017 U.S. Dist. LEXIS 165824, at *55-61

(E.D. Va. Oct. 4, 2017), the district court, in a 2255 proceeding, vacated some of the bribery

schemes for which former Congressman Jefferson had been convicted and upheld one of the

schemes.  In upholding Jefferson's conviction for pressuring the United States Trade and

Development Agency ("USDTA") officials to approve funding for a feasibility study, the Court

analyzed the requisite portion of the McDonnell opinion finding that exerting pressure on

another public official is sufficient to sustain a conviction.  Just as Petitioner did in the present

case, Jefferson "used his office to place significant pressure" on other government officials.  He

called "on several occasions to check on the status of the project" which caused those officials

"to pay closer attention to the project."  He also requested status updates, and expressed a level of involvement that was "abnormal," all facts that are consistent with Petitioner's actions as set forth below in the Scheme-by-Scheme analysis.[5]  The court in Jefferson stated that in McDonnell, the Supreme Court did not define "exerting pressure" but that "it must at least include repeated actions by a public official to push and promote a project, encouraging other officials to find ways to keep [a] project going even after similar projects would fail."  Id. at *59. It is not necessary that a witness use the word "pressure" to describe a defendant's actions.  It is sufficient that a defendant "hold[s] a certain sway" over the official's decision making.  Id. at *60.

In United States v. Silver, 864 F.3d 102 (2d Cir. 2017), the court, on direct appeal, reversed the bribery convictions of Sheldon Silver, the Speaker of the New York State Assembly, because of McDonnell error in the jury instructions.  Silver has no precedential value for the present case for the following reasons: (1) Silver was on direct review and applied a standard of review far more generous than the standard of review in Section 2255 cases, (2) as discussed in Section II.D. below, the jury instructions in the present case were much more restrictive than those given by the trial court in Silver and (3) the official acts at issue in Silver are distinguishable from those in the present case.

Regarding the standard of review, Silver applied the direct appeal harmless error standard to determine if "it [was] clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error" in the instructions.  Id. at 118.  In applying this standard,

---

[5] For example, Herron had never before experienced the level of attention from a commissioner that he received from Petitioner when working on the Parkview loan for Pumper.  (R. 1034: Tr. Jury Trial Vol. 21 (Herron), PageID 27623) and Judge Pokorny had never before received a call from a commissioner on a budget matter prior to Petitioner calling him about funding Alternatives Agency (R. 1017: Tr. Jury Trial Vol. 10 (Pokorny), PageID 24140).

the court concluded that "a rational jury might not have convicted had the charge more fully described an official act'" Id.

However, here, on collateral attack, the standard of review is much more favorable to the government.  If the Court finds that Petitioner did not preserve the issue on appeal, the question is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether 'the instruction is undesirable, erroneous or even universally condemned.'" Frady, 456 U.S. at 169.  If this Court determines that Petitioner did preserve the issue, the harmless error standard for review is whether "the instructions, as a whole, were so infirm that they rendered the entire trial fundamentally unfair." Murr, 200 F.3d at 906.  Even a "jury instruction that omits an element of the offense" does not "necessarily render a trial fundamentally unfair." Neder, 527 U.S. at 8.  See also Smith, 723 F.3d at 517 ("[w]e must determine whether the erroneous instruction had a substantial and injurious effect or influence on the jury's verdict, and to resolve this, we consider the effect or influence that the erroneous instruction had in light of the evidence presented.").

Regarding the jury instructions, the trial court in Silver charged the jury that, "Official action includes any action taken or to be taken under color of official authority,"[6] an instruction which was much more over-inclusive than the charges given in the present case, or in McDonnell.  See discussion in Section II.D. below.

Regarding the official acts, the Court in Silver found that a jury might have acquitted where the defendant sent a letter on official letterhead vaguely offering to help navigate the permit process for a charity race if needed, or recommending someone for a job without any evidence of pressure being applied, or took a public position on the location of a methadone

---

[6] Silver, 864 F.3d at 112.

clinic.  <u>Silver</u>, 864 F.3d at 120.  In the present case, Petitioner's official acts were more than vague offers of assistance, or job recommendations without Petitioner pressuring other public officials, or just taking a public position on a matter.  When Petitioner pressured or advised other public officials, he did so privately.  When Petitioner made a request of another public official, his request carried great weight, and satisfied the pressure or advice requirement of <u>McDonnell</u> at 2371-72.  He held "a certain sway" over the public officials he advised or pressured. <u>Jefferson</u>, at *60.  <u>See</u> discussion of Petitioner's powers in Section II.E.1. below.

Regarding other official acts, <u>Silver</u> found that because there was little evidence of corrupt intent or the official act was perfunctory, the court could not conclude beyond a reasonable doubt that the jury would have convicted absent the erroneous jury instruction. <u>Silver</u>, 864 F.3d at 120-23.  Contrast that finding to the present case where co-conspirators and bribe payors testified about their quid-pro-quo intent, where Title III interceptions recorded Petitioner's own words indicating intent, where Petitioner fabricated documents to conceal receiving things of  value, where Petitioner used cash to conceal bribes, where Petitioner engaged in acts of obstruction, and where Petitioner accepted the bribes close in time to performing official acts.  <u>See</u> discussion below in the Scheme-by-Scheme Analysis in Sections II. H and II. I.  In addition, in several schemes, the evidence established that Petitioner pressured other public officials to do official actions that were controversial, ill-advised, or about which his staff had concerns, such as hiring two unneeded plumbers during a County budget crunch, giving a raise to Linda Rybak which the personnel director had opposed, asking Russo to hire Michael Gabor in weights and measures even though there were no job openings, causing a disruption in the administration of the Engineer's Office by insisting that a certain inspector be assigned to a Kleem project, pushing an extension on a County loan that later went into default, interfering in

litigation by applying unethical ex parte pressure on the judge, and approving the Coe Lake grant for a project in Berea when the County Development Department prioritized projects for disadvantaged neighborhoods.

There is no danger in the present case that the nature of the official acts would lead a jury to acquit because the jury was specifically instructed, at defendant's request, that it could "consider the official action's lawfulness, desirability, or benefit to the public welfare . . . as it may bear upon the intent of a defendant in accepting the thing of value." (R. 1044: Tr. Jury Trial Vol. 35, PageID 29974-75, 30006).  Thus, the jury already factored into their deliberations the nature of the official acts.

In addition, Silver does not even discuss two other ways public officials can (and Petitioner did) perform official acts; namely, giving advice to another public official knowing that such advice will form the basis for an official act by another public official, McDonnell, 136 S.Ct. at 2371-72 or by making a decision or taking action on a qualifying step toward an official act.  Id. at 2370.

Because Silver was on direct appeal, and not on collateral attack, and because the record in the present case shows overwhelming evidence of intent, overwhelming evidence of a deeply ingrained pattern of corruption, dozens of official acts that meet the McDonnell standard, a jury instruction limiting the definition of official act in many ways that the Silver instruction did not, Petitioner was not prejudiced and the convictions must remain intact.

In this district post-McDonnell, Judge Boyko held an indictment sufficient on the performance prong when it alleged the following actions on the part of a Summit County Councilwoman:  a County Judge's actions on pending criminal cases, a City Prosecutor initiating criminal proceedings, Children and Family Services officials removing children from their

homes, the Ohio Liquor Commission issuing a liquor license, and the IRS electing to pursue criminal charges.  Lee, at *7.  Judge Boyko rejected the defense argument that the indictment was deficient (1) under the "providing advice" language of McDonnell because the defendant did not have any "advisory role" over the officials making the decisions on the above matters and (2) under the "exerting pressure" language of McDonnell because the defendant did not have "authority or leverage" over the officials having jurisdiction over the above matters.  Id. at *8.  In rejecting these arguments, the Court stated:

> If a public official uses his or her official position to provide advice to another official either knowing or intending the advice to form the basis of an official act, that can qualify as taking action on a matter under § 201(a)(3).  Further, it is not required that the official actually make a decision or take an action; it is merely enough that the official agree to do so.  The McDonnell decision makes no mention that the public official providing the information must be in an advisory role[,] . . . nor does McDonnell require that the defendant have some kind of leverage over the public official he or she is pressuring or advising.

Id. at *9-10 (internal citations omitted).

C.      McDonnell has no Application to Schemes Not Requiring an Official Act

1.      The Money and Property Mail Fraud and Wire Fraud Conspiracies are Not
Affected by McDonnell (Counts 2, 9, 16 and 32)

This Court should not address the merits of Petitioner's allegations concerning the money and property fraud convictions on the following counts because those crimes did not require the jury to find an "official act:"

- Count 2 (Alternatives Agency scheme): Conspiracy to Commit Mail Fraud

- Count 9 (Coppers scheme): Conspiracy to Commit Mail Fraud

- Count 16 (Neiheiser scheme): Conspiracy to Commit Wire Fraud

- Count 32 (Gallucci scheme): Conspiracy to Commit Mail Fraud[7]

These counts charged conspiracies with two objects, the first object being traditional money or property fraud (described in the indictment as simply mail fraud or wire fraud), and the second object being honest services fraud.  The jury returned special verdicts finding Petitioner guilty on each of the above counts, specifying that Petitioner was guilty of each of the two objects: conspiring to commit money or property fraud and conspiring to commit honest services fraud. (R. 738: Jury Verdict James C. Dimora, PageID 17117, 17118, 17125, 17126, 17133, and 17134).

---

[7] Petitioner was not charged in this substantive count, but it formed part of the basis for his liability on the RICO conspiracy (Count 1) because Petitioner agreed that a co-conspirator would commit this type of offense.  (R. 1039: Tr. Jury Trial Vol. 26 (Russo), PageID 28982, (Kelley), PageID 26219-20; R. 999: Tr. Sentencing Hrg. Vol. 1, PageID 20441-20446; R. 1000: Tr. Sentencing Hrg. Vol. 2, PageID, 20498).  As this Court stated in an order responding to a motion to dismiss part of the RICO conspiracy count, the government need only have proved that Petitioner " intend[ed] to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense. . . .[it] suffices that he adopt[ed] the goal of furthering or facilitating the criminal endeavor . . . . One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense."  (R. 530: Order, PageID 11070-71), citing Salinas v. United States, 522 U.S. 52, 65 (1997).

McDonnell had no impact on the traditional money or property fraud special verdicts because the jury was required only to find that Petitioner conspired to defraud and to obtain money and property by means of a false statement or material omission.  (R. 735-1: Jury Instructions, PageID 17018-17022); Sixth Circuit Pattern Instructions §§ 10.01 and 10.02.  This is in stark contrast to the finding required for the honest services fraud conspiracy counts – that Petitioner accepted a thing of value in exchange for an official act.  Skilling v. United States, 561 U.S. 358 (2010); United States v. Terry, 707 F.3d 607, 612 (6th Cir. 2013).

Ignoring the fact that the fraud conspiracy counts did not require the jury to find an official act, Petitioner contends, "In each traditional fraud count, however, the government's primary alleged fraudulent concealment was identical to the bribery charge: that [Petitioner] was receiving a thing of value in exchange for official acts."  (R. 1162-1: Brief in Support, PageID 32305).  The fact that some of the evidence in support of the honest services object of the conspiracies overlapped with some of the evidence in support of the traditional money or property fraud objects of the conspiracies is of no moment.  Indeed, such would be expected when there are dual objects in one conspiracy.  The only inquiry for this Court is whether McDonnell had any impact on counts in which an official act was not required.  The answer, of course, is no.

Petitioner cites United States v. Wright, 665 F.3d 560, 576-77 (3d Cir. 2012) in support of his position that McDonnell requires the money or property fraud conviction be set aside.  The defendant in Wright was convicted of both honest services fraud and money or property fraud.  On direct appeal, the court held that the honest services theory was flawed in its totality because it alleged a concealed conflict of interest, an impermissible theory of liability following Skilling, 561 U.S. 358.  Petitioner cites the portion of Wright that has no application to flawed jury

instructions.  Indeed, where a court has instructed a jury on multiple theories of liability, one of which is invalid, there is no structural error.  The instructions are subject to the harmless error standard of review.  Hedgpeth v. Pulido, 555 U.S. 57, 60 (2008).

In Wright, the court found the evidence on the money or property fraud sufficient, but found prejudicial spillover from the flawed honest services theory, applying a two-part test.  The first part of that two-part test involved determining whether any evidence in support of the flawed count would have been inadmissible at trial.  In the Sixth Circuit, in order to show prejudice from the joinder of offenses, a defendant must demonstrate that the spillover caused "substantial prejudice." Conclusory allegations, such as those Petitioner makes in the present case, are insufficient.  United States v. Tran, 433 F.3d 472, 478 (6th Cir. 2006); United States v. Johnson, 763 F.2d 773, 777 (6th Cir. 1985).

Petitioner has not identified with particularity any evidence that would have been inadmissible if the money and property allegations in the present case had been tried alone.  Most of the evidence admitted to support the honest services objects of the conspiracies would have been admitted to prove the money and property conspiracies, so there could be no prejudicial spillover even if the honest services objects of the conspiracy were found defective under McDonnell.  In addition, as set forth below, all of the bribery counts charged official acts that survive McDonnell, so no prejudicial spillover analysis is required.

### 2.    McDonnell has No Application to the § 666 Convictions (Counts 4, 5, 6, 17, 18 and 19).

The indictment charged the Pumper and Kleem schemes in several § 666 counts.  By its terms, Section 666 does not require proof of an "official act."  It simply requires that a defendant take a thing of value "with the intent to be influenced or rewarded in connection with any business, transaction, or series of transactions" of the organization receiving federal funds.

32

Several courts have determined that McDonnell does not affect prosecutions under 18 U.S.C §§ 666(a)(1)(B).  United States v. Jackson, 688 F. App'x 685, 696, f.n.9 (11th Cir. 2017) (Section 666 "does not use the term 'official act'") (citing United States v. McNair, 605 F.3d 1152, 1191 (11th Cir. 2011)) ("§ 666 sweeps more broadly than [the definition of official act in the federal bribery statute]);"  United States v. Boyland, 862 F.3d 279 (2d Cir. 2017);[8] United States v. Porter, No. 7:15-022 DCR, 2017 WL 1095040, at *3 (E.D. Ky. Mar. 22, 2017).

Even prior to McDonnell, the Sixth Circuit refused to read an "official act" requirement into § 666. United States v. Abbey, 560 F.3d 513, 521 (6th Cir. 2009).  Indeed, Porter cited Abbey in holding that McDonnell is not implicated in a § 666 case.  Porter, 2017 WL 1095040 at *3.  See also, United States v. Garrido, 713 F.3d 985, 1001 (9th Cir. 2013) ("§ 666 . . . makes no mention of an 'official act' or a requirement that anything be given in exchange or return for an official act.").

All of the bribery schemes alleged in the Pumper Hobbs Act counts (Counts 20 and 21) were also charged in the Pumper § 666 counts (Counts 17, 18 and 19).  All but two of the bribery schemes charged in the Kleem Hobbs Act count (Count 7) were charged in the Kleem § 666 counts (Counts 4,5 and 6).  The two remaining Kleem schemes (hiring Kleem's cousin and the airport taxiway) formed some of Petitioner's liability on the RICO count.  Thus, this Court need not address any of the Pumper schemes because they are unaffected by McDonnell and need only address two of the Kleem schemes as part of its review of the RICO count.  In case this

---

[8] But see United States v. Skelos, No. 16-1618, 2017 U.S. App. Lexis 18525, at *7 (2d Cir. Sept. 26, 2017) in which the Second Circuit, in a summary opinion on direct appeal, distinguished Boyland because the government in Skelos agreed to include "official act" in the Section 666 instruction.  The same is true here, but given that the present case is not on direct appeal, and that Petitioner procedurally defaulted on the 666 counts, Skelos has no precedential value.

Court wishes to review the Pumper and Kleem schemes charged in the § 666 counts, the

government addresses them in the Scheme-by-Scheme analysis below.

        3.    <u>McDonnell has No Impact on the State Bribery Predicates of the RICO
Count</u>

The RICO count of the indictment charged that Petitioner conspired with others to

"conduct . . . the activities of the Enterprise [Cuyahoga County] through a pattern of

racketeering activity involving multiple acts indictable under provisions of federal law . . . . and

***multiple acts of bribery under the following provision of state law: Ohio Revised Code Section
2921.02 (Bribery).***"  (R. 444: Third Superseding Indictment at PageID 9641-42) (emphasis

added).  This Court charged the jury on the elements of state law bribery.  (R. 1044: Tr. Jury

Trial Vol. 35, PageID 30101-102).  Thus, all of the bribery schemes alleged in the substantive

counts of the indictment were incorporated into the RICO conspiracy and form one of several

independent bases for conviction on that count.

In his present motion, Petitioner did not contend that <u>McDonnell</u> applies to state law

bribery, nor did he cite any authority for that proposition.  Indeed, <u>McDonnell</u> interprets the

definition of official act in the federal bribery statute, not Ohio Revised Code, § 2921.02, which

does not contain the phrase, "official act."  Therefore, Petitioner has not established a basis for

relief from his conviction on the RICO count.

        D.    <u>In Closing Argument, Petitioner, Under the Jury Instructions this Court Gave, was
Able to, and did Make, his Arguments about Meetings and Phone Calls Not
Constituting Official Acts</u>

The Court's instructions in the present case covered both the identification and

performance prongs of <u>McDonnell</u> (although not in the exact language of <u>McDonnell</u>) and

limited the definition of official act in ways that the district court in <u>McDonnell</u> did not.  Thus,

the instructions in the present case did not suffer from the same over-inclusiveness as the

instructions in McDonnell.  Taken as a whole, the instructions made clear that the official act had

to be something more than non-specific benefits to the bribe payer, such as generalized goodwill

or cultivating friendship, and, that the official acts had to be actions Petitioner took in his official

capacity, and not personal or political acts.  In fact, given these instructions, nothing prevented

Petitioner from making his arguments on what constituted official acts despite any McDonnell

errors in the instructions.

In McDonnell, the challenged instructions were found over-inclusive because they stated

official acts could include acts "'that a public official customarily performs,' including acts 'in

furtherance of longer-term goals' or 'in a series of steps to exercise influence or achieve an

end.'" McDonnell, 136 S. Ct. at 2366.  However, this Court did not include such language in its

instructions and "sufficiently captured the concerns later addressed in McDonnell."  United

States v. Woodward, No. 95-10234, 2017 U.S. Dist. LEXIS 172084, at *21-22 (D. Mass. Oct.

18, 2017); (R. 735-1: Jury Instructions, PageID 30004-30008).

McDonnell, 136 S. Ct. at 2374 stated that the following three instructions should be given

when a court defines "official act."

1.      "[T]he jury must identify a 'question, matter, cause, suit, proceeding or
        controversy' involving the formal exercise of governmental power."  Id.

In essence, this Court satisfied this requirement, although not in these exact words, when

the Court instructed that the official act had to involve a "question, matter, cause, suit,

proceeding or controversy, which may at any time be pending, or which may by law be brought

before any public official, in such official's capacity, or in such official's place of trust or profit"

and, that "[t]he term "official act" does not include actions taken in a personal or non-official

capacity, such as actions taken as a political party leader."  (R. 1044: Tr. Jury Trial Vol. 35,

PageID 30005).

2.      The 'question, matter, cause, suit, proceeding or controversy' must be something specific and focused that is 'pending' or 'may by law be brought before any public official,' such as the question whether to initiate research studies.  Id.

By giving instructions with appropriate examples of formal and informal influence being specific and focused, this Court satisfied this McDonnell requirement by charging, "[O]fficial acts include the decisions or actions generally expected of the public official.  In addition, 'official action' includes the exercise of both formal official influence (such as a public official's votes) and informal official influence (such as a public official's influence on other public officials)."  (R. 735-1: Jury Instructions, PageID 30008). With its parentheticals, this instruction aligns very closely to the Supreme Court's limits on the definition of official act (an official act "may include using [an] official position to exert pressure on another official to perform an 'official act' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official."  Id. at 2372.

3.      Merely arranging a meeting or hosting an event to discuss a matter does not count as a decision or action on that matter.  Id. at 2357.

This Court gave limiting instructions (which were not given in McDonnell) that did much to insure that the jury did not convict on an over-inclusive theory that Petitioner's relationships with bribe payors were just innocent lobbying relationships.  For example, this Court instructed:

1. The term "official act" includes any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may be by law be brought before any public official in such official's official capacity or in such official's place of trust or profit.  (R. 1044: Tr. Jury Trial Vol. 35, PageID 30007-30008).

2. Official acts include the decisions or actions generally expected of the public official. In addition, "official action" includes the exercise of both formal official influence, such as a public official's votes, and informal official influence, such as a public official's influence on other public officials.  (Id. at 30008).

36

3. The term "official act" does not include actions taken in a personal or non-official capacity, such as actions taken as a political party leader.[9]  (Id. at PageID 30008).

4. [B]ribery or kickbacks are not proved if the benefit is intended to be, and is accepted as, simply an effort to buy favor or generalized goodwill from a public official who either has been, is, or may be at some unknown, unspecified later time, in a position to act favorably on the giver's interests.  (Id. at 30005).

5. [Y]ou may consider the official action's lawfulness, desirability, or benefit to the public welfare, just as you would any other circumstances in the case, as it may bear upon the intent of a defendant in accepting the thing of value.  (Id. at 30006).[10]

6. [P]roperty given with the sole motive of cultivating friendship is not a bribe.  (Id. at PageID 30007).

Thus, the instructions in this case, taken as a whole, made clear that the official act had to be something more than non-specific benefits to the bribe payer, such as generalized goodwill or cultivating friendship, and, they had to be actions Petitioner took in his official capacity, and not personal or political acts.

In fact, given these instructions, Petitioner made repeated arguments about meetings and phone calls not being official acts despite any McDonnell errors in the instructions.  Specifically, he argued (without objection from the government) that:

1. "He set up meetings.  That's what commissioners are supposed to do."  (R. 1045: Tr. Jury Trial Vol. 36, PageID 30274).

2. Regarding the Lakewood ice rink and the call to the Lakewood Mayor, "Look, you might want to listen to my friend . . . He doesn't say, "Look, I'm the commissioner.  This is a guy that I want you to do this for . . . That's what commissioners are supposed to do. (Id. at PageID 30278). . . . And what does [Petitioner] do? He calls [the mayor], 'Can you

---

[9] Petitioner argues several times that he was prejudiced by potential jury confusion about whether he took official action in his role as Commissioner or in his role as Chairman of the County Democratic Party.  (R. 1162-1: Brief in Support, PageID 32301-303).  With the benefit of this instruction, the jury could not have convicted on acts Petitioner did as the County Chairman.  Weeks v. Angelone, 528 U.S. 225, 234 (2000) (a jury is presumed to follow its instructions).  Thus, this Court should reject Petitioner's McDonnell challenge on this ground.

[10] This language was added at Petitioner's request. (R. 1044: Tr. Jury Trial Vol. 35, PageID 29974-75).

sit down with him?' He tells him, 'I'm sitting here with a friend.' He tells him, 'He's got a proposal to make for you.'  There's no undue influence here.  There's no official action here."  (Id. at PageID 30374).

3. Regarding the above, "There's nothing wrong with calling a mayor from a dinner and saying, "you might want to listen to this.  I'm a booster of Cuyahoga County.  I want to see things happen good in Cuyahoga County."  (Id. at PageID 30283).

4. Regarding the DAS Litigation and Petitioner's call to a Common Pleas judge, "He only had a phone conversation with her."  (Id. at PageID 30294).

5. Regarding obtaining a public job for Gina Coppers, "Simply putting a piece of paper, a resume on somebody's chair is not official action. Take a look at the instructions.  It defines it for you.  It uses terms like 'influence,' . . ."  (Id. at PageID 30305).

6. "[Petitioner] didn't have influence far and wide.  He set up meetings.  And you hear, when you listen to the calls, even on the calls, he's not trying to push influence."  (Id. at PageID 30307).

7. Re: Kleem and First Energy, "There's no official action there.  There's no pressure. There's no influence. This is a private company, a private company that public official contacted regularly."  (Id. at PageID 30311).

8. Re Kleem and the taxiway, "[Petitioner's] calling for a status. . . He's not saying, 'Give him the contract.' He's not saying do anything.  He's saying, 'What's the status?'"  (Id. at PageID 30312).

9. Re Kleem and Coe Lake, "Same thing, Coe Lake.  He took a meeting with the mayor. He took a meeting with the head of the board of development for Berea maybe on request of Mr. Kleem, maybe not on the request of Mr. Kleem.  Either way, he took a meeting with these people.  They told him that the funding was supported by the ADA. He called Tracey Nichols and he said, 'Hey, they're telling me this should be covered.  Can you look into it? . . .' [Petitioner] didn't tell her what to do. He didn't tell her to do the funding.  He said, 'Can you look into it?'"  (Id. at PageID 30312).

10. Regarding funding for Alternatives Agency, "[Petitioner was told] that the purpose of that meeting is to discuss funding for halfway houses.  It's a legitimate reason for a dinner . . . ."  (Id. at PageID 30320).

