# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JAMES C. DIMORA, | ) | CASE NO. 1:10CR387 |
| | ) | (CASE NO. 1:17-cv-1288) |
| | ) | |
| PETITIONER, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| RESPONDENT. | ) | |

In 2012, petitioner James C. Dimora ("Dimora") was tried by a jury and convicted of multiple federal crimes, including extortion, bribery, money and property mail and wire fraud and honest services mail and wire fraud, racketeering, obstruction, falsifying documents, and tax evasion, as well as conspiracy to commit many of these crimes. He was sentenced by this Court, and, thereafter, he unsuccessfully appealed the Court's judgment to the Sixth Circuit Court of Appeals and was ultimately denied certiorari review by the United States Supreme Court.

Dimora now returns to this Court, by and through his counsel, seeking collateral review of his convictions and sentence under 28 U.S.C. § 2255. (Doc. No. 1162 ["Mot."].) His motion is grounded in the Supreme Court's ruling in *McDonnell v. United States*, -- U.S. --, 136 S. Ct. 2355, 195 L. Ed. 2d 639 (2016), which narrowed and focused the legal definition of "official act" in the federal bribery statute, 18 U.S.C. § 201(a)(3). According to Dimora, the activities for which he was convicted no longer qualify as "official acts" under the law.

But unlike *McDonnell*, the facts in this case involve a multitude of official acts, and the instructions do not suffer from the same deficiencies. "Through thousands of wiretaps and other

means, the investigation revealed that Dimora's tenure as [Cuyahoga County Commissioner] was rife with *quid pro quo* arrangements between him and individuals seeking favors of one sort or another from the county and other governments. He handed out public jobs, influenced Cleveland decision-makers and steered public contracts in return for approximately 100 bribes worth more than $250,000." *United States v. Dimora*, 750 F.3d 619, 623 (6th Cir. 2014). Accordingly, Respondent United States of America ("government") opposes the motion, arguing that the evidence offered at trial overwhelmingly supports a finding that Dimora traded official acts for bribes, even after *McDonnell*. (Doc. No. 1182 ["Opp'n"]; *see* Doc. No. 1189 ["Reply"].)

I. **BACKGROUND**

Even though the underlying facts of this case have been set forth in numerous opinions at the trial and appellate level, in light of the ruling in *McDonnell*, it is necessary to revisit the salient facts in some detail. In 2007, the Federal Bureau of Investigation ("FBI") launched a multi-year probe into political corruption in Cuyahoga County, Ohio. At the heart of the investigation were two men: Dimora and Frank Russo ("Russo"), who were the "centers of influence" for the county government. (Doc. No. 1038, Tr. Jury Trial Vol. 25 (Randazzo), at 28817.[1]) Russo served as County Auditor, and his department was the single largest in the county government.

Dimora was one of three elected members of the Board of County Commissioners

---

[1] All page number references are to the page identification number generated by the Court's electronic docketing system.

("BOCC"), and his influence and authority as a member of this board was significant.[2] The BOCC had the statutory power to, among other things: enter into contracts with other governmental units; purchase, lease, or construct county facilities; sell, lease, or rent any real property owned by the county and not used for public purposes; appropriate funds for the court of common pleas; approve loans or grants for economic development; issue bonds to secure grants in excess of the community improvement fund; and enter into agreements for construction or repair of county infrastructure. (*See* Ohio Rev. Code §§ 307.01 *et seq.*) The BOCC also had control over the budgets for the various county departments, including the Auditor's Office and the Common Pleas Court. (Doc. No. 1026, Tr. Jury Trial Vol. 18 (Kelley), at 26219-20; Doc. No. 1017, Tr. Jury Trial Vol. 10 (Pokorny), at 24135.)

Testimony at Dimora's trial demonstrated that he also had authority over the many municipalities within the county. Several witnesses testified as to Dimora's financial control over county suburbs like Bedford, (Doc. No. 1019, Tr. Jury Trial Vol. 12 (Massie), at 24830, 24838-39), including contracts for suburban road construction (Doc. No. 1015, Tr. Jury Trial Vol. 8 (Dever), at 23773-79), and the distribution of grant money between the municipalities. (Doc. No. 1034, Tr. Jury Trial Vol. 21 (Oyaski), at 27550-51.) During this time period, Dimora also served as the county chair of the Democratic Party, making him ideally connected to all of the major power brokers in the county.

The investigation revealed that Dimora and Russo used their government positions to

---

[2] Shortly after the results of the FBI's investigation were made public, the voters of Cuyahoga County voted to eliminate the three-commissioner form of government and put in its place a government administered by an elected county executive and council. *See Dimora*, 750 F.3d at 623 ("Three commissioners historically have led the government of [Cuyahoga County], though that changed (perhaps due to the charges in this and related cases) when the people of Cuyahoga County voted for a county executive form of government that started in 2011.")

benefit themselves and their co-conspirators through multiple fraud and bribery schemes designed to trade official acts for things of value. Through these schemes, Dimora and Russo were believed to have corruptly affected and influenced the awarding of county contracts and grants, the hiring of county employees (including the hiring of ghost employees), the results of at least one county election, and the outcome of civil litigation in various county and municipal courts. *See generally Dimora*, 750 F.3d at 623. In addition to Russo and Dimora, more than sixty individuals—including other public officials, county judges, and private business executives— were ultimately indicted, and all but one were convicted. The vast majority of these individuals entered into plea agreements, some went to trial, and a number of them, like Russo, testified at Dimora's trial.

Dimora, along with his co-defendant, Michael Gabor ("Gabor") (one of the ghost employees hired in the Auditor's Office), were two of the last defendants to go to trial. Much of the focus of the trial was the vast authority Dimora had over the day-to-day activities of the county government, and his ability to exploit that authority to obtain things of value for himself and his friends. Russo testified that he and Dimora enjoyed socializing with a group of local businessmen and county officials they dubbed the "A Team" or the "in-crowd" or the "in-circle," and they used "sponsors" to fund the group's activities. (Doc. No. 1039, Tr. Jury Trial Vol. 26 (Russo), at 28886-87; *see id*. at 28923.) If no sponsor attended a dinner or event, a member of the group would make calls to find one. Sometimes they asked for a sponsor's credit card number to pay the bill. (*Id*. at 28886-91.) One thing remained constant—Dimora never paid the bill. (Doc. No. 1024, Tr. Jury Trial Vol. 15 (Kelley), at 25751.)

The sponsors included Kevin Kelley, Steve Pumper, Michael Forlani, Ferris Kleem, and

Rob Rybak. (Doc. No. 1039, Tr. Jury Trial Vol. 26 (Russo), at 28897, 28902-03.) In exchange for providing these dinners and other things of value, "[s]ponsors received personal attention on anything that came up," such as a "daughter getting a parking ticket, a son wanting a [county] job, a brother being [a] contractor and wanting a contract, there were multiple, multiple issues at all times that [the sponsors] had us [Dimora and Russo] doing for them." (*Id*. at 28901.) In other words, if you were a sponsor, you "got special treatment." (*Id*.)

Russo explained that the sponsors tailored their gifts to the things that Dimora enjoyed. Dimora "loved his backyard. . . . [I]t was the number one thing in his life. If anybody could help him in the backyard [with improvements such as a pool, outdoor kitchen and pizza oven, granite counter tops, tiki hut, etc.], it was a great privilege to him. The second thing was [Dimora] liked fine food and fine alcohol, only the best. Big thick steaks, Crown Royal . . . . [T]he third thing was . . . that [Dimora] like[d] cash from people. . . . And the fourth thing [was] [Dimora] like[d] pretty girls and prostitutes." (*Id*. at 28917-18; *see also id*. at 29012.)

One of the first sponsors to testify, Ferris Kleem ("Kleem"), a local contractor who owned construction companies and held interests in other businesses, explained that he helped finance a trip to Las Vegas for Dimora and his friends, paying for the airfare, hotel accommodations, alcohol, expensive dinners, gambling, trips to an exclusive swimsuit optional pool, and prostitutes. In exchange for these and others things of value given to Dimora over time, Dimora voted to award Kleem county construction contracts, obtained a county position for one of Kleem's relatives, assisted Kleem's cousin in obtaining a grant for his municipality, and fixed a county smoking violation issued against a restaurant in which Kleem held an interest.

Dimora's efforts to secure the Coe Lake grant, a construction grant to fund a handicap accessible bridge in the City of Berea, Ohio, showcased his influence and his ability to pressure

other public officials. Kleem's cousin (who was the Mayor of Berea) recalled a three-way telephone conversation with County Development Director Tracy Nichols ("Nichols") in which Nichols was much more deferential and cooperative regarding Kleem's efforts to obtain the Coe Lake grant for his cousin's community when Dimora was on the line. In the conversation, Dimora advocated Kleem's cousin's position that HUD guidelines permitted funding for handicapped accessibility projects, a position which Nichols had previously opposed. (Doc. No. 1029, Tr. Jury Trial Vol. 31 (Cyril Kleem), at 26898-99.) Nichols later testified that she made re-examining her rejection of the Coe Lake grant a priority because Dimora had called her about it, and he was her boss. (Doc. No. 1030, Tr. Jury Trial Vol. 32 (Nichols), at 27111-12.) Nichols ultimately did change her mind, and Dimora's efforts culminated in his casting a vote to approve the Coe Lake grant. (Gov't Trial Ex. 400-G (County Agenda Action).)

Another sponsor, Steve Pumper ("Pumper"), also spoke to Dimora's considerable power and influence. He testified that he was willing to pay Dimora bribes to gain access to that influence. He explained:

> You know, [Dimora] was one vote out of three on the [BOCC]. He had a lot of power at the time. He had control of a lot of folks on the council, on the – some of the judges, some of the council people. You know, so they had, between himself and Mr. Russo, they had a lot of control back then. . . . Well, it benefits me because I need things done, you know. So from my standpoint I was able to get some loans from the county a lot quicker and faster. Whenever I made a call to have something done, [Dimora] would make those calls on my behalf. And so, yeah, it was a great benefit to be able to just go to somebody like [Dimora] than climbing up through the chain through the bottom. . . . It's a huge benefit. It's a time-saving benefit when you're trying to get a project closed out, you know, or receive money that you need, you know, that you need for a project and you don't want to put up some of your own money. It's a huge benefit for myself. . . . He made a call for – I was going through a lawsuit with Letter Perfect on this Cleveland Browns suit I was involved with. And so [Dimora] made a call to the judge that was handling the case . . . to, you know, try to speed up the closing of that lawsuit and help obviously bring down what I needed to, you know, settle with. So by him making that call was a help for [the judge] to go ahead and react

pretty quickly to that as well.[3]

(Doc. No. 1034, Tr. Jury Trial Vol. 21 (Pumper), at 27741-42 (footnote added).)

After a 37-day jury trial, wherein the jury heard this and similar testimony regarding Dimora's corrupt schemes, the jury returned guilty verdicts against Dimora and his co-defendant on all but one charge. On August 1, 2012, the Court sentenced Dimora to a within-guidelines sentence of 336 months of imprisonment, to be followed by three years of supervised release. The Court also imposed restitution. (Doc. No. 957 (Dimora Judgment).)

On direct appeal, Dimora challenged the district court's jury instructions and refusal to admit certain end-of-year ethics reports that would have shown that Dimora reported receiving certain unspecified gifts from various individuals and entities. With respect to the jury instructions, the Sixth Circuit found that the district court had properly instructed the jury on the difference between gifts given in friendship and bribes given in exchange for official acts. As for the ethics reports, the court of appeals ruled that the error, if there was any, in excluding the reports was harmless "in view of the considerable array of evidence against Dimora." *Dimora*, 750 F.3d at 628.

---

[3] In the end, Dimora pressured the common pleas judge—Bridget McCafferty (convicted as a result of the Cuyahoga County public corruption investigation)—to do a whole lot more. During a fundraiser, Dimora instructed Judge McCafferty to "get this thing done" and, "[y]ou got to get a handle on it," referring to Pumper's civil lawsuit. (Doc. No. 1039, Tr. Jury Trial Vol. 26 (Russo), at 29010.) Pumper also testified that he had Dimora call the judge to "see if he [couldn't] push this thing along, get this thing done, and hopefully drive the difference of price of what [the subcontractor] was asking for versus where we were at." (Doc. No. 1035, Tr. Jury Trial Vol. 22 (Pumper), at 27862.) In a subsequently captured ex parte call to Pumper, Judge McCafferty detailed her efforts to resolve the lawsuit at an amount acceptable to him. (Gov't Ex. 1700-XX-TR.)

## II. THE DECISION IN *McDonnell*

Dimora's petition rests primary upon the Supreme Court's decision in *McDonnell*. There, the Court reviewed former Virginia Governor Robert McDonnell's conviction for bribery. 136 S. Ct. at 2361. Governor McDonnell and his wife received $175,000 in loans and gifts from a Virginia businessman, Jonnie Williams, and, in exchange, Governor McDonnell allegedly performed various tasks and favors to further Williams's plans to promote a nutritional supplement manufactured by his company. *Id*. The evidence at trial demonstrated that, in exchange for various gifts, including $20,000 in designer clothing for Governor McDonnell's wife, the governor passed on a scientific letter addressing a proposed research protocol for the supplement to the secretary of health and human resources, hosted a lunch event for Williams's company at the governor's mansion,[4] and recommended that two of his subordinates meet with a representative from Williams's company. *Id*. at 2362-64. With respect to setting up meetings for constituents, Governor McDonnell testified that this was "something he did 'literally thousands of times' as Governor, and that he did not expect his staff 'to do anything other than to meet' with Williams." *Id*. at 2366 (record cite omitted).

Under the relevant federal bribery law, the government was required to show that "Governor McDonnell committed (or agreed to commit) an 'official act' in exchange for the loans and gifts[]" from Williams. *Id*. at 2361. The indictment charged the governor with committing at least five "official acts," including "arranging meetings for [Williams] with

---

[4] During the luncheon, Governor McDonnell asked researchers present "whether they thought 'there was some scientific validity'" to the supplement and "'whether or not there was any reason to explore [studies of the supplement] further.'" *Id*. at 2363 (record cite omitted). When Williams directly asked Governor McDonnell "whether he would support funding for the research studies, Governor McDonnell 'very politely' replied, 'I have limited decision-making power in this area.'" *Id*. (record cite omitted).

