# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JAMES C. DIMORA, | ) | CASE NO. 1:10-cr-387-1 |
| | ) | (CASE NO. 1:17-cv-1288) |
| | ) | |
| | ) | |
| PETITIONER, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| | ) | |
| RESPONDENT. | ) | |

In 2012, following a 37-day jury trial, petitioner James C. Dimora ("Dimora") was convicted of thirty-two counts of numerous federal crimes, including extortion, bribery, money and property mail and wire fraud and honest services mail and wire fraud, racketeering, obstruction, falsifying documents, and tax evasion, as well as conspiracy to commit many of these crimes. He was sentenced by this Court, and, after an appeal to the Sixth Circuit, his convictions and sentence were affirmed. The United States Supreme Court subsequently denied certiorari review.

Four years after the jury returned its verdicts against Dimora, the Supreme Court in *McDonnell v. United States*, --U.S.--, 136 S. Ct. 2355, 195 L. Ed. 2d 639 (2016), narrowed and focused the legal definition of "official act" in the federal bribery statute, 18 U.S.C. § 201(a)(3). Relying on the decision in *McDonnell*, Dimora moved to vacate his convictions, maintaining that the conduct for which he was convicted no longer qualified as "officials acts" under the law.

(Doc. No. 1162 (28 U.S.C. § 2255 Motion).) In a decision dated October 22, 2018, the Court denied the motion to vacate. (Doc. No. 1196 (Memorandum Opinion); Doc. No. 1197 (Judgment Entry).) On August 31, 2020, a panel of the Sixth Circuit vacated the Court's ruling, finding that the Court's definition of "official act" in its jury instructions failed to comport with the narrowed definition later announced in *McDonnell*. *Dimora v. United States*, 973 F.3d 496, 505 (6th Cir. 2020) ("Although we do not fault the trial court for failing to anticipate *McDonnell*, we conclude that its instructions were erroneous in light of that decision.") The Sixth Circuit remanded the matter to this Court for the limited purpose of re-applying the harmless error standard to determine "whether the instructional error substantially influenced the jury's verdict" on certain identified counts. *Id*. at 506.

Following remand, the Court ordered the parties to submit supplemental briefs, but at the request of Dimora, the Court stayed its briefing schedule while Dimora appealed the Sixth Circuit's decision. (*See* Non-doc. Order, Feb. 9, 2021.) On March 23, 2021, the Supreme Court denied Dimora's request for certiorari review. (Doc. No. 1216.) Thereafter, the Court set a new briefing schedule, and the parties submitted their supplemental briefs. (Doc. No. 1221 (Government's Supplemental Brief); Doc. No. 1222 (Dimora's Supplemental Brief); Doc. No. 1223 (Dimora's Notice of Clarification).) Having reviewed the record and the parties' briefing, and in light of the Sixth Circuit's directions and limitations on remand, the Court hereby grants in part, and denies in part, Dimora's motion to vacate.

## I.  BACKGROUND

### A.  The Case Against Dimora

Even though this Court and the Sixth Circuit have addressed the facts of this case on numerous occasions, to properly conduct the harmless error analysis, it is necessary to revisit the facts of this case as they developed during trial. In 2007, the Federal Bureau of Investigation ("FBI") launched a multi-year probe into political corruption in Cuyahoga County, Ohio. At the heart of the investigation were two men: Dimora and Frank Russo ("Russo"). According to the government, Dimora and Russo were the "centers of influence" for the county government. (Doc. No. 1038, Tr. Jury Trial Vol. 25 (Randazzo), at 228.[1])

Russo served as County Auditor, and his department was the single largest in the county government. Dimora was one of three elected members of the Board of County Commissioners ("BOCC"), and his influence and authority as a member of this board was significant. The BOCC had the statutory power to, among other things: enter into contracts with other governmental units; purchase, lease, or construct county facilities; sell, lease, or rent any real property owned by the county and not used for public purposes; appropriate funds for the court of common pleas; approve loans or grants for economic development; issue bonds to secure grants in excess of the community improvement fund; and enter into agreements for construction or repair of county infrastructure.[2] (*See* Ohio Rev. Code §§ 307.01 *et seq.*)

---

[1] All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic docketing system.

[2] Shortly after the results of the FBI's investigation were made public, the voters of Cuyahoga County voted to eliminate the three-commissioner form of government and put in its place a government administered by an elected county executive and council. *See United States v. Dimora*, 750 F.3d 619, 623 (6th Cir. 2014) ("Three commissioners historically have led the government of [Cuyahoga County], though that changed (perhaps due to the charges in this and related cases) when the people of Cuyahoga County voted for a county executive form of government that started in 2011.").

3

"Through thousands of wiretaps and other means, the investigation revealed that Dimora's tenure as [Cuyahoga County Commissioner] was rife with *quid pro quo* arrangements between him and individuals seeking favors of one sort or another from the county and other governments. He handed out public jobs, influenced Cleveland decision-makers and steered public contracts in return for approximately 100 bribes worth more than $250,000." *United States v. Dimora*, 750 F.3d 619, 623 (6th Cir. 2014). At trial, much of the government's case centered around illustrating how the evidence gleaned during the investigation demonstrated that Dimora exercised his authority and influence as county commissioner to control virtually every aspect of county government, and, by so doing, facilitated multiple fraud and bribery schemes designed to trade official acts for things of value.

Russo testified that he and Dimora enjoyed socializing with a group of local businessmen and county officials they dubbed the "A Team" or the "in-crowd" or the "in-circle," and they used "sponsors" to fund the group's activities. (Doc. No. 1039, Tr. Jury Trial Vol. 26 (Russo), at 24–25; *see id.* at 61.) If no sponsor attended a dinner or event, a member of the group would make calls to find one. Sometimes they asked for a sponsor's credit card number to pay the bill. (*Id.* at 24–29.) One thing remained constant—Dimora never paid the bill. (Doc. No. 1024, Tr. Jury Trial Vol. 15 (Kelley), at 140.)

The sponsors included Kevin Kelley, Steve Pumper, Michael Forlani, Ferris Kleem, and Rob Rybak. (Doc. No. 1039, Tr. Jury Trial Vol. 26 (Russo), at 35, 40–41.) In exchange for providing these dinners and other things of value, "[s]ponsors received personal attention on anything that came up," such as a "daughter getting a parking ticket, a son wanting a [county] job, a brother being [a] contractor and wanting a contract, there were multiple, multiple issues at

4

all times that [the sponsors] had us [Dimora and Russo] doing for them." (*Id*. at 39.) In other words, if you were a sponsor, you "got special treatment[.]" (*Id*.)

Russo explained that the sponsors tailored their gifts to the things that Dimora enjoyed. Dimora "loved his backyard. . . . [I]t was the number one thing in his life. If anybody could help him in the backyard [with improvements such as a pool, outdoor kitchen and pizza oven, granite counter tops, tiki hut, etc.], it was a great privilege to him. The second thing was [Dimora] liked fine food and fine alcohol, only the best. Big thick steaks, Crown Royal . . . . [T]he third thing was . . . that [Dimora] like[d] cash from people. . . . And the fourth thing [was] [Dimora] like[d] pretty girls and prostitutes." (*Id*. at 55–56; *see also id*. at 150.)

One of the first sponsors to testify, Ferris Kleem ("Kleem"), a local contractor who owned construction companies and held interests in other businesses, explained that he helped finance a trip to Las Vegas for Dimora and his friends, paying for the airfare, hotel accommodations, alcohol, expensive dinners, gambling, trips to an exclusive swimsuit optional pool, and prostitutes. In exchange for these and other things of value given to Dimora over time, Dimora voted to award Kleem county construction contracts, obtained a county position for one of Kleem's relatives, assisted Kleem's cousin in obtaining a grant for his municipality, and fixed a county smoking violation issued against a restaurant in which Kleem held an interest.

Dimora's efforts to secure the Coe Lake grant, a construction grant to fund a handicapped accessible bridge in the City of Berea, Ohio, showcased his influence and his ability to pressure other public officials. Kleem's cousin (who was the Mayor of Berea) recalled a three-way telephone conversation with County Development Director Tracy Nichols ("Nichols") in which Nichols was much more deferential and cooperative regarding Kleem's efforts to obtain the Coe

Lake grant for his cousin's community when Dimora was on the line. In the conversation, Dimora advocated Kleem's cousin's position that HUD guidelines permitted funding for handicapped accessibility projects, a position which Nichols had previously opposed. (Doc. No. 1029, Tr. Jury Trial Vol. 31 (Cyril Kleem), at 25–26.) Nichols later testified that she made re-examining her rejection of the Coe Lake grant a priority because Dimora had called her about it, and he was her boss. (Doc. No. 1030, Tr. Jury Trial Vol. 32 (Nichols), at 130–31.) Nichols ultimately did change her mind, and Dimora's efforts culminated in his casting a vote to approve the Coe Lake grant. (Gov't Trial Ex. 400-G (County Agenda Action).)

After the lengthy jury trial, wherein the jury heard this and a wealth of other testimony regarding Dimora's corrupt schemes, the jury returned guilty verdicts, on all but one charge. On August 1, 2012, the Court sentenced Dimora to a within-guidelines sentence of 336 months of imprisonment, to be followed by three years of supervised release. The Court also imposed restitution. (Doc. No. 957 (Dimora Judgment).)

On direct appeal, Dimora challenged the district court's jury instructions and refusal to admit certain end-of-year ethics reports that would have shown that Dimora reported receiving certain unspecified gifts from various individuals and entities. With respect to the jury instructions, the Sixth Circuit found that the district court had properly instructed the jury on the difference between gifts given in friendship and bribes given in exchange for official acts. As for the ethics reports, the court of appeals ruled that the error, if there was any, in excluding the reports was harmless "in view of the considerable array of evidence against Dimora." *Dimora*, 750 F.3d at 628

**B.    Impact of the *McDonnell* Decision on Dimora's Motion to Vacate**

On June 27, 2016, the Supreme Court interpreted the meaning of "official act" for purposes of the federal bribery statute (18 U.S.C. § 201), narrowing its application. The Court in *McDonnell* held that to constitute an "official act," the government must first "identify a 'question, matter, cause, suit, proceeding or controversy' that 'may at any time be pending' or 'may by law be brought' before a public official." *McDonnell*, 136 S. Ct. at 2368 (quoting 18 U.S.C. § 201(a)(3)). The Court stated that "a typical meeting, telephone call, or event arranged by a public official does not qualify as a 'cause, suit, proceeding or controversy.'" *Id*. "Pending" or "may by law be brought" suggests "something that is relatively circumscribed—the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete. In particular, 'may by law be brought' conveys something within the specific duties of an official's position[.]" *Id*. at 2369. (emphasis omitted). Further, that the matter may be brought before any public official "conveys that the matter may be pending either before the public official who is performing the official act, or before another public official." *Id*.

