IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:10CR387 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES C. DIMORA, | ) | UNITED STATES' SUPPLEMENTAL |
| | ) | SENTENCING MEMORANDUM |
| Defendant. | ) | |

The United States of America, by and through its counsel, Michelle M. Baeppler, First Assistant United States Attorney, and Megan R. Miller and Laura McMullen Ford, Assistant United States Attorneys, respectfully submits this supplemental sentencing memorandum setting forth the United States' position regarding the resentencing for Defendant James C. Dimora. For the reasons set forth below and those to be articulated at the resentencing hearing, the United States respectfully submits that a sentence within the applicable Guidelines range is appropriate in this case.

      Respectfully submitted,

      MICHELLE M. BAEPPLER
      First Assistant United States Attorney

By:  /s/ Megan R. Miller
      Megan R. Miller (OH: 0085522)
      Laura McMullen Ford (OH: 0074818)
      Assistant United States Attorneys
      United States Court House
      801 West Superior Avenue, Suite 400
      Cleveland, Ohio 44113
      (216) 622-3855/3817
      (216) 522-7358/8355 (facsimile)
      Megan.R.Miller@usdoj.gov
      Laura.Ford@usdoj.gov

I.    **PROCEDURAL HISTORY**

Defendant James Dimora, a former Cuyahoga County Commissioner, used his office to engage in a series of wide-ranging bribery and fraud schemes wherein he "received over $250,000" in bribes, including "home renovations, expensive dinners, trips, . . . and encounters with prostitutes." *Dimora v. United States*, 973 F.3d 496, 499 (6th Cir. 2020) (*per curiam*). In return, Dimora performed official acts, such as casting formal votes, and exerted pressure on other public officials to commit official acts, to benefit bribe payors, resulting in him "corruptly influenc[ing] the awarding of County contracts and grants, the hiring of County employees, the results of at least one County election, and the outcome of civil litigation in County and municipal courts." *Id.* Consequently, on September 7, 2011, a Northern District of Ohio grand jury returned a third superseding indictment charging Dimora with the following crimes:

- RICO conspiracy under 18 U.S.C. § 1962(d) (Count 1);
- conspiracy to commit mail fraud and honest services mail fraud under 18 U.S.C. §§ 1341, 1346 and 1349 (Counts 2 and 9);
- mail fraud under § 1341 (Count 30);
- conspiracy to commit wire fraud and honest services wire fraud under 18 U.S.C. §§ 1343, 1346 and 1349 (Count 16);
- Hobbs Act conspiracy and Hobbs Act offenses under 18 U.S.C. § 1951 (Counts 3, 7-8, 11-15, 21-27);
- conspiracy to commit bribery concerning programs receiving federal funds under 18 U.S.C. § 371 (Counts 4 and 17);
- bribery concerning programs receiving federal funds under 18 U.S.C. §§ 666(a)(1)(B) and 2 (Counts 5-6 and 18-19);
- conspiracy to obstruct justice under 18 U.S.C. §§ 371 and 1512 (Count 28);
- obstructing a federal investigation under 18 U.S.C. §§ 1519 and 2 (Count 29); and
- making false statements on tax returns under 26 U.S.C. § 7206(1) (Counts 34-37).

(R. 444: Third Superseding Indictment, PageID 9630).

A jury trial commenced before this Court on January 12, 2012.  On March 9, 2012, following a 37-day trial, the jury returned guilty verdicts against Dimora on all but Count 30. (R. 738: Verdict, PageID 17116).[1]  On July 31, 2012, the Court sentenced Dimora to an aggregate of 336 months imprisonment, including concurrent 240-month sentences on Counts 1, 3, 7-9, 11-16, 20-27 and 29; concurrent 60-month sentences on Counts 4 and 17, a consecutive 60-month sentence on Count 28; concurrent 120-month sentences on Counts 5-6, 18 and 19; and 36-month sentences on Counts 34-37, to run concurrently with each other, but consecutively to the other counts of conviction.  (R. 957: Judgment, PageID 19981).