11. Re: the Parkview loans and Pumper, "Don't be fooled.  Steve Pumper knew what he was getting with a phone call to [Petitioner] was a meeting, a meeting where he would explore what loans are available.  That's not influence.  That's not official action.  Look at the definition.  There's no influence getting a meeting.  There's no influence putting him in touch with the person who could tell what programs are available."  (Id. at PageID 30340).

12. Re: extensions of the Parkview loans, "It goes to the Department of Development.  It goes to the Loan Committee.  This isn't influence.  [Petitioner] didn't try to circumvent the Loan Committee.  He did not try to circumvent the process.  He didn't try to influence the process.  What he did was set up a meeting so somebody could see whether or not they qualified.  That's not improper influence."  (Id. at PageID 30344).

13. Re: Petitioner's calls to Judge McCafferty, "You heard about the calls to the Judge . . . . calls about other judges.  And as Mr. Russo told you from the stand, [Petitioner] had a relationship with the judges of Cuyahoga County.  It was part of his position as a Democratic Party chair.  They needed his support.  They sought his support.  Frank Russo and [Petitioner] called judges.  Was that an official action?  It wasn't something he was going to vote on.  It wasn't something that was going to be put in front of him."  (Id. at PageID 30344).

14. Re: helping Gina Coppers get a public job, "And these phone calls to Tom Day, they're not an official act.  Look at the definition.  There's not an improper influence here.  What does [Petitioner] tell Ms. Coppers?  'If Tom couldn't do it, he would tell me no.'"  (Id. at PageID 30352).

15. Re: Gina Coppers, "This conversation he had with Renee Strong when the resume first came in, 'Just throw it on my chair'. . . .  [T]hat's not an official act.  That's not improper influence.  Look at the definition." (Id. at PageID 30353). . . .  There's no improper influence happening here . . . .  They introduced her to Tom Day."  (Id. at PageID 30355).

16. Re: Neiheiser and the JJC, in response to the government's argument that Neiheiser was asking Petitioner to scrutinize the bids, "To make that inference, you would have to ignore all the testimony you've heard about what happened in Cuyahoga County.  It wasn't up to [Petitioner] to scrutinize the bid or not.  It wasn't up to [Petitioner] to direct Mr. Maldonado. . . . This is controlled by the Ohio Revised Code.  (Id. at PageID 30375).

17. Re: Randazzo and FNA obtaining public contracts at the Sewer District and in Beachwood, "Not a peep from [Petitioner] not trying to influence this, not trying to make it happen.  What did he do?  They sat [sic] up some dinners and some meetings with people that don't work for Cuyahoga County.  He set up meetings with the mayor [of Beachwood].  He sat [sic] up [a] meeting with Ciaccia [at the Sewer District]". . . . [Petitioner] could get him a meeting.  He never said – he never thought he could give him a slot [a contract].  He thought he could get him a meeting.  That's what he was interested in.  That's not improper influence.  That's not official action.  And what did Mr. Randazzo say he wanted in exchange for the palm tree? An open line of communication.  Some hope of favor or generalized goodwill is not a violation of the statute. . . ."  (Id. at PageID 30381-82).

18. Re: Valentin, "He told you he gave [Petitioner] granite because 'I was thinking in the future maybe I will have some – if I need some help, I could get some favor.'  He said he never talked to [Petitioner] about that.  Again, some hope of favor or generalized

goodwill is not a violation here."  And later, after counsel described the immigration issue Valentin discussed with Petitioner, "This isn't some looking for a favor . . . .  At most, at most, we have favor or generalized goodwill.  That is not a violation of the statutes you're asked to look at here.  There is no official capacity.  There's no official action."  (Id. at PageID 30382-83).

19. Re: Zavarella and County jobs for his daughter, "[Zavarella testified]. . . . he gave free brickwork because [Petitioner's] a public official, and if he thought he helped [Petitioner], he was sure someday [Petitioner] could help him.  Again, hope of generalized goodwill or favor in the future is not a violation of the statutes here."  (Id. at PageID 30384).

20. In general, "There's no being influenced, intending to be influenced . . . It is not illegal for [Petitioner] to be friends with, socialize with, talk about business with people that do business with the county."  (Id. at PageID 30390-91).

Thus, Petitioner's counsel could, and did, argue that setting up meetings, attending meetings or making calls did not constitute official acts.  Counsel was also able to argue that certain matters would not come before Petitioner for a vote, all without objection from the government.  United States v. Clarke, 842 F.3d 288, 296 (4th Cir. 2016) (defendant failed to demonstrate actual prejudice due, in part, to his ability to make all arguments essential to his case).  Indeed, in many of the defense arguments, counsel supported her contentions with reference to the jury instructions this Court gave.  Accordingly, Petitioner was not prejudiced by any McDonnell error in the instructions.

For the counts on which Petitioner procedurally defaulted, he cannot show that the "ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," Frady, 456 U.S. at 169.  For the counts on which he did not procedurally default, he cannot show that the instruction had a "substantial and injurious effect," Kotteakos, 328 U.S. at 750 and specifically, that the instructions, as a whole, were so infirm that they rendered the entire trial fundamentally unfair," with "more than a reasonable possibility that the error was harmful [and] . . . that the defendant was actually prejudiced by the error."  Davis v. Ayala, 135 S. Ct. at 2198.

40

E.      Scheme-by-Scheme Analysis of Official Acts

1.      Petitioner's Official Powers in General

Petitioner, was one of three elected members of the BOCC, which had statutory power to: (1) enter into contracts with other units of government including but not limited to municipal corporations and townships (Ohio Revised Code § 307.15); (2) purchase, lease, or construct county facilities (Ohio Revised Code § 307.02); (3) to sell, lease, or rent any real property owned by the county and not used for public use; (Ohio Revised Code § 307.09); (4) appropriate funds for the court of common pleas; (Ohio Revised Code § 307. 01) (5) approve loans or grants for economic development Ohio Revised Code § 307.07); (6) issue bonds to secure grants in excess of the community improvement fund; (Ohio Revised Code § 307.284), and (7) enter into agreements for construction or repair of infrastructure (Ohio Revised Code § 307.082).

The BOCC had "control of a majority of [the Auditor's Office] budget.  The only thing that they didn't have control of was the appraisal money." (R. 1026: Tr. Jury Trial Vol. 18 (Kelley), PageID 26219-20).  The BOCC also controlled the Common Pleas Court budget.  (R. 1017: Tr. Jury Trial Vol. 10 (Pokorny), PageID 24135).

As a commissioner, Petitioner had formal authority over the many municipalities within the County.  Several witnesses testified about Petitioner's financial control over County suburbs like Bedford (R. 1019: Tr. Jury Trial Vol. 12 (Massie), PageID 24830), including contracts for suburban road construction, (R. 1015: Tr. Jury Trial Vol. 8 (Dever), PageID 23769, 23773-79), and sharing 40% of a grant (approximately $1.4 million) with County suburbs. (R. 1034: Tr. Jury Trial Vol. 21, (Oyaski), PageID 27551.  Further, on March 27, 2008, during the period Petitioner engaged in multiple conversations to secure employment for Coppers in Bedford, Petitioner voted to award Bedford a $100,000 grant. (R. 1019: Tr. Jury Trial Vol. 12 (Massie), PageID 24847-48).  In fact, Bedford received approximately $1 million in discretionary funding

41

from Cuyahoga County.  (R. 1029: Tr. Jury Trial Vol. 31 (Gambosi), PageID 26913-15).
Beyond discretionary funds, the County Commissioners voted to release funds totaling
approximately 40% of the salary and benefit expenses for Bedford judges and the court clerk,
Tom Day, the very public official whose acts were so important to Petitioner's efforts on behalf
of Coppers.

Many of the official acts Petitioner performed involved "using his official position to
exert pressure on <u>another</u> official to perform an official act," or "using his official position to
provide advice to another official, knowing or intending that such advice will form the basis for
an 'official act' by another official."  <u>McDonnell</u>, 136 S. Ct. at 2359.  Given Petitioner's official
powers over all subdivisions of the County, public officials presiding over any of the political
subdivisions of the County gave great weight to any request from Petitioner, whether it be
characterized as pressure or advice.

According to co-conspirator Kevin Kelley "[Petitioner] and Auditor Russo were two of
the most powerful politicians in Cuyahoga County." (R. 1015: Tr. Jury Trial Vol. 15 (Kelley),
PageID 25857).  Specifically, co-conspirator and former Cuyahoga County Auditor Frank Russo
stated, "[Petitioner] and I were probably the two most powerful people or well-known people in
Cuyahoga County."  (R. 1043: Tr. Jury Trial Vol. 26 (Russo), PageID 29738).  Moreover, co-
conspirator Steve Pumper stated "[Petitioner] had a lot of power at the time.  [Petitioner] had
control of a lot of folks on the council [and] . . . some of the judges. . . . [Petitioner] and Mr.
Russo, they had a lot of control back then."  (R. 1034: Tr. Jury Trial Vol. 21 (Pumper), PageID
27741).  According to co-conspirator Charles Randazzo, Auditor Russo and Petitioner were
important to him because, "they were centers of influence in Cuyahoga County." (R. 1038: Tr.
Jury Trial Vol. 25 (Randazzo), PageID 28817).

This power showed itself throughout the trial.  Cyril Kleem recalled a three-way telephone conversation with County Development Director Tracy Nichols in which Nichols was much more deferential and cooperative regarding Kleem's efforts to obtain the Coe Lake grant when Petitioner was on the line.  In the conversation, Petitioner advocated Cyril's Kleem position that HUD guidelines permitted funding for handicapped accessibility projects, a position which Nichols had previously opposed.  (R. 1029: Tr. Jury Trial Vol. 31 (Kleem), PageID 26898-99).

Another County Development Director, Paul Oyaski, recognized this influence too.  He told Petitioner, "[I]f it comes from you it's even better than coming from me," meaning "this was being initiated by the commissioner.  And the commissioner outranked me in the County hierarchy.  We all worked for the commissioner, and I wanted the staff [who would be working on the request for an extension] to be aware that it was something that mattered to Commissioner Dimora."  (R. 1034: Tr. Jury Trial Vol. 21, (Oyaski), PageID 27567- 73; R. 1034: Tr. Jury Trial Vol. 21, (Herron), PageID 27617; Gov't Ex. 1700-Y-TR).  In the words of County Development Official James Herron, "[T]he commissioners were – our bosses, and certainly, anything that came from any of their offices was the highest priority.  That was a meeting that we needed to attend and find time on our schedule right away." (R. 1034: Tr. Jury Trial Vol. 21 (Herron), PageID 27618; R. 1014: Tr. Jury Trial Vol. 7 (Herron), PageID 23412).

County Development Director Nichols made re-examining her rejection of the Coe Lake grant a priority because Petitioner had called her about it, and he was her boss.  (R. 1030: Tr. Jury Tr. Vol. 32 (Nichols), PageID 27111-12).

Steve Pumper, a contractor and bribe payor explained he did not work through the normal process in obtaining meetings with County staff because, "[I]t was easier to call [Petitioner].  If

he made a call to somebody, they jumped for him.  So I needed to get it done, and he did it for us."  (R. 1034: Tr. Jury Trial Vol. 21 (Pumper), PageID 27766).

Petitioner even had the power to reject a low bid and vote to award a contract to the next lowest bidder.  As Ferris Kleem testified, he was concerned about whether he would get a contract on the Juvenile Justice Center ("the JJC") project if he was the low bidder because, ". . . the bids on the asbestos [for the County's Ameritrust building] were awarded to the second highest bidder by a million dollars.  There was a million dollars difference between the low bid and the second bidder.  And they [the BOCC] awarded it to the second bidder, a million dollars more.  . . . and I thought maybe the rules are changing . . . and I could ask [Petitioner] if that was going to be the case with the Juvenile Justice Center."  (R. 1015: Tr. Jury Trial Vol. 15 (Kleem), PageID 23710-11).

Petitioner contends that he was only one of three commissioners, so his "votes were uncontroversial, unanimous, and approved staff recommendations."  (R. 1162-1: Brief in Support, PageID 32301-03).  This Court should reject Petitioner's argument for three reasons.

First, it is legally irrelevant.  <u>McDonnell</u> did nothing to change the long-standing legal principles enunciated by this Court in its instructions:

> It is not a defense to claim that a public official would have lawfully performed the official action in question even without having accepted a thing of value. In other words, it is not a defense that the offer or promise of anything of value was made to the public official in exchange for an official action that is actually lawful, desirable, or even beneficial to the public. ***The law of bribery and kickbacks is not concerned with the wisdom or results of the public official's decisions, but rather with the manner in which the public official makes his decisions.*** However, you may consider the official action's lawfulness, desirability, or benefit to the public welfare, just as you would any other circumstances in the case, as it may bear upon the intent of a defendant in accepting the thing of value.

> Also, it is not necessary for the government to prove that the scheme actually succeeded, or that any official act was actually taken by the public official in the course of the scheme. What the government must prove is the intent to effect an exchange of money or other thing of value in return for official action.

(R. 1044: Tr. Jury Trial Vol. 35, PageID 30006) (emphasis added); Evans v. United States, 504 U.S. 255, 268-69 (1992) (the offense is complete when the public official receives the payment in return for the official act – fulfillment of the promise to perform the act is not required).  See, United States v. Holzer, 816 F.2d 304, 308 (7th Cir. 1987) (vacated on other grounds, 484 U.S. 807 (1987)).

Second, as discussed below in the Scheme-by-Scheme Analysis in Section II. E. 3 et seq. below, there were many instances in which Petitioner changed the minds of County officials or overrode their concerns.  These include extending the Parkview loan so soon after it had issued, the Linda Rybak raise, disrupting the Engineer's Office construction inspection assignments, causing the Coe Lake grant to be approved even though it did not benefit a disadvantaged community, hiring two unneeded plumbers during a budget crunch, causing the Bedford Courts to create a job for Gina Coopers, and pressuring the Common Pleas Court to restore funding for a program it had decided to cut.

Third, there were at least three instances in which Petitioner was one of only two commissioners voting the way the bribe payors wanted him to vote.[11]

---

[11] On July 27, 2006, Petitioner voted in favor of awarding a $337,000 contract to Vandra Brothers for further repairs and resurfacing of St. Clair Avenue.  (R. 1037: Tr. Jury Trial Vol. 24, (Oliver), PageID 28576-77, R. 1015: Tr. Jury Trial Vol. 8, (Dever), PageID 23811; Gov't Ex. 2252 (Agenda Action showing only two commissioners, including Petitioner voted in favor)).

On May 29, 2007, Petitioner, in a two-to-one vote, voted in favor of the purchase of the Oppmann garage in exchange for cash bribes from Steve Pumper. (Govt. Ex. 1700-G; R. 1035: Tr. Jury Trial Vol. 22 (Pumper), PageID 27886-90).

On March 27, 2008, Petitioner and Commissioner Peter Lawson Jones voted in favor of appointing the two Plumbers as full-time temporary plumbers.  (Id. at PageID 25104; Gov't Exs.

Not only is Petitioner's argument about many of the BOCC decisions being unanimous irrelevant, the government proved that Petitioner's influence over official actions extended beyond his formal votes.  Commissioner Peter Lawson Jones owed his initial appointment to Petitioner.  (R. 1024: Tr. Jury Trial Vol. 15, PageID 25803).  The third Commissioner, Tim Hagan, had a good relationship with Petitioner and was not too involved in the day-to-day operations of the County.  Id.

With that background, Russo testified that the BOCC tried to avoid non-unanimous votes because they feared media scrutiny.  He explained that if there was a two-to-one vote, the media would study a project more carefully to ferret out why one member of the BOCC opposed it.  Thus, the commissioners worked to convince all members of the BOCC to vote in favor before a matter appeared on the agenda for a vote.  (R. 1039: Tr. Jury Trial Vol. 26, PageID 28952-53). [12] In that way Petitioner exerted power over his colleagues behind the scenes before the formal votes were made and was well worth bribing - he had a good working relationship with one of the commissioners who did not involve himself in the day to day operations of the County, and the other commissioner owed Petitioner his job.

2.    Introduction to Scheme-by-Scheme Analysis

The scheme-by-scheme analysis below summarizes the official acts Petitioner performed or promised to perform in each bribery scheme and sub-scheme.

---

2438, p. 8 (Reference to Executive Session), 2442 (Personnel Action), 2455 (Resolution, p. 3)).  That evening, Petitioner told Rybak, "I took care of you again today."  (Id. at PageID 25103).

[12] Examples of this kind of jockeying were intercepted on the wiretap.  See discussion of the Linda Rybak raise in Section II.E.13(a) below and discussion of Petitioner hiring two members of the Plumbers Union in Section II.E.13(c) below.

3.      RICO (Count 1)

To establish a criminal conspiracy violation under 18 U.S.C. § 1962(d), the United States was required to prove only that Petitioner knowingly agreed that a conspirator (which may have included the Petitioner) committed a violation of 18 U.S.C. § 1962(c).[13]  There is no requirement that Petitioner "himself committed or agreed to commit the two predicate acts requisite for a substantive RICO offense under § 1962(c)."  Salinas, 522 U.S. at 61.  Thus, to prove a RICO conspiracy under Salinas, it was sufficient that Petitioner agreed to the commission of at least two predicate acts (by any conspirator) on behalf of the conspiracy.  Id. at 63.  Thus, the Government was only required to prove that Petitioner agreed that another conspirator would commit multiple acts of the "type" or "types" of predicate crimes.  See, (R. 530: Order, PageID 11070-71, citing Id., at 65.)

a.      Agreeing that Russo Employ Gabor for a Partially No-Show
County Job in Exchange for $5,000 in Cash

If someone wanted a job in the Auditor's Office, Frank Russo – not the HR Department – did the hiring, clearly an official act under McDonnell.  In some cases, no job applications were submitted.  (R. 1026: Tr. Jury Trial Vol. 18, PageID 26220).

Petitioner asked Frank Russo to hire Michael Gabor in the Auditor's office.  Russo hired him in October 2012, and even though he did not have openings in the Weights and Measures Department, placed Gabor there.  In exchange, Gabor gave Russo $5,000.  Because the job allowed Gabor to work in the field, and the work load was very light, Gabor "had access to Petitioner all day long," and served as Petitioner's driver.  (R. 1039: Tr. Jury Trial Vol. 26,

---

[13]  See, e.g., Salinas, 522 U.S. at 62-65; United States v. Delgado, 401 F.3d 290, 296 (5th Cir. 2005); United States v. Pipkins, 378 F.3d 1281, 1288 (11th Cir. 2004); United States v. Posada-Rios, 158 F.3d 832, 857 (5th Cir. 1998); United States v. To, 144 F.3d 737, 744 (11th Cir. 1998); United States v. Pungitore, 910 F.2d 1084, 1117 (3d Cir. 1990).

(Russo), PageID 28957-59, 28963).  Petitioner knew Gabor's job was a partially no-show job and took advantage of Gabor's light and flexible schedule (he only worked an hour or two a day), by asking Gabor to do personal errands for Petitioner.  (R. 1026: Tr. Jury Trial Vol. 18 (Kelley), PageID 26205-06, 26209).

Petitioner was present when Kelley asked Gabor how much Gabor had to pay Russo for the job.  Gabor responded by gesturing with five fingers. (R. 1026: Tr. Jury Trial Vol. 18 (Kelley), PageID 26205-06; R. 1039: Tr. Jury Trial Vol. 26 (Russo), PageID 28958).  Because Petitioner initiated this scheme and knew Gabor obtained his job through bribery and because Petitioner personally profited from the scheme, the record demonstrates that Petitioner agreed that Russo and Gabor would commit bribery, one of the types of crimes charged in the RICO Conspiracy.  Thus, this scheme formed part of the foundation for Petitioner's conviction on Count 1.

b. Agreeing that Gabor would Bribe a County Domestic Relations Judge

In late Fall 2004, Gabor, with Petitioner participating, conspired to bribe a Cuyahoga County Domestic Relations Judge for a favorable order on a financial matter in his divorce proceedings.  In this scheme, Petitioner was part of the team paying and planning the bribe, and not the recipient of the bribe.

Petitioner asked Kelley to act as an intermediary for the bribe because Kelley knew someone who could serve as a second intermediary to the judge.  (R. 1026: Tr. Jury Trial Vol. 18 (Russo), PageID 26197- 205. ("[Petitioner told Gabor], hey, you go to Kevin Kelley.  He'll get you organized with the judge.  He knows who can work with the judge.").  (R. 1039: Tr. Jury Trial Vol. 26, PageID 28963-64). Gabor gave Kelley $10,000 in cash to convey to the judge through the second intermediary and reported back to Petitioner that he had met with the

intermediary and "everything was going to work out."  (R. 1026: Tr. Jury Trial Vol. 18, PageID 26203).  On February 7, 2005, without a hearing, the judge entered an order granting, in part, the relief Gabor sought.  (R. 1024: Tr. Jury Trial Vol. 15, PageID 25647- 25652; Gov't Ex. 125).  Gabor did not receive the exact ruling he had requested, and complained to Petitioner and other members of the conspiracy, ultimately requesting a refund from Kelley.  (R. 1026: Tr. Jury Trial Vol. 18, PageID 26201-202; R. 1039: Tr. Jury Trial Vol. 26, PageID 28966-67).

Petitioner participated in early discussions about this plan, and received a report back on its progress from Kelley.  Thus, the evidence establishes that he agreed that several of the RICO conspirators (including himself) would commit the bribery, one of the types of crimes charged in the RICO Conspiracy.  Thus, this scheme forms part of the foundation for Petitioner's conviction on Count 1.  Bribing a judge for a court order satisfies both the identification and performance prongs of McDonnell.

        c.        Voting for County Contracts for Benefit of Melaragno and Vandra Brothers

See discussion of Melaragno scheme below in Section II.E.12. below.

        d.        Advising or Pressuring City Officials to Expedite Execution of Taxiway Contract at the Airport

See discussion of Kleem scheme below in Section II.E.5. below.

        e.        Agreeing that Petitioner and Russo Would Accept Bribes in Exchange for Russo Hiring Mohammad

Kevin Payne, Dan Gallagher and Samir Mohammad conspired to bribe Frank Russo and Petitioner with cash and a gambling trip in exchange for Russo and Dimora considering Mohammad for employment as the County Administrator, or Deputy County Administrator. (R. 1045: Tr. Jury Trial Vol. 36 (Russo), PageID 29791).  Gallagher explained to Mohammad that Payne wanted Mohammad to give Gallagher $20,000 "to help secure the position for

[Mohammad]".  (R. 1019: Tr. Jury Trial Vol. 12 (Gallagher), PageID 24279, 24281).

Mohammad gave the cash to Gallagher, who in turn, gave it to Payne, saying, "I hope this is well

spent because I'm going to hear about it if it isn't.  And I hope you know what you're doing."

(Id.).  Payne used part of the cash for a gambling trip to Windsor for Petitioner, Russo and their

friends.  (Id. at PageID 24282-83).  Gallagher went on the trip to give Petitioner $2,000 of the

cash he had received from Mohammad ("I handed [Petitioner] $2,000 in cash.  And I told him

that this is so that he would keep Samir Mohammad in mind for the position of County

Administrator.").  Petitioner put the cash in his pocket.  (Id. at PageID 24284, 24294).

Ultimately, Petitioner could not obtain support from another commissioner for

Mohammad, so he could not deliver the County Administrator position, but Petitioner offered

Mohammad a job at the data center, which Mohammad turned down.  However, Russo hired

Mohammad as Deputy Auditor.  (R. 1018: Tr. Jury Trial Vol. 11 (Massie), PageID 24443; R.

1017: Tr. Jury Trial Vol. 10 (Gallagher), PageID 24302; R. 1024: Tr. Jury Trial Vol. 15 (Kelly),

PageID 25770-71; Gov't Ex. 133 (Roster of County Employees)).

Although the bribe was unsuccessful in part, the official act for which it was paid – hiring

Mohammad as County Administrator or Deputy County Administrator clearly satisfies both the

identification and performance prongs of the McDonnell standard, as did Petitioner offering

Mohammad a position at the data center, and Russo ultimately hiring him as Deputy Auditor.

> f.  Agreeing that Russo would Hire Gallucci in Exchange for
>     Dropping out of the Auditor's Race.  (Counts 31 and 32)

Gabor was convicted of conspiring with Russo and others to obtain things of value from

Gallucci in the form of cash, Gallucci's sham candidacy for County Auditor against Russo in

Russo's reelection campaign for County Auditor, and Gallucci withdrawing from the race late

enough that the Republican Party could not replace him on the ballot, all in exchange for Russo

hiring Gallucci in the County Auditor's Office at an inflated salary.  Petitioner was not charged

in these substantive counts, but they form one of the bases of his conviction on the RICO

conspiracy because the record establishes he agreed that Russo would engage in the scheme.

Russo advised Petitioner of his plans in advance, Petitioner controlled Russo's personnel budget

and continued to vote for it after Gallucci was hired, and Petitioner discussed concerns with

Russo about the Plain Dealer uncovering the scheme.  (R. 1039: Tr. Jury Trial Vol. 26 (Russo),

PageID 28982; R. 1026: Tr. Jury Trial Vol. 18 (Kelley), PageID 26219-20; R. 999: Tr.