Virginia government officials," "hosting, and . . . attending, events" to promote Williams's business, and "recommending that senior government officials in the [Governor's Office] meet with" executives from Williams's company. *Id*. at 2365-66. At trial, the judge instructed the jury that an "official act" could include acts "in furtherance of longer-term goals" or "in a series of steps to exercise influence or achieve an end." *Id*. at 2366 (additional quotation marks and record cites omitted).

The Supreme Court vacated Governor McDonnell's conviction. *Id*. at 2375. In so doing, the Court adopted "a more bounded interpretation of 'official act[,]'" and found that "[u]nder that interpretation, setting up a meeting, calling another public official, or hosting an event does not, standing alone, qualify as an 'official act.'" *Id*. at 2368. With respect to Governor McDonnell's actions, the Court held that "[s]imply expressing support for the research study at a meeting, event, or call—or sending a subordinate to such a meeting, event, or call—similarly does not qualify as a decision or action on the study, as long as the public official does not intend to exert pressure on another official or provide advice, knowing or intending such advice to form the basis for an 'official act.'" *Id*. at 2371. "Otherwise," the Court explained, "if every action somehow related to the research study were an 'official act,' the requirement that the public official make a decision or take an action on that study, or agree to do so, would be meaningless." *Id*.

Nevertheless, the Supreme Court noted that,

Of course, this is not to say that setting up a meeting, hosting an event, or making a phone call is always an innocent act, or is irrelevant, in cases like this one. If an official sets up a meeting, hosts an event, or makes a phone call on a question or matter that is or could be pending before another official, that could serve as evidence of an agreement to take an official act. A jury could conclude, for

example, that the official was attempting to pressure or advise another official on a pending matter. And if the official agreed to exert that pressure or give that advice in exchange for a thing of value, that would be illegal.

*Id.*

Instead, the Court found that the text of the federal bribery statute, § 201(a)(3), sets forth two requirements for an "official act":

First, the Government must identify a "question, matter, cause, suit, proceeding or controversy" that "may at any time be pending" or "may by law be brought" before a public official. Second, the Government must prove that the public official made a decision or took an action "on" that question, matter, cause, suit, proceeding, or controversy, or agreed to do so.

*Id.* at 2368.

The Court explained that the words "'cause,' 'suit,' 'proceeding' and 'controversy' [] connote a formal exercise of governmental power, such as a lawsuit, hearing, or administrative determination." *Id.* The Court interpreted "pending" and "may by law be brought" to indicate a matter that is "relatively circumscribed—the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *Id.* at 2369. The Court interpreted "may *by law* be brought" as conveying "something within the specific duties of an official's position—the function conferred by the authority of his office." *Id.* (emphasis in original). Finally, the Court stated "'any' conveys that the matter may be pending either before the public official who is performing the official act, or before another public official." *Id.*

The Court provided examples of qualifying official acts including (1) "a decision or action to initiate a research study[,]" or (2) a "decision or action on a qualifying step, such as narrowing down the list of potential research topics[,]" or (3) "using his official position to exert pressure on *another* official to perform an 'official act[,]'" or (4) "a public official us[ing] his official position to provide advice to another official, knowing or intending that such advice will

10

form the basis for an 'official act' by another official[.]" *Id*. at 2370 (emphasis in original). The Court also observed that "a public official is not required to actually make a decision or take an action . . . it is enough that the official agree to do so." *Id*. at 2370-71.

Applying these terms and concepts to the facts in the case before it, the Court held that the jury instructions in Governor McDonnell's trial on the meaning of "official act" were inadequate. *Id*. at 2375. The Court concluded that the jury may not have relied on the properly narrowed definition of "official act" and may have instead believed that Governor McDonnell's efforts to schedule a meeting for Williams, alone, could have constituted an "official act." *Id*. at 2374-75.

Dimora points to the Second Circuit's decision in *United States v. Silver*, wherein it applied the teachings of *McDonnell* to find deficient the definition of "official act" in the district court's charge in the trial of the former speaker of the New York State Assembly, Sheldon Silver. *United States v. Silver*, 864 F.3d 102, 119 (2d Cir. 2017). There, the district court charged Silver's jury that an official act was "'any action taken or to be taken under color of official authority[.]'" *Id*. at 106. The Second Circuit reversed the former speaker's convictions for Hobbs Act extortion and honest services fraud and remanded, reasoning that "a rational jury with a proper jury instruction could have found that Silver's letter offering general assistance with an event occurring in his district—absent any actual 'exert[ion] [of] pressure' on other officials regarding a particular matter under their consideration—did not satisfy the standards for an

official act as defined by *McDonnell*."[5] *Id*. at 120.

Dimora argues that, like the defendants in *McDonnell* and *Silver*, there is a risk that his jury may have convicted him based on conduct that no longer qualifies as official acts, such as setting up a meeting. The government concedes that, in the wake of *McDonnell*, setting up a meeting, *without more*, is insufficient to support a conviction for Hobbs Act extortion or honest services fraud. But, it is the government's position that, in Dimora's case, there was *always more*. (Opp'n at 32679.) Specifically, the government underscores the fact that Dimora's "official acts were more than vague offers of assistance, or job recommendations without [Dimora] pressuring other public officials, or just taking a public position on a matter." (*Id*. at 32683.) Rather, the government maintains that the evidence offered at trial convincingly established that Dimora corruptly and knowingly took actions, or exerted substantial pressure on other public officials to take actions, that qualify as "official acts," even after *McDonnell*.

## III. STANDARD OF REVIEW

A prisoner who moves to vacate his sentence under § 2255 must show that the sentence was imposed in violation of the Constitution or laws of the United States, that the court was without jurisdiction to impose such a sentence, that the sentence was in excess of the maximum

---

[5] The event was a charity race that one of Silver's constituents, a physician who agreed to send Silver's law firm referrals for Mesothelioma actions, was sponsoring. *Silver*, 864 F.3d at 120. The evidence at trial demonstrated that Silver offered to help the physician "'navigate the process [of getting permits for the event] if needed.'" *Id*. at 120. The other two acts Silver was alleged to have assisted the physician with involved helping the doctor's son secure a job with a nonprofit organization receiving federal funds and obtaining an assembly resolution honoring the physician. *Id*. at 120-21. Of the three acts, the court concluded that only the assembly resolution still qualified as an "official act" after *McDonnell*. *Id*. at 120.

authorized by law, or that it is otherwise subject to collateral attack. 28 U.S.C. § 2255. To prevail under § 2255, "a petitioner must demonstrate the existence of an error of constitutional magnitude which had a substantial and injurious effect or influence on the guilty plea or the jury's verdict." *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)). "Relief is warranted only where a petitioner has shown 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *Id.* (quoting *Davis v. United States*, 417 U.S. 333, 346, 94 S. Ct. 2298, 41 L. Ed. 2d 109 (1974)).

The movant bears the burden of articulating sufficient facts to state a viable claim for relief under § 2255. *McQueen v. United States*, 58 F. App'x 73, 76 (6th Cir. 2003) (per curiam). Vague and conclusory claims that are not substantiated by allegations of specific facts with some probability of verity are not enough to warrant relief. A § 2255 motion may be dismissed if it only makes conclusory statements without substantiating allegations of specific facts and fails to state a claim cognizable under § 2255. *Green v. Wingo*, 454 F.2d 52, 53 (6th Cir. 1972); *O'Malley v. United States*, 285 F.2d 733, 735 (6th Cir. 1961).

### A.   Procedural Default

The doctrine of procedural default bars a habeas petitioner from raising previously waived claims on collateral review. A petitioner must show "cause" why he did not previously object and "'actual prejudice' resulting from the error" before he will be allowed to raise such a claim in a habeas proceeding. *Napier v. United States*, 159 F.3d 956, 961 (6th Cir. 1998) (citing *United States v. Frady*, 456 U.S. 152, 167-68, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982)); *see*

*Bousley v. United States*, 523 U.S. 614, 622, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998) (citations omitted). A petitioner procedurally defaults on a challenge to a jury instruction if he (1) fails to object to the jury instruction as required by Fed. R. Crim. P. 30(d), or (2) fails to raise the issue on direct appeal. *See Frady*, 456 U.S. at 166-68; Fed. R. Crim. P. 30(d) ("A party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate. . . . Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b).").

The government does not contend, nor could it, that Dimora failed to raise the issue of the definition of "official act" at trial. Indeed, this issue was the subject of much debate during the charging conference and at trial, resulting in the Court giving several (though not all) requested instructions relative to "official acts" under the Hobbs Act. Instead, it is the government's position that Dimora has procedurally defaulted on all counts because he failed to raise the sufficiency of the Court's instruction of "official act" on direct appeal. (Opp'n at 32669.) In support, the government cites to the fact that the Sixth Circuit limited its discussion of Dimora's challenge to the Court's jury instructions to the distinction between giving gifts and receiving bribes. (*Id*. at 32670.) The government reasons that, "[t]he Sixth Circuit did not characterize [Dimora's] arguments as raising error in the definition of 'official act[.]'" (*Id.*)

Yet, it is clear from the briefing on appeal that Dimora sufficiently preserved the issue for further review, arguing that "[t]he district court also gave an expansive and confusing definition of 'official act,' while refusing to give proposed instructions that explained the limits on what constitutes an official act." (Doc. No. 1189-1 (Opening Appellate Brief) at 32950; *see* Doc. No. 1189-2 (Appellate Reply Brief) at 32990-91 [the jury instructions "expanded the definition of

official act beyond the limits set by law"].) In particular, Dimora complained on appeal that the district court refused to give instructions that would have informed the jury (1) that it was not an official act for a public official to merely introduce a giver to other decision-makers, or (2) that an official act did not involve merely encouraging subordinates to assist a giver. (Opening Appellate Brief at 32951.) Accordingly, the Court finds that Dimora did not procedurally default because he raised the essence of the *McDonnell* "official act" issue throughout the prosecution and on appeal.[6] *See, e.g., United States v. Skelos*, 707 F. App'x 733, 736 (2d Cir. 2017) ("We are satisfied that defendants adequately preserved this challenge [to the definition of "official act"] in the district court even though they did not propose specific alternative language.").

## B. Harmless Error Standard

Because Dimora did not procedurally default on this claim, he is entitled to rely on the harmless error standard. However, the harmless error standard as applied to § 2255 proceedings is more favorable to the government than the harmless error standard on direct review. *See United States v. Jefferson*, 289 F. Supp. 3d 717, 734 (E.D. Va. 2017) ("Where, as here, a defendant mounts a collateral attack on a jury instruction that erroneously instructs on an element of an offense, the courts in this circuit apply a less-stringent 'harmless error' standard than that

---

[6] In so finding, the Court also rejects the government's alternative argument that, if Dimora did raise the issue, he did so only as to Counts 9, 11, and 12-13 of the Indictment. (Opp'n at 32673.) The government reasons that Dimora only preserved the issue, at best, as to these four counts because he specifically argued that "applying the correct law that the district court omitted from its jury instructions, four counts must be reversed and dismissed based on insufficient evidence." (*Id.*, citing Opening Appellate Brief at 32951.) "In other words," the government reasons, "on appeal [Dimora] conceded he was not prejudiced by the jury instructions on 28 of the 32 counts." (*Id.* at 32673.) The Court rejects the government's hypertechnical view of preservation, finding that Dimora properly informed the Sixth Circuit that he was challenging this Court's interpretation of the term "official act." *See McDonnell*, 136 S. Ct. at 2367 ("The issue in this case is the proper interpretation of the term, 'official act.'"). No more was needed to preserve the issue, and Dimora may avail himself of *McDonnell* on the instant § 2255 motion. *See generally United States v. Hassan*, 578 F.3d 108, 129 (2d Cir. 2008) ("[T]he substance of the claim now being raised on appeal was squarely raised below: counsel made it clear to the trial court that he objected to the charge because he believed it permitted the jury to convict" based on a finding not permitted by law.)

applicable on direct appeal.") "To warrant habeas relief because of incorrect jury instructions, [Dimora] must show that the instructions, as a whole, were so infirm that they rendered the entire trial fundamentally unfair." *Murr v. United States*, 200 F.3d 895, 906 (6th Cir. 2000) ("If this Court is sure that the error had no or very slight effect or influence on the jury's decision, the verdict and judgment must stand.") (citing, among authority, *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991)). "There must be more than a 'reasonable possibility' that the error was harmful. . . . [And] the court must find that the defendant was actually prejudiced by the error." *Davis v. Ayala*, -- U.S. --, 135 S. Ct. 2187, 2198, 192 L. Ed. 2d 323 (2015) (quoting, among authority, *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993) (some quotation marks omitted)). In making this determination, the Court must apply the *Kotteakos* standard, which considers whether the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946)).

Under this more deferential standard, even a jury "instruction that omits an element of the offense" does not "*necessarily* render a trial fundamentally unfair[.]" *Neder v. United States*, 527 U.S. 1, 8, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) (emphasis added). Nevertheless, "[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error[.]" *Kotteakos*, 328 U.S. at 765. Rather, if "one is left in grave doubt . . . whether the error itself had substantial influence" on the jury's verdict, then "the conviction cannot stand." *Id*. In other words, if "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error," then the standard is met

and the matter must be remanded. *O'Neal v. McAninch*, 513 U.S. 432, 435, 115 S. Ct. 992, 130 L. Ed. 2d 947 (1995). Given the contours of this standard, the question of whether an instruction had a substantial and injurious effect on a jury's verdict must be answered "in light of the evidence presented" at trial. *United States v. Smith*, 723 F.3d 510, 517 (4th Cir. 2013).