Second, the government must prove that "the public official made a decision or took an action 'on' that question, matter, cause, suit, proceeding, or controversy, or agreed to do so." *McDonnell*, 136 S. Ct. 2368. The Court ruled that these criteria are not met by proof merely that an official hosted an event, meeting, or speech "related to" a pending question or matter. *Id*. at 2370.

Nevertheless, the Court stated that while "setting up a meeting, calling another public official, or hosting an event does not, standing alone, qualify as an 'official act,'" *id*. at 2368, such actions "could serve as evidence of an agreement to take an official act." *Id*. at 2371 And a

jury would be entitled to "conclude that an agreement was reached if the evidence shows that the public official received a thing of value knowing that it was given with the expectation that the official would perform an 'official act' in return." *Id*. Further, the Court noted that the government is not required to prove that the defendant official actually performed the agreed task; it is enough for purposes of the federal bribery statute to show that the official "agree[d]" to make a decision or take an action. *Id*. at 2370–71 (citation omitted).

Additionally, the Supreme Court explained that merely "expressing support . . . does not qualify as a decision or action . . . as long as the public official does not intend to exert pressure on another official or provide advice, knowing or intending such advice to form the basis for an 'official act.'" *Id*. Thus, a public official may engage in an 'official act' by 'exert[ing] pressure on another official to perform an 'official act,' or . . . advis[ing] another official, knowing or intending that such advice will form the basis for an 'official act' by another official." *Id*. at 2372.

Seizing on the ruling in *McDonnell*, Dimora sought to vacate his convictions, arguing that he was convicted based on conduct that no longer qualifies as official acts, such as setting up a meeting. He further argued that this Court's pre-*McDonnell* jury instruction relative to the existence of official acts had such an injurious effect on the fairness of his trial that vacation of all counts, including those counts involving crimes that did not require the existence of official acts, was necessary. The government opposed the motion. In doing so, it conceded that, in the wake of *McDonnell*, setting up a meeting, *without more*, was insufficient to support a conviction for crimes requiring an official act. Nevertheless, it insisted that when it came to Dimora and his corrupt activities as county commissioner, there was *always more*.

The Court denied Dimora's motion in three stages. First, it determined that the reach of the decision in *McDonnell* only extended to the counts charging a conspiracy to commit Hobbs Act Extortion and the underlying substantive extortion counts. Accordingly, it found undisturbed by *McDonnell* Dimora's convictions for RICO conspiracy, obstruction of justice, bribery concerning programs receiving federal funds, mail and/or wire fraud, honest services mail and/or wire fraud, as well as conspiracy to commit mail and/or wire fraud and honest services mail and/or wire fraud. (Doc. No. 1196 at 18–20.) Second, the Court determined that, while its jury instructions did not fully anticipate the parameters of the decision in *McDonnell*, its instructions did not result in error because they "sufficiently captured the concerns . . . addressed in *McDonnell*." (*Id*. at 26) (quotation marks and citation omitted). Third, it concluded alternatively that any possible instructional error was harmless, because "with few exceptions, the conduct which underli[ed] Dimora's convictions [still] qualifie[d] as official acts." (*Id*.)

### C.   The Sixth Circuit's Remand

On appeal, the Sixth Circuit disagreed that the definition of "official act" contained in the jury instructions substantially satisfied the concerns raised in *McDonnell*. *Dimora*, 973 F.3d at 505. By defining "official act" to include any action "generally expected of the public official[,]" the Sixth Circuit concluded that the Court's instruction was "'significantly overinclusive.'" *Id*. (quoting *McDonnell*, 136 S. Ct. at 2373–74). The panel also took issue with the Court's harmless error analysis, finding that even though the Court identified the appropriate standard, it erred in the application of the standard. *Id*. In particular, the Sixth Circuit observed that the Court "repeatedly relied on evidence sufficiency to conclude that any instructional error was harmless." *Id*. at 505–06 (citing trial record). It also noted that the Court "repeatedly pointed back to its

9

belief that the instructions had been adequate to conclude that any error was harmless." *Id*. at 506 ("By bootstrapping its harmlessness finding to the purported validity of the instructions, the district court rested its harmless-error analysis on a faulty premise."). Ultimately, the Sixth Circuit determined that these missteps required vacatur of the decision and remand.

But the panel underscored that this remand was limited. First, it excluded from further review Dimora's convictions for bribery concerning programs receiving federal funds, conspiracy to commit mail fraud and honest services mail fraud, RICO conspiracy, conspiracy to obstruct justice, and falsification of records in a federal investigation. *Id*. It also removed from reconsideration Dimora's Hobbs Act convictions in Counts 8, 22, and 23, as these counts were premised exclusively on conduct that, even after *McDonnell*, qualified as "quintessential official acts[;]" namely, votes Dimora cast as county commissioner. *Id*. at 506–07 (citing *McDonnell*, 136 S. Ct. at 2368.) Finally, the Sixth Circuit instructed this Court to consider, in the first instance, whether the "cumulative effect" of the instructional error, coupled with the failure to allow admission of the ethics reports, entitled Dimora to a new trial and whether such an argument is even available to § 2255 petitioners. *Id*. at 507 ("But we leave these questions for the district court to consider on remand after it assesses the harmlessness of the instructional error independent of any cumulative effect.") (citations omitted).

## II. DISCUSSION

By its order of remand, the Sixth Circuit has directed this Court to apply a harmless error analysis to Dimora's convictions on the following counts: 3, 7, 11–15, 20–21, and 24–27. The parties agree that this analysis considers whether the error had a substantial and injurious effect or influence in determining the jury's verdict. (Doc. No. 1221 at 10–11; Doc. No. 1222 at 9.)

### A.    Harmless Error Standard

"To warrant habeas relief because of incorrect jury instructions, [Dimora] must show that the instructions, as a whole, were so infirm that they rendered the entire trial fundamentally unfair." *Murr v. United States*, 200 F.3d 895, 906 (6th Cir. 2000) ("If this Court is sure that the error had no or very slight effect or influence on the jury's decision, the verdict and judgment must stand.") (citing *O'Neal v. McAninch*, 513 U.S. 432, 436–38, 115 S. Ct. 992, 130 L. Ed. 2d 947 (1995)). In making this determination, the Court must apply the *Kotteakos* standard, which considers whether the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946)).

This standard requires more than a "reasonable possibility" that the error was harmful. *Davis v. Ayala*, 576 U.S. 257, 268, 135 S. Ct. 2187, 192 L. Ed. 2d 323 (2015) (quoting *Brecht*, 507 U.S. at 637). Nevertheless, "'[t]he inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error had substantial influence. If so, *or if one is left in grave doubt*, the conviction cannot stand.'" *O'Neal*, 513 U.S. at 438 (emphasis in original) (quoting *Kotteakos*, 328 U.S. at 764–65). "Grave doubt," in turn, refers to the situation where, "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id*. at 435. Ultimately, a reviewing court must ask: "'Do I, the judge, think that the error substantially influenced the jury's decision?'" *Dimora*, 973 F.3d at 505 (quoting *O'Neal*, 513 U.S. at 436). "If

the answer is 'yes' or the court is in 'grave doubt' about the error's harmlessness, the conviction cannot stand." *Id*. (citation omitted).

Dimora suggests that "[w]hether the jury was substantially influenced by the instructional error is best established by what the government told the jury in closing argument—its efforts to persuade the jury." (Doc. No. 1222 at 8.) The Court does not agree that the harmless error analysis is properly limited, in the context of a 37-day jury trial, to a consideration of counsel's closing remarks to the jury. While the Court finds that counsel's arguments are a valid consideration, the jury was clearly instructed, on multiple occasions, that its verdict was to come from the evidence offered at trial and not counsel's arguments. (*See, e.g*., Doc. No. 1046, Tr. Jury Trial Vol. 37 (Closing Arguments), at 86; Doc. No. 1044, Tr. Jury Trial Vol. 35 (Charge), at 25.) Accordingly, the Court must consider counsel's arguments in the context of the entirety of the proceedings and the evidence offered at trial. *See Kotteakos*, 328 U.S. at 762 ("In the final analysis[,] judgment in each case must be influenced by conviction resulting from examination of the proceedings in their entirety[.]"); *United States v. Smith*, 723 F.3d 510, 517 (4th Cir. 2013) (the question of whether a trial error had a substantial and injurious effect on a jury's verdict must be answered "in light of the evidence presented" at trial). As the Supreme Court observed:

> Errors [in admitting evidence or erroneously charging a jury] in criminal causes conceivably may be altogether harmless in the face of other clear evidence, although the same error might turn scales otherwise level, as constantly appears in the application of the policy of [the harmless error statute, 28 U.S.C. § 329] to questions of the admission of cumulative evidence.

*Kotteakos*, 328 U.S. at 763. This Court must, therefore, consider "all that happened" in conducting its harmless error analysis. *Id*. at 765.

**B.    Count-by-Count Discussion of Official Acts[3]**

*1.    Counts and Schemes Containing Exclusively Post-McDonnell Official Acts*

A count-by-count analysis of the counts implicated by the remand demonstrates that much of the evidence offered by the government at trial related to governmental action by Dimora and others that still qualifies as official acts in a post-*McDonnell* analysis. Indeed, with respect to the counts reviewed in this section, the government's evidence was limited exclusively to official acts that meet the *McDonnell* definition.

a.    Conspiracy Involving Alternatives Agency (Count 3)

Beginning with Count 3 (conspiracy to commit Hobbs Act extortion), the evidence at trial established that, between February and April 2008, using Kevin Kelley as an intermediary, Alternatives Agency ("AA")—a halfway house providing services for the Cuyahoga County Common Pleas Court—bribed Dimora and Russo by helping to fund the Las Vegas trip to which Kleem also contributed. In exchange, Dimora voted on several funding initiatives favorable to AA.

---

[3] As it previously observed in its original opinion on Dimora's motion to vacate, the Court finds that a count-by-count harmless error analysis is especially appropriate in the present case for a number of reasons. First, the Court permitted the government's lead investigating agent to testify in segments. *See United States v. Dimora*, 843 F. Supp. 2d 799, 822 (N.D. Ohio 2012). As each new scheme was introduced, FBI Special Agent Michael Massie (or in some instances FBI Special Agent Christine Oliver) testified to the details of the investigation and identified the evidence relevant to that scheme. The government also called fact witnesses and offered evidence relative to that scheme before moving on to the next scheme. Even the government's trial exhibits were labeled in such a way that they corresponded to the schemes in which they were being offered.