The Sixth Circuit affirmed Dimora's convictions on direct appeal.  *United States v. Dimora*, 750 F.3d 619 (6th Cir. 2014).  Dimora subsequently sought relief in this Court under 28 U.S.C. § 2255 based on the Supreme Court's intervening decision in *McDonnell v. United States*, 136 S. Ct. 2355 (2016), which clarified the "official act" definition under 18 U.S.C. § 201(a)(3) that applies to Hobbs Act extortion charges under 18 U.S.C. § 1951 and "honest services" fraud charges under 18 U.S.C. §§ 1343 and 1346.  Specifically, he challenged this Court's "official act" jury instruction and claimed that it prejudicially conflicted with *McDonnell*.  The Court denied his motion and declined to issue a certificate of appealability, finding no instructional error and that, at most, any error was harmless.  (R. 1196: Opinion, PageID 33131; R. 1199: Order, PageID 33201).

The Sixth Circuit subsequently issued a limited certificate of appealability, primarily on whether this Court's official acts jury instructions concerning the Hobbs Act-related counts were

---

[1]   The Court subsequently granted a judgment of acquittal on Count 10.  (R. 930: Opinion, PageID 18881).

2

erroneous in light of *McDonnell*.  (Sixth Circuit Case No. 18-4260, Doc. 9-2: Order, Pages 5-6).  The Sixth Circuit declined to include in the certificate of appealability whether the instructional error "extended to [Dimora's] convictions involving bribery concerning programs receiving federal funds under 18 U.S.C. § 666 (Counts 4-6, 17-19)" because "reasonable jurists could not debate that Dimora's bribery convictions pursuant to § 666 are unaffected by the *McDonnell* decision."  (*Id.*, Page 4 (citing *United States v. Porter*, 886 F.3d 562, 565-66 (6th Cir. 2018)).  Nor could reasonable jurists debate that Dimora's convictions for mail/wire fraud conspiracy under § 1349 (Counts 2, 9, and 16), premised *both* on simple money or property fraud grounds and honest services mail/wire fraud, remain valid post-*McDonnell*, given that the jury specifically convicted Dimora on both theories, and traditional mail/wire fraud does not require an official act.  (*Id.*, Page 5).

Following briefing and argument, the Sixth Circuit found that an instructional error had occurred at Dimora's jury trial in light of *McDonnell*, and further, that in considering Dimora's § 2255 petition, this Court had not applied the correct harmless-error analysis.  *Dimora*, 973 F.3d at 505-06.  The panel vacated the Court's judgment and remanded the matter for the limited purpose of reapplying the proper harmless-error analysis to determine "whether the instructional error substantially influenced the jury's verdict" on the Hobbs Act extortion counts.  *Id.* at 506.  The remand specifically excluded Hobbs Act Counts 8, 22 and 23 because they were wholly unaffected by the instructional error, relying "exclusively on votes Dimora had cast as commissioner to show 'official acts,'" which still qualify post-*McDonnell*.  *Dimora*, 973 F.3d at 506-07.  The Sixth Circuit also declined to extend the certificate of appealability to Dimora's convictions for federal funds bribery and mail/wire fraud conspiracy.  *Id.* at 506.

Following remand, this Court granted in part and denied in part Dimora's motion to vacate, set aside or correct his sentence. Specifically, the Court vacated Dimora's convictions on Counts 12 and 13, which relate to the Zavarella scheme, and upheld his convictions on the remaining 11 counts at issue, leaving 30 of his 32 convictions intact. (R. 1226: Opinion, PageID 33431-42). The United States now submits this supplemental sentencing memorandum to address the issues raised in Dimora's resentencing brief.[2] (R. 1230: Sent. Memo., PageID 33446-57).

## II.   APPLICABLE LEGAL STANDARDS

A well-established legal framework guides the Court's sentencing determination. The advisory Guidelines range serves as "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007); *see also United States v. Collington*, 461 F.3d 805, 807 (6th Cir. 2006). The Guidelines thus remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses. The Sentencing "Commission fills an important institutional role: It has the capacity courts lack to 'base its determination on empirical data and national experience, guided by a professional staff with appropriate expertise.'" *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (internal citation omitted). After determining the appropriate Guidelines range, the Court then turns to the familiar factors set forth in 18 U.S.C. § 3553(a). In general, this sentencing framework applies both at a

---

[2]   The United States also incorporates its prior sentencing memoranda, which the Court has indicated it will consider. (R. 1226: Opinion, PageID 33432).

4

defendant's initial sentencing and at any subsequent resentencing.  *See Pepper v. United States*, 562 U.S. 476, 490 (2011).