Sentencing Hrg. Vol. 1 (Court), PageID 20445; Govt. Ex. 3105-TR).

On November 29, 2006, Russo hired Gallucci at a salary of $67,849 per year, $3,400

more than the salary of Gallucci's supervisor at the Auditor's Office.  (R. 1020: Tr. Jury Trial

Vol. 13, PageID 24948, 24952-54, 24960, 24969-71, 24983-85, 24988-89, 25005, 25037, 25041;

R. 1039: Tr. Jury Trial Vol. 26, PageID 28976-81; Gov't. Ex. 3121).  Russo then gave Gallucci's

supervisor a raise to cover up the scheme. (R. 1045: Tr. Jury Trial Vol. 36, PageID 30242

("[Russo] raised her salary over mine."), R. 1020: Tr. Jury Trial Vol. 13, PageID 24989), all

official acts that satisfy both the performance and identification prongs of McDonnell.

g.    Pulling the Towpath Vote from the Agenda.

In March 2008, Petitioner did an official act – pulling a matter off the Commissioners'

agenda – because Michael Baker Group, the consulting engineer for the project, failed to pay a

bribe in the form of a campaign contribution.  Petitioner had told Kevin Kelley to have Michael

Baker buy a table for the Democratic Party's annual dinner. The company bought two tickets but

refused to buy a table.  Dimora pulled their project from the agenda, "scaring them basically that

their item is not going to pass, and maybe [the company] would reconsider buying a table in the

future if not then." (R. 1024: Tr. Jury Trial Vol. 15 (Kelley), PageID 25833-34; Gov't Ex. 106-

TR).  Delaying a vote is an official act post-McDonnell.  Hill v. United States, No. 3:15CV725-

M, 2016 U.S. Dist. LEXIS 165084, at *4 (N.D. Tex. Nov. 3, 2016) (Petitioner "took action in his position on the Dallas City Council to approve, deny or delay development projects pending before the City Council . . . .").

    4.     Voting on, and Taking Action on Qualifying Steps to, Fund Alternatives Agency (Counts 2 and 3)

    a.     Background

Alternatives Agency ("AA") was a halfway house providing services for the Cuyahoga County Common Pleas Court.  (R. 1017: Tr. Jury Trial Vol. 10 (McDonnell), PageID 24158-60). Between February and April 2008, AA, using Kelley as an intermediary, bribed Petitioner and Russo with money for the Las Vegas trip and an $800 three-hour dinner for Petitioner and his friends at Delmonico's in exchange for official acts relating to AA's efforts to obtain funding and restore funding.  (R. 1024: Tr. Jury Trial Vol. 15 (Kelley), PageID 25864; R. 1016: Tr. Jury Trial Vol. 9 (Massie), PageID 23919, 25341; R. 1016: Tr. Jury Trial Vol. 9 (Schuman), PageID 24037, 24054-55, 24061-62; R. 1039: Tr. Jury Trial Vol. 26 (Russo), PageID 29048-50.)  AA's funding issues involved: (1) contract amendments extending its contract, (2) $250,000 for the work release program, (3) the halfway house initiative, and (4) the Sheriff's Board and Care line item. (Gov't Ex. 230; R. 1016: Tr. Jury Trial Vol. 9 (Massie), PageID 23940).  The BOCC was required to vote on all of these sources of funding for AA.  (Ohio Revised Code, Section 307.07, and see, e.g., Gov't. Exs. 233 and 289).

Kelley did not think AA funding (that had been cut by the court) could have been restored without the help of Petitioner and Russo because ". . . the power was basically with the commissioner and Mr. Russo, the auditor." (R. 1024: Tr. Jury Trial Vol. 15 (Kelley), PageID 25852-53).  Kelley went straight to Petitioner and Russo for assistance in restoring AA funding "[b]cause the system, the way it worked at Cuyahoga County, their clout meant a lot more than

trying to go through the bureaucracy that was set in place." (R. 1024: Tr. Jury Trial Vol. 15 (Kelley), PageID 25840).

Russo "was very clear" on "the amount of bribes [he and Petitioner] were looking for [sic] restoring the funds [for AA]." (R. 1024: Tr. Jury Trial Vol. 15 (Kelley), PageID 25859; Govt. Ex. 208-TR, p. 2).  Kevin Kelley, the conduit for the bribes, was concerned about being late in paying Russo and Petitioner "[b]ecause they were expecting a certain amount and, you know, it wasn't an option not to come up with that amount." (Id. at PageID 25860).  Brian Schuman, co-executive director of AA was "nervous [about paying for the Las Vegas trip] because [he] knew it was wrong."  (R. 1016: Tr. Jury Trial Vol. 9 (Schuman), PageID 24062).

Initially, Kevin Kelley discussed with Russo cash payments of $3,000 each for Petitioner and Russo in exchange for their assistance in funding AA.  The plan changed as the Las Vegas trip was being planned.   Kelley proposed that AA give Kelley cash and he would use it to fund the trip for Petitioner and Russo.  AA increased its consulting payments to Kelley so that Kelley would have the money to fund the trip, including first class air fare, hotel and food which would cost about $8,000.  (Id. at PageID 25840-42).  Kelley "went to great lengths to keep the [payments] quiet . . . . [b]ecause it would – it's illegal to do that [pay bribes]."  (R. 1022: Tr. Jury Trial Vol. 16 (Kelley), PageID 25395-96; R. 1016: Tr. Jury Trial Vol. 9 (Schuman), PageID 24043, 24053-55).

In order to conceal the fact that Alternatives Agency paid for first class air fare and to make it appear that they had paid their own way to Las Vegas, Russo and Petitioner wrote checks to Kevin Kelley.  However, Kelley gave them cash to reimburse them for the checks.  (R. 1039, Tr. Jury Trial Vol. 26 (Russo), PageID 29050-51).

b.    Official Acts

Petitioner and Russo performed the following official acts for AA's benefit.

In January 2008, Petitioner told Kevin Kelley that Petitioner would assist AA in obtaining more County funds.  (R. 1024: Tr. Jury Trial Vol. 15 (Kelley), PageID 25839, 25853-56; Gov't Ex. 207-TR).

On January 3, 2008, Petitioner voted to approve the first amendment to a contract with AA extending the existing contract to March 31, 2008.  (Gov't Ex. 259; R. 1016: Tr. Jury Trial Vol. 9 (Massie), PageID 23913-16).

On January 4, 2008, Petitioner advised AA to "keep the billing up" so AA would run out of funding which would prevent the money from being decertified and used for other programs.  (Gov't Ex. 207-TR; Id. at PageID 23914).

On February 14, 2008, Petitioner voted to put $250,000 back into the County budget for the work release program, funds that had previously been removed as part of the County's cost-cutting efforts.  (R. 1024: Tr. Jury Trial Vol. 15 (Kelley), PageID 25864; R. 1017: Tr. Jury Trial Vol. 10 (Pokorny), PageID 24137; R. 1016: Tr. Jury Trial Vol. 9 (Massie), PageID 23909-12; Gov't Ex. 289, p.6 (Agenda Action)).  The night before, Kelley reminded Petitioner that restoration of the AA funding would be on the agenda the next day.  Petitioner responded, "I don't want to know what you get out of this.  I don't even want to know. . . . The less I know the better."  Kelley responded, "Speaking of that, Vegas."  (Gov't. Ex. 210-TR; R. 1024: Tr. Jury Trial Vol. 15 (Kelley), PageID 25863-64).

On March 20, 2008, Petitioner got "all the power brokers in the county that needed to make [a] decision [on] that board and care line item [for the benefit of halfway houses], he was able to get everybody in there so we can discuss it and see if we could go forward with this contract – project. . . . [Petitioner] said [at the meeting] that it was a good idea and it definitely

54

needed further consideration." (R. 1016: Tr. Jury Trial Vol. 9 (Schuman), PageID 24057-59;

Gov't Ex. 213-TR, 260).  Schuman believed that his ability to get Petitioner at that meeting, with

all of the county people there, and representatives of the other halfway houses, gave him an

advantage in competing against them for contracts.  "They know we [AA] got the juice, we got

him in the room. So it tells everyone else [the competing agencies], back off." (Id. at PageID

24059).

On March 25, 2008, Petitioner called Dennis Madden, the County Administrator.  (R.

1016: Tr. Jury Trial Vol. 9 (Massie) PageID 23940). They discussed funding for AA and the fact

that the Common Pleas judges wanted the commissioners to come over to a meeting and weigh

in.  Petitioner volunteered to go to the meeting.  He said, "[W]e [the commissioners] just gotta

convince these judges if there's some that are skeptical that it's safe to house prisoners there [in

halfway houses].  That they don't have to worry about 'em escaping. . . .  I just wanna make sure

we don't let the thing fall through the cracks.  That we follow up and get . . . the meeting date

when they're gonna have the judges together.  That's what [the chief judge] said. . . .  I'll have

you guys come and those halfway house people [AA] come to talk to the judges." (Gov't Ex.

201-TR).[14]

In response to Petitioner's request, Madden sent an email to the court administrator,

Judge Pokorny, and asked if he had identified a date and time of the meeting with the other

judges.  Judge Pokorny said Chief Judge McDonnell would be happy to have Petitioner attend

---

[14] Approximately one week later, on April 2, 2008 Petitioner and Kelley discussed the
tickets for Las Vegas that Kelley had purchased for Petitioner.  Petitioner was concerned that the
Plain Dealer might investigate payment for the tickets.  To conceal the illegality of the scheme,
Petitioner wrote a check to Kelley purporting to pay for the tickets.  Kelley gave cash to
Petitioner in exchange, the net effect being that Petitioner paid nothing for the tickets.  (R. 1024:
Tr. Jury Trial Vol. 15 (Kelley), PageID 25879-81. Govt. Ex. 202-TR).

the meeting on April 8, 2008.  (Gov't Ex. 257).  Petitioner was unavailable on April 8, 2008,[15] so he attended the meeting in May.  (Gov't Exs. 257, p.2 and 290).

On April 8, 2008, Madden signed, on behalf of the BOCC, a Second Amendment to a contract between the BOCC and AA, extending the County contract for a work release program with AA for 18 months.  (Gov't Ex. 233, p. 2; R. 1016: Tr. Jury Trial Vol. 9 (Massie) PageID 23913-16).

Sometime prior to April 17, 2008, Petitioner called Judge Pokorny, the Court Administrator, pressuring him not to cut the whole halfway house program (the $250,000 in funding for AA) from the Court's budget as part of the County's cost-cutting efforts. [16] Instead, he requested (as Frank Russo had in a previous call) that the cuts be spread around. (R. 1017: Tr. Jury Trial Vol. 10 (Pokorny), PageID 24139-40).  Petitioner then called Chief Judge McDonnell, who was in charge of the Court's budget.  As a result of the call, she decided, with her colleagues, to restore half of the funding for the coming year.   (R. 1017: Tr. Jury Trial Vol. 10 (McDonnell), PageID 24160-61).

On April 17, 2008, nine days after the Las Vegas trip, Petitioner voted in favor of restoring the funding about which he had called Judge McDonnell and Madden signed the contract on behalf of the BOCC.  (Gov't. Ex. 241, pp. 2,3,59 (contract and resolution); R. 1016: Tr. Jury Trial Vol. 9 (Massie), PageID 23987-88; R. 1017: Tr. Jury Trial Vol. 10 (McDonnell), PageID 24162).

---

[15] Indeed, he was in Las Vegas on that date, a trip funded in part by AA. (R. 1012: Tr. Jury Trial Vol. 5 (Massie) PageID 22906-907).

[16] This was the only time the court administrator had ever received a call from a commissioner about a budget matter. (R. 1017: Tr. Jury Trial Vol. 10 (Pokorny), PageID 24140).

On May 20, 2008, Petitioner attended a judges meeting and stated that "the use of the halfway house program would save significant dollars as the county is incurring additional expenses for county jail alternative housing in Bedford Heights, Geauga County and other sites." (Gov't Ex. 290 (minutes of meeting); R. 1017: Tr. Jury Trial Vol. 10 (McDonnell), PageID. 24165).

Petitioner contends in his brief that government counsel improperly argued in closing that the official acts included Petitioner having "his assistant schedule a judges' meeting . . . [and attending] the meeting and speak[ing] highly of Alternatives Agency."  (R. 1162-1: Brief in Support, PageID 32299). Government counsel listed those acts among many others (including Petitioner's votes and the pressure he placed on the chief judge to have funding reinstated).  (Id. at PageID 30152-53).  Arranging for the meeting and attending the meeting to advocate for Alternatives Agency are both official acts under McDonnell at 2370-72 because, although merely "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more" is not sufficient, there was much more here.  An official act does include "using [one's] official position to exert pressure on another official to perform an 'official act,' [as Petitioner did in his meeting with the judges] or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official [as Petitioner did with the chief judge]."  Further, in addition to "a decision or action" on a matter involving the exercise of governmental power, "a decision or action on a qualifying step" toward that final decision, "such as narrowing down the list of potential research topics," also qualifies as an "official act."  Id.  Thus, Petitioner's actions satisfy McDonnell in two ways, (1) voting and (2) taking qualifying steps such as arranging meetings, attending meetings and advocating for

AA and which led to the commissioners and other officials restoring the funding for Alternatives Agency.

     5.    <u>Kleem and His Companies (Counts 4, 5, 6 and 7)</u>

Ferris Kleem and his companies paid a series of bribes to Petitioner over a period of years from the time Petitioner was first elected Commissioner through mid-2008.  Sometimes he gave things of value for past official acts, and sometimes for future ones.  (R. 1014: Tr. Jury Trial Vol. 8 (Kleem), PageID 23707).  He paid the bribes to "gain influence at Cuyahoga County," (R. 1014: Tr. Jury Trial Vol. 7 (Kleem), PageID 23323), to "get stuff done" on County work, (<u>id.</u> at PageID 23339), and to have Petitioner make a phone call on Coe Lake (Kleem felt comfortable asking for Petitioner's help because "I was giving him things.  And he – I had expected that he would do me favors, and he always did," <u>id.</u> at PageID 23360), to obtain help on a County smoking violation (Kleem felt comfortable asking Petitioner for help at the time because they were planning the Las Vegas trip and he was giving Petitioner things of value, <u>id.</u> at PageID 23407).

These bribes included a $400 ring, a $4,000 dinner party for Petitioner and 20 of his friends, $2,000 toward a Rolex watch, (Kleem flew on a separate flight for the trip because he did not want to be seen with Petitioner at the airport in case anybody made a connection between them and avoided the telephone to talk about the trip because the trip did not look right), a refrigerator (concealed with a phony invoice), a television, numerous restaurant and Trout Club meals, enrolling his companies in a managed care organization affiliated with a Russo relative and an all-expenses paid trip to Las Vegas, including a hotel room, meals, $6,000 in cash for gambling, privileges at the Bare pool and the services of a prostitute.  (R. 1014: Tr. Jury Trial Vol. 7 (Kleem), PageID 23345-47, 23376-77 23399, 23408-409, 23412, 23420, 23436-39,

23448-55, 23459-65, 23469-74; R. 1015: Tr. Jury Trial Vol. 8 (Kleem), 23688, 23377-81, 28904).  In return Petitioner agreed to perform the following official acts for Kleem's benefit.

### a.     Agreeing that Russo Hire Kleem's Cousin

Kleem sought the assistance of County Auditor Frank Russo and Petitioner to obtain a County job for his cousin.  In a meeting with both Russo and Petitioner, Russo agreed to hire Kleem's cousin if Petitioner would fund the job.  Ultimately, Russo hired Kleem's cousin. (R. 1014: Tr. Jury Trial Vol. 7 (Kleem), PageID 23328-33).  This scheme was not charged in the substantive Kleem counts, but formed part of the basis for Petitioner's conviction on the RICO count in that Petitioner agreed that Russo, a member of the RICO conspiracy, would perform the official act of hiring Kleem's cousin.

### b.     Voting for the Coe Lake Grant

On February 1, 2007, Petitioner voted to approve a $150,000 Community Development Block Grant for constructing a pedestrian foot bridge at Coe Lake in Berea. (Gov't Ex. 400-G (Agenda Action)).

The process for obtaining these grants was highly competitive. (R. 1029: Tr. Jury Trial Vol. 31 (Cyril Kleem), PageID 26885).  The County received federal funds, the County Development Department reviewed and scored the applications and the BOCC voted on which cities received them. (Id., R. 1013: Tr. Jury Trial Vol. 6 (Massie), PageID 23147; R. 1030: Tr. Jury Trial Vol. 32 (Nichols) PageID 27073-75, 27080; Gov't Ex. 454).

Prior to the vote approving the grant, Petitioner took several actions to insure that it reached the Commissioners' agenda, as set forth below.

Kleem had run into some obstacles in obtaining the grant. (R. 1029: Tr. Jury Trial Vol. 31 (Kleem), PageID 26887, 26890, 26896; R. 1030: Tr. Jury Trial Vol. 32 (Nichols), PageID

27073). County Development Director Tracy Nichols gave priority to projects that would serve impoverished communities, not communities like Berea.  (Id. (Kleem) at PageID 26895).

To assist Kleem, Petitioner called Tracey Nichols, the County Director of Development, who oversaw the grant program. (Id. at PageID 26899, 23360, 27073, 27080).  After receiving Petitioner's call, Nichols agreed to take a second look at the project and asked her staff to do so. (Gov't Ex. 454 (June 2006 memo Nichols to Petitioner); Id. at PageID 27110).  She made it a priority and caused her staff to expend time and resources to research the issue because the call had come from the Petitioner and because he was her boss.  (Id. at PageID 27111-12).

Cyril Kleem, the brother of Ferris, who was also working on the project, recalled a three-way telephone conversation with Nichols and Petitioner.  When Petitioner was on the line, Nichols was much more deferential and cooperative than she had been before. In the conversation, Petitioner advocated Cyril's Kleem position that HUD guidelines permitted funding for handicapped accessibility projects, a position which Nichols had previously opposed. (R. 1029: Tr. Jury Trial Vol. 31 (Kleem), PageID 26898-99).

By January 2007, Petitioner had become frustrated by delays in approving the grant.  He asked his executive assistant, Pat Smock, "[i]f there [was] an update on the agenda item."  (Id. at PageID 27113; Gov't Ex. 465).  Smock contacted Nichols and inquired.  Nichols explained that Congress had not acted and she was not sure if the County would have adequate funds to cover the grant.  (Id.).

On January 11, 2007, Petitioner told his executive assistant, "I need to have this request funded. I was told no problem. We would have the funding locally if needed and we're going to do the funding at a January 2007 Board of County Commissioners' meeting.  There are only two Board of Commissioners' meetings left in January. I wanted to do this as part of the budget

process and was told by Tracey [Nichols] not for the end of the year. Do it in January of 2007."
(Gov't Ex. 465, p. 1; R. 1030: Tr. Jury Trial Vol. 32 (Nichols), PageID 27113-14).

All of this led up to Petitioner voting to fund the project on February 1, 2007.  (Gov't Ex.
400-G (Agenda Action)).

Petitioner contends that his request of Nichols that she "look into" the grant was not an
official act and that government counsel should not have argued in closing that it was. (R. 1162-
1: Brief in Support, PageID 32299 (citing R. 1045: Tr. Jury Trial, Vol. 36, PageID 30168)). After
arguing that Nichols had initially determined that Coe Lake did not qualify for a grant,
government counsel pointed out that, in response to Petitioner's request, Nichols "sharpened her
pencil and went to work and had her staff look.  And they were looking for ways to get this
money to Berea, and that but for [Petitioner] calling, she wouldn't have looked for other ways,
but she did because [Petitioner] called."  (Emphasis added; Id. at PageID 30168).  This was an
official act because it was a "qualifying step" toward a final decision – Petitioner's vote on Coe
Lake – in that it was necessary to making the grant qualify under the rules for such grants.
McDonnell, 136 S. Ct. at 2370.  Indeed, government counsel immediately followed her argument
with the fact that Petitioner voted to approve the Coe Lake grant.  (R. 1045: Tr. Jury Trial, Vol.
36, PageID 30168)  If he hadn't requested that Nichols figure out a way to fund it, the grant
would not have come before Petitioner for a vote.  Thus it was a necessary qualifying step
toward getting the project funded.

> c.     Voting on Juvenile Justice Center Contracts and Taking Action on
> Qualifying Steps
>
> i.     Background

The County was planning to build a new JJC.  Petitioner voted several times on matters
for Kleem's benefit on the JJC during the time Kleem and Petitioner were making plans for

Kleem to take Petitioner on an all-expenses paid trip to Las Vegas and while they were in Las Vegas.  (R. 1012: Tr. Jury Trial Vol. 5 (Massie), PageID 22878, 22935-43, 22954-56; R. 1014, Tr. Jury Trial Vol. 7 (Kleem), PageID 23323, 23377-81).  In addition, Petitioner caused other public officials to take actions on qualifying steps which, if successful, would have led to Petitioner's vote on a contract for Kleem's benefit.

ii.　　Official Acts

On February 22, 2008, Petitioner and Kleem had a telephone call in which they made plans for the Las Vegas trip.  Kleem was in the process of bidding on the JJC and told Petitioner, "You know, this Juvenile Justice Center, it's way over budget on the general trades. . . .  It's gonna be thirty-five million, Jimmy, instead of twenty-two.  You gonna be able to award it to me if I'm low?"  Petitioner replied in the affirmative.  (Gov't. Ex. 400-L-TR, p. 5).  Kleem explained he was concerned because in a previous unrelated County project, the commissioners voted to award a contract to company that was not the low bidder. That raised red flags in the construction industry.  (R. 1015: Tr. Jury Trial Vol. 15 (Kleem) PageID 23385).  Thus, in the same conversation in which Kleem offered to pay expenses for the Las Vegas trip, Petitioner committed to voting in favor of Kleem's company if its bid was low.  Evans 504 U.S. at 268-69 (fulfillment of the promise to do an official act is not an element of bribery).

On March 13, 2008, after the County determined that all of the JJC bids were over budget, Petitioner voted to reject all bids for the main building packages, to revise the specifications and to re-advertise for bids.  (R. 1012: Tr. Jury Trial Vol. 5 (Massie), PageID 22877-78, Gov't Ex. 400-R-1 (Agenda Action)).  Kleem's bid had been thrown out because there had been a problem with his bid bond.  Thus, Petitioner's vote allowed Kleem to re-submit a bid with proper bonding and at a revised cost of 36.8 million compared to the 22 million that was in the original estimate.  (Id. (Massie) at PageID 22878, 22939).

On March 20, 2008, Petitioner voted to award a $4,576,000 award for concrete on the JJC to Phoenix Cement to one of Kleem's companies.  (Id. at PageID 22879; Gov't Ex. 400-R, page 7).

On April 3, 2008, two days before the Las Vegas trip, and one day after Kleem, at Teamz Restaurant, had given $6,000 in cash to Petitioner and $6,000 in cash to Russo for gambling, Petitioner voted to request an additional addendum increasing the general trades estimate from $36,800,000 to $37,000,000. (Id. at PageID 22902-03, 22979; R. 1014: Tr. Jury Trial Vol. 7 (Kleem), PageID 23412; Gov't Ex. 441, p. 7).

On April 7, 2008, while Petitioner and Kleem were in Las Vegas, with Kleem paying the expenses, Kleem learned that he was the second lowest bidder on the JJC general trades re-bids. Petitioner, for the benefit of Kleem, called his executive assistant in an effort to determine if the low bidder (Panzica) could be excluded.  This call, and others related to it, were decisions or actions on qualifying steps toward excluding Panzica's bid, paving the way for Petitioner to vote on Kleem's company for the contract.  This process was very similar to "narrowing down the list of potential research topics," which McDonnell, 136 S. Ct. at 2370 stated qualifies as an "official act."

Petitioner's assistant, at Petitioner's behest, called Adrian Maldonado, the County Director of Procurement and Diversity (who reported to the commissioners), to research whether the Panzica bid could be excluded for either omitting an allowance or for having an inexperienced Small Business Enterprise ("SBE").  Maldonado reported to Petitioner's executive assistant, who told Petitioner, that Maldonado was looking at Panzica's SBE experience to determine if it was sufficient.  If Panzica's bid was thrown out for having an insufficient SBE, or on the allowance issue, Kleem would be the low bidder and Petitioner would vote to award the

contract. (Gov't Ex. 400-L-TR, p.5 (Kleem asked Petitioner if he would award the contract to

Kleem if he was low and Petitioner responded in the affirmative), 400-CC-TR, 400-FF-TR, 400-

NN-TR, p.2 (all calls in which Petitioner assisted Kleem in investigating the Panzica bid), Id. at

PageID 22955-56, 22979-81, 22937-42).

Petitioner contends that he did not do an official act when he called a County staff person

to "inquire about the status of bids" in connection with the JJC, citing government counsel's

argument at (R. 1162-1: Brief in Support, PageID 32299).  However, Petitioner fails to quote the

entire argument – that Petitioner performed an official act by trying to "throw[] out the bids and

trying to find a way, once Ferris Kleem was low, to get the company in." (R. 1045: Tr. Jury

Trial, Vol. 36, PageID 30159).  The telephone calls were an essential qualifying step on a matter

that would come before Petitioner for a vote.  Thus, the argument was proper under McDonnell

because Petitioner (1) cast votes on JJC matters for Kleem's benefit, and (2) pressured his staff

to take action which, if successful, would have eliminated Panzica's bid, resulting in Petitioner

voting to award the contract to Kleem.