### C.   Evidentiary Hearing

In an action to vacate or correct the sentence, a court is required to grant a hearing to determine the issues and make findings and conclusions of law "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief . . . ." 28 U.S.C. § 2255(b). No evidentiary hearing is required if the prisoner's allegations "cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995) (quoted in *Arrendondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999)); *cf. Valentine v. United States*, 488 F.3d 325, 334 (6th Cir. 2007) (finding that the burden is met where the prisoner "offers more than a mere assertion . . . he presents a factual narrative of the events that is neither contradicted by the record nor 'inherently incredible'"). Where, as here, the judge considering the § 2255 motion also conducted the trial, the judge may rely on his or her recollections of the trial. *Blanton v. United States*, 94 F.3d 227, 235 (6th Cir. 1996) (citing *Blackledge v. Allison*, 431 U.S. 63, 74 n.4, 97 S. Ct. 1621, 52 L. Ed. 2d 136 (1977)).

Here, the parties agree that a hearing is unnecessary because Dimora makes no factual allegations outside the record. (Opp'n at 32784; Reply at 32891.) Rather, as previously observed, the appropriate inquiry in this case is whether the jury instructions were in error, and, if so, whether any such error had a substantial and injurious effect on the jury's verdict. Inasmuch as the undersigned presided over the trial of this matter and is intimately familiar with the record,

the Court agrees that an evidentiary hearing is unnecessary. Such an inquiry is properly confined to a review of the record. *See generally Smith*, 723 F.3d at 517.

## IV. COUNTS UNAFFECTED BY *MCDONNELL*

Before the Court can measure its charge against current federal bribery law, it is important to identify the counts and schemes for which *McDonnell* has no application. Dimora concedes that Count 28 of the indictment,[7] charging obstruction of justice, was unaffected by the ruling in *McDonnell*. (Mot. at 32286, 32298.) Additionally, the ruling in *McDonnell* has no bearing on Count 29, in which Dimora was convicted of destruction, alteration, or falsification of records in a federal investigation in violation of 18 U.S.C. §§ 1519 & 2. Like the related crime of obstruction of justice, destruction or falsification of records under § 1519 does not require the commission of an "official act." *See also United States v. Kernell*, 667 F.3d 746, 756 (6th Cir. 2012) (Section 1519 required the government to prove that the defendant (1) "knowingly deleted or altered information . . . (2) with the intent to impede, obstruct or influence an investigation that (3) he contemplated at the time of the deletion or alteration.").

The ruling in *McDonnell* also does not reach the crime of bribery concerning programs receiving federal funds under 18 U.S.C. § 666, and, accordingly, Counts 4, 5, 6, 17, 18, and 19 do not factor into the *McDonnell* analysis. Again, *McDonnell* concerned the meaning of "official act" as used in the federal bribery statute, 18 U.S.C. § 201(a)(3). Section 666 is "more expansive" than § 201(a)(3). *United States v. Boyland*, 862 F.3d 279, 291 (2d Cir. 2017). Section 666 prohibits individuals from "solicit[ing] . . . anything of value from any person, *intending to be influenced* or rewarded *in connection with any* business, transaction, or series of transactions of [an] organization, government, or agency." *Id.* (quoting 18 U.S.C. § 666(a)(1)(B) (emphasis

added by the Second Circuit)); *see United States v. Suhl*, 885 F.3d 1106, 1112 (8th Cir. 2018) ("Section 666 . . . does not include the term 'official act.'"). Accordingly, courts have found the ruling in *McDonnell* inapplicable to bribery under § 666.[8] *Boyland*, 862 F.3d at 291; *see also United States v. Ferguson*, No. 10-20403, 2018 WL 1071743, at *4 (E.D. Mich. Feb. 27, 2018) ("*McDonnell* does not apply to 18 U.S.C. § 666, which does not include the term 'official act' or any similar term.") (collecting cases).[9]

Finally, the Court finds that Counts 2, 9, 16 and 32 remain undisturbed by *McDonnell*. To be sure, these counts charged Dimora with conspiracy to commit honest services mail and/or wire fraud, a crime for which the commission of an official act is required. *See Suhl*, 885 F.3d at 1112 (applying *McDonnell's* definition of "official act" to conviction for honest services fraud); *Boyland*, 862 F.3d at 290 (similar). Nonetheless, the conspiracies charged in Dimora's indictment charged two objects, the first being traditional money or property fraud. The jury returned special verdicts finding Dimora guilty on the above counts, for each count specifying that Dimora was guilty of both of the objects: conspiracy to commit money or property fraud and conspiring to commit honest services fraud. (*See* Doc. No. 738 (Dimora Jury Verdicts) at 17117-

---

[7] By "indictment," the Court refers to the Third Superseding Indictment, filed September 7, 2011. (Doc. No. 444.)

[8] For similar reasons, the Court finds that *McDonnell* has no impact on the state bribery predicates contained in the RICO conspiracy charged in Count 1. As part of the pattern of racketeering identified in Count 1, Dimora and his co-conspirators were charged with a conspiracy to commit "multiple acts involving bribery chargeable under . . . Ohio Revised Code Section 2921.02 (Bribery)." (Indictment at 9642.) Dimora does not argue that *McDonnell* applies to state law bribery, nor does he cite any authority for that proposition. As previously noted, *McDonnell* interpreted the definition of official act in the federal bribery statute, not Ohio Rev. Code § 2921.02, which does not contain the phrase "official act."

[9] Dimora complains that the term "official act" appeared in a section of the Court's instructions relating to general bribery terms and concepts. While this is true, the Court also specifically instructed the jury separately on the elements for each statute, including § 666, and even bolded the elements for each offense (which is significant because each juror was given a copy of the jury instructions). Dimora has failed to explain, in light of these attendant circumstances, how he was prejudiced by the Court's discussion of general bribery concepts, or how the jury's unlikely consideration of an *additional* element, such as an official act, would have prejudiced him.

18, 17125-26, 17133-34.)[10]

With respect to traditional money or property fraud, the jury was only required to find that Dimora conspired to defraud and to obtain money and property by means of a false statement or material omission. (Doc. No. 735-1 (Jury Instructions ["JI"]) at 17018-17022.) While Dimora argues that some of the evidence in these alternatively pleaded fraud claims overlapped with the bribery counts, the fact remains that an official act is not an element of traditional money and property fraud, and the jury was properly so instructed. *See United States v. Frost*, 125 F.3d 346, 358-59 (6th Cir. 1997) (setting forth the elements of the substantive crime of mail fraud); Sixth Circuit Pattern Instruction 10.01 (mail fraud); Sixth Circuit Pattern Instruction 10.02 (wire fraud); *see also* Doc. No. 1045, Tr. Jury Trial Vol. 36 (Government Closing Argument ["Gov't Close"]), at 30141 ["Mail fraud without honest services has nothing whatsoever to do with bribery."]; 30181 [similar].)

Dimora's reliance on *United States v. Wright*, 665 F.3d 560, 576-77 (3d Cir. 2012) in support of his position that *McDonnell* requires these alternatively pleaded conspiracies to be set

---

[10] Dimora was not charged in Count 32 but the fraud charged against his co-conspirator and co-defendant, Gabor, forms one of the predicate acts for Count 1, in which Dimora was charged with and convicted of RICO conspiracy. (*See* Doc. No. 739 (Gabor Jury Verdicts) at 17199-20.)

aside is misplaced. There, the court held that the defendant's honest services mail fraud convictions, based in part on a conflict-of-interest theory, were subject to reversal in light of the Supreme Court's ruling in *Skilling v. United States*, -- U.S. --, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010). *Wright*, 665 F.3d at 567. The court went on to hold that the traditional mail fraud counts were also subject to reversal because of prejudicial spillover. Applying a two-step test, the court found that much of the evidence relating to the honest services counts would have been inadmissible in a trial limited to the traditional mail fraud counts and that this inadmissible evidence was prejudicial. *Id.* at 575-76.

In conclusory fashion, Dimora suggests that the traditional money and property fraud counts were tainted by prejudicial spillover. Such perfunctory allegations are insufficient to demonstrate the "substantial prejudice" needed to show prejudicial spillover under Sixth Circuit precident. *See United States v. Tran*, 433 F.3d 472, 478 (6th Cir. 2006) (citing *United States v. Johnson*, 763 F.2d 773, 777 (6th Cir. 1985)). Dimora has failed to identify with particularity any evidence that would have been inadmissible in a hypothetical trial on traditional money and property mail fraud alone, let alone any evidence the admission of which would have resulted in substantial prejudice. Accordingly, there can be no prejudicial spillover even if the honest services objects of the conspiracy were found defective under *McDonnell*. In addition, as will be set forth below, neither the Court's charge, nor the official acts established at trial, run afoul of *McDonnell*.

## V. THIS COURT'S CHARGE IN LIGHT OF *MCDONNELL*

This brings the Court to its instruction on "official act." Specifically, this Court instructed Dimora's jury that:

The term "official act" includes any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit. Official acts include the decisions or actions generally expected of the public official. In addition, "official action" includes the exercise of both formal official influence (such a public official's votes) and informal official influence (such as a public official's influence on other public officials). The term "official act" does not include actions taken in a personal or nonofficial capacity, such as actions taken as a political party leader.

(JI at 16988-89; *see* Doc. No. 1044, Tr. Jury Trial Vol. 35 (Charge), at 30007-08.) As will be seen below, when combined with other instructions, the charge as a whole did not suffer from the same over-inclusiveness as the instructions in *McDonnell* and *Silver*. Dimora's motion, therefore, fails for this reason alone. *See, e.g., United States v. Woodward*, No. 95-10234-DPW, 2017 WL 4684000, at *9 (D. Mass. Oct. 18, 2017)

*McDonnell* requires three instructions to be given when a court defines "official act." *See McDonnell*, 136 S. Ct. at 2372-74. According to *McDonnell*, the jury must first be advised that an "official act" is a decision or action on a "'question, matter, cause, suit, proceeding or controversy' involving the formal exercise of governmental power." *Id.* at 2374. The Court satisfied this requirement when it instructed the jury that the official act had to involve a "question, matter, cause, suit, proceeding or controversy, which may at any time be pending," and, that "[t]he term 'official act' does not include actions taken in a personal capacity or nonofficial capacity, such as actions taken as a political party leader." (Doc. No. 144, Tr. Jury Trial Vol. 35 (Charge), at 30007-08.) The combination of the two instructions ensured that the jury did not consider matters that were informal, like a "typical meeting, call, or event[.]" *McDonnell*, 136 S. Ct. at 2374.

While the Court advised Dimora's jury that official acts could include both "formal" and

"informal" acts, it used these terms to differentiate between actions taken directly by the public official, and those actions designed to influence another public official into taking an official act. Specifically, this Court explained that "'official action' includes the exercise of both formal official influence (such as a public official's votes) and informal official influence (such as a public official's influence on other public officials)." (JI at 16989; *see* Doc. No. 1044, Tr. Jury Trial Vol. 35 (Charge), at 30008) Taken as a whole, this instruction aligns closely with the Supreme Court's limits on the definition of official act. *McDonnell*, 136 S. Ct. at 2372 (an official act "may include using [an] official position to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official").

The Court in *McDonnell* found that the district court should also have instructed the jury that the pertinent "'question, matter, cause, suit, proceeding or controversy' must be something specific and focused that is 'pending' or 'may by law be brought before any public official,' such as the question whether to initiate the research studies." *McDonnell*, 136 S. Ct. at 2374. This Court satisfied this requirement when it instructed the jury that the question, matter, cause, suit, proceeding or controversy was something that "may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit[.]" (JI at 16988-89; *see* Doc. No. 1044, Tr. Jury Trial Vol. 35 (Charge), at 30007-08.) This instruction informed the jury that it should limit its consideration to acts that involved "the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *McDonnell*, 136 S. Ct. at 2369.

Finally, the Supreme Court found that the district court should have instructed McDonnell's jury that "merely arranging a meeting or hosting an event to discuss a matter does

not count as a decision or action on that matter." *Id*. at 2375. Because the Court did not anticipate the circumstances surrounding the ruling in *McDonnell*, it did not give this third instruction. Still, the Court gave limiting instructions not given in *McDonnell* that ensured that the jury did not convict on a theory that Dimora's relationships with his bribe payers were just innocent lobbying relationships, general efforts to respond to the needs and interests of his constituents, or pro forma acts routinely performed by public officials. In addition to requiring the "official act" to be associated with a pending "question, matter, cause, suit, or proceeding or controversy," and informing that an official act can involve pressuring another public official to perform an official action, the Court advised the jury that: (1) "the term 'official act' does not include actions taken in a personal or non-official capacity, such as actions taken as a political party leader"; (2) "bribery or kickbacks are not proved if the benefit is intended to be, and is accepted as, simply an effort to buy favor or generalized goodwill from a public official who either has been, is, or may at some unknown, unspecified later time, in a position to act favorably on the giver's interests[;]" (3) "you may consider the official actions' lawfulness, desirability, or benefit to the public welfare, just as you would any other circumstances in the case, as it may bear upon the intent of a defendant in accepting a thing of value[;]" and (4) "property given with the sole motive of cultivating friendship is not a bribe." (JI at 16987-89.) Together, these instructions made clear that the official act had to be something more than non-specific benefits to the bribe payer, such as generalized goodwill or the cultivation of friendship, and that they had to be actions Dimora took in his official capacity, and not personal or political acts.

In fact, these instructions permitted Dimora's trial counsel to repeatedly argue, without objection, that setting up meetings, placing phone calls, and directing ministerial functions are not official acts for purposes of the Hobbs Act. (*See* Doc. No. 1045, Tr. Jury Trial Vol. 36

(Defense Close), at 30274 ["He set up meetings. That's what commissioners are supposed to do."]; *Id.* at 30305 ["Simply putting a piece of paper, a resume on somebody's chair is not official action. Take a look at the instructions. It defines it for you. It uses terms like 'influence[.]'"]; *Id.* at 30340 ["Don't be fooled. Steve Pumper knew what he was getting with a phone call to [Dimora] was a meeting, a meeting where he would explore what loans are available. That's not influence. That's not official action. Look at the definition. There's no influence getting a meeting. There's no influence putting him in touch with the person who could tell what programs are available."]; *Id.* at 30353 [In regard to the hiring of Gina Coppers, "This conversation [Dimora] had with Renee Strong when the resume first came in, 'Just throw it on my chair.' . . . [T]hat's not an official act. That's not improper influence. Look at the definition."].)