In closing arguments, counsel for both sides presented their arguments in terms of the schemes and corresponding counts. The Court's instructions were also separated by counts and even included a chart that identified each count and corresponding scheme. (Doc. No. 735-1 (Jury Instructions), at 14–16.) The instructions further directed the jury to consider each count separately, and, as evidence that the jury was able to appreciate and follow this directive, the jury returned a "not guilty" verdict as to the crime charged against Dimora in Count 30. (*Id.* at 9–10; *see* Doc. No. 738 (Dimora Jury Verdicts), at 34.)

There was considerable testimony offered at trial as to this scheme and the votes Dimora ultimately cast in support of funding for AA. (*See, e.g*., Doc. No. 1016, Tr. Jury Trial Vol. 9 (Massie), at 62–65 [citing Gov't Ex. 259, 1-3-08 Dimora Vote to extend funding for AA]; *Id*. (Massie), at 58–61 [citing Gov't Ex. 289, Agenda Action].) Of course, the casting of votes designed to award government contacts clearly meets the two-part *McDonnell* definition of "official act." First, it is "'the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete.'" *See Miserendino v. United States*, 307 F. Supp. 3d 480, 490 (E.D. Va. 2018) (quoting *McDonnell*, 136 S. Ct. at 2369). Second, voting obviously requires the taking of an action. *See McDonnell*, 136 S. Ct. at 2368 (Step 2 requires the government to prove that the public official made a "decision" or took "an action" on the identified "question, matter, cause, suit, proceeding or controversy.").

There was also evidence that Dimora performed a number of qualifying steps that led to his eventual votes on funding for AA. On March 20, 2008, Dimora got "all the power brokers in the county that needed to make decisions on that board and care line item [for the benefit of halfway houses], he was able to get everybody there so we can discuss it and see if we could go forward with this contract—project. . . . [Dimora] said [at the meeting that] it was a good idea and it definitely needed further consideration." (Doc. No. 1016, Tr. Jury Trial Vol. 9 (Schuman), at 206–08.) AA's director, Brian Schuman, testified that he believed his ability to get Dimora at that meeting with all of the county people there, and representatives of the other halfway houses, gave him the advantage in competing against them for contracts. "They know we [AA] got the juice, we got [Dimora] in the room. So it tells everyone else [the competing agencies], back off." (*Id*. at 208.) Kelley similarly testified that he did not believe that county funding for AA's

14

programs could have been restored without Dimora's assistance "[b]ecause the system, the way it worked at Cuyahoga County, their clout [Dimora's and Russo's] meant a lot more than trying to go through the bureaucracy that was set in place." (Doc. No. 1024, Tr. Jury Trial Vol. 15 (Kelley), at 229; *see id.* at 248 [Russo was "very clear" on "[t]he amount of bribes [he and Dimora] were looking for [sic] restoring the funds [for AA]."].)

Additionally, the government offered evidence that Dimora volunteered to go to a meeting with the common pleas judges to convince them to use AA's services. In a wiretapped conversation, Dimora indicated that he and the other commissioners needed to "convince" the judges to utilize AA's programs. He also placed calls to Judge Pokorney, the Court Administrator, and Chief Judge McDonnell, who was in charge of the court's budget, to pressure them not to cut funding for the halfway house program. (Doc. No. 1017, Tr. Jury Trial Vol. 10 (Pokorny), at 9–10; *Id.* (McDonnell), at 30–31.) McDonnell testified that, as a result of the call from Dimora, she decided to approve half of the funding for the coming year. (*Id.* (McDonnell), at 30–31.) On April 17, 2008, nine days after the Las Vegas trip, Dimora voted to restore funding for AA. (Gov't Ex. 241 (Contract and Resolution); Doc. No. 1016, Tr. Jury Trial Vol. 9 (Massie), at 136–37.)

Leading up to the eventual votes he would cast in favor of AA, these actions showed that Dimora was "working hard" to convince other public officials to look favorably upon AA and take their own official acts—such as agreeing to use the services of AA or keeping the expenditures for such programs in the court budgets—paving the way for Dimora's official acts. Of course, "[a]n official does not take an 'official act' by '[s]imply expressing support [for an official act] . . . as long as the public official does not intend to exert pressure on another official.

15

. . ." *United States v. Mendendez*, 291 F. Supp. 3d 606, 618-19 (D. N.J. 2018) (quoting *McDonnell*, 136 S. Ct. at 2371). However, "work[ing] hard to persuade other officials" to take official action is sufficient to establish that an official used his official position to exert pressure on another official or advised another official, knowing or intending that such advice would form the basis for an "official act." *Miserendino*, 307 F. Supp. 3d at 492 (citing, among authority, *United States v. Pinson*, 860 F.3d 152, 169 (4th Cir. 2017) (further quotation marks and citations omitted)).

Dimora complains that the government's attorney improperly argued in her close that, in addition to voting on funding initiatives, the official acts included setting up meetings and "sp[eaking] highly of Alternatives Agency." (*See* Doc. No. 1045, Tr. Jury Trial Vol. 36 (Closing Arguments), at 26–27.) Yet, the record evidence demonstrated that Dimora did much more than attend a meeting and offer a favorable opinion about a private organization. Whether these actions are considered "a decision or action on a qualifying step" necessary to permit him to ultimately vote further funding to AA, or they were designed to exert pressure on another official to convince them to perform an official act, the end result was conduct that still qualifies as official acts under *McDonnell*. Moreover, Dimora himself took official action by voting in favor of funding initiatives favorable to AA. Because this count is supported entirely by post-*McDonnell* "official acts," the Court is not left with any doubt (let alone a grave doubt) that the Court's overinclusive instruction on "official acts" substantially influenced the jury's decision on Count 3.

b.      Schemes Involving Neiheiser (Counts 14 and 15)

Count 14 (conspiracy to commit Hobbs Act extortion) and Count 15 (Hobbs Act extortion) involved the *quid pro quo* agreement between Dimora and William Neiheiser, a businessman who ran an electrical construction company. The evidence at trial established that, in exchange for Dimora's help, Neiheiser offered Dimora bribes in the form of home improvements, a check for $3,600 to finance a college football jersey Dimora purchased at a charity auction, and a gambling junket to Atlantic City.

Two sets of actions underlie these convictions. The first group involved votes Dimora cast on the project to construct the new Juvenile Justice Center ("JJC") that benefitted Neiheiser's company, Reliance Mechanical. On December 13, 2007, Dimora voted to authorize bidding for the JJC. (Gov't Ex. 524-TR (Agenda Action).) Two months later, Dimora and Neiheiser had a conversation about the JJC bidding, during which Neiheiser reminded Dimora that last time "you didn't pick the low bidders. You threw 'em off for technicalities." (Gov't Ex. 1407-TR.) Neiheiser then emphasized to Dimora: "so when you see Reliance Mechanical is the low bidder [this time], don't f—ck it up[,]" Dimora responded, "No alright, that's good to know[.]" (*Id.*) Later in the conversation Neiheiser added, "It's a big enough job [the JJC] so we're going after it to get it and then you and I can have fun for two years." (*Id.*) Dimora asked him when the bid was due and told him he hoped that his company's bid was low. Reliance Mechanical was not the lowest bid, but on March 13, 2008, Dimora voted to reject all of the bids for the main building packages, giving Reliance the opportunity to rebid.[4] (Doc. No. 1012, Tr.

---

[4] The evidence further demonstrated that, on February 14, 2008, Dimora voted to approve an addendum to the specifications on the JJC projects, including clarifications and technical changes to the HVAC building package that would be of interest to Neiheiser and Reliance Mechanical. (Gov't Ex. 1454 (Agenda Actions).)

Jury Trial Vol. 5 (Massie), at 26; Gov't Ex. 400-R-1 (Agenda Action); Doc. No. 1021, Tr. Jury Trial Vol. 14 (Massie), at 219.) These votes, tied to specific county contracts, clearly qualify as official acts under *McDonnell*.

As for the second set of acts, the evidence at trial revealed that, during the time period relevant to the indictment, the City of Lakewood, Ohio, was contemplating the future of a city-owned and operated ice rink. Neiheiser was having trouble scheduling an appointment with Lakewood's mayor, Edward Fitzgerald, to discuss his plans to purchase the ice rink from the city. Dimora was able to arrange a phone conversation with Fitzgerald. During the call, Dimora indicated that he was there with Neiheiser who had been trying to reach Fitzgerald. Fitzgerald acknowledged that Neiheiser had been calling and explained to Dimora that he had been in around-the-clock union negotiations. He instructed Dimora to have Neiheiser call the office the following morning, assuring Dimora that he would "make time to talk to him." (Doc. No. 1021, Tr. Jury Trial Vol. 14 (Massie), at 200–02; Gov't Ex. 1403-TR.)

In his motion, Dimora argued that the call amounted to nothing more than a "[c]all [to] a local mayor to ask him to meet with a businessman[]," something that would have fallen short of an official act under *McDonnell*. (Doc. No. 1162-1 at 19.) But from the recording of the call, which was played for the jury at trial, it was clear that Dimora did much more than merely secure an appointment for Neiheiser. During the call, Dimora clearly and aggressively advocated Neiheiser's position. He promised Mayor Fitzgerald that Neiheiser's deal would be mutually "advantageous" to Neiheiser and the city. He encouraged the mayor to speak with Neiheiser because "there might be a good opportunity" for the city to "get [the ice rink] off your [the city's] back[.]" (Gov't Ex. 1403-TR.) He explained that Neiheiser "owns a rink in Strongsville

18

already[,]" and runs a successful construction company so that he would have the experience, knowledge, and resources to make whatever renovations were necessary to make the ice rink a going concern. He also personally vouched for Neiheiser, suggesting that he was "very legitimate," and that he was "definitely" the "real deal."[5] (*Id.*) Finally, Dimora offered to assist the mayor with his ongoing union negotiations, which, according to the mayor, had been going poorly and were the reason that he had not been able to get in touch with Neiheiser. (*Id.*)

This evidence demonstrated that Dimora's support for Neiheiser and his project was clearly offered and intended to exert pressure on Fitzgerald to perform the official act of privatizing the rink and selling it to Neiheiser. *See Miserendino*, 307 F. Supp. 3d at 491 ("expressing strong support for a matter, and requesting that another official approve of such a matter have been found sufficient to establish that an official used 'his official position to exert pressure on another official,' or advised 'another official, knowing or intending that such advice [would] form the basis for an 'official act'") (quoting *McDonnell*, 136 S. Ct. at 2372)); *see United States v. Boyland*, 862 F.3d 279, 291–92 (2d Cir. 2017) (expressing "strong support" for the awarding of permits by advising another official that he knew he would look favorably on the permit application constituted exerting pressure on another official). To sweeten the deal, Dimora even offered his help with the mayor's union negotiations—help that was not available before the phone call.