Upon resentencing, the Court applies the Guidelines in effect at the time of resentencing unless doing so would violate the *Ex Post Facto* Clause.  *See United States v. Mehmood*, 742 F. App'x 928, 941 (6th Cir. 2018).  When a defendant has been previously sentenced on multiple counts as a "sentencing package" and receives § 2255 relief on any of those counts, a district court has "jurisdiction and authority to reevaluate the entire aggregate sentence to ensure that the defendant receives the appropriate sentence on the remaining count[s]."  *Pasquarille v. United States*, 130 F.3d 1220, 1222 (6th Cir. 1997).  Further, "general remands allow district courts to conduct full, fresh sentencings without constraining the evidence or arguments that the district courts may consider."  *United States v. Boyd*, 543 F. App'x 584, 585 (6th Cir. 2013).  That includes "considering new evidence and issues."  *United States v. McFalls*, 675 F.3d 599, 604 (6th Cir. 2012).  The Court, in conducting *de novo* resentencing, therefore has "discretion to consider and balance all of the competing elements of the sentencing calculus."  *United States v. Campbell*, 168 F.3d 263, 266 (6th Cir. 1999).

### III.    SENTENCING GUIDELINES COMPUTATION

The United States concurs with the Guidelines calculation set forth in Dimora's resentencing brief.  (R. 1230: Sent. Memo., PageID 33448).  Dimora's base offense level for bribery is 14 under U.S.S.G. § 2C1.1(a)(1) because he was a public official.  A two-level enhancement applies under § 2C1.1(b)(2) because Dimora's offense involved multiple bribes.  A 12-level enhancement applies under §§ 2C1.1(b)(2) and 2B1.1(b)(1)(G) because Dimora caused loss between $250,000 and $550,000.[3]  As an elected public official, Dimora receives a four-

---

3       At Dimora's first sentencing hearing, the Court determined the applicable loss amount to

5

level enhancement under § 2C1.1(b)(3). He receives an additional four-level enhancement under § 3B1.1(a) based on his leadership role in the offense. And a two-level enhancement under § 3C1.1 applies based on Dimora's willful efforts to obstruct justice. Dimora's adjusted offense level is thus 38, as set forth in the table below:

| U.S.S.G. § 2C1.1 | | |
|---|---|---|
| Base offense level | 14 | § 2C1.1(a)(1) |
| Multiple bribes | +2 | § 2C1.1(b)(2) |
| Loss: More than $250,000 but less than $550,000 | +12 | §§ 2C1.1(b)(2); 2B1.1(b)(1)(G) |
| Elected public official | +4 | § 2C1.1(b)(3) |
| Role in offense | +4 | § 3B1.1(a) |
| Obstruction | +2 | § 3C1.1 |
| **Adjusted Offense Level** | **38** | |

At a total offense level 38, Criminal History Category I, Dimora's advisory Guidelines sentencing range is 235 to 293 months.

IV. **APPLICATION OF § 3553(a) FACTORS AND DIMORA'S DOWNWARD DEPARTURE/VARIANCE ARGUMENTS**

    A.    <u>The Nature and Circumstances of the Offenses Support a Within-Guidelines Sentence.</u>

The Court is well aware of the offense conduct in this case, which counsels in favor of a within-Guidelines sentence. Collectively, former Cuyahoga County Commissioner Dimora and co-defendant Michael Gabor were convicted of "39 violations of federal-anti-corruption laws stemming from their participation in a slate of bribery and fraud schemes involving various

---

be $451,801.52. (R. 1000: Sent. Trans., PageID 20497-98). Using the then-applicable 2011 Guidelines, this amount resulted in a 14-level increase pursuant to U.S.S.G. §§ 2C1.1(b)(2) and 2B1.1(b)(1)(H) because the value of the payments received and the value of the things obtained exceeded $400,000. (*Id.*, PageID 20529). Of the total loss amount, the Court found that $34,237.04 was attributable to the Zavarella scheme charged in Counts 12 and 13. (*Id.*, PageID 20497). Following the Court's decision vacating Dimora's convictions on those counts, *see* R. 1226: Opinion, PageID 33426, the total loss amount is now $417,564.48. Using the applicable 2021 Guidelines, this amount results in a 12-level enhancement under §§ 2C1.1(b)(2) and 2B1.1(b)(1)(G).