> d.    Voting on the Snow Road Contract and Advising or Pressuring the
> Engineer's Office to Assign a Particular Inspector for Snow Road

On May 1, 2008, shortly after the Las Vegas trip, Petitioner voted to approve a

$2,887,359 contract for the resurfacing of Snow Road to Kleem's company.  (Gov't Ex. 400-VV

(Agenda Action); R. 1012: Tr. Jury Trial Vol. 6 (Massie), PageID 23023).

While in Las Vegas the month before, and knowing that the contract was awaiting

approval by the BOCC, Kleem told Petitioner he wanted a particular County inspector, John

Chyla, assigned to the job.  Petitioner explained that having the right inspector on a job was like

"heaven on earth. . . . it's the biggest thing that you could ask for on a project . . ."  Having a

focused and professional inspector has a significant impact on the profitability of a job.  Kleem

hoped to earn a 4% - 5% profit on contracts, but with a bad inspector he might just break even. In addition, an inefficient inspector slows down payments to the contractor.  (R. 1014: Tr. Jury Trial Vol. 7 (Kleem), PageID 23488, 23491-93).

Petitioner agreed to work on having Chyla assigned to the Snow Road contract.  (Id. at PageID 23488).  He enlisted two intermediaries (co-conspirators Kevin Kelley and Kevin Payne, both employed by the County Engineer) to coerce Mike Dever, the County Engineer's Office supervisor with official responsibility for assigning inspectors, to assign Chyla.  Kelley threatened Dever that if Dever did not assign Chyla, Petitioner would call Dever's boss, County Engineer Bob Kleiber.  (Gov't Exs. 400-OO-TR; 400-PP-TR, 400-QQ-TR, p. 8-9; 400-TT-TR, 400-UU-TR; R. 1026: Tr. Jury Trial Vol. 18 (Kelley), PageID 26173-96).   At the same time, Payne (Chief of Staff at the County Engineer's Office, and supervisor of Mike Dever) was soliciting assistance from Petitioner to increase the salary of County Engineer Bob Kleiber, an action that would have required a vote of the Commissioners.[17]  (Gov't Exs. 513-TR, 820-TR; R: 1026: Tr. Jury Trial Vol. 18 (Kelley), PageID 26187, R. 1018: Tr. Jury Trial Vol. 11 (Massie), PageID 24384).

Dever probably would not have assigned Chyla to Snow Road without Petitioner's intervention because it caused him to reassign other personnel.  (R. 1015: Tr. Jury Trial Vol. 8 (Dever), PageID 23787-92).  Dever made the assignment because of Petitioner's threat to contact the County Engineer, Dever's boss, and because Dever was planning to apply for a promotion which would have required a vote from Petitioner in the form of a personnel action.  (Id. at PageID 23788-89).  Thus, Petitioner's pressure and advice carried great weight for Dever.

_____

[17] Payne was providing things of value to Petitioner in exchange for this request.  See discussion of Stonebridge scheme below in Section II.E.6. below.

e.       Advising or Pressuring the Cuyahoga County Board of Health to
          Resolve a Smoking Violation

Kleem's brother, Tony, had an interest in a restaurant, Tony K's Bar and Grill.  On

January 29, 2008, Tony K's received notice of a smoking violation from the Cuyahoga County

Board of Health ("CCBH").  (R. 1013: Tr. Jury Trial Vol. 6 (Massie), PageID 23222).  The

violation notice was on CCBH letterhead, listing Terrance Allen as the CCBH commissioner.

(Gov't Ex. 400-J-1, p.2).  It cited various violations of the Ohio Revised Code and set forth the

procedures of appeal to the Cuyahoga County Health District.  (Id.).  The CCBH was governed

by a board of trustees which included representatives from the County and all the municipalities

it represented.  (R. 1013: Tr. Jury Trial Vol. 6 (Massie), PageID 23111-12).  The BOCC had a

representative on the board. (Id.).

Kleem was concerned that a violation of the newly enacted smoking ban would cost his

brother $40,000 to $50,000 in renovations.  (Id. at PageID 23401).  Therefore, he requested that

Petitioner "interfere" on the smoking violation.  Petitioner thought it would be fairly easy to help

Kleem by calling someone at the County.  The next thing Kleem heard, Petitioner told him to

expect a call from "this Terry person, and I did."  (R. 1014: Tr. Jury Trial Vol. 7 (Kleem),

PageID 23373, 23402-403).

Petitioner had called Allen to pressure him and advise him to resolve the citation in favor

of Tony K's.  Petitioner said he "was hoping you [Allen] could maybe, um, intervene here and

take a look at uh, a particular issue one, uh, that somebody's [Kleem's] having a little problem.  I

don't know if it's a difference of opinion or a definition or a judgment call here.  It's one of those

smoking issues with a bar." (Gov't Ex.400-K TR).  In the course of the conversation, Petitioner

acknowledged that Allen was the official who would decide whether there was a violation.  (R.

1013: Tr. Jury Trial Vol. 6 (Massie), PageID 23110-11).  Petitioner went on to discuss the

66

structure of the smoking patio and its roof and to vouch for Kleem.  Allen agreed to sort it out.
(R. 1010: Tr. Jury Trial Vol. 4 (Massie), PageID 22529; Gov't Ex. 400-K TR, p.1).  Following
Petitioner's intervention, the violation was closed.  (Id. at PageID 22536).

On February 22, 2008, Kleem and Kelley were discussing the upcoming Las Vegas trip
when Petitioner (who was in the presence of Kelley during the call) got on the phone and asked
Kleem how "that thing worked out for you with the board," referring to the smoking violation
and saying he wanted to make sure that [Allen] treated you right." (R. 1014: Tr. Jury Trial Vol. 7
(Kleem), PageID 23372-73).  Kleem confirmed that Allen definitely did.  Kleem went on to
express his excitement about the Las Vegas trip and offered to pay Petitioner's expenses.  (R.
1010: Tr. Jury Trial Vol. 4 (Massie), PageID 22510-13; Gov't Ex. 400-L TR, p.3).

Petitioner's official act, in pressuring or advising another public official (Allen) to take an
action within his jurisdiction, satisfies McDonnell.

### f.  Voting on Contracts for First Energy

This is a two-tier scheme.  First, Kleem was bribing Petitioner to perform a series of
official acts.  Second, Petitioner did an official act – voting for First Energy – in exchange for
First Energy providing a thing of value to Petitioner's designee, Ferris Kleem; that is, expediting
service for Kleem's construction project.

First Energy and Cleveland Public Power were competing to supply energy for the new
JJC.  Petitioner always supported First Energy as the supplier.  Indeed, the BOCC was required
to vote on which company supplied the power to all County buildings.  (R. 1021: Tr. Jury Trial
Vol. 14 (Ross), PageID 25277).  In this scheme, Petitioner used the threat of continued votes in
support of First Energy on County buildings to coerce First Energy to expedite service on a
Kleem construction project.

In late Winter or early Spring 2007, Kleem was confronting delays in having the power turned on for a construction project he was doing in Berea in the name of his company, FJR Properties.  He asked Petitioner to intervene.  Petitioner agreed to do so and had Kevin Kelley call Doug Hogan at First Energy to expedite the service.  (R. 1016: Tr. Jury Trial Vol. 9 (Hogan), R. 1022: Tr. Jury Trial Vol. 16 (Kelley), PageID 23858; 25401-402).

Petitioner contends that government counsel mischaracterized this phone call as an official act in closing, when she stated that calling businessmen was "part of the [the commissioners'] job duties."  However, she went on to explain, "And you may recall that during the same time, during the same time that the commissioner had Kevin Kelley call First Energy, that's when First Energy was bidding for county work.  And you may recall that some people, I think it was Jay Ross who testified, said they were debating between First Energy and the Illuminating Company and weren't sure and back and forth and [Petitioner] was really speaking highly of First Energy."  (R. 1046: Tr. Jury Trial Vol. 37, PageID 30482-83; R. 1162-1: Brief in Support, PageID 32299).

The official act in this scheme was Petitioner advocating for First Energy on a matter that would require his vote, not Kevin Kelley placing a call to a businessman.  Government counsel went on to explain in closing that Hogan expedited the service because "Commissioner Dimora wanted it done. . . .  We changed our process because [Petitioner called]." (R. 1046: Tr. Jury Trial Vol. 37, PageID 30483).  Although government counsel did allege that the call was an official act, she also argued that Petitioner would be voting on a matter of interest to First Energy, which constitutes an official act under McDonnell at 2371-72.  The phone call was just a qualifying step to Petitioner's official vote in favor of First Energy.  Indeed, it would have been reasonable for Hogan to conclude that if Hogan had refused to expedite the service, Petitioner

would probably have changed or delayed his vote, just as he did when he pulled a Michael Baker Group matter from the commissioners' agenda as a result of Michael Baker Group refusing to buy a table at a Democratic fundraiser.  See discussion of Michael Baker Group in Section II. E. 3.(g) above.

In this scheme, Kleem used his bribes to take advantage of Petitioner's official power over First Energy, Petitioner's vote in favor of First Energy being for Kleem's benefit on his construction project.  The fact that Petitioner's vote provided an indirect benefit to Kleem is of no moment.  In essence, Petitioner sold to Kleem his vote on First Energy's bid for County contracts.

> g.   Advising or Pressuring City of Cleveland Officials to Expedite Execution of Taxiway Contract

On April 9, 2008, the Board of Control for the City of Cleveland adopted a resolution awarding the $4.2 million Taxiway contract to Kleem's company, Blaze Construction.  Prior to that vote, Petitioner assisted Kleem with his concerns about the timing of this resolution.  Kleem had been the low bidder on the contract, but had heard nothing about it in the six or eight weeks since the bids had been opened.  It was important to Kleem to know the status of the contract so he could allocate employees and bonding to potential jobs in an efficient manner.  "It costs the company a lot of money when you're in that hold mode paying employees for doing nothing basically." (R. 1014: Tr. Jury Trial Vol. 7 (Kleem), PageID 23425).  Kleem believed that Cleveland Council President Sweeney would take Petitioner's call about this issue, but that he would not take Kleem's call.

On April 2, 2008, Petitioner, at Kleem's request, called Sweeney.  (Id. at PageID 23422-23).  The airport was in Sweeney's ward, and Sweeney, as a member of Cleveland City Council, would have voted on the contract.  When Petitioner called Sweeney, he explained that Kleem

was concerned that the contract had been held up, even though Kleem was the low bidder, and

that part of the problem might be that somehow the Port Authority had gotten involved.

Sweeney told Petitioner he "could figure it out."  (Gov't Ex. 101-TR).  Petitioner then put Kleem

on the telephone with Sweeney.  Kleem, in Petitioner's presence, explained that Kleem could not

get answers from airport employees and was concerned that other bidders might be in the mix for

the contract even though Kleem was the low bidder. Sweeney agreed to inquire and

demonstrated an understanding about the corrupt nature of the call when he said to Kleem:

> I'll . . .  give you an update . . . of a timing, and if there's any
> issues with any of the bids.  I won't specifically ask for you.  I'll
> just say, what's the status of everything in, if everything is in
> place, would it be a, a proper assumption that low bid would get it.
> . . . and then ask for the timing of it. . . . And tell the illustrious
> commissioner I appreciate the opportunity to have this time with
> you, Ferris Kleem . . . .  It's a nice opportunity that I have and the
> commissioner always delivers.

(Id., p. 3).  Sweeney then asked to talk with Petitioner. Petitioner asked which council member

was in charge of the airport committee.  Sweeney responded that it was Kevin Kelley,[18]  "[B]ut

it's also mine. . . . I'm Finance Chair, President, and local council person so all of these levels,

but I put Kevin over there for a little separation."  Sweeney then thanked Petitioner for the

opportunity to speak with Kleem, stating, "He's a hard man to find on occasion [meaning it was

difficult to obtain contributions from him]."  (Id. at pp. 3-4).   Later that night Petitioner and

Sweeney talked again on the phone.  Sweeney said, "I took care of [Kleem] a little bit if that's

alright [meaning that he had contacted an official in connection with the administration of the

contract]."  (Gov't Ex. 102-TR, p. 1).  Sweeney confirmed that Kleem got the contract and said:

> **You helped deliver** but I think it was gonna go his way.  We just
> gave him the timing so we gave him the word either was so . . . it

---

[18] This Kevin Kelley is not the same Kevin Kelley who pleaded guilty in a related case and
testified in the present case.

all that happened today was it got on their [the officials administering the contract] that ***I called which should be helpful*** and that, um, he's the low bidder and I guess the question from the person that's makin' the decision on the, uh, administrative side saying there's no problems internally.  Board of Control's the final step and he doesn't anticipate anything changing, and the lowest bid should be good. . . . ***If they're [the officials administering the contract] gonna f—k around with him now, they know I called***.  I didn't say anything about you. . . . [Kleem] kinda hides from me [regarding money].  We have all mutual friends.  Petitioner responded, "[Kleem] says he sends you money though.  Does he?"  Sweeney responded, "Minimal."  Sweeney went on to tell Petitioner that ***Petitioner could take credit for helping on the Taxiway***.

(Id.) (emphasis added). This conversation proves that Sweeney and Petitioner believed they took action – pressuring or advising city officials – which constituted a qualifying step toward the Board of Control voting a week later to adopt a resolution awarding the contract to Kleem's company.  (Gov't Ex. 140 (Resolution)).

      6.    <u>Stonebridge and the Engineer's Office: Voting to Make Kleiber the Sanitary Engineer, Voting for the Stonebridge Lease, Voting on Collective Bargaining Agreement for the Engineers Office and Other Labor Issues and Voting to Establish a County Sewer District in Parma (Count 8)</u>

      a.    <u>Background</u>

Kevin Payne, Chief of Staff for the County Engineer's Office and an attorney with a private practice on the side, gave Petitioner things of value in the form of using a Stonebridge condo for parties,[19] limousine trips, gambling trips, and the services of prostitutes in exchange for Petitioner taking certain official acts in connection with the Engineer's Office, including (1) approving the Stonebridge lease for the Engineer's office and resisting efforts to have the Engineer's Office move out of Stonebridge, (2) increasing the salary of the County Engineer

---

[19] Payne had access to the Stonebridge condo because Stonebridge allowed the Engineer's Office, as a tenant, the use of one of the condos "off the record."  (R. 1024: Tr. Jury Trial Vol. 15 (Kelley), PageID 25794).

(Bob Kleiber) and Payne, (3) facilitating labor union negotiations, and (4) trying to equalize pay issues between the former employees of the sanitary engineer and the Engineer's Office employees.  At trial, Russo explained the official acts Petitioner undertook for Payne's benefit on these four matters.

**The Stonebridge Lease**. Initially, Kevin Payne requested that Petitioner approve the Stonebridge lease for the Engineer's Office.  Petitioner's reaction to the lease was a "very, very positive thing."   When the lease was approved it came with a personal office for Payne on the lake "with gorgeous carpeting [and] sliding doors to a deck. . . ." and use of a condo in the Stonebridge development.  Any time Payne wanted a budget allocation, or more money for payroll, furniture or computers, he could obtain it from Petitioner and the BOCC who were in charge of the budget.  (R. 1039: Tr. Jury Trial Vol. 26 (Russo), PageID 28947-49).

When questioned about the possibility of the County consolidating office space, which would require the Engineer's Office to move into the Ameritrust Building, Russo testified:

> Well, Kevin Payne had a fit. He and Kevin Kelley -- and I mean an outrageous fit. They did not want to leave Stonebridge where they leased in '02 or '03. . . . So they were begging me to talk to [Petitioner] . . . . They did not want to move to the new downtown location. . . . In other words, they were obsessed, is everything okay? [Petitioner's] not going to throw us out of here. Is he going to let us stay here?
>
> * * *
>
> I brought to [Petitioner's] attention, you better give them their way. **You better let them keep the lease here. You went this far with them, you can't turn back. Because after all they've done for us, how could you not?**
>
> ***
>
> [Petitioner] was tending to agree with me.

(Id. at PageID 28949 – 51) (emphasis added).

In requesting help from Petitioner on this issue, co-conspirators Kelley and Payne reminded Petitioner about the use of the condo as a side benefit to the lease, and about having

prostitutes there.  (R. 1024: Tr. Jury Trial, Vol. 15 (Kelley), PageID 25795). Petitioner indicated

to Payne and Kelley that he was fine with the Stonebridge lease and keeping the Engineer's

Office there. (Id. at PageID 25796).

**Budget Items and Kleiber Raise**.  Russo described Payne obtaining official acts from

Petitioner on budget items as follows:

> Budget items are a long, long, long request. If I put a budget item
> in and say, you know, I need three new employees for a certain
> department I'm starting up, it's a long, long, long process to go
> through. And [Petitioner] could speed the process up where you
> don't have to wait. You don't have to -- you know, he could open
> doors, tell you where to go, a roadmap, and made things easier.

(Id. at PageID 28951-52).  In addition, Petitioner gave Payne a substantial raise when [he voted

to put] the sanitary engineers under the Engineer's office.  "[T]hat was another big way to thank

Kevin Payne for what he's done [giving things of value to Petitioner]."  (Id. at PageID 28952).

The Sanitary Engineering Department was headed by a professional engineer appointed

by the BOCC.  When he retired, Payne recognized that if the BOCC allowed Bob Kleiber, the

elected County Engineer, to take over the Sanitary position, he would get a raise under Ohio law.

Kevin Payne would also get a raise.  Payne requested that the BOCC, approve the appointment.

(R. 1018: Tr. Jury Trial Vol. 11 (Gouker), PageID 24613-14).  This move added 100 employees

to the Engineer's Office.  Payne worked to equalize salaries between the former Sanitary

employees and raises for the former Sanitary employees being approved by the BOCC, including

Petitioner. (Id. at PageID 24615-18).

In an April 2008 call, Kevin Payne talked to Kevin Kelley about trying to raise the salary

of County Engineer Bob Kleiber.  (Gov't Ex. 820-TR).  Although the Engineer's salary was set

by state statute, they were trying to get it raised because of the increased responsibility that

would come with absorbing the Sanitary Engineer's Department, which reported directly to the

BOCC.  The BOCC would have to vote to approve any such increase in Kleiber's salary.  In addition, Kelley and Payne were concerned about Kleiber's salary because they both made more money than Kleiber did, and the Cleveland Plain Dealer was beginning an investigation into County salaries.  Payne and Kelley were concerned it would look bad if their salaries were reported as higher than their boss's, the elected Engineer. (Id. at PageID 24383-86; R. 1024: Tr. Jury Trial Vol. 15 (Kelley), PageID 25796, 25825; Gov't Ex. 820-TR, p.2) (Kelley told Payne he would explore the issue with Petitioner).  As noted above, Payne and Kelley thought it was a good time to raise Kleiber's salary because it could be tied to Parma being brought into the sanitary system as reflected in the May 1, 2008 vote of the BOCC.

**Raising pay for the former Sanitary employees.** Payne believed it was a perfect time in the spring of 2008 to obtain Petitioner's help because the County was negotiating with Parma for a contract to bring Parma into the County's sanitary system, thereby increasing the business of the Engineer's Office by 40%.  Obtaining Petitioner's support on these issues gave Payne "clout and power.  It gave him more flexibility to do things in the office."  It also gave him more influence with his own boss, the County Engineer, Bob Kleiber. (R. 1024: Tr. Jury Trial Vol. 15 (Kelley), PageID 25794-98; R. 1018: Tr. Jury Trial Vol. 11 (Massie), PageID 24367).  Prior to, and after, the Sanitary Engineers were folded into the Engineer's Office, any personnel decisions for that office went through a personnel board and ultimately to the BOCC for approval.  (R. 1015: Tr. Jury Trial Vol. 8 (Dever), PageID 23819).

All of the official acts summarized above involved Petitioner voting on matters that did come before him or would, if successful, come before him.  ("The commissioners would have to vote to approve any increase in Kleiber's salary.") (R. 1018: Tr. Jury Trial Vol. 11 (Massie), PageID 24384).

b.    Official Acts

On June 10, 2003, about when Petitioner started getting free limousine service from Payne, Petitioner voted to recommend awarding a $4 million lease for the Engineer's Office at Stonebridge. (Gov't Ex. 840, p. 2 (Agenda Action); R. 1018: Tr. Jury Trial Vol. 11 (Massie), PageID 24479). Under its terms, the County could terminate the lease before the 10-year term ended if "the county commissioners engage[d] a plan where county facilities [were] to be combined in a centralized location." (Id. at PageID 22481-81; Gov't Ex. 841). This provision made it necessary for Kelley and Payne to continue providing things of value to Petitioner in an effort to minimize the risk that Petitioner would participate in a finding that the Engineer's Office should be in a central location with other County offices.

In 2004, Petitioner appointed Bob Kleiber to serve as the Sanitary Engineer – a function that was under the BOCC (in addition to his elected responsibilities as the County Engineer), resulting in a $40,000 pay increase. (R. 1024: Tr. Jury Trial Vol. 15 (Kelley), PageID 25796).

On January 27, 2005, Petitioner voted to submit an amendment to a collective bargaining agreement in effect with a union representing employees of the Engineer's Office. Kevin Payne was the primary person at the Engineer's Office handling negotiations with the union. (Id. at PageID 24399; Gov't Ex. 851, p. 3).

On June 2, 2005, Petitioner voted to approve an amendment to the Stonebridge lease for the County Engineer's Office for an additional $47,505. (Gov't Ex. 846 (Resolution)).

On November 17, 2005, Petitioner voted to submit an amendment to a collective bargaining agreement in effect with a union representing employees of the Engineer's Office. (Gov't Ex. 852, p. 2).

75

On December 8, 2005, Petitioner voted to submit an amendment to a collective bargaining agreement in effect with a union representing employees of the Engineer's Office. (Gov't Ex. 853, p. 2).

When the County purchased the Ameritrust Building to consolidate its office space and Payne and Kelley asked Petitioner to help them keep the Engineer's Office at Stonebridge, Petitioner agreed, saying he was fine with keeping the Engineer's Office at Stonebridge and would work to get the two other commissioners "on board." (Id. at PageID 25796; R. 1039: Tr. Jury Trial Vol. 26 (Russo), PageID 28949-51).

On January 5, 2006, Petitioner voted to submit an amendment to a collective bargaining agreement in effect with a union representing employees of the Engineer's Office.  (Gov't Ex. 854, p. 2).

On November 2, 2006, Petitioner voted to amend the Stonebridge lease for an additional $28,758.  (Gov't Ex. 848 (Resolution)).

On March 8, 2007, Petitioner voted to submit an amendment to a collective bargaining agreement in effect with a union representing employees of the Engineer's Office.  (Gov't Ex. 855, p. 2).

On June 5, 2007, Petitioner, Petitioner voted to submit an amendment to a collective bargaining agreement in effect with a union representing employees of the Engineer's Office. (Gov't Ex. 856, p. 1).

On October 9, 2007, Petitioner voted to submit an amendment to a collective bargaining agreement in effect with a union representing employees of the Engineer's Office. (Gov't Ex. 857, p. 1).

On May 1, 2008, Petitioner voted to (1) recommend establishing a County Sewer District no. 1A in the City of Parma and (2) to submit an Agreement with the City of Parma for maintenance of sanitary and storm sewerage and water systems.  (Gov't Ex. 842, p.2).  On the day of this meeting, Kelley reminded Petitioner that Kevin Payne had an item on the Commissioners' agenda that day.  (Gov't Ex. 808-TR; R. 1024: Tr. Jury Trial Vol. 15 (Kelley), PageID 25830-31). In calls leading up to this vote, Payne asked for Petitioner's support because it related to other things Payne wanted to accomplish. On April 3, 2008, in the first of a series of calls about Payne and Kelley trying to get Petitioner access to the Stonebridge condo, Petitioner asked Payne, "[W]hen does that Parma thing go into effect?" Payne responded that it would come before Petitioner in a few weeks, referring to the May 1, 2008 vote summarized above. (Id. at PageID 25831-32; Gov't Ex. 809-TR).  In the same call, Payne asked for Petitioner's assistance on the following issues that related to that vote: (1) license plate fees (which would provide additional fees to help offset the increased burden of absorbing Parma – Petitioner said he was ok with the license plate proposal), (Gov't Ex. 809-TR, p. 2; (R. 1024: Tr. Jury Trial Vol. 15 (Kelley), PageID 25801, 25796),[20] (2) pay equity issues between the former sanitary engineer's employees and the employees of the County Engineer's Office (Petitioner indicated that pay raises for the former sanitary employees would have to go on the public agenda of the Commissioners).  (Gov't Ex. 809-TR, p. 2), and (3) the Kleiber pay raise.  (R. 1018: Tr. Jury Trial Vol. 11 (Massie), PageID 24360-67; Gov't Ex.  809-TR).  In the call, Petitioner agreed with Payne that it seemed like a good time (when the Parma contract is approved, which

---

[20] The Commissioners would have to vote on license plate fees ("the Commissioners wanted to know what the Governor's position was on the license plate fees 'cause they don't want to do anything contrary to what the Governor wants.") (Gov't Ex. 814-TR).