Dimora notes that government counsel countered with arguments that setting up a meeting, making a phone call, or directing a clerical task was an official act for purposes of Hobbs Act and honest services fraud. Like his counsel's arguments, these too were offered without objection. Still, the Court instructed the jury on multiple occasions, including during the parties' closing arguments, that the Court's instructions on the law controlled. (*See, e.g.,* Doc. No. 1046, Tr. Jury Trial Vol. 37 (Rebuttal), at 30495 ["Well, what I will do is I will say to the jurors that the court gives you the law in the case, and to the extent counsel, any counsel, have commented on what they believe the law is, in the end, you apply what this court has instructed you on the law."]; *see also* Doc. No. 1044, Tr. Jury Trial Vol. 35 (Charge), at 29982 ["The lawyers may talk about the law during their arguments. But if what they say is different from what I say, you must follow what I say. What I say about the law controls."].) The jury is presumed to have followed these instructions. *See United States v. Taylor*, 814 F.3d 340, 365

(6th Cir. 2016) (citing *Penry v. Johnson*, 532 U.S. 782, 799, 121 S. Ct. 1910, 150 L. Ed. 2d 9 (2001)). Nevertheless, the record clearly reflects that both Dimora and the government were permitted to make their arguments relative to whether the evidence established the existence of an official act. *See United States v. Clarke*, 842 F.3d 288, 296 (4th Cir. 2016) (defendant failed to demonstrate actual prejudice due, in part, to his ability to make "'all arguments essential to his case'").

Even though the trial in this matter was conducted more than four years before the ruling in *McDonnell*, the Court finds that its charge "sufficiently captured the concerns later addressed in *McDonnell*." *Woodward*, 2017 WL 4684000, at *9. Notwithstanding this conclusion, and in an abundance of caution, the Court shall engage in a count-by-count analysis of the evidence offered at trial. Such an analysis demonstrates that the instructions actually given in this case continue to support the convictions from which Dimora seeks relief. Even if these instructions were technically in error, however, this same analysis shows that any such error was harmless because, with few exceptions, the conduct which underlies Dimora's convictions qualifies as official acts.

VI. **ANALYSIS OF THE EVIDENCE OFFERED AT TRIAL**

A. **Appropriateness of a Count-by-Count Analysis**

In the wake of *McDonnell*, courts have engaged in a count-by-count, or scheme-by-scheme, analysis of the evidence in order to determine whether any error in instructing on the term "official act" resulted in substantial and injurious harm to the defendant. *See, e.g., Jefferson*, 289 F. Supp. 3d at 736-44; *see also Boyland*, 862 F.3d at 290-91 (following similar approach to evaluate harmless error on direct appeal). Dimora complains that such an approach is inappropriate here because any error in the charge infected the entire case, bleeding into the other counts not directly impacted by the ruling in *McDonnell*. The Court disagrees, and finds that, for a number of reasons, the circumstances of this case make it an ideal candidate for such an approach.

First, the Court permitted the government's lead investigating agent to testify in segments. *See United States v. Dimora*, 843 F. Supp. 2d 799, 822 (N.D. Ohio 2012). As each new scheme was introduced, FBI Special Agent Michael Massie (or in some instances FBI S.A. Christine Oliver) testified to the details of the investigation and identified the evidence relevant to that scheme. The government also called fact witnesses and offered evidence relative to that scheme before moving on to the next scheme. Even the government's trial exhibits were labeled in such a way that they corresponded to the schemes in which they were being offered.

In closing arguments, counsel for both sides presented their arguments in terms of the schemes and corresponding counts. The Court's instructions were also separated by counts and even included a chart that identified each count and corresponding scheme. (JI at 16979-81.) The instructions further directed the jury to consider each count separately, and, as evidence that the

jury was able to appreciate and follow this directive, the jury returned a "not guilty" verdict as to the crime charged against Dimora in Count 30. (*Id.* at 16974-75; *see* Dimora Jury Verdicts at 17149.)

B.    **The Evidence of Official Acts**[11]

*Counts 2 and 3*

Beginning with Count 2 (conspiracy to commit honest services and money and property mail fraud) and Count 3 (conspiracy to commit Hobbs Act extortion), the evidence at trial established that, between February and April 2008, using Kevin Kelley as an intermediary, Alternatives Agency ("AA")—a halfway house providing services for the Cuyahoga County Common Pleas Court—bribed Dimora and Russo by helping to fund the Las Vegas trip to which Kleem also contributed. In exchange, Dimora voted on several funding initiatives favorable to AA.

There was considerable testimony offered at trial as to this scheme and the votes Dimora ultimately cast in support of funding for AA. (*See, e.g.*, Doc. No. 1016, Tr. Jury Trial Vol. 9 (Massie), at 23913-16 [citing Gov't Ex. 259, 1-3-08 Dimora Vote to extend funding for AA]; *Id.* (Massie), at 23909-12 [citing Gov't Ex. 289, Agenda Action].) Of course, the casting of votes designed to award government contacts clearly meets the two-part *McDonnell* definition of "official act." First, it is "'the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete.'" *See Miserendino v. United States*, 307 F. Supp. 3d 480, 490 (E.D. Va. 2018) (quoting *McDonnell*, 136 S. Ct. at 2369). Second, voting obviously requires the

---

[11] Though the Court has found that the counts charging bribery concerning programs receiving federal funds, honest services fraud, and state bribery are unaffected by *McDonnell*, the Court includes a discussion of the official acts supporting these claims, as well.

taking of an action. *See McDonnell*, 136 S. Ct. at 2368 (Step 2 requires the government to prove that the public official made a "decision" or took "an action" on the identified "question, matter, cause, suit, proceeding or controversy.").

There was also evidence that Dimora performed a number of qualifying steps that led to his eventual votes on funding for AA. On March 20, 2008, Dimora got "all the power brokers in the county that needed to make decisions on that board and care line item [for the benefit of halfway houses], he was able to get everybody there so we can discuss it and see if we could go forward with this contract—project. . . . [Dimora] said [at the meeting that] it was a good idea and it definitely needed further consideration." (Doc. No. 1016, Tr. Jury Trial Vol. 9 (Schuman), at 24057-59.) AA's director, Brian Schuman, testified that he believed his ability to get Dimora at that meeting with all of the county people there, and representatives of the other halfway houses, gave him the advantage in competing against them for contracts. "They know we [AA] got the juice, we got [Dimora] in the room. So it tells everyone else [the competing agencies], back off." (*Id*. at 24059.) Kelley similarly testified that he did not believe that county funding for AA's programs could have been restored without Dimora's assistance "[b]ecause the system, the way it worked at Cuyahoga County, their clout [Dimora's and Russo's] meant a lot more than trying to go through the bureaucracy that was set in place." (Doc. No. 1024, Tr. Jury Trial Vol. 15 (Kelley), at 25840; *see id*. at 25859 [Russo was "very clear" on "[t]he amount of bribes [he and Dimora] were looking for [sic] restoring the funds [for AA]."].)

The evidence further demonstrated that Dimora volunteered to go to a meeting with the common pleas judges to convince them to use AA's services. In a wiretapped conversation, Dimora indicated that he and the other commissioners needed to "convince" the judges to utilize

AA's programs. He also placed calls to Judge Pokorney, the Court Administrator, and Chief Judge McDonnell, who was in charge of the court's budget, to pressure them not to cut funding for the halfway house program. (Doc. No. 1017, Tr. Jury Trial Vol. 10 (Pokorney), at 24139-40; *Id*. (McDonnell), at 24160-61.) McDonnell testified that, as a result of the call from Dimora, she decided to approve half of the funding for the coming year. (*Id*. (McDonnell), at 24160-61.) On April 17, 2008, nine days after the Las Vegas trip, Dimora voted to restore funding for AA. (Gov't Ex. 241 (Contract and Resolution); Doc. No. 1016, Tr. Jury Trial Vol. 9 (Massie), at 23987-88.)

Leading up to the eventual votes he would cast in favor of AA, these actions demonstrate that Dimora was "working hard" to convince other public officials to look favorably upon AA and take their own official acts—such as agreeing to use the services of AA or keeping the expenditures for such programs in the court budgets—paving the way for Dimora's official acts. Of course, "[a]n official does not take an 'official act' by '[s]imply expressing support [for an official act] . . . as long as the public official does not intend to exert pressure on another official . . .'" *Mendendez*, 291 F. Supp. 3d 606, 618-19 (D. N.J. 2018) (quoting *McDonnell*, 136 S. Ct. at 2371). However, "work[ing] hard to persuade other officials" to take official action is sufficient to establish that an official used his official position to exert pressure on another official or advised another official, knowing or intending that such advice would form the basis for an "official act." *Miserendino*, 307 F. Supp. 3d at 492 (citing, among authority, *United States v. Pinson*, 860 F.3d 152, 169 (4th Cir. 2017) (further quotation marks and citations omitted)).

Dimora complains that government counsel improperly argued in her close that, in addition to voting on funding initiatives, the official acts included setting up meetings and "sp[eaking] highly of Alternatives Agency." (*See* Doc. No. 1045, Tr. Jury Trial Vol. 36

(Government Closing Argument), at 30152-53.) Yet, the record established that Dimora did much more than attend a meeting and offer a favorable opinion about a private organization. Whether these actions are considered "a decision or action on a qualifying step" necessary to permit him to ultimately vote further funding to AA, or they were designed to exert pressure on another official to convince them to perform an official act, the end result was conduct that still qualifies as official acts under *McDonnell*. Moreover, Dimora himself took official action by voting in favor of funding initiatives favorable to AA. There is no basis to reverse Counts 2 and 3.

*Counts 4, 5, 6, and 7*

Count 4 (conspiracy to commit bribery concerning programs receiving federal funds), Counts 5 and 6 (bribery concerning programs receiving federal funds), and Count 7 (Hobbs Act extortion) related to the various schemes involving Ferris Kleem and his companies. Count 5 was a substantive count limited to the Coe Lake grant, and Count 6 was the substantive count underlying the construction of a new county juvenile justice center ("JJC"). Count 4 and Count 7 covered all of the schemes associated with Kleem, including the Coe Lake grant, the JJC project, the project covering the resurfacing of Snow Road, and the enrollment of Kleem's employees in Russo's son's business. (Indictment at 9659-84.)

There was substantial evidence offered at trial relating to the county's plan to build the new JJC, as well as the interest of Kleem and other sponsors in obtaining JJC construction contracts. In exchange for the Las Vegas trip and other things of value, Dimora agreed to award one of the contacts to Kleem if he was the low bidder. (Doc. No. 1014, Tr. Jury Trial Vol. 7 (Kleem), at 23384.) In addition to ultimately casting a vote in favor of awarding the contract to Kleem's company (Doc. No. 1012, Tr. Jury Trial Vol. 5 (Massie), at 22879), the government

identified several official acts taken by Dimora in connection with this scheme, including voting to throw out all of the original bids, which permitted Kleem, whose bid had been rejected because of a problem with his bond, an opportunity to rebid for the project. (*Id*. at 22788, 22939.) Additionally, on April 3, 2008, two days before the Las Vegas trip, Dimora voted to request an addendum increasing the general trades estimate, a result that would ultimately benefit Kleem's company. (*Id*. at 22879.)

Also associated with the JJC scheme, there was testimony that, on April 7, 2008, after Kleem learned that he was only the second lowest bidder on the project, Dimora called his executive assistance, Pat Smock, in an effort to determine if the low bidder (Panzica) could be excluded. Through the efforts of Smock, at the direction of Dimora, Panzica's bid was disqualified leaving the way clear for Dimora to vote in favor of awarding a 4.5 million dollar cement contract to Phoenix Cement, one of Kleem's companies. (*Id*. at 22955-56, 22979-81, 22937-42; Gov't Ex. 400-CC-TR; Gov't Ex. 400-FF-TR; Gov't Ex. 400-NN-TR.) These acts were qualifying steps on a matter that would ultimately come before Dimora for a vote. They were, along with the votes cast by Dimora, official acts under *McDonnell*.

There were also numerous official acts identified in connection with the Coe Lake grants. As previously discussed, the evidence demonstrated that Dimora did more than contact a subordinate and share a favorable opinion about the grant. He pressured Nichols to reexamine her rejection of the grant, which led to ensuring that the grant proposal would make its way onto the BOCC's agenda for a vote. Exerting pressure on other officials to keep projects moving forward "when other projects would have stopped[,]" qualifies as an official act. *See, e.g., Jefferson*, 289 F. Supp. 3d at 742 (testimony that the congressman's "continuing interest" forced other officials "to continue to look at that project in new lights to come to a conclusion that we

could move forward"); *see Skelos*, 707 F. App'x at 739 ("Using one's influence as a high ranking state official to push through county legislation and to bestow a county-issued contract are indisputably formal exercises of governmental power constituting official acts under *McDonnell*." (citing *McDonnell*, 136 S. Ct. at 2372)).

The government also presented evidence that Dimora performed various official acts for Kleem relating to the Snow Road construction project and a smoking citation issued against a restaurant associated with Kleem. Leading up to Dimora casting a vote to approve a nearly 3 million dollar contract for the resurfacing of Snow Road to Kleem's company (Gov't Ex. 400-VV (Agenda Action); Doc. No. 1013, Tr. Jury Trial Vol. 6 (Massie), at 23023), Dimora pushed to have a particular county inspector, John Chyla, assigned to the project. Kleem testified that having the right inspector on the job had a significant impact on the amount of profit that could be realized on a project. The evidence at trial demonstrated that Dimora, through two intermediaries, Kevin Kelley and Kevin Payne, coerced Mike Dever, the County Engineer's Office supervisor, to assign Chyla or else Dimora would call Dever's Boss, County Engineer Bob Klaiber. (Gov't Exs. 400-OO-Tr; 400-QQ-TR; 400-TT-TR; 400-UU-TR; Doc. No. 1026, Tr. Jury Trial Vol. 18 (Kelley), at 26173-76.) At the same time, Payne, Dever's supervisor, was soliciting assistance from Dimora to increase the salary of Klaiber—an action that would have required a vote of the commissioners. (Gov't Exs. 513-TR, 820-TR; Doc. No. 1026, Tr. Jury Trial Vol. 18 (Kelley), at 26187.) Dever ultimately assigned Chyla to the project, an assignment he testified that he would not have made but for Dimora's pressure.[12] (Doc. No. 1015, Tr. Jury Trial Vol. 8 (Dever), at 23787-92.)