In fact, the government's evidence as to this count was consistent with the government's overall theory of the case; namely, that Dimora used his position as commissioner to take official

---

[5] Dimora assured Fitzgerald that Neiheiser was not one of those people who had grandiose ideas accompanied by big talk but without the resources or means to follow through. (*Id.*)

acts himself—or where necessary to pressure other public officials to take official acts—to benefit his sponsors. Through the evidence gleaned during the FBI investigation, the government told this story again and again during the trial and always with the same result—Dimora received something of value and the sponsor received the benefit of one or more public officials taking official acts on their behalf. Given that Dimora's conduct tied to the JJC and the ice rink still qualifies as official acts after *McDonnell*, this Court does not believe that the instructional error substantially influenced the jury's verdict, nor is the Court left with a grave doubt about the harmlessness of the Court's instruction as to these counts.

c. Conspiracy/Extortion Involving Rybak (Counts 24 and 25)

Count 24 (conspiracy to commit Hobbs Act extortion) and Count 25 (Hobbs Act extortion) involve Dimora's dealings with Rob Rybak, the then-secretary/treasurer of a local plumbers' union. There was evidence at trial that Rybak paid bribes to Dimora in the form of home improvements and restaurant meals in exchange for three acts by Dimora: (1) voting for a raise for Rybak's wife, Linda, who was employed by the county in the Human Resources Department; (2) pressuring county employees to hire Rybak's daughter, Dana, for summer employment; and (3) voting to employ two union plumbers.

The government offered evidence that Rybak sought a raise for his wife because the couple was contemplating a divorce. (Doc. No. 1026, Tr. Jury Trial Vol. 18 (Kelley), at 97–100 ["We need to get [Linda] more money so . . . Rob [would not] get stuck paying a bunch of alimony."].) Dimora took a number of qualifying steps to ensure that the matter was on the BOCC agenda before he ultimately voted in favor of the raise on April 24, 2008. (Doc. No. 1020,

Tr. Jury Trial (Spielmaker), at 204–05; Gov't Ex. 2461 (Agenda Action); Gov't Ex. 2460 (Resolution).) This action qualifies as an official act.

Likewise, the vote to employ two union plumbers also constitutes an official act. At Rybak's request, Dimora voted in favor of appointing two members of Rybak's local plumbers' union as full-time temporary county employees. (Gov't Ex. 2438 (Reference to Executive Session); Gov't Ex. 2442 (Personnel Action); Gov't Ex. 2455 (Resolution). After the vote, Dimora reminded Rybak that he "took care of [him] again today." (Doc. No. 1020, Tr. Jury Trial Vol. 13 (Spielmaker), at 182.)

The third action related to Dimora's efforts to arrange a summer county job for Dana Rybak. Dimora did not want to hire her in his office because Dana's mother already worked there, and Dimora was afraid that people would talk. Therefore, he pressured Kelley into arranging for her hire in the Sanitary Engineer's Office. Kelley testified that it took "mountains" to convince the County Engineer to approve starting Dana earlier than the other summer employees. (Doc. No. 1026, Tr. Jury Trial Vol. 18 (Kelley), at 118.) The pressure Dimora exerted over Kelley was evident in a phone call, wherein he told Kelley,

> If you can't [hire her], tell Pat [Dimora's assistant] we're gonna have to hire her. What else can I do? I can't say no. . . . So I'm going to have to take her if you guys don't take her. . . . I just have no choice. I'll start her tomorrow. What am I gonna do?

(Gov't Ex. 2429-TR.) This pressure on Kelley to convince him to perform (through the County Engineer) the official act of hiring Dana Rybak also qualified as an official action. *See United States v. Fattah*, 914 F.3d 112, 156 (3d Cir. 2018) (hiring specific individual met both steps in *McDonnell's* "official act" analysis); *United States v. Lee*, 919 F.3d 340, 357 (6th Cir. 2019) (pressuring a public official to take an official act constitutes an "official act" as defined by

*McDonnell*). These convictions rest entirely on conduct that survives *McDonnell*; as such, the Court finds that the instructional error did not substantially influence the jury's decision on these counts.

><ins>d.</ins> Conspiracy/Extortion Involving Randazzo (Counts 26 and 27)

Count 26 charged conspiracy to commit Hobbs Act extortion, and Count 27 charged the underlying Hobbs Act violations. Both counts related to the relationship between Dimora and businessman Charlie Randazzo. In these counts, the government offered evidence showing that Dimora received things of value from Randazzo in the form of food, meals, wine, sporting event tickets, and outdoor furnishings in exchange for helping Randazzo's company obtain workers compensation contracts with public entities, including the county. Randazzo explained that he paid the bribes to Dimora and Russo because "they helped me; I helped them." (Doc. No. 1038, Tr. Jury Trial Vol. 25 (Randazzo), at 227–28.)

It was the government's position that two official acts supported these counts. First, the government offered evidence that Randazzo informed Dimora that he was encountering difficulties reaching the director of the Northeast Ohio Regional Sewer District, Julius Ciaccia, to pitch his company's deferred compensation product. On February 15, 2008, Dimora called Ciaccia in Randazzo's presence, saying

>I was hoping you could do me a favor. I gotta good friend of mine that has a deferred comp program that does, uh[,] deferred comp for the County. . . . It's called Financial Network of America and they wanted to come out and meet with you to talk to you about the Regional Sewer employees, you know, possibly giving them an option for deferred comp program. . . . You know [the County Prosecutor's] in it, in this program. I'm in it. Frank Russo. We're all in this. ***I mean, to me, it's offered a better financial reward.*** And, again, it's optional for your employees as you know. . . . I just wanted him [Randazzo] to say hi to you and maybe you guys could, uh, swap phone numbers or he could set somethin' up . . . . He's got a

> meeting set up to do Cleveland's. . . . Marty Sweeney's [Cleveland City
> Council Member] helpin' him get that set up.

(Gov't Ex. 2601-TR) (emphasis added). Dimora then put Randazzo on the phone, who continued to promote the product, mentioning Dimora and the county in the process. (Doc. No. 1038, Tr. Jury Trial Vol. 25 (Oliver), at 168, 199; *id.* (Randazzo), at 224, 250–51.) Dimora later made efforts to have his staff get contact information to Randazzo so that he could follow up when Ciaccia did not immediately get back to him.

The evidence at trial established that Dimora did much more than simply place a phone call, set up a meeting, or offer an opinion on Randazzo's behalf. Rather, his "strong support" for Randazzo and his company's deferred compensation product was clearly offered and intended to exert pressure on Ciaccia to perform the official act of buying into the program. *See Miserendino*, 307 F. Supp. 3d at 492 (quoting *McDonnell*, 136 S. Ct. at 2372); *see Boyland*, 862 F.3d at 291–92.

Randazzo also asked Dimora for assistance in meeting with the Mayor of Beachwood because he was trying to pick up the City of Beachwood as a customer. In much the same way that he assisted Randazzo with Ciaccia, Dimora agreed to help land this client as well, and set up a dinner meeting with Randazzo, the mayor, himself, Russo, Gabor, and others. During the meeting, Dimora touted Randazzo's product, underscoring the fact that the county was a customer. (Doc. No. 1038, Tr. Jury Trial Vol. 25 (Randazzo), at 222–23.) Once again, Dimora did more than simply set up a meeting and leave Randazzo to fend for himself. He provided strong support for Randazzo's deferred compensation product at the meeting, with the expectation that the Mayor of Beachwood would rely on that support to take an official action that would benefit Dimora's bribe payor. *Cf. McDonnell*, 136 S. Ct. at 2374 (McDonnell's

23

subordinates testified that McDonnell merely asked them to attend meetings and did not expect them to do anything beyond that). Moreover, like he did with the sewer district director, Dimora touted the product and offered the mayor advice knowing or intending that the advice would form the basis for the mayor's decision. *See Menendez*, 291 F. Supp. 3d at 619 ("[P]roviding advice can be an official act only when the official 'know[s] or intend[s] such advice [will] form the basis for an 'official act.'") (alterations in original) (quoting *McDonnell*, 136 S. Ct. at 2371). These counts also rest on post-*McDonnell* official acts, and any error in the instructions as to "official acts" did not have had a substantial and injurious effect on the verdict.

### 2. *Mixed Official Acts and Other Acts Counts*

With respect to the remaining counts under consideration, the government offered evidence at trial of at least some conduct that arguably would no longer satisfy the *McDonnell* definition of "official act." According to Dimora, "[c]ourts have uniformly held that, where there is evidence of both unofficial and official acts under such an instruction, the convictions must be vacated[.]"[6] (Doc. No. 1222 at 10) (citing *United States v. Silver*, 864 F.3d 102 (2d Cir. 2017) and *United States v. Skelos*, 707 F. App'x 733 (2d Cir. 2017)). Yet, the cases relied upon by Dimora—*Silver* and *Skelos*—involved harmless error reviews on direct appeal, whereas this

---

[6] In a similar vein, Dimora argues that "[w]here the 'verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected, the verdict should 'be set aside.'" (Doc. No. 1222 at 10 (quoting *United States v. Palazzolo*, 71 F.3d 1233, 1236 (6th Cir. 1995) (quoting *Yates v. United States*, 354 U.S. 298, 312, 77 S. Ct. 1064, 1 L. Ed. 2d 1356 (1957))). In so arguing, Dimora seeks to invoke the language utilized in *Yates*. However, the Supreme Court in *Hedgpeth* subsequently abandoned the "impossible to tell" standard (referred to as the "absolute certainty" standard) for a harmless error analysis. *See Hedgpeth v. Pulido*, 555 U.S. 57, 61, 129 S. Ct. 530, 172 L. Ed. 2d 388 (2008) ("An instructional error arising in the context of multiple theories of guilt" does not "vitiate[] *all* the jury's findings.") (emphasis in original); *see also Granda v. United States*, 990 F.3d 1272, 1294 (11th Cir. 2021) ("[I]t is proper to look at the record to determine whether the invalid predicate actually prejudiced the petitioner—that is, actually led to his conviction—or whether the jury instead (or also) found the defendant guilty under a valid theory. Limiting harmless error review to the invalid basis alone . . . would in this case effectively entitle Ganda to review if the jury may have relied on the invalid predicate to convict.").