6

Cleveland-area favor-seekers." *Dimora*, 750 F.3d at 623.  Meals, prostitutes, *id.* at 629, "[e]xpensive trips to Las Vegas in exchange for county patronage, thousands of dollars in cash in exchange for government jobs, extensive home improvements to the tune of $30,000 in exchange for public construction projects—these and other this-for-that arrangements were more than kindly gestures, more than mere 'pleases' and 'thank yous,' among friends." *Id.* at 623.  As the jury found, "Dimora and Gabor participated in a host of corrupt bargains and arrangements prohibited by federal law." *Id.*

The government established at trial that Dimora, while serving as County Commissioner for a decade, (R. 1000: Sent. Trans., PageID 20621), "work[ed] in tandem" with former Cuyahoga County Auditor Frank Russo.  (*Id.*, PageID 20625).  Testimony established that Dimora sold public jobs, tried to fix court cases, steered County funding and otherwise used his power to give bribe payors an unfair advantage over others. (*See, e.g.*, R. 1017: Gallagher, Trial Trans., PageID 24278-79, 24282-301; R. 1013: Massie, Trial Trans., PageID 23222-23; R. 1019: Massie, Trial Trans., PageID 24753-54, 24757-74, 24779-827; R. 1034: Pumper, Trial Trans., PageID 27742, 27859-72; R. 1014: Kleem, Trial Trans., PageID 23400-04, 07; R. 1039: Russo, Trial Trans., PageID 28931-36, 29036-38; R. 1040: Russo, Trial Trans., PageID 29118-19).  In return, Dimora received approximately 100 bribes totaling over $250,000.  (PSR, pp. 22-33).

This Court previously observed that "the breadth and depth of the corruption of the County government in which Mr. Dimora and Mr. Russo and others [we]re entrenched [wa]s staggering and the destruction in its wake incalculatable [sic]," (R. 1000: Sent. Trans., PageID 20626), citing Dimora's receipt of "lavish" "meals, home improvements, gambling trips, services of prostitutes, and . . . cash" in return for his influence.  (*Id.*, PageID 20622-23).  Recognizing that "[t]he reach of his corruption was far and wide. . . . [by] caus[ing] the

7

businessmen who became involved in the schemes to lose their livelihoods and their liberty. . . . [and] prevent[ing] others from having any opportunity to play on a level playing field," the Court concluded that "this is exactly the type of conduct that undermines the public's confidence in their government." (*Id.*, PageID 20621).

The Court's recognition of Dimora's systemic, corrupt criminal conduct, which left virtually no aspect of Cuyahoga County local government untouched, remains intact notwithstanding the Court's decision to vacate Dimora's convictions on Counts 12 and 13 concerning the Zavarella scheme. This scheme, factually unremarkable in light of Dimora's other schemes and a mere drop in the ocean of Dimora's conduct, does not alter the viability of Dimora's other counts of conviction or otherwise materially undercut Dimora's culpability and the breadth, scope and egregiousness of his crimes. While Zavarella was generally identified as a bribe payor in the Count 1-RICO conspiracy, the specific Zavarella scheme was not. The Zavarella scheme also accounted for only approximately $34,000 of the $450,000 value of the payments Dimora received and the things he obtained. The jury's Count 1-RICO conviction thus does not at all depend on the same factual basis of the vacated counts. The tax counts likewise remain independently supported based on the unreported income from other bribes that Dimora received from Kevin Payne and Kevin Kelley (Count 8), Steven Pumper (Count 17) and Anthony Melaragno (Count 22 and 23). With 30 of Dimora's 32 convictions remaining intact, *see* R. 1226: Opinion, PageID 33431-42, the Court is well justified to resentence Dimora within the newly applicable Guidelines range that properly factors in the reduced loss amount in light of the two vacated Zavarella-related counts.

B.     Defendant's Age and/or Health Do Not Warrant a Downward Departure.

Dimora argues in his sentencing memorandum that he is entitled to a downward departure due to his age and/or health conditions under U.S.S.G. §§ 5H1.1 and 5H1.4. (*See* R. 1230: Sent. Memo., PageID 33449-51). Whether considered alone or in combination, neither circumstance is particularly noteworthy for Dimora, and neither warrants a departure.

Dimora—a 66-year-old man—now claims that he is "aged 'to an unusual degree'" to warrant a departure under U.S.S.G. § 5H.1.1. (R. 1230: Sent. Memo., PageID 33449). Section 5H1.1 provides as follows concerning age-based departures:

> Age (including youth) may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines. Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration.