Petitioner would be voting on) for the increase at Sanitary (the pay equity issue).  Thus, there was a quid and a quo in the same call.

On May 8, 2008, Petitioner voted to (1) recommend accepting the purchase and installation of an emergency generator system for the Valley View Central Facility for the County Engineer and (2) submit an amendment to the County Engineer's Policies and Procedures Manual to change Section IV relating to Corrective Action and Attendance Policy. (Gov't Ex. 858, p.2).

7.      Pressuring or Advising Municipal Officials to Hire Gina
        Coppers (Count 9)

Petitioner pressured or advised three suburban officials to hire Gina Coppers for a job with Ohio Public Employees Retirement System (OPERS) benefits at a salary agreeable to her. McDonnell at 2371-72.  (R. 1019: Tr. Jury Trial Vol. 12, PageID 24759-74, 24779-24803, 24807-10, 24818-19; see also R. 1033: Tr. Jury Trial Vol. 20 (Jaworski), PageID 27398).  In exchange, Coppers gave Petitioner sexual favors and a hotel room.

Petitioner succeeded in this effort, which he accomplished by making 70 calls, many of them to Tom Day, the City of Bedford Clerk of Courts, and to Tom Cornhoff, the Human Resources Director for the City of Solon.  He also talked to the Bedford Municipal Judge.  (Govt. Ex. 920-TR). Ultimately, Tom Day hired Coppers.  (Gov't Ex. 900 (Summary Chart); R. 1019: Tr. Jury Trial Vol. 12 (Massie), PageID 24751, 24763, 24768, 24773).  Petitioner was unable to hire her at the County because there was a hiring freeze.  (Id. at PageID 24819).

Petitioner pressured Day to create a position in the Bedford Heights Court for Coppers (id. at PageID 24779-80, 24784-86, 24792), even though there were no available positions, (id., PageID 24771-72; see also id. at PageID 24802), and investigators found no evidence Bedford ever advertised for the position Coppers received.  (Id. at PageID 24881).  Despite these

78

obstacles, Day said he would pay Coppers what she needed to make, (id. at PageID 24808), and told Petitioner "I know she is looking to you . . . I want to do this for you and . . . for her, and . . . the judge does, too . . . we'll get it done."  (Id. at PageID 24810).  Day also confirmed with Petitioner that Coppers wanted to earn $24,000 per year for a part-time job. (Id.; Gov't Ex. 924). In short, Petitioner placed Coppers' desires above Bedford's by focusing solely on Copper's desired salary. In fact, Coppers' predecessor earned substantially less than Coppers' starting salary.  (Id. at PageID 24822-25, 24825).

The following calls between Petitioner and Coppers demonstrate the pressure Petitioner placed on Day and Cornhoff for Coppers' benefit.  Petitioner said:

> I told [Day], let's . . . get her in, back into PERS, even if it's part time to start out with . . . and then we'll either move it to full time over at Solon or we'll try to put you at the Court. . . . *I'll stay on top of [Day], hound him . . . .* I'll touch base with him on Monday.

(Gov't Ex. 905-TR) (emphasis added).  Petitioner told Day he had also talked to Cornhoff in Solon.  Petitioner said he had promised he would help her.  Day said, ". . . I hear you.  We'll figure something out. . . . Have her come in to see me. . . ." (Gov't Ex. 906-TR).  Petitioner and Day discussed Coppers' salary requirements.  Day said, "we'll get something worked out." (Gov't Ex. 907-TR).  Coppers told Petitioner, "Don't let Tom Day forget about me."  Petitioner responded, "*I won't let 'em. They* [sic] *never be able to forget*."  (Gov't Ex. 908-TR) (emphasis added).  Petitioner agreed to talk to Tom Day about what days Coppers would work.  (Gov't Ex. 909-TR).  In connection with Solon, Petitioner said to Coppers, "Let me work on that [the salary number], even before you make the call back, back to Cornhoff?"  (Gov't Ex. 910; R. 1019: Tr. Jury Trial Vol. 12 (Massie), PageID 24784).  Petitioner said, "We're three quarters of the way there so *I'm gonna make sure we get it and . . . I just want you to get in there* . . . so I gotta get everybody familiar with you is what it is."  (Gov't Ex.  911-TR) (emphasis added).  Petitioner

79

left a voicemail message for Coppers, stating that he had talked to Tom Day and he was going to talk to Tom Cornhoff about trying to get a "few more dollars" and get her closer to the 2,400 "for the time being" and to get her back in PERS.  (Gov't Ex. 912-TR; Id. at PageID 24785).  Petitioner said he would call Day that night to relay Coppers' desire to make $2,000 per month.  (Gov't Ex. 914-TR).  "Keep in touch.  If you don't hear nothing . . . by next week, let me know and this way *I'll stay on top of people*."  (Gov't Ex. 915-TR; Id. at PageID 24782) (emphasis added).  Petitioner said he would "*stay on top of Tom Day here then and make this other thing happen . . . I'll just keep pressing these guys to get it done*."  (Id. at PageID 24791; Gov't Ex. 916-TR) (emphasis added) and would "*stay on top of these guys*."  (Gov't Ex. 918-TR; Id. at PageID 24795) (emphasis added).  He explained Bedford would "pay you at least what you're making a week [at your current job] for the time being.  And maybe he can do a little more.  That's what he's working on."  He also told her he had talked to the judge[21] in Bedford.  (Gov't Ex. 920-TR; Id. at PageID 24801).

On June 2, 2008, Day reported to Petitioner that he was going to pay Coppers so it works out that she's making what she needs to make.  Petitioner asked whether Day could keep her on until the Solon deal came through.  Day responded that he would not "stiff her." Later Day said, "*I know she is looking to you, and you know, I --- I want to do this for you and, you know, for her, and you know the judge does, too, and I mean, we'll get it done.*" (Gov't Ex. 924-TR; Id. at PageID 24808-10) (emphasis added).

On July 21, 2008, Tom Day documented the official act he had been pressured by Petitioner to perform by sending a letter to the City of Bedford Finance Director on Bedford

---

[21] Petitioner pressured three public officials to hire Coopers – Day, the Bedford judge, and Cornhoff.

Municipal Court stationary stating that the Court had hired Coppers as a part-time Deputy effective July 15, 2008 and that her pay rate was $16.50 per hour.  (Gov't Ex. 954, p. 4).

Several witnesses testified about Dimora's financial control over County suburbs like Bedford, (id. at PageID 24830), including contracts for suburban road construction, (R. 1015: Tr. Jury Trial Vol. 8 (Dever), PageID 23769, 23773-79), and sharing 40% of a grant (approximately $1.4 million) with County suburbs. (R. 1034: Tr. Jury Trial Vol. 21, (Oyaski), PageID 27551). Further, on March 27, 2008, during the period Petitioner engaged in multiple conversations to secure employment for Coppers in Bedford, Petitioner voted to award Bedford a $100,000 grant. (R. 1019: Tr. Jury Trial Vol. 12 (Massie), PageID 24847-48). In fact, Bedford received approximately $1 million in discretionary funding from Cuyahoga County. (R. 1029: Tr. Jury Trial Vol. 31 (Gambosi), PageID 26913-15).  Beyond discretionary funds, the County Commissioners voted to release funds totaling approximately 40% of the salary and benefit expenses for Bedford judges and the court clerk, Tom Day, the very public official whose acts were so important to Petitioner's efforts on behalf of Coppers. (Id. at PageID 26907-13; R. 1019: Tr. Jury Trial Vol. 12 (Massie), PageID 24838-40).  Thus, Petitioner's pressure on Day had great weight -- he controlled the purse strings for Day's salary.

Because of Petitioner's formal power over the finances of suburban courts, his repeated calls requesting court personnel to hire Coppers amounted to pressuring or advising "other officials, knowing or intending that such advice would form the basis for an 'official act' by the other official."  McDonnell, 136 S. Ct. at 2371-72.

Petitioner contends that government counsel should not have argued in closing that Petitioner performed an official act by telling a staff member to retrieve and file a copy of Copper's resume.  (R. 1162-1: Brief in Support, PageID 32300 (citing R. 1045: Tr. Jury Trial,

Vol. 36, PageID 30186).  This comment followed government counsel's argument that Petitioner performed official acts with his calls to Day pressuring him to hire Coppers.  (Id. at PageID 30185).  As noted, these official acts alone satisfy McDonnell.  Adding an isolated argument, (id. at PageID 30185), describing a staffer retrieving and filing the Coppers resume was not erroneous given that it was a qualifying step in Petitioner obtaining a public job for Coppers. McDonnell, 136 S. Ct. at 2371-72.  Even if Petitioner's order to his staffer is deemed not to be a qualifying step, the isolated argument alone can hardly have prejudiced Petitioner, particularly when there was such overwhelming and compelling evidence of Petitioner's extensive pressure on Day to hire Coppers.

### 8.    Valentin and Salva Stone (Count 11)

Valentin paid bribes in the form of granite, valued at $3,250, for Petitioner's house remodeling in exchange for Petitioner performing two official acts.  He did so because "I considered it like a favor that I did to him in expecting in the future some favors from him, too." (R. 1036: Tr. Jury Trial Vol. 23 (Valentin), PageID 28228, 28232-33, 28236). Valentin did not charge Petitioner for the granite he supplied because "I was thinking in the future maybe I will have some – if I need some help from him I can get some favors. . . . If I make him a favor, I'm going to get a favor back in the future.  If I have a problem, I can have a door open to him to ask him for help if I need help."  (Id. at 28226, 28242).

Once Petitioner became aware of the investigation, and long after the project had been completed, Petitioner solicited a phony invoice for the granite, and made a modest payment for it in a vain attempt to make the transaction appear legitimate.  (Gov't. Exs. 1004, 2807-TR; R. 1036: Tr. Jury Trial Vol. 23 (Valentin) PageID 28239-40).

a.      Pressuring or Advising Federal Officials to Issue a Visa

Petitioner agreed to assist Valentin in obtaining a visa for a Romanian friend who wanted to enter the United States.  He did so by asking Frank Russo[22] to contact an associate of a United States Senator, which Russo did.  Russo gave the associate the paperwork connected with the matter, including a case number, and told him, "[Petitioner] really wants this bad.  So do I.  It would be a big favor to us.  I hope you can accommodate us."  (R. 1039: Tr. Jury Trial Vol. 26 (Russo), PageID 29040).  The Senator (who was then on the Foreign Relations Committee) wrote to the United States embassy in Bucharest seeking the visa stating he was doing so on behalf of Petitioner.  (R. 1036: Tr. Jury Trial Vol. 23 (Valentin), PageID 28243; R. 1038: Tr. Jury Trial Vol. 25 (Oliver), PageID 28620; Gov't Ex. 1002, 1003).  Thus, through intermediaries and a co-conspirator (Frank Russo), Petitioner pressured or advised a Senator and an embassy official to issue the visa.

b.      Voting to Approve Funds for Employment of Valentin's Daughter in the Auditor's Office

Petitioner voted to approve funds so that Russo could create a foreclosure department and hire Valentin's daughter. She had been unhappy working in the County Prosecutor's Office and wanted to change jobs.  (R. 1039: Tr. Jury Trial Vol. 26 (Russo), PageID 29037-38, R. 1036: Tr. Jury Trial Vol. 23 (Valentin), PageID 28220).

---

[22] About the same time, Russo had also received free granite from Valentin in exchange for arranging a County job for Valentin's daughter and a County job for a friend of Valentin.  (R. 1039: Tr. Jury Trial Vol. 26 (Russo), PageID 29036).

9.      Zavarella and Zavarella Brothers (Counts 12 and 13)

Nicholas Zavarella paid bribes to Petitioner in the form of home improvements in exchange for Petitioner assisting Zavarella on contracts and for employing a friend and a relative.  He did so because he "figured if I could help him, I'm sure he could help me." (R. 1037: Tr. Jury Trial Vol. 24 (Zavarella), PageID 28331).

a.      Hiring Zavarella's Daughter at the County

In 2002, the same year that Zavarella's company built a retaining wall on Petitioner's property at no charge, Petitioner assisted Zavarella's daughter by recommending her for County employment.  (R. 1037: Tr. Jury Trial Vol. 24 (Zavarella), PageID 28331; R. 1038: Tr. Jury Trial Vol. 25 (Oliver), PageID 286610).  She was successful in obtaining that job.  (Id. at PageID 28610).   Thus, Petitioner advised another public official to do an official act, McDonnell at 2371-72.

b.      Pressuring or Advising the Parma School Board to Hire
        Zavarella's Daughter as a Substitute Teacher

In 2006, two years after Zavarella built the columns on Petitioner's patio at no charge, Zavarella gave Petitioner his daughter's resume and asked him to assist her in obtaining a substitute teaching job in the Parma Schools.  Zavarella was aware that Petitioner knew Kevin Kelley, a member of the Parma School Board.  (R. 1037: Tr. Jury Trial Vol. 24 (Zavarella), PageID 28332-33; R. 1038: Tr. Jury Trial Vol. 25 (Oliver), PageID 28613-14).   Kelley testified that Petitioner had, indeed, asked for his help getting Zavarella's daughter (Lauren Zavarella) the job in Parma.  He, in turn, asked the superintendent to put her on the payroll, which she did. (R. 1026: Tr. Jury Trial Vol. 18 (Kelley), PageID 26239).   Thus, Petitioner again advised another public official – Kevin Kelley – to perform an official act.

          c.        <u>Pressuring or Advising the Bedford Schools to Hire Zavarella's</u>
                       <u>Daughter</u>

In 2007, the same year Zavarella worked on Petitioner's outdoor kitchen expansion at no charge and after his daughter had been working in the Parma schools as a substitute, Zavarella's daughter was interested in a full-time teaching position.  Petitioner sent a letter of recommendation on County letter head to the Superintendent of Schools in Bedford recommending Zavarella's daughter for the position and also talked to Kevin Kelley about a full-time job in Parma.  Kelley testified that obtaining a fulltime position in the primary grades was difficult.  Petitioner told Kelley he was working on finding her a position in Bedford.  She got the Bedford job, and Zavarella believed the letter was helpful.  (R. 1037: Tr. Jury Trial Vol. 24 (Zavarella), PageID 28333; R. 1026: Tr. Jury Trial Vol. 18 (Kelley), PageID 26239-41; R. 1038: Tr. Jury Trial Vol. 25 (Oliver), PageID 28613-14; Gov't Ex. 1232).  The Bedford superintendent testified that a recommendation letter such as that sent by Petitioner, when it is from someone "we know" and "we respect" gets the applicant a courtesy interview.  (R. 1029: Tr. Jury Trial Vol. 31 (Micsak), PageID 26950).  That courtesy interview led to Lauren Zavarella's employment the following year.  (<u>Id.</u> at PageID 26954).  Thus, Petitioner advised or pressured Bedford school officials in an important qualifying step in the process.

Petitioner contends that government counsel improperly argued that Petitioner performed an official act when he wrote a letter of recommendation for Zavarella's daughter on County letterhead to Bedford school officials.  (R. 1162-1: Brief in Support, PageID 32300 (citing R. 1045: Tr. Jury Trial, Vol. 36, PageID 30193)).  However, a defendant performs an official act when he exerts pressure on other public officials (in this case, the Bedford School public officials) to perform an "official act," (in this case, hiring Zavarella's daughter) or to advise other officials, knowing or intending that such advice would form the basis for an "official act" by the

other official.  McDonnell, at 2371-72.  Petitioner's advice, as someone Bedford School officials "knew" and "respected" carried great weight.  (R.1029: Jury Trial Vol. 31 (Miscak), PageID 26950.

### d.    Pressuring or Advising Russo to Hire Lillian Trovato

In summer 2007, the same year Zavarella worked on Petitioner's outdoor kitchen expansion at no charge, he asked Petitioner to help Zavarella's neighbor, Lillian Trovato, obtain a part-time County job. Petitioner asked Frank Russo to hire her, which he did, because Petitioner had asked him to.  (R. 1039: Tr. Jury Trial Vol. 26 (Russo), PageID 29078). [23]

### e.    Taking Action on Qualifying Steps on the Eastside Neighborhood Service Center Contract

In March 2008, Zavarella requested that Petitioner assist him and his company in connection with a County project.  (Gov't Ex. 1201-TR).  He explained that his company did a lot of work with Neskin Construction and that Neskin was interested in obtaining a contract for a new County services building.  It was on the east side and involved a person named Jerry Zoeller, whom Zavarella did not know.  Neskin had told Zavarella that he had been working with the County on the project and "they love us," based on prior work they (Zavarella and Neskin) had done for the County on a similar project on the west side.   Zavarella explained this east side project would provide work for Neskin and for Zavarella.  (Id.).

Neskin was already working on budget figures.  Zavarella explained to Petitioner that "some political party [was] undermining [the project]."  (Id.).  Petitioner agreed to check into it. Zavarella said there were not a lot of construction jobs available and everyone needed work.

---

[23] Using Gabor as an intermediary, Trovato's husband later gave Russo $6,000 in exchange for Russo increasing Trovato's hourly salary, increasing her work hours and providing health insurance benefits.  Count 33, on which the jury acquitted, charged Gabor with this later conduct.

Petitioner again agreed to "check it out a little bit here and see if I can, uh find out anything. . . . I'll have my executive assistant snoop around and see if he can find anything out with regard to the project on the east side neighborhood service center.  And I'll let you know what's shakin'." (Id.).

Within a few minutes, Petitioner called his executive assistant and said, "There's somethin' brewin' with the neighborhood service center because I got a call that somebody was getting sidestepped for their proposal that they thought they had for the neighborhood service center . . . ." Petitioner asked his assistant to find out what was going on.  (Gov't Ex. 1203-TR).

A few hours later, Petitioner's assistant reported back to Petitioner that three property owners (including Zoeller) were solicited by the County for their final and best offers. The County's letters to the property owners asked each for details on specific issues associated with each of their properties.  There was no effort to exclude Zoeller and he was wrong to interpret his letter that way.  They also discussed how the three city council members who had the properties in their wards were weighing in.  (Gov't Ex. 1204-TR).

A little over an hour later, Petitioner called Zavarella.  The call was placed on a line that was not being intercepted but a pen register recorded that the call lasted a little over eight minutes.  It is likely that Petitioner gave Zavarella the information he had received from his assistant.  (Gov't Ex. 1239; R. 1038: Tr. Jury Trial Vol. 25 (Oliver), PageID 28610).  Indeed, Zavarella testified Petitioner had told him that three council members each wanted the building in their wards.  (R. 1037: Tr. Jury Trial Vol. 24 (Zavarella), PageID 28338).

Petitioner contends that government counsel improperly argued that Petitioner performed an official act when he obtained information from County officials about the proposed County services building. (R. 1162-1: Brief in Support, PageID 32300; R. 1046: Tr. Jury Trial, Vol. 37,

PageID 30554).  As made clear by the calls summarized above, Zavarella, worrying about being the victim of some type of political maneuvering, was really asking about internal County and city deliberations on the project.  His partner, Zoeller, was already working on budget numbers, expending resources that would be wasted if they were being locked out for political reasons. The inside information that Petitioner obtained as a result of a request he made of his assistant, and his providing it to Zavarella, was an essential qualifying step toward Zavarella landing County work on a contract that Petitioner would ultimately vote on.   Thus, the <u>McDonnell</u>, standard is satisfied.

>            10.    <u>Neiheiser (Counts 14, 15 and 16)</u>

William Neiheiser paid bribes to Petitioner in the form of home improvements, an offer for a gambling junket to Atlantic City via private jet,[24] and a check in the amount of $3,600;[25] in exchange for Petitioner doing official acts for Neiheiser and his company; namely, (1) assisting Neiheiser in his efforts to take over the ice rink owned by the City of Lakewood and (2) assisting Neiheiser in his efforts to obtain a contract for the JJC project.

>            a.    <u>Advising or Pressuring the Mayor of Lakewood to Enter Into Contract re: the Lakewood Ice Rink</u>

The City of Lakewood owned an ice rink that was a "drain on the general fund."  (R. 1015: Tr. Jury Trial Vol. 8 (Dever), PageID 23815). The City was considering privatizing it, or closing it down.  (<u>Id.</u>).  To accomplish this, the Lakewood City Council ultimately approved

---

[24] R. 1036: Tr. Jury Trial Vol. 14 (Massie), PageID 25359, R. 1024: Tr. Jury Trial Vol. 15 (Kelley), PageID 25877, R. 1039: Tr. Jury Trial Vol. 26 (Russo), PageID 29018.

[25] Neiheiser gave Petitioner a $3,600 check to reimburse Petitioner for his impulsive purchase of a Beanie Wells jersey at a charity auction.  Petitioner kept the jersey and the check.  (Gov't Exs. 1401-TR; 1408-TR; 1431 (receipt), 1432 (Neiheiser check payable to Petitioner's wife); R. 1039: Tr. Jury Trial Vol. 26 (Russo), PageID 29020-22, 29196-97, R. 1024: Tr. Jury Trial Vol. 15 (Kelley), PageID 25871-74, R. 1021: Tr. Jury Trial Vol. 14 (Massie), PageID 25365, R. 1037: Tr. Jury trial Vol. 24 (Oliver), PageID 28156).

privatization and sent the matter to the Mayor to enter into an agreement with Neiheiser and his company.  (Id. at 23822).

As Neiheiser explored taking over the ice rink, he was having trouble obtaining an appointment with the Mayor of Lakewood.  (R. 1021: Tr. Jury Trial Vol. 14 (Massie), PageID 25343).  The Mayor was the executive of the city responsible for its day-to-day operations, including the ice rink.  (R. 1015: Tr. Jury Trial Vol. 8 (Dever), PageID 23816).   Petitioner called the Mayor to begin the negotiations,[26] to vouch for Neiheiser and to set up a meeting that led to Neiheiser, in fact, taking over the ice rink from the City of Lakewood.

In the course of the call, the Mayor relayed to Petitioner information about his private communications with the City's rink manager and suggested that Petitioner relay that information to Neiheiser.  In the same call, Petitioner, in addition to pressuring the Mayor to consider Neiheiser's proposal, offered the County's help with Lakewood's union problems.  Those problems had interfered with the Mayor's ability to schedule an appointment with Neiheiser. The juxtaposition of Petitioner's efforts to convince the Mayor or Lakewood to contract with Neiheiser on the ice rink and Petitioner's offer of official help with Lakewood's union negotiations, made the call much more than just setting up a meeting.  Indeed, the Commissioners had tremendous official power over distributing funds to the suburbs.  (R. 1024: Tr. Jury Trial Vol. 15 (Kelley), PageID 25875).[27]  Thus the call amounted to pressure.  And the pressure was for the Mayor to take action on a matter coming before him in his official capacity – privatizing the ice rink.  The fact that the call was not just a request for a meeting is evident by

---

[26] Petitioner placed the call while he, Kevin Kelley and Neiheiser were at dinner together and with others.  The Mayor then called back later the same evening.  (Id. at PageID 25873).

[27] See discussion of the Commissioners' powers over the suburbs in Section II. E.1. above.  This power made suburban officials susceptible to Petitioner's pressure and advice on the official acts over which they had jurisdiction.

(1) Petitioner vouching for Neiheiser on the merits of the project, and answering a specific

question from the Mayor about Neiheiser, (2) the Mayor relaying important inside information

back to Neiheiser through Petitioner about the project which would help Neiheiser pitch his

proposal, and (3) Petitioner subtly reminding the Mayor at the end of the call about the

Commissioner's power over the financial affairs of the suburbs, thus enhancing the pressure he

was placing on the Mayor to select Neiheiser for privatization.

> Petitioner started the call by stating:

>> I'm sittin' here with a friend of mine who's been tryin' to get a
>> hold of you and talk to you about your ice rink.  He wants, wants
>> to make a proposal to you that uh that he thinks'll be advantageous
>> to the city and to, to you if uh you wanted talk to him and I mean
>> the guy's . . . .

(Gov't Ex. 1403-TR).  The Mayor responded that he knew Neiheiser had been trying to reach

him but that he had been in round-the-clock union negotiations.  He told Petitioner to tell

Neiheiser that:

>> I met today with the guy that ran the uh, ice rink [for the city] and I
>> said, listen, uh, this isn't workin' for us budget wise and I'm
>> getting some, I'm getting some calls about some things to do.  So
>> I'd be more than happy to talk to the guy [Neiheiser]. . . . Tell him
>> I'm gonna be in my office tomorrow by 9:30, and tell him to start
>> callin' me at 9:30. . . .

(Id.).  Petitioner went on to encourage the Mayor, saying that if he would like to get the ice rink

off the city's back, "there might be a good opportunity for you to do that, you know?"  The

Mayor responded . . . "[t]hat's what I told our union guys today.  I said, look, I said, you know,

if, if you guys can't run this profitably, I gotta, . . . you know, I'm layin' people off.  I gotta look

at everything.  So yeah, I'll look at it [Neiheiser's proposal].  Definitely."