---

[12] In fact, Dever testified that he had already assigned another inspector, Todd Zima, but he made the switch because Kelley "invoked the commissioner's name, Commissioner Dimora's name, saying that he [Dimora] would contact

Dimora also utilized his influence and power to favorably resolve a smoking violation issued against a restaurant owed by Kleem's brother. Kleem asked Dimora to "interfere" with the smoking violation, and Dimora contacted the public official listed on the citation, Terrance Allen. In a recorded conversation, Dimora asked Allen to "intervene" on the citation and take another look at it. During the conversation, Dimora acknowledged that Allen was the official who would decide whether there was a violation. Emphasizing that Kleem was a friend, a good guy, and a contractor for the county, he noted that Kleem's cousin had just been elected mayor of the city in which the restaurant was located and a violation could hurt his reputation. He told Allen that he was personally at the restaurant on the night in question, and that, based on his own understanding of the law, there was no violation, noting that the covered patio was in the same location as the summer open air patio. He also insisted that he did not smell any smoke in the restaurant. He suggested that perhaps the investigator was simply being "aggressive." Allen agreed to sort it out, and, following the phone call, the violation was closed. (Gov't Ex. 400-K-TR; Doc. No. 1010, Tr. Jury Trial Vol. 4 (Massie), at 22529-33.) In a subsequent conversation with Kleem, Dimora asked Kleem how "that thing worked out for you with the board" referring to the smoking violation, and added that "he wanted to make sure that [Allen] treated [Kleem] right." (Doc. No. 1014, Tr. Jury Trial Vol. 7 (Kleem), at 23372-74.) The men then discussed the planned Las Vegas trip that Kleem was bankrolling. (Gov't Ex. 400-L-TR.) Again, a jury could conclude that Dimora used his influence to pressure another public official to take an official action. *See McDonnell*, 136 S. Ct. at 2371.

The analysis regarding the final two sets of actions relating to these counts is more nuanced, but the charges still involved conduct leading to official acts. The first involved a

---

my boss, Robert Klaiber, if I couldn't get John Chyla moved over to the project." (*Id*. at 23787-88.)

contract to build a taxiway at Cleveland Hopkins Airport. Kleem was pursuing the $4.2 million contract on behalf of one of his companies, Blaze Construction. Dimora would ultimately vote to award the contract to Blaze, and his vote would qualify as an official act. There was also testimony, however, that prior to the vote, Dimora agreed to contact Cleveland Council President Sweeney to get him to push for an update on the status of the contract. In the recorded conversation that followed, Sweeney promised Dimora that he could "figure it out" for Dimora's "good friend," Ferris Kleem. (Gov't Ex. 101-TR). Sweeney then thanked Kleem for the opportunity to speak with Dimora, noting that the "commissioner always delivers." (*Id.*)

At first blush, this exchange could be viewed as merely a public official's efforts to get an update for a constituent. But in a follow-up phone conversation with Dimora, Sweeney acknowledged that, even though Kleem was likely to have gotten the contract,  Dimora certainly had "helped deliver" the award by contacting Sweeney. (Gov't Ex. 102-TR.) Sweeney explained that he [Sweeney] made some inquires regarding the contact that proved "helpful" and, more importantly, sent the message that the officials associated with this project should not drag their feet. (*Id.*) He went on to tell Dimora that, because he and Dimora got involved, Dimora "could take credit for puttin' it together." (*Id.*) Again, this scheme demonstrated how Dimora used his position and clout to influence the official actions of other public officials and, because the government tied these actions to the taking of unlawful bribes, his conduct violated the Hobbs Act, even after *McDonnell*.

The final set of official acts offered involved Kleem's difficulties with First Energy, a private utility company. The evidence at trial demonstrated that, in 2007, Kleem was experiencing delays in establishing utility service for one of his construction projects. He asked Dimora to intervene, and Dimora directed Kevin Kelley to call Doug Hogan at First Energy to

expedite the service as "a personal favor to Commissioner Dimora[.]" (Doc. No. 1016, Tr. Jury Trial Vol. 9 (Hogan), at 23858-61; Doc. No. 1022, Tr. Jury Trial Vol. 16 (Kelley), at 25401-02.) Hogan would testify at trial that, following the call from Kelly, he made sure that service was expedited. (Doc. No. 1016, Tr. Jury Trial Vol. 9 (Hogan), at 23858-61.) The government argues that the official act was Dimora advocating for First Energy on a matter that would eventually require his vote, whether to keep First Energy as the energy provider for the county.

However, in her close, government's counsel argued that calling businessmen "was part of the [commissioner's] job duties," and she identified the phone call Kelley placed to First Energy as an official act. The government now argues that the phone call was a qualifying step toward the ultimate vote for First Energy, but the connection to the threat that the county would vote to change energy providers was tenuous at best. Rather, the jury could have viewed the call as nothing more than one public official responding to a concern from a constituent, something

that would likely not have qualified as an official act under *McDonnell*.[13]

Still, the Court's charge would have informed the jury that such an act did not qualify under the law. By instructing the jury that they could consider the actions' "lawfulness, desirability, or benefit to the public welfare" in deciding whether an official act qualifies under the statute, and further requiring them to exclude actions that were not tied to a pending matter or merely designed to cultivate friendship, the Court ensured that general inquiries on behalf of constituents would not be considered official acts.[14]

Of course, even if there had been error associated with this last scheme, the breadth of the evidence involving the other Kleem schemes, including the evidence directly connecting the purported acts to the numerous bribes Kleem paid Dimora, removed the possibility of any doubt—let alone a "grave doubt"—that the jury instructions had a "substantial and injurious influence" on the jury's verdict. *See Kotteakos*, 328 U.S. at 765. This is especially true when one considers that the Hobbs Act violation charged in Count 7 also included the JJC and Coe Lake grant schemes alleged in substantive Counts 5 and 6 for which Dimora was convicted and which clearly involved official acts. Counts 4-7 survive after *McDonnell*.

---

[13] The government argues that "[i]t would have been reasonable for Hogan to conclude that if Hogan refused to expedite the service, Petitioner would probably have changed or delayed his vote [for First Energy], just as he did when he pulled a Michael Baker Group matter from the commissioners' agenda as a result of Michael Baker Group refusing to buy a table at a Democratic fundraiser." (Opp'n at 32724-25, citations omitted.) Such an argument is steeped in speculation and assumes facts that were unknown to Hogan, a private businessman with no known familiarity with the inner workings of county government.

[14] In fact, in his close, defense counsel was able to argue, without objection, that the conduct did not amount to an official act under the law. Specifically, counsel posited, "[y]ou heard from Mr. Hogan. Mr. Hogan told you that anybody can make that call. 'I get those calls all the time. Ferris Kleem could have called me.' There's no influence. This is a private company, a private company that public officials contacted regularly." (Doc. No. 1045, Tr. Jury Trial (Defense Close), at 30311.) Because counsel was not prohibited from arguing his client's defense theory—a theory that was not contradicted by the jury instructions—there can be no actual prejudice. *See Clarke*, 842 F.3d at 296.

*Count 8*

Count 8 charged Dimora with violating the Hobbs Act by accepting things of value from Kevin Payne in exchange for a series of votes on county business. (*See, e.g.,* Gov't Ex. 840 (Agenda Action); Doc. No. 1024, Tr. Jury Trial Vol. 15 (Kelley), at 25796-97; Gov't Ex. 842 (Agenda Action); Gov't Ex. 846 (Resolution); Gov. Ex. 852 (Agenda Action).) These votes, which ran the gamut from approving a lease that enabled a co-conspirator to keep his county department in a coveted office space to increasing the county salary of one of Dimora's co-conspirators, obviously involved the "formal exercise of governmental power," on specific, pending matters, as required by *McDonnell*. 136 S. Ct. at 2371-72.

Count 9 charged Dimora with conspiracy to commit honest services and money and property mail fraud. The evidence offered at trial established that Dimora attempted to pressure three suburban officials—Tom Day, the City of Bedford Clerk of Courts; Tom Cornhoff, Human Resources Director for the City of Solon; and a Bedford Municipal Judge—to secure for Gina Coppers a public job with state benefits offered through a program known as OPERS,[15] at a salary agreeable to her. (Doc. No. 1019, Tr. Jury Trial Vol. 12 (Massie), at 24759-74, 24779-24803, 24807-10, 24818-19.) In exchange, Coppers gave Dimora sexual favors and a paid for a hotel room.

In a series of calls between Dimora and Coppers, Dimora made clear that he would use his substantial influence to get Coppers a position in Bedford. In one call, Dimora informed

---

[15] OPERS stands for Ohio Public Employees Retirement System, and there was testimony at trial as to the desirable nature of these benefits. In fact, it was the government's theory that many ghost employees, including Gabor, sought county employment to obtain these benefits.

Coppers that:

> I told [Day], let's . . . get her in, back into P-E-R-S, even if it's part time to start
> out with. . . . And then we'll either move it to full time over at Solon or we'll try
> to put you at the Court. . . . *I'll stay on top of [Day], hound him* . . . . I'll touch
> base with him on Monday.

(Gov't Ex. 905-TR) (emphasis added). In another call, when Coppers told petitioner not to let

Tom Day forget about her, Dimora assured her "I won't let 'em. They [sic] never be able to

forget." (Gov't Ex. 908-TR.)

Day didn't forget about Coppers or Dimora, eventually telling Dimora that "I know

[Coppers] is looking to you . . . I want to do this for you and . . . for her . . . we'll get it done."[16]

(Doc. No. 1019, Tr. Jury Trial Vol. 12 (Massie), at 24810.) Even though there were no positions

available, and there was no evidence Bedford ever advertised for a position, Day hired Coppers.

(Gov't Ex. 900 (Summary Chart); Doc. No. 1019, Tr. Jury Trial Vol. 12 (Massie), at 24751,

24763, 24768-9, 24771-73.)

Applying the Court's instructions on exerting influence on other officials, there was

sufficient evidence for the jury to find that Dimora influenced Day to perform an official act—

hiring Coppers— an act that Day was not likely to perform but for Dimora's pressure. *See*

*Miserendino*, 307 F. Supp. 3d at 491 ("[H]iring a specific individual 'squarely fit[s] the

definition of an official act under *McDonnell*.'" (quoting *United States v. Fattah*, 223 F. Supp. 3d

336, 362-63 (E.D. Pa. 2016) (underlining in original))).

*Counts 10 and 11*

---

[16] Unlike Governor McDonnell who did not expect his subordinates to do anything other than attend a meeting, *see McDonnell*, 136 S. Ct. at 2374, this and other evidence—like Dimora calling Kleem to make sure Allen "treated him right" and Dimora directing McCafferty to "get it done"—demonstrated that when Dimora asked another official to make a call or attend a meeting, there was always an expectation that an official act would follow.

Count 10 charged Dimora with conspiracy to commit Hobbs Act extortion and Count 11 charged the underlying extortion acts. These counts related to bribes Dimora received from a local businessman, John Valentin. Valetin testified that he and his company supplied free granite countertops, valued at $3,250, for Dimora's home because "I was thinking in the future maybe I will have some—if I need some help from [Dimora] I can get some favors. . . . [I]f I make him a favor, I'm going to get a favor back in the future. If I have a problem, I can have a door open to him to ask him for help if I need help." (Doc. No. 1036, Tr. Jury Trial Vol. 23 (Valentin), at 28226, 28242.)

Valentin did solicit Dimora's help with two matters, both of which, the government contends, involved official acts. First, Dimora voted to approve funds so that Russo could create a foreclosure department and hire Valentin's daughter. She had been unhappy working in the County Prosecutor's Office and wanted to change jobs. (*Id*. at 28220; Doc. No. 1039, Tr. Jury Trial Vol 26 (Russo), at 29037-38.) The vote certainly qualifies as an official act.

The second act involved Dimora's efforts to pressure federal officials to issue a VISA for a Romanian friend who wanted to enter the United States. Russo testified that Dimora directed him to contact an associate of a United States senator. Russo told the contact that Dimora "really wants this done bad. So do I. It would be a big favor to us. I hope you can accommodate us." (Doc. No. 1039, Tr. Jury Trial Vol. 26 (Russo), at 29040.) The Senator (who was then on the Foreign Relations Committee) wrote to the United States embassy in Bucharest seeking the VISA stating that he was doing so on behalf of Dimora. (Doc. No. 1036, Tr. Jury Trial Vol. 23 (Valentin), at 28243; Doc. No. 1038, Tr. Jury Trial Vol. 25 (Oliver), at 28620; Gov't Exs. 1002, 1003.) From this evidence, a rational juror could have concluded that Dimora sought, through

Russo, to pressure or advise government officials to take official action for Valentin's benefit. *See, e.g., Menendez*, 291 F. Supp. 3d at 618 ("There is available evidence that, with regard to the visas, Menendez by phone call or by correspondence interceded with appropriate State Department officials to obtain favorable consideration of visa applications made by [Menendez's co-defendant] friend.") Both acts qualify as official acts under *McDonnell*.

*Counts 12 and 13*

The schemes charged in Count 12 (conspiracy to commit Hobbs Act extortion) and Count 13 (Hobbs Act extortion) related to another businessman, Nicholas Zavarella. Like Valentin, Zavarella paid Dimora bribes in the form of home improvements in exchange for access to Dimora's influence as commissioner. In her closing argument, the government identified five official acts: (1) recommending Zavarella's daughter for a position with the county, (2) pressuring the Parma School Board to hire Zavarella's daughter as a substitute teacher, (3) pressuring Russo to hire Lillian Trovato, (4) recommending Zavarella's daughter for a position with the Bedford School District, and (5) obtaining an update on a county contract. Two of the five acts qualify as official acts under *McDonnell*, but the Court finds that three do not.