Court's harmless error review is conducted on collateral review. In order to obtain collateral relief under § 2255, a movant must clear a significantly higher hurdle than would exist on direct appeal. *United States v. Frady*, 456 U.S. 152, 166, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982)  As previously observed, this Court applies the less-stringent *Kotteakos* "substantial and injurious effect" standard applicable for collateral review. *See Brecht*, 507 U.S. at 623 ("The *Kotteakos* harmless-error standard is better tailored to the nature and purpose of collateral review than the *Chapman* standard, and application of a less onerous harmless-error standard on habeas promotes the considerations underlying our habeas jurisprudence.").

        a.      Extortion Involving Kleem (Count 7)

The Court, therefore, turns to the remaining counts and considers the acts supporting these claims in the context of the more forgiving standard that takes into consideration "all that happened" with respect to these counts. *See Kotteakos*, 328 U.S. at 765. Count 7 (Hobbs Act extortion) related to the various schemes involving Ferris Kleem and his companies, including the Coe Lake grant, the JJC project, the project covering the resurfacing of Snow Road, and the enrollment of Kleem's employees in Russo's son's businesses. (*See* Doc. No. 444 (Indictment), at 30–55.)

  The government offered at trial testimony, wire taps, and documentation relating to the county's plan to build the new JJC, as well as the interest of Kleem and other sponsors in obtaining JJC construction contracts. In exchange for the Las Vegas trip and other things of value, Dimora agreed to award one of the contacts to Kleem if he was the low bidder. (Doc. No. 1014, Tr. Jury Trial Vol. 7 (Kleem), at 102–03.) In addition to ultimately casting a vote in favor of awarding the contract to Kleem's company (Doc. No. 1012, Tr. Jury Trial Vol. 5 (Massie), at

28), the government identified several official acts taken by Dimora in connection with this scheme, including voting to throw out all of the original bids, which permitted Kleem, whose bid had been rejected because of a problem with his bond, an opportunity to rebid for the project. (*Id*. at 27, 88.) Additionally, on April 3, 2008, two days before the Las Vegas trip, Dimora voted to request an addendum increasing the general trades estimate, a result that would ultimately benefit Kleem's company. (*Id*. at 51–52.)

Also associated with the JJC scheme, there was testimony that, on April 7, 2008, after Kleem learned that he was only the second lowest bidder on the project, Dimora called his executive assistance, Pat Smock, in an effort to determine if the low bidder (Panzica) could be excluded. Through the efforts of Smock, at the direction of Dimora, Panzica's bid was disqualified leaving the way clear for Dimora to vote in favor of awarding a 4.5 million dollar cement contract to Phoenix Cement, one of Kleem's companies. (*Id*. at 86–91, 104–05, 128–30; Gov't Ex. 400-CC-TR; Gov't Ex. 400-FF-TR; Gov't Ex. 400-NN-TR.) These acts were qualifying steps on a matter that would ultimately come before Dimora for a vote. They were, along with the votes cast by Dimora, official acts under *McDonnell*.

There were also numerous official acts identified in connection with the Coe Lake grant. As previously discussed, the evidence demonstrated that Dimora did more than contact a subordinate and share a favorable opinion about the grant. He pressured Nichols to reexamine her rejection of the grant, which led to ensuring that the grant proposal would make its way onto the BOCC's agenda for a vote. Exerting pressure on other officials to keep projects moving forward "when other projects would have stopped[,]" qualifies as an official act. *See, e.g., United States v. Jefferson*, 289 F. Supp. 3d 717, 742 (E.D. Va. 2017) (testimony that the congressman's

"continuing interest" forced other officials "to continue to look at that project in new lights to come to a conclusion that we could move forward") (citing record); *see Skelos*, 707 F. App'x at 739 ("Using one's influence as a high ranking state official to push through county legislation and to bestow a county-issued contract are indisputably formal exercises of governmental power constituting official acts under *McDonnell*." (citing *McDonnell*, 136 S. Ct. at 2372).

The government also presented evidence that Dimora performed various official acts for Kleem relating to the Snow Road construction project and a smoking citation issued against a restaurant associated with Kleem. Leading up to Dimora casting a vote to approve a nearly 3 million dollar contract for the resurfacing of Snow Road to Kleem's company (Gov't Ex. 400-VV (Agenda Action); Doc. No. 1013, Tr. Jury Trial Vol. 6 (Massie), at 11–12), Dimora pushed to have a particular county inspector, John Chyla, assigned to the project. Kleem testified that having the right inspector on the job had a significant impact on the amount of profit that could be realized on a project. The evidence at trial demonstrated that Dimora, through two intermediaries, Kevin Kelley and Kevin Payne, coerced Mike Dever, the County Engineer's Office supervisor, to assign Chyla or else Dimora would call Dever's boss, County Engineer Bob Klaiber. (Gov't Exs. 400-OO-Tr; 400-QQ-TR; 400-TT-TR; 400-UU-TR; Doc. No. 1026, Tr. Jury Trial Vol. 18 (Kelley), at 25–28.) At the same time, Payne, Dever's supervisor, was soliciting assistance from Dimora to increase the salary of Klaiber—an action that would have required a vote of the commissioners. (Gov't Exs. 513-TR, 820-TR; Doc. No. 1026, Tr. Jury Trial Vol. 18 (Kelley), at 39.) Dever ultimately assigned Chyla to the project, an assignment he testified that

he would not have made but for Dimora's pressure. (Doc. No. 1015, Tr. Jury Trial Vol. 8 (Dever), at 258–63.)[7]

Dimora also utilized his influence and power to favorably resolve a smoking violation issued against a restaurant owned by Kleem's brother. Kleem asked Dimora to "intervene" with the smoking violation, and Dimora contacted the public official listed on the citation, Terrance Allen. In a recorded conversation, Dimora asked Allen to "intervene" on the citation and take another look at it. During the conversation, Dimora acknowledged that Allen was the official who would decide whether there was a violation. Emphasizing that Kleem was a friend, a good guy, and a big contractor for the county, he noted that Kleem's cousin had just been elected mayor of the city in which the restaurant was located and a violation could hurt his reputation. He told Allen that he was personally at the restaurant on the night in question, and that, based on his own understanding of the law, there was no violation, noting that the covered patio was in the same location as the summer open air patio. He also insisted that he did not smell any smoke in the restaurant. He suggested that perhaps the investigator was simply being "aggressive." Allen agreed to sort it out, and, following the phone call, the violation was closed. (Gov't Ex. 400-K-TR; Doc. No. 1010, Tr. Jury Trial Vol. 4 (Massie), at 268–72.) In a subsequent conversation with Kleem, Dimora asked Kleem how "that thing worked out for you with the board" referring to the smoking violation, and added that "he wanted to make sure that [Allen] treated [Kleem] right." (Doc. No. 1014, Tr. Jury Trial Vol. 7 (Kleem), at 90–92.) The men then discussed the planned Las Vegas trip that Kleem was bankrolling. (Gov't Ex. 400-L-TR.) Once again, the evidence

---

[7] In fact, Dever testified that he had already assigned another inspector, Todd Zima, but he made the switch because Kelley "invoked the commissioner's name, Commissioner Dimora's name, saying that he [Dimora] would contact my boss, Robert Klaiber, if I could not get John Chyla moved over to that project." (*Id.* at 259.)

established that Dimora used his influence to pressure another public official to take an official action. *See McDonnell*, 136 S. Ct. at 2371.

The next set of actions related to a contract to build a taxiway at Cleveland Hopkins Airport. Kleem was pursuing the $4.2 million contract on behalf of one of his companies, Blaze Construction. Dimora would ultimately vote to award the contract to Blaze, and his vote would qualify as an official act. There was also testimony, however, that prior to the vote, Dimora agreed to contact Cleveland Council President Martin Sweeney to get him to push for an update on the status of the contract. In the recorded conversation that followed, Sweeney promised Dimora that he could "figure it out" for Dimora's "good friend," Ferris Kleem. (Gov't Ex. 101-TR). Sweeney then told Kleem to "tell the illustrious commissioner [Dimora] I appreciate the opportunity to have this time with you, Ferris Kleem", noting that the "commissioner always delivers." (*Id.*)

At first blush, this exchange could be viewed as merely a public official's efforts to get an update for a constituent. But in a follow-up phone conversation with Dimora, Sweeney acknowledged that, even though Kleem was likely to have gotten the contract, Dimora certainly had "helped deliver" the award by contacting Sweeney. (Gov't Ex. 102-TR.) Sweeney explained that he [Sweeney] made some inquires regarding the contact that proved "helpful" and, more importantly, sent the message that the officials associated with this project should not drag their feet. (*Id.*) He went on to tell Dimora that, because he and Dimora got involved, Dimora "could take credit for puttin' it together." (*Id.*) Again, this scheme demonstrated how Dimora used his position and clout to influence the official actions of other public officials and, because the government tied these actions to the taking of unlawful bribes, his conduct violated the Hobbs

Act, even after *McDonnell*. *See Lee*, 919 F.3d at 357 (finding that county councilman's telephone call to a local prosecutor constituted an attempt to influence the prosecutor and, when viewed with other evidence, established a *quid pro quo* arrangement, as clarified by *McDonnell*).

The final act offered in support of Hobbs Act Extortion in Count 7 involved Kleem's difficulties with First Energy, a private utility company. The evidence at trial demonstrated that, in 2007, Kleem was experiencing delays in establishing utility service for one of his construction projects. He asked Dimora to intervene, and Dimora directed Kevin Kelley to call Doug Hogan at First Energy to expedite the service as "a personal favor to Commissioner Dimora[.]" (Doc. No. 1016, Tr. Jury Trial Vol. 9 (Hogan), at 7–10; Doc. No. 1022, Tr. Jury Trial Vol. 16 (Kelley), at 16–17.) Hogan would testify at trial that, following the call from Kelly, he made sure that service was expedited. (Doc. No. 1016, Tr. Jury Trial Vol. 9 (Hogan), at 7–10.)