Notably, the Court previously considered and rejected Dimora's request for an age-related departure, observing that "[it] do[es]n't know that anyone would consider [57] to be elderly when you're dealing with the concept that . . . the age provision may relate to someone elderly and infirm." (R. 1000: Sent. Trans., PageID 20542). It was certainly reasonably foreseeable to the Court at the time it imposed Dimora's initial sentence that he would continue to age while he served his 336-month sentence, and that his age would continue to be an insufficient justification for a downward departure. This remains doubly so when considering that Dimora committed his crimes at the same age that he then complained warranted a downward departure. It is not unusual for white collar criminals to have some advanced standing and stature within the community, which typically comes with age, that facilitates and enables the very commission of their crimes. And while Dimora also argues that he is unlikely to

9

recidivate due to his age, *see* R. 1230: Sent. Memo., PageID 33449, given the breadth and destructive nature of his crimes, the best way to ensure that Dimora will not commit additional crimes is to keep him incarcerated.

Dimora also argues that his current medical conditions—including diabetes, atrial fibrillation, diverticulitis, Meniere's disease, his use of a wheelchair, and the need for a knee replacement—warrant a departure under U.S.S.G. § 5H1.4. Section 5H1.4 provides, in part that:

> Physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. An extraordinary physical impairment may be a reason to depart downward; *e.g.*, in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

As an initial matter, Dimora has apparently suffered from several of these health conditions—including a history of aneurysm, knee and mobility issues—since at least the time of his original sentencing hearing. Then, this Court considered and rejected his request for an age and/or health-related downward departure, finding "nothing so extraordinary about the defendant's health conditions, even coupled with his age and other factors listed in those two provisions, that would warrant a departure." (R. 1000: Sent. Trans., PageID 20542). The Court's prior reasoning applies equally now.

Dimora submits no documentation from the Bureau of Prisons ("BOP") to indicate that these medical conditions are exceptional, let alone that the BOP cannot meet his medical needs, particularly at a designated medical facility such as FMC Devens, where he currently is housed. Undersigned counsel has obtained and reviewed Dimora's medical records from the BOP.[4] His

---

[4] The government will submit Dimora's BOP medical records to defense counsel and/or the Court upon request.

medical conditions appear to be appropriately managed at his facility, and Dimora does not allege otherwise. Further, in considering and rejecting Dimora's previous request for a health-related departure, the Court found persuasive that it "ha[d] received no indication from the institution that his actual health conditions have posed an unusual challenge relative to treatment." (R. 1000: Sent. Trans., PageID 20542). The Court ultimately concluded that while "[h]e does have some medical conditions, [] the conditions are not so unusual or severe and the circumstances are not so extraordinary that he cannot receive appropriate treatment through the Bureau of Prisons." (*Id.*).

While ten years have now passed since the Court first considered the Guidelines departure provisions, the Court's conclusion that Dimora's age and health do not warrant a downward departure remains no less valid today. When the Court originally sentenced Dimora, it reasonably foresaw that Dimora would continue to age and continue to suffer from certain health conditions while incarcerated. Dimora's medical conditions are relatively unremarkable for his age and do not constitute extraordinary reasons justifying a downward departure.

Finally, while Dimora maintains that imprisonment will make him more vulnerable to contracting COVID-19 or suffering a more severe case should he contract the virus, he also admits that he twice contracted and recovered from COVID-19. Although unfortunate that Dimora contracted the virus, his fear of contracting it again and potentially experiencing more severe symptoms associated with it are not sufficiently extraordinary to compel a downward departure. Dimora also conveniently omits any indication of whether he has availed himself of COVID-19 vaccinations and boosters, which, according to the Centers for Disease Control and

11

Prevention, remain highly effective at preventing infection and severe illness from COVID-19 and its variants.[5]

Moreover, in the context of compassionate release requests under 18 U.S.C. § 3582(c)(1)(A), the Sixth Circuit has recognized that the availability of COVID-19 vaccines has changed the compassionate-release landscape, severely restricting the pandemic's relevance in considering a reduced sentence.  *United States v. Lemons*, 15 F.4th 747 (6th Cir. 2021).  Indeed, *Lemons* recognized that because full vaccination reduces both the likelihood of contracting COVID-19 and the risk of severe illness if someone were to contract the virus, a defendant with access to the vaccine cannot establish an extraordinary and compelling reason for a sentence reduction.  *Id.* at 751.