(Id.).  Petitioner then vouched for Neiheiser, saying:

>> You know, he owns a rink in Strongsville already . . . and he's very
>> legitimate.  He's got a big uh, HVAC, uh company . . . very

> successful . . . sometimes you get these guys with big ideas and big visions but no financial resources to back it up.  This is not the case. . . .

The Mayor asked, "This guy's the real deal as far as that goes?"  (Id.).  Petitioner responded, "Definitely."  (Id.) The Mayor said, "I can tell you, Jimmy, I will, I will give him, I will give him a hearing.  I'm very interested to talk to him." (Id.).

The Mayor went on to discuss the status of his union negotiations and the concessions he hoped to obtain.  Petitioner responded, "Now listen, if there's anything we can do, uh, let us know, you know, uh, any help we can provide."  (Id.).

Petitioner contends that in closing, government counsel improperly characterized this call as an official act. (R. 1162-1: Brief in Support, PageID 32300 (citing R. 1046: Tr. Jury Trial, Vol. 37, PageID 30531)).  In fact, she was simply arguing the influence that call had on the Mayor – the pressure Petitioner was putting on the Mayor to meet with Neiheiser.  But it was not just a meeting, it was a qualifying step toward the Mayor executing an agreement with Neiheiser's company, a contract Petitioner encouraged the Mayor to execute during the course of the call by vouching for Neiheiser and offering to assist in his labor dispute.   This call – made the very night Neiheiser wrote a check to Petitioner's wife for $3,600 - fits squarely within the type of corrupt conduct criminalized under the McDonnell standard.

>    b.    Voting on JCC Contracts and Taking Action on Qualifying Steps

As discussed above in connection with Kleem's bribes, the County was planning to build a new JJC.  As set forth below, Petitioner cast two votes on the JCC for the benefit of Neiheiser and his efforts to obtain a JJC contract for his company, Reliance Mechanical.  He also agreed to accept the low bid if Reliance Mechanical was the low bidder.

On December 13, 2007, Petitioner voted to authorize bidding for the JJC.  (Gov't Ex. 524-TR, p.10).

On February 11, 2008, Petitioner and Neiheiser had a conversation about the JCC bids containing an explicit quid pro quo in which Neiheiser asked Petitioner if he would be opening the JJC bids.  Neiheiser reminded Petitioner that last time, "[Y]ou didn't pick the low bidders. You threw 'em off for technicalities." (Gov't Ex. 1407-TR).  Petitioner agreed that they had taken the third bidder.  Neiheiser then told Petitioner, "Right, so when you see Reliance Mechanical is the low bidder, don't f—k it up."  (Id.).  Petitioner responded, "No, alright, that's good to know," (id.) and went on to explain why the third bidder was selected in the prior bid situation. Neiheiser responded, *"**It's a big enough job [the JCC] so we're going after it to get it and then you and I can have fun for two years**,"* (id., emphasis added) Petitioner responded, "Good, good, I hope you are low. . . .  When's [the bid] due?"  (Id.).   Neiheiser responded, "[A] week from Friday."  (Id.).

On March 13, 2008, Petitioner voted to reject all bids for the main building packages, to revise the specifications and to re-advertise for bids.  (R. 1012: Tr. Jury Trial Vol. 5 (Massie), PageID 22877, Gov't Ex. 400-R-1 (Agenda Action)).  The Reliance Mechanical bid had not been low, so this opportunity to re-bid benefited Neiheiser. (R. 1021: Tr. Jury Trial Vol. 14 (Massie), PageID 25361).

On February 14, 2008, Petitioner voted to approve an addendum to the specifications on the JJC projects, including clarifications and technical changes to the HVAC building package that would be of interest to Neiheiser and Reliance Mechanical.  (Gov't Ex. 1454, p. 6).

### 11.   Pumper (Counts 17-21)

Pumper paid bribes to Petitioner in the form of cash, home improvements, sports tickets, dinners and the promise of a percentage of profits from one of his companies, all in exchange for official acts on numerous business projects and personal matters.  Regarding the cash, Pumper promised Petitioner $35,000 which he gave to Petitioner in $2000 to $3000 cash installments

"every two weeks, a month" ending in May 2008 with a balance owed of $5,000.  (R. 1035: Tr.

Jury Trial Vol. 22 (Pumper), PageID 27889, 27891).

When asked why he paid the bribes, Pumper testified:

Gaining [Petitioner's] influence.  You know, he was one vote out of three on the [BOCC].  He had a lot of power at the time.  He had control of a lot of folks on the council, on the – some of the judges, some of the council people.  You know, so they had, between himself and Mr. Russo, they had a lot of control back then. . . . .  Well, it benefits me because I need things done, you know.  So from my standpoint I was able to get some loans from the county a lot quicker and faster.  Whenever I made a call to have something done, [Petitioner] would make those calls on my behalf.  And so, yeah, it was a great benefit to be able to just go to somebody like [Petitioner] than climbing up through the chain through the bottom. . . . It's a huge benefit.  It's a time-saving benefit when you're trying to get a project closed out, you know, or receive money that you kneed, you know, that you need for a project and you don't want to put up some of your own money.  It's a huge benefit for myself. . . . He made a call for – I was going through a lawsuit with Letter Perfect on this Cleveland Browns suit I was involved with.  And so he made a call to the judge that was handling the case . . . to try to speed up the closing of that lawsuit and help obviously bring down that I needed to, you know, settle with.  So by him making that call was a help for [the judge] to go ahead and react pretty quickly to that as well.  Child Services, when I was going through – me and my wife had a huge drinking problem, and so I was worried about the kids.  So I had [Petitioner] call over to Child Services to try to get somebody to take a look and see what's going at the house and make sure things were going on okay over there.  And it's better being – you know, having that reacted to quicker than going thought the typical process.

(R. 1016: Tr. Jury Trial Vol. 9 (Pumper), PageID 27741-42).

        a.     <u>DAS</u>

        (i)     <u>Signing County Resolution for Courthouse Square Contract</u>

In 2004, Pumper became aware that the County was going to hire a construction manager

for Courthouse Square.  Although no bids were required, the BOCC had to approve the contract.

(R. 1024: Tr. Jury Trial Vol. 15 (Ross), PageID 25825).  Pumper asked Petitioner to call Jay

Ross, who Pumper believed to be the head of purchasing at the County and to get his company,

DAS, "in . . . to pitch DAS . . . to pitch their services to handle the construction job that they

were going to do."  Petitioner made the call and advised Pumper that DAS should bid under

$25,000 so there would be no formal bidding process.  DAS did so and obtained the contract

even though DAS had never done this type of work before.  Pumper wanted to expand its County work and this was an opportunity to do that.  (R. 1034: Tr. Jury Trial Vol. 21, (Pumper), PageID 27743-48).

In October 2004, Petitioner signed the County resolution awarding the Courthouse Square contract to DAS.  At the same time, Pumper was supplying materials for the free work he did on Petitioner's house; namely, the patio expansion, and the overhang with a roof and four pillars.  (Id.; R. 1021: Tr. Jury Trial Vol. 14 (Ross), PageID 25260-61, R. 1037, Tr. Jury Trial Vol. 24 (Oliver), PageID 28668-69; Gov't Exs. 1700-A, 1700-B).

(ii)  Pressuring or Advising Federal Officials to Expedite HUD Financing for Neal and Boulevard Terrace

Pumper was working with a developer, Harvey Oppmann, to renovate two buildings – Neal and Boulevard Terrace.  Oppmann was looking to HUD for financing.  DAS stood to receive $11 Million and $13 Million in contracts respectively for the two buildings, but the HUD financing had to come through first.  Oppmann was also seeking a County brownfield loan for the project.  Pumper asked Petitioner to call a United States Senator in an attempt to exert pressure on HUD to provide the funds and close the deal.  Petitioner agreed to arrange a meeting with the Senator's office to move the HUD process along in Washington.  (Id. at PageID 27878-81; Gov't Ex. 1820 (details about the project Pumper gave to Petitioner for forwarding to the Senator's Office. (Id.)

On April 7, 2008, Petitioner asked his assistant to call the Senator's office. Petitioner put Pumper on the phone so Pumper could explain that because of a prior negative history with HUD, Oppmann was having trouble getting the funding approved.  Pumper wanted HUD in Washington to contact HUD in Cleveland to expedite the funding. (Id. at PageID 27883-84; Gov't Ex. 1710-TR).

94

Thus, Petitioner agreed to place a call to pressure another official to, in turn, advise HUD to expedite the funding process.

(iii)    Voting for County Purchase of Oppmann Parking Garage

In September 2005, the County purchased the Ameritrust Building for use as a new County Administration Building.   As part of that project, the County entered into protracted negotiations to purchase the Oppmann garage.

Oppmann asked Pumper to get involved for two reasons.  First, DAS had done earlier construction on the building and was familiar with its issues, and second, Oppmann was having trouble with the County's pace on the deal "so [Pumper] told Oppmann he [could] take care of getting that pushed along for him."  Oppmann retained Pumper as a consultant on the project for a $250,000 fee.  Pumper then sat down with [Petitioner], told him he was receiving a consulting fee to get the deal and offered Petitioner $75,000 of the fee.  Petitioner agreed to the offer and to "move forward to help [Pumper] out."  Petitioner agreed to "make some calls," including, probably to Jay Ross, the County official negotiating the deal with Oppmann.  (R. 1035: Tr. Jury Trial Vol. 22 (Pumper), PageID 27886-90).

Jay Ross confirmed receiving calls from Petitioner's executive assistant and further recalled Petitioner, in executive session, expressing support for purchasing the garage.  In a two-to-one vote on May 29, 2007, Petitioner voted in favor of the purchase for $5,145,000.  (R. 1021: Tr. Jury Trial Vol. 14 (Ross), PageID 25261-68; Gov't. Ex. 1700-G).

(iv)    Pressuring or Advising Common Pleas Judge to Schedule Settlement Conference and to Settle DAS Litigation with the Cleveland Browns

Pumper's company, DAS, had performed work on the Cleveland Browns locker room. Litigation ensued between DAS and a subcontractor before Cuyahoga County Common Pleas Judge Bridget McCafferty.  Pumper "had [Petitioner] call the judge to see if he [couldn't] push

this thing along, get this thing done, and hopefully drive the difference of price of what [the subcontractor] was asking for versus where we were at." (R. 1035: Tr. Jury Trial Vol. 22, (Pumper), PageID 27862).  It was important to Pumper to have the case resolved quickly because of his agreement with the Browns.  (Id.).  Petitioner agreed to make the call.  (Id.).

On April 22, 2008, Petitioner called Pumper to report that he had had "a nice talk with uh Bridget." (Id.; Gov't Ex. 1700UU-TR).  Pumper took this to mean that the judge "was on board with what [he] was looking to do." (Id. at PageID 27863).  In a later in-person meeting, Petitioner told Pumper that the judge was "going to try to get this thing done for [Pumper and DAS] ASAP.  (Id. at PageID 27864).  Petitioner then arranged for Pumper to speak directly with the judge and her bailiff on the telephone, saying, "If there's something more we need to do or I need to talk to somebody, . . . after you get the conversation and the uh, um opinion back." (Id. at PageID 27864-670; Gov't Ex. 1700VV).  Thereafter, Pumper presented his position to the judge who responded, "We'll get it done.  We'll set up something right away." (Id.).  Thus, Petitioner agreed to advise and pressure another public official, the judge, to perform official acts, expediting the settlement and "driv[ing]" the difference in price.

Within ten days of Petitioner's call, the judge held a telephonic settlement conference with the litigants and their attorneys and settled the case.  Although Pumper was not happy about the number, he was happy that it was resolved so quickly.  (Id.).  In a call between the judge and Pumper after the settlement, the judge apologized for the settlement number, saying, "I was trying to get it at [$175,000 as opposed to the $190,000 settlement figure], but I just couldn't get it done. . . . I thought if I could just get the thing done for you and get it out of your life." (Id. at PageID 27870-72; Gov't Ex. 1700-XX-TR).

        (v)      <u>Voting to Approve a $1.1 Million County Loan to K & D<br>for 668 Euclid Development</u>

This was a two-tier scheme similar to the First Energy scheme involving Kleem. Pumper was giving things of value to Petitioner in exchange for Petitioner exerting his official power for Pumper's benefit. In this scheme, Petitioner sold Pumper his vote on a loan for K&D in exchange for K&D contracting with DAS.

Pumper was interested in DAS obtaining the construction management contract for the rehabilitation of 668 Euclid owned by developer Doug Price and his company, K&D Group. Pumper asked Petitioner to help him get the contract. Petitioner agreed to help and had a conversation with Price. Pumper figured Petitioner's influence would be helpful because Price might need County funding on the project, and such a request would have to go through the BOCC. (<u>Id.</u> at PageID 27856-58).

Pumper was right. In January 2008, the BOCC approved a $1.1 million loan to K&D for 668 Euclid. (Govt. Ex. 2827, p. 4; R. 1037: Tr. Jury Trial Vol. 24, (Oliver), PageID 28434). In addition, (1) the County leased space from K&D, and (2) K&D was one of the companies interested in purchasing the Ameritrust Building from the County (after the County decided not to put its Administration Building there), all of which would have become before Petitioner for a vote.

      b.      <u>GreenSource</u>

        (i)      <u>Voting, and Taking Action on Qualifying Steps Toward<br>Changing Bid Specifications on JJC Contract and Other<br>County Projects</u>

Pumper's family owned GreenSource, a company that manufactured an insulation product. Petitioner and Pumper had conversations about Pumper's desire to place GreenSource products in County projects. (R. 1026: Tr. Jury Trial Vol. 18 (Kelley), PageID 26276).

Specifically, Pumper was interested in having the County adjust bid specifications for its JJC project to require the specific insulation product that GreenSource manufactured.  Pumper also asked Petitioner for assistance in obtaining advance word on where the County intended to build its East Side Neighborhood Family Cervices Center so Pumper could work on pitching GreenSource for the project.  Petitioner agreed to help.  (R. 1034: Tr. Jury Trial Vol. 21, (Pumper), PageID 27768-70; Gov't Ex. 1700-CC).

At Pumper's request, and beginning at least as early as February 2008, Petitioner did the following to assist Pumper and GreenSource in this effort.  (Id. at PageID 27816-18 (Pumper – "I had a conversation with [Petitioner] about giving Adrian [the County Director of Diversity and Procurement] a call and pushing that process a bit."); Gov't Ex. 1700-X; 1700-W).

First, Petitioner arranged for and attended a meeting for Pumper, Gabor and Petitioner with Adrian Maldonado, the County Director of Diversity and Procurement.  (Gov't Ex. 1700-EE-TR, 1700-GG-TR, 1709; R. 1037: Tr. Jury Trial Vol. 24 (Oliver), PageID 28513, 28520 -22).  Maldonado was in charge of all County contracting operations, including the bidding process, and reported to the Commissioners.  (R. 1030: Tr. Jury Trial Vol. 32 (Maldonado), PageID 27011).  Maldonado attended the meeting because Petitioner asked him to.  Absent the request from Petitioner, he would not have attended.  (Id. at PageID 27043). At the meeting, on March 12, 2008, Petitioner told Maldonado that GreenSource produced a good product and that Maldonado needed to go by the GreenSource facility and take a look at the plant.  He also said the GreenSource product would save money for the County.  Petitioner falsely stated to Maldonado that Petitioner was not getting anything out of pushing GreenSource Products for County work, even though he, Pumper and Gabor had an arrangement whereby Petitioner would

receive a percentage of the GreenSource profits on the JJC.  (R. 1035: Tr. Jury Trial Vol. 22,

(Pumper), PageID 27822-28; Gov't Ex.  1717-TR).

      Second, the next day, March 13, 2008, Petitioner voted to reject all bids for the JJC main

building packages, to revise the specifications and to re-advertise for bids, thus giving Pumper

more time for adjusting specifications for GreenSource's benefit. (R. 1012: Tr. Jury Trial Vol. 5

(Massie), PageID 22877, Gov't Ex. 400-R-1 (Agenda Action)).

      Third, Petitioner arranged for Maldonado and staff from the County's Central Services

Department to conduct a walkthrough of the GreenSource facility.  (R. 1021: Tr. Jury Trial Vol.

14 (Ross), PageID 25274; R. 1034: Tr. Jury Trial Vol. 21, (Pumper), PageID 27786; R. 1037: Tr.

Jury Trial Vol. 24, (Pumper), PageID 28473; Gov't Ex. 1700-V-TR ("all [Petitioner] has to do is

call [the County officials involved in the JJC specifications] and say, hey, these guys

[GreenSource] want to introduce their product over there.")).  Maldonado took the tour because

Petitioner asked him to.  (R. 1030: Tr. Jury Trial Vol. 32 (Maldonado), PageID 27046-47).   This

was a decision or action on a qualifying step towards a contract with GreenSource products as a

subcontractor which, if this scheme had been successful, would have come before Petitioner for a

vote.  In Pumper's words, Maldonado could "help make decisions on changing some of the

specifications and adding GreenSource to the project."  (R. 1035: Tr. Jury Trial Vol. (Pumper),

PageID 27818).  <u>McDonnell</u> at 3702 ("a decision or action . . . on a qualifying step . . . would

qualify as an 'official act.'").

      Fourth, Petitioner arranged a meeting for Pumper, Paul Voinovich (the principal of

Vocon, the JJC architect) and Petitioner to discuss GreenSource products being used in the JJC.

(Gov't Ex. 1700-PP-TR, 1700-RR-1-TR).  In the course of arranging the meeting, Petitioner said

to Pumper that Petitioner was trying to "help my friends make more money than they already

got." (Gov't Ex. 1700-QQ-TR).  After receiving the message that Petitioner wanted to meet, Voinovich told Pumper that the call from Petitioner had made him "nervous," proving he was feeling pressured.  At the meeting, Petitioner spoke positively about GreenSource's product.  (R. 1035: Tr. Jury Trial Vol. 22, (Pumper), PageID 27847-50). After the meeting with Petitioner, that had made Voinovich "nervous," Voinovich agreed to "write the specs for [GreenSource,]" meaning that he would specify using GreenSource products in the JJC building.  (Id. at PageID 27850; Gov't Ex. 1700-TT-TR).  Convincing the architect to include GreenSource products in the specifications was Petitioner taking an action on a qualifying step toward voting on a contract for Pumper's benefit.

At the time of the meetings described above, it was clear that the JJC contracts were going to be re-bid and that the bids would be due in early April.  If the specifications were re-done to include GreenSource products, the County would have had to delay the bids.  (R. 1030: Tr. Jury Trial Vol. 32 (Maldonado), PageID 27052-53).  Ultimately, Petitioner would have had to vote on the bids including GreenSource specifications.  But for the search warrants being executed in this case in July 2008, Pumper believes GreenSource would have gotten the JJC contract, on which Petitioner would have voted.  (R. 1035: Tr. Jury Trial Vol. 22, (Pumper), PageID 27854).

                (ii)      Voting to Approve Two County Loans for 1170 Ivanhoe
                                  LLC, a Pumper Company that Housed GreenSource

GreenSource was planning to renovate a building on Ivanhoe for its manufacturing function.  Pumper needed some funds for the renovation and asked Petitioner for help.  Petitioner agreed and set up a meeting for Pumper and his team to "get together with his staff to pitch to them what [they were] doing and how many dollars [they were] gonna need." (R. 1034: Tr. Jury Trial Vol. 21 (Pumper), PageID 27784).  At the meeting, Pumper told the staff what he was

"looking to do for GreenSource and asked . . .  what the process was to get these loans in place,
and this thing pushed along pretty quickly."  (Id. at 22785).  Petitioner "stayed mostly on top of
just making sure those loans got through.  And once everybody was agreed upon regarding the
terms, then all the attorneys took care of it from there."  (Id.).  Working with Petitioner was
much easier than working through the normal process at the Department of Development.
Pumper said:  "I mean, with [Petitioner] making those phone calls they could set up the meetings
really quick and get things done.  You know, the system, not only the city but in the county,
they're slow.  I mean, we just needed to get things done."  (Id. at 27786).

On January 8, 2008, Petitioner voted to approve two loans for one of Pumper's
companies, 1170 Ivanhoe LLC, – one a $200,000 brownfield redevelopment loan and one a
$800,000 commercial redevelopment fund loan.  (R. 1037: Tr. Jury Trial Vol. 24 (Oliver),
PageID 28435; Gov't. Ex.  1700-N).

(iii)  <u>Pressuring or Advising County Officials to
Expedite Closing the Ivanhoe Loans</u>

In March 2008, Pumper became frustrated that the loan, having been approved by the
BOCC, had not yet closed.  Petitioner's assistant called Laura Clark in the County's Department
of Development and told her that Petitioner had run into Pumper at a social event and that
Pumper was "concerned and was sort of complaining about the pace at which the loan was
closing."  So, Petitioner's assistant was following up on behalf of Petitioner to see what was
going on.  (Id. at PageID 27653-34).  Thus, Petitioner was advising or pressuring a subordinate
to do an official act – expedite the closing of the loan.

The loans closed in April 2008, with Paul Oyaski signing on behalf of the BOCC.  The
interest rate on the loans was 4%, the lowest interest of any County loans from the period August

101

2006 through November 2008.  (Gov't. Ex. 1839; Id. at PageID 27658-59).  By the time of trial, the loan was in default.  (Id. at PageID 27654).

c.     Parkview/Allerton Loans

Pumper was involved in the redevelopment of the Parkview building in Playhouse Square.  He sought and obtained County loans for the project.

(i)     Voting for $1 million loan for Parkview Rehabilitation

On October 23, 2006, Petitioner voted in favor of County Brownfield loans for the Parkview rehabilitation project in an amount not to exceed $1 million.  (Gov't Ex. 1700-D, p.5).  In reliance on that vote, the County entered into a loan agreement for Parkview.  Dennis Madden signed on behalf of the County Commissioners.  (Gov't Ex. 1815).  The interest rate was low compared to a commercial loan, and part of the loan would be forgiven, which made it quite favorable compared to a commercial loan.  (R. 1034: Tr. Jury Trial Vol. 21, (Oyaski), PageID 27563- 67).

(ii)     Pressuring or Advising County Officials to Extend the<br>Parkview Loan

In February 2008, 60 days after the loan closed, Pumper asked Petitioner if the County could extend the loan for a year or so.  Petitioner responded that the staff usually worked with borrowers to avoid default and agreed to arrange a meeting for Pumper with the staff.  (Gov't Ex. 1705-TR).  Soon thereafter, Petitioner called Paul Oyaski, the County official responsible for administering the loan, stating that Parkview was "in a bind" and wanted a meeting to discuss an extension on the loan.  They discussed which County officials should attend the meeting.

On the merits of the extension, Petitioner stated to Oyaski, "I'm OK with giving 'em an extension um and again . . . they're willing to pay the interest on the extension."  Oyaski said, "You tell me where and when and I'll have [my staff] there."  Oyaski also noted that "if it comes

102

from you it's even better than coming from me," meaning "this was being initiated by the commissioner.  And the commissioner outranked me in the County hierarchy.  We all worked for the commissioner, and I wanted the staff [who would be working on the request for an extension] to be aware that it was something that mattered to Commissioner Dimora."  (R. 1034: Tr. Jury Trial Vol. 21, (Oyaski), PageID 27567- 73).

Oyaski was concerned that there was a problem so soon after the loan closed.  (Id. at PageID 27567- 73, 27617; Gov't Ex. 1700-Y-TR).  But, in the word of County Official James Herron, "[T]he commissioners were – our bosses, and certainly, anything that came from any of their offices was the highest priority.  That was a meeting that we needed to attend and find time on our schedule right away." (Id. at PageID 27618).  Thus, Petitioner was pressuring or advising other public officials to perform an official act.

Petitioner instructed his staff to make sure that Pumper was informed of the meeting date regarding the Parkview extension.  He also requested that particular County employees attend the meeting.  (Id. at PageID 27576-77; Gov't Ex. 1700-AA).

On March 3, 2008, Petitioner expressed frustration to his staff that the meeting had not yet been scheduled, stating "The people that are callin' askin' for the meeting are nervous 'cause they you know, they wanna get an extension on this . . . and nobody's called them."  (Gov't Ex. 1700-Z-TR, 1700-Z-1-TR, 1700-DD-TR).

Pumper explained he did not work through the normal process in obtaining meetings with County staff because, "[I]t was easier to call [Petitioner].  If he made a call to somebody, they jumped for him.  So I needed to get it done, and he did it for us."  (Id. at PageID 27766).

On March 5, 2008, Petitioner told Pumper, "You got your meeting March tenth."  (Gov't Ex. 1700-EE-TR).  Pumper said he wanted to get the loan extended five to ten years.  (Id.).  After

the meeting, which occurred on March 10, 2008, Petitioner asked his staff what the decision was on the extension request.  (Gov't Ex. 1700-FF, 1700-FF-1).  James Herron, a member of Oyaski's staff, received the inquiry from Petitioner's assistant, and because it came from the Commissioner, he gave it the highest priority and reported that they had agreed to extend the loan for an additional three years.  (Gov't Ex.  1700-FF-1, 1821; (letter to Parkview partner with cc to Petitioner indicating the loan would be extended); R. 1034: Tr. Jury Trial Vol. 21, (Oyaski), PageID 27579); R. 1034: Tr. Jury Trial Vol. 21, (Herron), PageID 27621-22).  Herron prepared a letter to one of the Parkview partners agreeing to the extension, with a cc to Pumper and to Petitioner.  (Gov't Ex. 1821; Id. at PageID 27622).  Herron copied Petitioner because of the attention he paid to the project, a level of interest from a Commissioner he had never before experienced. (Id. at PageID 27623).  Thus, Petitioner did more than set up a meeting – he pressured his staff on the substance of the decision, extending the loan.