When Dimora approached Kelley about securing a teaching position for Zavarella's daughter, Lauren, with the Parma City Schools, and instructed Russo to hire Zavarella's neighbor, Lillian Travato, he pressured other public officials to perform official acts. Two years after Zavarella built columns on Dimora's patio at no charge, Kelley testified that Dimora asked him to find Lauren a teaching position with the Parma City schools. Kelley explained that the "superintendent had the ultimate power to hire or fire teachers. But as a school board member, the superintendent worked for the school board and [Kelley] had a lot of influence over the superintendent at the time." (Doc. No. 1026, Tr. Jury Trial Vol. 18 (Kelley), at 26240; *see* Doc.

No. 1038, Tr. Jury Trial Vol. 25 (Oliver), at 28613-14.) At Dimora's direction, Kelley used that influence to request that the superintendent hire Lauren, which she did. (*Id.*)

Similarly, in summer 2007, the same year Zavarella worked on Dimora's outdoor kitchen expansion at no charge, he asked Dimora to help his neighbor, Trovato, obtain county employment. (Doc. No. 1039, Tr. Jury Trial Vol. 26 (Russo), at 29078.) This time Dimora turned to Russo, who, in turn, hired Trovato in the Auditor's Office. Russo testified that he "hired [Trovato] because [Dimora] asked [him] to hire her." (*Id.*) In each of these instances, Dimora influenced or pressured other public officials, either directly or indirectly, to perform the official act of hiring someone.

The evidence relating to the two other employment opportunities was materially different. Zavarella testified that, in 2002, the same year he built a retaining wall on Dimora's property at no charge, he asked Dimora to help Lauren obtain a county job by "put[ting] in a good word." (Doc. No. 1037, Tr. Jury Trial Vol. 24 (Zavarella), at 28331.) There was no testimony regarding what actions Dimora did in this regard, or who was responsible for the hiring decision, but Lauren was successful in securing county employment. (*Id.*) Then, in 2007, the same year he worked on Dimora's outdoor kitchen expansion at no charge, Zavarella asked Dimora to recommend Lauren for a teaching position with Bedford City Schools. The record reflects that Dimora wrote Lauren a letter of recommendation on his commissioner letterhead. (*Id.* at 28333; Doc. No. 1038, Tr. Jury Trial Vol. 25 (Oliver), at 28613.) Zavarella believed that the letter "helped" Lauren secure a teaching position with Bedford. (Doc. No. 1037, Tr. Jury Trial Vol. 24 (Zavarella), at 28333.)

The government argues that both instances represent additional times that Dimora used his influence to pressure other public officials to take official action, but the record does not

establish that Dimora did anything more than express his opinion about a possible hire. *See Jefferson*, 289 F. Supp. 3d at 739 (writing a letter on official letterhead, standing alone, is insufficient to satisfy the exertion of "pressure" requirement); *see also Silver*, 864 F.3d at 122 (expressing an opinion on a matter of public concern did not constitute an official action). There was no evidence that any public official was pressured because Dimora intervened. In fact, the Bedford superintendent testified simply that they [school district personnel] appreciated receiving letters of recommendation from people they respected, and that such a letter might get a candidate a courtesy interview, but that the candidate would still have to stand on her merits against the other applicants.[17] (Doc. No. 1029, Tr. Jury Trial Vol. 31 (Micsak), at 26950.) Absent evidence that Dimora exerted any pressure on another public official, Dimora's efforts to put in a good word for Zavarella's daughter amounted to nothing more than "speaking with interested parties" or "expressing support" for a certain issue, and, without more, does not qualify as an official act, even if it is tied to a pending question or matter. *See McDonnell*, 136 S. Ct. at 2370-71.

Likewise, the last identified action no longer qualifies as an official act after *McDonnell*. In 2008, Zavarella asked Dimora to determine the status of certain proposed county projects. The evidence established that Dimora asked his assistant to "snoop" around, and his assistant was able to confirm that the plans to build an eastside neighborhood service center were still in the works. (Gov't Ex. 1201-TR; Gov't Ex. 1203-TR; Gov't Ex. 1204-TR.) The government argues that Dimora's efforts to obtain inside government information for Zavarella constituted an essential qualifying step in Zavarella eventually obtaining the contract. The Court disagrees, as

---

[17] The superintendent further testified that they preferred to receive letters of recommendation from people who had professional experience over a letter writer who, like Dimora, was really serving as a character witness. (*Id.* at

there was no evidence that this information was essential, necessary, or factored in any way into the eventual award of the contract. Instead, it merely represents an inquiry made in response to a concern of a constituent. While that inquiry may have been prompted by a bribe, it does not violate the Hobbs Act. Having determined that three of the five *quid pro quo* actions no longer qualify as official acts, the Court must determine whether the Court's instructions would have left the jury free to find to the contrary in violation of the dictates of *McDonnell*.

The Court finds that the Court's jury instructions adequately covered these situations. Applying the Court's instructions, a rational juror would have concluded that offering a letter of recommendation for a friend's daughter, without any attempt to exert influence over the public official responsible for the hiring decision, amounted to either a personal action or an action designed merely to cultivate a friendship. This is especially true for the teaching position, as it is not within the function of a county commissioner to recommend teachers for positions with city schools. Likewise, the call regarding the service center was nothing more than an attempt to get information for a friend or constituent, and the Court's instructions would have permitted the jury to find that such conduct was not unlawful. Even setting aside the three acts that did not qualify as official acts, Counts 12 and 13 were still supported by convincing evidence that Dimora engaged in conduct that does qualify as official acts and, as such, there is no basis to vacate these convictions.

*Counts 14, 15, and 16*

Count 14 (conspiracy to commit Hobbs Act extortion), Count 15 (Hobbs Act extortion), and Count 16 (conspiracy to commit honest services and money and property wire fraud), all involved the *quid pro quo* agreement between Dimora and William Neiheiser, a businessman

who ran an electrical construction company. The evidence at trial established that, in exchange for Dimora's help, Neiheiser offered Dimora bribes in the form of home improvements, a check for $3,600 to finance a college football jersey Dimora purchased at a charity auction, and a gambling junket to Atlantic City.

Two sets of actions underlie these convictions. The first group involved votes Dimora cast on the JJC project that benefitted Neiheiser's company, Reliance Mechanical. On December 13, 2007, Dimora voted to authorize bidding for the JJC. (Gov't Ex. 524-TR (Agenda Action).) Two months later, Dimora and Neiheiser had a conversation about the JJC bidding, during which Neiheiser reminded Dimora that last time "you didn't pick the low bidders. You threw 'em off for technicalities." (Gov't Ex. 1407-TR.) Neiheiser then emphasized to Dimora: "so when you see Reliance Mechanical is the low bidder [this time], don't f—ck it up," Dimora responded, "No alright, that's good to know[.]" (*Id*.) Later in the conversation Neiheiser added, "It's a big enough job [the JJC] so we're going after it to get it and then you and I can have fun for two years." (*Id*.) Dimora asked him when the bid was due and told him he hoped that his company's bid was low. Reliance Mechanical was not the lowest bid, but on March 13, 2008, Dimora voted to reject all of the bids for the main building packages, giving Reliance the opportunity to

rebid.[18] (Doc. No. 1012, Tr. Jury Trial Vol. 5 (Massie), at 22877; Gov't Ex. 400-R-1 (Agenda Action); Doc. No. 1021, Tr. Jury Trial Vol. 14 (Massie), at 25361.) These votes, tied to specific county contracts, clearly qualify as official acts under *McDonnell*.

As for the second set of acts, the evidence at trial established that, during the time period relevant to the indictment, the City of Lakewood, Ohio, was contemplating the future of a city-owned and operated ice rink. Neiheiser was having trouble scheduling an appointment with Lakewood's mayor, Edward Fitzgerald, to discuss his plans to purchase the ice rink from the city. Dimora was able to arrange a phone conversation with Fitzgerald. During the call, Dimora indicated that he was there with Neiheiser who had been trying to reach him. Fitzgerald acknowledged that Neiheiser had been calling and explained to Dimora that he had been in around-the-clock union negotiations. He instructed Dimora to have Neiheiser call the office the following morning, assuring Dimora that he would "make time to talk to him." (Doc. No. 1021, Tr. Jury Trial Vol. 14 (Massie), at 25342-43; Gov't Ex. 1403-TR.)

In his motion, Dimora argues that the call amounted to nothing more than a "[c]all [to] a local mayor to ask him to meet with a businessman[]," something that would have fallen short of an official act under *McDonnell*. (Mot. at 32330.) Similarly at trial, defense counsel argued that the evidence proved only that he assisted a constituent in getting an audience with a city mayor to discuss a matter of public importance. Indeed, counsel was permitted to argue without objection in his close that his client merely said,

> "Look, you may want to listen to my friend. . . ." He doesn't say, "Look, I'm the commissioner. This is a guy that I want you to do this for . . . ." [He just said] "[Y]ou might want to talk to him." ***Guess what? He did talk to him. And guess***

---

[18] The evidence further demonstrated that, on February 14, 2008, Dimora voted to approve an addendum to the specifications on the JJC projects, including clarifications and technical changes to the HVAC building package that would be of interest to Neiheiser and Reliance Mechanical. (Gov't Ex. 1454` (Agenda Actions).)

**what? The City of Lakewood is better today. That rink is still going. It got renovated. It's a beautiful rink. It's making money and everybody is happy about it. That's what commissioners are supposed to do. . . .** And what does [Dimora] do? He calls [the mayor], "Can you sit down with him?" He tells him, "I'm sitting here with a friend." He tells him, "He has a proposal to make for you." There's no undue influence here. There's no official action here.

(Doc. No. 1045, Tr. Jury Trial Vol. 36 (Defense Close), at 30278, 30374, emphasis added.)

Given the fact that the Court's instruction invited the jury to consider the public benefit of the action and whether the defendant attempted to influence another public official into taking an official action, as well as whether the defendant's action was merely designed to cultivate friendship, the jury was free to find that Dimora did not perform an official act.

However, given the nature of the call, a recording of which was played for the jury at trial, the jury was also free to find that Dimora did much more than merely secure an appointment for Neiheiser. During the call, Dimora clearly and aggressively advocated Neiheiser's position. He promised Mayor Fitzgerald that Neiheiser's deal would be "mutually advantageous" to him and the city. He encouraged the mayor to speak with Neiheiser because "there might be a good opportunity" for the city to "get [the ice rink] off your [the city's] back." (Gov't Ex. 1403-TR.) He explained that Neiheiser "owns a rink in Strongsville already[,]" and runs a successful construction company so that he would have the experience, knowledge, and resources to make whatever renovations were necessary to make the ice rink a going concern. Finally, he personally vouched for Neiheiser, suggesting that he was "very legitimate," and that he was "definitely" the "real deal."[19] (*Id*.) Finally, Dimora offered to assist the mayor with his ongoing union negotiations, which, according to the mayor, had been going poorly and were the

---

[19] Dimora assured Fitzgerald that Neiheiser was not one of those people who had grandiose ideas accompanied by big talk but without the resources or means to follow through.

reason that he had not been able to get in touch with Neiheiser. (*Id.*)

Based on this exchange, the jury could also have properly found that Dimora's support for Neiheiser and his project was clearly offered and intended to exert pressure on Fitzgerald to perform the official act of privatizing the rink and selling it to Neiheiser. *See Miserendino*, 307 F. Supp. 3d at 491 ("expressing strong support for a matter, and requesting that another official approve of such a matter have been found sufficient to establish that an official used 'his official position to exert pressure on another official,' or advised 'another official, knowing or intending that such advice [would] form the basis for an 'official act.'" (quoting *McDonnell*, 136 S. Ct. 2372)); *see Boyland*, 862 F.3d at 291-92 (expressing "strong support" for the awarding of permits by advising another official that he knew he would look favorably on the permit application constituted exerting pressure on another official). To sweeten the deal, Dimora even offered his help with the mayor's union negotiations—help that was not available before the phone call. The jury would have been permitted to take all of this into consideration in determining whether Dimora was attempting to coerce or influence the official action of another public official.

Because the jury was properly instructed on these counts, and Dimora was permitted to make his arguments relative to whether his actions were unlawful under the Hobbs Act, there is no prejudice and no reason to justify vacating these counts. *See Neder*, 527 U.S. at 8; *Clarke*, 842 F.3d at 296.

*Counts 17–21*

Counts 17-21 relate to bribes Steve Pumper paid to Dimora in the form of cash, home improvements, sport tickets, dinners, and the promise of a percentage of profits from a business venture in exchange for action taken on numerous business projects and personal matters. The

government offered substantial evidence at trial as to Pumper's many projects and concerns, as well as the official actions Dimora took on Pumper's behalf. Specifically, there was evidence that Dimora agreed to, and did, cast at least six votes to either award various contracts to Pumper's companies or, in some instances, to reject the slate of bids to give Pumper's companies a second chance to bid. (Doc. No. 1038, Tr. Jury Trial Vol. 25 (Oliver), at 28668-69; Gov't Exs. 1700-A (Agenda Action), 1700-B (Resolution); Doc. No. 1037, Tr. Jury Trial Vol. 24 (Oliver), at 28434; Gov't Ex. 2827; Doc. No. 1012, Tr. Jury Trial Vol. 5 (Massie), at 22876-77, citing Gov't Ex. 400-R-1 (Agenda Action)); Doc. No. 1037, Tr. Jury Trial Vol. 24 (Oliver), at 28435; Gov't Ex. 1700-N (Agenda Action); Gov't Ex. 1700-D (Agenda Action).) There was also considerable evidence showcasing Dimora's efforts to push along Pumper's various business projects—at each step of the process—performing essential qualifying acts that would ensure that he could ultimately have the opportunity to cast a vote that would repay Pumper for his bribes. (*See, e.g.,* Doc. No. 1034, Tr. Jury Trial Vol. 21 (Pumper), at 27768-70; Doc. No. 1035, Tr. Jury Trial Vol. 22 (Pumper), at 27816-18; Doc. No. 1030, Tr. Jury Trial Vol. 32 (Maldonado), at 27011, 27043; Gov't Ex. 1700-CC-TR; Gov't Ex. 1700-EE-TR; Gov't Ex. 1700-GG-TR; Gov't Ex. 1709.)