In her closing argument, the government's attorney argued that calling businessmen "was part of the [commissioner's] job duties," and she identified the phone call Kelley placed to First Energy as an official act. The government now argues that the call "constituted evidence of Dimora's agreement to perform official acts in exchange for things of value from Kleem and his resulting pattern and practice in light of those corrupt agreements." (Doc. No. 1221 at 22.) According to the government, "[t]hat corrupt agreement sufficed irrespective of whether the call itself properly constituted a qualifying step to an official act" concerning First Energy. (*Id.*)

The Court does not believe that, in the wake of *McDonnell*, this phone call would constitute an official act. There was no evidence that Hogan, a private businessman, was pressured by Dimora to restore utility service. Nor was there any evidence at trial to suggest that this call represented some type of qualifying step leading to the eventual exercise of an official

act.[8] While evidence of the other actions taken—voting to award and/or manipulating the award of contracts and grants, pressuring public officials to fix a smoking violation—still qualify as official acts, there was no evidence that this call rose above the level of a "conscientious" public official making an inquiry on behalf of a constituent. *See McDonnell*, 136 S. Ct. at 2372 ("The basic compact underlying representative government *assumes* that public officials will hear from their constituents and act appropriately on their concerns—whether it is the union official worried about a plant closing or the homeowners who wonder why it took five days to restore power to their neighborhood after a storm.") (emphasis in original).

Nevertheless, the Court is not left with a grave doubt that the conviction in Count 7 rests on conduct that no longer qualifies as an official act. The First Energy call was a footnote in the overall story that surrounded Count 7. Indeed, there was abundant evidence that Dimora committed numerous official acts in support of this scheme. Given the totality of evidence offered in support of this count, the Court and finds that the instructional error was harmless.

Moreover, the jury unanimously found Dimora guilty of substantive Counts 5 and 6, both charging bribery concerning programs receiving federal funds. Count 5 charged bribery concerning the Kleem-based schemes involving Coe Lake (Doc. No. 444 ¶ 187), and Count 6 charged bribery concerning the JJC project, the Snow Road project, and smoking violation. (*Id.* ¶ 190.) As set forth above, these schemes were all supported by official acts that survived *McDonnell*, and they were specifically identified as part of the conduct that formed the basis for

---

[8] In its opposition to Dimora's motion, the government argued that "[i]t would have been reasonable for Hogan to conclude that if Hogan had refused to expedite the service, [Dimora] would probably have changed or delayed his vote [for First Energy], just as he did when he pulled a Michael Baker Group matter from the commissioners' agenda as a result of Michael Baker Group refusing to buy a table at a Democratic fundraiser." (Doc. No. 1182 at 68–69, citations omitted.) Such an argument is steeped in speculation and assumes facts that were unknown to Hogan, a private businessman with no known familiarity with the inner workings of county government.

the Hobbs Act violation set forth in Count 7. Because it is crystal clear that Dimora's conviction on Count 7 is predicated on the commission of acts that meet the *McDonnell* definition, the erroneous instruction did not have a substantial and injurious effect on the verdict on this count.

      b.      Schemes Involving Pumper (Counts 20–21)

A similar result is warranted for Counts 20–21. These counts relate to bribes Steve Pumper paid to Dimora in the form of cash, home improvements, sport tickets, dinners, and the promise of a percentage of profits from a business venture in exchange for action taken on numerous business projects and personal matters. The government offered substantial evidence at trial as to Pumper's many projects and concerns, as well as the official actions Dimora took on Pumper's behalf. Specifically, there was evidence that Dimora agreed to, and did, cast at least six votes to either award various contracts to Pumper's companies or, in some instances, to reject the slate of bids to give Pumper's companies a second chance to bid. (Doc. No. 1038, Tr. Jury Trial Vol. 25 (Oliver), at 79–80; Gov't Exs. 1700-A (Agenda Action), 1700-B (Resolution); Doc. No. 1037, Tr. Jury Trial Vol. 24 (Oliver), at 113; Gov't Ex. 2827; Doc. No. 1012, Tr. Jury Trial Vol. 5 (Massie), at 25–26, citing Gov't Ex. 400-R-1 (Agenda Action)); Doc. No. 1037, Tr. Jury Trial Vol. 24 (Oliver), at 114; Gov't Ex. 1700-N (Agenda Action); Gov't Ex. 1700-D (Agenda Action).) There was also considerable evidence showcasing Dimora's efforts to push along Pumper's various business projects—at each step of the process—performing essential qualifying acts that would ensure that he could ultimately have the opportunity to cast a vote that would repay Pumper for his bribes. (*See, e.g.,* Doc. No. 1034, Tr. Jury Trial Vol. 21 (Pumper), at 225–27; Doc. No. 1035, Tr. Jury Trial Vol. 22 (Pumper), at 13–15; Doc. No. 1030, Tr. Jury Trial

Vol. 32 (Maldonado), at 30, 62; Gov't Ex. 1700-CC-TR; Gov't Ex. 1700-EE-TR; Gov't Ex. 1700-GG-TR; Gov't Ex. 1709.)

The government also offered evidence that Dimora pressured other public officials to perform official acts in connection with Pumper's businesses, his children, and his involvement in certain civil litigation, including evidence that Dimora pressured Common Pleas Judge Bridget McCafferty to expedite a settlement between Pumper and the Cleveland Browns over a contract dispute at terms acceptable to Pumper. (Doc. No. 1035, Tr. Jury Trial Vol. 22 (Pumper), at 59–69; Gov't Ex. 17700-VV-TR; Gov't Ex. 1700-XX-TR.) Judge McCafferty was charged for her involvement in this scheme in the same indictment charging Dimora and was eventually convicted of lying to the FBI.[9]

Of the schemes charged relating to Counts 20–21, only one gives the Court pause in light of *McDonnell*. In spring 2008, Pumper was working with developer, Harvey Oppmann, to renovate two buildings in Cleveland. Oppmann was looking to the Federal Department of Housing and Urban Development ("HUD") for the financing. DAS, one of Pumper's family's companies, stood to receive millions in revenue from the renovations, but the HUD financing had to come first. Pumper asked Dimora to call a United States senator in an attempt to exert pressure on HUD to move the process along in Washington. On April 7, 2008, Dimora placed the call through his assistant, and put Pumper on the phone so he could plead his case with the

---

[9] The evidence at trial demonstrated that Dimora pressured Judge McCafferty to resolve litigation involving Pumper quickly and in a way favorable to Pumper. During a fundraiser, Dimora instructed Judge McCafferty to "get this thing done" and, "[y]ou got to get a handle on it," referring to Pumper's civil lawsuit. (Doc. No. 1039, Tr. Jury Trial Vol. 26 (Russo), at 148.) Pumper also testified that he had Dimora call the judge to "see if he [couldn't] push this thing along, get this thing done, and hopefully drive the difference of price of what [the subcontractor] was asking for versus where we were at." (Doc. No. 1035, Tr. Jury Trial Vol. 22 (Pumper), at 59.) In a subsequently captured *ex parte* call to Pumper that was played at trial, Judge McCafferty detailed her efforts to resolve the lawsuit at an amount acceptable to him. (Gov't Ex. 1700-XX-TR.)

senator. (Doc. No. 1035, Tr. Jury Trial Vol. 22 (Pumper), at 74–78, 80–81; Gov't Ex. 1710-TR.)

Here, the evidence established that Dimora did little more than help Pumper get in contact with the right public official. There was no evidence that, in this instance, Dimora exerted or attempted to exert any pressure on the senator or on anyone associated with HUD funding. This act, alone, would not support a Hobbs Act violation regarding this particular scheme.

But the fact remains that eight of the nine sub-schemes charged in these counts were firmly supported by conduct that still qualifies as official acts post-*McDonnell*. As a result, Dimora's convictions on these counts are *fundamentally* factually different from *Silver* where most of the actions offered at trial no longer qualified as "official acts" post- *McDonnell*.[10] *See Silver*, 864 F.3d at 120 (Of the acts charged as official acts under the relevant bribery statutes, "only the Assembly resolution clearly remains an 'official act' under *McDonnell*.") Under these circumstances, the Court finds that the instructional error did not have a substantial and injurious effect or influence on the jury's verdict on these counts, and the Court is not left with a grave doubt as to the harmlessness of the error; there is no basis to vacate the convictions.

c.     Extortion Involving Valentin (Count 11)

Count 11 (Hobbs Act Extortion) related to bribes Dimora received from a local businessman, John Valentin. Valentin testified that he and his company—Salva Stone—supplied free granite countertops, valued at $3,250, for Dimora's home because "I was thinking in the

---

[10] As alluded to earlier, they are also *procedurally* different as they are evaluated under the "less onerous" harmless error standard applied to cases on collateral review. *Brecht*, 507 U.S. at 623.

future maybe I will have some—if I need some help from [Dimora] I can get some favors. . . . [I]f I make him a favor, I'm going to get a favor back in the future. If I have a problem, I can have a door open to him to ask him for help if I need help." (Doc. No. 1036, Tr. Jury Trial Vol. 23 (Valentin), at 178, 194.)

Valentin did solicit Dimora's help with two matters, both of which, the government contended at trial, involved official acts. First, Dimora voted to approve funds so that Russo could create a foreclosure department and hire Valentin's daughter. She had been unhappy working in the county prosecutor's office and wanted to change jobs. (*Id*. at 172; Doc. No. 1039, Tr. Jury Trial Vol 26 (Russo), at 175–76.) The vote certainly qualifies as an official act.

The second act involved Dimora's efforts to encourage a United States senator to intervene with federal officials to expedite the issuance of two VISAs, including a VISA for a Romanian friend who wanted to enter the United States. Russo testified that Dimora directed him to contact an associate of Senator George Voinovich. Russo told the senator's former-aide that Dimora "really wants this done bad. So do I. It would be a big favor to us. I hope you can accommodate us." (Doc. No. 1039, Tr. Jury Trial Vol. 26 (Russo), at 178.) Senator Voinovich (who was then on the Foreign Relations Committee) wrote to the United States embassy in Bucharest seeking the VISA stating that he was doing so on behalf of Dimora. (Doc. No. 1036, Tr. Jury Trial Vol. 23 (Valentin), at 195; Doc. No. 1038, Tr. Jury Trial Vol. 25 (Oliver), at 31; Gov't Exs. 1002, 1003.)