Simply put, Dimora has not shown that his age and/or his health conditions are extraordinary, thus making a Guidelines-based departure unwarranted.  In fact, in reviewing a district court's decision denying a variance request based on the defendant's health, the Sixth Circuit recognized that a defendant seeking a Guidelines departure based on health generally must demonstrate that the condition is "extraordinary," and even coupled with age, such departures "are rare":

> [Defendant] did not establish that her medical conditions were so extraordinary as to warrant a downward variance.  *See United States v. Jones*, 445 F.3d 865, 870 n.7 (6th Cir. 2006) (noting that, absent extraordinary circumstances, "[t]he Guidelines discourage courts from considering a defendant's physical condition in determining whether a departure may be warranted"); *United States v. Johnson*, 71 F.3d 539, 545 (6th Cir. 1995) ("[A]n aged defendant with a multitude of health problems may qualify for a downward departure under § 5H1.4.  However, we note that such downward departures are rare.").

---

[5]   *See* CDC, COVID-19 Vaccines Work, *available at*: https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/work.html (last visited June 2, 2022).

12

*United States v. Darji*, 609 F. App'x 320, 330-31 (6th Cir. 2015). Dimora has not shown that his age and health constitute extraordinary circumstances that would warrant such rare relief. Accordingly, the United States respectfully requests that the Court again deny Dimora's request for an age and/or health-related departure.

      C.      <u>The Need to Avoid Unwarranted Sentencing Disparities</u>

Dimora spends a substantial portion of his resentencing memorandum arguing that the Court should vary below the Guidelines range to avoid unwarranted sentencing disparities. (R. 1230: Sent. Memo., PageID 33451-56). In so doing, however, Dimora does nothing more than recycle variants of the same disparity arguments that he previously raised—and the Court previously considered and rejected—at his first sentencing hearing. This Court likewise should reject those arguments now.

      1.      *The Court Should Reject Dimora's Policy-Based Challenge.*

Dimora first raises a policy-based challenge to the "severe" impact on his Guidelines calculation from applying U.S.S.G. § 2B1.1's loss table (incorporated into his Guidelines calculation under § 2C1.1(b)(2)), which ultimately results in a 12-level increase based on the value of the benefits received and the value of the things obtained by Dimora. (R. 1230: Sent. Memo., PageID 33452). He specifically argues that this Court should vary below the applicable Guidelines range because the loss table is not based on empirical data. (*Id.*, PageID 33452-53).

As an initial matter, the Court previously rejected Dimora's general policy-based objections to the Sentencing Guidelines and its enhancements that pertain to public and elected officials. (*See* R. 999: Sent. Trans., PageID 20269 ("While the court is mindful that it has the discretion to disagree with the guidelines on policy grounds, the court does not share the defendant's criticism and has no policy disagreement with the enhancements identified.")).

Indeed, in the context of empirical-based challenges to other Guidelines, such as U.S.S.G. § 2G2.2 in child pornography cases, the Sixth Circuit has repeatedly affirmed a district court's right to embrace or discard policy challenges to the Guidelines. *Cf. United States v. Brooks*, 628 F.3d 791, 800 (6th Cir 2011) ("The fact that a district court may disagree with a Guideline for policy reasons and may reject the Guidelines range because of that disagreement does not mean that the court must disagree with that Guideline or that it must reject the Guidelines range if it disagrees."); *see also United States v. Cunningham*, 669 F.3d 723, 733 (6th Cir. 2012).

Moreover, other than the numerical adjustments to the § 2B1.1 loss table discussed in footnote 3 above, the structure of the applicable public corruption Guidelines has remained unchanged for the last ten years. The Guidelines continue to account for—and enhance—a defendant's total offense conduct based on his position as a public official and the loss occasioned by his crimes. In this regard, U.S.S.G. § 2C1.1(a)—both the 2011 version applicable at Dimora's initial sentencing and the 2021 version applicable now—imposes a base offense level of 12 for a regular recipient or offeree of a bribe, but automatically elevates the base offense level to 14 for public officials. Likewise, § 2C1.1(b)(3)—both then and now—applies a four-level enhancement for elected or high-ranking public officials offering or accepting bribes. And § 2C1.1(b)(2), which incorporates the § 2B1.1 loss table, continues to adjust a defendant's Guidelines upward based on the value of the payments received and the value of the things obtained from bribes.