### (iii)  Pressuring or Advising Children's Services to Expedite Checking on Pumper's Children

In February 2008, Pumper was going through a difficult divorce and was worried about the welfare of his children.  He asked Petitioner to call Child Services to "try to get someone to take a look and see what's going on at the house and make sure things were going on okay over there.  And it's better – you know, having that reacted to quicker than going through the typical process."  (R. 1035: Tr. Jury Trial Vol. 22, (Pumper), PageID 27742; Gov't Ex. 1700-U-TR).  Petitioner told Pumper he had made the call, and that Child Services would look into it explaining that "they were going to have someone call [Pumper] right away." (Id. at PageID 27742-77).

(iv)     Petitioner's Arguments

In his brief, Petitioner challenged only a few of the Pumper-related official acts summarized above. He alleges that government counsel inappropriately argued that calling a staffer to meet with Pumper, or to set up and attend a meeting with Pumper were not official acts, (R. 1162-1: Brief in Support, PageID 32300 (citing R. 1045: Tr. Jury Trial, Vol. 36, PageID 30207)).

In arguing the official act element of the Pumper schemes, government counsel started with Petitioner voting to award loans, and moved on to Petitioner using his influence on Oyaski to arrange a meeting of County officials for the express purpose of approving an extension on the Parkview loan. The latter was more than a meeting – it was a qualifying step in approving the extension, clearly an official act. McDonnell, at 2370.

Government counsel went on to argue that Petitioner scheduling a meeting for Pumper with Maldonado (who reported to Petitioner) and attending the meeting himself, was an official act. Indeed, Maldonado re-writing the JJC bid specifications to include Pumper's product was also an essential qualifying step toward Petitioner's goal – voting for Pumper's company on the JJC contract. This was not just setting up meetings and letting Pumper fend for himself, this was Petitioner using his influence to change the bid specifications, and ultimately to vote, for the benefit of Pumper on a specific contract, from which Petitioner, himself, would receive a share of the profits.

12.     Melaragno and Vandra Brothers (Counts 22 and 23)

Anthony Melaragno paid bribes to Petitioner in the form of free home improvements over a period of years in exchange for Petitioner voting on County contracts for the benefit of Melargano's company, Vandra Brothers, and hiring a relative of Melaragno in the Sanitary Engineer's Office.

a.  Voting for $1.3 Million County Contract to Vandra Brothers, and for Two Amendments

In 2002, the same year Vandra Brothers provided and installed concrete for Petitioner's pool, Petitioner voted in favor of the County awarding Vandra Brothers a $1.3 million contract.[28] (Gov't Exs. 151, 159, p. 5; R. 1037: Tr. Jury Trial Vol. 24, (Oliver), PageID 28575).  Later that year, Petitioner voted in favor of two amendments to the contract. (Gov't Ex. 157, 156 (Resolution)).  In 2003, Petitioner voted to finalize the contract. (Gov't Ex. 154; R. 1015: Tr. Jury Trial Vol. 8, (Dever), PageID 23799-808).

b.  Voting for $6 Million County Contract to Vandra Brothers

On September 2, 2005, the same year Vandra Brothers worked on Petitioner's bathroom, Petitioner voted in favor of awarding Vandra Brothers a $6 million contract to repair and resurface St. Clair Avenue.  (R. 1018: Tr. Jury Trial Vol. 11, (Gouker), PageID 24625, R. 1037: Tr. Jury Trial Vol. 24, (Oliver), PageID 28575, R. 1015: Tr. Jury Trial Vol. 8, (Dever), PageID 23810-11; Gov't Ex. 2251 (Agenda Action)).

c.  Voting for Employment of Melaragno's Relative at the County Sanitary Engineer's Office

In March 2006, Petitioner voted to approve the appointment of Melaragno's relative for employment in the County Sanitary Engineer's Office.  (R. 1018: Tr. Jury Trial Vol. 11, (Gouker), PageID 24620-21, 24630-31, R. 1037: Tr. Jury Trial Vol. 24, (Oliver), PageID 2875-76; Gov't Exs. 2233 (Personnel Action, Executive Session, appointing Anthony Melaragno as a project inspector for the County Sanitary Engineer's Office), 2215 (Personnel File)).

d.  Voting for $337,000 County Contract to Vandra Brothers

---

[28] This official act was not charged in Counts 22 or 23 but formed part of the evidence in support of the RICO conspiracy charged in Count 1.

106

On July 27, 2006, Petitioner voted in favor of awarding a $337,000 contract to Vandra Brothers for further repairs and resurfacing of St. Clair Avenue.  (R. 1037: Tr. Jury Trial Vol. 24, (Oliver), PageID 28576-77, R. 1015: Tr. Jury Trial Vol. 8, (Dever), PageID 23811; Gov't Ex. 2252 (Agenda Action showing only two commissioners, including Petitioner voted in favor)).

e.     Voting for $5 Million County Contract to Vandra Brothers

On December 21, 2006, Petitioner voted to award a $5 million contract to Vandra Brothers to repair and resurface Berea Road.  (R. 1018: Tr. Jury Trial Vol. 11, (Gouker), PageID 24625-26, R. 1037: Tr. Jury Trial Vol. 24, (Oliver), PageID 28577, R. 1015: Tr. Jury Trial Vol. 8, (Dever), PageID 23812; Gov't Ex. 2253 (Agenda Action)).  In 2007, Vandra Brothers did free work on Petitioner's patio and outdoor kitchen.  (Id. at PageID 28579).

13.     Rybak and the Plumbers Local (Counts 24 and 25)

Rob Rybak, the Secretary/Treasurer of a local Plumbers Union, paid bribes to Petitioner in the form of home improvements and restaurant meals.  (R. 1026: Tr. Jury Trial Vol. 18, (Kelley), PageID 26243-45).  In exchange, Petitioner performed the following official acts:

a.     Voting for Linda Rybak Raise

On April 24, 2008, Petitioner voted in favor of a raise for Linda Rybak.  (R. 1020: Tr. Jury Trial (Spielmaker), PageID 25125-26; Gov't Exs. 2461, p. 9 (Agenda Action), 2460, p. 2 (Resolution)).  That official act was preceded by the following qualifying steps.

Rob Rybak wanted a raise for his wife, Linda Rybak, an employee of the County's Human Resources Department, a department under the authority of the County Commissioners, and asked Kelley to be an intermediary in making the request to Petitioner.  (R. 1026: Tr. Jury Trial Vol. 18, (Kelley), PageID 26245).  Linda Rybak was thinking of divorcing Rob Rybak, who would have to pay alimony.  As Kelley explained, "We needed to get [Linda] more money so . . . Rob [would not] get stuck paying a bunch of alimony."  (Id. at PageID 26248).  As Kelley

explained to Rob Rybak, County employees tended to get raises or promotions based on who they knew, not necessarily how hard they worked.  (Id. at PageID 26247).  When Kelley relayed the request, Petitioner agreed to look into it.  (Id. at PageID 26248).

On February 20, 2008, Petitioner asked Dennis Madden to talk to Joe Nanni, the County's Director of Human Resources, about a raise for Linda Rybak.  (R. 1020: Tr. Jury Trial (Spielmaker), PageID 25085; Gov't Ex. 2430-TR).  On March 10, 2008, Petitioner asked Madden if he had received his message regarding the raise for Linda, and he replied that he had taken care of it.  (Id. at PageID 25088; Gov't Ex. 2407-TR).

On April 15, 2008, Linda Rybak had a lengthy conversation with Petitioner about the raise.  She explained that Joe Nanni was opposed to her proposal and that Commissioner Tim Hagan might back Nanni.  Petitioner asked if he should talk to Nanni or whether "we need to override him."  (Gov't Ex. 2416-TR; Id. at PageID 25116).  Petitioner concluded by saying, "[T]he best thing to do is to pull it off the agenda for April 24th . . . . [but] before we pull it let's see if uh [Commissioner] Jones bites though . . . that's the key. . . . it's still two to one."  (Id.).  Petitioner later said, "Let's see where Jones is at because, um, we need to get another vote."  (Id.).  A few minutes later, Petitioner told Rob Rybak he needed another commissioner on board in order to obtain a raise for Linda Rybak and suggested that Rybak talk to Commissioner Peter Lawson Jones that day or the next day "because he is on the hook here with his election time."[29]  He further instructed Rybak to tell Lawson Jones that Petitioner was "on board."[30]  They then

---

[29] Rybak was sponsoring a fund raiser for Commissioner Peter Lawson Jones.  (R. 1026: Tr. Jury Trial Vol. 18 (Kelley), PageID 26250, 26252-53; Gov't Ex. 2422-TR).

[30] Kelley ended up placing the call to Jones and did tell him that Petitioner had agreed.  (Id. at PageID 26258; Gov't Ex. 2418-TR).  He reported his conversation back to Petitioner, explaining that Jones preferred to give Linda Rybak a little bump then and then another bump after the election. (Gov't Ex. 2420-TR).

discussed whether it should go on the agenda that week, or whether Petitioner should pull it.  (Id. at PageID 25117-18; Gov't Ex. 2417-TR).

On April 17, 2008, two minutes before the Commissioner's meeting was scheduled to begin, Petitioner called his assistant and told him to pull Linda Rybak's raise from the agenda that day and to delay it for one week.  He explained to his assistant that he needed time to talk with Commissioner Hagan and Joe Nanni.  (Id. at PageID 25124; Gov't Ex. 2423).

On April 24, 2008, Petitioner voted to increase Linda Rybak's salary.  (Id. at PageID 25125-26; Gov't Exs.  2461, 2460 p.2 (Resolution), 2461, p. 9 (Agenda Action)).

b.  <u>Advising or Pressuring County Employees to Hire Dana Rybak for Summer Job</u>

On May 15, 2008, Petitioner agreed to arrange a summer County job for Dana Rybak, the daughter of Rob Rybak.  (Id. at PageID 25137; Gov't Ex. 2425-TR).  Petitioner asked Kelley if he could take Dana at the Sanitary Engineer's Office or the County Engineer's Office.  Petitioner explained he did not want to put her on the "fourth floor" because her mother worked there and people would talk.  Kelley agreed to hire her.  (R. 1026: Tr. Jury Trial Vol. 18 (Kelley), PageID 26263-66; Gov't Ex.  2427-TR, 2429-TR).  It took "mountains" for Kelley to convince the County Engineer to approve Dana starting earlier than the other summer employees at Sanitary.  (Id. at PageID 26266).  At one point, Petitioner told Kelley,

> If you can't [hire her], tell Pat [Petitioner's assistant] we're gonna have to hire her.  What else can I do?  I can't say no . . . . So I'm gonna have to take her if you guys don't take her.  If you can't take her early, I'm going to have to take her.  I just have no choice.  I'll start her tomorrow.  What am I gonna do?

(R. 1021: Tr. Jury Trial Vol. 14, (Spielmaker), PageID 25146-49, R. 1026: Tr. Jury Trial Vol. 18 (Gouker), PageID 26267, 24629-30 (Gouker – this was a "political hire."); Gov't Ex. 2429-TR).

The day after Petitioner thanked Rob Rybak for working on his house, Dana began her summer employment at the County.  (Id. at PageID 25148, 24629; Gov't Ex. 2440, p. 1).

c. Voting to Employ Two Plumbers

At Rybak's request, Petitioner voted in favor of appointing two members of the Plumbers Union as full-time temporary plumbers.  (R. 1020: Tr. Jury Trial Vol. 13 (Spielmaker), PageID 25104, R. 1043: Tr. Jury Trial Vol. 26 (Russo), PageID 29876-88; Gov't Ex.  2438, p. 8 (reference to Executive Session), 2442 (Personnel Action), 2455 (Resolution, p. 3); R. 1026: Tr. Jury Trial Vol. 18 (Kelley), PageID 26246; R. 1020: Tr. Jury Trial Vol. 13 (Spielmaker), PageID 25090-92).  Prior to the vote, Petitioner pressured his staff on the following qualifying steps.

At the time of Rybak's request, the County, then in poor financial condition, was making budget cuts.  (R. 1021: Tr. Jury Trial Vol. 14 (Ross), PageID 25253).  Therefore, Jay Ross, the County's Director of Central Services, had told Rybak that the County would not hire temporary plumbers.  (Id. at PageID 25255).  Later he heard from County Administrator Dennis Madden that he should hire them, Madden explaining to Ross that Madden was receiving pressure from Petitioner to do so.  As a result of that call, Ross agreed to hire them.  (Id.).

On March 12, 2008, Rybak asked Petitioner to put the plumbers vote on the agenda for the next day.  Petitioner said he could not do it then, but that Rybak should write a letter to all three commissioners and Petitioner would then express his support to the other two commissioners.  (Gov't Ex.  2408-TR).  The next day, after Rybak had faxed such a letter to the commissioners, Petitioner told Dennis Madden, the County Administrator, that Rybak wanted the plumbers hired.  Petitioner said that Jay Ross, the County's Director of Central Services, had refused to hire them.  Petitioner said:

> I don't know what this Jay's issue is . . . I mean you get two [plumbers] out, you gotta put two back [hire them] . . . well, just make sure you f----n . . . I mean why do they got to do that?  I

110

don't understand why they just can't f----n', he's only asking for temporary replacements . . .  to fill the two spots . . . ***would you please lean on him***?

Madden agreed to take care of it.  (Gov't Ex.  2409-TR) (emphasis added).

Later the same day, Petitioner reported back to Rybak that Madden had "told Jay Ross, take care of this [hiring the plumbers].  Hagan and [Petitioner] want it.  Get it done." (R. 1020: Tr. Jury Trial Vol. 13 (Spielmaker), PageID 25101; Gov't Ex. 2410-TR).  Petitioner told Rybak he had told Madden, "[W]hat the f--k?  If you gave the electricians the temporary spots, why wouldn't you do the plumbers?  Why do we gotta f----n' always get these memos?  People can't take care of business."  (Id.).  Petitioner told Rybak that Madden had responded that he would handle it.  (Id.).  The next day, Petitioner instructed Madden to "stay on top of the Plumbers thing," and Madden replied that he would.  (Id. at PageID 25103; Gov't Ex. 2411-TR).

On March 27, 2008, Petitioner and Commissioner Peter Lawson Jones voted in favor of appointing the two Plumbers as full-time temporary plumbers.  (Id. at PageID 25104; Gov't Exs. 2438, p. 8 (Reference to Executive Session), 2442 (Personnel Action), 2455 (Resolution, p. 3)).  That evening, Petitioner told Rybak, "I took care of you again today."  (Id. at PageID 25103).

14.    Randazzo and FNA (Counts 26 and 27)

Petitioner took things of value from Randazzo in the form of food, meals, wine, sporting event tickets and outdoor furnishings in exchange for them helping his company, FNA, obtain workers compensation contracts with public entities, including the County.  Randazzo paid the bribes because "they helped me; I helped them."  R. 1038: Tr. Jury Trial Vol. 25 (Randazzo), PageID 28816-17.  Petitioner's assistance was valuable because, as Randazzo explained, the government sector was a difficult arena.  "I can give you a list of cities that we've been talking to for over five years and we can't get anywhere with it." Petitioner and Russo were well known and well liked.  They "were centers of influence in Cuyahoga County."  In exchange for

providing a palm tree to Petitioner, Randazzo expected in return "an open line of communication.  So if I needed some help, I could ask." Id.

> a.  Voting for County Contract with FNA for Deferred Compensation Product

On August 11, 2004, two months after Randazzo purchased outdoor furnishings for Petitioner, Petitioner voted in favor of selecting Randazzo's company, FNA, as a deferred compensation provider for the County.  (Gov't Ex. 2635, p. 7 (Agenda Action), 2627 (Parkview Federal checks); R. 1038: Tr. Jury Trial Vol. 25 (Oliver), PageID 28744-55, R. 1038: Tr. Jury Trial Vol. 25 (Randazzo), PageID 28803).  Prior to that vote, Petitioner took a qualifying step toward the vote by using his position to introduce Randazzo to a County employee with influence over the deferred compensation selection process.  (R. 1046: Tr. Jury Trial Vol. 37 (Letsky), PageID 30520; R. 1038: Tr. Jury Trial Vol. 25 (Oliver), PageID 28773-74, R. 1038: Tr. Jury Trial Vol. 25 (Randazzo), PageID 28803).  Kelley overheard Petitioner calling his assistant to check on the status of Randazzo's efforts to obtain the County contract.  (R. 1026: Tr. Jury Trial Vol. 18 (Kelley), PageID 26228-29).

Later, on October 5, 2006, after Randazzo received the contract, the BOCC entered into a service agreement with FNA to resolve some difficulties with the administration of the program.  The agreement referenced the August 11, 2004, vote of the commissioners. (Gov't Ex. 2634; (R. 1038: Tr. Jury Trial Vol. 25 (Oliver), PageID 28778-79, R. 1038: Tr. Jury Trial Vol. 25 (Randazzo), PageID 28804-05).

This scheme was not charged in the substantive Randazzo counts, but formed part of the evidence in support of Petitioner's conviction on the RICO count.

b.    Taking Action on Qualifying Steps Toward Sewer District
Officials Contracting with FNA

Randazzo was having trouble reaching Julius Ciaccia, the director of the Northeast Ohio

Regional Sewer District,[31] to pitch his deferred compensation product.  On February 15, 2008,

Randazzo relayed this problem to Petitioner who called Ciaccia in Randazzo's presence.  As

Randazzo testified, "[Petitioner] called [Ciaccia] and said . . .  'help my friend out.'  And let's

see if we can get this done." (R. 1038: Tr. Jury Trial Vol. 25 (Randazzo), PageID 28813).  In the

call to Ciaccia, Petitioner touted FNA's deferred compensation product, saying

> I was hoping you could do me a favor.  I gotta good friend of mine that has a deferred
> comp program that does, uh deferred comp for the County. . . . It's called Financial
> Network of America and they wanted to come out and meet with you to talk to you about
> the Regional Sewer employees, you know, possibly giving them an option for deferred
> comp program. . . .  You know [the County Prosecutor's] in it, in this program.  I'm in it.
> Frank Russo.  We're all in this.  ***I mean, to me it's offered a better financial reward***.
> And, again, it's optional for your employees as you know. . . . I just wanted him to say hi
> to you and maybe you guys could, uh, swap phone numbers or he could set somethin' up
> . . . He's got a meeting set up to do Cleveland's . . . Marty Sweeney's [Cleveland City
> Council Member] helpin' him get that set up.

(Gov't Ex. 2601-TR) (emphasis added).

Petitioner then put Randazzo on the phone, who promoted his product in Petitioner's

presence, mentioning Petitioner and the County in the process. (R. 1038: Tr. Jury Trial Vol. 25

(Oliver), PageID 28757, 28788, R. 1038: Tr. Jury Trial Vol. 25 (Randazzo), PageID 28813,

28839-40).

Ciaccia had not called Randazzo back, so, on March 7, 2008, Randazzo called Gabor

looking for Ciaccia's number to follow up.  (Id. at PageID 28814).  Gabor relayed the request to

Petitioner who authorized Gabor to obtain the number from his assistant and relay it to

---

[31] The BOCC appoint one of the trustees for the Sewer District. (R. 1038: Tr. Jury Trial Vol. 25
(Oliver), PageID 28756).

Randazzo.  (Gov't Ex. 2610-TR).  He further instructed Gabor to call Randazzo back and confirm that Randazzo had called Petitioner about the Sewer District contract.  If Randazzo had called about the Sewer District, Petitioner said he would talk to Ciaccia.  Petitioner instructed Gabor to tell Randazzo, "You don't know him, [Petitioner] does, and he can say listen, where do you want me to have [Randazzo] call him, on his cell?"  (Gov't Ex. 2612-TR).  Later the same day, Petitioner called Ciaccia and said Randazzo wanted to set up a meeting.  Ciaccia gave Petitioner the number on which Randazzo should call him.  (Gov't Ex. 2605-TR).

Petitioner contends that Petitioner having his staff arrange a call with Ciaccia was not an official act.  (R. 1162-1: Brief in Support, PageID 32300).  However, his staff's efforts were qualifying first steps to the call between Petitioner and Ciaccia, in which Petitioner pressured Ciaccia to use his official power at the Sewer District for the benefit of Randazzo's company. The same is true for Petitioner's request that Ciaccia meet with Randazzo, another qualifying step toward Randazzo obtaining a contract with the Sewer District.  Petitioner was using his much-touted influence and pressure, enhanced by the fact that the BOCC appointed a member to the Sewer District Board, which influence and pressure Randazzo was buying to obtain a contract for Randazzo with the Sewer District.

c.    Taking Actions on Qualifying Steps Toward Beachwood Officials Contracting with FNA

On March 20, 2008, Petitioner attended a dinner with the Mayor of Beachwood and touted FNA for a Beachwood contract.  (Gov't Ex. 2630 (Calendar Entry); R. 1038: Tr. Jury Trial Vol. 25 (Oliver), PageID 28769-70, 28788; R. 1038: Tr. Jury Trial Vol. 25 (Randazzo), PageID 28809-11, 28839).  Leading up to that dinner, Randazzo had asked Petitioner if Petitioner "could help [him] a little bit and set up a meeting with that mayor.  We [FNA] were trying to pick up the City of Beachwood as a customer. . . .  I [Randazzo] was having a real hard

114

time sitting down with him [the mayor]. . . . He wasn't returning my call. . . . [Petitioner] got in touch with the mayor and set up a dinner meeting."  (Id. at PageID 28810).  At the dinner meeting, Petitioner said he, meaning the County, was "a customer" of FNA, "was familiar with the [deferred compensation] product [FNA offered]" and spoke "positively" about the product at the dinner meeting.  In scheduling the meeting, Petitioner explained to his assistant, "[T]he meeting's for him [Randazzo].  It's not for me. . . . He is the one who wanted the meeting." (Gov't Ex. 2604-TR).

Petitioner contends that government counsel should not have argued that Petitioner directing his staff efforts to arrange a meeting with the Mayor of Beachwood, and attending the meeting, were official acts.  (R. 1162-1: Brief in Support, PageID 32300 (citing R. 1046: Tr. Jury Trial, Vol. 37, PageID 30520)). Arranging the meeting was an essential first qualifying step, and at the meeting itself, Petitioner indicated the County was a customer of Randazzo and spoke highly of the product that Randazzo offered public employees, clearly pressuring or advising the Mayor of Beachwood to contract with Randazzo's company and satisfying McDonnell.

F.      Petitioner's Allegations re: Government Counsel's Closing Argument

Petitioner made no objections to the government's arguments about official acts at trial. Thus, Petitioner has procedurally defaulted any error.  To obtain habeas relief on the ground that the prosecutor misstated the law in closing argument, a defendant must show that 1) the prosecutor in fact misstated the law and 2) that the misstatement rendered the trial fundamentally unfair.  Dobbs v. Kemp, 790 F.2d 1499, 1504 (11th Cir. 1986), modified in other part, 809 F.2d 750 (11th Cir. 1987).  As demonstrated above, each of the schemes of conviction involved official acts that satisfy McDonnell.  Thus, there was no misstatement in closing argument that rendered the trial fundamentally unfair.  This court advised the jury that arguments were not

evidence.  (R. 735-1: Jury Instructions, PageID 16967-69).  ("lawyers' statements and arguments are not evidence").

In the scheme-by-scheme analysis above, the United States has addressed all of Petitioner's specific complaints about the closing arguments of government counsel.   They are unfounded under a fair reading of <u>McDonnell</u>, even if government counsel did not use the exact wording of <u>McDonnell</u>.  If any fail to meet the <u>McDonnell</u> standard, they were isolated remarks in a five-hour closing argument to which Petitioner did not object on <u>McDonnell</u> grounds. (R. 1045: Tr. Jury Trial, PageID 30129, 30254, 30468, 30563).

For these reasons, Petitioner's contentions about the closing argument have no merit.

G.    <u>The Jury Could Not Have Convicted on Acts Petitioner Might Have Performed as Democratic Party Chair.</u>

This Court was careful to instruct the jury that it could not convict Petitioner for acts he performed as Chair of the Cuyahoga County Democratic Party.  (R. 1044: Tr. Jury Trial Vol. 35, PageID 30008, R. 735-1: Jury Instructions, PageID 16989).  Still, Petitioner contends that he was somehow prejudiced post-<u>McDonnell</u> in his ability to pursue a defense at trial that his actions were not official actions, but political actions.  (R. 1162-1: Brief in Support, PageID 32302-03).  Because the jury was properly instructed on this defense, he has no claim of prejudice.  With the benefit of this instruction, the jury could not have convicted on acts Petitioner did as the Cuyahoga County Party Chair.  <u>Weeks v. Angelone</u>, 528 U.S. 225, 234 (2000) (a jury is presumed to follow its instructions).  Thus, this Court should reject Petitioner's <u>McDonnell</u> challenge on this ground.