As previously noted, there was also evidence that Dimora pressured other public officials to perform official acts in connection with Pumper's businesses, his children, and his involvement in certain civil litigation, including evidence that Dimora pressured Common Pleas Judge Bridget McCafferty to expedite a settlement between Pumper and the Cleveland Browns over a contract dispute at terms acceptable to Pumper. (Doc. No. 1035, Tr. Jury Trial Vol. 22 (Pumper), at 27862-72; Gov't Ex. 17700-VV-TR; Gov't Ex. 1700-XX-TR.) Judge McCafferty was charged for her involvement in this scheme in the same indictment charging Dimora and

was eventually convicted of lying to the FBI.

Of the nine schemes charged relating to Counts 17-21, only one gives the Court pause in light of *McDonnell*. In spring 2008, Pumper was working with developer, Harvey Oppmann, to renovate two buildings in Cleveland. Oppmann was looking to the Federal Department of Housing and Urban Development ("HUD") for the financing. DAS, one of Pumper's family's companies, stood to receive millions in revenue from the renovations, but the HUD financing had to come first. Pumper asked Dimora to call a United States senator in an attempt to exert pressure on HUD to move the process along in Washington. On April 7, 2008, Dimora placed the call through his assistant, and put Pumper on the phone so he could plead his case with the Senator. (Doc. No. 1035, Tr. Jury Trial Vol. 22 (Pumper), at 27878-81, 27883-84; Gov't Ex. 1710-TR.)

Here, the evidence established that Dimora did little more than help Pumper get in contact with the right public official. There was no evidence that, in this instance, Dimora exerted or attempted to exert any pressure on the Senator or on anyone associated with HUD funding. This act, alone, would not support a Hobbs Act violation regarding this particular scheme.

Nevertheless, while the Court believes that the jury would have applied the instructions to the evidence to find that the call amounted simply to the cultivation of friendship, there was a wealth of evidence that Dimora took numerous official acts to assist Pumper with his various business endeavors in eight other schemes; several of which formed the basis for the substantive crimes charged in Counts 17 and 18 for which Pumper was also convicted. As such, Dimora's convictions on these counts are *fundamentally* different from *Silver* where only one possible official act remained after the ruling in *McDonnell*. *See Silver*, 864 F.3d at 120 (Of the acts

charged as official acts under the relevant bribery statutes, "only the Assembly resolution clearly remains an 'official act' under *McDonnell*.") Under these circumstances, the Court cannot say there is a risk that Dimora was convicted for performing nonqualifying pro forma acts such as "setting up a meeting, talking to another official, or organizing an event (or agreeing to do so)[.]" *See McDonnell*, 136 S. Ct. at 2372. Because the Court finds that any error in the instructions did not have a substantial and injurious effect or influence on the jury's verdict on these courts, there is no basis to vacate the conviction as to these counts.

*Counts 22 and 23*

Count 22 (conspiracy to commit Hobbs Act extortion) and Count 23 (Hobbs Act extortion) relate to bribes in the form of free home improvements Anthony Melaragno gave to Dimora in exchange for Dimora's votes benefitting Melaragno's company, Vandra Brothers, and hiring a relative of Melaragno in the Sanitary Engineer's Office. (Doc. No. 1037, Tr. Jury Trial Vol. 24, (Oliver), at 28574-76; Gov't Exs. 156 (Resolution), 157 (Request for Action); Gov't Ex. 154 (Resolution); Gov't Ex. 2251 (Agenda Action); Gov't Ex. 2233 (Personnel Action involving relative); Doc. No. 1018, Tr. Jury Trial Vol. 11 (Gouker), at 24620-31; Gov't Ex. 2252 (Agenda Action); Gov't Ex. 2253 (Agenda Action).) Each vote was an official act. There is no basis to vacate the convictions relative to these counts.

*Counts 24 and 25*

Count 24 (conspiracy to commit Hobbs Act extortion) and Count 25 (Hobbs Act extortion) involve Dimora's dealings with Rob Rybak, the then-secretary/treasurer of a local plumbers' union. There was evidence at trial that Rybak paid bribes to Dimora in the form of home improvements and restaurant meals in exchange for three acts by Dimora: (1) voting for a raise for Rybak's wife, Linda, who was employed by the county in the Human Resources Department; (2) pressuring county employees to hire Rybak's daughter, Dana, for summer employment; and (3) voting to employ two union plumbers.

The government offered evidence that Rybak sought a raise for his wife because the couple was contemplating a divorce. (Doc. No. 1026, Tr. Jury Trial Vol. 18 (Kelley), at 26245-48 ["We needed to get [Linda] more money so . . . Rob [would not] get stuck paying a bunch of alimony."].) Dimora took a number of qualifying steps to ensure that the matter was on the BOCC agenda before he ultimately voted in favor of the raise on April 24, 2008. (Doc. No. 1020, Tr. Jury Trial (Spielmaker), at 25125-26; Gov't Ex. 2461 (Agenda Action); Gov't Ex. 2460 (Resolution).) This action qualifies as an official act.

Likewise, the vote to employ two union plumbers also constitutes an official act. At Rybak's request, Dimora voted in favor of appointing two members of Rybak's local plumbers' union as full-time temporary county employees. (Gov't Ex. 2438 (Reference to Executive Session); Gov't Ex. 2442 (Personnel Action); Gov't Ex. 2455 (Resolution). After the vote, Dimora reminded Rybak that he "took care of [him] again." (Doc. No. 1020, Tr. Jury Trial Vol. 13 (Spielmaker), at 25103.)

The third action related to Dimora's efforts to arrange a summer county job for Dana

Rybak. Dimora did not want to hire her in his office because Dana's mother already worked there, and Dimora was afraid that people would talk. Therefore, he pressured Kelley into arranging for her hire in the Sanitary Engineer's Office. Kelley testified that it took "mountains" to convince the County Engineer to approve starting Dana earlier than the other summer employees. (Doc. No. 1026, Tr. Jury Trial Vol. 18 (Kelley), at 26266.) The pressure Dimora exerted over Kelley was evident in a phone call, wherein he told Kelley,

> If you can't [hire her], tell Pat [Dimora's assistant] we're gonna have to hire her. What else can I do? I can't say no. . . . So I'm going to have to take her if you guys don't take her. . . . I just have no choice. I'll start her tomorrow. What am I gonna do?

(Gov't Ex. 2429-TR.) This pressure on Kelley to convince him to perform (through the County Engineer) the official act of hiring Dana Rybak also qualified as an official action, and the jury was properly instructed. These convictions remain sound after *McDonnell*.

*Counts 26 and 27*

The final relationship between Dimora and a business associate that formed the basis for Hobbs Act charges involved Charlie Randazzo. Count 26 charged conspiracy to commit Hobbs Act extortion, and Count 27 charged the underlying Hobbs Act violations. In these counts, the government offered evidence from which a rational juror could have found that Dimora took things of value from Randazzo in the form of food, meals, wine, sporting event tickets, and outdoor furnishings in exchange for helping Randazzo's company obtain workers compensation contracts with public entities, including the county. Randazzo explained that he paid the bribes to Dimora and Russo because "they helped me; I helped them." (Doc. No. 1038, Tr. Jury Trial Vol. 25 (Randazzo), at 28816-17.)

Two official acts support these counts. First, trial evidence established that Randazzo informed Dimora that he was encountering difficulties reaching the director of the Northeast Ohio Regional Sewer District, Julius Ciaccia, to pitch his company's deferred compensation product. On February 15, 2008, Dimora called Ciaccia in Randazzo's presence, saying

> I was hoping you could do me a favor. I gotta good friend of mine that has a deferred comp program that does, uh. deferred comp for the County. . . . It's called Financial Network of America and they wanted to come out and meet with you to talk to you about the Regional Sewer employees, you know, possibly giving them an option for deferred comp program. . . . You know [the County Prosecutor's] in it, in this program. I'm in it. Frank Russo. We're all in this. *I mean, to me, it's offered a better financial reward.* And, again, it's optional for your employees as you know. . . . I just wanted him [Randazzo] to say hi to you and maybe you guys could, uh, swap phone numbers or he could set somethin' up . . . . He's got a meeting set up to do Cleveland's. . . . Marty Sweeney's [Cleveland City Council Member] helpin' him get that set up.

(Gov't Ex. 2601-TR) (emphasis added). Dimora then put Randazzo on the phone, who continued to promote the product, mentioning Dimora and the county in the process. (Doc. No. 1038, Tr.

Jury Trial Vol. 25 (Oliver), at 28757, 28788; *Id.* (Randazzo), at 28813, 28839-40.) Dimora later made efforts to have his staff get contact information to Randazzo so that he could follow up when Ciaccia did not immediately get back to him.

The evidence at trial established that Dimora did much more than simply place a phone call, set up a meeting, or offer an opinion on Randazzo's behalf. Rather, his "strong support" for Randazzo and his company's deferred compensation product was clearly offered and intended to exert pressure on Ciaccia to perform the official act of buying into the program. *See Miserendino*, 307 F. Supp. 3d at 491 (quoting *McDonnell*, 136 S. Ct. 2372); *see Boyland*, 862 F.3d at 291-92.

Randazzo also asked Dimora for assistance in meeting with the Mayor of Beachwood because he was trying to pick up the City of Beachwood as a customer. Dimora agreed to help, and set up a dinner meeting with Randazzo, the mayor, himself, Russo, Gabor, and others. During the meeting, Dimora touted Randazzo's product, underscoring the fact that the county was a customer. (Doc. No. 1038, Tr. Jury Trial Vol. 25 (Randazzo), at 28811-12.) Once again, Dimora did more than simply set up a meeting and leave Randazzo to fend for himself. He took action by providing strong support for Randazzo's deferred compensation product at the meeting, with the expectation that the Mayor of Beachwood would rely on that support to take an official action that would benefit Dimora's bribe payer. *Cf. McDonnell*, 136 S. Ct. at 2374 (McDonnell's subordinates testified that McDonnell merely asked them to attend meetings and did not expect them to do anything beyond that). Moreover, like he did with the sewer district director, Dimora offered the mayor advice knowing or intending that the advice would form the basis for the mayor's decision. *See Menendez*, 291 F. Supp. 3d at 619 ("[P]roviding advice can be an official act only when the official 'know[s] or intend[s] such advice [will] form the basis

for an 'official act.'" (quoting *McDonnell*, 136 S. Ct. at 2371 (alterations in original))). These counts are supported by post-*McDonnell* official acts.

*Count 1*

This leaves Count 1, which charged a RICO conspiracy. This count detailed a number of racketeering schemes and, while included in these schemes were some of the ones charged in other counts discussed *supra*, it also comprised schemes that were not directly charged against Dimora. One such scheme involved Gabor's purchase of his county job in exchange for $5,000 in cash paid to Russo. The evidence demonstrated that Dimora asked Russo to hire Gabor in the Auditor's Office notwithstanding the lack of job openings in the Auditor's Office, and then took advantage of Gabor's light schedule by asking him to serve as his driver and run personal errands for him during the work day. (Doc. No. 1039, Tr. Jury Trial Vol. 26 (Russo), at 28957-59, 28963; Doc. No. 1026, Tr. Jury Trial Vol. 18 (Kelley), at 26205-06, 26209.) Dimora was also present when Kelley asked Gabor how much he paid Russo for his job, and Gabor responded by gesturing with five fingers. (*Id.* (Kelley), at 26205-06; Doc. No. 1039, Tr. Jury Trial Vol. 26 (Russo), at 28958-9.) Because Dimora initiated the scheme and personally benefited from it, the record demonstrated that Dimora agreed that Russo and Gabor would commit bribery (and Russo would take an official action), one of the types of crimes charged in the RICO conspiracy.

In another scheme, Dimora was alleged to have performed an official act—pulling a matter off the commissioners' agenda—because Michael Baker Group, the consulting engineer for the project, failed to pay a bribe in the form of a campaign contribution. Dimora instructed Kelley to have Michael Baker Group buy a table for the Democratic Party's annual dinner. The company bought two tickets but refused to buy a table. In retaliation Dimora pulled their project from the agenda, "scaring them basically that their item [was] not going to pass, and maybe [the

company] would reconsider . . . buying a table in the future if not then." (Doc. No. 1024, Tr. Jury Trial Vol. 15 (Kelley), at 25833-34.) Delaying a vote is an official act post-*McDonnell*. *Hill v. United States,* No. 3:15CV725-M, 2016 U.S. Dist. LEXIS 165084, at \*4 (N.D. Tex. Nov. 3, 2016) (Petitioner "took action in his position on the Dallas City Council to approve, deny or delay development projects pending before the City Council . . . .") (decision available only on LEXIS).

These were just two of the many schemes charged in, and for which the jury heard evidence in connection with, Count 1. Other schemes also involved post-*McDonnell* official acts, such as hiring county employees and bribing a county domestic relations judge. The ruling in *McDonnell*, to the extent that official acts were necessary to support a RICO conspiracy, provides no basis for overturning Dimora's conviction in Count 1.