Citing *Silver*, Dimora argues that the senator's letter writing in support of a VISA application does not constitute an official act under *McDonnell*, and Dimora cannot, therefore, be liable under the Hobbs Act for pressuring a public official to take an official act. (Doc. No. 1222

at 16.) In *Silver*, a state legislator was convicted on Hobbs Act (and other fraud) charges relating to two criminal schemes in which he received referrals to his law firm in exchange for alleged official acts. Following the ruling in *McDonnell*, the Second Circuit found that his act of sending a letter on his official letterhead recommending a co-conspirator's son for a job with a non-profit organization did not rise to the level of an official act because the use of the letterhead is not a formal exercise of power. *Silver*, 864 F.3d at 120.

In turn, the Court believes that the senator's letter "respectfully requesting that" a VISA application issue "if appropriate under US laws and regulations" would not constitute an official act. (Gov. Ex. 1002; Gov. Ex. 1003.) In the letter, written on his official letterhead, Senator Voinovich did little more than request that the applications issue if appropriate and indicate that he was making the request "on behalf of a constituent, Jimmy Dimora, Cuyahoga County Commissioner[.]" (*Id.*) Because the writing of such a letter was well within the permissible scope of routine assistance a "conscientious public official" might extend to a constituent, it does not constitute official action. *See McDonnell*, 136 S. Ct. at 2372. And because the senator did not perform any official acts, Dimora could not have exerted pressure on the public official to perform an official act in violation of the Hobbs Act. *See Silver*, 864 F.3d at 120. *Cf. Menendez*, 291 F. Supp. 3d at 617 ("There is available evidence that, with regard to the visas, Menendez by

phone call or by correspondence interceded with appropriate State Department officials to obtain favorable consideration of visa applications made by [Menendez's co-defendant] friends.")[11].

But this conclusion does not end the inquiry as to Count 11. Even though the Court now finds that one of the two sub-schemes charged in this count involved conduct that arguably would no longer qualify as an "official act", it concludes that the error was harmless. The jury heard evidence that Dimora voted to approve the funds so that Frank Russo could create a job—and, in fact, an entire department—in his office for Valentin's daughter, and this conduct was consistent with other votes Dimora took to fund positions or raises to benefit his sponsors and their families. (*See, e.g., supra,* Counts 24 and 25 (Votes for a raise for Rob Rybak's wife and for the employment of two union plumbers).) Given that there is no question that the remaining "official act" survives a post-*McDonnell* analysis, the Court is not left with "grave doubt" as to the harmlessness of the error. Because the Court does not believe that the instructional error substantially influenced the jury's verdict as to Count 11, Dimora's motion as to this count is denied.

d.     Schemes Involving Zavarella (Counts 12 and 13)

The final relationship between Dimora and a business associate that formed the basis for Hobbs Act charges (Count 12 [conspiracy to commit Hobbs Act extortion], Count 13 [Hobbs Act extortion]) related to Nicholas Zavarella. It was the government's theory that Zavarella paid

---

[11] While the Court finds that Senator Voinovich did not take an "official act", there is at least an argument to be made that Dimora pressured Russo who, in turn, pressured the senator's aide in the hopes that the senator would try to sway the outcome of the visa application. As the Sixth Circuit observed in its decision on direct appeal, Russo did much more than request that the senator look into the status of the pending visa matter. Instead, in his phone call, Russo pressured the senator aide's by stressing that Dimora "really want this done bad" and that he hoped the senator could "accommodate us." Both the pressure Dimora exerted on Russo and the pressure Russo exerted on the aide would constitute "official acts" (or at least qualifying steps) in a post-*McDonnell* analysis. Nevertheless, because the government focused at trial on the letter, itself, which was nothing more than a courtesy permissibly extended by a conscientious legislator, the Court concludes that this count only contained one qualifying official act.

Dimora bribes in the form of home improvements in exchange for access to Dimora's influence as commissioner. In its closing argument, the government identified five official acts: (1) recommending Zavarella's daughter for a position with the county, (2) pressuring the Parma School Board to hire Zavarella's daughter as a substitute teacher, (3) pressuring Russo to hire Lillian Trovato, (4) recommending Zavarella's daughter for a position with the Bedford School District, and (5) obtaining an update on a county contract. Two of the five acts qualify as official acts under *McDonnell*, but the Court finds that three do not.

When Dimora approached Kelley about securing a teaching position for Zavarella's daughter, Lauren, with the Parma City Schools, and instructed Russo to hire Zavarella's neighbor, Lillian Trovato, he pressured other public officials to perform official acts. Two years after Zavarella built columns on Dimora's patio at no charge, Kelley testified that Dimora asked him to find Lauren a teaching position with the Parma City schools. Kelley explained that the "superintendent had the ultimate power to hire or fire teachers. But as a school board member, the superintendent worked for the school board and [Kelley] had a lot of influence over the superintendent at the time." (Doc. No. 1026, Tr. Jury Trial Vol. 18 (Kelley), at 92; *see* Doc. No. 1038, Tr. Jury Trial Vol. 25 (Oliver), at 24–25.) At Dimora's direction, Kelley used that influence to request that the superintendent hire Lauren, which she did. (*Id.*)

Similarly, in summer 2007, the same year Zavarella worked on Dimora's outdoor kitchen expansion at no charge, he asked Dimora to help his neighbor, Trovato, obtain county employment. (Doc. No. 1039, Tr. Jury Trial Vol. 26 (Russo), at 216.) This time Dimora turned to Russo, who, in turn, hired Trovato in the Auditor's Office. Russo testified that he "hired [Trovato] because [Dimora] asked [him] to hire her." (*Id.*) In each of these instances, Dimora

38

influenced or pressured other public officials, either directly or indirectly, to perform the official act of hiring someone.

The evidence relating to the two other employment opportunities was materially different. Zavarella testified that, in 2002, the same year he built a retaining wall on Dimora's property at no charge, he asked Dimora to help Lauren obtain a county job by "put[ting] in a good word." (Doc. No. 1037, Tr. Jury Trial Vol. 24 (Zavarella), at 10.) There was no testimony regarding what actions Dimora did in this regard, or who was responsible for the hiring decision, but Lauren was successful in securing county employment. (*Id.*) Then, in 2007, the same year he worked on Dimora's outdoor kitchen expansion at no charge, Zavarella asked Dimora to recommend Lauren for a teaching position with Bedford City Schools. The record reflects that Dimora wrote Lauren a letter of recommendation on his commissioner letterhead. (*Id.* at 12; Doc. No. 1038, Tr. Jury Trial Vol. 25 (Oliver), at 24.) Zavarella believed that the letter "helped" Lauren secure a teaching position with Bedford. (Doc. No. 1037, Tr. Jury Trial Vol. 24 (Zavarella), at 12.)

The government argues that both instances represent additional times that Dimora used his influence in order to pressure other public officials to take official action, but the record does not establish that Dimora did anything more than express his opinion about a possible hire. *See Jefferson*, 289 F. Supp. 3d at 739 (writing a letter on official letterhead, standing alone, is insufficient to satisfy the exertion of "pressure" requirement); *see also Silver*, 864 F.3d at 122 (expressing an opinion on a matter of public concern did not constitute an official action). There was no evidence that any public official was pressured because Dimora intervened. In fact, the Bedford superintendent testified simply that they [school district personnel] appreciated

receiving letters of recommendation from people they respected, and that such a letter might get a candidate a courtesy interview, but that the candidate would still have to stand on her merits against the other applicants. (Doc. No. 1029, Tr. Jury Trial Vol. 31 (Micsak), at 77.)[12] Absent evidence that Dimora exerted any pressure on another public official, Dimora's efforts to put in a good word for Zavarella's daughter amounted to nothing more than "speaking with interested parties" or "expressing support" for a certain issue, and, without more, does not qualify as an official act, even if it is tied to a pending question or matter. *See McDonnell*, 136 S. Ct. at 2370–71.

Likewise, the last identified action no longer qualifies as an official act after *McDonnell*. In 2008, Zavarella asked Dimora to determine the status of certain proposed county projects. The evidence established that Dimora asked his assistant to "snoop" around, and his assistant was able to confirm that the plans to build an eastside neighborhood service center were still in the works. (Gov't Ex. 1201-TR; Gov't Ex. 1203-TR; Gov't Ex. 1204-TR.) The government argues that Dimora's efforts to obtain inside government information for Zavarella constituted an essential qualifying step in Zavarella eventually obtaining the contract. The Court disagrees, as there was no evidence that this information was essential, necessary, or factored in any way into the eventual award of the contract. Instead, it merely represents an inquiry made in response to a concern of a constituent. While that inquiry may have been prompted by a bribe, it does not violate the Hobbs Act.

---

[12] The superintendent further testified that they preferred to receive letters of recommendation from people who had professional experience over a letter writer who, like Dimora, was really serving as a character witness. (*Id*. at 82–83.)

40

Having determined that three of the five *quid pro quo* actions no longer qualify as official acts, the Court must determine whether the Court's erroneous instruction substantially influenced the jury's decision as to these counts. *See Dimora*, 973 F.3d at 505 (quoting *O'Neal*, 513 U.S. at 436). Much of the testimony and evidence offered in support of the substantive count involved the three non-official actions. Further, in her closing argument, the government's attorney discussed the link between these non-official acts and the things of value that were offered by Zavarella. (Doc. No. 1045, Tr. Jury Trial Vol. 36 (Closing Arguments), at 68.) In rebuttal, the government's attorney re-emphasized the value of Dimora's offers to write letters and obtain contract updates. (Doc. No. 1046, Tr. Jury Trial Vol. 37 (Rebuttal), at 144 [Zavarella's daughter's "resume, she gets a courtesy interview. She goes to the top of the stack. So sending that letter has a lot of value to Mr. Zavarella."], 145–46.) And while the Court gave limiting instructions that cautioned the jury against convicting based on gifts given "with the sole motive of cultivating friendship" (Doc. No. 735-1, Jury Instructions, at 22–24), the government also argued that the alleged bribes could not be merely acts of friendship because Dimora later attempted to generate phony invoices and checks to cover them up. (*See* Doc. No. 1045, Tr. Jury Trial Vol. 36 (Closing Arguments), at 69–71, 83–85.)

Given that several of the sub-schemes identified in this scheme no longer qualify as "official acts" under *McDonnell*, this jurist believes that the "matter is so evenly balanced" that she finds herself in "virtual equipoise as to the harmlessness of the error." *O'Neal,* 513 U.S. at 438; It will, therefore, err on the side of caution and conclude that the instructional error substantially influenced the jury's decision as to these counts. Accordingly, Dimora's motion as to Counts 12 and 13 is granted, and the Court vacates the convictions on these counts.