This framework—and the ten years from Dimora's initial sentencing during which it remained intact—thus reflects a reasoned, rational, and ongoing decision on behalf of the Sentencing Commission to punish incrementally the use of public position for private gain as well as the loss stemming from such misuse. *See, e.g.,* U.S.S.G. § 2B1.1 Background ("The

14

Commission has determined that, ordinarily, the sentences of defendants convicted of federal offenses should reflect the nature and magnitude of the loss caused or intended by their crimes. Accordingly, along with other relevant factors under the guidelines, loss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level under this guideline.").

Dimora's reliance on the unpublished decision in *United States v. Musgrave*, 647 F. App'x 529, 538 (6th Cir. 2016), to suggest that the § 2B1.1 loss Guidelines are "particularly appropriate for variances" fares no better. In *Musgrave*, the Sixth Circuit found that the district court did not abuse its discretion in varying downward from the 57-to-71 month Guidelines range to sentence the defendant to one day of incarceration with 24 months' home confinement and five years' supervised release. *Id.* at 531-32. While the Sixth Circuit mentioned in passing that the § 2B1.1 loss Guidelines may be more appropriate for variances because they were not developed using an empirical approach, it did so in the context of the government also agreeing that a variance was appropriate, with the parties simply disagreeing about the extent of the variance. *Id.* at 538. Moreover, in upholding the substantive reasonableness of the district court's sentence on the specific facts of the case, the Sixth Circuit noted that the defendant's criminal conduct included only *one transaction* and that he received no personal benefit from his crime. *Id.* at 537-38. Dimora's criminal conduct, of course, involved multiple schemes and multiple transactions, committed over a several-year period. Given these obviously dissimilar facts regarding the scope and breadth of Musgrave's culpability and criminal conduct vis-à-vis that of Dimora, his reliance on *Musgrave* is unpersuasive.

Therefore, this Court can and should rely on the sentencing enhancements contained in U.S.S.G. §§ 2C1.1 and 2B1.1 and reject Dimora's policy-based sentencing disparity arguments.

15

2. *This Court Should Reject Dimora's Statistics-Based Argument.*

Dimora also claims that imposing a within-Guidelines sentence would create a "statistical anomaly" when compared to similarly situated offenders. (R. 1230: Sent. Memo., PageID 33454). Again, the Court considered and rejected that same argument at Dimora's previous sentencing hearing. Acknowledging the need to avoid unwarranted sentencing disparities, the Court explicitly indicated that it considered the statistics Dimora submitted along with other information about analogous cases, stating: "The court is well aware of the requirement that the court avoid unwarranted sentencing disparities with defendants with similar records who have been found guilty of similar conduct, and the court has factored that particular factor into consideration in determining a sentence in this case." (R. 1000: Sent. Trans., PageID 20620). After considering all of the 18 U.S.C. § 3553(a) factors, the Court found that a Guidelines sentence was sufficient but not greater than necessary to comply with the purposes of sentencing. (*Id.*, PageID 20626).

Oddly, Dimora appears to suggest that the Sentencing Commission's creation of the Judicial Sentencing Information ("JSI") platform, which collects sentencing data for similarly-situated defendants, somehow alters this Court's sentencing disparity analysis under 18 U.S.C. § 3553(a)(6). (R. 1230: Sent. Memo., PageID 33451-52). But while the JSI tool may make it easier for judges to access and search sentencing information, it does not change the Court's underlying inquiry. To the contrary, the Court—which is uniquely well-positioned to conduct § 3553(a) analyses—continues to evaluate and incorporate this statutory requirement into its sentencing pronouncements, along with all other relevant § 3553(a) factors. Thus, the intervening sentencing data from 2011 and 2021 (and the ease of access that JSI provides) does

16

not somehow elevate the need to avoid unwarranted sentencing disparities above other § 3553(a) factors or otherwise upend this Court's reasoned balancing of those factors.

More importantly, and contrary to Dimora's assertion, this Court is far from an outlier in imposing substantial sentences in public corruption cases where state and local elected officials have inflicted serious damage to the local community, the public trust and the democratic process as a whole. For example, in 2009, the Honorable Edwin M. Kosik of the Middle District of Pennsylvania sentenced Mark Ciavarella to 28 years in prison following his racketeering conviction at trial. *See United States v. Mark Ciavarella*, M.D. Pa. Case No. 3:09-CR002672, (R. 271: Sent. Trans., Page 39). Ciavarella was a Luzerne County Common Pleas Court Judge who, along with his codefendant and fellow jurist, accepted a combined $2.8 million from the owners of several juvenile detention centers in return for the judges' support in the construction and operation of the facilities as well as for the judges' failure to disclose their conflicts of interest when placing juvenile offenders at the facilities. (*See id.*, Pages 34-36).