H.    <u>There was Overwhelming Evidence Linking the Things of Value Petitioner Received to Official Acts He Performed</u>

<u>McDonnell</u> does not address the nature of the evidence required to prove the "pro" part of the "quid pro quo" of bribery.  Nevertheless, Petitioner contends that "the government had to

116

prove more than just that Mr. Dimora engaged in official acts: it had to prove the link: that he knowingly exchanged things of value for official acts."  (R. 1162-1: Brief in Support, PageID 32303).  He goes on to argue that because some of his official acts were "uncontroversial, unanimous [or] came before them by staff recommendation, a jury would reasonably wonder if things of value were given in exchange for these votes."  (Id.).[32]

At the outset it should be noted that, in response to a request from the defense, the jury in the present case was instructed: "[Y]ou may consider the official action's lawfulness, desirability, or benefit to the public welfare, just as you would any other circumstances in the case, as it may bear upon the intent of a defendant in accepting the thing of value." (R. 1044: Tr. Jury Trial Vol. 35, PageID 29974-75, 30006). So the jury fully considered the nature of the official acts when determining whether the linkage between the official act and the thing of value was established.

In his argument, Petitioner ignores McCormick v. United States, 500 U.S. 257, 285 (1991), unaffected by McDonnell: "A claim that a public official's actions would have been the same whether or not he received the alleged payments is . . . is no defense. . . ."  It was not even necessary for the government to prove that Petitioner "misused his public office in the sense that he granted some benefit or advantage to the [bribe payor]." Id. at 284.  Indeed, fulfillment of the quid pro quo is not an element of bribery – the government need only prove that a public official accepted a thing of value "in return for his agreement to perform specific official acts." Evans, 504 U.S. at 268.

Russo testified extensively about Petitioner's corrupt thinking.  He and Petitioner were very close politically and socially, going out to dinner at high-end restaurants in the years 2002

---

[32] As discussed above in Section II.E.1., evidence showed that many of Petitioner's acts were not uncontroversial, or were not unanimous.  Some also went against staff recommendations.

through 2008 approximately three to four times a week with a group of about six to eight people they dubbed the "A Team"[33] or the "in-crowd" or the "in-circle."   The group had "sponsors" for their dinners who paid the bill.  (R. 1039: Tr. Jury Trial Vol. xx (Russo), PageID 28886-87, 28897-98, 28923).   If no sponsor attended the dinner, a member of the group would make calls to find one.  Sometimes they asked for a sponsor's credit card number to pay the bill.  (Id. (Russo), at PageID 28886, 28888-91).  Petitioner never paid the bill.  (R. 1024: Tr. Jury Trial Vol. 15 (Kelley), PageID 25751).

     The sponsors included Kevin Kelley, Steve Pumper, Michael Forlani, Ferris Kleem and Rob Rybak.  (Id. at PageID 28897, 28902).  In exchange for providing these dinners, sponsors received personal attention on "anything that came up . . . [such as] the daughter getting a parking ticket, a son wanting a job, a brother being [a] contractor and wanting a contract, there were multiple, multiple issues at all times that everybody [the sponsors] had us [Petitioner and Russo] doing for them." (Id. at PageID 28901).

     Russo went on to explain the benefits Petitioner gave sponsors. Petitioner made calls for Kleem regarding County contracts, provided a grant for the Coe Lake project, called the city council president about an airport contract, testifying, "[I]f you were a sponsor, of course, you got special treatment." (Id. at PageID 28903).

     The sponsors tailored their gifts to the things Petitioner enjoyed.  Petitioner "loved his backyard, . . . it was the number one thing in his life.  If anyone could help him in the backyard [with improvements such as the pool, the pizza oven, etc.], it was a great privilege to him. . . . The second thing was [Petitioner] liked  fine food and fine alcohol, only the best.  Big thick steaks, Crown Royal . . . and the third thing was . . . that [Petitioner] like [sic] cash from people.

---

[33] (R. 1024: Tr. Jury Trial Vol. 15 (Kelley), PageID 25726).

[a]nd the fourth thing is [Petitioner] like [sic] pretty girls and prostitutes." (Id. at PageID 28917-18, R. 1024: Tr. Jury Trial Vol. 15 (Kelley), PageID 25751-52).

The government also proved the linkage between the things of value and the official acts through:

(1) Testimony of bribe payors and co-conspirators establishing that they gave things of value to Petitioner in exchange for favors he did, or might do, for them in the future. (R. 1014: Tr. Jury Trial Vol. 7 (Kleem), PageID 23323, 23338-41, 23345-47, 23360; 23399, 23407, 23439; R. 1015: Tr. Jury Trial Vol. 8 (Kleem), PageID 23707-09; R. 1019: Tr. Jury Trial Vol. 12 (Gallagher), PageID 24278-95, 24310; R. 1022: Tr. Jury Trial Vol. 16 (Kelley), PageID 25395-96; R. 1024: Tr. Jury Trial Vol. 15 (Kelly), PageID 25840-53, 25859-60, 25879-80; R. 1027: Tr. Jury Trial Vol. 19, PageID 26490-91, 26636-38; R. 1016: Tr. Jury Trial Vol. 9 (Schuman), PageID 24043, 24052-55, 20061-62; R. 1034: Tr. Jury Trial Vol. 21 (Pumper), PageID 27741-42; R. 1037: Tr. Jury Trial Vol. 24 (Zavarella), PageID 28331; R. 1036: Tr. Jury Trial Vol. 23 (Valentin), PageID 28233; 28226, 28242; R. 1038: Tr. Jury Trial Vol. 25 (Randazzo), PageID 28816-17); R. 1039: Tr. Jury Trial Vol. 26 (Russo) PageID 28949-52;  R. 1018: Tr. Jury Trial Vol. 11, (Gouker), PageID 24625, R. 1037: Tr. Jury Trial Vol. 24, (Oliver), PageID 28575, R. 1015: Tr. Jury Trial Vol. 8, (Dever), PageID 23810-11; Gov't Ex. 2251 (Agenda Action));

(2) Intercepted telephone calls, including (Gov't Exs. 106-TR, 210-TR, 400-L-TR, 400-NN-TR, 1407-TR, 809-TR, 2413-TR, 1700-QQ-TR, 2417-TR, 2429-TR);

(3) Russo's testimony about how he and Petitioner operated, including how sponsors providing meals received "personal attention on anything that came up." (R. 1039: Tr. Jury Trial Vol. 26 (Russo), PageID 28901; see also Id., PageID 28931, 28936-49, 29048-51);

(4) Evidence showing that Petitioner solicited and received things of value at about the same time he performed official acts for the bribe payors.  (R. 1012: Tr. Jury Trial Vol. 5 (Massie), PageID 22935-43, 22954-56; R. 1014: Tr. Jury Trial Vol. (Kleem), PageID 23323, 23377-81, 23408-09, 23420, 23436-39, 23448-55, 23459-65, 23469-74; R. 1024: Tr. Jury Trial Vol. 15 (Kelley), PageID 25795, 25872-74; R. 1021: Tr. Jury Trial Vol. (Massie), PageID 25336, 25341-46, 25365; R. 1021: Tr. Jury Trial Vol. 14 (Ross), PageID 25260-61, 25285-86; R. 1034: Tr. Jury Trial Vol. (Pumper), PageID 27743-44, 27747-48; R. 1037: Tr. Jury Trial Vol. 24 (Oliver), PageID 28516; R. 1038: Tr. Jury Trial Vol. 25 (Oliver), PageID 28669); and Gov't Exs. 151, 159, p. 5; R. 1037: Tr. Jury Trial Vol. 24, (Oliver), PageID 28575; R. 1021: Tr. Jury Trial Vol. 14, (Spielmaker), PageID 25146-49, Gov't Ex. 2440, p. 1).

(5) Petitioner's obstruction, including Petitioner writing several checks to contractors the day the FBI approached Pumper about bribery. (R. 1035: Tr. Jury Trial Vol. 22 (Pumper), PageID 27894-278901, 27911, 27917-18; R. 1038: Tr. Jury Trial Vol. 25 (Oliver), PageID 28647; R. 1036: Tr. Jury Trial Vol. 23 (Valentin), PageID 28239-40; R. 1036: Tr. Jury Trial Vol. 23 (D. Shortridge), PageID 28279; R. 1037: Tr. Jury Trial Vol. 24 (Oliver), PageID 28558-62, 28578-79; R. 1036: Tr. Jury Trial Vol. 23 (Zavarella), PageID 28315-16).  Indeed, after the FBI confronted Pumper, he did not deliver the last $5000 in cash bribes he was paying Petitioner in connection with the parking garage because "it was panic city.  Everybody was scrambling." R. 1035: Tr. Jury Trial Vol. 22 (Pumper), PageID 27894.

(6) Taking steps to avoid paper trails, creating false paper trails, making false statements and concern about the investigation.  For example, Petitioner wrote a check to make it appear that he had reimbursed Kevin Kelley for first class air fare to Las Vegas, thus concealing that Kelley had given him cash for the check and satisfying Petitioner's concern that the Plain Dealer

might inquire about who paid for the trip.  (R. 1024: Tr. Jury Trial Vol. 15 (Kelley), PageID 25879-81, 25843; Gov't Ex. 202-TR).  Petitioner accepted most of an agreed $35,000 in cash from Pumper, $6,000 in cash from Kleem, and $2,000 in cash from Gallagher, thus avoiding paper trails for those bribes.  (R. 1015: Tr. Jury Trial Vol. 8 (Kleem), PageID 23706, R. 1035: Tr. Jury Trial Vol. 22 (Pumper), PageID 27889, R. 1017: Tr. Jury Trial Vol. 10 (Gallagher), PageID 24284, 24294).  In addition, Kleem billed Petitioner $1,149 for the refrigerator with which he bribed him, but also gave him $1,149 in cash.  Petitioner was to pay the invoice with a check so there would be a paper trail to make the transaction look legitimate, and keep the cash. (R. 1014: Tr. Jury Trial Vol. 7 (Kleem), PageID 23345, R. 1015: Tr. Jury Trial Vol. 8 (Kleem), PageID 23631, 23705). While in Las Vegas, and making calls for the benefit of Kleem, Petitioner lied to his executive assistant, saying that he "just bumped into Ferris Kleem," when, in fact, he had planned to meet Kleem in Las Vegas and Kleem was paying Petitioner's expenses there.  (Gov't Ex. 400-FF-TR (R. 1012: Tr. Jury Trial Vol. 5 (Massie), PageID 22955-56). Petitioner lied to Adrian Maldonado, stating that he was not getting anything out of pushing GreenSource for County work, even though he, Pumper and Gabor had an arrangement whereby Petitioner would receive a percentage of the GreenSource profits on the JCC.  (R. 1035: Tr. Jury Trial Vol. 22 (Pumper), PageID 27822-28; Govt. Ex. 1717-TR).  Petitioner told Kelley he was concerned that Russo's extravagant spending habits were "going to get all of us [Kelley and Petitioner] in a jackpot."  (R. 1022: Tr. Jury Trial Vol 16 (Kelley), PageID 25431).

In Silver, 864 F. 3d at 119, the court did consider the non-controversial nature of two official acts in its harmless error analysis on direct appeal.  Regarding the first official act, the court discussed the pro forma nature of an honorary resolution of the type doled out by the hundreds and rubber stamped by Assembly members.  The court found that it was not clear

121

beyond a reasonable doubt that that a rational jury would have convicted.  Regarding the second official act, the court in <u>Silver</u> made the same finding about a perfunctory approval of a financing request where the evidence showed that every such request was always approved.  <u>Id.</u> at 123. None of the official acts in the present case were as routine as the two in <u>Silver.</u>  Indeed, Petitioner's official acts were more substantial and generally benefitted the bribe payors financially in a much more significant way.  In addition, this Court's standard of review on collateral attack, whether it be cause or prejudice, or the enhanced Section 2255 harmless error standard, is much less beneficial to Petitioner than <u>Silver's</u> direct appeal standard.

I.      This Court Need Not Address the Tax Counts

Because Petitioner fails in his <u>McDonnell</u> arguments, this Court need not address the continued validity of the tax counts which were based on Petitioner failure to report as income the bribes he received.

J.      This Court's Ruling Excluding the Ethics Reports is Not Reviewable on Collateral Attack Five Years After Trial, And, As the Sixth Circuit Found on Direct Appeal, Did Not Alter the Verdicts

The record clearly establishes that Petitioner is not entitled to relief on his <u>McDonnell</u> arguments.  Thus, this Court need not address his attempt to re-litigate in this 2255 petition what he argued on direct appeal about this Court's decision not to admit his ethics reports.  If this Court is inclined to re-address the issue, it should conclude, as the Sixth Circuit found, that "any error was harmless in view of the considerable array of evidence against [Petitioner]."  <u>Dimora</u>, 750 F.3d at 628.  Applying the harmless error standard on direct appeal, the Sixth Circuit concluded "exclusion of the reports did not alter the verdicts." <u>Id</u>.   First, "the government produced overwhelming evidence against Petitioner," the Sixth Circuit finding that "one evidentiary mistake, if a mistake it was, in the context of all else that happened in a 37-day trial

would not have a difference to the jury," and further noting that Petitioner "himself does not even independently challenge the sufficiency of the evidence on 28 of the 32 counts of conviction."  Id. at 628-29.

Second, the Sixth Circuit reasoned that Petitioner's "ethics reports would have done little to tip the scales against the overwhelming weight of the evidence" in that the "reports *do not contradict a single element* of these public corruption convictions." Id. at 629 (emphasis in original).  After a thorough discussion of the limited value of the reports to Petitioner's defense, the Court concluded, "Excluding evidence with such limited exculpatory value is the quintessence of harmlessness," Id. (citing United States v. Rayborn, 491 F.3d 513, 518 (6th Cir. 2007)).

Third, the Sixth Circuit found that admitting the ethics reports "would have *hurt* [Petitioner] by opening the door to evidence that would have done him no favors[,]" specifically, it would have highlighted that many of the bribe payers were never identified in the reports. Dimora, 750 F.3d at 629 (emphasis in original).   The Sixth Circuit dismissed Petitioner's arguments (which he again makes now at R. 1162-1: Brief in Support, PageID 32306) about the error not being harmless because the government asked several questions about Petitioner not disclosing bribes.  The Court concluded that the government's questions "had nothing to do with [Petitioner's] disclosures" in the reports filed annually and not contemporaneously with the bribe payments.  Rather, the government's questions probed whether Petitioner received things of value "*at the time*" he did official acts on behalf of bribe payers.  Id. at 629-30 (emphasis added). Thus the arguments about concealment Petitioner makes in his brief (R. 1162-1: Brief in Support, PageID 32292) have no merit.

The record supports the Sixth Circuit's reasoning.  While Petitioner contends the forms would have refuted claims that he concealed receiving things of value from nine of eleven bribers in Counts 2-9 and 11-27, at minimum, Petitioner did not disclose receiving "gifts" from four bribers in that offense grouping, including:

1) Payne, who provided Petitioner free limousine services between 2003 and 2008, prostitutes and access to a Stonebridge condominium (Count 8) (Compare, (R. 1017: Tr. Jury Trial Vol. 10 (Gallagher), PageID 24280; R. 1018: Tr. Jury Trial Vol. 11 (Massie), PageID 24404, 24431-36, 24443-45, 24458-59, 24478-79; R. 1024: Tr. Jury Trial Vol. 15 (Kelley), PageID 25774; R. 1018: Pistone, Trial Tr., PageID 24544, 24555-57, 24591-92). 24452-59, 24479; R. 1018: Tr. Jury Trial Vol. 11 (Pistone), PageID 24557; R. 1024: Tr. Jury Trial Vol. 15 (Kelley), PageID 25728-30, 25774-76, 25780-82, 25791, 25798-99, 25822-23, 25829-30; R. 1019: Tr. Jury Trial Vol. 12 (Johnson), PageID 24661-67, 24670-77; R. 1039: Transcript Jury Trial Volume 26 (Russo), PageID 28928-30, 28932-33, 28936-41, with R. 940-2: Sentencing Memorandum Exhibit B-Ethics Reports, PageID 19155, 19126, 19139, 19153, 19169, 19186);

2) AA, the halfway house that paid for Petitioner's first class airfare to Las Vegas and a dinner at Delmonico's totaling over $800 in 2008 (Count 2) (Compare R. 1016: Tr. Jury Trial Vol. 9 (Massie), PageID 23931-32, 23953-54; R. 1024: Tr. Jury Trial Vol. 15 (Kelley), PageID 25841-50, 25870-73, 25878-80; R. 1027: Tr. Jury Trial Vol. 19 (Kelley), PageID 26636-38; R. 1016: Tr. Jury Trial Vol. 9 (Schuman), PageID 24052-55, with R. 940-2: Sentencing Memorandum Exhibit B-Ethics Reports, PageID 19186-87);

3) Valentin and Salva Stone, which provided free granite and installed it at Petitioner's residence in 2007 and 2008 (Count 11) (Compare R. 1036: Tr. Jury Trial Vol. 23 (Valentin),

PageID 28219, 28221-38, with R. 940-2: Sentencing Memorandum Exhibit B-Ethics Reports, PageID 19169, 19186); and

4) Coppers, from whom Petitioner accepted a hotel room valued at $121 and sexual services in 2008 (Count 9) (compare R. 1019: Tr. Jury Trial Vol. 12 (Massie), PageID 24757-62, with R. 940-2: Sentencing Memorandum Exhibit B-Ethics Reports, PageID 19186).

Moreover, Petitioner did not list Samir Mohammad under the 2003 "gift" section (R. 904-2: Motion (Request for Forfeiture Hearing & Brief), PageID 19115), even though Mohammad funded Petitioner's 2003 Niagara Falls gambling trip and provided $2,000 that Daniel Gallagher handed Petitioner during the trip to keep "Mohammad in mind" for the County Administrator position (Count 1). (R. 1019: Tr. Jury Trial Vol. 12 (Gallagher), PageID 24278-79, 24282-24301; R. 1039: Tr. Jury Trial Vol. 26 (Russo), PageID 28931-33). Petitioner also omitted Kelley's name from the 2003 reports. (R. 904-2: Motion (Request for Forfeiture Hearing & Brief), PageID 19115-16). Yet, in Fall 2003, Kelley paid for Petitioner's airfare and hotel room for a New Orleans gambling trip. (R. 1024: Tr. Jury Trial Vol. 15 (Kelley), PageID 25744-46) (admitted under Fed. R. Evid. 404(b)). Kelley also testified about spending approximately $20,000 on sponsored meals for Petitioner between 2003 and July 28, 2008, and contributing money toward the prostitutes Payne provided Petitioner. (Id. at PageID 25751, 25776-81).

Additionally, Petitioner failed to list any of the corporate entities that bribed him.  For example, Petitioner received things of value from William Neiheiser and Reliance Mechanical, but the official act was for Neiheiser's companies, Reliance Mechanical and Ice Land USA – Lakewood, LLC. (R. 1024: Tr. Jury Trial Vol. 15 (Kelley), PageID 25872; R. 1021: Tr. Jury Trial Vol. 14 (Massie), PageID 25336, 25341-46, 25360-61, 25365; R. 1037: Tr. Jury Trial Vol. 24 (Oliver), PageID 28516). Similarly, Petitioner received things of value from DAS, but

Petitioner provided official acts for Pumper personally, DAS and for Pumper's other companies, including GreenSource. (R. 1034: Tr. Jury Trial Vol. 21 (Pumper), PageID 27719-28, 27676-80, 27694-97, 27701-04, 27709-10, 27714-19, 27742, R. 1035: Tr. Jury Trial Vol. 22 (Pumper), PageID 27814-15, 27822-24, 27828-29, 27849, 27859-72).

To further rebut Petitioner's claims about the exculpatory nature of the ethics reports, the government would have called the Director of the Ohio Ethics Commission to testify "that all income from any source that is reportable on a tax return, including bribery, should have been reported under the [report's] income section," (R. 1031: Tr. Jury Trial Vol. 33, PageID 27285), not the gift section as Petitioner reported. Further, Petitioner's vague disclosures about gifts and meals highlight the reports' irrelevance. As the district court recognized, the forms do not ask the reporting person to specify the gift or the dollar amount. (R. 1030: Tr. Jury Trial Vol. 32, PageID 27167). "All you know is that it's a gift over $75." (Id.). Without knowing which "gifts" Petitioner reported, the reports did not demonstrate that Petitioner disclosed the things of value that cooperating witnesses testified he received as bribes. Similarly, listing those who provided unspecified meals, did not show that Petitioner openly disclosed the meals he received from bribers. As this court recognized, the reports' "meals portion . . . would be very confusing to this jury as well without a competent witness to explain, because that seems to indicate that those were provided to the individual in their official capacity . . . ." (Id.; accord R. 930: Memorandum Opinion & Order, PageID 18912). Indeed, "[w]hile Dimora claims . . . the fact that he listed . . . certain co-conspirators in response to Question No. 3 is evidence of his willingness to reveal these connections, the fact remains that free dinners and other things of value offered by contractors seeking County projects would not have been expenses legitimately received 'in connection with [Petitioner's] official duties.'" (R. 930: Memorandum Opinion & Order, PageID

18912).  Thus, "[n]ot only would such a disclosure have to be explained in the context of the law relating to the duties of a Commissioner, it would also have had the effect of implicating Dimora in wrongdoing by virtue of his arguably inappropriate disclosure."  (Id.).

Excluding the reports did not prejudice Petitioner.  Each bribe payor gave multiple things of value. Thus, without specifying particular "gifts" and meals on the reports, the jury would have no way to determine whether Petitioner disclosed some or all of the things of value. Beyond Petitioner's ambiguous disclosures, as this Court noted, there was no testimony that the reports were "provided to any of the decision-makers . . . who voted on matters." (R. 1031: Tr. Jury Trial Vol. 33, PageID 27279).  As the government noted in argument, "secrecy is very relevant evidence of intent." (R. 1020: Tr. Jury Trial Vol. 13, PageID 25129 (discussing the Robert Rybak Hobbs Act Counts 24-25)); see also United States v. White, 663 F.3d 1207, 1214 (11th Cir. 2011) (recognizing in a Section 666 federal funds bribery case that the extent to which parties "conceal their bribes is powerful evidence of their corrupt intent"). For instance, despite listing Kleem on the reports, Petitioner actively concealed from his own assistant, Smock, that Petitioner's and Kleem's meeting in Vegas was planned, not coincidence, as Petitioner falsely claimed. (R. 1012: Tr. Jury Trial Vol. 5 (Massie), PageID 22956).

Concealment was only one way the government proved Petitioner's intent, however. The government also proved Petitioner's intent through many other means.  See discussion above at Section II.H, summarizing the linkage between the things of value and the official acts. Simply put, the reports constituted one piece of irrelevant circumstantial hearsay evidence that would have been heavily outweighed by the testimony of those who bribed Petitioner, stating they gave Petitioner things of value in exchange for official acts, and the heavy weight of corroborating evidence.

As the Sixth Circuit found using the direct appeal standard of review, Petitioner was not prejudiced by this Court's ruling on the ethics reports. "Evidentiary rulings rarely constitute a violation of a defendant's right to present a defense." United States v. Hardy, 586 F.3d 1040, 1044 (6th Cir. 2009). "In asking whether Defendant was ultimately denied a meaningful defense , . . . [courts] look to whether the improperly excluded evidence . . . would have created a reasonable doubt as to Defendant's guilt," United States v. Blackwell, 459 F.3d 739, 757 (6th Cir. 2006). It follows that here, where the claims were procedurally defaulted, or the 2255 harmless error standard applies, both of which are far less beneficial to Petitioner than the standard the Sixth Circuit used on direct appeal, that this Court should reject Petitioner's arguments regarding the ethics reports.

## III.   THIS COURT SHOULD DENY PETITIONER'S MOTION WITHOUT A HEARING

For the reasons set forth above, this Court should deny Petitioner's 2255 motion and should do so without a hearing. As this Court stated in denying a 2255 motion of Petitioner's co-defendant, Michael Gabor, "A court should hold an evidentiary hearing '[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief[.]'" 28 U.S.C. § 2255(b). (R. 1167: Memorandum Opinion, PageID 32331). (internal citations omitted). Petitioner's 2255 motion makes no factual allegations outside the record. Thus, no evidentiary hearing is necessary or required.

## IV.    CONCLUSION

On the basis of the foregoing, this Court should deny Petitioner's 2255 motion. He has not demonstrated that, for the counts on which Petitioner procedurally defaulted, the "ailing instruction by itself so infected the entire trial that the resulting conviction violates due process" Frady, 456 U.S. at 169. For the counts on which he may not procedurally defaulted, Petitioner

cannot show that the instruction had a "substantial and injurious effect," <u>Kotteakos</u>, 328 U.S. 750 and specifically, that the instructions, as a whole, were so infirm that they "rendered the entire trial fundamentally unfair," with "more than a reasonable possibility that the error was harmful [and] . . . that the defendant was actually prejudiced by the error." <u>Davis v. Ayala</u>, 135 S. Ct. at 2198.