There is no doubt that the Supreme Court's decision in *McDonnell* changed the legal landscape regarding the federal bribery statute and the concept of "official acts." That ruling did not, however, change the evidence offered at Dimora's trial or the instructions given to Dimora's jury by this Court. Because the vast majority of the acts charged in the indictment, and proven by the government at trial, established that Dimora engaged in conduct that constitutes official acts in a post-*McDonnell* world, his convictions must stand. Those few acts that would no longer pass muster under *McDonnell* would have been disregarded by a rational juror applying the Court's instructions. However, any possible error in charging the jury on the subject of "official acts," to the extent that the jury was not sufficiently charged, was harmless. The jury heard nearly six weeks of testimony—in addition to Dimora's own self-implicating words in tape-recorded conversations—that established that he did so much more than set up meetings or place phone calls. He repeatedly solicited and received bribes in exchange for official acts, and pressured

other public officials to take official action in furtherance of these bribery schemes. The jury properly concluded that this conduct violated the Hobbs Act and constituted honest services fraud. Accordingly, Dimora's motion to set aside his convictions on this ground is **DENIED**.[20]

VII.    **EXCLUSION OF ETHICS REPORTS**

According to Dimora, ["t]his Court also erred by excluding Mr. Dimora's ethics reports, and that error compounded the prejudice caused by the faulty jury instructions." (Mot. at 32306.) Because the Court finds that the jury instructions were not faulty and did not result in any prejudice to Dimora, it need not address an issue that was thoroughly litigated on direct appeal. *See DuPont v. United States*, 76 F.3d 108, 110 (6th Cir. 1996) ("A § 2255 motion may not be used to relitigate an issue that was raised on appeal absent highly exceptional circumstances.") (quotation marks and citation omitted).

Even if the Court were willing to revisit this issue, however, Dimora would not be entitled to relief. As the Sixth Circuit concluded, any possible error in excluding the reports was harmless "in view of the considerable array of evidence against Dimora." *Dimora*, 750 F.3d at 628-29 (noting that "the government produced overwhelming evidence against" Dimora, and "one evidentiary mistake, if a mistake it was, in the context of all that happened at this 37-day trial would not have made a difference to the jury"). In reaching this conclusion, the Sixth Circuit reasoned that "the ethics reports would have done little to tip the scales against the overwhelming weight of [the] evidence" in that "the reports *do not contradict a single element* of [Dimora's] public corruption convictions." *Id*. at 629 (emphasis in original). Neither the passage

---

[20] Likewise, because Dimora fails on his arguments under *McDonnell*, the Court need not consider the continued validity of his convictions on the tax counts. (*See* Mot. at 32305 ["The tax counts depended entirely on the bribery counts—if the things of value Mr. Dimora received were bribes, then he underreported his income and his tax returns were false; if not, then his tax returns were accurate."], record cites omitted.)

of time, nor the ruling in *McDonnell*, changes that result.

Moreover, the Sixth Circuit did not even reach many of this Court's reasons for excluding the evidence. In addition to hearsay concerns, this Court found that the ethics reports were subject to exclusion under Fed. R. Evid. 403 because they actually implicated Dimora in wrong-doing, would "open the door to evidence of ethics reporting requirements[,]" and "likely cause confusion, requiring a mini-trial on the disclosure laws governing elected officials in the State of Ohio." (Doc. No. 930 (Memorandum Opinion & Order ["MOO"]) at 18911, record cites omitted.)[21] The Sixth Circuit agreed that the ethics reports "would have *hurt* Dimora by opening the door to evidence that would have done him no favors[,]" including the fact that many bribe payers were never identified in the reports.[22] *Dimora*, 750 F.3d at 629 (emphasis in original). Still, it indicated that it need not reach this Court's Rule 403 analysis because of the weight and depth of the evidence offered against Dimora.[23] *Id*. at 628. Because the reports would have been

---

[21] The government notes that, had the ethics reports been admitted, it would have called the Director of the Ohio Ethics Commission to testify to the deficiencies in Dimora's reporting, including the fact "that all income from any source that is reportable on a tax return, including bribery, should have been reported under the [report's] income section [instead of the gift section where Dimora inserted it]." (Opp'n at 32782, citing Doc. No. 1031, Tr. Jury Trial Vol. 33, at 27285.) The Court found that this and other ethics testimony regarding the sufficiency of the reports under Ohio law would have added length to an already lengthy trial, confused the jury, and even damaged Dimora. (MOO at 18911-12.)

[22] The Sixth Circuit underscored the fact that certain alleged bribers were "conspicuously absent from the list. Where, for example, is Kevin Payne's name? The evidence showed that he paid for Dimora's use of limousine services, that he covered the cost of prostitutes, and that he picked up the check at more than a few expensive dinners. What of Gina Coppers? She paid for Dimora's hotel room. A jury reading Dimora's reports could only conclude that he was indeed hiding things—and breaking Ohio disclosure laws in the process. *See* Ohio Rev. Code § 102.02. Excluding the reports was harm*less* error because including the reports would have been harm*ful*." *Id*. (emphasis in original).

[23] Adding to possible juror confusion, this Court observed that the reporting forms were made under penalty of perjury and contained a provision that provided that the forms ensured transparency in the government, "increas[ing] public awareness of potential conflicts and reassur[ing] Ohio citizens in the integrity of government." (MOO at 18913, record cite omitted.") This Court noted that "such a statement would have the effect of usurping the jury's province, by suggesting that the Ohio Ethics Commission had already determined that Dimora, by virtue of his disclosure [however deficient or deceitful], lacked the intent to conceal the fraud." (*Id*.) Given the inherent limitations of this evidence, such a misleading statement would have confused the jury and unfairly prejudiced the government.

unfairly prejudicial to the government (and, ironically, also to Dimora), and would have served only to confuse the jury and unnecessarily extend the trial, they were properly excluded. This evidentiary ruling, fully vetted on direct appeal, provides no basis for relief under 28 U.S.C. § 2255.

VIII.   **MOTION TO AMEND**

As the Court was in the process of finalizing and filing this Memorandum Opinion resolving Dimora's counseled § 2255 motion, the Sixth Circuit transferred to this Court's docket a *pro se* motion, filed by Dimora with the Sixth Circuit on July 12, 2018, for leave to file a second or successive motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255. His motion requests permission to raise entirely new and unrelated claims sounding in judicial bias and prosecutorial misconduct. These claims are purportedly based upon Dimora's reading of the § 2255 motions of two of co-conspirators, Gabor and Pumper, this Court's rulings on those motions, and what Dimora refers to as newly discovered evidence that he gleaned from reading these other motions and rulings and reviewing documents recently produced by his trial attorneys. (Affidavit of James C. Dimora ¶¶ 5, 8-9.) Because this Court had yet to issue its ruling on Dimora's initial motion, the Sixth Circuit held that Dimora did not need circuit authorization to file his proposed § 2255 motion, and that he could "instead seek leave [from the district court] to amend that motion to add the claims that he seeks to raise in his proposed § 2255 motion."

Appended to what the Court will now treat as Dimora's *pro se* motion to amend is Dimora's proposed amendment to his § 2255 motion. In it, Dimora essential adopts the arguments made by Gabor that the district judge who briefly presided over certain preliminary

matters in this case, Kathleen O'Malley, was biased based on certain attenuated connections to the underlying public corruption trials, and that the prosecutors that tried the case before the undersigned engaged in prosecutorial misconduct. To these arguments, he adds certain facts, all known to him at the time of trial and pertinent to the charges that were pending against him. Also, adopting the arguments raised in co-conspirator Pumper's motion, he adds additional prosecutorial misconduct allegations, essentially arguing that the government's attorneys knowingly offered testimony from Pumper that was perjured and/or unreliable.

Because Dimora is represented by counsel—and this belated motion to amend was filed *pro se*—the Court elects not to rule on it. "Sixth Circuit [case law] is clear that a criminal defendant does not have a constitutional right to 'hybrid representation.'" *Miller v. United States*, 561 F. App'x 485, 488 (6th Cir. 2014) (quoting *United States v. Mosley*, 810 F.2d 93, 98 (6th Cir. 1987)). "A defendant has a constitutional right to be presented by counsel *or* to represent himself during his criminal proceedings, but not both." *Id.* (quoting *Mosley*, 810 F.2d at 97) (emphasis in original). Likewise, "[a] habeas petition has neither a constitutional right nor a statutory right to hybrid representation." *Id.* at 489 (quoting 28 U.S.C. § 1654) ("In all courts of the United States the parties may plead and conduct their own cases *personally or by counsel*[ .]") (emphasis added by the court). "Hybrid representation is generally prohibited because it increases the risk of undue delay, jury confusion, and conflicts as to trial strategy." *Id.* at 488. The decision of whether to consider such pleadings is left to the discretion of the trial or habeas court. *See id.* at 489; *see, e.g., Abela v. Heyns*, No. 17-1342, 2017 WL 8727425, at *2 (6th Cir. Oct. 12, 2017) ("Because [petitioner] was represented by counsel [during his habeas proceeding], the trial court was not compelled to rule on his pro se discovery motions.").

The Court finds that it would be especially inappropriate to permit Dimora to proceed in a hybrid fashion and amend his motion at this late stage in this proceeding. His *pro se* motion to amend was filed in the Sixth Circuit more than a year after Dimora filed his counseled motion to vacate his sentence. In the interim, the Court granted requests for extensions of time and leave to exceed page limit restrictions to ensure that the issues raised in the initial motion were fully briefed. The result was comprehensive briefing that properly framed the issues. Additionally, the Court has reviewed the factually intensive briefing prepared by counsel, as well as the voluminous record relative to the issues raised by counsel, and, as previously noted, was prepared to issue its ruling.

Moreover, even if the Court were to consider Dimora's motion to amend on the merits and pursuant to Federal Rule of Civil Procedure 15(a), it would be denied because it seeks leave to raise claims that are both untimely and futile. Dimora has not identified any newly discovered evidence that would rescue his proposed claims from the statutory requirement that he file within one year of his judgment of conviction becoming final in 2014, pursuant to 28 U.S.C. §

2255(f)(1), (4).[24] Nor do these newly proposed claims relate back to the original motion pursuant to Fed. R. Civ. P. 15(c)(2) because the new claims raise different theories for relief that are supported by facts that differ entirely from those set forth and relied upon in the original pleading. *See Mayle v. Felix*, 545 U.S. 644, 650, 125 S. Ct. 2562, 162 L. Ed. 2d 582 (2005) ("An amended habeas petition, we hold, does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth.")

Further, it would serve no purpose for the Court to devote judicial resources to revisiting claims that the Court has already determined to be entirely devoid of merit. With respect to Gabor's claim of judicial bias, the Court held that his unsubstantiated "conjecture, rank speculation, and hearsay (even double hearsay) statements" failed to establish the kind of pecuniary interest necessary to overcome the presumption against judicial bias. (Doc. No. 1167 at 32337.) More to the point, the Court indicated that it did not even need to consider Gabor's "evidence" of Judge O'Malley's purported bias because the "undersigned—not Judge O'Malley—presided over *all* substantive phases" of the trial, and Gabor did not allege that the undersigned had any impermissible ties to the underlying investigation. He, therefore, received

---

[24] The facts Dimora identifies in his proposed amendment, such as the fact that he supported Judge O'Malley's appointment to the federal bench and that his son once served as a law clerk for Judge O'Malley's husband's law firm, were known to Dimora at the time of his trial. Further, the documents he claims he recently received from trial counsel—a trial transcript from a 2011 hearing and a 2011 newspaper article—involved a trial proceeding in a related case of which he was a named defendant and had first-hand information. Instead, Dimora appears to be arguing that he did not realize that he could assert judicial bias and prosecutorial misconduct claims until he read his co-conspirator's § 2255 motions. But the Sixth Circuit has made clear that § 2255(f)(4) addresses the discovery of new facts, not the recognition of their legal importance. *Phillips v. United States*, 734 F.3d 573, 580 (6th Cir. 2013) (Section 2255(f)(4) is "directed at the discovery of new facts, not newly discovered law"); *see, e.g., Alexander v. United States*, No. 11-20180, 2016 WL 6158961, at *6 (E.D. Mich. Oct. 24, 2016) (applying *Phillips* and observing that "Petitioner appears to be conflating his ability to discover the facts underlying his ineffective state counsel claim, with his ability to recognize the legal significance of such facts"); *Woodley v. United States*, No. 04-80335, 2016 WL 4701464, at *4 (E.D. Mich. Sept. 8, 2016) ("[D]elayed realization of the precise manner in which the sentencing court allegedly misapplied the Sentencing Guidelines in determining his sentence does not qualify as a

"precisely what the Due Process Clause requires—a fair trial before a fair tribunal." (*Id.* at 32334, emphasis added.) The same holds true for Gabor's co-defendant, Dimora.[25] Similarly, the Court would find, once again, that the unsubstantiated and attenuated connections between certain co-conspirators and family members of the prosecution would not have required the prosecutors to withdraw from the case or supported a new trial.[26] (*See id.* at 32340-45; *see also* Doc. No. 1192 (Sixth Circuit Order Denying Appeal from Refusal to Issue a Certificate of Appealability) at 33012 ["The connections that support Gabor's claim that the AUSAs on his case had impermissible conflicts of interest are so attenuated to the issues at trial that no reasonable jurist could conclude that the alleged conflicts affected the outcome of his trial."].)

Accordingly, it would be futile to allow an untimely amendment to Dimora's § 2255 motion.

---

discovery of new 'facts' that would warrant a renewed one-year period under § 2255(f)(4).").

[25] Dimora's argument that Judge O'Malley's involvement in his case "was far deeper than the involvement she had in Gabor's case" is without merit. While he cites Judge O'Malley's decision to *grant* his motion for appointment of counsel, Dimora ultimately elected to proceed to trial with retained counsel. This alleged involvement in a preliminary matter had no bearing on the outcome of the trial before the undersigned.

[26] Likewise, the Court would, once again, reject the arguments originally raised by Pumper in his § 2255 motion that he was coerced by the government into testifying and was under the influence of drugs *at his own sentencing*, as these allegations were refuted by the record. (*United States v. Pumper*, Case No. 1:09-cr-00317, Doc. No. 40 at 595 [citing *Blackedge v. Allison*, 431 U.S. 63, 74, 97 S. Ct. 1621, 52 L. Ed. 2d 136 (1977) (representations of the defendant, his lawyer, the prosecutor, and the judge at the time of sentencing "constitute a formidable barrier in any subsequent collateral proceeding")].)

IX. **CONCLUSION**

For all of the foregoing reasons, Dimora's motion to vacate, set aside, or correct his sentence, pursuant to 28 U.S.C. § 2255, is **DENIED**.

**IT IS SO ORDERED**.

Dated: October 22, 2018

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**