### C.   Cumulative Effect

In his § 2255 motion, Dimora argued that the district court "also erred by excluding Mr. Dimora's ethics reports, and that error compounded the prejudice caused by the faulty jury instructions." (Doc. No. 1162-1 at 25.) He noted that the Sixth Circuit previously determined that the ethics reports were not hearsay but did not reach the district court's alternative reasons for excluding the documents, including its concern under Fed. R. Evid. 403 that admission of the reports would be unduly prejudicial and result in jury confusion. (*Id.*) Dimora argued that this Court erred in its Rule 403 analysis and that this alleged error, when coupled with the faulty jury instruction on "official acts," resulted in cumulative error that infected the entire trial. (*Id.*)

"In order to obtain a new trial based upon cumulative error, a defendant must show that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair." *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004) (citing *United States v. Parker*, 997 F.2d 219, 221 (6th Cir. 1993)). The Sixth Circuit directed this Court to address Dimora's cumulative error argument, including the question of whether such relief is even available on collateral review, after it completed its harmless error analysis. *Dimora*, 973 F.3d at 507.

The Sixth Circuit has previously determined that "cumulative error claims are not cognizable on habeas [review] because the Supreme Court has not spoken on this issue." *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006) (citing *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005)). The Court believes, and other courts have concluded, that similar "relief under § 2255 is not available on a claim of cumulative error." *See United States v. Watson*, No. 1:15-cr-113, 2020 WL 3071788, at *5 (S.D. Ohio June 10, 2020) (quoting, among authority,

*Moreland v. Bradshaw*, 699 F.3d 908, 931 (6th Cir. 2012) ("[P]ost-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief.")); *see, e.g., United States v. Brown*, 528 F.3d 1030, 1034 (8th Cir. 2008) (rejecting cumulative error claim on motion to vacate and noting that the Eighth Circuit has "repeatedly rejected the cumulative error theory of post-conviction relief") (citation omitted); *see also Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) (cumulative errors claims are not cognizable on habeas review). Further, as the Sixth Circuit observed, even if such relief were available for certain claims, it would likely be unavailable here, where one of the two errors Dimora seeks to cumulate was an alleged evidentiary error. *See Dimora*, 973 F.3d at 507 (citing *Davis v. United States*, 417 U.S. 333, 346, 94 S. Ct. 2298, 41 L. Ed. 2d 109 (1974) (holding that non-constitutional claims are cognizable under § 2255 only if "the claimed error . . . [is] a fundamental defect which inherently results in a complete miscarriage of justice.")).

And even if the Court considered the cumulative error claim on its merits, Dimora would not be entitled to relief. As previously noted, the Sixth Circuit did not even reach many of this Court's reasons for excluding the evidence. In addition to hearsay concerns, this Court found that the ethics reports were subject to exclusion under Fed. R. Evid. 403 because they actually implicated Dimora in wrong-doing, would "open the door to evidence of ethics reporting requirements[,]" and "likely cause confusion, requiring a mini-trial on the disclosure laws governing elected officials in the State of Ohio." (Doc. No. 930 (Memorandum Opinion &

Order), at 18911, record citations omitted.)[13] The Sixth Circuit agreed that the ethics reports "would have *hurt* Dimora by opening the door to evidence that would have done him no favors[,]" including the fact that many bribe payers were never identified in the reports. *Dimora*, 750 F.3d at 629[14] (emphasis in original). Still, it indicated that it need not reach this Court's Rule 403 analysis because of the weight and depth of the evidence offered against Dimora. *Id*. at 628. Because the reports would have been unfairly prejudicial to the government (and, ironically, also to Dimora), and would have served only to confuse the jury and unnecessarily extend the trial, they were properly excluded.[15]

While the ethics reports may not have constituted hearsay, they were properly excluded under Rule 403 and for the other reasons advanced by this Court. In the absence of any error as to the admission of the reports, the failure to admit them cannot contribute to any cumulative error claim. *See United States v. Bankston*, 820 F.3d 215, 234 (6th Cir. 2016) ("The existence of only one error . . . eliminates the foundation of [defendant's] cumulative-effect theory. Indeed,

---

[13] The government notes that, had the ethics reports been admitted, it would have called the Director of the Ohio Ethics Commission to testify to the deficiencies in Dimora's reporting, including the fact "that all income from any source that is reportable on a tax return, including bribery, should have been reported under the [report's] income section [instead of the gift section where Dimora inserted it]." (Doc. No. 1182 at 126, citing Doc. No. 1031 (Tr. Jury Trial Vol. 33), at 83.) The Court found that this and other ethics testimony regarding the sufficiency of the reports under Ohio law would have added length to an already lengthy trial, confused the jury, and even damaged Dimora. (Doc. No. 930 at 41–42.)

[14] The Sixth Circuit underscored that certain alleged bribers were "conspicuously absent from the list. Where, for example, is Kevin Payne's name? The evidence showed that he paid for Dimora's use of limousine services, that he covered the cost of prostitutes, and that he picked up the check at more than a few expensive dinners. What of Gina Coppers? She paid for Dimora's hotel room. A jury reading Dimora's reports could only conclude that he was indeed hiding things—and breaking Ohio disclosure laws in the process. *See* Ohio Rev. Code § 102.02. Excluding the reports was harm*less* error because including the reports would have been harm*ful*." *Id*. (emphasis in original).

[15] Adding to possible juror confusion, this Court observed that the forms were made under penalty of perjury and provided that they ensured government transparency, "increas[ing] public awareness of potential conflicts and reassur[ing] Ohio citizens in the integrity of government." (Doc. No. 930 at 43 (quoting instructions from Ohio Ethics Commission forms).) This Court noted that "such a statement would have the effect of usurping the jury's province, by suggesting that the Ohio Ethics Commission had already determined that Dimora, by virtue of his disclosure [however deficient or deceitful], lacked the intent to conceal the fraud." (*Id.*) Given the limitations of this evidence, such a misleading statement would have confused the jury and unfairly prejudiced the government.

our recognition of the cumulative-effect theory has been limited to situations where '[e]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair.'") (quoting *United States v. Hernandez*, 227 F.3d 686, 697 (6th Cir. 2000)); *see also Campbell v. United States*, 364 F.3d 727, 736 (6th Cir. 2004) ("[T]he accumulation of non-errors cannot collectively amount to a violation of due process.") (quotation marks and citation omitted). And even if the ethics reports should have been admitted under Rule 403, given the fact that they implicated Dimora in wrongdoing consistent with the government's overall theory that he fraudulently received bribes in exchange for favors and conspired with others to cover it up, it cannot be said that any such evidentiary error—even in combination with the Court's instructional error—was "so prejudicial as to render his trial fundamentally unfair." *Trujillo*, 376 F.3d at 614.

### D.    Tax Counts (Counts 34–37)

In Counts 34–37, Dimora was charged with making false statements on his federal tax returns in violation of 26 U.S.C. § 7206(1). (Doc. No. 444, Indictment, ¶ 517.) These counts related to Dimora's failure to report the bribes he received in each charged tax year. (*See id*. (Count 34 [Tax Year 2004]; Count 35 [Tax Year 2005]; Count 36 [Tax Year 2006]; Count 37 [Tax Year 2006]).) Dimora argues that the "tax counts turn on the bribery counts implicated by the remand[.]" (Doc. No. 1222 at 23.)[16] He insists that any invalid Hobbs Act conviction would have impacted the corresponding tax count and would require vacation of the conviction on the tax count, as well. (*Id*.) The government disagrees and argues that the tax counts "are supported

---

[16] It is worth noting that the counts vacated by this Court's ruling herein—Counts 12 and 13—only involved bribes received (in the form of home renovations) for tax years 2002, 2007 and 2008. (*See* Doc. No. 1036 at 174, 261; Doc. No. 1037 at 258.) Accordingly, even if the Court were to accept Dimora's argument, only Count 37 would be subject to possible vacatur.

independently by Dimora's convictions on Count 17 (conspiracy to commit bribery concerning programs receiving federal funding), and on Counts 8, 22, and 23 (Hobbs Act offenses) that were unaffected by *McDonnell*." (Doc. No. 1221 at 43.) The government has the better argument.

IRS Special Agent Kelly Fatula testified that Dimora reported receiving wages and pension income for tax years 2004—2007, but did not report the additional income he received from bribes in the following amounts: $31,034 for 2004; $17,145 for 2005; $15,791 for 2006; and $102,172 for 2007. (Doc. No. 1042, Tr. Jury Trial Vol. 28 (Fatula), at 98–109.) The unreported income included bribes that Dimora received from bribery schemes that the Sixth Circuit found were unaffected by the *McDonnell* instructional error; namely, Counts 8 (Stonebridge scheme), 17 (Pumper scheme), and 22 and 23 (Melaragno, dba Vandra Brothers Construction scheme). (Doc. No. 444 at 55–57, 89–95, 107–110.)[17] Because the tax counts were supported by underlying evidence from charges for convictions that were unaffected by the instructional error, Dimora is not entitled to § 2255 relief on Counts 34–37.

### E. Remedy

Where a district court grants a defendant's motion to vacate, in whole or in part, § 2255(b) dictates that "the court shall vacate and set the judgement aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b). Given that thirty of the thirty-two counts of conviction

---

[17] In tax year 2004, the bribes included $5,182 in limousine services and $600 for female entertainers (Count 8), and $18,878 in labor/materials for Dimora's patio and roof project (Count 17). In tax year 2005, the bribes included $1,362 in limousine services and $300 for female entertainers (Count 8), $13,098 in labor/materials for Dimora's patio bathroom (Count 17), and concrete work for Dimora's patio bathroom (Counts 22 and 23). In tax year 2006, the bribes included $2,115 in limousine services and $600 for female entertainers (Count 8). In tax year 2007, the bribes included $125 in limousine services and $300 for female entertainers (Count 8), $62,324 for various items including a patio extension and cash payments (Count 17), and $1,089 for work on Dimora's patio extension/outdoor kitchen (Counts 22 and 23). (Doc. No. 1221 at 44–45, collecting record citations.)

remain, the Court will revisit petitioner's sentence. At the resentencing hearing, the Court will consider all prior sentencing memoranda. Additionally, on or before April 29, 2022, the parties may file supplemental sentencing memoranda to address any new sentencing issues in light of the vacatur.

### III. CONCLUSION

For the forgoing reasons, Dimora's motion to vacate, set aside, or correct his sentence is GRANTED in part and DENIED in part. Dimora's convictions on Counts 12–13 are VACATED. A resentencing hearing will be conducted on June 8, 2022 at 10:00 am.

**IT IS SO ORDERED**.


Dated: March 14, 2022

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**