In October 2013, following this Court's imposition of Dimora's sentence, the Honorable Nancy Edmunds of the Eastern District of Michigan sentenced the former mayor of Detroit, Kwame Kilpatrick—who had been convicted of bribery, extortion and fraud following a six-month racketeering trial—to 28 years' imprisonment,[6] specifically mentioning this Court's

---

[6] Although President Trump subsequently commuted Kilpatrick's sentence in 2021, after Kilpatrick had served approximately seven years imprisonment, *see* https://www.justice.gov/pardon/page/file/1358296/download (last visited June 2, 2022), that does not weigh in favor of a below-Guidelines sentence for Dimora. First, Kilpatrick received relief through an executive action, rather than a judicial determination about whether his sentence was sufficient but not greater than necessary to serve § 3553(a)'s sentencing goals or an appellate court's review of the sentence for substantive reasonableness. Second, Dimora currently has a pending commutation of sentence request. *See generally*, https://www.justice.gov/pardon/search-clemency-case-status-since-1989 (last visited June 2, 2022). For whatever reason, neither President Obama nor President Trump decided that Dimora's case merited commutation. *See generally,*

17

28-year sentence for Dimora. *See United States v. Kwame Kilpatrick*, 2:10CR20403 (E.D. Mich. Oct. 10, 2013) (Edmunds, J.) (R. 492: Sent. Trans., PageID 16231-32). In addressing the need to avoid unwarranted sentencing disparities, Judge Edmunds reasoned:

> Now, the last factor that the Court is directed to consider is the need to avoid unwarranted sentence disparities among persons who have committed similar crimes. It's kind of a hard question in this case because the breadth, the scope of the activity in this case extended for so long, involved so much money, involved so many people, and ran so deep.
>
> In recent years, public corruption sentences have run from 14 years, I guess, on the low side, maybe there were a couple that were maybe even a little lower than that, to 28 years on the high side for a sentence meted out against a county commissioner in Ohio in federal court about two years ago. In my mind -- the government has asked for a sentence of at least 28 years, and I believe that that is in fact where this sentence should be.

(*Id.*).

At bottom, § 3553(a)(6) imposes on the Court a need to avoid *unwarranted* sentencing disparities.[7] But as the Court observed in 2011, the depth and scope of Dimora's criminality was unfathomable. (R. 1000: Sent. Trans., PageID 20626). Dimora "violated his oath and betrayed the trust that was placed on him by the citizens of Cuyahoga County and he brought dishonor to

---

https://www.justice.gov/pardon/commutations-denied-president-barack-h-obama-2009-2017 (last visited June 2, 2022); and https://www.justice.gov/pardon/commutations-denied-president-donald-j-trump-2017-2021 (last visited June 2, 2022).

[7] That Kilpatrick's co-defendant, Bobby Ferguson, subsequently received a reduced sentence from 257 months to time-served under 18 U.S.C. § 3582(c)(1)(A), based in part on the need to avoid unwarranted sentencing disparities in light of Kilpatrick's release, also does not support a below-Guidelines sentence for Dimora. *United States v. Ferguson*, 536 F. Supp. 3d 139, 145 (E.D. Mich. 2021). Ferguson, as the district court recognized, "was not an elected official and took no oath to serve the people of any constituency. He was a single-minded crony of the mayor's." *Id.* at 145. Additionally, "he was not the driver of the bus; that was Mr. Kilpatrick, where the power resided." *Id.* Dimora, by contrast, was an elected public official who had an organizer or leadership role in his offenses. Thus, the equity concerns about a substantially less culpable codefendant serving a lengthier sentence than Kilpatrick, after his sentence commutation, simply are not present here.

his office. When his misdeeds were about to be revealed, he compounded his dishonesty and tried to cover up the trail of corruption, and this makes his conduct all the more egregious." (*Id.*, PageID 20624). Any disparity—to the extent it exists—is well warranted by the frequency, duration and egregiousness of Dimora's lengthy criminal conduct. The United States continues to urge that the Court impose a within-Guidelines sentence of imprisonment for Dimora.

## V. CONCLUSION

For the reasons set forth above and those to be articulated at the resentencing hearing, the United States respectfully requests that the Court impose a sentence within the applicable Guidelines range.